1  William A. Hector (SBN 298490)
      Email: wahector@venable.com
2  VENABLE LLP
   101 California St, Suite 3800
3  San Francisco, Ca 94111
   415.653.3738
4
   VENABLE LLP
5  Frank C. Cimino, Jr.
      Email: fccimino@venable.com
6  Megan S. Woodworth
      Email: mswoodworth@venable.Com
7  600 Massachusetts Avenue, NW
   Washington, DC  20001
8  202.344.4569
9  VENABLE LLP
   Robert E. Bugg
10     Email: rebugg@venable.com
   151 West 42nd Street
11 New York, NY 10036
   212.370.6241
12
   Attorneys for Non-Party
13 WARDELL STEPHEN CURRY II

14

## UNITED STATES DISTRICT COURT

15

## NORTHERN DISTRICT OF CALIFORNIA

16

17

18  ATHALONZ, LLC                            Case No. 3:23-MC-80324

19            Plaintiff,

20                                           **DECLARATION OF ROBERT E. BUGG
                                             IN SUPPORT OF MOTION TO QUASH
21        v.                                 SUBPOENA OF NON-PARTY WARDELL
                                             STEPHEN CURRY II**
22

23  UNDER ARMOUR, INC.

24            Defendant.

25

26

27

28

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

I Robert E. Bugg, do hereby declare as follows:

1.    I am an attorney licensed to practice law in New York, a partner at Venable LLP, and counsel of record for non-party Wardell Stephen Curry II ("Curry").  I have personal knowledge of the matters contained herein and if called, could and would testify competently thereto.

2.    I am over 18 years of age and suffer no legal disabilities.

3.    This declaration is submitted in support of non-party Curry's Motion to Quash Subpoena of Non-Party Wardell Stephen Curry II.

4.    On April 26, 2023, Athalonz filed an action against Under Armour alleging infringement of the Asserted Patents, *Athalonz, LLC v. Under Armour, Inc.*, Case No. 2:23-cv-00193-JRG, in the United States District Court for the Eastern District of Texas.

5.    Attached hereto as Exhibit 1 is a true and accurate copy of Athalonz's original Complaint in this case, *Athalonz, LLC v. Under Armour, Inc.*, Case No. 2:23-cv-00193-JRG, Dkt. No. 01.

6.    Attached hereto as Exhibit 2 is a true and accurate copy of Under Armour's original Answer in this case, *Athalonz, LLC v. Under Armour, Inc.*, Case No. 2:23-cv-00193-JRG, Dkt. No. 12.

7.    Attached hereto as Exhibit 3 is a true and accurate copy of Under Armour's Motion to Transfer Venue to District of Maryland Under 28 U.S.C. § 1404 in this case, *Athalonz, LLC v. Under Armour, Inc.*, Case No. 2:23-cv-00193-JRG, Dkt. No. 17.

8.    Attached hereto as Exhibit 4 is a true and correct copy of Athalonz's Notice of Subpoena to Wardell Stephen Curry II, served on November 21, 2023.

9.    Attached hereto as Exhibit 5 is a true and correct copy of a letter from Athalonz's counsel, Connor S. Houghton, addressed to Under Armour's counsel, Robert E. Bugg, dated October 26, 2023.

10.    Attached hereto as Exhibit 6 is a true and correct copy of a letter from Under Armour's counsel, Robert E. Bugg, addressed to Athalonz's counsel, Connor S. Houghton, dated November 2, 2023.

DECLARATION OF ROBERT E. BUGG

11.    Attached hereto as Exhibit 7 is a true and correct copy of a letter from Athalonz's counsel, Connor S. Houghton, addressed to Under Armour's counsel, Robert E. Bugg, dated November 3, 2023.

12.    Attached hereto as Exhibit 8 is a true and correct copy of a letter from Under Armour's counsel, Robert E. Bugg, addressed to Athalonz's counsel, Connor S. Houghton, dated November 7, 2023.

13.    Attached hereto as Exhibit 9 is a true and correct copy of a letter from Athalonz's counsel, Connor S. Houghton, addressed to Under Armour's counsel, Robert E. Bugg, dated November 8, 2023.

14.    Attached hereto as Exhibit 10 is a true and correct copy of a letter from Under Armour's counsel, Robert E. Bugg, addressed to Athalonz's counsel, Connor S. Houghton, dated November 13, 2023.

15.    Attached hereto as Exhibit 11 is a true and correct copy of the Docket Control Order in this case, *Athalonz, LLC v. Under Armour, Inc.*, Case No. 2:23-cv-00193-JRG, Dkt. No. 35.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 8, 2023.


_____

Robert E. Bugg

DECLARATION OF ROBERT E. BUGG

**EXHIBIT 1**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ATHALONZ, LLC, | § | Case No.: _____ |
| | § | |
| Plaintiff, | § | |
| | § | DEMAND FOR JURY TRIAL |
| v. | § | |
| | § | |
| UNDER ARMOUR, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

## PLAINTIFF ATHALONZ, LLC'S COMPLAINT

Plaintiff Athalonz, LLC ("Athalonz") files this Complaint against Defendant Under Armour, Inc. ("Defendant"), and respectfully shows the Court as follows:

## I.
## NATURE OF THE ACTION

1.      Athalonz's inventors developed breakthrough technology in sports footwear to immediately help athletes improve athletic performance. They did this with innovative footwear that shifts athletes' weight so that they naturally adopt an athletic stance that efficiently transfers force during movement. For example, a golfer wearing shoes equipped with Athalonz technology will adopt a more efficient athletic stance that results in greater driving distance and better accuracy. But Athalonz's technology goes far beyond golf—it is game-changing for all sports that require an athlete to adopt an athletic position, such as baseball, football, basketball, soccer, tennis, running, skiing, and athletic training. Athalonz's inventors were awarded patents for their innovations.

2.      Professional athletes and coaches lauded their designs. When Tommy Hunter, a pitcher for Major League Baseball's Baltimore Orioles switched to shoes with Athalonz technology, he experienced a 43% improvement in his Earned Run Average (ERA), a 29%

improvement in his Walks and Hits Per Innings Pitched (WHIP), and a 53% improvement in Home Runs Per Nine Innings (HR/9). Mr. Hunter remarked, "I don't know how the shoes work, I just know I throw 6 mph harder with better control." Other professional athletes agreed. Minor league pitcher Michael Peoples, minor league outfielder Royce Bollinger, softball player Eddie Chatham, softball player Vincent Sieckowski, and many others applauded the Athalonz technology as immediately improving their athletic abilities without sacrificing comfort.

3.        Athalonz's technology was so compelling that Under Armour took Athalonz's ideas and intellectual property without authorization and incorporated Athalonz's patented technology into Under Armour shoes.

4.        Athalonz has no recourse but to file this action to stop Under Armour's misuse of its intellectual property. Athalonz has invested millions of dollars and a decade of hard work to develop and commercialize products embodying its intellectual property. Athalonz cannot fairly compete against a behemoth like Under Armour unless its intellectual property is respected.

5.        In the end, this case is about ensuring a level playing field so small competitors like Athalonz can compete fairly based on their hard work and protected innovations against larger companies like Under Armour.

**II.**
**PARTIES**

6.        Athalonz, LLC (originally named AdMark Athletic Ventures) was formed in 2011 under the laws of the State of Texas. Athalonz's principal place of business is located at 2716 North Ogden Road, Suite 101 Mesa, AZ 85215. It filed patents describing and claiming the pioneering inventions in this case and owns the resulting patents. Timothy Markison and Michael "Rick" Adair, a former pitching coach for the Baltimore Orioles, are the named inventors. Mr. Markison serves as Athalonz's Chief Executive Officer.

PLAINTIFF ATHALONZ, LLC'S ORIGINAL COMPLAINT – page 2

7.      Upon information and belief, Under Armour, Inc. is a publicly traded corporation organized and existing under the laws of the State of Maryland, with a place of business at 1020 Hull Street, Suite 300, Baltimore, MD 21230-5358.

**III.**
**JURISDICTION AND VENUE**

8.      This is a civil action asserting claims of patent infringement of U.S. Patent Nos. 11,013,291 ("the '291 patent"); 11,064,760 ("the '760 patent"); 10,674,786 ("the '786 patent"); and 11,510,456 ("the '456 patent") (collectively, the "Asserted Patents").

9.      This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338.

10.     Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400(b).  Under Armour has offered and sold, and continues to offer and sell, its infringing products in this District.  For example, on information and belief, Under Armour sells and offers to sell the infringing products to partners or customers at the Under Armour Factory House at 820 West Stacy Road, Suite 518, Allen, TX 75013.  Under Armour has committed acts of patents infringement in this District and regularly does business in this District, including at the aforementioned Under Armour Factory House, which is a regular and established place of business of Under Armour.

11.     This Court has personal jurisdiction over Under Armour.  Under Armour has continuous and systemic business contacts with the State of Texas.  Under Armour, directly and/or through subsidiaries or intermediaries, conducts its business extensively throughout Texas, by shipping, distributing, offering for sale, selling, and advertising its products in the State of Texas and in this District.  Under Armour, directly and/or through subsidiaries or intermediaries, has purposefully and voluntarily placed its infringing products into this District and into the stream of

commerce with the intention and expectation that they will be purchased and used by consumers in this District, including at its Allen, TX store.

## IV.
## BACKGROUND

### A.    Athalonz and Its Patented Technology

12.    When a baseball player is up at bat, he has a lot on his mind: who is on base, how many outs there are, the pitcher's style, the blinding sun, signals from his manager, and so on. Thinking about athletic positioning cannot be one of those things.  If it is, the batter is at a severe disadvantage.

13.    Due to sub-optimal athletic positioning, many athletes do not live up to their full potential.  For example, a baseball player adopting optimal athletic positioning has his feet engaged through the balls of his feet, his knees slightly bent, his backside sticking out slightly, his core engaged, his spine elongated, and his chest over his toes.  An athlete in this stance can more efficiently transfer force from the ground to his body and then to the ball, producing more power and reducing his risk of injury.  But for all its benefits, most athletes struggle to consistently adopt this unnatural pose and require continuous training for it to become second nature.

14.    Athalonz was founded in 2011 to solve this problem.  Co-founders Tim Markison and Michael "Rick" Adair, then-pitching coach for the Baltimore Orioles, conceptualized footwear that encouraged an ideal stance for executing an athletic movement across multiple sports.  Mr. Markison and Mr. Adair knew that all athletes—from professionals to little leaguers—would benefit from more efficient form with their "Optimal Athletic Positioning" ("OAP") technology.

15.    To accomplish this, Athalonz's inventors developed footwear that naturally encourages athletes to adopt optimal athletic positions.  When an athlete wears the innovative footwear, the particularly three-dimensional sloped shape and compressibility of the shoe shifts

the athlete's weight into an ideal athletic stance.  Optimal athletic positioning becomes one less thing competing for an athlete's attention.

16.    Athalonz's inventors devised an embodiment of footwear with a flat heel from the inner to outer edge of the shoe, a first downward slope from heel to toe along the outer edge of the midfoot and toe sections, a second downward slope along the inner edge of the midfoot and toe sections, and a varying inward slope from the outer to inner edges of the midfoot and toe sections. A simplified block diagram of an example of this three-dimensional solution to the optimal athletic positioning problem is shown below in figures from the '786 patent.



*Figure 1.  Figures from the '786 patent, which illustrate possible isometric and cross-sectional views of the inventions.*

17. Additional figures from the '786 patent demonstrate this three-dimensional solution in the context of a specific embodiment.



*Figure 2. Figures from the '786 patent, which illustrate possible embodiments of the inventions.*

18. Athalonz's inventors also devised footwear with a gradient of compressible material in the forefoot, where the material is more compressible towards the inner edge (e.g., under the big toe) and less compressible towards the outer edge (e.g., the little toe). The footwear may include a more compressible material in the heel section than in the inner toe section. An

example of this is shown below in figures from the '786 patent, which illustrate possible cross-sectional views of the invention.



*Figure 3. Figures from the '786 patent, showing that Athalonz's inventions concerned footwear made of materials with different densities.*

19.    Athalonz invested heavily in developing and researching its OAP technology, conducting numerous studies of athletes at the collegiate and professional level, measuring safety, comfort, ease of use, and performance.  For example, Athalonz conducted a study of college baseball pitchers and found that 70% of players improved their pitching velocity when using shoes

equipped with Athalonz technology.  Athalonz also studied how its technology could help soldiers in a counter-terrorism branch of the United States military; every single soldier reported some aspect of improvement in military training.  Over years, Athalonz solicited and incorporated feedback from professional coaches, professional athletes, and experts in mechanical engineering, physical therapy, and orthopedics.

20.     After years of research and development, Athalonz launched its own line of athletic footwear based on its proprietary and patented technology.  Athalonz released the GF1 Baseball and Softball Shoe in 2015, the GF2 Baseball and Softball Shoe in 2017, and the EnVe Golf Shoe in 2018.  These shoes incorporated one or more inventions claimed in Athalonz's patents.  In 2019, Athalonz released the OAP insole kit to allow athletes to fine-tune the OAP fit of their Athalonz shoes.  Some also used the kit to modify their existing shoes to contain Athalonz's technology.



*Figure 4. The Athalonz GF1 shoe*          *Figure 5. The Athalonz GF2 shoe*

          

*Figure 6. The Athalonz EnVe shoe*          *Figure 7. The Athalonz OAP insole kit*

21.     Athalonz counts among its customers elite athletes, coaches, and recruiters, along with everyday sports enthusiasts.  Minor league pitcher Michael Peoples reported that his deadlift increased forty pounds in one day from the shoes.  Minor league outfielder Royce Bollinger found

that Athalonz shoes provide supportive functionality. Softball player Eddie Chatham liked that Athalonz shoes reduced knee pain. Professional trainer John Neel reported Athalonz shoes as comfortable and supportive. Baseball scout Rafael Melchione found that Athalonz shoes helped with his chronic foot pain, saying, "Athalonz has something special and I recommend them to my clients." Golf equipment website Golf WRX called Athalonz's EnVe "The best golf shoes you've never heard of."[1]

22.     Once the United States Golf Association approved Athalonz's EnVe Golf Shoe for use in competition, professional golfers quickly adopted the EnVe shoe. For example, at the 2019 World Long Drive, 8 of the top 10 men, 8 of the top 10 women, and more than 50% of all competitors were wearing Athalonz golf shoes, including the men's and women's 2019 world champions.

23.     Athalonz's technology instantly improves athletic performance by increasing strength, balance, and efficiency. It improves body alignment, which reduces an athlete's risk of injury. It does so by applying principles of anatomy, physiology, and physics. When an athlete stands still, the athlete is exerting force straight down to the ground, and the ground itself is exerting an equal and opposite force back up; this is called the ground reaction force. But when the athlete, say, swings a baseball bat, the athlete is exerting forces on the ground from additional angles. The ground, in turn, exerts equal and opposite forces to those additional angles, not just straight down. Some athletic force is lost due to these different, competing angles. This lost force, known as "leakage," is exacerbated when, for example, an athlete wears shoes with U-shaped midsoles, which are common in many athletic shoes, because these midsoles angle the ground

---

[1] Ex. A [Todd McGill, *WRX Spotlight: Athalonz EnVe—The best golf shoes you've never heard of*, GOLF WRX, (February 8, 2020), available at https://www.golfwrx.com/592854/wrx-spotlight-athalonz-enve-the-best-golf-shoes-youve-never-heard-of/].

reaction force away from the athlete's body.  The more pronounced the U-shape, the more ground reaction force is directed away from the athlete's body and is lost to leakage.[2]



*Figure 8. Comparison of the various forces at play when an athlete wears a flat midsole, U-shaped midsole, or an Athalonz developed midsole.*

24.     Although researchers studied the effects of ground reaction force on athletic performance, they did not recognize the impact of an athlete's shoes on the ground-body force interaction and the role it plays in athletic performance.  Athalonz's inventors appreciated this gap and developed footwear technology that directs more force towards the body, creating a more stable athletic base that enables increased power.  Based on the laws of physics and mathematical principles, a six-foot-tall athlete can experience an 8.99% increase in athletic power just by switching to an Athalonz midsole.[3]  For athletes switching from a less efficient U-shaped midsole, they can experience upwards of 30% increased force, simply by using Athalonz technology.  In

---

[2] Ex. B [*The Three Key Aspects of a Golf Shoe: Part 2*, available at https://www.athalonz.com/blogs/news/the-three-key-aspects-of-a-golf-shoe-part-2].
[3] Ex. C [*Athalonz Shoes Improve Your Power by 9%*, available at https://www.athalonz.com/blogs/news/athalonz-shoes-improves-your-power-by-9].

PLAINTIFF ATHALONZ, LLC'S ORIGINAL COMPLAINT – page 10

addition to increasing the power transferred, Athalonz's design increases stability and thereby reduces the risk of ankle rollover by reducing ankle stress.[4]

25.    Athalonz has been recognized for its innovations and has been granted patents on its technologies by the U.S. Patent and Trademark Office ("PTO").

26.    On June 9, 2020, the PTO duly and legally issued U.S. Patent No. 10,674,786, entitled "Athletic positioning apparatus including a heel platform and applications thereof," with Mr. Markison and Mr. Adair as inventors.  The application giving rise to the '786 patent was filed on January 23, 2012 and claims priority to U.S. provisional patent application having a provisional application number of 61/450,485 and filed on March 8, 2011.  A true and correct copy of the '786 patent is attached as Exhibit E.

27.    On May 25, 2021, the PTO duly and legally issued U.S. Patent No. 11,013,291, entitled "Athletic positioning apparatus and applications thereof," with Mr. Markison and Mr. Adair as inventors.  The application giving rise to the '291 patent was filed on April 29, 2019 and claims priority to U.S. provisional patent application having a provisional application number of 61/450,485 and filed on March 8, 2011.  A true and correct copy of the '291 patent is attached as Exhibit F.

28.    On July 20, 2021, the PTO duly and legally issued U.S. Patent No. 11,064,760, entitled "Adjustable athletic positioning apparatus and applications thereof," with Mr. Markison and Mr. Adair as inventors.  The application giving rise to the '760 patent was filed on October 5, 2018 and claims priority to a U.S. provisional patent application having a provisional application

---

[4] Ex. D [*Athalonz Shoes – Leveraging the Laws of Physics*, available at https://www.athalonz.com/blogs/news/athalonz-shoes-leveraging-the-laws-of-physics-1].

number of 61/450,485 and filed on March 8, 2011. A true and correct copy of the '760 patent is attached as Exhibit G.

29. On November 29, 2022, the PTO duly and legally issued U.S. Patent No. 11,510,456, entitled "Athletic positioning apparatus and applications thereof," with Mr. Markison and Mr. Adair as inventors. The application giving rise to the '456 patent was filed on May 5, 2021 and claims priority to U.S. provisional patent application having a provisional application number of 61/450,485 and filed on March 8, 2011. A true and correct copy of the '456 patent is attached as Exhibit H.

30. Athalonz is the sole and exclusive owner of all rights, title, and interest to the Asserted Patents, including the rights necessary to bring this action and to recover past and future damages.

31. The Asserted Patents are enforceable and valid.

**B. Under Armour Has Known About Athalonz's Patented Technology And Its Infringement Of The Asserted Patents**

32. Under Armour, including senior employees and executives, has known about Athalonz's patented technology since at least 2013. For example, on information and belief, Kevin Culley (then Director of Innovation), Don Gibadlo (Director of Footwear Development), David Stakel (Senior Director – Team Sports Footwear), Joshua Rattet (VP of Team Sports Footwear, Accessories and Equipment Business Units) were familiar with Athalonz's Application No. 13/355,801, which would ultimately publish as the '786 patent, and Application No. 13/355,778, of which the '456, '291, and '760 patents are continuations.

33. Further, Under Armour, including senior employees and executives, has been additionally aware of the Asserted Patents since at least January 2022. For example, on

information and belief at least, Mr. Culley (then VP of Strategic Innovation Partnerships) and Craig Foster (Director of Corporate Development) were aware of the Asserted Patents since at least January 2022, as well as the potential applicability of the Asserted Patents to Under Armour's products. Given such knowledge and awareness, on information and belief, Under Armour is and has been aware and knowledgeable of the applicability of the Asserted Patents to its Accused Products and the infringement of the Asserted Patents since the Asserted Products were first developed and sold.

### C. Under Armour's Infringement of Athalonz's Intellectual Property

34.     Upon information and belief, Under Armour has infringed and continues to infringe one or more claims of the Asserted Patents by, at minimum, making, using, offering for sale, and selling infringing products in the United States and in this District.

