Jennifer Estremera (CA Bar No. 251076)
jestremera@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, California 94065
Telephone: (650) 623-1401
Facsimile: (650) 623-1449

Christine E. Lehman (*pro hac vice* forthcoming)
clehman@reichmanjorgensen.com
Connor S. Houghton (*pro hac vice* forthcoming)
choughton@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
1909 K Street NW, Suite 800
Washington, DC 20006
Telephone: (202) 894-7311
Facsimile: (650) 623-1449

Attorneys for Plaintiff
*Athalonz, LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ATHALONZ, LLC,<br><br>              Plaintiff,<br><br>    v.<br><br>UNDER ARMOUR, INC.,<br><br>              Defendant. | Case No. 3:23-mc-80324-LJC<br><br>**PLAINTIFF'S OPPOSITION TO MOTION TO QUASH SUBPOENA OF WARDELL STEPHEN CURRY II**<br><br>Date:      February 13, 2024<br>Time:     10:30 a.m.<br>Place:    Zoom videoconference<br>Judge:   Lisa J. Cisneros |

# **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................... 1

II. STATEMENT OF ISSUES TO BE DECIDED .................................................... 2

III. BACKGROUND ................................................................................................... 2

    A. The Underlying Litigation and the Accused Curry Products. ...................... 2

    B. Mr. Curry's Role in the Dispute. ................................................................. 4

    C. The Subpoena to Mr. Curry. ........................................................................ 5

IV. ARGUMENT ........................................................................................................ 6

    A. Rule 45 Permits Parties to Seek Discovery From Non-Party Witnesses with Relevant Knowledge. ................................................................................... 7

    B. Mr. Curry Possesses Unique, Relevant Knowledge to the Litigation. ......... 8

        1. Mr. Curry's Involvement with the Accused Products Makes Him a Key Fact Witness in this Case. ................................................................. 8

        2. The Conclusory Declarations Filed with Mr. Curry's Motion Fail to Show He Lacks Relevant Information. ...................................................... 11

        3. Mr. Curry's Cited Cases Bear Little Resemblance to this Dispute. ............... 13

    C. The Subpoena Does Not Impose an Undue Burden on Mr. Curry. ........................... 14

        1. A Deposition is Not Unduly Burdensome. ...................................................... 15

        2. The Document Requests are Not Unduly Burdensome, and in any Event, Can be Narrowed. ................................................................................. 15

    D. The Subpoena Provided Sufficient Time to Comply and Mr. Curry Never Requested any Additional Time. ................................................................. 18

V. CONCLUSION .................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Am. Broad. Companies, Inc. v. Aereo, Inc.*,
   No. CV-12-80300-RMW, 2013 WL 1508894 (N.D. Cal. Apr. 10, 2013)......................... 7, 14

*Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*,
   300 F.R.D. 406 (C.D. Cal. 2014) ....................................................................... 14

*Aqua Shield v. Inter Pool Cover Team*,
   774 F.3d 766 (Fed. Cir. 2014)............................................................................. 9

*Athalonz LLC v. Under Armour, Inc.*,
   No. 2:23-CV-00193-JRG, 2023 WL 8809293 (E.D. Tex. Dec. 20, 2023) ........................ 2, 10

*Bonzani v. Shinseki*,
   No. 2:11-cv-00007-EFB, 2014 WL 2521849 (E.D. Cal. June 4, 2014) ................................. 18

*Free Stream Media Corp. v. Alphonso Inc.*,
   No. 17-CV-02107-RS (KAW), 2017 WL 6209309 (N.D. Cal. Dec. 8, 2017) ...................... 19

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970), *judgment modified*, 446 F.2d 295 (2d Cir.
   1971) ..................................................................................................... 9

*Lillie v. ManTech Int'l. Corp.*,
   No. 217CV02538CASSSX, 2019 WL 653085 (C.D. Cal. Feb. 15, 2019) ........................... 18

*Optimize Tech. Solutions, LLC v. Staples, Inc.*,
   No. 5:14-mc-80095-LHK, 2014 WL 1477651 (N.D. Cal. Apr. 14, 2014) ............................. 7

*Ruiz v. A.B. Chance Co.*,
   234 F.3d 654 (Fed. Cir. 2000)............................................................................. 10

*Staley v. Gilead Scis., Inc.*,
   No. 19-CV-02573-EMC (LB), 2022 WL 789125 (N.D. Cal. Mar. 14, 2022).................. 7, 11

*The Universal Church, Inc. v. Standard Constr. Co. of San Francisco, Inc.*,
   No. 14-CV-04568-RS (KAW), 2015 WL 6167968 (N.D. Cal. Oct. 21, 2015) .................... 18

*Under Armour, Inc v. Battle Fashions, Inc.*,
   No. 18-MC-80117-LB, 2018 WL 3689664 (N.D. Cal. Aug. 3, 2018) ................................. 13

*Waymo LLC v. Uber Techs., Inc.*,
   No. 17-CV-00939-WHA(JSC), 2017 WL 2929439 (N.D. Cal. July 7, 2017)......................... 7

1

**Federal Statutes**

2

35 U.S.C. § 103(a) ................................................................................................ 10

3

**Rules**

4

Fed. R. Civ. P. 26 ............................................................................................... 7, 9

5

Fed. R. Civ. P. 45 ................................................................................ 5, 7, 17, 18

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO MOTION TO QUASH SUBPOENA OF WARDELL STEPHEN CURRY II
Case No. 3:23-mc-80324-LJC

1    I.      **INTRODUCTION**

2            Athalonz recognizes that issuing a subpoena to Stephen Curry—one of the NBA's most

3    recognized names—may seem unusual for a patent infringement case. But Mr. Curry is no mere

4    celebrity product sponsor, and his relevance to the patent allegations at issue in the underlying

5    litigation is critical. Mr. Curry is the President of one of (if not the) most profitable divisions of Under

6    Armour ("UA"), the Curry Brand, which houses many of the Accused Products at issue in the

7    underlying litigation between Athalonz and UA. He is more than just a well-recognized face used by

8    UA to sell its products. Instead, UA's own extensive public documentation highlights the substantial

9    role Mr. Curry plays in the design and development of products that Athalonz accuses of infringing

10   its patents, as well as their marketing, promotion, and sale. And Mr. Curry has entered into contracts

11   with UA worth hundreds of millions of dollars for his efforts working on the very products at issue

12   in the Litigation. The district court in the underlying litigation has already recognized that testimony

13   in this case from UA's sponsored athletes involved in designing and developing the accused products

14   would be relevant and highly material. Put simply, Mr. Curry is a significant fact witness in the

15   underlying litigation, and his deposition is an important part of Athalonz's case.