35.     The accused products include, without limitation, athletic shoes provided by Under Armour, such as the HOVR Forge RC Spikeless Golf Shoe, Unisex Curry HOVR Splash Basketball Shoe, Unisex Curry 4 FloTro Basketball Shoe, Harper 7 Low Elite TPU Baseball Cleat, and the HOVR Drive 2 Spiked Golf Shoe (collectively, the "Accused Products"). Each of these shoes practice at least one claim of each Asserted Patent.

36.     On information and belief, after Under Armour learned about Athalonz's technology, Under Armour released and began selling in the United States the Accused Products which infringe Athalonz's patented inventions.

37.     As an example, Under Armour's HOVR Forge RC Spikeless Golf Shoe has "responsive" cushioning that "returns energy to help your game."[5] Under Armour released the

---

[5]     Ex. I [*Men's UA HOVR Forge RC Spikeless Golf Shoes*, available at https://www.underarmour.com/en-us/p/golf/mens_ua_hovr_forge_rc_spikeless_golf_shoes/3024366.html].

HOVR Forge RC Spikeless shoe in or around May 2021, marketing the shoe as providing better stability and more efficient transfer of force due to the shoe's sole.



*Figure 9. HOVR Forge RC Spikeless Golf Shoe.*

38.   As another example, Under Armour's Unisex Curry HOVR Splash Basketball Shoe has "[r]esponsive" cushioning that "reduces impact, returns energy & helps propel you forward."[6] Under Armour released the Curry HOVR Splash shoe in or around June 2022, marketing the shoe as providing better stability and more efficient transfer of force due to the shoe's sole.



*Figure 10. Curry HOVR Splash Basketball Shoe.*

---

[6]   Ex. J [*Unisex Curry HOVR™ Splash Basketball Shoes*, available at https://www.underarmour.com/en-us/p/curry_brand_shoes_and_gear/unisex_curry_hovr_splash_basketball_shoes/3024719.html].

39.     As another example, Under Armour's Unisex Curry 4 FloTro Basketball Shoe has "cushioning technology" that is "super-light, bouncy & provides insane grip."[7]   Under Armour released the Curry 4 FloTro in or around July 2022, marketing the shoe as improving control, grip, and comfort.



*Figure 11. Curry 4 FloTro Basketball Shoe.*

40.     As another example, Under Armour's Harper 7 Low Elite TPU Baseball Cleat has a "zero gravity feel" "for more energy return, a stable base, and incredible comfort."[8]   Under Armour released the Harper 7 Low Elite in or around August 2022, marketing the shoe as improving energy return, stability, and comfort.

---

[7] Ex. K [*Unisex Curry 4 FloTro Basketball Shoes*, available at https://www.underarmour.com/en-us/p/curry_brand_shoes_and_gear/unisex_curry_4_flotro_basketball_shoes/3024861.html].

[8] Ex. L [Men's UA Harper 7 Low Elite TPU Baseball Cleat, available at https://www.underarmour.com/en-us/p/baseball/mens_ua_harper_7_low_elite_tpu_baseball_cleats/3025585.html].

PLAINTIFF ATHALONZ, LLC'S ORIGINAL COMPLAINT – page 15



*Figure 12. Harper 7 Low Elite TPU Baseball Cleat.*

41.     As another example, Under Armour's HOVR Drive 2 Golf Shoe has "responsive" cushioning that "actually returns energy."[9]  Under Armour released the HOVR Drive 2 in or around April 2022, marketing the shoe as "support[ing] the natural motion of the foot in a golf swing & help[ing] eliminate impact."[10]



*Figure 13. HOVR Drive 2 Golf Shoes.*

42.     On information and belief, the Accused Products have a substantially flat heel from the inner edge to the outer edge, a first downward slope from heel to toe along the outer edge of the midfoot and toe sections, a second downward slope along the inner edge of the midfoot and toe sections, and a varying inward slope from the outer to inner edges of the midfoot and toe sections.  The Accused Products additionally have a gradient of compressible material in the

---

[9] Ex. M [Men's UA HOVR™ Drive 2 Golf Shoe, available at https://www.underarmour.com/en-us/p/golf/mens_ua_hovr_drive_2_golf_shoes/3025070.html#index-0].

[10] *Id.*

PLAINTIFF ATHALONZ, LLC'S ORIGINAL COMPLAINT – page 16

forefoot where the material is more compressible near the inner edge and less compressible near the outer edge.

43. For at least these reasons, the Accused Products directly infringe at least claim 1 of the '786 patent, claim 1 of the '291 patent, claim 1 of the '760 patent, and claim 10 of the '456 patent.

## V.
## COUNT I: INFRINGEMENT OF THE '786 PATENT

44. Athalonz incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

45. On information and belief, Under Armour has infringed and will continue to infringe the '786 patent. Under Armour directly infringes the '786 under 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or importing into the United States and in this District, products covered by one or more claims of the '786 patent, including the Accused Products. As an example, the Accused Products directly infringe at least claim 1 of the '786 patent.

46. Claim 1 of the '786 patent is directed to an athletic positioning apparatus comprising a heel platform, a midfoot section juxtaposed to the heel platform, and a toe section juxtaposed to the midfoot section. The heel platform "has a uniform height from an outer edge to an inner edge of the apparatus at the rear edge of the apparatus," which establishes a "reference slope" that is "substantially parallel to a bottom surface of the apparatus." Claim 1 further recites that "the mid-foot section and the toe section form an angled support platform" with three slopes: "a first slope along the inner edge of the apparatus from a front edge of the apparatus to the heel platform section, a second slope along the front edge of the apparatus from the inner edge to the outer edge of the apparatus, and a third slope along the outer edge of the apparatus from the front

edge of the apparatus to the heel platform section." The three slopes are each greater than the reference slope, "wherein the toe section is lower than the heel platform section as a result."

47. On information and belief, the Accused Products practice every element of Claim 1 of the '786 patent. For example, on information and belief, the Under Armour Curry 4 FloTro has a heel platform, a midfoot section juxtaposed to the heel platform, and a toe section juxtaposed to the midfoot section.



*Figure 14. Medial view of the Curry 4 FloTro, showing a heel platform, midfoot section, and a toe section.*

48. On information and belief, the Curry 4 FloTro has a heel platform section with a uniform height from the outer edge to an inner edge, establishing a reference slope that is substantially parallel to a bottom surface of the apparatus. This is shown in the below cross-sectional view of the heel of a left shoe from a posterior perspective.



*Figure 15. Cross-cut of the heel platform of the Curry 4 FloTro shoe.*

PLAINTIFF ATHALONZ, LLC'S ORIGINAL COMPLAINT – page 18

49.    On information and belief, the Curry 4 FloTro has a midfoot section and a toe section that form an angled support platform with three slopes.  The first slope is along the inner edge from the front edge to the heel platform section.  The second slope is along the front edge from the inner edge to the outer edge.  The third slope is along the outer edge from the front edge to the heel platform section.

50.    On information and belief, the Curry 4 FloTro has a first, second, and third slope each greater than the reference slope, wherein the toe section is lower than the heel platform section.  The toe section has a height of approximately 22.2-24.1mm, which is lower than the heel platform height of 29.56-29.68mm.  The other Accused Products similarly practice every element of Claim 1 of the '786 patent.

**VI.**
**COUNT II: INFRINGEMENT OF THE '291 PATENT**

51.    Athalonz incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

52.    On information and belief, Under Armour has infringed and will continue to infringe the '291 patent.  Under Armour directly infringes the '291 under 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or importing into the United States and in this District products covered by one or more claims of the '291 patent, including the Accused Products.  As an example, the Accused Products directly infringe at least claim 1 of the '291 patent.

53.    Claim 1 of the '291 patent is directed to a shoe with an upper section, a midsole, an insole, and a bottom outsole, which form an athletic positioning shape.  The athletic positioning shape is described as having "a first height at an inside edge and at an outside edge of the shoe along a heel section," "a second height on the outside edge of the shoe at a toe section of the shoe," and "a third height on the inside edge of the shoe at the toe section of the shoe."  Claim 1 further

recites that the first height is greater than the second height, which itself is greater than the third height. Further still, claim 1 recites that there is a first slope formed between the first and second heights, a second slope formed between the first and third heights, and a third slope formed between the second and third heights.

     54.    On information and belief, the Accused Products practice every element of Claim 1 of the '291 patent. For example, on information and belief, the Curry HOVR Splash has an upper section, a midsole coupled to the upper section, an insole positioned proximal to the midsole and within the upper section, and a bottom outsole coupled to the midsole.



*Figure 16. Showing the upper, midsole, and insole sections of a Curry HOVR Splash shoe, and how these parts are coupled.*

55.     On information and belief, the Curry HOVR Splash has a first height at an inside edge and at an outside edge of the shoe along a heel section of the shoe.  This is shown in the below cross-sectional view of the heel.



*Figure 17. Cross-sectional view of the heel section of a Curry HOVR Splash shoe.*

56.     On information and belief, the Curry HOVR Splash has a second height on the outside edge of the shoe at a toe section and a third height on the inside edge of the shoe at the toe section.  This is shown in the below cross-sectional view of the toe section.



*Figure 18. Cross-sectional view of the toe section of a Curry HOVR Splash shoe.*

57.     On information and belief, the first height is approximately 26mm, the second height is approximately 15mm, and the third height is approximately 12.5mm.  Thus, the first height is greater than the second height, which is itself greater than the third height.  This creates a first slope between the first and second heights, a second slope between the first and third heights, and a third slope between the second and third heights.  These measurements are represented in the below diagram.



*Figure 19. Representation of the three heights and three slopes in a Curry HOVR Splash shoe.*

58.     As another example, on information and belief, the Curry 4 FloTro has an upper section, a midsole coupled to the upper section, an insole positioned proximal to the midsole and within the upper section, and a bottom outsole coupled to the midsole.



*Figure 20. Showing the upper, midsole, and insole sections of a Curry 4 FloTro shoe.*

59. On information and belief, the Curry 4 FloTro has a first height at an inside edge and at an outside edge of the shoe along a heel section of the shoe. This is shown in the below cross-sectional view of the heel.



*Figure 21. Cross-sectional view of the heel section of a Curry 4 FloTro shoe.*

60. On information and belief, the Curry 4 FloTro has a second height on the outside edge of the shoe at a toe section and a third height on the inside edge of the shoe at the toe section. This is shown in the below cross-sectional view of the toe section.



*Figure 22. Cross-sectional view of the toe section of a Curry 4 FloTro shoe.*

61. On information and belief, the first height is approximately 34mm, the second height is approximately 24mm, and the third height is approximately 22mm. Thus, the first height is greater than the second height, which is itself greater than the third height. This creates a first slope between the first and second heights, a second slope between the first and third heights, and a third slope between the second and third heights. These measurements are represented below:



*Figure 20. Representation of the three heights and three slopes in a Curry 4 FloTro shoe.*

62.     The other Accused Products similarly practice every element of Claim 1 of the '291 patent.

## VII.
## COUNT III: INFRINGEMENT OF THE '760 PATENT

63.     Athalonz incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

64.     On information and belief, Under Armour has infringed and will continue to infringe the '760 patent.  Under Armour directly infringes the '760 under 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or importing into the United States and in this District products covered by one or more claims of the '760 patent, including the Accused Products.  As an example, the Accused Products directly infringe at least claim 1 of the '760 patent.

65.     Claim 1 of the '760 patent is directed at a pair of shoes with soles that provide athletic positioning.  Each shoe contains an upper portion and a sole coupled to the upper portion. For each shoe, claim 1 recites that the sole's foot platform positions the big toe area at a lower position than both the heel area and the outer small toe area.  Further, the heel area has substantially

no slope between the inner and outer edges.  Further still, the bottom of the sole, at a cross section of the ball of the foot, is substantially linear from the inner to outer edges.

66.     On information and belief, the Accused Products practice every element of Claim 1 of the '760 patent.  For example, on information and belief, the Curry 4 FloTro is a pair of shoes with each shoe containing an upper portion and a sole coupled to the upper portion.



*Figure 23.  A pair of Curry 4 FloTro shoes, showing the upper portion and a sole.*

67.     On information and belief, each Curry 4 FloTro shoe has a sole with a foot platform that positions the big toe area at a lower position than both the heel area and the outer small toe area.  For example, the big toe area has an approximate height of 15.0mm, which is lower than the approximate heights of the heel area (27.6mm) and the outer small toe area (16.6mm).



*Figure 24. Cross-section of a Curry 4 FloTro shoe, showing the measurements of the heel area (left) and toe area (right).*

68.    On information and belief, each Curry 4 FloTro shoe has a heel area that has substantially no slope between the inner and outer edges.



*Figure 23. Cross-section of the heel area of a Curry 4 FloTro shoe, showing substantially no slope from inner to outer edges.*

69.    On information and belief, the bottom of the sole of each Curry 4 FloTro shoe, at a cross-section of the ball of the foot, is substantially linear from the inner to outer edges.



*Figure 25.  Cross section of a Curry 4 FloTro shoe at the ball of the foot, showing that the bottom is substantially linear from inner to outer edges.*

70.    The other Accused Products similarly practice every element of Claim 1 of the '760 patent.

## VIII.

## COUNT IV: INFRINGEMENT OF THE '456 PATENT

71.     Athalonz incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

72.     On information and belief, Under Armour has infringed and will continue to infringe the '456 patent.  Under Armour directly infringes the '456 under 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or importing into the United States and in this District, products covered by one or more claims of the '456 patent, including the Accused Products.  As an example, the Accused Products directly infringe at least claim 10 of the '456 patent.

73.     Claim 10 of the '456 patent is directed at an athletic shoe that has an upper section coupled to a sole section.  Claim 10 recites that the sole section includes a heel platform and a forefoot platform.  The heel platform has a first height that is substantially uniform from an inner edge to an outer edge and is constructed out of a first material.  Claim 10 further recites that the forefoot platform is constructed out of a second material such that when an athlete wears the athletic shoe, "the second material compresses to a first level near an outer edge of the sole section and the second material compresses to a second level near an inner edge of the sole section, wherein the second level of compression is greater than the first level of compression."

74.     On information and belief, the Accused Products practice every element of Claim 10 of the '456 patent.  For example, on information and belief, the HOVR Forge RC Spikeless is an athletic shoe with an upper section and a sole section coupled to the upper section.  This is shown in the below cross-cut of the shoe.



*Figure 26. Cross-cut of the HOVR Forge RC Spikeless shoe, showing upper and sole section.*

75.     On information and belief, the HOVR Forge RC Spikeless shoe has a sole section

that includes a heel platform and a forefoot platform.



*Figure 27. Cross-cut of the HOVR Forge RC Spikeless shoe, showing the heel and forefoot platforms.*

76.    On information and belief, the HOVR Forge RC Spikeless shoe has a heel platform with a first height that is substantially uniform from the inner edge to the outer edge of the sole section.  The heel platform is constructed out of a first material.



*Figure 28.  Cross-cut of the heel platform of a HOVR Forge RC Spikeless shoe.*



*Figure 28.  Cross-cut of the heel of a HOVR Forge RC Spikeless shoe.*

77.     On information and belief, the HOVR Forge RC Spikeless has a forefoot platform with a first level of compression proximal to the outer edge of the shoe and a second level of compression proximal to an inner edge of the shoe, wherein the second level of compression is greater than the first level of compression.



*Figure 29. Cross-section of the toe portion of a HOVR Forge RC Spikeless shoe.*

78.    On information and belief, the first level of compression proximal to the outer edge has a durometer reading of 43 and the second level of compression proximal to the inner edge has a durometer reading of 24.  A lower durometer reading corresponds to a softer, more compressible material.  Thus, the second level of compression (24) is more compressible than the first level of compression (43).  The other Accused Products similarly practice every element of Claim 10 of the '456 patent.

## IX.
## DAMAGES

79.    Athalonz incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

80.     As a result of Under Armour's acts of infringement, Athalonz has suffered actual and consequential damages; however, Athalonz does not yet know the full extent of the infringement and its extent cannot be ascertained except through discovery and special accounting. To the fullest extent permitted by law, Athalonz seeks recovery of damages for reasonable royalties, unjust enrichment, lost profits, and/or benefits received by Under Armour as a result of its past and ongoing infringement of the Asserted Patents.  Athalonz further seeks any other damages to which Athalonz is entitled under law or in equity.

81.     On information and belief, to the extent applicable, Athalonz has complied with the notice and/or marking requirements of 35 U.S.C. § 287(a), to the extent they apply, with respect to each of the Asserted Patents.

82.     Athalonz is entitled to recover reasonable and necessary attorneys' fees under applicable law.

# X.
## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Athalonz respectfully requests that this Court enter judgment in its favor and grant the following relief:

a)  A judgment that the Accused Products infringe the Asserted Patents;

b)  That such infringement is willful;

c)  A judgment and order requiring Under Armour to pay Athalonz's damages in an amount adequate to compensate Athalonz for Under Armour's infringement, but in no event less than a reasonable royalty under 35 U.S.C. § 284, including supplemental damages for any continuing post-verdict infringement up until entry of judgment and beyond, with accounting, as needed;

d)  An award of enhanced damages pursuant to 35 U.S.C. § 284;

e) A ruling finding that this case is exceptional and awarding Athalonz its reasonable attorneys' fees under 35 U.S.C. § 285;

f) A judgment and order requiring Under Armour to pay Athalonz's costs of this action (including all disbursements);

g) An order for accounting of damages;

h) A judgment and order requiring Under Armour to pay pre-judgment and post-judgment interest to the full extent allowed under the law; and,

i) A permanent injunction prohibiting Under Armour from continued infringement of the Asserted Patents.

Such other and further relief as the Court may deem just and proper under the circumstances.

## XI.
## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Athalonz hereby demands a trial by jury for all issues triable by jury.

Dated: April 26, 2023

Respectfully Submitted,

/s/ *Taylor N. Mauze*

Taylor N. Mauze (TX Bar No. 24102161)
tmauze@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN
& FELDBERG LLP
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735
Telephone: (650) 623-1401
Facsimile: (650) 650-3501

Courtland L. Reichman (pending *pro hac vice*)
creichman@reichmanjorgensen.com
Jennifer Estremera (pending *pro hac vice*)
jestremera@reichmanjorgensen.com
Savannah Carnes (pending *pro hac vice*)
scarnes@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN
& FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
Facsimile: (650) 560-3501

Christine E. Lehman (pending *pro hac vice*)
clehman@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN
& FELDBERG LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 894-7310
Facsimile: (650) 560-3501

Michael Matulewicz-Crowley (pending *pro hac vice*)
Mmatulewicz-
crowley@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN
& FELDBERG LLP
400 Madison Avenue, Suite 14D
New York, NY 10017
Telephone: (212) 381-1965
Facsimile: (650) 560-3501

Attorneys for Plaintiff
*Athalonz, LLC*

**EXHIBIT 2**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| ATHALONZ, LLC, | § | |
| | § | |
| Plaintiff, | § | Case No. 2:23-cv-00193-JRG |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| UNDER ARMOUR, INC., | § | |
| | § | |
| Defendant | § | |

## <u>DEFENDANT UNDER ARMOUR, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO ATHALONZ, LLC'S COMPLAINT</u>

Defendant Under Armour, Inc. ("Under Armour" or "Defendant"), by and through its undersigned counsel, files this Answer and Affirmative Defenses to the Complaint of Plaintiff Athalonz, LLC ("Plaintiff" or "Athalonz") and in support thereof states as follows:

### NATURE OF THE ACTION

1.      Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1 of the Complaint and on that basis denies the allegations.

2.      Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 of the Complaint and on that basis denies the allegations.

3.      Under Armour denies the allegations in Paragraph 3 of the Complaint.

4.      Under Armour denies that it has misused Athalonz's intellectual property.  Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 4 of the Complaint and on that basis denies those allegations.

5.      Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 5 of the Complaint and on that basis denies the allegations.

## PARTIES

6.       Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 6 of the Complaint and on that basis denies the allegations.

7.       Under Armour admits the allegations in Paragraph 7 of the Complaint.

## JURISDICTION AND VENUE

8.       Under Armour admits that the Complaint purports to allege claims for patent infringement of U.S. Patent Nos. 11,013,291 ("the '291 patent"); 11,064,760 ("the '760 patent"); 10,674,786 ("the '786 patent"); and 11,510,456 ("the '456 patent") (collectively, the "Asserted Patents") but denies any wrongdoing or liability for the reasons stated herein.

9.       To the extent a response is required, Under Armour does not contest that this Court has jurisdiction over the subject matter under 28 U.S.C. §§ 1331 and 1338 solely for the limited purposes of this civil action.