16           This subpoena is not, as Mr. Curry argues, an attempt to harass a famous athlete. To the

17   contrary, it is a request for relevant, proportional discovery from a fact witness—exactly what the

18   Federal Rules contemplate. As explained in detail below, Mr. Curry has unique, relevant knowledge

19   to the claims and defenses at issue in the litigation based on his role as President of UA's Curry Brand

20   in designing, developing, and marketing the Curry Brand products accused of infringement. In

21   addition, Mr. Curry has personally used the accused products in an NBA environment and can thus

22   provide unique testimony regarding the value of and benefits of Athalonz's patented invention—

23   testimony that no UA witness can provide that goes squarely Athalonz's damages claims. All of this

24   makes his testimony and documents squarely relevant to patent issues in the Litigation, including

25   damages, validity, and infringement. While Athalonz has sought discovery from UA relating to Mr.

26   Curry's role, and will continue seeking that discovery, that does not immunize Mr. Curry from a

27   deposition based on his own unique, personal knowledge. Mr. Curry's arguments as to the purported

28   burden this subpoena places on him are overblown—while Athalonz recognizes the busy schedule of

-1-

a professional athlete, it is ready and willing to accommodate Mr. Curry's travel and game schedule and take his deposition on a mutually agreeable date and time. And Mr. Curry's arguments as to the timeliness of the subpoena are unsupported and without merit. Athalonz therefore respectfully requests that the Court deny the motion to quash ("the Motion" or "Mot.") and set a date and time for Mr. Curry's deposition and document production.

## II.    STATEMENT OF ISSUES TO BE DECIDED

Whether the Court should deny Mr. Curry's motion to quash the subpoena.

## III.    BACKGROUND

### A.    The Underlying Litigation and the Accused Curry Products.

This subpoena arises from underlying patent infringement litigation between Athalonz and UA pending in the Eastern District of Texas (Case No. 2:23-cv-00193, "the Litigation"). In April 2023, Athalonz filed a complaint alleging that UA willfully infringes five of Athalonz's patents relating to athletic shoes. Dkt. 1-1 ("Bugg Dec."), Ex. 1. Athalonz's infringement allegations in the Litigation are directed to a variety of UA shoes, many of which are part of UA's Curry Brand. Specifically, Athalonz asserts that at least the following Curry Brand products infringe its patents: UA Charged Curry, Curry 4 FloTro, Curry 1 FloTro, Curry 2 FloTro, Curry 8, Curry 9, Curry 10, Curry 11,[1] Curry HOVR Splash, Curry HOVR Splash 2, and Curry HOVR Splash 3 (collectively, the "Accused Curry Products"). Houghton Dec., Ex. A[2] (Plaintiff's Infringement Contentions).

The Litigation is currently in fact discovery, which closes in October 2024. Bugg Dec., Ex. 11 (Docket Control Order). The court denied UA's motion to transfer venue from the Eastern District of Texas to the District of Maryland on December 20, 2023. *See Athalonz LLC v. Under Armour, Inc.*, No. 2:23-CV-00193-JRG, 2023 WL 8809293 (E.D. Tex. Dec. 20, 2023). Athalonz served its infringement contentions against the UA products (including the Accused Curry Products) on September 14, 2023. Ex. A. Contrary to Mr. Curry's assertions in the Motion, neither Athalonz's

---

[1] UA released the Curry 11 after Athalonz's infringement contentions were served, but it is still an Accused Product. *See id.* at 3 (stating that Curry 10 is representative of future releases implementing the same relevant features); *id.* at 2 ("past or future releases are Accused Instrumentalities" if they incorporate the same infringing features).

[2] All citations to "Ex. __" throughout this opposition are to the exhibits attached to the Houghton Declaration, filed concurrently, unless stated otherwise.

patent claims nor its infringement contentions are limited to "specific accused features" relating only to the shape and materials of the sole of a shoe. *See, e.g.*, Dkt. 1 at 1 ("allegedly infringing features of the accused products, *i.e.* the shape and materials used in the accused shoe soles"), Mot. at 3 ("the specific accused features of the accused products"), *id.* at 8 ("the accused features of the accused products, *i.e.*, the shape and materials of the shoe sole"), *id.* at 9 ("Curry does not have unique personal knowledge of material facts bearing on whether the ***accused features*** of the Under Armour Curry products infringe the asserted patent claims."). Instead, each of the five Asserted Patents broadly claim and cover an entire athletic shoe, such as the Accused Curry Products. For example, asserted claim 1 of U.S. Patent No. 11,013,291 claims:

> A shoe comprises:
> an upper section;
> a midsole coupled to the upper section;
> an insole positioned proximal to the midsole and within the upper section; and
> a bottom outsole coupled to the midsole, wherein a combination of the midsole, the insole, and the bottom outsole form an athletic positioning shape, wherein the athletic positioning shape has:
> a first height at an inside edge and at an outside edge of the shoe along a heel section of the shoe,
> a second height on the outside edge of the shoe at a toe section of the shoe,
> a third height on the inside edge of the shoe at the toe section of the shoe, and
> the first height being greater than the second height and the second height being greater than the third height, wherein a first slope is formed by the first height and the second height, wherein a second sloped is formed by the first height and the third height, and
> wherein a third slope is formed by the second height and the third height.

Ex. B ('291 Patent) at claim 1. The dependent claims add further limitations, and the other Asserted Patents are similarly directed to the entire shoe; they are not limited to only the shape and materials of the shoe sole. *See, e.g.*, U.S. Patent Nos. 10,674,786 claim 5 ("a shoe comprises"); 11,064,760 claim 1 ("a pair of shoes comprises"); 11,510,456 claim 1 ("an athletic shoe comprises"); 11,375,768 claim 1 ("an athletic shoe comprises").[3]

---

[3] Due to their size and public availability, Athalonz is not attaching the other four Asserted Patents referenced above, and simply excerpts the relevant claim language.