10.       Under Armour admits that it offers for sale and has sold its products to individuals in this District and has a retail store located at 820 West Stacy Road, Suite 518, Allen, TX 75013, but denies that this District is the most convenient forum.  Under Armour denies that it has committed any wrongdoing or acts of infringement within this District, directly or indirectly, literally or under the doctrine of equivalents, willfully or otherwise.  To the extent there are any remaining allegations in Paragraph 10 of the Complaint not addressed by the foregoing, Under Armour denies them.

11.       Under Armour admits that it conducts business within the State of Texas and does not contest jurisdiction in the United States District Court for the Eastern District of Texas for the limited purposes of this civil action only.  To the extent there are any remaining allegations in Paragraph 11 of the Complaint not addressed by the foregoing, Under Armour denies them.

# BACKGROUND

12.     Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 of the Complaint and on that basis denies the allegations.

13.     Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13 of the Complaint and on that basis denies the allegations.

14.     Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14 of the Complaint and on that basis denies the allegations.

15.     Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 of the Complaint and on that basis denies the allegations.

16.     Under Armour admits Figure 1 appears to show figures from the '786 patent. Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 16 of the Complaint and on that basis denies those allegations.

17.     Under Armour admits that Figure 2 appears to show figures from the '786 patent. Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 17 of the Complaint and on that basis denies those allegations.

18.     Under Armour admits that Figure 3 appears to show figures from the '786 patent. Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 18 of the Complaint and on that basis denies those allegations.

19.     Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 of the Complaint and on that basis denies the allegations.

20.     Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 of the Complaint and on that basis denies the allegations.

21.     Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 of the Complaint and on that basis denies the allegations.

22.     Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 of the Complaint and on that basis denies the allegations.

23.     Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 of the Complaint and on that basis denies the allegations.

24.     Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 of the Complaint and on that basis denies the allegations.

25.     Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 25 of the Complaint and on that basis denies the allegations.

26.     Under Armour admits that the '786 patent appears on its face to have issued on June 9, 2020 and identifies Michael R. Adair and Timothy W. Markison as the named inventors, and that a copy of what appears to be the '786 patent is provided as Exhibit E to the Complaint. Under Armour admits that the application giving rise to the '786 patent was filed on January 23, 2012 and claims priority to U.S. provisional patent application number 61/450,485 filed on March 8, 2011.  Under Armour denies that '786 patent was duly and legally issued.  Under Armour denies any remaining allegations in Paragraph 26 of the Complaint.

27.     Under Armour admits that the '291 patent appears on its face to have issued on May 25, 2021 and identifies Michael R. Adair and Timothy W. Markison as the named inventors, and that a copy of what appears to be the '291 patent is provided as Exhibit F to the Complaint.  Under Armour admits that the application giving rise to the '291 patent was filed on

4

April 29, 2019 and claims priority to U.S. provisional patent application number 61/450,485

filed on March 8, 2011.  Under Armour denies that '291 patent was duly and legally issued.

Under Armour denies any remaining allegations in Paragraph 27 of the Complaint.

28.      Under Armour admits that the '760 patent appears on its face to have issued on

July 20, 2021 and identifies Michael R. Adair and Timothy W. Markison as the named inventors,

and that a copy of what appears to be the '760 patent is provided as Exhibit G to the Complaint.

Under Armour admits that the application giving rise to the '760 patent was filed on October 5,

2018 and claims priority to U.S. provisional patent application number 61/450,485 filed on

March 8, 2011.  Under Armour denies that '760 patent was duly and legally issued.  Under

Armour denies any remaining allegations in Paragraph 28 of the Complaint.

29.      Under Armour admits that the '456 patent appears on its face to have issued on

November 29, 2022 and identifies Michael R. Adair and Timothy W. Markison as the named

inventors, and that a copy of what appears to be the '456 patent is provided as Exhibit H to the

Complaint.  Under Armour admits that the application giving rise to the '456 patent was filed on

May 5, 2021 and claims priority to U.S. provisional patent application number 61/450,485 filed

on March 8, 2011.  Under Armour denies that '456 patent was duly and legally issued.  Under

Armour denies any remaining allegations in Paragraph 29 of the Complaint.

30.      Under Armour lacks knowledge and information sufficient to form a belief as to

the truth of the allegation in Paragraph 30 of the Complaint and on that basis denies the

allegations.

31.      Under Armour denies the allegations in Paragraph 31 of the Complaint.

32.     Under Armour denies that Kevin Culley, Don Gibadlo, David Stakel and Joshua Rattet had knowledge of Athalonz's Patent Application Nos. 13/355,801 and 13/355,778, at least within the meaning of 35 U.S.C. §287, and denies any remaining allegations in Paragraph 32.

33.     Under Armour denies that Kevin Culley and Craig Foster had knowledge of the Asserted Patents, at least within the meaning of 35 U.S.C. §287, and denies any remaining allegations in Paragraph 33.

34.     Under Armour denies the allegations in Paragraph 34 of the Complaint.

35.     Under Armour admits that it sells or has sold the following products: HOVR Forge RC Spikeless Golf Shoe, Unisex Curry HOVR Splash Basketball Shoe, Unisex Curry 4 FloTro Basketball Shoe, Harper 7 Low Elite TPU Baseball Cleat, and HOVR Drive 2 Spiked Golf Shoe, (collectively, the "Accused Products").  Under Armour denies the remaining allegations in Paragraph 35 of the Complaint.

36.     Under Armour denies the allegations in Paragraph 36 of the Complaint.

37.     Under Armour admits that Figure 9 appears to show the HOVR Forge RC Spikeless Golf Shoe.  Under Armour denies the remaining allegations in Paragraph 37 of the Complaint.

38.     Under Armour admits that Figure 10 appears to show the Curry HOVR Splash Basketball Shoe.  Under Armour admits that its website states or stated that the Curry HOVR Splash Basketball Shoe has "[r]esponsive" cushioning that "reduces impact, returns energy & helps propel you forward."  Under Armour denies the remaining allegations in Paragraph 38 of the Complaint.

39.     Under Armour admits that Figure 11 appears to show the Curry 4 FloTro Basketball Shoe.  Under Armour denies the remaining allegations in Paragraph 39 of the Complaint.

40.     Under Armour admits that Figure 12 appears to show the Harper 7 Low Elite TPU Baseball Cleat and that the Harper 7 Low Elite was released in August 2022.  Under Armour denies the remaining allegations in Paragraph 40 of the Complaint.

41.     Under Armour admits that Figure 13 appears to show the HOVR Drive 2 Golf Shoe.  Under Armour admits that its website states or stated that the HOVR Drive 2 Golf Shoe has "responsive" cushioning that "actually returns energy."  Under Armour denies the remaining allegations in Paragraph 41 of the Complaint.

42.     Under Armour denies the allegations in Paragraph 42 of the Complaint.

43.     Under Armour denies the allegations in Paragraph 43 of the Complaint.

### COUNT I: ALLEGED INFRINGEMENT OF THE '786 PATENT

44.     Under Armour hereby realleges and incorporates by reference its responses in Paragraphs 1–43 above.

45.     Under Armour denies the allegations in Paragraph 45 of the Complaint.

46.     Under Armour admits that claim 1 of the '786 patent recites a heel platform section that "has a uniform height from an outer edge to an inner edge of the apparatus at the rear edge of the apparatus," wherein the uniform height establishes a "reference slope" that is "substantially parallel to a bottom surface of the apparatus."  Under Armour admits that claim 1 further recites that "the mid-foot section and the toe section form an angled support platform" that has "a first slope along the inner edge of the apparatus from a front edge of the apparatus to the heel platform section, a second slope along the front edge of the apparatus from the inner

7

edge to the outer edge of the apparatus, and a third slope along the outer edge of the apparatus from the front edge of the apparatus to the heel platform section." Under Armour admits that claim 1 further recites "wherein the toe section is lower than the heel platform section as a result." Under Armour denies any remaining allegations in Paragraph 46 of the Complaint.

47.    Under Armour denies the allegations in Paragraph 47 of the Complaint.

48.    Under Armour denies the allegations in Paragraph 48 of the Complaint.

49.    Under Armour denies the allegations in Paragraph 49 of the Complaint.

50.    Under Armour denies the allegations in Paragraph 50 of the Complaint.

**COUNT II: ALLEGED INFRINGEMENT OF THE '291 PATENT**

51.    Under Armour hereby realleges and incorporates by reference its responses in Paragraphs 1–50 above.

52.    Under Armour denies the allegations in Paragraph 52 of the Complaint.

53.    Under Armour admits that claim 1 of the '291 patent recites "a first height at an inside edge and at an outside edge of the shoe along a heel section," "a second height on the outside edge of the shoe at a toe section of the shoe," and "a third height on the inside edge of the shoe at the toe section of the shoe." Under Armour denies any remaining allegations in Paragraph 53 of the Complaint.

54.    Under Armour denies the allegations in Paragraph 54 of the Complaint.

55.    Under Armour lacks knowledge and information sufficient to form a belief as to the truth of the allegation in Paragraph 55 of the Complaint and on that basis denies the allegations.

56.     Under Armour lacks knowledge and information sufficient to form a belief as to the truth of the allegation in Paragraph 56 of the Complaint and on that basis denies the allegations.

57.     Under Armour denies the allegations in Paragraph 57 of the Complaint.

58.     Under Armour lacks knowledge and information sufficient to form a belief as to the truth of the allegation in Paragraph 58 of the Complaint and on that basis denies the allegations.

59.     Under Armour lacks knowledge and information sufficient to form a belief as to the truth of the allegation in Paragraph 59 of the Complaint and on that basis denies the allegations.

60.     Under Armour lacks knowledge and information sufficient to form a belief as to the truth of the allegation in Paragraph 60 of the Complaint and on that basis denies the allegations.

61.     Under Armour denies the allegations in Paragraph 61 of the Complaint.

62.     Under Armour denies the allegations in Paragraph 62 of the Complaint.

**COUNT III: ALLEGED INFRINGEMENT OF THE '760 PATENT**

63.     Under Armour hereby realleges and incorporates by reference its responses in Paragraphs 1–62 above.

64.     Under Armour denies the allegations in Paragraph 64 of the Complaint.

65.     Under Armour denies the allegations in Paragraph 65 of the Complaint.

66.     Under Armour denies the allegations in Paragraph 66 of the Complaint.

67.     Under Armour denies the allegations in Paragraph 67 of the Complaint.

68.     Under Armour denies the allegations in Paragraph 68 of the Complaint.

9

69.     Under Armour denies the allegations in Paragraph 69 of the Complaint.

70.     Under Armour denies the allegations in Paragraph 70 of the Complaint.

## COUNT IV: ALLEGED INFRINGEMENT OF THE '456 PATENT

71.     Under Armour hereby realleges and incorporates by reference its responses in Paragraphs 1–70 above.

72.     Under Armour denies the allegations in Paragraph 72 of the Complaint.

73.     Under Armour admits that claim 10 of the '456 patent recites a sole section, including a heel platform and a forefoot platform.  Under Armour denies any remaining allegations in Paragraph 73 of the Complaint.

74.     Under Armour denies the allegations in Paragraph 74 of the Complaint.

75.     Under Armour denies the allegations in Paragraph 75 of the Complaint.

76.     Under Armour denies the allegations in Paragraph 76 of the Complaint.

77.     Under Armour denies the allegations in Paragraph 77 of the Complaint.

78.     Under Armour denies the allegations in Paragraph 78 of the Complaint.

## ALLEGED DAMAGES

79.     Under Armour hereby realleges and incorporates by reference its responses in Paragraphs 1–78 above.

80.     Under Armour denies the allegations in Paragraph 80 of the Complaint.

81.     Under Armour lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81 of the Complaint and on that basis denies the allegations.

82.     Under Armour denies the allegations in Paragraph 82 of the Complaint.

## PRAYER FOR RELIEF

Under Armour denies that Athalonz is entitled to any of the relief sought in its Prayer for Relief in the Complaint, or any relief whatsoever.

## DEMAND FOR JURY TRIAL

Under Armour admits that Athalonz demands a jury trial.

## <u>AFFIRMATIVE DEFENSES</u>

Further answering Plaintiff's Complaint, Under Armour sets forth the following affirmative defenses. Assertion of a defense does not concede that Under Armour has a burden of proving the matter asserted or otherwise alter the burden of proof. Under Armour expressly reserves the right to assert any other legal or equitable defenses to which it is shown to be entitled, including all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the Patent Laws of the United States, and any other defenses that may not exist or in the future be available based on discovery or further factual investigation in this case.

## FIRST AFFIRMATIVE DEFENSE: NONINFRINGEMENT

Under Armour does not and has not infringed any of the Asserted Patents, either directly or indirectly, willfully or otherwise, either literally or under the doctrine of equivalents.

## SECOND AFFIRMATIVE DEFENSE: INVALIDITY

The claims of the Asserted Patents are invalid for failure to meet one or more of the conditions for patentability specified in 35 U.S.C. § 1, *et seq.*, including but not limited to 35 U.S.C. §§ 101, 102, 103, and/or 112.

## THIRD AFFIRMATIVE DEFENSE: FAILURE TO STATE A CLAIM FOR WILLFUL INFRINGEMENT

The Complaint fails to state a claim against Under Armour for willful infringement upon which relief can be granted.

**FOURTH AFFIRMATIVE DEFENSE: PROSECUTION HISTORY ESTOPPEL**

Plaintiff is estopped and otherwise barred under the doctrine of prosecution history estoppel from alleging that one or more of the claims of the Asserted Patents should be interpreted to cover any product made, used, imported, sold, or offered by Under Armour.

**FIFTH AFFIRMATIVE DEFENSE: EQUITABLE DEFENSES**

Plaintiff's claims are barred, in whole or in part, under the doctrines of equitable estoppel, waiver, acquiescence, implied license, and/or unclean hands

**SIXTH AFFIRMATIVE DEFENSE: NO ENHANCED DAMAGES OR ATTORNEY'S FEES**

Plaintiff is not entitled to any enhanced damages because it has failed to plead, and Under Armour's allegedly infringing activities do not meet, the requirements of 35 U.S.C. § 284 to entitle Plaintiff to a finding of willfulness or deliberate infringement.

Plaintiff is also not entitled to any attorneys' fees because it has failed to plead, and Under Armour's allegedly infringing activities and conduct in this litigation do not meet, the requirements of 35 U.S.C. § 285 to show that this case is exceptional.

**SEVENTH AFFIRMATIVE DEFENSE: 35 U.S.C. §§ 287 & 288**

To the extent that Plaintiff, any of its predecessors in interest, or licensees of the Asserted Patents failed to comply with 35 U.S.C. § 287, including by failing to properly mark relevant products or otherwise give proper notice, Under Armour is not liable to Plaintiff for any acts allegedly performed before Under Armour received actual notice of infringement with respect to each of those patents.  To the extent that any claim of the Asserted Patents is held invalid, Plaintiff is precluded under 35 U.S.C. § 288 from recovering costs relating to this action.

**EIGHTH AFFIRMATIVE DEFENSE: ADEQUATE REMEDY AT LAW**

Plaintiff is not entitled to injunctive relief because any alleged injury to it is not immediate and/or irreparable, and because Plaintiff has an adequate remedy at law.

**NINTH AFFIRMATIVE DEFENSE: RESERVATION OF ADDITIONAL DEFENSES**

Under Armour reserves the right to supplement this Answer with additional affirmative defenses as discovery proceeds in this case.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Under Armour respectfully requests a jury trial on all issues properly triable to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Under Armour, Inc. respectfully requests that the Court enter judgment in its favor and against Plaintiff as follows:

(i)     That the Court enter judgment against Plaintiff and in favor of Under Armour, and order that Plaintiff is entitled to no recovery on the Complaint;

(ii)    That the Court find that Under Armour has not infringed and is not infringing any valid claim of the Asserted Patents, either directly or indirectly, contributorily, or otherwise, and has not induced others to infringe the Asserted Patents;

(iii)   That the Court find that each claim of the Asserted Patents is invalid, void, and without any force or effect against Under Amour and its officers, employees, agents and attorneys;

(iv)    That the Court find that no damages or royalties are due for any of the acts alleged by Plaintiff in its Complaint, and that no preliminary or permanent injunction is appropriate as a matter of law;

(v)      That the Court award Under Armour its costs and disbursements in this action;

(vi)     That the Court declare this case exception pursuant to 35 U.S.C. § 285 and award Under Armour its reasonable attorney's fees and costs in this action; and

(vii)    That the Court grant Under Armour such other and further relief to which it may be entitled.

Dated: July 14, 2023

Respectfully submitted,

*/s/ J. Thad Heartfield*
J. Thad Heartfield
State Bar No. 09346800
Email: thad@heartfieldlawfirm.com
THE HEARTFIELD LAW FIRM
Dowlen Road Beaumont, TX 77706
Telephone: 409-866-3318
Facsimile: 409-866-5789

Frank C. Cimino, Jr.
Email: fccimino@Venable.com
Megan S. Woodworth
Email: mswoodworth@Venable.com
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 344-4569
Facsimile: (202) 344-8300

Robert E. Bugg
Email: rebugg@Venable.com
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
New York, NY 10020
Telephone: (212) 370-6241
Facsimile: (212) 307-5598

*ATTORNEYS FOR DEFENDANT*
*UNDER ARMOUR, INC.*

14

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic services are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a) on this 14th day of July, 2023.

*/s/ J. Thad Heartfield*
J. Thad Heartfield

**EXHIBIT 3**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| ATHALONZ, LLC, | § | |
| | § | |
| Plaintiff, | § | Case No. 2:23-cv-00193 JRG |
| | § | |
| v. | § | |
| | § | |
| UNDER ARMOUR, INC., | § | |
| | § | |
| Defendant | § | |

## UNDER ARMOUR, INC.'S MOTION TO TRANSFER VENUE TO DISTRICT OF MARYLAND UNDER 28 U.S.C. § 1404

## <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ........................................................................................................... 1

II.  FACTUAL BACKGROUND .......................................................................................... 1

    A.  Under Armour's Connection to the District of Maryland and Lack of Connection to this District ...................................................................................................................... 1

    B.  Athalonz's Lack of Connections to this District ................................................... 4

    C.  Third Party Witnesses Located in Maryland ........................................................ 4

III. LEGAL STANDARD ..................................................................................................... 5

IV.  ARGUMENT .................................................................................................................. 6

    A.  This Action Could Have Been Filed in the District of Maryland ......................... 6

    B.  The Private Interest Factors Favor Transfer ........................................................ 6

    C.  The Public Interest Factors Favor Transfer ....................................................... 12

V.   CONCLUSION ............................................................................................................ 15

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*In re Apple Inc.*,
   979 F.3d 1332 (Fed. Cir. 2020) ..............................................................................11

*ATEN Intern. Co. Ltd. v. Emine Tech. Co*,
   261 F.R.D. 112 (E.D. Tex. 2009) ..............................................................................7

*Endo Pharms. Inc. v. Lupin Atlantis Holdings Sa*,
   No. 2:17-CV-00558-JRG, 2018 U.S. Dist. LEXIS 249013 (E.D. Tex. May 30,
   2018) .......................................................................................................................11

*Entropic Commc'ns, LLC v. DIRECTV, LLC*,
   No. 2:22-cv-00076-JRG2022-JRG, U.S. Dist. LEXIS 240237 (E.D. Tex. Oct.
   24, 2022) ..............................................................................................................9, 12

*Farmobile LLC v. Farmers Edge Inc.*,
   No. 2:21-cv-00411-JRG, 2022 U.S. Dist. LEXIS 120370 (E.D. Tex. July 7,
   2022) .................................................................................................................. *passim*

*In re Genentech, Inc.*,
   566 F.3d 1338 (Fed. Cir. 2009) ...................................................................8, 10, 11

*In re Hoffman-La Roche Inc.*,
   587 F.3d 1333 (Fed. Cir. 2009) ..............................................................................10

*Implicit, LLC v. Trend Micro, Inc.*,
   No. 6:16-cv-00080-JRG, 2016 WL 9245067 (E.D. Tex. Sept. 1, 2016) ..................7

*Jawbone Innovations, LLC v. Amazon.com, Inc.*,
   No. 2:21-cv-435-JRG, Dkt. 60 (E.D. Tex. Sept. 21, 2022) ........................... *passim*

*In re Juniper Networks, Inc.*,
   14 F.4th 1313 (Fed. Cir. 2021) ...............................................................................10

*Koster v. Lumbermens Mut. Cas. Co.*,
   330 U.S. 518 (1947) .................................................................................................13

*In re Link_A_Media Devices Corp.*,
   662 F.3d 1221 (Fed. Cir. 2011) ...............................................................................13

*In re Netflix, Inc.*,
   No. 2022-110, 2022 WL 167470 (Fed. Cir. Jan. 19, 2022) .......................................7

*In re Nintendo Co., Ltd.*,
   589 F.3d 1194 (Fed. Cir. 2009) ...............................................................................10

*Seagen Inc. v. Daiichi Sankyo Co., Ltd.*,
   546 F. Supp. 3d 515 (E.D. Tex. 2021) ..................................................................13

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*,
   581 U.S. 258 (2017).................................................................................................6

*In re TS Tech USA Corp.*,
   551 F.3d 1315 (Fed. Cir. 2008)............................................................................12

*Unicorn Energy GMBH v. Tesla, Inc.*,
   No. 2:20-CV-00338-JRG, 2021 U.S. Dist. LEXIS 167381 (E.D. Tex. Sept. 3,
   2021) .......................................................................................7, 12, 14, 15

*Uniloc 2017 LLC v. Google LLC*,
   2:18-cv-00504-JRG-RSP, 2020 WL 3064460 (E.D. Tex. June 8, 2020) ..................8

*Uniloc USA, Inc. v. Apple Inc.*,
   No. 2:17-CV-00258-JRG, 2017 WL 11553227 (E.D. Tex. Dec. 22, 2017) .....................14, 15

*Viking Techs., LLC v. Assurant, Inc.*,
   No. 2:20-CV-00357-JRG, 2021 WL 3520756 (E.D. Tex. June 21, 2021) .........................7, 14

*In re Volkswagen AG*,
   371 F.3d 201 (5th Cir. 2004) ........................................................................5, 6, 12

*In re Volkswagen Am., Inc.*,
   545 F.3d 304 (5th Cir. 2008) ...................................................................... *passim*

**Statutes**

28 U.S.C. § 1332(c)(1)..............................................................................................6

28 U.S.C. § 1400(b) ...................................................................................................6

28 U.S.C. § 1404(a) ................................................................................................1, 5

## I.      INTRODUCTION

The District of Maryland is a clearly more convenient forum for this action.  Neither party has any meaningful connection to the Eastern District of Texas.  Athalonz has its principal place of business in Mesa, Arizona and there does not appear to be a single witness or document relevant to this case located in this District.