**B.** **Mr. Curry's Role in the Dispute.**

The Curry Brand and many of the shoes sold under that brand are at the center of the dispute between Athalonz and UA. Contrary to the allegations in the Motion, Mr. Curry is not simply a spokesperson or celebrity endorsement for the Curry Brand. Instead, Mr. Curry is the President of the Curry Brand at UA—a significant fact that appears nowhere in the Motion. Ex. C (2023 UA Press Release). Extensive, public documentation from UA highlights Mr. Curry's deep involvement in the design and development of its signature Curry basketball shoes that are accused of infringement in the Litigation. For instance:

- A 2022 article explains that in their unique partnership, "Under Armour gave Curry more involvement in the creation of the shoes." Ex. D (Fast Company). "Curry says that despite his grueling schedule, he remains intimately involved with the creation of each sneaker in his line—from choosing colors that reflect his fashion sensibilities to *picking materials that will improve performance*—since he wears the sneakers on the court. When he experienced ankle injuries, he worked with Under Armour designers to adapt the shoe." *Id.* (emphasis added).

- Under Armour's 2023 press release explains that Mr. Curry's "new role as President of Curry Brand will enhance his ability to drive athlete insights, *product development*, and strategic business and marketing endeavors. Since 2013, he's helped propel industry-leading signature launches and *provided key insights on Under Armour product technologies* such as UA Charged, UA HOVR®, UA Warp, and UA Flow." Ex. C (2023 UA Press Release) (emphasis added). The press release also notes that in 2020, "Stephen and Under Armour introduced UA Flow, a best-in-class cushioning technology that has helped take his signature shoes, and his game, to the next level." *Id.*

- Under Armour's lead designer for the Curry 3 "noted that Curry is *heavily involved in the design of the shoes* and explained the things that Curry demands in his shoes." Ex. E (2023 Insider Article) (emphasis added).

- Interview with lead designer of an earlier Curry model explaining: "How involved is Steph throughout these projects? *Steph is fully involved from start to finish*. When I've worked with a few different athletes throughout my career everybody's different, but Stephen is pretty highly involved along the way, during the entire process." Ex. F (2018 Hoops Hype Article) (emphasis added).

- Under Armour's Innovation's Director of Footwear Design "has worked closely with Stephen since designing the Curry 2." Ex. G (2020 Curry Flow Article).

- Mr. Curry discussed his new Curry 11 shoe, released a few weeks ago, stating: "When designing this shoe, we wanted athletes to have the ultimate experience on and off the court – both when it comes to comfort and to traction – and the Curry 11 does just that." Ex. H (2023 Curry 11 Article).

In addition to these articles, UA itself publicly touts its partnership and important relationship with Mr. Curry and the Curry Brand in its annual SEC filings. For example, in its 2023 annual report, UA noted in the cover letter from the CEO that "[t]his past year also saw strong brand momentum, exemplified by the announcement of our stronger partnership with Stephen Curry – a crucial catalyst for Under Armour as we drive and prioritize the impact of sport on communities worldwide." Ex. I (2023 10K). Mr. Curry's agreements with UA include an ownership stake in the company and millions of dollars in compensation for his role. *See id.* at 77 ("the Company issued an award of restricted stock units for 8.8 million shares of the Company's Class C common stock to an entity affiliated with professional basketball player Stephen Curry. The award was issued in connection with Mr. Curry's entry into a stock unit agreement and an Under Armour, Inc. Athlete Product, Brand, Ambassador, and Endorsement Agreement with the Company, pursuant to which Mr. Curry is continuing his relationship with the Company."); Ex. J (2023 Athletic Article) (noting that Mr. Curry's stock award alone was publicly reported to be worth $75 million at the time of the grant).

Athalonz has sought discovery from UA in the Litigation regarding Mr. Curry's role relating to the Accused Curry Products. *See, e.g.*, Bugg Dec., Ex. 5 (Athalonz requesting "Documents related to Stephen Curry's involvement in the design, development, testing, marketing, advertising, promotion, and/or sale of the Accused Products."). Athalonz has also sought production from UA of its contracts and agreements with Mr. Curry relating to his role as sponsor of the Accused Products. *Id.* ("Contracts, draft agreements, and communications related to Stephen Curry's role as a sponsor of the Accused Products, including documents sufficient to show the amount and terms of payment from Under Armour to Stephen Curry."). To date, UA has either refused to produce these outright, or has improperly limited its production to only documents relating to the "accused features" of the Accused Curry Products. Athalonz has filed a motion to compel UA to produce these (and other) documents, which remains pending in the Litigation. Ex. K at 5-7 (Athalonz Motion to Compel).

### C.    The Subpoena to Mr. Curry.

On November 17, 2023, Athalonz issued a subpoena to Mr. Curry ("the Subpoena") and notified UA pursuant to Rule 45 that it was serving the Subpoena on Mr. Curry. Ex. L (Email Chain re: Curry Subpoena). The Subpoena sought a return date of December 1 for documents (two weeks)

-5-

and a deposition date of December 8 (three weeks), and noticed a deposition to occur at Athalonz counsel's Redwood Shores office (located less than 7 miles and 15 minutes away from Mr. Curry's residence). Bugg Dec., Ex. 4 (Subpoena). The return dates in the Subpoena were chosen in an attempt to eliminate an argument that the Subpoena would be a burden on Mr. Curry by analyzing the publicly-available schedule for Mr. Curry's team, the Golden State Warriors. At the time of the Subpoena, the Warriors had no games scheduled between December 3 and December 11—the longest break in their schedule during the entire NBA season.[4] Ex. M (Warriors Schedule). The Subpoena also noted that the deposition would take place on December 8 "or at a mutually agreeable time and location," clarifying that Athalonz was open to negotiating the deposition date to occur at a different, more convenient time for Mr. Curry. Bugg Dec., Ex. 4 (Subpoena).