By contrast, Under Armour Inc. is headquartered in Maryland and the locus of most relevant activities and witnesses and evidence are located in that District.  In addition, third party witnesses identified by both Under Armour and Athalonz (in its Complaint) are or may be subject to Maryland's subpoena power.

Because it would be clearly more convenient to try this case in Maryland, the location of Under Armour's witnesses and where relevant third-party witnesses are subject to compulsory process, and because Athalonz has no meaningful ties to the Eastern District of Texas, Under Armour respectfully requests that the case be transferred to the District of Maryland pursuant to 28 U.S.C. § 1404(a).

## II.     FACTUAL BACKGROUND

### A.      Under Armour's Connection to the District of Maryland and Lack of Connection to this District

Under Armour employs approximately 1,000 people in its Baltimore, Maryland headquarters, and more than 1,900 people in the District of Maryland.  Ex. A, Heagy Declaration, ¶ 3.  Many of the employees that designed and developed the Accused Products, as well as those responsible for sales, marketing and finance, are located in the District of Maryland.  *Id*., ¶ 4.  The decision making relating to the design, development, sales, and marketing of the Accused Products took place primarily, and continues to take place primarily, in the District of Maryland.  *Id*., ¶ 5.

1

In its Complaint, Athalonz has identified several Under Armour employees as witnesses having knowledge of the asserted patents and the Accused Products:

➢ David Stakel (Senior Director – Team Sports Footwear) - current Under Armour employee identified by Athalonz as allegedly having knowledge of Athalonz's patented technology since at least 2013 including at least some of the asserted patents (or family members).  Complaint, ¶ 32.   Mr. Stakel is located in Maryland.  Heagy Declaration, ¶ 6.

➢ Joshua Rattet (VP of Team Sports Footwear, Accessories and Equipment Business Units) - current Under Armour employee identified by Athalonz as allegedly having knowledge of Athalonz's patented technology since at least 2013 including at least some of the asserted patents (or family members).  Complaint, ¶ 32.  Mr. Rattet is located in Maryland.  Heagy Declaration, ¶ 6.

➢ Craig Foster (Director of Corporate Development) - current Under Armour employee identified by Athalonz as allegedly having knowledge of the asserted patents and potential applicability of the asserted patents to Under Armour's accused products since January 2022.  Complaint, ¶ 33.  Mr. Foster is located in Maryland.  Heagy Declaration, ¶ 6.

Given their alleged interactions with Athalonz, as pled in the Complaint, each can be expected to testify at trial.

In addition to those identified by Athalonz, Under Armour expects to call the following employees as likely trial witnesses:

➢ Shawn McManus, Sr. Designer, Footwear, Field Sports, is likely to testify regarding the design of Accused Products related to golf.  Mr. McManus may also

2

testify regarding his knowledge and understanding of prior and current designs of golf shoes in the market.  *Id.*, ¶ 7.  Mr. McManus is located in Maryland.  *Id.*, ¶ 6.

➤ Spencer Hawkins, Sr. Design Lead, Footwear, Field Sports, is likely to testify regarding the design of Accused Products related to baseball.  Mr. Hawkins may also testify regarding his knowledge and understanding of prior and current designs of baseball shoes/cleats in the market.  *Id.*, ¶ 8.  Mr. Hawkins is located in Maryland.  *Id.*, ¶ 6.

➤ Tom Luedecke, Design Director, Innovation, Footwear, is likely to testify regarding the design of the Accused Products related to basketball.  Mr. Luedecke may also testify regarding his knowledge and understanding of prior and current designs of basketball shoes in the market.  *Id.*, ¶ 11.  Mr. Luedecke is located in Portland, Oregon, but is available to travel to Maryland when needed in this litigation.  *Id.*, ¶¶ 11, 12.

➤ Teresa Oles, Vice-President, Consumer Operations, is likely to testify regarding Under Armour's marketing of the Accused Products, and the marketing of Under Armour footwear generally.  *Id.*, ¶ 9.  Ms. Oles is located in Maryland.  *Id.*, ¶ 6.

➤ Katie Fink, Director, FP&A, is likely to testify regarding the sales of the Accused Products.  *Id.*, ¶ 10.  Ms. Fink is located in Maryland.  *Id.*, ¶ 6.

None of Under Armour's employees with relevant knowledge of the Accused Products and/or the marketing and sales of the Accused Products are located in the Eastern District of Texas.  *Id.*, ¶ 13.

Under Armour's documents and business records relevant to the design, development, marketing, sales, and financial accounting of the Accused Products are also controlled in Under

Armour's Baltimore headquarters.  *Id*., ¶ 15.  Under Armour is not aware of any relevant documents located in the Eastern District of Texas.  *Id*., ¶ 16.

### B.      Athalonz's Lack of Connections to this District

Athalonz's only tie to this District is its choice of formation in Texas.  Athalonz is headquartered in Mesa, Arizona and it does not appear that Athalonz maintains any physical presence or employees in the Eastern District.  Bugg Declaration, ¶¶ 4-6.  This is also the only action involving the asserted patents in any jurisdiction, and Under Armour is the sole defendant.

### C.      Third Party Witnesses Located in Maryland

In addition to the current employees identified above, Athalonz also identified two former Under Armour employees as witnesses in its Complaint:

> ➢      Kevin Culley (former Director of Innovation, former VP of Strategic Innovation Partnerships) - former Under Armour employee identified by Athalonz as allegedly having knowledge of Athalonz's patented technology since at least 2013 including at least some of the asserted patents (or family members) and potential applicability of the asserted patents to Under Armour's accused products since January 2022.  Complaint, ¶¶ 32-33.  Mr. Culley is located in Maryland.  Heagy Declaration, ¶ 14.

> ➢       Don Gibadlo (former Senior Director, Sourcing Operations, Team Sports) - former Under Armour employee identified by Athalonz as allegedly having knowledge of Athalonz's patented technology since at least 2013 including at least some of the asserted patents (or family members).  Complaint, ¶ 32.  The last known address that Under Armour has for Mr. Gibadlo is in Pikesville, Maryland.   Heagy Declaration, ¶ 14.

In addition, a significant issue in this case concerns standing. Specifically, it appears that the asserted patents may be the property of the Baltimore Orioles, rather than Athalonz. One of the inventors of the asserted patents, Michael "Rick" Adair, was employed by the Baltimore Orioles at the time of invention. For example, the provisional patent (Application No. 61/450,485) upon which the asserted patents depend was filed on March 8, 2011. At this time, Mr. Adair was employed as a pitching coach for the Baltimore Orioles. Complaint, ¶ 14; Bugg Declaration, ¶ 12. Because Mr. Adair was employed by the Baltimore Orioles when he invented the subject matter of the asserted patents, he likely was obligated to assign all intellectual property, especially that involving allegedly improved methods and devices for baseball related activities, to his employer, the Baltimore Orioles. Under Armour intends to seek testimony from the Baltimore Orioles organization, and members of its staff, located in Maryland regarding this issue.

## III.    LEGAL STANDARD

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." First, the movant needs to show that the claims "might have been brought in the destination venue." *In Re Volkswagen Am., Inc.*, 545 F.3d 304, 312 (5th Cir. 2008) ("*Volkswagen II*"). Once this threshold is met, the party seeking transfer must show that the "transferee venue is clearly more convenient" than the district where the case was originally filed. *Id.* at 315.

This District determines which forum is best suited to adjudicate a matter by weighing a series of "public" and "private" factors. *In Re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*"). The private factors include: "(1) the relative ease of access to sources

of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the

cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a

case easy, expeditious and inexpensive." *Id.*  The public factors include: "(1) the administrative

difficulties flowing from court congestion; (2) the local interest in having localized interests

decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4)

the avoidance of unnecessary problems of conflict of laws of the application of foreign law." *Id.*

Notably, a plaintiff's choice of venue is not a factor in the transfer analysis. *Volkswagen II*, 545

F.3d at 315.

## IV. ARGUMENT

### A. This Action Could Have Been Filed in the District of Maryland

Under 28 U.S.C. § 1400(b), venue is proper in a judicial district where a defendant

resides.  A domestic corporate defendant is deemed to reside both in its state of incorporation

and in the state where it has its principal place of business. *TC Heartland LLC v. Kraft Foods

Grp. Brands LLC*, 581 U.S. 258, 266-67 (2017); 28 U.S.C. § 1332(c)(1).  Here, Under Armour is

a corporation existing under the laws of the State of Maryland, with its principal place of

business in Baltimore, Maryland.  Complaint, ¶ 7; Bugg Declaration ¶ 3.  Thus, this case could

have been brought in the District of Maryland.

### B. The Private Interest Factors Favor Transfer

The private interest factors demonstrate that the District of Maryland is "clearly more

convenient" than this District: The majority of factors weigh in favor of transfer, and none weigh

against it.

#### 1. Access to Sources of Proof Heavily Favors Transfer

Access to sources of proof favors transfer.  This District has explained that "this factor

will turn upon which party will most probably have the greater volume of documents relevant to

the litigation and their presumed physical location." *ATEN Intern. Co. Ltd. v. Emine Tech. Co*, 261 F.R.D. 112, 123 (E.D. Tex. 2009). In patent infringement cases, "the bulk of the relevant evidence usually comes from the accused infringer." *Viking Techs., LLC v. Assurant, Inc.*, 2021 WL 3520756, at *4 (E.D. Tex. June 21, 2021) (citing *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009)). That is exactly the case here. All of documents and sources of proof regarding the research, design, development, sales and marketing of the Accused Products, prior art products, and alleged knowledge of the asserted patents are controlled at Under Armor headquarters in Baltimore, Maryland. Heagy Declaration, ¶ 15. "Notwithstanding well-known advances in technology and the digitization of data, courts nonetheless continue to consider the relevance and importance of the physical location of these sources." *Farmobile LLC v. Farmers Edge Inc*., No. 2:21-cv-00411-JRG; 2022 U.S. Dist. LEXIS 120370, *6 (E.D. Tex. July 7, 2022); *see also Implicit, LLC v. Trend Micro, Inc.*, No. 6:16-cv-00080-JRG, 2016 WL 9245067, at *2 (E.D. Tex. Sept. 1, 2016) (citing *Volkswagen II*, 545 F.3d at 316).

Given Athalonz's place of business outside this District, its relevant documents are presumably not located here, requiring transportation regardless of venue.

Comparing the volume of evidence from Under Armour in the District of Maryland with the lack of documents or other evidence in this District, the "ease of access to sources of proof" factor favors transfer. *See In re Netflix, Inc.*, No. 2022-110, 2022 WL 167470, at *3 (Fed. Cir. Jan. 19, 2022) (the "sources of proof" factor favors transfer where "documentation about the research, design, and development" of the accused products is located in the transferee forum); *Unicorn Energy GMBH v. Tesla, Inc*., No. 2:20-CV-00338-JRG, 2021 U.S. Dist. LEXIS 167381, *5-6 (E.D. Tex. Sept. 3, 2021) (transfer favored where research, development, design and engineering documentation related to the accused products located in transferee district,

explaining that "[w]hile the Court agrees with [plaintiff] that most of this information will likely be electronically transferred in this case, it is clear that, under current precedent, such realities do not prevent this factor from weighing in [defendant's] favor."); *Farmobile*, 2022 U.S. Dist. LEXIS 120370, *8-9 ("[g]iven that the majority of the sources of proof are either located in or near Nebraska, and none have been identified in the EDTX, the Court concludes that this factor favors transfer."); *Jawbone Innovations, LLC v. Amazon.com, Inc*., Case No. 2:21-cv-435-JRG, Dkt. 60, p. 6-7 (E.D. Tex. Sept. 21, 2022) (granting transfer, holding that sources of proof favors transfer where bulk of relevant evidence will come from Defendant and is stored in the transferee district).

### 2. The Availability of Compulsory Process to Secure the Attendance of Witnesses Favors Transfer

The location of potential third-party witnesses and the availability of compulsory process also favors transfer. Transfer is favored when "a transferee district has absolute subpoena power over a greater number of non-party witnesses" than the transferor district. *Uniloc 2017 LLC v. Google LLC*, 2:18-cv-00504-JRG-RSP, 2020 WL 3064460, at *12-13 (E.D. Tex. June 8, 2020); *see also Genentech*, 566 F.3d at 1345 ("The fact that the transferee venue is a venue with usable subpoena power here weighs in favor of transfer, and not only slightly."). Here, the District of Maryland is believed to have "absolute subpoena power" over at least one former Under Armour employees and the Baltimore Orioles—non-parties referenced by Athalonz in its Complaint. No non-parties are located in the Eastern District of Texas.

In its Complaint, Athalonz identified Kevin Culley and Don Gibadlo, two former employees of Under Armour, as relevant witnesses. Complaint, ¶¶ 32-33. According to Athalonz both witnesses have relevant knowledge of Athalonz's patented technology dating back

to 2013, and the "potential applicability of the Asserted Patents to Under Armour's Products" since January 2022. *Id.*

Mr. Culley and Mr. Gibadlo are no longer employed at Under Armour and thus not party witnesses that can be compelled to appear in this District for trial. Heagy Declaration, ¶ 14. Mr. Culley is believed to reside in Maryland, and is subject to subpoena power there. *Id.* Mr. Gibadlo's last known address is in Maryland. *Id.* Accordingly, he may be subject to subpoena power there.

In addition, Under Armour intends to seek documents and testimony from the Baltimore Orioles organization, and members of its staff, in Maryland regarding the terms of Mr. Adair's employment with the Baltimore Orioles to determine whether the assignment of the asserted patents to Athalonz was proper.

Because it is likely that several non-party witnesses with relevant and material information are in the District of Maryland, and none are in the Eastern District of Texas, this factor favors transfer. *Farmobile*, 2022 U.S. Dist. LEXIS 120370, *11 (compulsory process favored transfer where former employees with relevant knowledge were within subpoena power of transferee court); *Jawbone*, Case No. 2:21-cv-435-JRG, Dkt. 60, p. 11 (compulsory process favored transfer where defendant identified multiple third-party witnesses in transferee district and plaintiff identified none in this District, other than "speculative component manufacturer witnesses"); *Entropic Commc'ns, LLC v. DIRECTV, LLC*, No. 2:22-cv-00076-JRG2022-JRG, U.S. Dist. LEXIS 240237, *20 (E.D. Tex. Oct. 24, 2022) ("the most relevant non-party witnesses are located in California. Compulsory process will therefore be required to compel attendance of witnesses in California …. Accordingly, the Court finds that this factor weighs in favor of transfer to CDCA.").

### 3.    The Cost of Attendance of Willing Witnesses Favors Transfer

The District of Maryland is also clearly more convenient for potential party witnesses given that almost all of Under Armour's witnesses are located there, which weighs heavily in favor of transfer.  "[T]he relative convenience for and cost of attendance of witnesses between the two forums is 'probably the single most important factor in transfer analysis.'"  *In re Juniper Networks, Inc.*, 14 F.4th 1313, 1318 (Fed. Cir. 2021) (quoting *Genentech*, 566 F.3d at 1343).  The proposed transferee venue is "clearly more convenient" where, as here, most of the potential witnesses and relevant evidence are located in the transferee venue.  *See In re Nintendo Co., Ltd.*, 589 F.3d 1194, 1197 (Fed. Cir. 2009); *In re Hoffman-La Roche Inc.*, 587 F.3d 1333, 1336-37 (Fed. Cir. 2009).  In analyzing this factor, the Fifth Circuit has adopted a "100-mile rule," explaining that "[w]hen the distance between [venues] . . . is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled."  *Genentech*, 566 F.3d at 1343; *Volkswagen II*, 545 F.3d at 317.

Here, all Under Armour employees identified by Athalonz in the Complaint that allegedly possess relevant knowledge, including David Stakel, Joshua Rattet and Craig Foster work and reside in Maryland.  Complaint, ¶¶ 32-33; Heagy Declaration, ¶ 6.  In addition, the vast majority of Under Armour employees with relevant design, development, financial and marketing knowledge, including Shawn McManus, Spencer Hawkins, Teresa Oles and Katie Fink also work and reside in Maryland. Heagy Declaration, ¶¶ 6-10.  Given the location of Under Armour's relevant witnesses in the District of Maryland, the cost and inconvenience to Under Armour displacing these witnesses for trial would be substantially higher in Texas than in Maryland.  Under Armour's Maryland witnesses are all close to each of the District of Maryland courthouses and could attend trial each day while staying at home.  Heagy Declaration, ¶ 6; Bugg

10

Declaration, ¶ 7.  In contrast, travelling to trial here would require Under Armour's witnesses to travel to Texas and stay in hotels for the duration of trial (and trial preparation).  Heagy Declaration, ¶ 6; Bugg Declaration, ¶ 13.  It is clearly more convenient for these witnesses to testify close to home.  *See Volkswagen II*, 545 F.3d at 317.  Mr. Luedecke would need to travel a significant distance to attend trial in either Maryland or Texas.  Bugg Declaration, ¶ 16.

For Athalonz, its potential witnesses would likely need to travel a significant distance regardless of whether the case proceeds in this District or in the District of Maryland.  For example, Timothy Markison, a named inventor, the prosecuting attorney for the asserted patents and founder and CEO of Athalonz is believed to reside in Mesa, Arizona.  Bugg Declaration, ¶¶ 8-10.  And Rick Adair, the other named inventor of the asserted patents, is believed to reside in Spartanburg, South Carolina.  *Id.*, ¶ 11.  While Mesa, Arizona is closer to this District than Maryland, Spartanburg, South Carolina is closer to Maryland.  *Id.*, ¶¶ 14, 15.  And generally, when a particular witness will be required to travel "a significant distance no matter where they testify," the 100-mile rule "should not be rigidly applied."  *Genentech*, 566 F.3d at 1344; *see also In re Apple Inc.*, 979 F.3d 1332, 1342 (Fed. Cir. 2020) (finding the district court misapplied the law by "too rigidly applying the 100-mile rule" in giving too much significance to the shorter travel distance for witnesses located in New York to W.D. Tex. as compared to N.D. Cal.).

Because the vast majority of relevant witnesses are located within the District of Maryland, this factor favors transfer.  *Endo Pharms. Inc. v. Lupin Atlantis Holdings Sa*, No. 2:17-CV-00558-JRG, 2018 U.S. Dist. LEXIS 249013, *17 (E.D. Tex. May 30, 2018) ("Since [Defendant] has identified two party witnesses that reside in the transferee district and neither party has identified a witness that resides in this district, this factor favors transfer."); *Farmobile*, 2022 U.S. Dist. LEXIS 120370, *13-14 ("[g]iven that [Defendant] identified

11

witnesses located in the District of Nebraska and none have been identified here, this factor weighs in favor of transfer."); *Unicorn Energy*, 2021 U.S. Dist. LEXIS 167381, *12 ("given the particular identification of [Defendant's] witnesses located in the Northern District and the absence of [Plaintiff's] witnesses here, the Court is persuaded this factor slightly favors transfer."); *Jawbone,* Case No. 2:21-cv-435-JRG, Dkt. 60, p. 14 (Sept. 21, 2022) (willing witnesses factor favored transfer where defendant identified multiple witnesses by name and job role in transferee district with knowledge relevant to the claims and defenses in the case); *Entropic,* 2022 U.S. Dist. LEXIS 240237, *21-22 ("[t]he majority of the willing witnesses in this case will come from [Defendant's] headquarters in Colorado. … Accordingly, the Court finds that this factor weighs in favor of transfer to the District of Colorado."); *In re TS Tech USA Corp.*, 551 F.3d 1315, 1320 (Fed. Cir. 2008) (finding "clear error" in the failure to consider 900 miles of travel for witnesses).