Athalonz made multiple attempts to serve Mr. Curry personally at his residence in Atherton, CA immediately after notifying UA on November 17. Houghton Dec. ¶ 20. Before Athalonz was able to serve Mr. Curry, on November 21, counsel for UA accepted service of the subpoena and notified Athalonz that it was also representing Mr. Curry. In accepting service, Mr. Curry's counsel stated "we object to the return dates, but will get back to you shortly." Ex. L (Email Chain re: Curry Subpoena). Mr. Curry never requested an extension of time to respond to the Subpoena or sought to meet and confer about the scope of the document requests or the deposition date. Instead, on December 1, Mr. Curry served objections to the requests for production in the subpoena and indicated he intended to move to quash the subpoena in its entirety "within the next 7-10 days." Ex. O (Email re: Curry Objections); Ex. P (Curry Objections to Subpoena). Mr. Curry then filed this motion on December 8 without any further correspondence.

## IV.    ARGUMENT

The Court should deny the Motion for three main reasons. First, Mr. Curry has unique, relevant knowledge pertinent to the claims and defenses in the underlying litigation. Second, Mr.

---

[4] On November 28 (11 days after the Subpoena issued), the Warriors added two additional games to their regular season schedule. Ex. N (Warriors Additions to Schedule). Those games were scheduled for December 6 and December 8. *Id.* The Warriors still had only two games in the nine days between December 3 and December 11, the fewest games scheduled in this length of time in the entire regular season. *See* Ex. M (Warriors Schedule).

Curry has failed to meet his burden to show the subpoena imposes an undue burden. And third, Mr. Curry's arguments regarding the timeliness of the subpoena fail.

**A.     Rule 45 Permits Parties to Seek Discovery From Non-Party Witnesses with Relevant Knowledge.**

Federal Rule of Civil Procedure 45 governs subpoenas. It permits parties to issue subpoenas commanding production of documents and attendance at a deposition from non-parties to a litigation. Fed. R. Civ. P. 45(a)(1). "The scope of discovery under Rule 45 is the same as under Rule 26(b)." *Waymo LLC v. Uber Techs., Inc.*, No. 17-CV-00939-WHA(JSC), 2017 WL 2929439, at *2 (N.D. Cal. July 7, 2017) (citing Fed. R. Civ. P. 45 Advisory Comm.'s Note (1970)); *see also* 9A Fed. Prac. & Proc. Civ. § 2452 (3d ed.) ("Rule 26 clearly defines the scope of discovery for all discovery devices," including subpoenas). Rule 26, in turn, permits "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).

Rule 45 also provides the circumstances under which a court can quash a subpoena: if a subpoena fails to allow a reasonable time to comply, requires a person to comply beyond the geographical limits specified, requires disclosure of privilege or other protected matter, or subjects a person to undue burden. *See* Fed. R. Civ. P. 45(d)(3). "While Rule 45(c) of the Federal Rules of Civil Procedure requires a party to avoid undue burden or expense, it does not force parties to forgo necessary depositions." *Staley v. Gilead Scis., Inc.*, No. 19-CV-02573-EMC (LB), 2022 WL 789125, at *1 (N.D. Cal. Mar. 14, 2022). "The burden of showing that a subpoena is unreasonable and oppressive is upon the party to whom it is directed." *Am. Broad. Companies, Inc. v. Aereo, Inc.*, No. CV-12-80300-RMW, 2013 WL 1508894, at *4 (N.D. Cal. Apr. 10, 2013). "The party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings." *Optimize Tech. Solutions, LLC v. Staples, Inc.*, No. 5:14-mc-80095-LHK, 2014 WL 1477651, at *2 (N.D. Cal. Apr. 14, 2014) (quotation omitted).

**B.    Mr. Curry Possesses Unique, Relevant Knowledge to the Litigation.**

    **1.    Mr. Curry's Involvement with the Accused Products Makes Him a Key Fact Witness in this Case.**

The Motion argues that UA does not intend to offer Curry as a witness at trial, and therefore Athalonz has no legitimate reason for deposing him. Mot. 7. That is not—and cannot be—the standard. Rule 26 permits parties to seek discovery into "any nonprivileged matter that is relevant to any party's claim or defense," and Mr. Curry's testimony and related documents are unquestionably relevant to Athalonz's claims and defenses. That UA would prefer to shield Mr. Curry from involvement in this willful infringement case is no reason to quash the subpoena, given the relevance of his knowledge.

First, Mr. Curry's role in designing and developing the Accused Curry Products means he has unique, relevant insight into those products and the value of the features in those products— information squarely relevant to Athalonz's damages claims. By virtue of Mr. Curry's deep involvement in the design and development of the Accused Curry Products, *see supra* § III.B, he has relevant knowledge of the products and their value, including the value of their particular features and benefits. For example, Mr. Curry helped design the Accused Curry Products to prevent athletic injuries. *See* Ex. D (Fast Company) (2022 article noting Curry, "[w]hen he experienced ankle injuries, . . . worked with Under Armour designers to adapt the shoe."). Accordingly, he has relevant insight into the value of the injury prevention aspects of the Accused Curry Products, which is unique to him as the driving force of these design features.

Second, Mr. Curry's roles as President of the Curry Brand and Under Armour Sponsored Athlete further underscores his unique, relevant knowledge about the value of the Accused Curry Products and the features they bring to the market. By nature of Mr. Curry's role with UA, he has information that is highly relevant to the damages in this case, which UA acknowledges that Athalonz has the burden of proving at trial. Mot. 8. Specifically, as President of the Curry Brand and as an Under Armour Sponsored Athlete, Mr. Curry wears the Accused Curry Products while playing professional basketball. Accordingly, Mr. Curry has personal, unique experience with, and highly relevant knowledge about, how and why the Accused Curry Products have been commercially

-8-

successful, and what benefits the accused features in the Accused Curry Products bring consumers. This knowledge goes directly to the factors that Athalonz will use to prove its damages at trial, including the "commercial success" of the accused features, their "utility and advantages" over other shoes, and their "benefits to those who have used" them. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *judgment modified*, 446 F.2d 295 (2d Cir. 1971) (listing factors used to evaluate patent damages via a "hypothetical negotiation," including factors 8 (commercial success), 9 (utility and advantages of the patent property over the old modes or devices), and 10 (the benefits to those who have used the invention)).