### 4.    There are No Practical Problems with Transfer

No practical problems exist by transferring this case to the District of Maryland.  This case is in the very early stages of litigation and is not one that makes trial more "easy, expeditious and inexpensive" in any forum in order to preserve judicial economy.  *Volkswagen I*, 371 F.3d at 203.  Under Armour filed its motion before the Court has entered a scheduling order. Moreover, the asserted patents have not previously been litigated in either venue, or anywhere else in the U.S.  This factor therefore slightly favors transfer or is neutral.

### C.    The Public Interest Factors Favor Transfer

The public interest factors also support transfer because Maryland has a strong interest in this case and this District's faster time to trial is not dispositive.

### 1.    The District of Maryland has a Strong Interest in This Case

The "local interest in having localized interests decided at home" also favors transfer to the District of Maryland.  Athalonz's only tie to this District is its choice of formation in Texas, a fact "entitled to little weight (if any)."  *Seagen Inc. v. Daiichi Sankyo Co., Ltd.*, 546 F. Supp. 3d 515, 533 (E.D. Tex. 2021) (citing *In re Link_A_Media Devices Corp*., 662 F.3d 1221, 1223-24 (Fed. Cir. 2011); *Koster v. Lumbermens Mut. Cas. Co*., 330 U.S. 518, 527-28 (1947)).

It is true that certain of Under Armour's products are available for purchase in this District.[1]  But Under Armour sells them nationwide and therefore this District has no more of a localized connection based on product sales than any other District.  Heagy Declaration, ¶ 2.  The Fifth Circuit has rejected such a "localized interest" argument, holding that the rationale "stretches logic in a manner that eviscerates the public interest that this factor attempts to capture," because it "could apply virtually to any judicial district or division in the United States."  *Volkswagen II*, 545 F.3d at 318.

On the other hand, the Accused Products bear a strong connection to the District of Maryland, as Under Armour witnesses designed and developed them there.  Heagy Declaration, ¶¶ 4-5.  The decisions by those designers regarding the construction of the Accused Products and the results of those decisions took place primarily in Maryland.  *Id*.  Accordingly, the decisions that directly led to Athalonz's claims of infringement were made there, and the District of Maryland has an interest in adjudicating this dispute regarding technology created within its jurisdiction.  In short, the owner of the Accused Products is located in Maryland, most individuals possessing knowledge of the Accused Products and asserted patents are located in

---

[1] For example, the Complaint alleges that venue is proper based on Under Armour's offers to sell and sales of the accused products at Under Armour's Factory House in Allen, Texas—an Under Armour retail store located in an outlet mall.

Maryland, and decisions concerning Under Armour's design, development, sales and advertising are made there. *Id.* Although Under Armour denies that Athalonz has any justiciable claims, to the extent the claims arose anywhere, they did so in Maryland, giving it a local interest in this action. *See Unicorn Energy,* 2021 U.S. Dist. LEXIS 167381, *12 (local interest factor favored transfer where Defendant was headquartered in transferee district and the design, development, management, and decision making related to the Accused Products were centered there); *Farmobile*, 2022 U.S. Dist. LEXIS 120370, *18 ("The District of Nebraska has a greater localized interest than the EDTX because [Defendant] is connected via its offices and at least some of the source code for the Accused Products was developed in Nebraska. … [W]here a movant has a local interest in the transferee venue and no presence in the transferor venue, this factor favors transfer."); *Jawbone*, Case No. 2:21-cv-435-JRG, Dkt. 60, p. 15-16 (localized interest factor favored transfer despite plaintiff being a Texas entity with an office in this District that distributes products in this district and Defendant having employees in Texas doing work relating to the accused products, because the transferee district "ha[d] an interest in adjudicating this dispute regarding technology created within its jurisdiction."); *Viking Techs. v. Assurant, Inc.*, No. 2:20-CV-00359-JRG, 2021 U.S. Dist. LEXIS 154161, *16-17 (E.D. Tex. Jun 21, 2021) ("this factor favors transfer because, relative to the Marshall Division, potential jurors in the Sherman Division have a greater interest in adjudicating the rights of businesses that have a material physical presence in their immediate community.").

## 2. This Court's Shorter Time to Trial Cannot Outweigh the Many Factors That Favor Transfer

The time to trial in this District is historically several months faster than the time to trial in the District of Maryland. Bugg Declaration, ¶ 17. This factor "weighs slightly against transfer." *Uniloc USA, Inc. v. Apple Inc.*, No. 2:17-CV-00258-JRG, 2017 WL 11553227, at *9

(E.D. Tex. Dec. 22, 2017).  As this is the only factor to weigh against transfer, and only slightly, it does not outweigh the many factors enumerated above favoring transfer.  *Id.* at \*10; *see also Unicorn Energy,* 2021 U.S. Dist. LEXIS 167381 (granting transfer despite a shorter time to trial in this District); *Jawbone*, Case No. 2:21-cv-435-JRG, Dkt. 60 (same); *Farmobile*, 2022 U.S. Dist. LEXIS 120370, \*19 (same) (citing *In re Juniper Networks, Inc*., 14 F.4th 1313, 1319 (Fed. Cir. 2021)).

### 3.    The Remaining Public Interest Factors are Neutral

The remaining public factors, including familiarity with the law governing the action and the avoidance of unnecessary problems with conflict of laws are neutral.

## V.    CONCLUSION

For the foregoing reasons, Under Armour respectfully requests that the Court transfer this action to the United States District Court for the District of Maryland, which is a clearly more convenient forum for this case.


Dated: August 30, 2023                    Respectfully submitted,

                                          */s/J. Thad Heartfield*
                                          J. Thad Heartfield
                                          THE HEARTFIELD LAW FIRM
                                          2195 Dowlen Rd
                                          Beaumont, Texas 77706
                                          409.866.3318
                                          thad@heartfieldlawfirm.com

                                          Frank C. Cimino, Jr.
                                          Megan S. Woodworth
                                          VENABLE LLP
                                          600 Massachusetts Avenue, NW
                                          Washington, DC  20001
                                          202.344.4569
                                          202.344.8300 – Facsimile
                                          fccimino@Venable.com
                                          mswoodworth@Venable.com

Robert E. Bugg
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
New York, NY 10020
212.370.6241
212.307.5598 – Facsimile
rebugg@Venable.com

*ATTORNEYS FOR DEFENDANT*
*UNDER ARMOUR, INC.*

## CERTIFICATE OF CONFERENCE

The parties met and conferred on August 29, 2023 and Athalonz's counsel indicated that they oppose Defendant's Motion to Transfer.

*/s/ J. Thad Heartfield*
J. Thad Heartfield

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic services are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a) on August 30, 2023.

*/s/ J. Thad Heartfield*
J. Thad Heartfield

**EXHIBIT 4**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ATHALONZ, LLC, | § | Case No.: 2:23-cv-00193-JRG |
| | § | |
| *Plaintiff*, | § | **DEMAND FOR JURY TRIAL** |
| | § | |
| v. | § | |
| | § | |
| UNDER ARMOUR, INC., | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

**NOTICE OF SUBPOENA TO WARDELL STEPHEN CURRY II**

PLEASE TAKE NOTICE that, pursuant to Rule 26, 30, 34 and 45 of the Federal Rules of Civil Procedure, Plaintiff Athalonz, LLC ("Athalonz") intends to serve Wardell Stephen Curry II ("Curry") on or after November 17, 2023 with a Subpoena to Produce Documents and Testify at a Deposition in a Civil Action. A true and correct copy of the subpoena is attached as **Exhibit A.**

Mr. Curry has been requested to produce documents designated in Attachment A to the subpoena by December 1, 2023.

PLEASE TAKE FURTHER NOTICE that Athalonz, by and through its attorneys, will take the deposition by oral examination of Mr. Curry on December 8, 2023 at the offices of Reichman Jorgensen Lehman & Feldberg, 100 Marine Pkwy Suite 300, Redwood City, CA 94065, or at a mutually agreeable time and location, and continue from day to day, until completed. The deposition will occur before a notary public, court reporter, or any other person qualified to administer oaths, will be conducted in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Eastern District of Texas, and may be recorded by stenographic, sound, video, audiovisual, and/or any other such appropriate means. The deposition will be taken for the purpose of discovery, for use at trial or any hearing in this matter, and for any other purpose

permitted by the Federal Rules of Civil Procedure.

Dated: November 17, 2023

Respectfully submitted,

/s/    Connor S. Houghton

Taylor N. Mauze (TX Bar No. 24102161)
tmauze@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN
& FELDBERG LLP
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735
Telephone: (650) 623-1401
Facsimile: (650) 650-3501

Christine E. Lehman (pro hac vice)
clehman@reichmanjorgensen.com
Connor S. Houghton (pro hac vice)
choughton@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN
& FELDBERG LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 894-7310
Facsimile: (650) 560-3501

Melissa R. Smith
State Bar No. 24001351
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
Email: melissa@gillamsmithlaw.com

**_Attorneys for Plaintiff Athalonz, LLC_**

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Texas

| Athalonz, LLC | ) |
| :---: | :---: |
| *Plaintiff* | ) |
| v. | ) |
| Under Armour, Inc. | ) |
| | ) |
| *Defendant* | ) |

Civil Action No.  2:23-cv-00193-JRG

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:          Wardell Stephen Curry II
             28 Selby Lane, Atherton, CA 94027

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place:  Reichman Jorgensen Lehman & Feldberg LLP<br>         100 Marine Pkwy Suite 300, Redwood City, CA 94065 | Date and Time:<br>         12/08/2023 10:00 am |
| :--- | :--- |

The deposition will be recorded by this method:  videographic and/or stenographic means

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  See Attachment A.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/17/2023

| *CLERK OF COURT* | | |
| :---: | :---: | :---: |
| | OR | |
| _____ | | /s/ Connor S. Houghton |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Athalonz, LLC
_____ , who issues or requests this subpoena, are:

Connor S. Houghton, Reichman Jorgensen Lehman & Feldberg LLP, 1909 K St. NW, Suite 800, Washington, D.C. 20006, choughton@reichmanjorgensen.com, 202-894-7315

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   2:23-cv-00193-JRG

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named individual as follows: _____

_____  on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

Print          Save As...          Add Attachment          Reset

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*

    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A

## INSTRUCTIONS

1.      You are requested to produce all the requested documents in Your possession, custody, or control, regardless of the physical location of the documents.

2.      Your obligation to provide the information sought by the requests for production herein ("Requests") is continuing, and should You discover new documents responsive to the Requests after initial responses are provided, You are obligated to supplement Your responses as appropriate to the full extent provided for by the Federal Rules of Civil Procedure or any other applicable law.

3.      All documents shall be produced in the same order and format as they are kept or maintained in the ordinary course of business.  If any documents have been removed from the files in which they were found for purposes of producing them in response to these Requests, for each such document, identify the file(s) in which the document was originally located.

4.      You are to produce each document requested, together with all non-identical copies and drafts of such document. Documents attached to each other should not be separated when being produced in response to these Requests.

5.      If no documents exist that are responsive to a particular Request, that fact should be stated in Your response to that Request.

6.      If any document is withheld based on any claim of privilege, protection, or immunity, You are required to provide a detailed privilege log containing, separately and for each document withheld, an explanation of the claim being asserted and the following information:

        a.   The date the document was created, and the dates of any revisions to the document;

    b.   The identity of the author(s) of the document;

    c.   The identity of the recipient(s) or addressee(s) of the document;

    d.   The identity of the person(s) from whom the document was received, if not the author(s);

    e.   The basis for withholding the document, including the nature of the privilege or protection asserted;

    f.   A description of the subject matter of the document sufficient to allow the Court, if necessary, to determine the appropriateness of the privilege or protection claimed.

7.     If any requested document cannot be produced in full, You are to produce it to the extent possible, indicating which document, or portion of such document, is being withheld, and the reason that the document, or portion of such document, is being withheld.

8.     If a document or group of documents responsive to these Requests once existed, but has been destroyed or discarded, for each such document or group of documents: (a) identify the document or group of documents; (b) state when the document or group of documents was destroyed or discarded; (c) state why the document or group of documents was destroyed or discarded; (d) identify the persons most knowledgeable about the contents of the document or group of documents; and (e) describe the circumstances under which the document or group of documents was destroyed or discarded.

## **DEFINITIONS**

1.     "Curry," "You," and "Your" mean collectively and individually Wardell Stephen Curry II.

2.     "Defendant," "Under Armour," and "UA," mean collectively and individually Under Armour, Inc. and all of its parents, predecessors, subsidiaries, divisions, affiliates, and entities acting in joint interest, as well as all past or present directors, officers, agents, representatives, employees, consultants, attorneys, and any other person or entity subject to

Under Armour's control.

3.      "Plaintiff" and "Athalonz" mean collectively and individually Athalonz, LLC and all of its parents, predecessors, subsidiaries, divisions, affiliates, and entities acting in joint interest, as well as all past or present directors, officers, agents, representatives, employees, consultants, attorneys, and any other person or entity subject to Athalonz's control.

4.      Singular forms of nouns or pronouns encompass their plural forms and vice versa, and any verbs encompass all tenses.

5.      "Litigation" means *Athalonz, LLC v. Under Amour, Inc.*, Case No. 2:23-cv-00193-JRG pending in the Eastern District of Texas.

6.      "Asserted Patents" means U.S. Patent Nos. 11,013,291 ("the '291 patent"); 11,064,760 ("the '760 patent"); 10,674,786 ("the '786 patent"); 11,510,456 ("the '456 patent"); and 11,375,768 ("the '768 patent").

7.      "Asserted Claims" means claims 1-5 of the '291 patent, claims 1-11 of the '760 patent, claims 1-8 of the '786 patent, claims 1-5, 7, 9-15, and 17 of the '456 patent, and claims 1-5 and 8 of the '768 patent.

8.      "Accused Products" includes at least the following Under Armour shoes: Harper 5, Harper 6, Harper 7, Harper 8, HOVR Drive, HOVR Drive 2, HOVR Forge, HOVR Show GTX, Jordan Spieth 4 GTX, UA Charged Curry, Curry 4 FloTro, Curry 1 FloTro, Curry 2 FloTro, Curry 11, Curry 10, Curry 9, Curry 8, Curry HOVR Splash, Curry HOVR Splash 2, Curry HOVR Splash 3, HOVR Highlight Ace, HOVR Block City, and UA Flow Dynamic. "Accused Products" also includes all past and future releases of the same Accused Products that contain substantially the same features and infringe the Asserted Claims for substantially the same reasons, as well as products with variations of size, color, model year, low/high version,

3

version number, cleat or bottom pattern, etc.

9.      "Accused Curry Products" means the Under Armour shoes accused of infringement sponsored by Curry, including at least: UA Charged Curry, Curry 4 FloTro, Curry 1 FloTro, Curry 2 FloTro, Curry 11, Curry 10, Curry 9, Curry 8, Curry HOVR Splash, Curry HOVR Splash 2, Curry HOVR Splash 3. "Accused Curry Products" also includes all past and future releases of the same Accused Products that contain substantially the same features and infringe the Asserted Claims for substantially the same reasons, as well as products with variations of size, color, model year, low/high version, version number, cleat or bottom pattern, etc.

10.      "Athalonz Products" means the Athalonz EnVe Golf Shoe, the Athalonz GF1 cleat and shoe, and the Athalonz GF2 cleat and shoe.

11.      "Communications" means any contact, whether in person, in writing, oral, formal, informal, by telephone or any method whereby knowledge, facts or information is imparted or transmitted from one person or entity to another or to a file.

12.      "Document" or "documents" mean the original and all copies of any written, printed, typed, photocopied, photographic, and recorded matter of any kind or character (including, but not limited to, magnetic, mechanical, or electronic recordings), however produced or reproduced, and any tangible thing which, in whole or in part, illustrates or conveys information in Your possession, custody, or control, whether produced or stored on paper, cards, tapes, disks, belts, charts, film, computer storage devices, cellular phones, "smart" phones, microfilm, wires, cables, magnetic and electronic recordings, sound recordings, computer printouts, or records. The term includes, but is not limited to, data, data compilations, and other electronically stored information, stored in any medium from which information can be obtained

either directly or, if necessary, after translation by the responding party into a reasonably usable form (e.g., computer memory); as well as electronic mail and instant messaging, text messaging, video messaging, correspondence, memoranda, studies, maps, analyses, diagrams, scraps of paper, notes, applications, drawings, charts, graphs, plans, photographs, video tapes, audio tapes, computer disks, computer hard drives, contracts, agreements, working papers, drafts, reports of investigations or inspections of any kind, opinions of consultants or experts, diaries, minutes, calendars, field notes, logs, checks, receipts, images, and the like.

13.     "Refer," "relate to," or "concerning" (or any form thereof) mean constituting, reflecting, representing, supporting, contradicting, referring to, stating, describing, recording, noting, embodying, containing, mentioning, studying, analyzing, discussing, evaluating, or being relevant to.  As indicated, the term necessarily includes information that is in opposition to, as well as in support of, Your position(s) and claim(s) in this action.

14.     The use of the singular form of any word includes the plural and vice versa.

15.     "All" shall be construed as "all and each."

16.     "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

17.     If You believe that any document (or testimony) or any portion of any document (or testimony) is confidential, you may designate the document pursuant to the attached Stipulated Protective Order and request confidential treatment of the document.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1

All Documents or communications that describe or refer to this Litigation, the Asserted Patents, or the Athalonz Products.

### REQUEST FOR PRODUCTION NO. 2

All Documents or communications that describe or refer to Athalonz.

### REQUEST FOR PRODUCTION NO. 3

All Documents or communications that describe, refer, or otherwise relate to Your role in the design, development, and testing of the Accused Curry Products.

### REQUEST FOR PRODUCTION NO. 4

All Documents or communications that describe, refer, or otherwise relate to Your role in the marketing, advertising, promotion, and/or sale of the Accused Curry Products.

### REQUEST FOR PRODUCTION NO. 5

All Documents or communications that describe, refer, or otherwise relate to Your role as President of the Curry Brand at Under Armour, including the terms of any agreements with Under Amour relating to that role.

### REQUEST FOR PRODUCTION NO. 6

All Documents or communications that describe, refer, or otherwise relate to the value or benefits of the Accused Curry Products, particularly as compared to other Under Armour basketball shoes or other basketball shoes available on the market.

### REQUEST FOR PRODUCTION NO. 7

All Documents or communications that describe or refer to the market for basketball shoes in the United States.

**REQUEST FOR PRODUCTION NO. 8**

All Documents or communications that describe or refer to sales of the Accused Curry Products, including documents discussing pricing, margins, costs, strategies for sales, as well as comparing sales of the Accused Curry Products against sales of other Under Armour basketball shoes or competitive basketball shoes.

**REQUEST FOR PRODUCTION NO. 9**

All contracts, draft agreements, and communications related to Your role as a sponsor of the Accused Curry Products, including documents sufficient to show the amount and terms of payment You receive from Under Armour. This request includes but is not limited to a copy of the Under Armour, Inc. Athlete Product, Brand, Ambassador, and Endorsement Agreement entered into in 2023 between Curry and Under Armour.

**REQUEST FOR PRODUCTION NO. 10**

All Documents and communications related to any agreements or potential agreements relating to the Litigation between You and Under Armour or Venable LLP.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ATHALONZ, LLC,

               *Plaintiff*,

    v.

UNDER ARMOUR, INC.,

               *Defendant*.