Also relevant to damages, Mr. Curry's knowledge will be used to discern which features of the shoes specifically speak to the benefits and value of the invention (as opposed to other commercially beneficial aspects of the shoes). This goes to "the core economic question" in the hypothetical negotiation that Athalonz will use to evaluate its damages. *See Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014) ("[T]he core economic question" of the hypothetical negotiation is "what the infringer . . . would have anticipated the profit-making potential of use of the patented technology to be, compared to using non-infringing alternatives." (italics in original)). This information cannot be provided by other UA witnesses. For example, Mr. Curry is the only person who can explain what benefits the Accused Curry Products bring to his personal professional basketball experience, and the other shoes which he has used but presumably determined do not offer those same benefits. No UA employee will have that same insight into the utility of the Accused Curry Products to one of the best basketball players in the NBA. At bottom, the Motion's assertion (at 9) that Mr. Curry has no "unique personal knowledge as to specific marketing, advertising, promotion or sale" of the products "that could bear on Athalonz's damages theories"—made without any factual support—is simply wrong.

Additionally, Mr. Curry's involvement in the design and development of the Accused Curry Products informs Athalonz's affirmative case of the validity of its patents. UA alleges that the Asserted Patents are invalid. Bugg Dec., Ex. 2 (UA pleading affirmative defenses of invalidity). To rebut UA's assertions that the patents are invalid as obvious, Athalonz will need to show secondary considerations of nonobviousness, including for example long-felt but unsolved needs and failure of

others. Mr. Curry has unique knowledge of these issues, given his role in designing and developing the Accused Curry Products from the ground up. *Supra*, § III.B. The same is true of Mr. Curry in his position as a professional athlete who wears the Accused Curry Products—that is, Mr. Curry has unique, relevant knowledge about any long-felt need he experienced for the accused features and the benefits they bring (e.g., injury prevention), and the failure of other products to provide these same benefits. Again, no UA employee can possess this knowledge.

Similarly, to address UA's allegations of invalidity, both parties will need to gauge the level of a person of ordinary skill in the art (POSITA). *See, e.g.*, 35 U.S.C. § 103(a) (2012) ("… obvious at the time the invention was made to a ***person having ordinary skill in the art*** to which said subject matter pertains" (emphasis added)); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666 (Fed. Cir. 2000) ("Without a determination of the level of ordinary skill in the art, a district court cannot properly assess obviousness because the critical question is whether a claimed invention would have been obvious at the time it was made to one with ordinary skill in the art." (cleaned up)). Given his involvement in the design and development of the Accused Curry Products, Athalonz is entitled to probe Mr. Curry's level of skill and knowledge in a deposition so that it may itself gauge the level of skill of a POSITA related to the products and patents at issue in the Litigation.

In the underlying litigation, Judge Gilstrap has recognized the significance of the type of information uniquely possessed by Mr. Curry. In denying UA's motion to transfer the underlying litigation from Texas to Maryland, the court agreed with Athalonz that Jordan Spieth—another UA sponsored athlete involved in designing and developing certain accused products—was a "key witness" for Athalonz's claims. *See Athalonz LLC v. Under Armour, Inc.*, No. 2:23-CV-00193-JRG, 2023 WL 8809293, at *5 (E.D. Tex. Dec. 20, 2023). In particular, the court held that, similar to Mr. Curry, "Mr. Spieth allegedly helped Under Armour design the accused products, and he has advertised the shoes by wearing them at tournaments, putting them in the public's eye and promoting them before hundreds of thousands of people . . . Mr. Spieth's testimony would be relevant and highly material to Athalonz's case." *Id.* The court rejected UA's attempts to make the same arguments made by Mr. Curry here, finding that while UA ***claimed*** Mr. Spieth's testimony was not material or relevant, its arguments were "unconvincing given the evidence from Mr. Spieth's own website where it states

he was involved in designing the accused products." *Id.* at *6. Here, Mr. Curry's testimony is even more significant than Mr. Spieth's, given his unique role at UA. Mr. Curry is the President of the Curry Brand, and substantial public documentation highlights his role in designing and developing a number of accused products at issue in the underlying litigation over the course of several years. Put simply, Mr. Curry is a key witness, and his testimony is critical.

Mr. Curry's motion claims—without factual support—that "he lacks knowledge material to the underlying Action" regarding issues ranging from marketing, advertising, and promotion of the products, to their comparative value and benefits to the market, to sales of the products. Mot. 9. But such a broad, unsupported statement cannot withstand scrutiny. UA made Mr. Curry the President of its most lucrative brand and paid him over $75 million in stock to do something (Ex. E)—and a wide array of public articles make clear that Mr. Curry's role as President gives him involvement in all of these things. The court has rejected similar conclusory arguments about lack of relevant knowledge in denying other motions to quash. For example, in *Staley v. Gilead Sciences., Inc.*, No. 19-CV-02573-EMC (LB), 2022 WL 789125, at *2 (N.D. Cal. Mar. 14, 2022), the court denied a motion to quash where the non-party, a former Board member of defendants, similarly argued he lacked relevant knowledge. There, the Court found the deponent had "at least some involvement in relevant decision making" and that his "purported lack of knowledge is insufficient to establish undue burden." *Id.* Here, Mr. Curry does not (because he cannot) argue he has *no* involvement in relevant decision making—he is the President of the Curry Brand and clearly has a significant role in bringing the Accused Curry Products to market. That is ample support to deny the Motion.

### 2. The Conclusory Declarations Filed with Mr. Curry's Motion Fail to Show He Lacks Relevant Information.

Mr. Curry's motion is not supported by any of his own statements under oath, but instead relies on broad, conclusory declarations signed by his agent William Austin (Mot. Ex. 2) and UA's Vice President of the Curry Brand, Ryan Drew (Mot. Ex. 3). Neither of those declarations supports quashing the subpoena.