Case No. 2:23-cv-00193-JRG

**DEMAND FOR JURY TRIAL**

## PROTECTIVE ORDER

WHEREAS, Plaintiff Athalonz, LLC and Defendant Under Armour, Inc., hereafter referred to as "the Parties," believe that certain information that is or will be encompassed by discovery demands by the Parties involves the production or disclosure of trade secrets, confidential business information, or other proprietary information;

WHEREAS, the Parties seek a protective order limiting disclosure thereof in accordance with Federal Rule of Civil Procedure 26(c):

THEREFORE, it is hereby stipulated among the Parties and ORDERED that:

1.    Each Party may designate as confidential for protection under this Order, in whole or in part, any document, information or material that constitutes or includes, in whole or in part, confidential or proprietary information or trade secrets of the Party or a Third Party to whom the Party reasonably believes it owes an obligation of confidentiality with respect to such document, information or material ("Protected Material"). Protected Material shall be designated by the Party producing it by affixing a legend or stamp on such document, information or material as follows: "CONFIDENTIAL." The word "CONFIDENTIAL"

1

shall be placed clearly on each page of the Protected Material (except deposition and hearing transcripts) for which such protection is sought.  For deposition and hearing transcripts, the word "CONFIDENTIAL" shall be placed on the cover page of the transcript (if not already present on the cover page of the transcript when received from the court reporter) by each attorney receiving a copy of the transcript after that attorney receives notice  of  the designation of some or all of that transcript as "CONFIDENTIAL."

2.    Any document produced under Patent Rules 2-2, 3-2, and/or 3-4 before issuance of this Order with the designation "Confidential" or "Confidential - Outside Attorneys' Eyes Only" shall receive the same treatment as if designated "RESTRICTED - ATTORNEYS' EYES ONLY" under this Order, unless and until such document is redesignated to have a different classification under this Order.

3.    With respect to documents, information or material designated "CONFIDENTIAL, "RESTRICTED - ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" ("DESIGNATED MATERIAL"),[1] subject to the provisions herein and unless otherwise stated, this Order governs, without limitation: (a) all documents, electronically stored information, and/or things as defined by the Federal Rules of Civil Procedure; (b) all pretrial, hearing or deposition testimony, or documents marked as exhibits or for identification in depositions and hearings; (c) pretrial pleadings, exhibits to pleadings and other court filings; (d) affidavits; and (e) stipulations.  All copies, reproductions, extracts, digests and complete or partial summaries prepared from any DESIGNATED

---

[1] The term DESIGNATED MATERIAL is used throughout this Protective Order to refer to the class of materials designated as "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE," both individually and collectively.

MATERIALS shall also be considered DESIGNATED MATERIAL and treated as such under this Order.

4.      A designation of Protected Material (i.e., "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE") may be made at any time.   Inadvertent or unintentional production of documents, information or material that has not been designated as DESIGNATED MATERIAL shall not be deemed a waiver in whole or in part of a claim for confidential treatment.  Any party that inadvertently or unintentionally produces Protected Material without designating it as DESIGNATED MATERIAL may request destruction of that Protected Material by notifying the recipient(s), as soon as reasonably possible after the producing Party becomes aware of the inadvertent or unintentional disclosure, and providing replacement Protected Material that is properly designated.  The recipient(s) shall then destroy all copies of the inadvertently or unintentionally produced Protected Materials and any documents, information or material derived from or based thereon.

5.      "CONFIDENTIAL" documents, information and material may be disclosed only to the following persons, except upon receipt of the prior written consent of the designating party, upon order of the Court, or as set forth in paragraph 12 herein:

(a)      outside counsel of record in this Action for the Parties;

(b)      employees of such counsel assigned to and reasonably necessary to assist such counsel in the litigation of this Action;

(c)      in-house counsel for the Parties who either have responsibility for making decisions dealing directly with the litigation of this Action, or who are assisting outside counsel in the litigation of this Action;

(d)      up to and including three (3) designated representatives of each of the Parties to the extent reasonably necessary for the litigation of this Action, except that either party may in good faith request the other party's consent to designate one or more

additional representatives, the other party shall not unreasonably withhold such consent, and the requesting party may seek leave of Court to designate such additional representative(s) if the requesting party believes the other party has unreasonably withheld such consent;

(e)     outside consultants or experts (*i.e.*, not existing employees or affiliates of a Party or an affiliate of a Party) retained for the purpose of this litigation, provided that: (1) such consultants or experts are not presently employed by the Parties hereto for purposes other than this Action; (2) before access is given, the consultant or expert has completed the Undertaking attached as Exhibit A hereto and the same is served upon the producing Party with a current curriculum vitae of the consultant or expert at least ten (10) days before access to the Protected Material is to be given to that consultant or Undertaking to object to and notify the receiving Party in writing that it objects to disclosure of Protected Material to the consultant or expert. The Parties agree to promptly confer and use good faith to resolve any such objection. If the Parties are unable to resolve any objection, the objecting Party may file a motion with the Court within fifteen (15) days of the notice, or within such other time as the Parties may agree, seeking a protective order with respect to the proposed disclosure. The objecting Party shall have the burden of proving the need for a protective order. No disclosure shall occur until all such objections are resolved by agreement or Court order;

(f)     independent litigation support services, including persons working for or as court reporters, graphics or design services, jury or trial consulting services, and photocopy, document imaging, and database services retained by counsel and reasonably necessary to assist counsel with the litigation of this Action; and

(g)     the Court and its personnel.

6.     A Party shall designate documents, information or material as "CONFIDENTIAL" only upon a good faith belief that the documents, information or material contains confidential or proprietary information or trade secrets of the Party or a Third Party to whom the Party reasonably believes it owes an obligation of confidentiality with respect to such documents, information or material.

7.     Documents, information or material produced pursuant to any discovery request in this Action, including but not limited to Protected Material designated as DESIGNATED MATERIAL, shall be used by the Parties only in the litigation of this Action and shall not be used for any other purpose. Any person or entity who obtains access to DESIGNATED

MATERIAL or the contents thereof pursuant to this Order shall not make any copies, duplicates, extracts, summaries or descriptions of such DESIGNATED MATERIAL or any portion thereof except as may be reasonably necessary in the litigation of this Action. Any such copies, duplicates, extracts, summaries or descriptions shall be classified DESIGNATED MATERIALS and subject to all of the terms and conditions of this Order.

8.    To the extent a producing Party believes that certain Protected Material qualifying to be designated CONFIDENTIAL is so sensitive that its dissemination deserves even further limitation, the producing Party may designate such Protected Material "RESTRICTED -- ATTORNEYS' EYES ONLY," or to the extent such Protected Material includes computer source code and/or live data (that is, data as it exists residing in a database or databases) ("Source Code Material"), the producing Party may designate such Protected Material as "RESTRICTED CONFIDENTIAL SOURCE CODE."

9.    For Protected Material designated RESTRICTED -- ATTORNEYS' EYES ONLY, access to, and disclosure of, such Protected Material shall be limited to individuals listed in paragraphs 5(a-c) and (e-g); provided, however, that access by in-house counsel pursuant to paragraph 5(c) be limited to in-house counsel who exercise no competitive decision-making authority on behalf of the client.

10.    For Protected Material designated RESTRICTED CONFIDENTIAL SOURCE CODE, the following additional restrictions apply:

(a)    Access to a Party's Source Code Material shall be provided only on "stand-alone" computer(s) (that is, the computer may not be linked to any network, including a local area network ("LAN"), an intranet or the Internet). The stand-alone computer(s) may be connected to (i) a printer, or (ii) a device capable of temporarily storing electronic copies solely for the limited purposes permitted pursuant to paragraphs 10 (h and k) below. Additionally, except as provided in paragraph 10(k) below, the stand-alone computer(s) may only be located at the offices of the producing Party's outside counsel;

(b)     The receiving Party shall make reasonable efforts to restrict its requests for such access to the stand-along computer(s) to normal business hours, which for purposes of this paragraph shall be 8:00 a.m. through 6:00 p.m.  However, upon reasonable notice from the receiving party, the producing Party shall make reasonable efforts to accommodate the receiving Party's request for access to the stand-alone computer(s) outside of normal business hours.  The Parties agree to cooperate in good faith such that maintaining the producing Party's Source Code Material at the offices of its outside counsel shall not unreasonably hinder the receiving Party's ability to efficiently and effectively conduct the prosecution or defense of this Action;

(c)     The producing Party shall provide the receiving Party with information explaining how to start, log on to, and operate the stand-alone computer(s) in order to access the produced Source Code Material on the stand-alone computer(s);

(d)     The producing Party will produce Source Code Material in computer searchable format on the stand-alone computer(s) as described above;

(e)     Access to Protected Material designated RESTRICTED CONFIDENTIAL - SOURCE CODE shall be limited to outside counsel and up to three (3) outside consultants or experts[2] (*i.e.*, not existing employees or affiliates of a Party or an affiliate of a Party) retained for the purpose of this litigation and approved to access such Protected Materials pursuant to paragraph 5(e) above.  A receiving Party may include excerpts of Source Code Material in a pleading, exhibit, expert report, discovery document, deposition transcript, other Court document, provided that the Source Code Documents are appropriately marked under this Order, restricted to those who are entitled to have access to them as specified herein, and, if filed with the Court, filed under seal in accordance with the Court's rules, procedures and orders;

(f)     To the extent portions of Source Code Material are quoted in a Source Code Document, either (1) the entire Source Code Document will be stamped and treated as RESTRICTED CONFIDENTIAL SOURCE CODE or (2) those pages containing quoted Source Code Material will be separately stamped and treated as RESTRICTED CONFIDENTIAL SOURCE CODE;

(g)     Except as set forth in paragraph 10(k) below, no electronic copies of Source Code Material shall be made without prior written consent of the producing Party, except as necessary to create documents which, pursuant to the Court's rules, procedures and order, must be filed or served electronically;

---

[2] For the purposes of this paragraph, an outside consultant or expert is defined to include the outside consultant's or expert's direct reports and other support personnel, such that the disclosure to a consultant or expert who employs others within his or her firm to help in his or her analysis shall count as a disclosure to a single consultant or expert.

(h)   The receiving Party shall be permitted to make a reasonable number of printouts and photocopies of Source Code Material, all of which shall be designated and clearly labeled "RESTRICTED CONFIDENTIAL SOURCE CODE," and the receiving Party shall maintain a log of all such files that are printed or photocopied;

(i)   Should such printouts or photocopies be transferred back to electronic media, such media shall be labeled "RESTRICTED CONFIDENTIAL SOURCE CODE" and shall continue to be treated as such;

(j)   If the receiving Party's outside counsel, consultants, or experts obtain printouts or photocopies of Source Code Material, the receiving Party shall ensure that such outside counsel, consultants, or experts keep the printouts or photocopies in a secured locked area in the offices of such outside counsel, consultants, or expert. The receiving Party may also temporarily keep the printouts or photocopies at: (i) the Court for any proceedings(s) relating to the Source Code Material, for the dates associated with the proceeding(s); (ii) the sites where any deposition(s) relating to the Source Code Material are taken, for the dates associated with the deposition(s); and (iii) any intermediate location reasonably necessary to transport the printouts or photocopies (*e.g.*, a hotel prior to a Court proceeding or deposition); and

(k)   A producing Party's Source Code Material may only be transported by the receiving Party at the direction of a person authorized under paragraph 10(e) above to another person authorized under paragraph 10(e) above, on paper or removable electronic media (*e.g.*, a DVD, CD-ROM, or flash memory "stick") via hand carry, Federal Express or other similarly reliable courier. Source Code Material may not be transported or transmitted electronically over a network of any kind, including a LAN, an intranet, or the Internet. Source Code Material may only be transported electronically for the purpose of Court proceeding(s) or deposition(s) as set forth in paragraph 10(j) above and is at all times subject to the transport restrictions set forth herein. But, for those purposes only, the Source Code Materials may be loaded onto a stand-alone computer.

11.   Any attorney representing a Party, whether in-house or outside counsel, and any person associated with a Party and permitted to receive the other Party's Protected Material that is designated RESTRICTED -- ATTORNEYS' EYES ONLY and/or RESTRICTED CONFIDENTIAL SOURCE CODE (collectively "HIGHLY SENSITIVE MATERIAL"), who obtains, receives, has access to, or otherwise learns, in whole or in part, the other Party's HIGHLY SENSITIVE MATERIAL under this Order shall not

prepare, prosecute, supervise, or assist in the preparation or prosecution of any patent application pertaining to the field of the invention of the patents-in-suit on behalf of the receiving Party or its acquirer, successor, predecessor, or other affiliate during the pendency of this Action and for one year after its conclusion, including any appeals. To ensure compliance with the purpose of this provision, each Party shall create an "Ethical Wall" between those persons with access to HIGHLY SENSITIVE MATERIAL and any individuals who, on behalf of the Party or its acquirer, successor, predecessor, or other affiliate, prepare, prosecute, supervise or assist in the preparation or prosecution of any patent application pertaining to the field of invention of the patent-in-suit. Nothing in this Order shall prevent a person with access to HIGHLY SENSITIVE MATERIAL from participating in a PTO proceeding—e.g., *Inter Partes* Review or Post Grant Review— except for that person shall not participate in the amendment of any claim(s).

12. Nothing in this Order shall require production of documents, information or other material that a Party contends is protected from disclosure by the attorney-client privilege, the work product doctrine, or other privilege, doctrine, or immunity. If documents, information or other material subject to a claim of attorney-client privilege, work product doctrine, or other privilege, doctrine, or immunity is inadvertently or unintentionally produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any such privilege, doctrine, or immunity. Any Party that inadvertently or unintentionally produces documents, information or other material it reasonably believes are protected under the attorney-client privilege, work product doctrine, or other privilege, doctrine, or immunity may obtain the return of such documents, information or other material by promptly notifying the recipient(s) and providing a privilege log for the inadvertently or

unintentionally produced documents, information or other material. The recipient(s) shall gather and return all copies of such documents, information or other material to the producing Party, except for any pages containing privileged or otherwise protected markings by the recipient(s), which pages shall instead be destroyed and certified as such to the producing Party.

13.     There shall be no disclosure of any DESIGNATED MATERIAL by any person authorized to have access thereto to any person who is not authorized for such access under this Order. The Parties are hereby ORDERED to safeguard all such documents, information and material to protect against disclosure to any unauthorized persons or entities.

14.     Nothing contained herein shall be construed to prejudice any Party's right to use any DESIGNATED MATERIAL in taking testimony at any deposition or hearing provided that the DESIGNATED MATERIAL is only disclosed to a person(s) who is: (i) eligible to have access to the DESIGNATED MATERIAL by virtue of his or her employment with the designating party, (ii) identified in the DESIGNATED MATERIAL as an author, addressee, or copy recipient of such information, (iii) although not identified as an author, addressee, or copy recipient of such DESIGNATED MATERIAL, has, in the ordinary course of business, seen such DESIGNATED MATERIAL, (iv) a current or former officer, director or employee of the producing Party or a current or former officer, director or employee of a company affiliated with the producing Party; (v) counsel for a Party, including outside counsel and in-house counsel (subject to paragraph 9 of this Order); (vi) an independent contractor, consultant, and/or expert retained for the purpose of this litigation; (vii) court reporters and videographers; (viii) the Court; or (ix) other persons entitled hereunder to access to DESIGNATED MATERIAL. DESIGNATED MATERIAL shall not be disclosed

to any other persons unless prior authorization is obtained from counsel representing the producing Party or from the Court.

15. Parties may, at the deposition or hearing or within thirty (30) days after receipt of a deposition or hearing transcript, designate the deposition or hearing transcript or any portion thereof as "CONFIDENTIAL," "RESTRICTED - ATTORNEY' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" pursuant to this Order. Access to the deposition or hearing transcript so designated shall be limited in accordance with the terms of this Order. Until expiration of the 30-day period, the entire deposition or hearing transcript shall be treated as RESTRICTED - ATTORNEY' EYES ONLY.

16. Any DESIGNATED MATERIAL that is filed with the Court shall be filed under seal and shall remain under seal until further order of the Court. The filing party shall be responsible for informing the Clerk of the Court that the filing should be sealed and for placing the legend "FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER" above the caption and conspicuously on each page of the filing. Exhibits to a filing shall conform to the labeling requirements set forth in this Order. If a pretrial pleading filed with the Court, or an exhibit thereto, discloses or relies on confidential documents, information or material, such confidential portions shall be redacted to the extent necessary and the pleading or exhibit filed publicly with the Court.

17. The Order applies to pretrial discovery. Nothing in this Order shall be deemed to prevent the Parties from introducing any DESIGNATED MATERIAL into evidence at the trial of this Action, or from using any information contained in DESIGNATED MATERIAL at the trial of this Action, subject to any pretrial order issued by this Court.

18. A Party may request in writing to the other Party that the designation given to any

DESIGNATED MATERIAL be modified or withdrawn. If the designating Party does not agree to redesignation within ten (10) days of receipt of the written request, the requesting Party may apply to the Court for relief. Upon any such application to the Court, the burden shall be on the designating Party to show why its classification is proper. Such application shall be treated procedurally as a motion to compel pursuant to Federal Rules of Civil Procedure 37, subject to the Rule's provisions relating to sanctions. In making such application, the requirements of the Federal Rules of Civil Procedure and the Local Rules of the Court shall be met. Pending the Court's determination of the application, the designation of the designating Party shall be maintained.

19. Each outside consultant or expert to whom DESIGNATED MATERIAL is disclosed in accordance with the terms of this Order shall be advised by counsel of the terms of this Order, shall be informed that he or she is subject to the terms and conditions of this Order, and shall sign an acknowledgment that he or she has received a copy of, has read, and has agreed to be bound by this Order. A copy of the acknowledgment form is attached as Appendix A.

20. To the extent that any discovery is taken of persons who are not Parties to this Action ("Third Parties") and in the event that such Third Parties contended the discovery sought involves trade secrets, confidential business information, or other proprietary information, then such Third Parties may agree to be bound by this Order.

21. To the extent that discovery or testimony is taken of Third Parties, the Third Parties may designate as "CONFIDENTIAL" or "RESTRICTED -- ATTORNEYS' EYES ONLY" any documents, information or other material, in whole or in part, produced or give by such documents, information or other material, in whole or in part, produced or give by

such Third Parties. The Third Parties shall have ten (10) days after production of such documents, information or other materials to make such a designation. Until that time period lapses or until such a designation has been made, whichever occurs sooner, all documents, information or other material so produced or given shall be treated as "CONFIDENTIAL" in accordance with this Order.

22.   Within thirty (30) days of final termination of this Action, including any appeals, all DESIGNATED MATERIAL, including all copies, duplicates, abstracts, indexes, summaries, descriptions, and excerpts or extracts thereof (excluding excerpts or extracts incorporated into any privileged memoranda of the Parties and materials which have been admitted into evidence in this Action), shall at the producing Party's election either be returned to the producing Party or be destroyed. The receiving Party shall verify the return or destruction by affidavit furnished to the producing Party, upon the producing Party's request.

23.   The failure to designate documents, information or material in accordance with this Order and the failure to object to a designation at a given time shall not preclude the filing of a motion at a later date seeking to impose such designation or challenging the propriety thereof. The entry of this Order and/or the production of documents, information and material hereunder shall in no way constitute a waiver of any objection to the furnishing thereof, all such objections being hereby preserved.

24.   Any Party knowing or believing that any other party is in violation of or intends to violate this Order and has raised the question of violation or potential violation with the opposing party and has been unable to resolve the matter by agreement may move the Court for such relief as may be appropriate in the circumstances. Pending disposition of the motion by the Court, the Party alleged to be in violation of or intending to violate this Order shall

discontinue the performance of and/or shall not undertake the further performance of any action alleged to constitute a violation of this Order.

25. Production of DESIGNATED MATERIAL by each of the Parties shall not be deemed a publication of the documents, information and material (or the contents thereof) produced so as to void or make voidable whatever claim the Parties may have as to the proprietary and confidential nature of the documents, information or other material or its contents.

26. Nothing in this Order shall be construed to effect an abrogation, waiver or limitation of any kind on the rights of each of the Parties to assert any applicable discovery or trial privilege.

27. Each of the Parties shall also retain the right to file a motion with the Court (a) to modify this Order to allow disclosure of DESIGNATED MATERIAL to additional persons or entities if reasonably necessary to prepare and present this Action and (b) to apply for additional protection of DESIGNATED MATERIAL.

## So Ordered this

**Oct 23, 2023**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

ATHALONZ, LLC,

               *Plaintiff*,

    v.

UNDER ARMOUR, INC.,

               *Defendant*.

Case No. 2:23-cv-00193-JRG

**DEMAND FOR JURY TRIAL**

**APPENDIX A**
**UNDERTAKING OF EXPERTS OR CONSULTANTS REGARDING**
**PROTECTIVE ORDER**

I, _____, declare that:

1.    My address is _____.

      My current employer is _____.

      My current occupation is _____.

2.    I have received a copy of the Protective Order in this action.  I have carefully read and understand the provisions of the Protective Order.

3.    I will comply with all of the provisions of the Protective Order.  I will hold in confidence, will not disclose to anyone not qualified under the Protective Order, and will use only for purposes of this action any information designated as "CONFIDENTIAL," "RESTRICTED -- ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" that is disclosed to me.