First, the Motion claims that "Curry plays no role in the design of development of the accused features of the accused products," citing both Mr. Austin and Mr. Drew's claims that that Mr. Curry

-11-

does not design or develop the shape of the sole or choose the materials that are used in the Accused Curry Products. Mot. 8 (citing Austin Dec. ¶ 4; Drew Dec. ¶¶ 5-6). As explained above, the infringement claims in the Litigation are not limited to the "accused features" as UA has unilaterally defined them. *See supra*, § III.A. Also, it is unclear how Mr. Austin and Mr. Drew have any knowledge whatsoever as to what the "accused features" in Athalonz's patents and infringement contentions are—neither declares to have seen or read the patents or the contentions or gained any understanding of them from any other source. For that reason, these statements are irrelevant and fail to show that Mr. Curry lacks relevant knowledge of the design and development of the Accused Curry Products at issue in the Litigation. But even if Mr. Austin's and Mr. Drew's conclusory assertions were relevant (they are not), they are directly contradicted by UA's own public documentation explaining that Mr. Curry *does* in fact play a role in developing UA's technologies and materials that are used in the soles of the Accused Curry Products. Ex. C (2023 UA Press Release) ("Since 2013, [Curry has] helped propel industry-leading signature launches and provided key insights on Under Armour product technologies such as UA Charged, UA HOVR®, UA Warp and UA Flow."); Ex. G (2020 Curry Flow Article) (explaining that "UA Flow" is a new UA shoe sole material).

Similarly, the Motion relies on Mr. Drew's statements that UA designs, develops, promotes the Accused Curry Products and that UA's employees have knowledge of Curry's involvement in this process. Drew Dec. ¶¶ 4, 7. That assertion fails to support a motion to quash. The fact that some unnamed employees at UA might know some of what Mr. Curry did as part of the design process of the Accused Curry Products is far from enough to prevent Athalonz from deposing Mr. Curry, who indisputably has his own firsthand knowledge of his role. And as discussed above, UA employees do not have Mr. Curry's knowledge of how the Accused Curry Products actually perform in a live NBA environment or benefit Mr. Curry personally.

Mr. Drew also states that Mr. Cury is not an "owner, officer, director or employee of Under Armour," but this statement is plainly false. For one, UA disclosed in its annual report that Mr. Curry *is in fact an owner* of the company—it awarded him over eight million units of stock worth over $75 million dollars in 2023 alone, Ex. I (2023 10K), in addition to Mr. Curry's already-existing stock ownership from his prior UA contracts. Further, the idea that Mr. Curry is not an officer or director

is suspect—UA itself named him "President of the Curry Brand," and UA publicly discloses that it "has no employment agreements with any of our named executive officers." Ex. Q (2023 Proxy Statement) at 50. Thus, while Mr. Curry may have no formal employment agreement with UA, his role as President of Curry Brand likely makes him an officer under Maryland corporate law. *See* https://businessexpress.maryland.gov/plan/choose-business-structure (Maryland stock corporations "must have at least three **officers** (**President**, Secretary, and Treasurer)").

The court should not credit the conclusory, hearsay declarations from Mr. Austin and Mr. Drew about Mr. Curry's involvement, both of which are irrelevant and contradicted by UA's own statements. To the extent they are given any weight, they do not support quashing the subpoena.

### 3.    Mr. Curry's Cited Cases Bear Little Resemblance to this Dispute.

The Motion relies heavily on a decision in an unrelated trademark infringement case from five years ago where the court quashed a subpoena directed toward Mr. Curry. *Under Armour, Inc v. Battle Fashions, Inc.*, No. 18-MC-80117-LB, 2018 WL 3689664 (N.D. Cal. Aug. 3, 2018). Contrary to the Motion's assertions, however, that case was nothing like this one, and fails to support quashing the Subpoena here. In *Battle Fashions*, the parties disputed whether UA's sale of Curry products using the phrase "I Can Do All Things" violated the defendant's trademark in "ICAN." *Id.* at *1. The defendant issued a subpoena to Mr. Curry seeking an extensive document production and a deposition related to Mr. Curry's personal use and views of the biblical phrase "I CAN DO ALL THINGS." *Id.* at *4. The court in that case quashed the subpoena because it found Mr. Curry's personal involvement in the design, marketing, and promotion of UA **products** that may or may not use the **trademark** at issue was irrelevant to the underlying dispute. *Id.* at *5. The court specified that the "litigation is not about marketing or promotion of Under Armour products generally; it is at most about the use of the" trademark. *Id.* The *Battle Fashions* case is nothing like the Litigation here, which is a patent infringement case focused specifically on the Accused Curry Products that Mr. Curry himself played a significant role in designing, developing, marketing, and promoting. Unlike in *Battle Fashions*, the Litigation **is** specifically about the marketing and promotion of the Accused Curry Products, and unlike that case, Mr. Curry **does** have a contract with UA to promote (and to design and develop) those particular products. Mr. Curry's reliance on *Battle Fashions* thus fails to move the needle.

-13-

1    Beyond that, the Motion relies on an out-of-district case where the court quashed a subpoena

2 directed to actress Jane Seymour in a trade dress infringement case. *Amini Innovation Corp. v.*

3 *McFerran Home Furnishings, Inc.*, 300 F.R.D. 406 (C.D. Cal. 2014). That case draws almost no

4 parallels to this one. There, the court relied heavily on the fact that the defendant waited until the very

5 end of the discovery period to issue any written discovery at all or to serve the subpoena on Seymour,

6 and as a result was unable to say one way or the other whether Seymour actually had any relevant

7 information at all. *Id.* at 411. The court also specifically noted that the "late service of the subpoena

8 on Seymour, at the *end* of the time allotted for discovery, undermines any claim that her testimony is

9 essential to McFerran's defense." *Id.* Further, the court noted that the evidence offered in opposition

10 to the motion "does not show that Seymour was greatly involved in the design" of the accused

11 products, or that Seymour was likely to have information about the "specialized topics" involved in

12 a trade dress infringement action. *Id.* at 412. And finally, the subpoena at issue in that case involved

13 such a wide breadth of deposition topics of such a general nature they called into question the

14 genuineness of defendant's interest in the witness. *Id.* None of those circumstances are present here.