4.    Promptly upon termination of these actions, I will return all documents and things designated as  "CONFIDENTIAL," "RESTRICTED -- ATTORNEYS' EYES ONLY,"

1

or "RESTRICTED CONFIDENTIAL SOURCE CODE" that came into my possession, and all documents and things that I have prepared relating thereto, to the outside counsel for the party by whom I am employed.

5.      I hereby submit to the jurisdiction of this Court for the purpose of enforcement of the Protective Order in this action.

I declare under penalty of perjury that the foregoing is true and correct.

Signature _____

Date _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**EXHIBIT 5**



REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP

Connor S. Houghton
1909 K Street, N.W.
Suite 800
Washington, DC 20006
Direct Dial: (202) 894-7315
choughton@reichmanjorgensen.com

October 26, 2023

**By Email**

Robert E. Bugg
Venable LLP
Rockefeller Center
1270 Avenue of the Americas
The Twenty-Fourth Floor
New York, NY 10020
REBugg@venable.com

      Re:     *Athalonz, LLC v. Under Armour, Inc.*, Case No. 2:23-cv-00193-JRG (E.D. Tex.)

Dear Rob:

Paragraph 3 of the Discovery Order required Under Armour to produce all documents relevant to any claims and defenses in this action by October 19, 2023. We have reviewed Under Armour's 98 document production from October 19, 2023. That production is deficient in many significant areas and fails to come close to meeting the requirements of the Discovery Order. Athalonz identified a number of categories of documents that are relevant in an October 4 letter, providing Under Armour with sufficient time to collect and produce important documents, yet Under Armour failed to produce almost all of those requested (and required) documents. Below is the list of relevant document categories from that letter, along with further explanation of missing documents within those categories based on a review of Under Armour's production.

Please either confirm that Under Armour will produce the documents below by November 6 or provide your availability to meet and confer before that date.

1. Documents sufficient to identify all Accused Products that Under Armour has made, used, offered for sale, and/or imported into the United States, including by code name, internal name, project name, marketing name, version number, and any other designation used in connection with each such product.

   - Under Armour produced a number of public webpage screenshots and marketing articles, but no internal documents. It is implausible that Under Armour has no internal documents identifying its products. In particular, none of the produced documents identify any code names, internal names, project names, or internal versions for the Accused Products.

2. Documents sufficient to identify the date each Accused Product was first made, used, sold, offered for sale, and/or imported into the United States and the date each Accused Product was discontinued (if applicable).

Robert E. Bugg
October 26, 2023
Page 2

- Under Armour has not produced any documents identifying the dates the Accused Products were first made, used, sold, offered for sale, and/or imported, or identifying applicable dates that the Accused Products were discontinued.

3. Two (2) physical samples of each Accused Product.

- The parties should agree to send physical samples of the Accused Products and the Athalonz Products to mutually agreeable locations.

4. Documents sufficient to show the design, development, testing, and sale of each Accused Product, including at least product requirements documents, business requirements or plans, technical specifications, engineering specifications, and marketing plans.

- Under Armour produced certain specifications and exploded drawings for a subset of the Accused Products, but did not produce such drawings for at least the following Accused Products:

  Specifications (e.g., UA0000012): Harper 7, HOVR Forge, HOVR Show GTX, Jordan Spieth 4 GTX, Curry 4 FloTro, HOVR Block City

  Exploded Drawings (e.g., UA0000457): Harper 5, Harper 6, Harper 7, HOVR Drive 2, HOVR Forge, Jordan Spieth 4 GTX, UA Charged Curry, Curry 1 FloTro, Curry 2 FloTro, Curry 4 FloTro, Curry 10, Curry HOVR Splash

- Under Armour should produce those same specifications and exploded drawings for the missing Accused Products. In addition, many of these drawings appear to come from native CAD files. Under Armour should produce or make those files available for inspection by November 6.

- Under Armour should also produce other internal specifications, business plans, and marketing plans, for each Accused Product. Under Armour must also produce manufacturing specifications showing tolerances for quality control limits for the Accused Products.

- In addition to these design documents, Under Armour must also product documents showing the "development, testing, and sale" of the Accused Products.

5. Documents sufficient to show advertising and promotional materials for each Accused Product, including advertisements, commercials, websites, promotions, and press releases.

- Under Armour produced public webpage screenshots for certain Accused Products. Under Armour should produce all such documents for each Accused Product, as well as any other advertising and promotional materials in its possession, custody, or control for the Accused Products.

6. Documents sufficient to show U.S. monthly sales information for each Accused Product, including information sufficient to show sales revenue, quantities, profitability, costs, and margins.

Robert E. Bugg
October 26, 2023
Page 3

- Under Armour has produced no sales information, which is unquestionably relevant to Athalonz's damages claims. Producing a publicly available 10-K and aggregated quarterly outlook for one year is grossly deficient. Under Armour must produce the requested sales information for each Accused Product from 2020 to the present. This is a time-sensitive issue that Athalonz intends to raise with the Court if not remedied by November 6.

7. All licenses, settlement agreements, covenants-not-to-sue, or other agreements or contracts related to patents or technologies entered into by Under Armour or otherwise available to Under Armour that relate to any patent or patent application related to athletic shoes (including but not limited to the Accused Products), subject matter Under Armour contends is similar to the subject matter in the Asserted Patents, or that Under Armour contends is comparable to a license it would have agreed to with Athalonz in the hypothetical negotiation in this case.

- Under Armour produced no license agreements or other settlement agreements. Athalonz understands this to mean Under Armour does not intend to rely on any such agreements. If Under Armour belatedly produces such documents, Athalonz reserves the right to seek their exclusion under Rule 37.

8. Documents relating to Under Armour's policies for licensing intellectual property.

- Under Armour produced no documents in this category. Under Armour must produce these documents, which are relevant to Athalonz's willful infringement and damages claims.

9. All documents related to Athalonz, including any discussions (internal or otherwise), analyses, comparisons, or evaluations of Athalonz, its intellectual property, or its products.

- Under Armour produced no documents mentioning Athalonz at all, which are clearly relevant to Athalonz's willful infringement claim. Under Armour must perform a reasonable search and produce its internal documents and correspondence regarding Athalonz. This is a time-sensitive issue that Athalonz intends to raise with the Court if not remedied by November 6.

10. All documents related to the Asserted Patents or any applications leading to the Asserted Patents, including any documents reflecting Under Armour's knowledge of the Asserted Patents or applications leading to the Asserted Patents before the Complaint.

- Under Armour produced no documents mentioning Athalonz or its patents at all, which are clearly relevant to Athalonz's willful infringement claim. Under Armour must perform a reasonable search and produce its internal documents and correspondence regarding Athalonz. This is a time-sensitive issue that Athalonz intends to raise with the Court if not remedied by November 6.

11. Documents sufficient to identify all individuals at Under Armour involved in any analysis or evaluation of Athalonz, its products, or its patents.

Robert E. Bugg
October 26, 2023
Page 4

- Under Armour produced no documents mentioning Athalonz at all, which are clearly relevant to Athalonz's willful infringement claim. Under Armour must perform a reasonable search and produce its internal documents and correspondence regarding Athalonz. This is a time-sensitive issue that Athalonz intends to raise with the Court if not remedied by November 6.

12. Documents concerning or evidencing any steps, procedures or efforts made by Under Armour to avoid infringement of the Asserted Patents, including, without limitation, documents that relate to any effort to design, redesign, modify, or discontinue the Accused Products, and, if applicable, any documents concerning or considered by Under Armour regarding any decision to redesign, modify, or discontinue any of the Accused Products.

- Under Armour produced no documents mentioning Athalonz or its patents at all, which are clearly relevant to Athalonz's willful infringement claim. Under Armour must perform a reasonable search and produce its internal documents and correspondence regarding Athalonz. This is a time-sensitive issue that Athalonz intends to raise with the Court if not remedied by November 6.

13. Documents related to Jordan Spieth's involvement in the design, development, testing, marketing, advertising, promotion, and/or sale of the Accused Products.

- Under Armour produced publicly available webpage screenshots relating to its partnership with Jordan Spieth, which along with the documents attached to Athalonz's transfer briefing, confirm his involvement in the design, development, testing, marketing, advertising, promotion, and/or sale of the Accused Products. But, unquestionably, internal documents related to "Jordan Spieth's involvement in the design, development, testing, marketing, advertising, promotion, and/or sale of the Accused Products" exist, and Under Armour must produce the requested documents.

14. Contracts, draft agreements, and communications related to Jordan Spieth's role as a sponsor of the Accused Products, including documents sufficient to show the amount and terms of payment from Under Armour to Jordan Spieth.

- Under Armour produced publicly available webpage screenshots relating to its partnership with Jordan Spieth, which along with the documents attached to Athalonz's transfer briefing, confirm his involvement with the Accused Products. But, unquestionably, "[c]ontracts, draft agreements, and communications related to Jordan Spieth's role as a sponsor of the Accused Products" must exist, and Under Armour must produce the requested documents (including those relating to the terms of his agreements), which are relevant to many issues in the case.

15. Documents related to Stephen Curry's involvement in the design, development, testing, marketing, advertising, promotion, and/or sale of the Accused Products.

- Under Armour produced publicly available webpage screenshots relating to its partnership with Stephen Curry, which along with the documents attached to Athalonz's transfer briefing, confirm his involvement in the design, development,

Robert E. Bugg
October 26, 2023
Page 5

testing, marketing, advertising, promotion, and/or sale of the Accused Products. But, unquestionably, internal documents related to "Stephen Curry's involvement in the design, development, testing, marketing, advertising, promotion, and/or sale of the Accused Products" exist, and Under Armour must produce the requested documents.

16. Contracts, draft agreements, and communications related to Stephen Curry's role as a sponsor of the Accused Products, including documents sufficient to show the amount and terms of payment from Under Armour to Stephen Curry.

- Under Armour produced publicly available webpage screenshots relating to its partnership with Stephen Curry, which along with the documents attached to Athalonz's transfer briefing, confirm his involvement with the Accused Products. But, unquestionably, "[c]ontracts, draft agreements, and communications related to Stephen Curry's role as a sponsor of the Accused Products" must exist, and Under Armour must produce the requested documents (including those relating to the terms of his agreements), which are relevant to many issues in the case.

17. Documents related to Bryce Harper's involvement in the design, development, testing, marketing, advertising, promotion, and/or sale of the Accused Products.

- Under Armour produced publicly available webpage screenshots relating to its partnership with Bryce Harper, which confirm his involvement in the design, development, testing, marketing, advertising, promotion, and/or sale of the Accused Products. But, unquestionably, internal documents related to "Bryce Harper's involvement in the design, development, testing, marketing, advertising, promotion, and/or sale of the Accused Products" exist, and Under Armour must produce the requested documents.

18. Contracts, draft agreements, and communications related to Bryce Harper's role as a sponsor of the Accused Products, including documents sufficient to show the amount and terms of payment from Under Armour to Bryce Harper.

Under Armour produced publicly available webpage screenshots relating to its partnership with Bryce Harper, which confirm his involvement with the Accused Products. But, unquestionably, internal documents related to "Bryce Harper's involvement in the design, development, testing, marketing, advertising, promotion, and/or sale of the Accused Products" exist, and Under Armour must produce the requested documents (including those relating to the terms of his agreements), which are relevant to many issues in the case.

Sincerely,

/s/ *Connor Houghton*
Connor S. Houghton

**EXHIBIT 6**



151 WEST 42ND STREET   49TH FLOOR   NEW YORK, NY 10036
**T** 212.307.5500  **F** 212.307.5598  www.Venable.com

November 2, 2023

t 212.370.6241
f 212.307.5598
REBugg@Venable.com

**Via Email**

Connor S. Houghton
1909 K Street, N.W.
Suite 800
Washington, DC 20006
(202) 894-7315
choughton@reichmanjorgensen.com

     Re:    *Athalonz, LLC v. Under Armour, Inc*., Case No. 2:23-cv-00193-JRG (E.D. Tex.)

Dear Connor,

I write in response to your October 26, 2023 letter.  We disagree with your assertion that Under Armour's document production to date is deficient.  Please see Under Armour's responses below to each of the categories of documents you identify:

**Category 1** – Under Armour agrees to produce additional documents that identify any code name, internal name, project name, marketing name, or version number associated with the Accused Products, to the extent such documents exist and are in Under Armour's possession, custody or control and are found after a reasonable and diligent search.

**Category 2** - Under Armour agrees to produce documents that identify the date the Accused Products were first sold in the United States, and the date they were discontinued, if applicable, to the extent such documents exist and are in Under Armour's possession, custody or control and are found after a reasonable and diligent search.

**Category 3** – Under Armour disagrees.  The currently sold Accused Products are publicly sold and Athalonz has provided evidence that most, if not all, of the Accused Products are already in Athalonz's possession.

**Categories 4-5** – Under Armour has produced technical drawings for the Accused Products that were located after a reasonable and diligent search.  Under Armour will continue its search for additional technical drawings for each of the Accused Products and will produce any additional documents that are located, along with native CAD files, in accordance with Patent Rule 3-4. Under Armour will also produce any additional internal specifications, business or marketing plans, promotional materials, development or testing documents for the Accused Products that

# VENABLE LLP

November 2, 2023
Page 2

have not yet been produced, to the extent such documents exist and are in Under Armour's possession, custody or control and are found after a reasonable and diligent search.

**Category 6** – Under Armour is working to compile the sales information for all Accused Products and agrees to produce it once it has been complied.

**Category 7** – Under Armour is still evaluating whether any agreements exist that are comparable to the subject matter of the Asserted Patents.  Under Armour will produce any such agreements when that evaluation has completed, in accordance with the Local Rules.

**Category 8** – Under Armour disagrees.  If you have precedent suggesting this request is relevant, please provide and we will consider it.

**Categories 9-12** – Under Armour agrees to produce documents (not including email) related to Athalonz, its products, or its patents, not protected from disclosure by the attorney-client privilege, work product doctrine, common-interest privilege, or any other applicable privilege or protection from disclosure, to the extent such documents exist and are in Under Armour's possession, custody or control and are found after a reasonable and diligent search.

**Categories 13, 15 and 17** – Under Armour agrees to produce any additional documents related to the involvement of Jordan Spieth, Stephen Curry, or Bryce Harper in the design, development, or testing of the accused features of the Accused Products, i.e. the shape and materials of the shoe sole, to the extent such documents exist and are in Under Armour's possession, custody or control and are found after a reasonable and diligent search.

**Categories 14, 16 and 18** – Under Armour disagrees. If you have precedent suggesting these requests are relevant, please provide and we will consider it.


Sincerely,

*Robert E. Bugg*

Robert E. Bugg

**EXHIBIT 7**



Connor S. Houghton
1909 K Street, N.W.
Suite 800
Washington, DC 20006
Direct Dial: (202) 894-7315
choughton@reichmanjorgensen.com

November 3, 2023

**By Email**

Robert E. Bugg
Venable LLP
Rockefeller Center
1270 Avenue of the Americas
The Twenty-Fourth Floor
New York, NY 10020
REBugg@venable.com

     Re:    *Athalonz, LLC v. Under Armour, Inc.*, Case No. 2:23-cv-00193-JRG (E.D. Tex.)

Dear Rob:

I write in response to your November 2, 2023 letter.

***First***, UA asserts that for categories 9-12 in my October 26, 2023 letter (relating to Athalonz, its products, and its patents), UA will not produce any email discovery. Athalonz disagrees that UA can withhold emails from production. Paragraph 3(b) of the Discovery Order requires UA to produce all documents, electronically stored information, and tangible things in its possession that are relevant to the pleaded claims or defenses involved in this action. This includes emails. *See, e.g., Huawei Techs. Co. Ltd. v. T-Mobile US, Inc.*, No. 2:16-cv-00055, Dkt. 190 (E.D. Tex. Apr. 21, 2017). UA's emails related to Athalonz are highly relevant to the claims and defenses in this action—particularly Athalonz's willful infringement claims—and must be produced immediately.

Athalonz proposes the following process to streamline UA's email production. To start, UA should search for the term "Athalonz" across the following custodians, all of whom were identified in Athalonz's complaint as having relevant knowledge about UA's interactions with Athalonz:

- Kevin Culley
- Dob Gibaldo
- David Stakel
- Joshua Rattet
- Craig Foster

Athalonz would also consider entering an ESI Order setting forth a procedure for identifying custodians and search terms, such as the model order regarding e-discovery in patent cases. Either way, if UA does not agree by Tuesday, November 7 to produce relevant emails relating to these issues, Athalonz will file a motion to compel. Please provide your availability to meet and confer next week to discuss.

***Second***, UA asserts that because its accused shoes are "publicly available," it will not produce physical samples (category 3). That position lacks merit. While Athalonz was able to purchase and

Robert E. Bugg
November 3, 2023
Page 2

test most of the Accused Products over time, UA itself has stated that some of the Accused Products are no longer manufactured but that physical samples of those products are available to UA. *See* Dkt. 30-1 ¶ 2. Athalonz needs physical samples of the accused products for at least upcoming expert discovery in this case. UA has not identified any burden from producing physical samples of the Accused Products, and has not claimed they are irrelevant. Please confirm by November 7 that UA will produce a sample of each Accused Product or provide your availability to meet and confer.

***Third***, UA refuses to produce documents relating to its policies for licensing intellectual property. Such documents are relevant to Athalonz's willful infringement allegations as they will show UA's internal policies for using and licensing other company's intellectual property and whether or not it takes steps to respect such IP. UA has identified no burden of producing these documents. Please confirm by November 7 that UA will produce such documents or provide your availability to meet and confer.

***Fourth***, UA has limited or refused to produce certain documents related to its sponsored athletes involved in the Accused Products. For categories 13, 15, and 17, UA has limited its agreement to produce documents related to the involvement of Messrs. Spieth, Curry, and Harper to the design, development, or testing of "the accused features of the Accused Products, i.e. the shape and materials of the shoe sole." That limitation is inappropriate. The claims of the Asserted Patents are not limited the shape and materials of the shoe sole, and documents related to other features of the Accused Products are highly relevant to many issues in the case, including infringement and damages. UA also appears to be refusing to produce documents related to these sponsored athletes' involvement in the marketing, advertising, promotion, and/or sale of the Accused Products. Those documents are relevant to many issues in the case, particularly the value and importance of Athalonz's patented technology. Similarly, for categories 14, 16, and 18, UA has refused to produce contracts and communications with the sponsored athletes relating to the Accused Products, which are relevant for at least the same reasons. Please confirm by November 7 that UA will produce these documents or provide your availability for a meet and confer.

***Finally***, we appreciate UA's confirmation that it plans to produce the following categories of documents from my October 26 letter:

- Documents that identify any code name, internal name, project name, marketing name, or version number associated with the Accused Products (category 1).

- Documents that identify the date the Accused Products were first sold in the United States, and the date they were discontinued, if applicable (category 2).

- Additional technical drawings for each of the Accused Products, along with native CAD files, in accordance with Patent Rule 3-4, as well as additional internal specifications, business or marketing plans, promotional materials, development or testing documents for the Accused Products (categories 4 and 5).

- U.S. monthly sales information for each Accused Product, including information sufficient to show sales revenue, quantities, profitability, costs, and margins, from 2020 to the present (category 6).

Robert E. Bugg
November 3, 2023
Page 3

- To the extent they exist, all licenses, settlement agreements, covenants-not-to-sue, or other agreements or contracts related to patents or technologies entered into by UA or otherwise available to UA that relate to any patent or patent application related to athletic shoes (including but not limited to the Accused Products), that UA contends is similar to the subject matter in the Asserted Patents, or that UA contends is comparable to a license it would have agreed to with Athalonz in the hypothetical negotiation in this case (category 7).

- Documents (not including email) related to Athalonz, its products, or its patents (categories 9-12). While Athalonz disagrees with UA's exclusion of email as discussed above, UA should produce non-email documents immediately.

- Additional documents related to the involvement of Jordan Spieth, Stephen Curry, or Bryce Harper in the design, development, or testing of the accused features of the Accused Products, i.e. the shape and materials of the shoe sole (categories 13, 15, and 17). While Athalonz disagrees with UA's exclusion of many types of documents within these categories, UA should produce the agreed scope of documents immediately.

Please confirm when Under Armour expects to make its production of these documents, each of which should have been produced on October 19. We expect at least the sales documents in category 6 to be produced next week and will move to compel on that issue if necessary.