15 Instead, 1) Athalonz has clearly identified Mr. Curry's unique, relevant information, 2) the subpoena

16 was served very early in discovery, highlighting the importance of Mr. Curry's role in Athalonz's

17 claims, 3) the evidence shows that Mr. Curry **was** greatly involved in the design of the accused

18 products and has information related to the patent infringement claims at issue, and 4) the subpoena

19 is narrowly focused on a few categories of documents and seeks deposition testimony limited to Mr.

20 Curry's involvement in the relevant issues of the case.

21    **C.    The Subpoena Does Not Impose an Undue Burden on Mr. Curry.**

22    The Motion claims that complying with the Subpoena would be unduly burdensome, but fails

23 to come close to meeting its burden of proof. *See Am. Broad. Companies, Inc.*, 2013 WL 1508894, at

24 *4 ("The burden of showing that a subpoena is unreasonable and oppressive is upon the party to

25 whom it is directed."). Instead, both the deposition and document requests are proportional to the

26 needs of the case and, if necessary, can be adjusted to reduce any burden on Mr. Curry.

27

28

### 1.    A Deposition is Not Unduly Burdensome.

Mr. Curry's argument that sitting for a deposition under any circumstances would be unduly burdensome fails. Mot. 11. According to the Motion, Curry has games with the Warriors on 63 of the 135 remaining days of the regular season, including 32 away games. *Id*. Athalonz of course respects that Mr. Curry is busy, but the fact that he has a job cannot be reason enough to quash a deposition subpoena. In any seven-day week, there are five workdays for most people—that is, any employee with a standard schedule would have 96 full days of work in the same 135-day period. Mr. Curry's Warriors schedule includes several significant blocks of time without away games and with off days from home games—the Warriors have no away games between January 19 and February 1, between February 13 and February 26[5], or between March 4 and March 10. Ex. M (Warriors Schedule). And Mr. Curry makes no argument (and has therefore waived any argument) that sitting for a deposition once the season ends would be any burden at all. Athalonz remains willing to find a mutually agreeable date and time for Mr. Curry's deposition to reduce any alleged burden, including limiting the deposition to half a day, taking it at any time of day or night, splitting it between multiple days, or taking it on a weekend. But the Subpoena should not be quashed just because Mr. Curry is a professional athlete.

Moreover, Mr. Curry's claim that he has endorsement and sponsorship commitments, Mot. 11, is precisely the point—Mr. Curry is paid hundreds of millions of dollars by UA to design, endorse and sponsor ***the Accused Curry Products***. Using that as a reason why he should ***not*** be deposed in this case is circular reasoning. Mr. Curry has a significant role in designing, developing, and marketing the Accused Curry Products, and Athalonz is entitled to discovery from Mr. Curry about that role.

### 2.    The Document Requests are Not Unduly Burdensome, and in any Event, Can be Narrowed.

The Subpoena contains only ten document requests, each of which are targeted to seek discovery related to the claims and defenses in the Litigation. Mr. Curry served objections and

---

[5] If Mr. Curry is selected to participate in the NBA All-Star Game, he would need to travel to Indiana during a few of these days. Ex. M (Warriors Schedule).

-15-

responses to the document requests on December 1 (which were not provided to the Court with his motion), Ex. P (Curry Objections to Subpoena), but never sought to confer with Athalonz about the scope of the requests. Each of the requests seeks relevant information, and to the extent Mr. Curry argues searching for certain categories would be unduly burdensome, those categories can be further narrowed as set forth below.

Requests 1 and 2. Mr. Curry responded that he was unaware of any responsive documents, Ex. P, and thus there should be no need for the Court to rule on these requests.

Requests 3 and 4. These requests seek documents related to Mr. Curry's rule in the design, development, and testing of the Accused Curry Products, as well as their marketing, advertising, promotion, and sale. As described in detail above, Mr. Curry's role relating to the Accused Curry Products is significant and relevant to a host of issues in the Litigation, and Athalonz is entitled to seek documents relating to that role directly from Mr. Curry.

Requests 5 and 9. These requests seeks documents related to Mr. Curry's role as President of the Curry Brand at UA and contracts related to Mr. Curry's role as a sponsor of the Accused Curry Products. Essentially, these requests seek Mr. Curry's Under Armour, Inc. Athlete Product, Brand, Ambassador, and Endorsement Agreement, identified in UA's annual report, which is readily available and is literally a single document. Mr. Curry's contract (and related documentation) relates to Athalonz's damages theories and the value of Athalonz's patented technology. It will show the amount UA pays Mr. Curry to sponsor the Accused Curry Products—information that goes to the value of Athalonz's patents embodied by those products—and may also include information relating to his role in the design and development of the Accused Curry Products. Beyond that, Athalonz expects that UA will argue that the primary reason the Accused Curry Products are successful is because they are sponsored by Mr. Curry, not because of Athalonz's patented technology. Thus, Athalonz is entitled to understand what it is UA is paying Mr. Curry to do and for how much.

Requests 6 and 7. These requests seek documents related to the value or benefits of the Accused Curry Products as compared to other basketball shoes on the market, and more generally to the market for basketball shoes in the US. To the extent Mr. Curry has any independent analysis or

other documents relating to the value or benefit of the Accused Curry Products as compared to other shoes on the market, those are directly relevant to Athalonz's damages claims against UA.

Request 8. This request seeks documents relating to sales prices, margins, costs, and strategies for the Accused Curry Products. To the extent Mr. Curry has any unique information on these topics—which is entirely plausible based on his role as President of the Curry Brand—he should produce it, since it is directly relevant to Athalonz's damages claims against UA. To the extent he does not, or the only information he has comes directly from UA, there is nothing for him to produce and no need for the Court to quash this request.

Request 10. This request seeks any agreements between Mr. Curry and either UA or UA's counsel related to this Litigation. According to the Motion, Mr. Curry has no role in this litigation and has not been retained as part of this litigation. However, the Motion's assertion that all communications between Mr. Curry and UA relating to this Litigation are attorney-client privileged is simply wrong—that Mr. Curry retained the same lawyers as UA does not shield his communications with UA about the Litigation. And while certain communications between Mr. Curry and Venable may be privileged if they relate to specific legal advice, others may not be; in any event, Mr. Curry should produce a privilege log relating to any withheld communications. *See* Fed. R. Civ. P. 45(e)(2)(A); Subpoena (Bugg Dec., Ex. 4) at Instruction 6 (requesting a privilege log for any withheld communications).