Sincerely,

/s/ *Connor Houghton*
Connor S. Houghton

# EXHIBIT 8



November 7, 2023

**t** 212.370.6241
**f** 212.307.5598
REBugg@Venable.com

**Via Email**

Connor S. Houghton
1909 K Street, N.W.
Suite 800
Washington, DC 20006
(202) 894-7315
choughton@reichmanjorgensen.com

      Re:    *Athalonz, LLC v. Under Armour, Inc*., Case No. 2:23-cv-00193-JRG (E.D. Tex.)

Dear Connor,

I write in response to your November 3, 2023 letter.

Regarding email discovery – Please confirm that the proposed search is the only email search that Athalonz is requesting in this action for the identified custodians. If so, Under Armour agrees to run the term "Athalonz" for the identified custodians and will produce the resultant emails, to the extent access to the custodian's email mailbox/archive is available, and such documents exist, taking into consideration Under Armour's email retention policy and the fact that some of the identified custodians are no longer employed by Under Armour. Otherwise, please propose a more fulsome procedure for handling all email discovery in this matter that Under Armour can consider to prevent the waste of time and resources.

Regarding samples of the Accused Products – Athalonz admits that it was able to purchase and test most of the Accused Products and has failed to identify a single product it has been unable to obtain. If Athalonz identifies an Accused Product it cannot obtain, Under Armour agrees to investigate whether it can produce a sample, or make that product available for inspection.

Regarding the documents relating to Under Armour's policies for licensing intellectual property and documents related to its sponsored athletes that Under Armour has not agreed to produce – Under Armour reiterates its prior response - If you have precedent suggesting these requests are relevant, please provide and we will consider it.

Regarding the scope of what Under Armour has agreed to produce, I refer you back to my November 2, 2023 letter. Under Armour is working diligently to gather and produce these additional documents, and will do so in a reasonable time frame.



November 7, 2023
Page 2

Sincerely,

*Robert E. Bugg*

Robert E. Bugg

# EXHIBIT 9



Connor S. Houghton
1909 K Street, N.W.
Suite 800
Washington, DC 20006
Direct Dial: (202) 894-7315
choughton@reichmanjorgensen.com

November 8, 2023

**By Email**

Robert E. Bugg
Venable LLP
Rockefeller Center
1270 Avenue of the Americas
The Twenty-Fourth Floor
New York, NY 10020
REBugg@venable.com

   Re: *Athalonz, LLC v. Under Armour, Inc.*, Case No. 2:23-cv-00193-JRG (E.D. Tex.)

Dear Rob:

I write in response to your November 7, 2023 letter.

**Email Discovery.** We appreciate UA's willingness to run the term "Athalonz" for the five custodians identified in our November 3 letter. To be clear, however, UA has an obligation under the Court's Discovery Order to produce relevant documents, including ESI and emails, and already should have done so on October 19. Athalonz at this point does not know which individuals within UA have what relevant information, including about Athalonz and its products and patents, and does not have any way to know what terms UA uses to refer to relevant concepts, including to Athalonz. Thus, Athalonz reserves the right to seek additional, follow-up discovery based on the results of the email production from running the "Athalonz" term across those five custodians. If UA has a different proposal for email production that timely satisfies its discovery obligations, such as its own identification of custodians and search terms to identify relevant documents now, we are willing to consider it. Otherwise, please either confirm your agreement with running the agreed term and custodians, or provide your availability to meet and confer on Athalonz's motion to compel on Monday, November 13.

**Product Samples.** As explained in my November 3 letter, Athalonz needs samples of each of the Accused Products for its infringement case, including for expert discovery. As UA is aware based on Athalonz's infringement contentions, testing of the Accused Products is destructive and the previous samples Athalonz was able to independently acquire cannot be reused for further discovery purposes. At this point, based on our investigation, Athalonz is not able to purchase the following Accused Products:

- Harper 5 (TPU, ST, and Turf)
- Harper 6 (TPU, ST, and Turf)
- Harper 7 (TPU, ST, and Turf)
- HOVR Drive
- HOVR Drive 2
- HOVR Forge

Robert E. Bugg
November 8, 2023
Page 2

- HOVR Show GTX
- Jordan Spieth 4 GTX
- Curry 1 FloTro
- Curry 2 FloTro
- Curry 4 FloTro
- Curry 8
- Curry 9
- Curry HOVR Splash

Please confirm by November 10 that Under Armour will provide a sample of each of these Accused Products in size 14 by November 15, or provide your availability to meet and confer on Athalonz's motion to compel on Monday, November 13.

**IP Licensing Policies**: Our previous letters explained why UA's documents related to IP licensing policies are relevant. Ample legal authority supports that position. *See, e.g.*, *Effingo Wireless, Inc. v. Motorola Mobility, LLC*, 2013 WL 12120965, at *3 (W.D. Tex. Mar. 8, 2013) (ordering production of defendant's written policies, guidelines, and general practices regarding licensing intellectual property); *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (damages construct considers the amount that a licensor and licensee would have agreed upon, at the time infringement began). UA has not provided any reason or basis for its claim that these documents are irrelevant and has not identified any burden or other reason why it cannot produce them. Please confirm by November 10 that UA will produce such documents, or if not, provide your availability to meet and confer on Athalonz's motion to compel on Monday, November 13.

**Sponsored Athlete Documents**: Our previous letters explained why UA's documents related to its sponsored athletes are relevant; again this position is supported by substantial authority. *See, e.g.*, *ICON Health & Fitness, Inc. v. Horizon Fitness, Inc.*, 2009 WL 10677745, at *3 (E.D. Tex. Mar. 16, 2009) (ordering defendant produce *all* documents relating to the design of the accused *products* and to identify *all* persons involved with or responsible for the design of the accused *products*), *4-*5 (ordering defendant produce *all* documents relating to marketing "or other testimonials by [defendant's] representatives"). UA has not provided any reason or basis for its claim that these documents are irrelevant and has not identified any burden or other reason why it cannot produce them. Please confirm by November 10 that UA will produce such documents, or if not, provide your availability to meet and confer on Athalonz's motion to compel on Monday, November 13.

**Agreed Document Production**: UA has still provided no timeline on which we can expect to receive the relevant documents that it has agreed to produce. Again, as we have repeatedly explained, these documents should have been produced on October 19. UA must agree by November 10 that it will produce these agreed-on documents, particularly the sales documents we have discussed at length, by November 15. Otherwise, please provide your availability to meet and confer on Athalonz's motion to compel on Monday, November 13.

Robert E. Bugg
November 8, 2023
Page 3

Sincerely,

/s/ *Connor Houghton*
Connor S. Houghton

**EXHIBIT 10**



151 WEST 42ND STREET   49TH FLOOR   NEW YORK, NY 10036
**T** 212.307.5500  **F** 212.307.5598  www.Venable.com

November 13, 2023

**t** 212.370.6241
**f** 212.307.5598
REBugg@Venable.com

**Via Email**

Connor S. Houghton
1909 K Street, N.W.
Suite 800
Washington, DC 20006
(202) 894-7315
choughton@reichmanjorgensen.com

      Re:    *Athalonz, LLC v. Under Armour, Inc.*, Case No. 2:23-cv-00193-JRG (E.D. Tex.)

Dear Connor,

I write in response to your November 8, 2023 letter.

Regarding email discovery – As discussed, Under Armour wants to avoid a piecemeal approach to email discovery, as it is wasteful and not what is intended by the court, particularly given the low relevance of emails to a patent case. Instead, Under Armour proposes the following: each party can identify up to five search terms to be run for up to three custodians. Under Armour has already identified the relevant individuals in its Initial Disclosures served on October 19, 2023 who may have discoverable information, and the subject of the information for which each individual has knowledge.

Regarding samples of the Accused Products – Under Armour will investigate whether it can produce a sample of the identified products or make those products available for inspection, and will respond in a reasonable time frame.

Regarding the documents relating to Under Armour's policies for licensing intellectual property – Under Armour confirms that it has no written policies, guidelines nor general practices regarding licensing of intellectual property.

Regarding documents related to its sponsored athletes that Under Armour has not agreed to produce – In my November 2, 2023 letter, Under Armour has already agreed to produce 1) documents related to the involvement of Jordan Spieth, Stephen Curry, or Bryce Harper in the design, development, or testing of the accused features of the Accused Products, and 2) any additional technical drawings, internal specifications, business or marketing plans, promotional materials, development or testing documents for the Accused Products, which by nature, includes any sponsored athlete's involvement in said promotion, marketing or testing. Regarding Athalonz's request for "contracts, draft agreements, and communications related to [the sponsored



November 13, 2023
Page 2

athlete's] role as a sponsor of the Accused Products, including documents sufficient to show the amount and terms of payment from Under Armour to [the sponsored athlete]" (Categories 14, 16 and 18 of your October 26, 2023 letter) - the *ICON* case you cite is inapposite, as it does not address this issue.

Under Armour reiterates that it is working diligently to gather and produce the documents we have agreed to produce, and will do so in a reasonable time frame.

Sincerely,

*Robert E. Bugg*

Robert E. Bugg

**EXHIBIT 11**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

ATHALONZ, LLC,

        *Plaintiff,*

    v.

UNDER ARMOUR, INC.,

        *Defendant.*

Case No. 2:23-cv-00193-JRG

**DEMAND FOR JURY TRIAL**

<u>**DOCKET CONTROL ORDER**</u>

      In accordance with the scheduling conference held in this case, it is hereby **ORDERED**

that the following schedule of deadlines is in effect until further order of this Court:

| Original Date | Amended Date | Event |
|---|---|---|
| March 3, 2025 | | *Jury Selection – 9:00 a.m. in **Marshall, Texas** |
| 7 days before Jury Selection | | *Defendant to disclose final invalidity theories, final prior art references/combinations, and final equitable defenses. |
| 10 days before Jury Selection | | *Plaintiff to disclose final election of Asserted Claims. |
| February 3, 2025 | | * If a juror questionnaire is to be used, an editable (in Microsoft Word format) questionnaire shall be jointly submitted to the Deputy Clerk in Charge by this date.[1] |
| January 27, 2025 | | *Pretrial Conference – 9 a.m. in **Marshall, Texas** before Judge Rodney Gilstrap |
| January 21, 2025 | | *Notify Court of Agreements Reached During Meet and Confer |

---

[1] The Parties are referred to the Court's Standing Order Regarding Use of Juror Questionnaires in Advance of *Voir Dire.*

| Original Date | Amended Date | Event |
|---|---|---|
| | | The parties are ordered to meet and confer on any outstanding objections or motions *in limine*. The parties shall advise the Court of any agreements reached no later than 1:00 p.m. three (3) business days before the pretrial conference. |
| January 21, 2025 | | *File Joint Pretrial Order, Joint Proposed Jury Instructions, Joint Proposed Verdict Form, Responses to Motions *in Limine*, Updated Exhibit Lists, Updated Witness Lists, and Updated Deposition Designations |
| January 13, 2025 | | *File Notice of Request for Daily Transcript or Real Time Reporting.<br><br>If a daily transcript or real time reporting of court proceedings is requested for trial, the party or parties making said request shall file a notice with the Court and e-mail the Court Reporter, Shawn McRoberts, at shawn_mcroberts@txed.uscourts.gov. |
| January 6, 2025 | January 13, 2025 | File Motions *in Limine*<br><br>The parties shall limit their motions *in limine* to issues that if improperly introduced at trial would be so prejudicial that the Court could not alleviate the prejudice by giving appropriate instructions to the jury. |
| January 6, 2025 | January 13, 2025 | Serve Objections to Rebuttal Pretrial Disclosures |
| December 30, 2024 | January 6, 2025 | Serve Objections to Pretrial Disclosures; and Serve Rebuttal Pretrial Disclosures |
| December 16, 2024 | | Serve Pretrial Disclosures (Witness List, Deposition Designations, and Exhibit List) by the Party with the Burden of Proof |
| December 9, 2024 | | *Response to Dispositive Motions (including *Daubert* Motions). Responses to dispositive motions that were filed prior to the dispositive motion deadline, including *Daubert* |

| Original Date | Amended Date | Event |
|---|---|---|
| | | Motions, shall be due in accordance with Local Rule CV-7(e), not to exceed the deadline as set forth in this Docket Control Order.[2] Motions for Summary Judgment shall comply with Local Rule CV-56. |
| November 25, 2024 | | *File Motions to Strike Expert Testimony (including *Daubert* Motions)<br><br>No motion to strike expert testimony (including a *Daubert* motion) may be filed after this date without leave of the Court. |
| November 25, 2024 | | *File Dispositive Motions<br><br>No dispositive motion may be filed after this date without leave of the Court.<br><br>Motions shall comply with Local Rule CV-56 and Local Rule CV-7. <u>Motions to extend page limits will only be granted in exceptional circumstances. Exceptional circumstances require more than agreement among the parties.</u> |
| November 18, 2024 | | Deadline to Complete Expert Discovery |
| November 4, 2024 | | Serve Disclosures for Rebuttal Expert Witnesses |
| October 15, 2024 | | Deadline to Complete Fact Discovery and File Motions to Compel Discovery |
| October 15, 2024 | | Serve Disclosures for Expert Witnesses by the Party with the Burden of Proof |

---

[2] The parties are directed to Local Rule CV-7(d), which provides in part that "[a] party's failure to oppose a motion in the manner prescribed herein creates a presumption that the party does not controvert the facts set out by movant and has no evidence to offer in opposition to the motion." If the deadline under Local Rule CV 7(e) exceeds the deadline for Response to Dispositive Motions, the deadline for Response to Dispositive Motions controls.

| Original Date | Amended Date | Event |
|---|---|---|
| October 9, 2024 | | Comply with P.R. 3-7 (Opinion of Counsel Defenses) |
| 2 weeks After Court's Issuance of Claim Construction Order | | Submit Joint Notice Indicating Whether the Case Should Be Referred For Mediation |
| September 18, 2024 | | *Claim Construction Hearing – 9 a.m.  in **Marshall, Texas** before Judge Rodney Gilstrap |
| September 4, 2024 | | *Comply with P.R. 4-5(d) (Joint Claim Construction Chart) |
| August 28, 2024 | | *Comply with P.R. 4-5(c) (Reply Claim Construction Brief) |
| August 21, 2024 | | Comply with P.R. 4-5(b) (Responsive Claim Construction Brief) |
| August 7, 2024 | | Comply with P.R. 4-5(a) (Opening Claim Construction Brief) and Submit Technical Tutorials (if any)<br><br>Good cause must be shown to submit technical tutorials after the deadline to comply with P.R. 4-5(a). |
| August 7, 2024 | | Deadline to Substantially Complete Document Production and Exchange Privilege Logs<br><br>Counsel are expected to make good faith efforts to produce all required documents as soon as they are available and not wait until the substantial completion deadline. |
| July 24, 2024 | | Comply with P.R. 4-4 (Deadline to Complete Claim Construction Discovery) |
| July 17, 2024 | | File Response to Amended Pleadings |
| July 3, 2024 | | *File Amended Pleadings<br><br>It is not necessary to seek leave of Court to amend pleadings prior to this deadline unless the amendment seeks to assert additional patents. |
| June 26, 2024 | | Comply with P.R. 4-3 (Joint Claim Construction Statement) |
| June 5, 2024 | | Comply with P.R. 4-2 (Exchange Preliminary Claim Constructions) |

| Original Date | Amended Date | Event |
|---|---|---|
| May 15, 2024 | | Comply with P.R. 4-1 (Exchange Proposed Claim Terms) |
| November 9, 2023 | November 30, 2023 | Comply with Standing Order Regarding Subject-Matter Eligibility Contentions |
| November 9, 2023 | November 30, 2023 | Comply with P.R. 3-3 & 3-4 (Invalidity Contentions) |
| October 19, 2023 | | *File Proposed Protective Order and Comply with Paragraphs 1 & 3 of the Discovery Order (Initial and Additional Disclosures)<br><br>The Proposed Protective Order shall be filed as a separate motion with the caption indicating whether or not the proposed order is opposed in any part. |
| October 12, 2023 | | *File Proposed Docket Control Order and Proposed Discovery Order<br><br>The Proposed Docket Control Order and Proposed Discovery Order shall be filed as separate motions with the caption indicating whether or not the proposed order is opposed in any part. |
| October 5, 2023 | | Join Additional Parties |
| September 14, 2023 | | Comply with P.R. 3-1 & 3-2 (Infringement Contentions) |

**(\*) indicates a deadline that cannot be changed without an acceptable showing of good cause. Good cause is not shown merely by indicating that the parties agree that the deadline should be changed.**

## ADDITIONAL REQUIREMENTS

**Mediation:** While certain cases may benefit from mediation, such may not be appropriate for every case. The Court finds that the Parties are best suited to evaluate whether mediation will benefit the case after the issuance of the Court's claim construction order. Accordingly, the Court **ORDERS** the Parties to file a Joint Notice indicating whether the case should be referred for mediation **within fourteen days of the issuance of the Court's claim construction order**. As a part of such Joint Notice, the Parties should indicate whether they have a mutually agreeable mediator for the Court to consider. If the Parties disagree about whether mediation is appropriate, the Parties should set forth a brief statement of their competing positions in the Joint Notice.

**Summary Judgment Motions, Motions to Strike Expert Testimony, and *Daubert* Motions:** For each motion, the moving party shall provide the Court with two (2) hard copies of the completed briefing (opening motion, response, reply, and if applicable, sur-reply), excluding exhibits, in D-three-ring binders, appropriately tabbed. All documents shall be single-sided and must include the CM/ECF header. These copies shall be delivered to the Court within three (3) business days after briefing has completed. For expert-related motions, complete digital copies of the relevant expert report(s) and accompanying exhibits shall be submitted on a single flash drive to the Court. Complete digital copies of the expert report(s) shall be delivered to the Court no later than the dispositive motion deadline.

**Indefiniteness:** In lieu of early motions for summary judgment, the parties are directed to include any arguments related to the issue of indefiniteness in their *Markman* briefing, subject to the local rules' normal page limits.

**Lead Counsel:** The Parties are directed to Local Rule CV-11(a)(1), which provides that "[o]n the first appearance through counsel, each party shall designate a lead attorney on the pleadings or otherwise." Additionally, once designated, a party's lead attorney may only be changed by the filing of a Motion to Change Lead Counsel and thereafter obtaining from the Court an Order granting leave to designate different lead counsel. The true lead counsel should be designated early and should not expect to parachute in as lead once the case has been largely developed.

**Motions for Continuance:** The following will not warrant a continuance nor justify a failure to comply with the discovery deadline:

(a)      The fact that there are motions for summary judgment or motions to dismiss pending;

(b)      The fact that one or more of the attorneys is set for trial in another court on the same day, unless the other setting was made prior to the date of this order or was made as a special provision for the parties in the other case;

(c)      The failure to complete discovery prior to trial, unless the parties can demonstrate that it was impossible to complete discovery despite their good faith effort to do so.

**Amendments to the Docket Control Order ("DCO"):** Any motion to alter any date on the DCO shall take the form of a motion to amend the DCO. The motion to amend the DCO shall include a proposed order that lists all of the remaining dates in one column (as above) and the proposed changes to each date in an additional adjacent column (if there is no change for a date the proposed date column should remain blank or indicate that it is unchanged). In other words, the DCO in the proposed order should be complete such that one can clearly see all the remaining deadlines and the changes, if any, to those deadlines, rather than needing to also refer to an earlier version of the DCO.

**Proposed DCO:** The Parties' Proposed DCO should also follow the format described above under "Amendments to the Docket Control Order ('DCO')."

- 6 -

**Joint Pretrial Order:** In the contentions of the Parties included in the Joint Pretrial Order, the Plaintiff shall specify all allegedly infringed claims that will be asserted at trial. The Plaintiff shall also specify the nature of each theory of infringement, including under which subsections of 35 U.S.C. § 271 it alleges infringement, and whether the Plaintiff alleges divided infringement or infringement under the doctrine of equivalents. Each Defendant shall indicate the nature of each theory of invalidity, including invalidity for anticipation, obviousness, subject-matter eligibility, written description, enablement, or any other basis for invalidity. The Defendant shall also specify each prior art reference or combination of references upon which the Defendant shall rely at trial, with respect to each theory of invalidity. The contentions of the Parties may not be amended, supplemented, or dropped without leave of the Court based upon a showing of good cause. The Parties in a case which has been consolidated for pre-trial purposes and which is moving towards a separate trial on the merits (subsequent to pre-trial) shall file, as an exhibit to the parties' Joint Pretrial Order, a list identifying all docket entries from the lead case that relate to the applicable member case.

**Trial:** All parties must appear in person at trial. All non-individual (including but not limited to corporate) parties must appear at trial through the presence in person of a designated representative. Once they have appeared, any representative of a non-individual party shall not be replaced or substituted without express leave of Court.

**So ORDERED and SIGNED this 17th day of October, 2023.**

RODNEY   GILSTRAP
UNITED STATES DISTRICT JUDGE