To the extent certain documents sought from Mr. Curry are also in UA's possession and may later be produced in the Litigation, Mr. Curry's counsel—who are also counsel for UA—can easily coordinate to avoid unnecessary duplication. And to the extent Mr. Curry claims the requests are unduly burdensome, that claim easily fails. Mr. Curry has an entire organization at his disposal—SC30—specifically created to manage his off-court business profile. Ex. R (SC30 LinkedIn). This is not a typical case where an individual would need to sift through their own personal email—Mr. Curry has a company to do that for him, so his personal schedule has little effect on his ability to produce responsive documents.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D.    The Subpoena Provided Sufficient Time to Comply and Mr. Curry Never Requested any Additional Time.**

The Motion claims that the Subpoena gave insufficient time for Mr. Cury to respond, but the facts show otherwise. Federal Rule of Civil Procedure 45 has no specific requirements for dates of compliance with a subpoena. Instead, "[s]ervice of subpoenas at least 10 days before the deposition or production is customary, but not mandatory." *The Universal Church, Inc. v. Standard Constr. Co. of San Francisco, Inc.*, No. 14-CV-04568-RS (KAW), 2015 WL 6167968, at *3 (N.D. Cal. Oct. 21, 2015) (citing *Bonzani v. Shinseki*, No. 2:11-cv-00007-EFB, 2014 WL 2521849, at * 4 (E.D. Cal. June 4, 2014)). "In fact, Rule 45 specifically contemplates circumstances where the response time might be less." *Universal Church*, 2015 WL 6167968, at *3 (internal quotations omitted) (citing Fed. R. Civ. P. 45(d)(2)(B) ("The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served.")) (other citations omitted); *see also Lillie v. ManTech Int'l. Corp.*, No. 217CV02538CASSSX, 2019 WL 653085, at *1 (C.D. Cal. Feb. 15, 2019).

In this case, the Motion ignores the actual events leading to the service of the subpoena to Curry in an attempt to portray Athalonz as unreasonable. The reality is that Athalonz issued the subpoena on November 17 and sought a return date for documents two weeks later and a deposition one week after that—a routine fourteen-day time to provide objections to a request for documents with one week to review those documents and prepare for the deposition. Mr. Curry's counsel received a copy of the subpoena on Friday, November 17, Ex. L (Email Chain re: Curry Subpoena); that Mr. Curry himself avoided personal service for one business day hardly makes the Subpoena's return dates unreasonable. Moreover, the dates in the Subpoena were based on Mr. Curry's own publicly-available NBA schedule to *reduce* his burden, given that the Warriors had no games scheduled in the week leading up to the deposition date or in the days immediately following it.

Most significantly, however, is that the dates were only meant to be placeholders and were subject to negotiation—the deposition date explicitly stated it was for December 8 "or at a mutually agreeable time and location." Bugg Dec. Ex. 4 (Subpoena). This was not a case where Athalonz demanded compliance on a date certain and refused an extension. To the contrary, Mr. Curry's counsel was in communication with Athalonz about the subpoena and could have requested an

-18-

extension, Ex. L (Email Chain re: Curry Subpoena), but chose not to do so. Mr. Curry instead served objections to the document requests on the date in the Subpoena and filed this motion without making any effort to narrow the scope of the Subpoena. Indeed, the fact that Mr. Curry easily served objections to the document requests and filed this Motion within the time for compliance shows the timeline was not unreasonable and is not grounds to quash, particularly where Mr. Curry has not produced any documents to date.

Mr. Curry's only cited authority granting a motion to quash on the grounds of insufficient time to comply is easily distinguishable. *See Free Stream Media Corp. v. Alphonso Inc.*, No. 17-CV-02107-RS (KAW), 2017 WL 6209309, at *2 (N.D. Cal. Dec. 8, 2017). In that case, the court granted a motion to quash from the plaintiff served nine days before the compliance date. *Id.* However, the facts of that case were far different. There, the ***defendant*** had already served a subpoena on third-party Shazam months earlier; Shazam and the defendant had extensive correspondence over the course of several months about the scope of the document requests and deposition topics; Shazam produced extensive documents at defendant's cost; and Shazam had already agreed to fly a witness from London for a narrow deposition on agreed topics on a date certain. *Id.* Then, nine days before that scheduled deposition, the plaintiff served a brand new, overbroad document and deposition subpoena demanding compliance with both the document requests and the deposition topics on the date of the already-scheduled deposition. *Id.* The court granted the motion to quash there because it found plaintiff's overbroad and unlimited subpoena was improper for multiple reasons, including because it gave only nine days before an already-scheduled deposition for compliance and could have been served earlier to give more time to negotiate with the third-party. *Id.* Here, as previously discussed, the dates in the subpoena were selected to reduce the burden on Mr. Curry based on his publicly available schedule, and were further only meant to be placeholders for mutually agreed dates.

Finally, quashing the subpoena based on an allegation of insufficient time for compliance would also waste judicial and party resources. Athalonz could (and would) simply re-serve the exact same subpoena with new return dates, leading to yet another motion being filed and briefed in this Court. Given that Mr. Curry already timely objected to the document requests, has not produced any documents, and has filed this motion, the Court should resolve this dispute now on the merits.

1

## V.    CONCLUSION

2      Athalonz respectfully requests that the Court deny the Motion and set dates for Mr. Curry to

3  produce documents and sit for a deposition.

4

5  Dated: January 12, 2024                     Respectfully submitted,

6
                                              REICHMAN JORGENSEN LEHMAN &
7                                             FELDBERG, LLP

8                                             By  */s/ Jennifer Estremera*

9

10                                            Attorneys for Plaintiff
                                              ATHALONZ, LLC
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO MOTION TO QUASH SUBPOENA OF WARDELL STEPHEN CURRY II
Case No. 3:23-mc-80324-LJC