1   Jennifer Estremera (CA Bar No. 251076)
    jestremera@reichmanjorgensen.com
2   REICHMAN JORGENSEN LEHMAN &
    FELDBERG LLP
3   100 Marine Parkway, Suite 300
4   Redwood Shores, California 94065
    Telephone: (650) 623-1401
5   Facsimile: (650) 623-1449

6   Christine E. Lehman (pro hac vice pending)
    clehman@reichmanjorgensen.com
7   Connor S. Houghton (pro hac vice pending)
    choughton@reichmanjorgensen.com
8   REICHMAN JORGENSEN LEHMAN &
    FELDBERG LLP
9   1909 K Street NW, Suite 800
    Washington, DC 20006
10  Telephone: (202) 894-7311
11  Facsimile: (650) 623-1449

12  Attorneys for Plaintiff
13  *Athalonz, LLC*

14
15                  **UNITED STATES DISTRICT COURT**
16                 **NORTHERN DISTRICT OF CALIFORNIA**
17                   **SAN FRANCISCO DIVISION**

18  ATHALONZ, LLC,                    | Case No. 3:23-mc-80324-LJC
19              Plaintiff,
20       v.                           | **DECLARATION OF CONNOR S.
                                         HOUGHTON IN SUPPORT OF
21  UNDER ARMOUR, INC.,                 PLAINTIFF'S OPPOSITION TO
                                         MOTION TO QUASH SUBPOENA OF
22              Defendant.             | WARDELL STEPHEN CURRY II**
23
24
25
26
27
28

I, Connor S. Houghton, declare as follows:

1.    I am an attorney at Reichman Jorgensen Lehman & Feldberg LLP, counsel for Plaintiff Athalonz, LLC in the above-referenced action. I am admitted to the bar of the District of Columbia and Massachusetts.  I have been admitted to appear in the underlying case pending in the Eastern District of Texas. I make this declaration of my own personal knowledge and, if compelled to testify, I could and would testify competently thereto. I submit this declaration in support of Plaintiff's Opposition to Motion to Quash Subpoena of Wardell Stephen Curry II.

2.    Attached as **Exhibit A** is a copy of Plaintiff's Disclosure of Asserted Claims and Infringement Contentions, which was served in the underlying litigation on September 14, 2023.

3.    Attached as **Exhibit B** is a copy of U.S. Patent No. 11,013,291, which was Exhibit F to Athalonz's complaint against Under Armour.

4.    Attached as **Exhibit C** is a copy of a press release titled "Under Armour and Stephen Curry enter long-term partnership," available at https://www.prnewswire.com/news-releases/under-armour-and-stephen-curry-enter-long-term-partnership-301785333.html. I downloaded this article on December 4, 2023.

5.    Attached as **Exhibit D** is a copy of an article titled "Stephen Curry drops his 10th signature shoe with Under Armour," available at https://www.fastcompany.com/90786870/stephen-curry-drops-his-10th-signature-shoe-with-under-armour. I downloaded this article on September 13, 2023.

6.    Attached as **Exhibit E** is a copy of an article titled "Steph Curry will only wear shoes that are loud," available at https://www.insider.com/steph-curry-under-armour-shoes. I downloaded this article on December 4, 2023.

1

DECLARATION OF C. HOUGHTON IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION TO QUASH
Case No. 3:23-mc-80324-LJC

7.      Attached as **Exhibit F** is a copy of an article titled "Inside the design process of the Curry 5," available at https://hoopshype.com/2018/05/18/inside-the-design-process-of-the-curry-5/. I downloaded this article on December 13, 2023.

8.      Attached as **Exhibit G** is a copy of an article titled "Introducing the Curry Flow," available at https://about.underarmour.com/en/stories/2020/12/introducing-the-curry-flow-.html#:~:text=The. I downloaded this article on September 13, 2023.

9.      Attached as **Exhibit H** is a copy of an article titled "The future of Curry starts now," available at https://about.underarmour.com/en/stories/2023/10/the-future-of-curry-starts-now.html. I downloaded this article on December 4, 2023.

10.     Attached as **Exhibit I** is a copy of Under Armour's 2023 Annual Report, which I downloaded from Under Armour's website.

11.     Attached as **Exhibit J** is a copy of an article titled "Steph Curry receives $75 million in Under Armour shares as part of compensation to remain company ambassador," available at https://theathletic.com/4391582/2023/04/07/steph-curry-under-armour-nba/. I downloaded this article on September 13, 2023.

12.     Attached as **Exhibit K** is a copy of Plaintiff's Motion to Compel Compliance with Discovery Order, filed in the underlying litigation at Dkt. 41 on November 29, 2023.

13.     Attached as **Exhibit L** is a copy of an email chain between counsel for Athalonz and counsel for Under Armour and Mr. Curry. The email chain begins on November 17, 2023 with an email from me to counsel for Under Armour, which attached the subpoena to Mr. Curry.

14.     Attached as **Exhibit M** is a copy of a document titled "Golden State Warriors 2023-24 Season," available at https://cdn.nba.com/teams/uploads/sites/1610612744/2023/10/2324Schedule_8.5x11.pdf?_ga=2.266

891918.1671209475.1704731849-1113575894.1700165638. I downloaded this article on December 11, 2023.

15.     Attached as **Exhibit N** is a copy of an article titled "Warriors Announce Additions to Regular Season Schedule," available at https://www.nba.com/warriors/news/warriors-announce-additions-to-regular-season-schedule-20231129. I downloaded this article on December 11, 2023.

16.     Attached as **Exhibit O** is a copy of an email from Robert Bugg, counsel for Under Armour and Mr. Curry, to me and the rest of Athalonz's counsel, received on December 1, 2023.

17.     Attached as **Exhibit P** is a copy of Non-Party Wardell Stephen Curry II's Objections and Responses to Athalonz, LLC's Subpona, received on December 1, 2023. This document was attached to the email in Exhibit O.

18.     Attached as **Exhibit Q** is a copy of Under Armour's 2023 Proxy Statement, which I downloaded from Under Armour's website.

19.     Attached as **Exhibit R** is a copy of the LinkedIn page for SC30 Inc., available at https://www.linkedin.com/company/sc30-inc. I downloaded this page on December 14, 2023.

20.     Athalonz engaged a process server to attempt service of the subpoena on Mr. Curry shortly after notifying Under Armour's counsel of the subpoena on November 17, 2023. The process server made multiple attempts to serve Mr. Curry with the subpoena, beginning on November 18, 2023.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed in on the 12th day of January, 2024.

   _/s/ Connor S. Houghton_
Connor S. Houghton (_pro hac vice_ forthcoming)
REICHMAN JORGENSEN LEHMAN
& FELDBERG LLP

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| ATHALONZ, LLC, | § | |
| | § | Case No.: 2:23-cv-00193-JRG |
| *Plaintiff,* | § | |
| | § | **DEMAND FOR JURY TRIAL** |
| v. | § | |
| | § | |
| UNDER ARMOUR, INC., | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

**PLAINTIFF'S DISCLOSURE OF ASSERTED CLAIMS
AND INFRINGEMENT CONTENTIONS**

Pursuant to Local Patent Rule 3-1, Plaintiff Athalonz, LLC ("Plaintiff" or "Athalonz") provides this disclosure of asserted claims and infringement contentions. Athalonz is contemporaneously providing the document production accompanying disclosure required by P.R. 3-2 as ATHALONZ000001 - ATHALONZ00001770.

**I.    P.R. 3-1(a): Identification of Asserted Claims**

Athalonz identifies the following claims of each patent in suit that are infringed by Under Armour. Athalonz reserves the right to supplement its identification of asserted claims as discovery proceeds.

| Asserted Patent | Asserted Claims |
|---|---|
| 11,013,291 | 1-5 |
| 11,064,760 | 1-11 |
| 10,674,786 | 1-8 |
| 11,510,456 | 1-5, 7, 9-15, 17 |
| 11,375,768[1] | 1-5, 8 |

---

[1] Athalonz informed Under Armour on September 8, 2023 that it intended to amend the Complaint to assert U.S. Patent No. 11,375,768, which is related to the other Asserted Patents. The parties met and conferred on September 12. Under Armour informed Athalonz on the date of these contentions (September 14) that it did not oppose a motion to amend the Complaint. Athalonz is timely serving its contentions for the '768 patent on the date set by the Court, and will soon file an unopposed motion to amend the complaint to add the '768 patent.

## II.    P.R. 3-1(b): Accused Instrumentalities

Athalonz identifies the Accused Instrumentalities (also referred to as the "Accused Products") below based solely on publicly available information.  The Accused Instrumentalities are representative of all past and future releases of the same or substantially similar Accused Instrumentalities that incorporate the infringing features.  For example, if a past or future release of the same Accused Instrumentality contains the same features and infringes the Asserted Claims for the same reasons as identified by Athalonz, those past or future releases are Accused Instrumentalities.  Further, unrelated variations in the Accused Instrumentalities (such as variation of size, color, model year, low/high version, version number, cleat or bottom pattern, etc.) are also included as Accused Instrumentalities.

| Accused Instrumentality | Asserted Patent | | | | |
|---|---|---|---|---|---|
| | '291 | '760 | '786 | '456 | '768 |
| Harper 5* | | | | X | X |
| Harper 6* | | | | X | X |
| Harper 7* | | | | X | X |
| Harper 8* | | | | X | X |
| HOVR Drive^ | X | X | X | X | X |
| HOVR Drive 2^ | X | X | X | X | X |
| HOVR Forge^ | | | | X | X |
| HOVR Show GTX^ | | | | X | X |
| Jordan Spieth 4 GTX^ | | | | X | X |
| UA Charged Curry^ | X | X | X | X | X |
| Curry 4 FloTro+ | X | X | X | X | X |
| Curry 10# | X | X | X | X | X |
| Curry HOVR Splash | X | X | X | | |
| Curry HOVR Splash 2& | X | X | X | | |
| HOVR Highland Ace | X | X | X | X | X |
| HOVR Block City | | | | X | X |
| UA Flow Dynamic | X | X | X | | |

*All designs of ST, TPU, Turf versions, which infringe for the same reasons.*

*^ All designs of spiked and spikeless/SL versions, which infringe for the same reasons.*

+ *Representative of other Curry FloTro shoes, including at least all designs of Curry 1 FloTro and Curry 2 FloTro, which infringe for the same reasons.[2]*

# *Representative of prior Curry shoes implementing same relevant features, including at least all designs of Curry 9 and Curry 8, which infringe for the same reasons, as well as future releases implementing the same relevant features.*

& *Representative of future Curry Splash shoes implementing same relevant features, including at least Curry Splash 3, which infringes for the same reasons.*

## III.     P.R. 3-1(c) and (d): Infringement Claim Charts

Athalonz provides the claim charts attached as **Exhibits A – E** identifying specifically where each element of each asserted claim is found within each Accused Instrumentality.

| Asserted Patent | Infringement Claim Chart |
|---|---|
| 11,013,291 | Exhibit A |
| 11,064,760 | Exhibit B |
| 10,674,786 | Exhibit C |
| 11,510,456 | Exhibit D |
| 11,375,768 | Exhibit E |

These claim charts are exemplary and are not meant to limit the evidence Athalonz will use to prove infringement by Under Armour.  For example, any measurements appearing in the claim charts are exemplary only and may vary depending on unrelated features such as shoe size. Athalonz reserves the right to use additional and/or different measurements.   Athalonz also reserves the right to rely on physical samples of the Accused Instrumentalities to show infringement, including physical samples obtained from Under Armour during discovery. Athalonz further incorporates the documents produced at ATHALONZ00002565 - ATHALONZ00002568 and ATHALONZ00002586 - ATHALONZ00002706, which are public documents showing certain features of the Accused Instrumentalities.  Athalonz reserves the right

---

[2] *See, e.g.*, ATHALONZ00002586 (Curry 4 FloTro is "[t]he first in a series of reimagined models set to debut this year.").

to use this information to show infringement as well as to show that certain Under Armour products are representative.

Athalonz reserves the right to supplement its infringement contentions based on information learned through discovery, including information provided by Under Armour. Athalonz reserves the right and expects to rely on documents, testimony, and other evidence obtained through discovery to prove infringement in this case. Athalonz reserves the right to rely on expert testimony to show infringement. These claim charts are not intended to and do not construe the claims of the Asserted Patents and do not limit Athalonz's contentions.

Athalonz contends that each element of each asserted claim is literally present in each Accused Instrumentality. To the extent Under Armour contends that any element of any asserted claim is not literally present in an Accused Instrumentality, Athalonz contends that such element is present under the doctrine of equivalents because the Accused Products perform substantially the same function, in substantially the same way, to achieve substantially the same result, as set forth in the attached claim charts.

## IV.    P.R. 3-1(e): Priority Date

The priority date to which each asserted patent is entitled is shown in the chart below.

| Asserted Patent | Asserted Claims | Priority Date |
|---|---|---|
| 11,013,291 | 1-5 | March 8, 2011 (Provisional App. No. 61/450,485) |
| 11,064,760 | 1-11 | March 8, 2011 (Provisional App. No. 61/450,485) |
| 10,674,786 | 1-8 | March 8, 2011 (Provisional App. No. 61/450,485) |
| 11,510,456 | 1-5, 7, 9-15, 17 | March 8, 2011 (Provisional App. No. 61/450,485) |
| 11,375,768 | 1-5, 8 | March 8, 2011 (Provisional App. No. 61/450,485) |

## V.    P.R. 3-1(f): Practice by Athalonz Products

Athalonz provides the claim charts attached as **Exhibits F – H** identifying specifically where each element of each claim practiced by the Athalonz Products is found within the Athalonz Products. These claim charts are exemplary and are not meant to limit the evidence Athalonz will

use to prove that its products practice the Asserted Patents. For example, any measurements appearing in the claim charts are exemplary only and may vary depending on unrelated features such as shoe size. Athalonz reserves the right to use additional and/or different measurements. Athalonz reserves the right to rely on physical samples of the Athalonz Products to show that they practice the Asserted Patents. Athalonz reserves the right to rely on expert testimony to show that its products practice the Asserted Patents. These claim charts are not intended to and do not construe the claims of the Asserted Patents and do not limit Athalonz's contentions.

Athalonz identifies the following patents and claims that are practiced by the Athalonz Products, and the corresponding claim chart.

| Patent | Claims | Claim Chart |
|--------|--------|-------------|
| 11,013,291 | 1-5 | Exhibit F |
| 11,064,760 | 1-11 | Exhibit G |
| 10,674,786 | 1-8 | Exhibit H |

In the attached claim charts, Athalonz has charted the Athalonz EnVe Golf Shoe and identified where each element of each claim is practiced by the EnVe. The Athalonz EnVe Golf shoe is representative of other Athalonz Products because it incorporates the claimed features in the same manner, including the following Athalonz Products: Athalonz GF1 cleat and shoe; Athalonz GF2 cleat and shoe. Athalonz further incorporates the documents produced at ATHALONZ00002569 - ATHALONZ00002585, which are public documents showing certain features of the Athalonz Products. Athalonz reserves the right to use this information to show practice, as well as to show that certain Athalonz products are representative.

Athalonz contends that each element of each asserted claim is literally present in each Athalonz Products. To the extent Under Armour contends that any element of any asserted claim is not literally present in an Athalonz Product, Athalonz contends that such element is present under the doctrine of equivalents because the Athalonz Products perform substantially the same

function, in substantially the same way, to achieve substantially the same result, as set forth in the attached claim charts.

## VI.    P.R. 3-2: Document Production Accompanying Disclosure

Athalonz is contemporaneously producing documents with the Bates numbers ATHALONZ000001 - ATHALONZ00001770.  These documents correspond to P.R. 3-2(c), a copy of the file history for each patent in suit.  Athalonz is not currently aware of any documents corresponding to the categories identified in P.R. 3-2(a) or 3-2(b).


Dated: September 14, 2023                    Respectfully submitted,

                                            /s/     Taylor N. Mauze
                                            Taylor N. Mauze (TX Bar No. 24102161)
                                            tmauze@reichmanjorgensen.com
                                            REICHMAN JORGENSEN LEHMAN
                                            & FELDBERG LLP
                                            7500 Rialto Blvd., Suite 1-250
                                            Austin, TX 78735
                                            Telephone: (650) 623-1401
                                            Facsimile: (650) 650-3501

                                            Christine E. Lehman (pending pro hac vice)
                                            clehman@reichmanjorgensen.com
                                            REICHMAN JORGENSEN LEHMAN
                                            & FELDBERG LLP
                                            1909 K Street, NW, Suite 800
                                            Washington, DC 20006
                                            Telephone: (202) 894-7310
                                            Facsimile: (650) 560-3501

                                            Melissa R. Smith
                                            State Bar No. 24001351
                                            GILLAM & SMITH, LLP
                                            303 South Washington Avenue
                                            Marshall, Texas 75670
                                            Telephone: (903) 934-8450
                                            Facsimile: (903) 934-9257
                                            Email: melissa@gillamsmithlaw.com

                                            *Attorneys for Plaintiff Athalonz, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certified that a true and correct copy of the above and foregoing document has been served by electronic mail on September 14, 2023 to all counsel for Under Armour.

*/s/ Taylor N. Mauze*
Taylor N. Mauze

# EXHIBIT B

US011013291B2

(12) **United States Patent**
Adair et al.

(10) Patent No.: **US 11,013,291 B2**
(45) Date of Patent: *May 25, 2021

(54) **ATHLETIC POSITIONING APPARATUS AND APPLICATIONS THEREOF**

(71) Applicant: **Athalonz, LLC**, Mesa, AZ (US)

(72) Inventors: **Michael R. Adair**, Woodruff, SC (US); **Timothy W. Markison**, Mesa, AZ (US)

(73) Assignee: **Athalonz, LLC**, Mesa, AZ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/397,605**

(22) Filed: **Apr. 29, 2019**

(65) **Prior Publication Data**

US 2019/0246735 A1    Aug. 15, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 14/563,135, filed on Dec. 8, 2014, now Pat. No. 10,271,611, which is a continuation of application No. 13/355,778, filed on Jan. 23, 2012, now Pat. No. 8,938,893.

(60) Provisional application No. 61/450,485, filed on Mar. 8, 2011.

(51) **Int. Cl.**
A43B 7/14      (2006.01)
A43B 13/14     (2006.01)
A43B 7/24      (2006.01)

(52) **U.S. Cl.**
CPC ................ *A43B 7/14* (2013.01); *A43B 7/141* (2013.01); *A43B 7/142* (2013.01); *A43B 7/143* (2013.01); *A43B 7/144* (2013.01); *A43B*

*7/1445* (2013.01); *A43B 7/24* (2013.01); *A43B 13/14* (2013.01); *A43B 13/143* (2013.01); *A43B 13/148* (2013.01)

(58) **Field of Classification Search**
CPC ........... A43B 7/14; A43B 7/141; A43B 7/142; A43B 7/143; A43B 7/144; A43B 7/1445; A43B 7/1465; A43B 7/24; A43B 11/00; A43B 13/148; A43B 13/189; A43B 13/26; A43B 5/00; A43B 13/143; A43B 13/14
USPC .................................. 36/142–144, 114, 25 R
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 1,477,825 A | * | 12/1923 | Heitler | A43B 7/142 36/162 |
| 2,616,190 A | * | 11/1952 | Darby | A43B 7/142 36/144 |
| 2,909,854 A | * | 10/1959 | Edelstein | A43B 7/1425 36/140 |
| 4,620,376 A | * | 11/1986 | Talarico, II | A43B 7/14 36/103 |
| 4,685,227 A | * | 8/1987 | Simmons | A43B 17/02 36/127 |
| 4,862,605 A | * | 9/1989 | Gardner | A43B 13/38 36/43 |

(Continued)

*Primary Examiner* — Marie D Bays
(74) *Attorney, Agent, or Firm* — Garlick & Markison; Timothy W. Markison

(57) **ABSTRACT**

An apparatus includes a heel section, a mid-foot section, and a toe section. The heel section, the mid-foot section, and the toe section collectively have a geometric shape having a first slope of a polarity along an inner edge of the apparatus from the toe section to the heel section and a second slope of the polarity along the inner edge of the apparatus to an outer edge of the apparatus at the toe section.

**8 Claims, 92 Drawing Sheets**



Isometric View of Insole 12 and/or sole 10

# US 11,013,291 B2
Page 2

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,345,701 A * | 9/1994 | Smith | A43B 7/24 |
| | | | 36/127 |
| 5,632,104 A * | 5/1997 | Zohar | A43B 7/14 |
| | | | 36/103 |
| 6,604,301 B1 * | 8/2003 | Manoli, II | A43B 7/141 |
| | | | 36/144 |
| 6,725,578 B2 * | 4/2004 | Kerrigan | A43B 7/142 |
| | | | 36/144 |
| 7,299,568 B2 * | 11/2007 | Tager | A61F 5/14 |
| | | | 36/140 |
| 7,464,428 B2 * | 12/2008 | Norton | A43B 13/04 |
| | | | 12/142 R |
| 8,387,277 B2 * | 3/2013 | Andriacchi | A61F 5/0127 |
| | | | 36/25 R |
| 8,631,592 B2 * | 1/2014 | Adair | A43C 15/162 |
| | | | 36/142 |
| 10,271,611 B2 * | 4/2019 | Adair | A43B 7/144 |
| 2002/0005000 A1 * | 1/2002 | Choi | A43B 7/1435 |
| | | | 36/144 |

* cited by examiner



Upper Shoe Portion

Padded Insole

Sole

Cleats

**FIG. 2**

Side Cross Section of
Drive Leg Shoe

Sole

Padded Insole

**FIG. 1**

Front Cross Section of
Drive Leg Shoe

Prior Art









**FIG. 11**



FIG. 12



FIG. 13



FIG. 14



**FIG. 15**

Case 2:23-cv-00196-JRG Document 23-6 Filed 09/15/23 Page 43 of 172 PageID #: 1318



Cross Section A-A

**FIG. 17**

Cup to Stabilize and/or Position Big Toe 42

Cross Section B-B

**FIG. 18**

Cup to Stabilize and/or Position Big Toe

42

92

A

A

B

B

**FIG. 16**



**FIG. 19**



FIG. 20



FIG. 21

Case 2:23-cv-03196-JXS Document 23-6 Filed 09/15/23 Page 247 of 127 PageID#: 1322



FIG. 22



Angled Support Platform 36

Heel Platform 38

Toe is Lowest Point 130

FIG. 23



**FIG. 24**

Layer 1



**FIG. 25**

Layer 2

Case 2:23-cv-00196-JRS-MG Document 236 Filed 09/15/23 Page 41 of 72 PageID #: 1326



**FIG. 26**

Layer 3



**FIG. 27**
Layer 4



**FIG.28**
Layer 5



**FIG.29**

Layer 6



**FIG.30**

Layer 7



**FIG.31**

Layer 8



**FIG. 33**

Layer 10



**FIG. 32**

Layer 9



**FIG. 35**
Front View

**FIG. 37**
Front View



**FIG. 34**
Insole Side View



**FIG. 36**
Insole Side View



FIG. 38

FIG. 39

Case 2:23-cv-01016-JNW Document 26 Filed 09/15/23 Page 240 of 117 Page 468   1335



Compressible Material 140

Rigid Material 142

Recoil Material 144

**FIG. 40**

Insole Side View

Recoil Material 144

Compressible Material 140

**FIG. 41**

Insole Side View



**FIG. 42**

Compressible Material #2 152
Compressible Material #1 150
Rigid Material 142
Insole Side View

**FIG. 43**

Compressible Material 140
Recoil Material 144
Compressible Material 140
Insole Side View



FIG. 44

Isometric View of Sole



Isometric View of Sole

Bottom of Sole

FIG. 45



FIG. 46

Case 2:23-cv-03191-BRM Document 23-6 Filed 09/15/23 Page 45 of 117 PageID: 1340



toe area 112

$h_2$

$\emptyset_2$

angled support platform 36

bottom of sole

$L_2$

$L$

Isometric View of Sole

FIG. 47

$\emptyset_1$

$L_1$

$h_1$

heel platform 38





FIG. 52



FIG. 53



**FIG. 54**





length and width for
an 11-1/2 shoe

Angled Support
Platform **36**

Inside View
**FIG. 61**

Top View
**FIG. 59**

Front View
**FIG. 62**

Sides
**180**

sole for left
foot
(prototype)

Heel Platform
**38**

Outside View
**FIG. 60**



Athletic Positioning Insole

Athletic Positioning Sole

Left Foot - Front View

Sport Specific Bottom 190

h1

h2

**FIG. 63**

Athletic Positioning Insole

Athletic Positioning Sole

Left Foot - Inside View

Sport Specific Bottom 190

h2

h3

**FIG. 64**



Athletic Positioning
Insole 12

Athletic Positioning
Sole 10

Upper Shoe 202

h1

Sport Specific
Bottom 190

Left Foot - Front
View

FIG. 65

Upper Shoe Securing
Area 200

h2





FIG. 67



cross section of adjustable athletic
positioning insole and/or sole

**FIG. 68**

Adjustable Area
220

Fixed Area
222

Adjustable Area
220

Fixed Area
222

Adjustable Area
220

Fixed Area
222



Adjust Angle and/or Height

Front View of Left Adjustable Toe Area 234

FIG. 70

Adjust Angle and/or Height

Side View of Left Adjustable Toe Area 234

FIG. 71

FIG. 69

Adjustable Toe Area 234

Adjustable Ball of Foot and Arch Area 232

left foot

Adjustable Heal Area 230



Top View
FIG. 75

Bottom View
FIG. 76

Adjustable Heel Area 230

Adjust Height

FIG. 74
Inside View

adjust angle and/or height

adjustable ball of foot and arch area 232

FIG. 73
Front View

adjust angle and/or height

Top View
FIG. 72



Shoe Top 246

Fixed Upper Plate of Sole 244

One or More Removable Plates of Sole 242

Sport Specific Lower Plate of Sole 240

Outside View of Left Shoe

FIG. 77



Shoe Top 246

Fixed Upper Plate of Sole 244

One or More Removable Plates of Sole 242

Sport Specific Lower Plate of Sole 240

Front View of Left Shoe

FIG. 78



Fixed Upper Plate of Sole 244

Removable Plate of Sole 242

Removable Plate of Sole 242

Sport Specific Lower Plate of Sole 240

**FIG. 79**

Expanded View of Adjustable Sole



plate n-1

**FIG. 80**

plate n

Securing
Mechanism
250



plug 274

**FIG. 81**

notched receptacle 272

base securing mechanism 260

fixed upper plate of sole 262

removable plate of sole 264

removable plate of sole 264

securing mechanism 268

sport specific lower plate of sole 270



FIG. 82



fixed upper plate of sole **244**

removable plate of sole **242**

sport specific lower plate of sole **240**

**FIG. 85**



keyhole receptacle **290**
bottom view
**FIG. 84**



fixed upper plate of sole **244**

insertion path

keyhole
receptacle **290**

mating peg **292**

removable plate of sole **242**

insertion path

sport specific lower plate of sole
**240**

securing mechanism **268**
**FIG. 83**









Full Insole
with Arch Support 342

Athletic Insole 342

Sole 10

**FIG. 91**



Insole with Arch Support 342

Sole with Integrated
Athletic Positioning 344

**FIG. 92**

Case 2:23-cv-00196-JRG Document 236 Filed 09/15/23 Page 240 of 467 PageID #: 1365





Less Dense Suport Channels or Column 360

More Dense Suport Channels or Column 362

Air

**FIG. 96**



Thinner, Less Rigid Walls 350

Thicker, More Rigid Walls 352

Air Chamber

**FIG. 95**



**FIG. 97**



**FIG. 98**



**FIG. 99**

Case 2:23-cv-00196-JRS-MKK Document 23-6 Filed 09/15/23 Page 244 of 457 PageID #: 1369



**FIG. 100**

Sole Front Cross Sectional View



direction of force for forward and backward movement

athletic positioning insole &/or sole

Ø1

sport specific bottom 190

left foot - front view **FIG. 101**

direction of force for movement with a lateral component

athletic positioning insole &/or sole

Ø2

sport specific bottom 190

left foot - front view **FIG. 102**



support and pressure
shifting vertical panels
382

front cross sectional view of left
insole 12 and/or sole 10
(no load steady state condition)

liquid material 384

elastic housing
380

**FIG. 103**



panel 398

FIG. 104

smaller release flap 396

smaller release hole 394

larger release hole 390

larger release flap 392

cross section A-A

FIG. 105



expanded panels 404

front cross sectional view of left
insole and/or sole
(lateral motion force condition)

direction of liquid
material

compressed panels
406

force 400

elastic housing
380

**FIG. 106**

Case 2:23-cv-00196-JRS Document 23 Filed 09/15/23 Page 249 of 717 Page ID 1374



direction of liquid material 410

force 400

support and pressure shifting vertical panels 382

front cross sectional view of left insole and/or sole (forward motion force condition)

liquid material 384

elastic housing 380

FIG. 107



elastic housing 380

support and pressure shifting vertical panels 382

inside cross sectional view of left insole and/or sole (no load steady state condition)

liquid material 384

support panels 420

heel section 21

FIG. 108



force 400

elastic housing 380

support and pressure shifting vertical panels 382

inside cross sectional view of left insole and/or sole (ball of foot contact state condition)

liquid material 384

support panels 420

heel section 21

**FIG. 109**



liquid material flow direction with lateral motion force and/or ball of foot force 400

support and pressure shifting vertical panels 382

support panels 420

top view of left insole and/or sole

chamber 430

liquid material 384

heel section 21

**FIG. 110**



rolls heel inward for lateral movement

Ø1

this section any one of preceding insole &/or sole heel designs

insole 12 and/or sole 10

**FIG. 111**



direction of force for forward and backward movement 440

easily compressible material 140

rigid material 142

athletic positioning insole 12 &/or sole 10

Ø1

left foot - front view **FIG. 112**

direction of force for movement with a lateral component 442

**FIG. 113**
left foot - front view

easily compressible material 140

rigid material 142

athletic positioning insole 12 &/or sole 10

Ø1



FIG. 114
left foot - front view

FIG. 115
left foot - front view



FIG. 117

FIG. 118

Bottom

FIG. 116



Front
**FIG. 120**



Sole **10**

**FIG. 119**



Bottom
**FIG. 121**



left foot - front view
FIG. 123

left foot - inside view

FIG. 122



**FIG. 124**



Pitcher's Cleat Pattern
Plant Foot
(top view)

**FIG. 125**



FIG. 126

FIG. 128



FIG. 127



Adjustable Insole 12

Sole 10

**FIG. 129**

Heel Lift 472

Heel 470

**FIG. 130**

Heel (bottom view) includes eyelet for clearing rear spike.

**FIG. 131**



TOE OF SHOE
(Bottom View)

Athletic positioning attachment
480

**FIG. 133**

Heel Lift 472

**FIG. 132**



FIG. 134

Outer Toe Lift 490

FIG. 135

Outer Toe Lift 490

Heel Lift 472



FIG. 138

FIG. 136

Bottom of Left Drive Shoe

Sole Attachment 500

FIG. 137



Topography of
Sole Attachment

**FIG. 139**



FIG. 140

Pitching Training Aid



**FIG. 141**

Pitching Training Aid



**FIG. 142**

Pitching Rubber

Case 2:23-cv-20193-SDW-LDW Document 26-1 Filed 09/15/23 Page 90 of 117 PageID: 1395



**FIG. 143**
Pitching Rubber



If using clasp, eyelet, want them recessed

Securing Mechanism (velcro, ski buckle, shoe laces, hook and eyelet, clasp, etc.) 526

Edge may be rigid or bent in

Force 400

Padding 528

Sole 10

Insole 12

**FIG. 144**

Hinged Connect 524

Bends in 522

Rigid Support Edge (opt) 520

Upper Shoe 534

**FIG. 145**

Full open for easy on/off and adjustment

One or More Securing Mechanisms 526

Tightening Section 532

Securing Tabs 530



Pull Over Top 532

Inside Edge

**FIG. 146**

Velcro, Buckle etc.

Shoe Lace Hoop
Fixed to Sole  550

**FIG. 147**
Anchored to
Sole

Anchor
548

Closing Force

Shoe Lace Hoop
on Lid 546

d1 > d2

d2

Shoe Lace 544 Some
to No Elasticity

Sole

d1

Tightening Section 532

Holding Tab 540

Pull Cord
542



FIG. 148



FIG. 149



Could be 2 Piece Pull Over

Flap-Over for More Snug Fit 532

Tongue 592

FIG. 150

Securing mechanism 526

Upper Shoe 590

US 11,013,291 B2

1

**ATHLETIC POSITIONING APPARATUS AND APPLICATIONS THEREOF**

CROSS REFERENCE TO RELATED PATENTS

The present U.S. Utility patent application claims priority pursuant to 35 U.S.C. § 120 as a continuation of U.S. Utility application Ser. No. 14/563,135, entitled "ATHLETIC POSITIONING APPARATUS AND APPLICATIONS THEREOF," filed Dec. 8, 2014, issuing as U.S. Pat. No. 10,271,611 on Apr. 30, 2019, which claims priority pursuant to 35 U.S.C. § 120 as a continuation of U.S. Utility application Ser. No. 13/355,778, entitled "ATHLETIC POSITIONING APPARATUS AND APPLICATIONS THEREOF," filed Jan. 23, 2012, issued as U.S. Pat. No. 8,938,893 on Jan. 27, 2015, which claims priority pursuant to 35 U.S.C. § 119(e) to U.S. Provisional Application No. 61/450,485, entitled "ATHLETIC POSITIONING FOOTWEAR," filed Mar. 8, 2011, all of which are hereby incorporated herein by reference in their entirety and made part of the present U.S. Utility patent application for all purposes.

STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

NOT APPLICABLE

INCORPORATION-BY-REFERENCE OF MATERIAL SUBMITTED ON A COMPACT DISC

NOT APPLICABLE

BACKGROUND OF THE INVENTION

Technical Field of the Invention

This invention relates generally to footwear and more particularly to athletic positioning footwear.

Description of Related Art

As is known, a wide variety of shoes are available in today's market. The types, designs, and style of the shoes vary greatly depending on their use. For example, dress shoes have a particular design and style based on a more formal use. As another example, athletic shoes have a particular design and style based on their use while playing sports. For instance, each of tennis shoes, golf shoes, running shoes, cross training shoes, hiking shoes, basketball shoes, etcetera have a particular sole pattern, a sole design, an insole design, and upper shoe portion design. In addition, each type of athletic shoe may further include a lateral stability design, an arch support design, a pronation compensation design, and/or a supination compensation design.

As another specific example, FIGS. 1 and 2 illustrate a cross sectional front view and a cross-sectional side view of a pair of baseball spikes. As is shown, the baseball spikes include a sole, a padded insole, an upper shoe portion, and cleats (or spikes). The positioning of the cleats facilitates better traction in grass and/or dirt while playing baseball. In these figures, the sole and/or the padded insole provide a relatively flat platform for the foot within the baseball spikes. In some designs of baseball spikes, the heel portion of the shoe may be higher than the toe portion of the shoe from a side perspective.

2

BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWING(S)

FIG. 1 illustrates a cross-sectional front view diagram of baseball spikes of the prior art;

FIG. 2 illustrates a cross-sectional side view diagram of baseball spikes of the prior art;

FIG. 3 illustrates a cross-sectional side view diagram of an embodiment of a shoe having an athletic positioning insole and/or sole in accordance with the present invention;

FIG. 4 illustrates a cross-sectional front view diagram of an embodiment of a shoe having an athletic positioning insole and/or sole in accordance with the present invention;

FIG. 5 illustrates an isometric diagram of an embodiment of an athletic positioning shape in accordance with the present invention;

FIG. 6 illustrates a cross-sectional side view diagram of an embodiment of an athletic positioning shape in accordance with the present invention;

FIG. 7 illustrates a cross-sectional front view diagram of an embodiment of an athletic positioning shape in accordance with the present invention;

FIG. 8 illustrates an isometric diagram of another embodiment of an athletic positioning shape in accordance with the present invention;

FIG. 9 illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning shape in accordance with the present invention;

FIG. 10 illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning shape in accordance with the present invention;

FIG. 11 illustrates an isometric diagram of another embodiment of an athletic positioning shape in accordance with the present invention;

FIG. 12 illustrates an isometric diagram of another embodiment of an athletic positioning shape in accordance with the present invention;

FIG. 13 illustrates an isometric diagram of another embodiment of an athletic positioning shape in accordance with the present invention;

FIG. 14 illustrates an isometric diagram of another embodiment of an athletic positioning shape in accordance with the present invention;

FIG. 15 illustrates an isometric diagram of another embodiment of an athletic positioning shape in accordance with the present invention;

FIG. 16 illustrates a top view diagram of an embodiment of an athletic positioning insole and/or sole having one or more cups in accordance with the present invention;

FIG. 17 illustrates a cross-sectional front view diagram of an embodiment of an athletic positioning insole and/or sole having a toe cup in accordance with the present invention;

FIG. 18 illustrates a cross-sectional front view diagram of an embodiment of an athletic positioning insole and/or sole having a ball of foot cup in accordance with the present invention;

FIG. 19 illustrates a topographical diagram of another embodiment of an athletic positioning shape in accordance with the present invention;

FIG. 20 illustrates a topographical diagram of another embodiment of an athletic positioning shape in accordance with the present invention;

FIG. 21 illustrates a topographical diagram of another embodiment of an athletic positioning shape in accordance with the present invention;

US 11,013,291 B2

3

FIG. **22** illustrates a topographical diagram of another embodiment of an athletic positioning shape in accordance with the present invention;

FIG. **23** illustrates a topographical diagram of another embodiment of an athletic positioning shape in accordance with the present invention;

FIGS. **24-33** illustrate layers of another embodiment of an athletic positioning shape in accordance with the present invention;

FIG. **34** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **35** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **36** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **37** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **38** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **39** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **40** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **41** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **42** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **43** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **44** illustrates an isometric diagram of an embodiment of an athletic positioning sole in accordance with the present invention;

FIG. **45** illustrates an isometric diagram of another embodiment of an athletic positioning sole in accordance with the present invention;

FIG. **46** illustrates an isometric diagram of another embodiment of an athletic positioning sole in accordance with the present invention;

FIG. **47** illustrates an isometric diagram of another embodiment of an athletic positioning sole in accordance with the present invention;

FIG. **48** illustrates a cross-sectional side view diagram of an embodiment of an athletic positioning sole and an athletic positioning insole in accordance with the present invention;

FIG. **49** illustrates a top view diagram of an embodiment of an athletic positioning sole and an athletic positioning insole in accordance with the present invention;

FIG. **50** illustrates a bottom view diagram of an embodiment of an athletic positioning sole and an athletic positioning insole in accordance with the present invention;

FIG. **51** illustrates a cross-sectional front view diagram of an embodiment of an athletic positioning sole and an athletic positioning insole in accordance with the present invention;

FIG. **52** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and an athletic positioning insole in accordance with the present invention;

4

FIG. **53** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and an athletic positioning insole in accordance with the present invention;

FIG. **54** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and an athletic positioning insole in accordance with the present invention;

FIG. **55** illustrates a cross-sectional outside view diagram of another embodiment of an athletic positioning insole in accordance with the present invention;

FIG. **56** illustrates a top view diagram of another embodiment of an athletic positioning insole in accordance with the present invention;

FIG. **57** illustrates a cross-sectional inside view diagram of another embodiment of an athletic positioning insole in accordance with the present invention;

FIG. **58** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning insole in accordance with the present invention;

FIG. **59** illustrates a top view diagram of another embodiment of an athletic positioning sole in accordance with the present invention;

FIG. **60** illustrates a cross-sectional outside view diagram of another embodiment of an athletic positioning sole in accordance with the present invention;

FIG. **61** illustrates a cross-sectional inside view diagram of another embodiment of an athletic positioning sole in accordance with the present invention;

FIG. **62** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole in accordance with the present invention;

FIG. **63** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole with compensating sport specific bottom in accordance with the present invention;

FIG. **64** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and/or insole with compensating sport specific bottom in accordance with the present invention;

FIG. **65** illustrates a cross-sectional front view diagram of another embodiment of shoe having an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **66** illustrates a cross-sectional heel view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **67** illustrates an isometric diagram of an embodiment of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **68** illustrates a cross-sectional side view diagram of another embodiment of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **69** illustrates a top view diagram of another embodiment of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **70** illustrates a cross-sectional front view diagram of an embodiment of an adjustable toe section of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **71** illustrates a cross-sectional side view diagram of an embodiment of an adjustable toe section of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **72** illustrates a top view diagram of another embodiment of an adjustable ball of foot section of an athletic positioning sole and/or insole in accordance with the present invention;

US 11,013,291 B2

5

FIG. **73** illustrates a cross-sectional front view diagram of an embodiment of an adjustable ball of foot section of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **74** illustrates a cross-sectional inside view diagram of an embodiment of an adjustable ball of foot section of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **75** illustrates a top view diagram of another embodiment of an adjustable heel section of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **76** illustrates a cross-sectional heel view diagram of an embodiment of an adjustable heel section of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **77** illustrates a side view diagram of an embodiment of a shoe having an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **78** illustrates a front view diagram of an embodiment of a shoe having an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **79** illustrates an expanded view diagram of another embodiment of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **80** illustrates a top view diagram of an embodiment of removable plates of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **81** illustrates a cross-sectional side view diagram of an embodiment of removable plates of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **82** illustrates a cross-sectional side view diagram of an embodiment of a securing mechanism for removable plates of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **83** illustrates an expanded cross-sectional side view diagram of another embodiment of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **84** illustrates a cross-sectional side view diagram of another embodiment of a securing mechanism for removable plates of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **85** illustrates a cross-sectional side view diagram of another embodiment of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **86** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **87** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **88** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **89** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **90** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **91** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **92** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

6

FIG. **93** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **94** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **95** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **96** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **97** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **98** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **99** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **100** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole and/or insole in accordance with the present invention;

FIG. **101** illustrates a cross-sectional front view diagram of another embodiment of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **102** illustrates a cross-sectional front view diagram of another embodiment of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **103** illustrates a cross-sectional front view diagram of another embodiment of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **104** illustrates a side view diagram of an embodiment of a panel of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **105** illustrates a cross-sectional front view diagram of an embodiment of a panel of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **106** illustrates a cross-sectional front view diagram of another embodiment of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **107** illustrates a cross-sectional front view diagram of another embodiment of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **108** illustrates a cross-sectional side view diagram of another embodiment of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **109** illustrates a cross-sectional side view diagram of another embodiment of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **110** illustrates a cross-sectional top view diagram of another embodiment of an adjustable athletic positioning sole and/or insole in accordance with the present invention;

FIG. **111** illustrates a cross-sectional heel view diagram of another embodiment of a varying positioning athletic positioning sole and/or insole in accordance with the present invention;

FIG. **112** illustrates a cross-sectional front view diagram of another embodiment of a varying positioning athletic positioning sole and/or insole in accordance with the present invention;

FIG. **113** illustrates a cross-sectional front view diagram of another embodiment of a varying positioning athletic positioning sole and/or insole in accordance with the present invention;

US 11,013,291 B2

7

FIG. **114** illustrates a cross-sectional front view diagram of another embodiment of a varying positioning athletic positioning sole and/or insole in accordance with the present invention;

FIG. **115** illustrates a cross-sectional front view diagram of another embodiment of a varying positioning athletic positioning sole and/or insole in accordance with the present invention;

FIG. **116** illustrates a side view diagram of an embodiment of a training shoe that includes an athletic positioning sole in accordance with the present invention;

FIG. **117** illustrates a front view diagram of an embodiment of a training shoe that includes an athletic positioning sole in accordance with the present invention;

FIG. **118** illustrates an isometric view diagram of an embodiment of an athletic positioning sole of a training shoe in accordance with the present invention;

FIG. **119** illustrates a side view diagram of another embodiment of a training shoe that includes an athletic positioning sole in accordance with the present invention;

FIG. **120** illustrates a front view diagram of another embodiment of an athletic positioning sole of a training shoe in accordance with the present invention;

FIG. **121** illustrates a bottom view diagram of another embodiment of an athletic positioning sole of a training shoe in accordance with the present invention;

FIG. **122** illustrates a side view diagram of an embodiment of baseball spikes that include an athletic positioning spike pattern in accordance with the present invention;

FIG. **123** illustrates a front view diagram of an embodiment of baseball spikes that include an athletic positioning spike pattern in accordance with the present invention;

FIG. **124** illustrates a top view diagram of another embodiment of baseball spikes that include an athletic positioning spike pattern in accordance with the present invention;

FIG. **125** illustrates a top view diagram of another embodiment of baseball spikes that include an athletic positioning spike pattern in accordance with the present invention;

FIG. **126** illustrates a heel view diagram of another embodiment of baseball spikes that include an athletic positioning spike pattern in accordance with the present invention;

FIG. **127** illustrates a heel view diagram of another embodiment of baseball spikes that include an athletic positioning spike pattern in accordance with the present invention;

FIG. **128** illustrates a diagram of an embodiment of a spike for baseball spikes that include an athletic positioning spike pattern in accordance with the present invention;

FIG. **129** illustrates a cross-section front view diagram of another embodiment of an athletic positioning pattern in accordance with the present invention;

FIG. **130** illustrates a side view diagram of an embodiment of an athletic positioning heel attachment for baseball spikes in accordance with the present invention;

FIG. **131** illustrates a bottom view diagram of an embodiment of an athletic positioning heel attachment for baseball spikes in accordance with the present invention;

FIG. **132** illustrates a bottom view diagram of another embodiment of an athletic positioning heel attachment for baseball spikes in accordance with the present invention;

FIG. **133** illustrates a bottom view diagram of an embodiment of an athletic positioning toe and ball-of-foot attachment for baseball spikes in accordance with the present invention;

8

FIG. **134** illustrates a heel view diagram of another embodiment of an athletic positioning heel attachment for baseball spikes in accordance with the present invention;

FIG. **135** illustrates a side view diagram of another embodiment of an athletic positioning heel attachment and athletic positioning toe and ball-of-foot attachment for baseball spikes in accordance with the present invention;

FIG. **136** illustrates a bottom view diagram of an embodiment of an athletic positioning attachment for baseball spikes in accordance with the present invention;

FIG. **137** illustrates an inside view diagram of an embodiment of an athletic positioning attachment for baseball spikes in accordance with the present invention;

FIG. **138** illustrates an outside view diagram of an embodiment of an athletic positioning attachment for baseball spikes in accordance with the present invention;

FIG. **139** illustrates a topological view diagram of an embodiment of an athletic positioning attachment for baseball spikes in accordance with the present invention;

FIG. **140** illustrates an isometric view diagram of an embodiment of a pitching training aid that includes an athletic positioning shape in accordance with the present invention;

FIG. **141** illustrates an isometric view diagram of another embodiment of a pitching training aid that includes an athletic positioning shape in accordance with the present invention;

FIG. **142** illustrates an isometric view diagram of an embodiment of a pitching rubber that includes an athletic positioning shape in accordance with the present invention;

FIG. **143** illustrates an isometric view diagram of another embodiment of a pitching rubber that includes an athletic positioning shape in accordance with the present invention;

FIG. **144** illustrates a cross-section view diagram of an embodiment of a fitting mechanism for a shoe that includes an athletic positioning shape in accordance with the present invention;

FIG. **145** illustrates a top front view diagram of an embodiment of a fitting mechanism for a shoe that includes an athletic positioning shape in accordance with the present invention;

FIG. **146** illustrates a side view diagram of an embodiment of a fitting mechanism for a shoe that includes an athletic positioning shape in accordance with the present invention;

FIG. **147** illustrates a side view diagram of another embodiment of a fitting mechanism for a shoe that includes an athletic positioning shape in accordance with the present invention;

FIG. **148** illustrates a side view diagram of another embodiment of a fitting mechanism for a shoe that includes an athletic positioning shape in accordance with the present invention;

FIG. **149** illustrates a side view diagram of another embodiment of a fitting mechanism for a shoe that includes an athletic positioning shape in accordance with the present invention; and

FIG. **150** illustrates an isometric view diagram of another embodiment of a fitting mechanism for a shoe that includes an athletic positioning shape in accordance with the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

FIGS. **3** and **4** illustrate a cross-sectional side view and a cross-sectional front view, respectively, of an embodiment

US 11,013,291 B2

9

of footwear having an apparatus that facilitates athletic positioning via an insole and/or a sole of a shoe. The shoe includes an upper section **18**, and insole section **12**, and a sole section **10**. The apparatus, which may be the insole section **12** and/or the sole section **10**, of a shoe, has an athletic positioning shape as formed by a heel section **21**, a mid-foot section **23**, and/or a toe section **25**. In general, the athletic positioning shape has the heel section **21** higher than the toe section by a particular angle (e.g., Ø**1**, which may range from a fraction of a degree to 10's of degrees) and the outside edge of the shoe higher than the inside edge of the shoe by another angle (e.g., Ø**2**, which may range from a fraction of a degree to 10's of degrees) at the ball of foot and/or toe section of the shoe.

When a person wears such a shoe, the athletic positioning shape of the insole and/or sole, places the person in an athletic position (e.g., knees slightly bent, weight more on the inside of the legs than the outside of the legs, knees position aligned with ankles and hips, and/or other athletic positioning characteristics). For example, when a pitcher wears a pair of baseball spikes that include the athletic positioning shape insole **12** and/or sole **10**, the pitcher's toe and ball of foot are a primary contact point with the ground, which shifts the pitcher's weight to the inside of his/her legs and slightly bends the pitcher's knees. In this position, the pitcher's lower half is in a more optimal position for pitching.

As another example, a batter may wear a pair of baseball spikes that include the athletic positioning shape insole **12** and/or sole **10**. When in the batter's box, the baseball spikes enable the batter to place more weight on his/her big toe and ball of foot than on the outer edge of the foot. In addition, the batter's knees are flexed and his/her weight is shifted to the inside portion of the leg as opposed to the outside portion of the leg, which promotes a better hitting stance.

The athletic positioning insole **12** and/or sole **10** may be used in any type of shoe (e.g., a dress shoe, a casual shoe, a sport specific shoe, a training shoe, and/or a combination thereof) For example, the athletic positioning insole **12** and/or sole **10** may be used in basketball shoes, tennis shoes, golf shoes, ski boots, ice skates, baseball cleats, football cleats, soccer shoes, running shoes, track shoes, cross fitness shoes, etc. For each of these sport specific shoes, the athletic positioning insole **12** and/or sole **10** are coupled to a specific bottom and a corresponding upper shoe section to promote a better athletic position for an athlete. The specific bottom may comprise one or more of a cleat pattern bottom, a baseball spike bottom, a basketball bottom, a tennis bottom, a golf bottom, an ice skate bottom, a ski boot bottom, a cross-trainer bottom, a running shoe bottom, a walking shoe bottom, a dress shoe bottom and a snowboard boot bottom. The upper section of a shoe may also have a sandal structure that includes one or more straps for securing the shoe to a foot.

FIGS. **5-7** illustrate an isometric diagram **20**, a cross-sectional side view diagram **22**, and a cross-sectional front view diagram **24** of an embodiment of an athletic positioning shape, which may be used in an insole **12** and/or sole **10** of a shoe. The athletic positioning shape includes a heel section **21**, a mid-foot section **23**, and a toe section that collectively have an overall geometric shape that corresponds to the shape of a shoe, but is shown in block form for ease of illustration. The heel section **21**, mid-foot section **23**, and toe section **25** may each be separate pieces, a uniform piece, and/or two of the sections may be a uniform piece while the other is a separate piece.

10

The heel section **21** has a first dimension that is substantially uniform from the outer edge to the inner edge along a back edge of the apparatus and from the back edge of the apparatus to a front portion of the heel section **21**. The toe section **25** has a second dimension at the front outer edge of the apparatus and a third dimension at the front inner edge of the apparatus. The first dimension has a magnitude that is greater than or equal to a magnitude of the second dimension and the magnitude of the second dimension is greater than a magnitude of the third dimension.

As shown, the heel section **21** of the shoe has a particular height (e.g., h**1**, which may be 1 to 10's of mm) that has a first slope (e.g., corresponding to Ø**1**) of the polarity through the mid-foot section **23** to the toe section **25** on the inside edge of the shoe. The inside edge of the shoe at the toe section may have a height of zero to a few millimeters.

As also shown, the athletic positioning shape includes a second height (e.g., h**2**) at the outer edge of the shoe at the toe section **25**, which has a second slope (e.g., corresponding to Ø**2**) of the polarity to the inside edge of the shoe. Accordingly, a third angle exists from the heel to the toe section **25** on the outer edge of the shoe.

The heel section **21** may also include a first structure corresponding to a first portion of the geometric shape, while the mid-foot section **23** may include a second structure corresponding to a second portion of the geometric shape, and the toe section **25** may include a third structure corresponding to a third portion of the geometric shape, wherein the heel section **21** is juxtaposed to the mid-foot section **23**, which is juxtaposed to the toe section **25**. For example, the heal section may be mechanically coupled to the mid-foot section **23** and the mid-foot section **23** may be mechanically coupled to the toe section **25**, wherein spacing between the sections may be near zero to several centimeters. The apparatus may also include a cushioning layer on a first surface covering at least a portion of the heel, mid-foot and/or toe sections.

While the surface on which the foot lies, the angles, and the perimeter lines are shown as straight lines and/or flat surfaces, they may be contoured lines and/or angles, contoured surfaces, contour slopes, concave and/or convex slopes and/or surfaces, and/or a combination thereof to provide a more comfortable and/or custom fit.

FIGS. **8-10** illustrate an isometric diagram **30**, a cross-sectional side view diagram **32**, and a cross-sectional front view diagram **34** of an embodiment of an athletic positioning shape, which may be used in an insole **12** and/or sole **10** of a shoe. The athletic positioning shape includes an overall geometric shape that corresponds to the shape of a shoe, but is shown in block form for ease of illustration. The athletic positioning shape further includes a heel platform **38** and an angled support platform **36**. The heel platform includes a height (h**1**) and width (w).

The angled support platform **36** includes a length (L—heel platform length), the width (w), a first height (h**1**), a second height (h**2**), an inner toe section height (e.g., 0 to a few mm), a first angle (e.g., Ø**1**) from the heel platform **38** to the toe on the inside edge of the shoe, a second angle (e.g., Ø**2**) from the outer edge of the shoe to the inside edge of the shoe, and a third angle (e.g., Ø**3**) from the heel platform **38** to the toe section **25** on the outer edge of the shoe.

In an example, the toe section **25** and the mid-foot section **23** collectively have a geometric shape having a first dimension along an abutment edge of the heel platform section **38** and the mid-foot section **23**, a second dimension at front outer edge of the apparatus, and a third dimension at front inner edge of the apparatus. The first dimension is substan-

US 11,013,291 B2

11

tially uniformly throughout the heel platform section **38** and has a magnitude that is greater than or equal to a magnitude of the second dimension. The magnitude of the second dimension is greater than a magnitude of the third dimension.

FIG. **11** illustrates an isometric diagram of another embodiment of an athletic positioning shape **40**, which may be used in an insole **12** and/or sole **10** of a shoe. The athletic positioning shape includes an overall geometric shape that corresponds to the shape of a shoe, but is shown in block form for ease of illustration. The athletic positioning shape further includes a heel platform **38**, an angled support platform **36**, and a toe area **42**. The heel platform **38** includes a height (h**1**), a width (w), a first length (L**4**) and a second length (L**3**), where L**3** is greater than L**4**.

The angled support platform **36** includes a length (L—L**3** and L—L**4**), a first width (w**1**), a second width corresponding to the toe area **42** (w**1**−w**2**), a first height (h**1**), a second height (h**2**), a first angle (e.g., Ø**1**) from the heel platform to the toe on the outside edge of the shoe, a second angle (e.g., Ø**2**) from the outer edge of the shoe to the edge of the toe area **42**, and a third angle (e.g., Ø**3**) from the heel platform **38** to the toe area **42** on the inner edge of the shoe.

FIG. **12** illustrates an isometric diagram **50** of another embodiment of an athletic positioning shape, which may be used in an insole **12** and/or sole **10** of a shoe. The athletic positioning shape includes an overall geometric shape that corresponds to the shape of a shoe, but is shown in block form for ease of illustration. The athletic positioning shape further includes a heel platform **38**, an angled support platform **36**, an angled edge platform **52**, and a ball-of-foot/toe area **54**. The heel platform **38** includes a height (h**1**), a width (w), and a length.

The angled support platform **36** includes a length (L—heel length), a first width (w**2**−w**1**) at heel platform **38**, a second width (w**2**−w**1**) at toe area, a first height (h**1**), a second height (h**2**), a first angle (e.g., Ø**1**) from the heel platform **38** to the toe on the outside edge of the shoe, and a second angle (e.g., Ø**2**) from the outer edge of the shoe to the edge of the toe area. The angled edge platform **52** includes a length (L—heel length), a first width (w**4**) at heel platform **38**, a second width (w**2**) at toe area, a first height (h**1**), a second height (h**2**), and a first angle (e.g., Ø**1**) from the heel platform **38** to the toe on the outside edge of the shoe.

FIG. **13** illustrates an isometric diagram **60** of another embodiment of an athletic positioning shape, which may be used in an insole **12** and/or sole **10** of a shoe. The athletic positioning shape includes an overall geometric shape that corresponds to the shape of a shoe, but is shown in block form for ease of illustration. The athletic positioning shape further includes an angled heel platform **62** and an angled support platform **36**. The angled heel platform **62** includes a first height (h**1**), a second height (h**2**), a length, a width (w), and an angle (Ø**1**), which may be in the range of −10 to 10 degrees. As shown, the angle (Ø**1**) is shown to be a positive angle such that the heel platform **62** is slightly angled from the outer edge of the shoe to the inner edge, which may be to facilitate the athletic position and/or to adjust for supination. While not shown, if the angle (Ø**1**) is negative, the heel platform **62** is slightly angled from the inner edge of the shoe to the outer edge, which may be to facilitate the athletic position and/or to adjust for pronation.

The angled support platform **36** includes a length (L—heel platform length), the width (w), a first height (h**1**), a second height (h**2**), an inner toe section height (e.g., 0 to a few mm), a first angle (e.g., Ø**4**) from the heel platform to

12

the toe on the inside edge of the shoe, a second angle (e.g., Ø**3**) from the outer edge of the shoe to the inside edge of the shoe, and a third angle (e.g., Ø**2**) from the angled heel platform **62** to the toe section **25** on the outer edge of the shoe.

FIG. **14** illustrates an isometric diagram of another embodiment of an athletic positioning shape **70**, which may be used in an insole **12** and/or sole **10** of a shoe. The athletic positioning shape includes an overall geometric shape that corresponds to the shape of a shoe, but is shown in block form for ease of illustration. The athletic positioning shape further includes a heel platform **38**, an angled arch support platform **72**, an angled toe platform **74**, and a big toe area **76**. Note that the inside portion of the ball of foot may be in the big toe area and the rest of the ball of foot may be in the angle arch support platform.

The heel platform includes a height (h**1**), a width, and a length. The angled arch support platform includes a length (L—heel length and the big toe area length), a width, a first height (h**1**), a second height (h**2**), a first angle (e.g., Ø**2**) from the heel platform to the toe on the outside edge of the toe platform, and a second angle (e.g., Ø**2**) from the outer edge of the shoe to the edge of the big toe area. The toe platform includes a length (L—heel length and the length of the arch platform), a width, a first height (h**2**), a second height (h**3**), and a first angle (e.g., Ø**1**) from the arch platform **72** to the toe platform **74** and a second angle (e.g., Ø**3**) from the outside edge of the shoe to the big toe area. In this embodiment, Ø**1** is greater than Ø**2** such that the angle of the toes is greater than the angle of the arch platform and allows for more flexing of the toes.

FIG. **15** illustrates an isometric diagram **80** of another embodiment of an athletic positioning shape, which may be used in an insole **12** and/or sole **10** of a shoe. The athletic positioning shape includes an overall geometric shape that corresponds to the shape of a shoe, but is shown in block form for ease of illustration. The athletic positioning shape further includes a heel platform **38**, an angled arch support platform **72**, an angled toe platform **74**, and a big toe area **76**. Note that the inside portion of the ball of foot may be in the big toe area and the rest of the ball of foot may be in the angle arch support platform.

The heel platform includes a height (h**1**), a width, and a length. The angled arch support platform includes a length (L—heel length and the big toe area length), a width, a first height (h**1**), a second height (h**2**), a first angle (e.g., Ø**2**) from the heel platform to the toe on the outside edge of the toe platform, and a second angle (e.g., Ø**2**) from the outer edge of the shoe to the edge of the big toe area. The toe platform includes a length (L—heel length and the length of the arch platform), a width, a first height (h**2**), a second height (h**3**), and a first angle (e.g., Ø**1**) from the arch platform to the toe platform and a second angle (e.g., Ø**3**) from the outside edge of the shoe to the big toe area. In this embodiment, Ø**2** is greater than Ø**1** such that the angle of the toes is less than the angle of the arch platform, which allows for less flexing of the toes.

While the surfaces on which the foot and toes lie, the angles, and the perimeter lines are shown as straight lines and/or flat surfaces in each of the embodiments of FIGS. **5**-**15**, they may be contoured lines and/or angles, contoured surfaces, contour slopes, concave and/or convex slopes and/or surfaces, and/or a combination thereof to provide a more comfortable and/or custom fit. Note that the shoe may further include arch support as a separate layer of the insole or integrated into the insole. Further note that the present athletic positioning shape may be used in a standalone

13                                                                14

athletic positioning insole product, in a standalone athletic positioning sole attachment, in a training shoe, and/or a sock. Still further note that with the combination of height and angles of the embodiments of FIGS. 5-15, the wearer of a shoe that incorporates an athletic positioning insole and/or sole having one of the athletic positioning shapes is placed in an athletic position, which may promote better athletic performance and/or which may promote better biomechanical body functioning.

FIG. 16 illustrates a top view diagram of an embodiment of an athletic positioning insole 12 and/or sole 10 having one or more positioning and/or stabilizing cups. The athletic positioning insole 12 and/or sole 10 may include one or more of the athletic positioning shapes of the previous figures and/or of the subsequent figures. In this example embodiment, the athletic positioning insole 12 and/or sole 10 includes a big toe stabilizing and/or positioning cup 90 and an inner-ball of foot stabilizing and/or positioning cup 92. The cup helps with positioning the foot on the athletic positioning insole and/or sole and may further help with stabilizing the foot in its position on the athletic positioning insole and/or sole during athletic activities. Each of the cups may be a few millimeters in depth, have sloped sides, may be of a different material then the insole and/or sole, and/or a combination thereof.

FIG. 17 illustrates a cross-sectional front view diagram of an embodiment of an athletic positioning insole and/or sole having a toe cup. As shown, the big toe fits within the toe cup 42 to provide positioning and/or stabilization of the foot within the insole 12 and/or sole 10.

FIG. 18 illustrates a cross-sectional front view diagram of an embodiment of an athletic positioning insole 12 and/or sole 10 having a ball of foot cup. As shown, the inner portion of the ball of the foot fits within the ball of foot cup 92 to provide positioning and/or stabilization of the foot within the insole 12 and/or sole 10.

FIG. 19 illustrates a topographical diagram 100 of another embodiment of an athletic positioning shape, which may be used in an insole 12 and/or sole 10 of a shoe. The athletic positioning shape further includes a heel platform 38, an angled support platform 36, a toe cup 42, and a ball-of-foot cup 92. With respect to the toe cup and/or the ball-of-foot cup, the heel platform may be 10 to 30 mm higher and may have a shape corresponding to the heel of a shoe.

The angle support platform includes a contoured shape that angles from the outer edge of the foot to the inner edge of the foot with a greater slope in the ball of foot area than in the toe area. The gradient at which the angled support platform angles may vary depending on the desired athletic positioning. In alternate implementations of this embodiment, the athletic positioning shape may omit one or both of the cups.

FIG. 20 illustrates a topographical diagram 110 of another embodiment of an athletic positioning shape, which may be used in an insole 12 and/or sole 10 of a shoe. The athletic positioning shape further includes a heel platform 38, an angled support platform 36, and a toe area 112. With respect to the toe area 112, the heel platform 38 may be 10 to 30 mm higher and may have a shape corresponding to the heel of a shoe.

The angle support platform 36 includes a contoured shape that angles from the outer edge of the foot to the inner edge of the foot with a lesser slope along the outer edge of the shape than along the inner edge of the shape. The gradient at which the angled support platform angles may vary depending on the desired athletic positioning.

FIG. 21 illustrates a topographical diagram of another embodiment of an athletic positioning shape, which may be used in an insole 12 and/or sole 10 of a shoe. The athletic positioning shape further includes a heel platform 38, an angled support platform 36, a toe cup 42, and/or a ball-of-foot cup 92. With respect to the toe cup and/or the ball-of-foot cup, the heel platform may be 10 to 30 mm higher and may have a shape corresponding to the heel of a shoe.

The angle support platform 36 includes a contoured shape that includes two angled sections. The first angled section is along the outer edge of the shape and slopes from the heel to the toe. The second angled section is from the first angled section to the inner edge of the shape and angles from the heel to the toe and from the outer edge to the inner edge. The gradient at which each of the angled section angles may vary depending on the desired athletic positioning.

FIG. 22 illustrates a topographical diagram 120 of another embodiment of an athletic positioning shape, which may be used in an insole 12 and/or sole 10 of a shoe. The athletic positioning shape further includes a heel platform 38 and an angled support platform 36. The athletic positioning shape may further include a toe layer 122 and/or a partial ball-of-foot cup layer 124. With respect to the big toe and/or ball of foot, the heel platform may be 10 to 30 mm higher and may have a shape corresponding to the heel of a shoe.

The angle support platform 36 includes a contoured shape that angles from the outer edge of the foot to the inner edge of the foot with a lesser slope along the outer edge of the shape than along the inner edge of the shape. The gradient at which the angled support platform angles may vary depending on the desired athletic positioning.

FIG. 23 illustrates a topographical diagram of another embodiment of an athletic positioning shape, which may be used in an insole 12 and/or sole 10 of a shoe. The athletic positioning shape further includes a heel platform 38 and an angled support platform 36 where the big toe is the lowest point 130. Alternatively, the athletic positioning shape may further include a toe layer and omit the layer under the inside ball-of-foot to allow the inside ball-of-foot to be the lowest point. With respect to the big toe and/or ball of foot, the heel platform 38 may be 10 to 30 mm higher and may have a shape corresponding to the heel of a shoe.

The angle support platform 36 includes a contoured shape that angles from the outer edge of the foot to the inner edge of the foot with a lesser slope along the outer edge of the shape than along the inner edge of the shape. The gradient at which the angled support platform angles may vary depending on the desired athletic positioning.

With the combination of heights and angles of the embodiments of FIGS. 19-23, the wearer of a shoe that incorporates an athletic positioning insole and/or sole having one of the athletic positioning shapes is placed in an athletic position, which may promote better athletic performance and/or which may promote better biomechanical body functioning. Note that a shoe, which incorporates one of the athletic positioning shapes of FIGS. 19-23, may further include arch support as a separate layer of the insole and/or integrated into the insole. Further note that one or more of the athletic positioning shapes may be used in a standalone athletic positioning insole product, in a standalone athletic positioning sole attachment, in a training shoe, and/or a sock.

FIGS. 24-33 illustrate layers of another embodiment of an athletic positioning shape for an insole 12 and/or a sole 10. Each layer may be of the same material (e.g., leather, rubber, foam, etc.), of a different material, or a combination thereof. For example, layers 1-4 may be of a rigid material (e.g.,

15

rubber, leather, plastic, carbon fiber, etc.) while layers **5-10** may be of a compressible material (e.g., foam, liquid material such as water, gel, etc.).

FIGS. **34** and **35** illustrate a cross-sectional side view diagram and a cross-sectional front view diagram of another embodiment of an athletic positioning sole **10** and/or insole **12** that includes a compressible material section **140** and a rigid material section **142**. In this embodiment, the compressible material section **140** is on top of the rigid material section **142** (i.e., closer to the foot). The compressible material section **140** includes one or more of the athletic positioning shapes and comprises a compressible material (e.g., foam, a soft rubber, memory foam, compressible housing that holds a liquid material (e.g., water, gel, etc.), and/or any other material that compresses under pressure and substantially returns to its uncompressed shape when the pressure is removed).

The rigid material section **142** includes one or more the athletic positioning shapes, which may be the same one as used in the compressible material section **140** or different, and comprises a rigid material. The rigid material has minimal compression under pressure but allows for a desired level of flexion of the foot during use of the shoe. For example, the rigid material may be a rubber, a carbon fiber, leather, plastic, Polyurethane, any material that provides a rigid structure for the shoe, and/or a combination thereof.

FIGS. **36** and **37** illustrate a cross-sectional side view diagram and a cross-sectional front view diagram of another embodiment of an athletic positioning sole **10** and/or insole **12** that includes a compressible material section and a rigid material section. In this embodiment, the compressible material section **140** is under the rigid material section **142** (i.e., farther from the foot). The compressible material section **140** includes one or more of the athletic positioning shapes and comprises a compressible material (examples previously provided). The rigid section **142** includes one or more the athletic positioning shapes, which may be the same one as used in the compressible material section **140** or different, and comprises a rigid material. The rigid material has minimal compression under pressure but allows for a desired level of flexion of the foot during use of the shoe (examples previously provided).

FIG. **38** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole **10** and/or insole **12** that includes a compressible material section **140**, a rigid material section **142**, and a recoil material section **144**. In this embodiment, the compressible material section is layered on top of the recoil material section **144**, which is layered on top of the rigid material section **142**. The compressible material section **140** includes one or more of the athletic positioning shapes and comprises a compressible material (examples previously provided). The rigid section includes one or more the athletic positioning shapes, which may be the same one as used in the compressible material section or different, and comprises a rigid material. The rigid material has minimal compression under pressure but allows for a desired level of flexion of the foot during use of the shoe (examples previously provided).

The recoil section **144** includes one or more the athletic positioning shapes, which may be the same as one of the ones used in the compressible material section **140** and/or on the rigid material section **142**, or a different shape. The recoil section **144** comprises a recoil material that, when placed under a force **146**, converts the force into a potential energy and, when the force is released, converts the potential energy into kinetic energy **148**. In this manner, the force that is generated by pushing off in the shoe is used to propel the

16

foot in a desired direction when the force is released. For example, when a pitcher loads his/her drive leg, a force is applied to the shoe. When the pitcher begins his/her motion and pushes off the rubber, the force is released and the recoil material section **144** applies a force to the foot in a direction toward home plate.

The recoil material **144** may be a series of springs embedded in the recoil material layer, may be a resilient rubber material, some other material that provides a recoil effect, and/or a combination thereof. In addition, the recoil material may be imbalanced such that the direction of the recoil force is between perpendicular and parallel to the foot force. For example, if the recoil material includes a series of springs, the springs along the outer edge of the shoe may have a greater recoil force than those on the inner edge of the shoe. As such, when the foot force is released, the springs on the outer edge of the shoe "push" harder than the springs on the inner edge of the shoe, thus creating a more horizontal force.

FIG. **39** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and/or insole that includes a compressible material section and a recoil material section. In this embodiment, the compressible material section is layered on top of the recoil material section. The compressible material section includes one or more of the athletic positioning shapes and comprises a compressible material (examples previously provided).

The recoil section includes one or more the athletic positioning shapes, which may be the same as the one used in the compressible material section or a different shape. The recoil section comprises a recoil material that, when placed under a force, converts the force into a potential energy and, when the force is released, converts the potential energy into kinetic energy.

FIG. **40** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole **10** and/or insole **12** that includes a compressible material section **140**, a rigid material section **142**, and a recoil material section **144**. In this embodiment, the compressible material section **140** is layered on top of the rigid material section **142**, which is layered on top of the recoil material section **144**. The compressible material section **140** includes one or more of the athletic positioning shapes and comprises a compressible material (examples previously provided). The rigid section **142** includes one or more the athletic positioning shapes, which may be the same one as used in the compressible material section **140** or different, and comprises a rigid material. The rigid material **142** has minimal compression under pressure but allows for a desired level of flexion of the foot during use of the shoe (examples previously provided).

The recoil section **144** includes one or more the athletic positioning shapes, which may be the same as one of the ones used in the compressible material section **140** and/or on the rigid material section **142**, or a different shape. The recoil section **144** comprises a recoil material that, when placed under a force, converts the force into a potential energy and, when the force is released, converts the potential energy into kinetic energy.

FIG. **41** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole **10** and/or insole **12** that includes a compressible material section **140** and a recoil material section **144**. In this embodiment, the compressible material section **140** is layered below the recoil material section **144**. The compressible material section **140** includes one or more of the athletic positioning shapes and comprises a compressible material (examples previously provided).

US 11,013,291 B2

17

The recoil section **144** includes one or more the athletic positioning shapes, which may be the same as the one used in the compressible material section **140** or a different shape. The recoil section **144** comprises a recoil material that, when placed under a force, converts the force into a potential energy and, when the force is released, converts the potential energy into kinetic energy.

FIG. **42** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole **10** and/or insole **12** that includes a first compressible material section **150**, a second compressible material section **152**, and a rigid material section **142**. In this embodiment, the second compressible material section **152** is layered above the first compressible material section **150**, which is layered above the rigid material section **142**. The first compressible material section **150** includes one or more of the athletic positioning shapes and comprises a first compressible material. The second compressible material section **152** includes one or more of the athletic positioning shapes and comprises a second compressible material. For example, the first compressible material may comprise a flexible housing containing a gel and the second compressible material may comprise a memory foam.

The rigid section **142** includes one or more the athletic positioning shapes, which may be the same as one of the ones used in the first or second compressible material sections or different. The rigid section **142** comprises a rigid material, which has minimal compression under pressure but allows for a desired level of flexion of the foot during use of the shoe.

FIG. **43** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole **10** and/or insole **12** that includes a first compressible material section **150**, a second compressible material section **152**, and a recoil material section **144**. In this embodiment, the first compressible material section **150** is layered above the recoil material section **144**, which is layered above the second compressible material section **152**. The first compressible material section **150** includes one or more of the athletic positioning shapes and comprises a first compressible material. The second compressible material section **152** includes one or more of the athletic positioning shapes and comprises a second compressible material. For example, the first compressible material may be more compressible material than that of the second compressible material.

The recoil section **144** includes one or more the athletic positioning shapes, which may be the same as the one of the ones used in the first or second compressible material sections or different. The recoil section **144** comprises a recoil material that, when placed under a force, converts the force into a potential energy and, when the force is released, converts the potential energy into kinetic energy.

FIG. **44** illustrates an isometric diagram of an embodiment of an athletic positioning sole that includes an overall geometric shape that corresponds to the shape of a shoe, but is shown in block form for ease of illustration. As shown, the heel of the sole has a particular height (e.g., h**1**, which may be 1's to 10's of mm) that slopes at an angle (e.g., Ø**1**) to the toe on the inside edge of the sole. The inside edge of the sole at the toe section **25** may have a height of zero to a few millimeters with respect to the insole of the shoe.

As also shown, the athletic positioning sole includes a second height (e.g., h**2**) at the outer edge of the sole at the toe section, which tapers at an angle (e.g., Ø**2**) to the inside edge of the sole. Accordingly, a third angle exists from the heel to the toe section **25** on the outer edge of the sole.

18

FIG. **45** illustrates an isometric diagram of another embodiment of an athletic positioning sole that includes an overall geometric shape that corresponds to the shape of a shoe, but is shown in block form for ease of illustration. The athletic positioning sole further includes a heel platform and an angled support platform. The heel platform includes a height (h**1**), a length (L**1**), and a width (w).

The angled support platform includes a length (L—heel platform length), the width (w), a first height (h**1**), a second height (h**2**), an inner toe section height (e.g., 0 to a few mm), a first angle (e.g., Ø**1**) from the heel platform to the toe on the inside edge of the shoe, a second angle (e.g., Ø**2**) from the outer edge of the shoe to the inside edge of the shoe, and a third angle from the heel platform **38** to the toe section **25** on the outer edge of the shoe.

FIG. **46** illustrates an isometric diagram of another embodiment of an athletic positioning sole that includes an overall geometric shape that corresponds to the shape of a shoe, but is shown in block form for ease of illustration. The athletic positioning sole further includes a heel platform **38**, an angled support platform **36**, and an angled edge platform **160**. The heel platform includes a height (h**1**), a width (w), and a length.

The angled support platform **36** includes a length (L—heel length), a first width (w—width of the angled edge platform), a first height (h**1**), a second height (h**2**), a first angle (e.g., Ø**1**) from the heel platform **38** to the toe on the outside edge of the shoe, and a second angle (e.g., Ø**2**) from the outer edge of the shoe to the edge of the toe area. The angled edge platform includes a length (L—heel length), a first width (w—width of the angled support platform), a first height (h**1**), a second height (h**2**), and a first angle (e.g., Ø**1**) from the heel platform to the toe on the outside edge of the shoe.

FIG. **47** illustrates an isometric diagram of another embodiment of an athletic positioning sole that includes an overall geometric shape that corresponds to the shape of a shoe, but is shown in block form for ease of illustration. The athletic positioning sole further includes a heel platform **38**, an angled support platform **36**, and a ball-of-foot/toe area **112**. The heel platform **38** includes a height (h**1**), a width (w), and a length (L**1**).

The angled support platform **36** includes a length (L—L**1**), a first width (w), a second width corresponding to the toe area (w-width of toe area), a first height (h**1**), a second height (h**2**), a first angle (e.g., Ø**1**) from the heel platform **38** to the toe on the outside edge of the shoe, a second angle (e.g., Ø**2**) from the outer edge of the shoe to the edge of the toe area, and a third angle (e.g., Ø**3**) from the heel platform **38** to the toe area **112** on the inner edge of the shoe.

For each of the athletic positioning soles of FIGS. **44-47**, the surface on which the specific sole pattern lies, the angles, and the perimeter lines are shown as straight lines and/or flat surfaces; however, they may be contoured lines and/or angles, contoured surfaces, contour slopes, concave and/or convex slopes and/or surfaces, and/or a combination thereof to provide a more comfortable and/or custom fit. In addition, each of the athletic positioning soles of FIGS. **44-47** may be flipped such that the angled surface is coupled to the shoe and the other side is coupled to a specific sole pattern (e.g., basketball, tennis, baseball, football, dress shoe, casual shoe, cross-training, etc.). In either implementation of coupling the athletic positioning sole to the remainder of the shoe, the wearer of the shoe is placed in an athletic position that may promote better athletic performance.

US 11,013,291 B2

19

FIGS. **48-51** illustrates a cross-sectional side view diagram, a top view diagram, a bottom view diagram, and a cross-sectional front view diagram of an embodiment of an athletic positioning sole **10** and an athletic positioning insole **12**. The athletic positioning insole may have one of the athletic positioning shapes and may be comprised of a compressible material **140**, a recoil material **144**, and/or a rigid material **142**. Similarly, the athletic positioning sole may have one of the athletic positioning shapes and may be comprised of a compressible material, a recoil material, and/or a rigid material.

In this embodiment, the combination of the sole and the insole provide the overall athletic positioning shape for a shoe. For example, the heel height of the combined insole and sole is h**1**, which may be 10-30 mm or more, and the outer edge toe height of the combined insole and sole is h**2**, which may be 5-15 mm. In the present example, the sole and the insole contribute equally to the heights (h**1** and h**2**); however the ratio of may range from 50/50 to 90/10 to 10/90 (insole/sole).

The heel-to-toe angles (e.g., Ø**1** for inner edge and Ø**3** for outer edge) are provided by a combination of the heel to toe angles of each of the insole and the sole. In the present example, the sole **10** and the insole **12** contribute equally to the heel-to-toe angles (Ø**1** and Ø**3**); however the ratio of may range from 50/50 to 90/10 to 10/90 (insole/sole). Similarly, the insole **12** and sole **10** are shown to equally contribute to the outer edge to inner edge angle (e.g., Ø**2**), however the ratio of may range from 50/50 to 90/10 to 10/90 (insole/sole).

FIG. **52** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and an athletic positioning insole. The athletic positioning insole may have one of the athletic positioning shapes and may be comprised of one or more compressible materials **170** and/or of one or more rigid materials **172**. The athletic positioning sole may have one of the athletic positioning shapes and may be comprised of one or more compressible materials **170** and/or of one or more rigid materials **172**. For example, the rigid material **172** may be a rubber, carbon fiber, and/or plastic that is/are traditionally used for athletic shoe soles and the compressible material **170** may be memory foam, foam, and/or a gel that is/are traditionally used for athletic shoe insoles.

FIG. **53** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and an athletic positioning insole. The athletic positioning insole may have one of the athletic positioning shapes and may be comprised of one or more compressible materials **170** and/or of one or more rigid materials **172**. The athletic positioning sole may have one of the athletic positioning shapes and may be comprised of one or more rigid materials **172**.

FIG. **54** illustrates a cross-sectional side view diagram of another embodiment of an athletic positioning sole and an athletic positioning insole. The athletic positioning insole may have one of the athletic positioning shapes and may be comprised of one or more compressible materials **170**. The athletic positioning sole may have one of the athletic positioning shapes and may be comprised of one or more rigid materials **172**. For example, the sole may be comprised of a rubber, carbon fiber, and/or plastic that is/are traditionally used for athletic shoe soles and the insole may be comprised of memory foam, foam, and/or a gel that is/are traditionally used for athletic shoe insoles.

For each of the athletic positioning soles of FIGS. **48-54**, the angled surfaces of the sole and/or insole, the angles, and the perimeter lines are shown as straight lines and/or flat

20

surfaces; however, they may be contoured lines and/or angles, contoured surfaces, contour slopes, concave and/or convex slopes and/or surfaces, and/or a combination thereof to provide a more comfortable and/or custom fit. In addition, the athletic positioning soles of FIGS. **48-54** may be flipped such that the angled surface is coupled to the shoe and the other side is coupled to a specific sole pattern (e.g., basketball, tennis, baseball, football, dress shoe, casual shoe, cross-training, etc.). In either implementation of coupling the athletic positioning sole to the remainder of the shoe, the wearer of the shoe is placed in an athletic position that may promote better athletic performance.

FIGS. **55-58** illustrate a cross-sectional outside view diagram, a top view diagram, a cross-sectional inside view diagram, and a cross-sectional front view diagram of a specific embodiment of an athletic positioning insole. The insole includes a heel platform, an angled support platform, and a partial ball-of-foot cup. The insole may have one of the athletic positioning shapes and is comprised of one or more compressible materials. For a given athletic positioning shape, the height of the heel section **21** is ⅜ inch and the length and width of the insole correspond to an 11½ size man's shoe (which can be adjusted for any shoe size). The big toe section is ⅛ inch thick and the little toe section is ¼ inch thick. The angles are based on the dimensions of the lengths, widths, and heights of the insole, where the dimensions may be for a pre-compressed condition or a compressed condition.

FIGS. **59-62** illustrate a top view diagram, a cross-sectional outside view diagram, a cross-sectional inside view diagram, and a cross-sectional front view diagram of a specific embodiment of an athletic positioning sole. The sole includes a heel platform **38**, an angled support platform **36**, and an upper shoe connecting sides **180**. The sole may have one of the athletic positioning shapes and is comprised of one or more rigid materials **172** and/or compressible materials **170**. For a given athletic positioning shape, the height of the heel section **21** is ½ inch and the length and width of the sole correspond to an 11½ size man's shoe (which can be adjusted for any shoe size). The big toe section is ⅛ inch thick and the little toe section is ¼ inch thick. The angles are based on the dimensions of the lengths, widths, and heights of the insole, where the dimensions may be for a pre-compressed condition or a compressed condition. The sizing of the sides may vary depending on the connecting mechanism (e.g., stitch, glue, stable, fuse, etc.) to the upper shoe section.

FIGS. **63-64** illustrate a cross-sectional front view diagram and a cross-sectional inside view diagram of another embodiment of an athletic positioning sole **10** and/or insole **12** with compensating sport specific bottom **190**. The athletic positioning insole may have one of the athletic positioning shapes and may be comprised of a compressible material, a recoil material, and/or a rigid material. Similarly, the athletic positioning sole may have one of the athletic positioning shapes and may be comprised of a compressible material, a recoil material, and/or a rigid material. Note that a shoe implemented in accordance with this embodiment may include the athletic positioning sole and a conventional insole, a conventional sole and an athletic positioning insole, or may include an athletic positioning insole and an athletic positioning sole.

In an athletic position, more pressure is applied on the inside edge of the shoe at the ball-of-foot area than on other parts of the shoe. To compensate for this increased pressure, which could lead to greater wear and tear, the sport specific bottom **190** is thicker in this region than along the outer edge

US 11,013,291 B2

21

22

of the shoe. In addition, the sport specific sole may be thicker or equally as thick in the inner ball-of-foot region as in the heel region of the shoe. The sport specific bottom **190** may have an overall shape that reduces shock on the body when running and/or when making explosive movement.

FIG. **65** illustrates a cross-sectional front view diagram of another embodiment of a shoe having an athletic positioning sole and/or insole and a sport specific bottom that includes an upper shoe securing area **200**. The athletic positioning insole may have one of the athletic positioning shapes and may be comprised of a compressible material, a recoil material, and/or a rigid material. Similarly, the athletic positioning sole may have one of the athletic positioning shapes and may be comprised of a compressible material, a recoil material, and/or a rigid material. Note that a shoe implemented in accordance with this embodiment may include the athletic positioning sole and a conventional insole, a conventional sole and an athletic positioning insole, or may include an athletic positioning insole and an athletic positioning sole.

The sport specific bottom **190** includes a sport specific tread pattern (e.g., tennis, basketball, training, running, etc.), a spike and/or cleat pattern (e.g., baseball, football, golf, soccer, etc.), or a sliding coupling pattern (e.g., ice skates, ski boots, snowboard boots, rollerblades, etc.). In addition, the sport specific bottom **190** includes the upper securing area **200** to secure the sole assembly (e.g., sport specific bottom, the athletic positioning insole, and/or the athletic positioning sole) to an upper shoe **202**, which may be a conventional upper shoe for a given sport, activity, or dress, or may an upper shoe as described in subsequent figures. The sole assembly may be secured to the upper shoe **202** by stitching, gluing, stapling, fusing, riveting, etc. The sport specific bottom may also include a sloped bottom as discussed with reference to FIGS. **63** and **64**.

FIG. **66** illustrates a cross-sectional heel view diagram of another embodiment of an athletic positioning sole **10** and/or insole **12** and a sport specific bottom **190**. The athletic positioning insole may have one of the athletic positioning shapes and may be comprised of a compressible material, a recoil material, and/or a rigid material. Similarly, the athletic positioning sole may have one of the athletic positioning shapes and may be comprised of a compressible material, a recoil material, and/or a rigid material. Note that a shoe implemented in accordance with this embodiment may include the athletic positioning sole and a conventional insole, a conventional sole and an athletic positioning insole, or may include an athletic positioning insole and an athletic positioning sole.

The sport specific bottom **190** includes a sport specific tread pattern (e.g., tennis, basketball, training, running, etc.), a spike and/or cleat pattern (e.g., baseball, football, golf, soccer, etc.), or a sliding coupling pattern **212** (e.g., ice skates, ski boots, snowboard boots, rollerblades, etc.). In addition, the sport specific bottom **190** includes a wider base than its upper portion to provide lateral stability. As shown, the outer edge of the sport specific bottom **190** angles in at a first angle (e.g., Ø1) and the inner edge of the bottom angles in at a second angle (e.g., Ø2). When the shoe includes the athletic positioning insole **12** and/or sole **10**, it may be desirable to have the first angle larger than the second to provide more lateral stability, but both angles may be equal. The sport specific bottom **190** may also include a sloped bottom as discussed with reference to FIGS. **63** and **64**. Note that the heel section may include a heel cup area **214**

FIG. **67** illustrates an isometric diagram of an embodiment of an adjustable athletic positioning sole **10** and/or insole **12**. The insole **12** and/or sole **10** includes a fixed area **220** and an adjustable area **222**, each area may be of one of the athletic positioning shapes. The fixed area **220** provides a positioning of a big toe area **76** at a lower position than a heel area **21** and at a lower position than an outer edge area. In addition, the fixed area **220** may include one or more compressible materials, one or more rigid materials, and/or one or more recoil materials.

The adjustable area **222** may be implemented in a variety of ways, which will be discussed in subsequent drawings. In general, the adjustable area **222** allows for the heights, widths, lengths, and/or angles of the athletic positioning insole and/or athletic positioning sole to be adjusted from a minimum setting (e.g., the fixed area dimensions) to a maximum setting (e.g., the fixed area dimensions plus the adjustable area dimensions). The present figures illustrate a left shoe implementation, but the concepts are equally applicable to a right shoe.

FIG. **68** illustrates a cross-sectional side view diagram of another embodiment of an adjustable athletic positioning sole **10** and/or insole **12** having an alternating fixed area **222** and adjustable area **220**. The first adjustable area (e.g., the lowest one) allows the height of the heel platform **38** to be adjusted. The second adjustable area (e.g., the next one up) allows for the angled support platform **36** to be adjusted with minimal adjustment to the toe area. The third adjustable area (e.g., the top one) allows for the overall athletic position shape to be adjusted.

In an example, the fixed section **222** includes a plurality of fixed subsections and the adjustable section **220** includes a plurality of adjustable subsections, which are layered to vary the lower positioning of the big toe area **76** with respect to the heel area **21** and/or the big toe area **76** with respect to the outer edge area.

FIG. **69** illustrates a top view diagram of another embodiment of an adjustable athletic positioning sole **10** and/or insole **12** that includes an adjustable heel section **230**, an adjustable ball of foot and arch area **232**, and an adjustable toe area **234**. Each adjustable area **220** may be implemented using an air bladder structure that can be expanded from a minimal size (e.g., height, width, length, and/or angles) to a maximum size. Accordingly, each section would need an air intake nozzle to allow a needle to be inserted to add or remove air from the air bladder. In this instance, the air bladder would maintain the minimal shape even when all of the air is removed and expands to the maximum shape when sufficient air is added.

Alternatively, each adjustable area may include a fixed section **222** and an adjustable section **220**. In an example, the fixed section **222** includes a fixed toe area, a fixed mid-foot area and a fixed heel area and the adjustable section **220** includes an adjustable toe area that is positioned proximal to the fixed toe area, an adjustable mid-foot area that is positioned proximal to the fixed mid-foot area, and an adjustable heel area that is positioned proximal to the fixed heel area. The fixed section **222** has a shape as shown and is comprised of one or more compressible materials, one or more rigid materials, and/or one or more recoil materials. The adjustable section **220** may be an air bladder, stackable plates, and/or another adjusting mechanism.

FIGS. **70** and **71** illustrate a cross-sectional front view diagram and a cross-sectional side view diagram of an embodiment of an adjustable toe section **234** of an athletic positioning sole **10** and/or insole **12**. The adjustable toe section **234** may be adjusted from a minimal size (e.g.,

23

24

height, width, length, and/or angles) to a maximum size. For example, the toe section 234 includes an air bladder that has a minimal shape corresponding to the toe section 234 of one of the athletic positioning shapes, which can be expanded to a maximum shape. As another example, the toe section 234 includes a fixed section 222 that has a minimal shape corresponding to the toe section 234 of one of the athletic positioning shapes and an adjustable section 220 (e.g., air bladder, stackable plates, etc.) that allows the toe section 234 to expand to its maximum shape.

FIGS. 72-74 illustrate a top view diagram, a cross-sectional front view diagram, and a cross-sectional inside view diagram of another embodiment of an adjustable ball of foot section of an athletic positioning sole 10 and/or insole 12. The adjustable ball of foot section 232 may be adjusted from a minimal size (e.g., height, width, length, and/or angles) to a maximum size. For example, the ball of foot section 232 includes an air bladder that has a minimal shape corresponding to the ball of foot and/or arch section 232 of one of the athletic positioning shapes, which can be expanded to a maximum shape. As another example, the ball of foot section includes a fixed section that has a minimal shape corresponding to the ball of foot and/or arch section of one of the athletic positioning shapes and an adjustable section (e.g., air bladder, stackable plates, etc.) that allows the ball of foot section to expand to its maximum shape.

FIGS. 75 and 76 illustrate a top view diagram and a cross-sectional view diagram of another embodiment of an adjustable heel section of an athletic positioning sole 10 and/or insole 12. The adjustable heel section 230 may be adjusted from a minimal size (e.g., height, width, length, and/or angles) to a maximum size. For example, the heel section includes an air bladder that has a minimal shape corresponding to the heel section of one of the athletic positioning shapes, which can be expanded to a maximum shape. As another example, the heel section 230 includes a fixed section that has a minimal shape corresponding to the heel section of one of the athletic positioning shapes and an adjustable section (e.g., air bladder, stackable plates, etc.) that allows the heel section to expand to its maximum shape.

FIG. 77 illustrates a side view diagram of an embodiment of a shoe 246 having an adjustable athletic positioning sole. The shoe includes a sport specific lower plate 240 of the sole (which includes the sport specific sole pattern), one or more removable plates of the sole 242, a fixed upper plate of the sole 244, and a shoe top 246. The shoe may further include an athletic positioning insole (not shown), which may be fixed or adjustable.

The fixed upper plate 244 is secured to the shoe top 246 using conventional means (e.g., glue, stitching, fusing, stapling, riveting, etc.). The fixed upper plate 244 includes a securing mechanism that allows a removable plate or the sport specific bottom (if no removable plates are used) to be mechanically coupled thereto. In addition, the fixed upper plate 244 includes a shape that corresponds to one of the athletic positioning shapes (or a relatively flat shape) and is comprised of one or more rigid materials and/or one or more recoil materials.

The sport specific plate includes a sport specific pattern 240 and a securing mechanism that allows it to be mechanically coupled to a removable plate 242 or to the sport specific bottom 240 (if no removable plates are used). The sport specific lower plate 240 includes a shape that corresponds to one of the athletic positioning shapes (or a relatively flat shape) and is comprised of one or more rigid materials and/or one or more recoil materials.

Each of the removable plates 242 includes a securing mechanism that allows it to be mechanically coupled to another removable plate, to the fixed upper plate 244, or to the sport specific bottom 240. Each of the removable plates includes a shape that corresponds to one of the athletic positioning shapes (which, from plate to plate, may be different and/or of the same shape but of different dimensions) and is comprised of one or more rigid materials and/or one or more recoil materials (which, from plate to plate, may be different or the same).

FIG. 78 illustrates a front view diagram of an embodiment of a shoe having an adjustable athletic positioning sole. The shoe, as discussed with reference to FIG. 77, includes a sport specific lower plate of the sole 240 (which includes the sport specific sole pattern), one or more removable plates of the sole 242, a fixed upper plate of the sole 244, and a shoe top 246. The shoe may further include an athletic positioning insole (not shown), which may be fixed or adjustable.

FIG. 79 illustrates an expanded view diagram of another embodiment of an adjustable athletic positioning sole, which includes the fixed upper plate 244, one or more removable plates 242, and a sport specific lower plate 240. Each of the plates includes a securing mechanism, a shape that corresponds to one of the athletic positioning shapes (or a relatively flat shape) and is comprised of one or more rigid materials and/or one or more recoil materials.

An adjustable athletic positioning insole includes a fixed upper insole plate 244, one or more removable insole plates 242, and a lower insole plate 240. Each of the plates includes a securing mechanism, a shape that corresponds to one of the athletic positioning shapes (or a relatively flat shape) and is comprised of one or more rigid materials, one or more compressible materials, and/or one or more recoil materials.

FIG. 80 illustrates a top view diagram of an embodiment of the fixed upper plate, one or more of the removable plates, and a lower plate of an adjustable athletic positioning sole and/or of an adjustable athletic positioning insole. The securing mechanisms 250 are positioned throughout the plate to provide secure and reliable mechanical fastening of one plate to another. Note that more or less locations of the securing mechanisms 250 may be included on each plate. Further note that each plate includes substantially the same pattern of securing mechanisms.

FIG. 81 illustrates a cross-sectional side view diagram of an embodiment of plates of an adjustable athletic positioning sole 10 and/or insole 12 mechanically coupled together at one of the securing mechanisms 268 of the pattern of securing mechanisms. The fixed upper plate 262 (of the sole or insole) includes a base securing mechanism 260 (e.g., a custom nut having an encircling flange to maintain its position in the fixed upper plate) at one or more securing mechanism positions of the securing mechanism pattern. Each of the other plates 264 (e.g., the lower plate 270 and the removable plates) includes a securing mechanism 268 (e.g., a custom bolt with a threaded receptacle head) at one or more securing mechanism positions of the securing mechanism pattern. Each of the plates 264 includes a notched receptacle 272, which may be tapered, for holding the respective securing mechanism 268 in place. In addition, each plate includes a securing ledge, which allows the securing mechanisms to be screwed together to produce a secure butt joint between the plates.

The lower plate securing mechanism 268 may include a threaded plug 274, which may include a cap, to substantially cover the open area of the securing mechanism holding area. Each of the securing mechanisms 268 includes a standard drive head pattern (e.g., Phillips, straight blade, star, Allen

US 11,013,291 B2

25

wrench, etc.) or a custom drive head pattern, which requires a proprietary tool for securing and unsecuring plates.

FIG. 82 illustrates a cross-sectional side view diagram of an embodiment of a securing mechanism **268** for removable plates of an adjustable athletic positioning sole and/or insole. The securing mechanism **268** includes a threaded bolt section **280**, a fastening ledge **282**, a pressure fit ring **284**, and a threaded receptacle **286**. The thread count may be any number so long as at least one full turn is required to secure the plates together. The fastening ledge presses against the inside edge of the plate as it is screwed into the threaded receptacle of the securing mechanism of the other plate, which presses against the notched receptacle **272**.

FIG. 83 illustrates an expanded cross-sectional side view diagram of another embodiment of an adjustable athletic positioning sole **10** and/or insole **12** at one of the securing mechanisms **268** of the pattern of securing mechanisms. The adjustable insole and/or sole includes a fixed upper plate **244**, one or more removable plates **242**, and a lower plate **240**. The fixed upper plate **244** includes a keyhole receptacle **290**, which is illustrated in FIG. **84**, at one or more securing mechanism positions of the securing mechanism pattern. Each of the removable plates includes a keyhole receptacle and a mating peg **292** at one or more securing mechanism positions of the securing mechanism pattern. The lower plate **240** includes a mating peg **292** at one or more securing mechanism positions of the securing mechanism pattern.

FIG. 85 illustrates a cross-sectional side view diagram of another embodiment of an adjustable athletic positioning sole **10** and/or insole **12** at one of the securing mechanisms **268** of the pattern of securing mechanisms. In this example, the mating pegs **292** are inserted and moved into position to provide mechanical coupling of the plates together. In an example, the keyhole **290** and peg assembly **292** may be used at the big toe—ball of foot area where the material is thinner and the securing mechanism of FIGS. **81** and **82** would be used at other securing mechanism positions.

FIG. 86 illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole **10** and/or insole **12** that includes a recoil component. The recoil component may be achieved by including a series of springs, stiffened memory foam, and/or resilient rubber material. The recoil component may have one of the athletic positioning shapes or it may be a layer in an athletic positioning sole and/or insole.

The recoil component functions to provide a recoil force **300** after a foot force **302** is removed. The force may be in the opposite direction of the foot force or at some angle thereof.

FIG. 87 illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole **10** and/or insole **12** that includes a recoil component within a housing. The recoil component may have one of the athletic positioning shapes or it may be a layer in an athletic positioning sole and/or insole. The recoil component **310** includes a series of springs, stiffened memory foam, and/or resilient rubber material that have more recoil force on the outer edge of the shoe **312** versus the inner edge of the shoe **314**. In this manner, the direction of the recoil force is not opposite that of the foot force, but more horizontal and in the direction from the outside of the shoe to the inside of the shoe.

FIG. 88 illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole **10** and/or insole **12** that includes a recoil layer **320**, a base layer **322**, and a foot layer **324**. The base layer **322** includes one of the athletic positioning shapes and may be comprises of one or more rigid materials and/or one or more compressible mate-

26

rials. The foot layer may include arch support and may include a relatively flat shape or it may include one of the athletic positioning shapes. In addition, the foot layer **324** may be comprised of one or more compressible materials. The recoil layer **320** includes one or more recoil materials and may include a relatively flat shape or it may include one of the athletic positioning shapes.

FIG. 89 illustrates a cross-sectional front view diagram of another embodiment of a shoe that includes an athletic positioning sole **10**, an athletic positioning insole **12**, and an upper shoe **330**. From the font perspective, the upper shoe **330** forms a toe box around and over the toe area. From a side perspective, the upper shoe **330** forms the remainder of the shoe for containing the foot. The upper shoe **330** may include one or more materials (e.g., leather, a synthetic material, plastic, cotton, a wicking material, etc.) to form the sides, heel, tongue, and/or toe areas of the shoe. The upper shoe **330** may further include a toe cover area of material similar to that of the sole **10**, which provides at least a portion of the toe box.

In this embodiment, the insole comprises a compressible material, which, under a load of the wearer, compresses by a few millimeters to 10 or more millimeters. The upper shoe **330** is mechanically coupled (e.g., stitched, glued, fused, stapled, etc.) to the insole and/or sole such that, as the insole **12** compresses and decompresses, the upper shoe moves accordingly to maintain the toe box at a desired size and/or shape. For example, the upper shoe **330** is mechanically coupled to the upper portion of the insole **12**, which is within a vertically extended outersole portion of the sole **10**, such that the upper shoe **330** moves with the compression and decompression of the insole **12**.

As another example, the upper shoe includes a compressible coupling section for mechanically coupling to the sole **10** and/or insole **12**. As the insole **12** compresses and decompresses, the compressible coupling section, which includes a compressible material, compresses and decompresses similarly. In this manner, the size and/or shape of the toe box is substantially maintained.

FIG. 90 illustrates a cross-sectional front view diagram of another embodiment of a shoe that includes a sole **10**, an insole **12**, and an upper shoe **330**. The insole **12** and/or sole **10** are/is adjustable and at least one of the sole and insole has a shape corresponding to one of the athletic positioning shapes. The upper shoe **330** may include one or more materials (e.g., leather, a synthetic material, plastic, cotton, a wicking material, etc.) to form the sides, heel, tongue, and/or toe areas of the shoe. The upper shoe **330** may further include a toe cover area of material similar to that of the sole **10**, which provides at least a portion of the toe box.

The upper shoe **330** is mechanically coupled to the sole/insole assembly such that, as the sole/insole assembly is adjusted, the upper shoe maintains a desired size and shape of the toe box. For example, the upper shoe **330** is mechanically coupled to the upper portion of the sole/insole assembly, which is within a vertically extended outersole portion of the sole, such that the upper shoe tracks the adjustment of the sole/insole assembly.

FIG. 91 illustrates a cross-sectional front view diagram of another embodiment of a sole/insole assembly that includes a sole **10**, an athletic positioning insole **340**, and an arch support **342**. The sole may include a conventional sole design for a specific sport (or other use) or it may include one of the athletic positioning shapes discussed herein. In addition, the sole **10** may be comprised of a conventional

US 11,013,291 B2

27

sole material and/or one or more rigid materials. Note that the conventional sole material and the rigid materials are not mutually exclusive.

The athletic positioning insole **340** has a shape corresponding to one of the athletic positioning shapes, may be adjustable, and is comprised of one or more rigid materials, one or more recoil materials, and/or one or more compressible materials. The athletic positioning insole may be mechanically coupled to the sole or it may just rest on the sole (i.e., not glued, stitched, fused, etc.).

The arch support may be integrated into the athletic positioning insole **340** or it may be a separate piece that is mechanically coupled to the sole and/or insole or rests on the sole and/or insole. The arch support may be shaped to compensate for one or more of flat feet, plantar fasciitis, high arches, low arches, pronation, supination, etc. The arch support **342** may be of a custom design, a conventional design, etc., and/or may be comprised of one or more of a graphite material, leather, a rigid material, a compressible material, etc.

FIG. **92** illustrates a cross-sectional front view diagram of another embodiment of a sole/insole assembly that includes an athletic positioning sole **10** and an insole **12** with an integrated arch support **342**. The sole **10** includes one of the athletic positioning shapes **344** discussed herein and may be adjustable. In addition, the sole **10** may be comprised of a conventional sole material and/or one or more rigid materials. Note that the conventional sole material and the rigid materials are not mutually exclusive.

The insole **12** has a conventional insole shape or a shape corresponding to one of the athletic positioning shapes and has an arch support integrated therein. The arch support may be shaped to compensate for one or more of flat feet, plantar fasciitis, high arches, pronation, supination, etc. The insole with the integrated arch support **342** may be of a custom design, a conventional design, etc., and may be comprised of one or more of a graphite material, leather, a rigid material, a compressible material, etc.

FIGS. **93** and **94** illustrate a cross-sectional front view diagram and a cross-sectional side view diagram of another embodiment of an integrated athletic positioning sole and insole. The integrated sole **10** and insole **12** is comprised of one or more materials that provides a more compressible area towards the big toe/ball of foot area and increasingly less compressible away from the big toe/ball of foot area to facilitate an athletic position. The integrated sole and insole may be adjustable to adjust the athletic position (e.g., include removable plates, air bladders, etc.).

For example, the integrated sole and insole may include a rigid material as an outersole (e.g., a sport specific bottom) to provide a base. On top of the base, the integrated sole and insole includes one or more varying compressible materials. For example, the next layer is a single resilient material (e.g., rubber, gel, foam, synthetic material, etc.) of varying density to provide a compressible gradient. As another example, the next layer includes a plurality of materials, each having a shape to collectively provide the athletic positioning shape. In addition, at least some of the materials have a different level of compressibility to facilitate the compressible gradient.

The integrated sole and insole may further include an insole cover layer and/or an arch support cover layer. The insole cover layer may be of a compressible material to provide a more comfortable fit. The arch support may be shaped to compensate for one or more of flat feet, plantar fasciitis, high arches, pronation, supination, etc. The arch support may be of a custom design, a conventional design,

28

etc., and may be comprised of one or more of a graphite material, leather, a rigid material, a compressible material, etc.

FIG. **95** illustrates a cross-sectional front view diagram of another embodiment of an integrated athletic positioning sole and insole. The integrated sole and insole is comprised of a flexible and resilient material that creates a chamber (which may be filled with gel, air, another liquid material, oil, water, etc), which provides a more compressible area towards the big toe/ball of foot area **350** and increasingly less compressible away from the big toe/ball of foot area **352** to facilitate an athletic position. The material may be one or more of rubber, a synthetic material, plastic, fiberglass, carbon fiber, etc. In addition, the integrated sole and insole may be adjustable to adjust the athletic position (e.g., include removable plates, air bladders, etc.). Further, the integrated sole and insole may include an outsole of a rigid material (e.g., a sport specific bottom).

As shown, the walls of the integrated sole and insole are thicker on the outer edge **352** of the shoe than on the inner edge of the shoe **350**. As such, the outer edge of the sole/insole is less compressible than the inner edge. Similarly, the walls of the sole/insole at big toe and ball of foot area are thinner than the walls towards the heel of the shoe. Accordingly, when a shoe that includes the present insole/ sole assembly is worn, the more compressible areas on the insole/sole assembly compress more than the less compressible areas, putting the wearer in an athletic position (e.g., one or more of heel higher than toes, knees bent, more weight on big toe and/or ball-foot, more weight on inside of leg versus outside of leg, etc.).

FIG. **96** illustrates a cross-sectional front view diagram of another embodiment of an integrated athletic positioning sole and insole. The integrated sole and insole is comprised of a flexible and resilient material and includes a plurality of supporting columns and/or panels. The columns and/or panels create a plurality of chambers (which may be filled with gel, air, oil, another liquid material, water, etc). The number and/or thickness of the columns and/or panels is greater at the outer edge **362** of the shoe than on the inner edge of the shoe **360**, which provides a more compressible area towards the big toe/ball of foot area and increasingly less compressible away from the big toe/ball of foot area. The material may be one or more of rubber, a synthetic material, plastic, fiberglass, carbon fiber, etc. In addition, the integrated sole **10** and insole **12** may be adjustable to adjust the athletic position (e.g., include removable plates, air bladders, etc.). Further, the integrated sole and insole may include an outsole of a rigid material (e.g., a sport specific bottom).

As shown, the number of columns is greater at the outer edge of the shoe than at the inner edge of the shoe. As such, the outer edge **362** of the sole/insole is less compressible than the inner edge **360**. Similarly, the number of columns and/or the thickness of the columns is less at the sole/insole at big toe and ball of foot area than the number and/or thickness of columns towards the heel of the shoe. Accordingly, when a shoe that includes the present insole/sole assembly is worn, the more compressible areas on the insole/sole assembly compress more than the less compressible areas, putting the wearer in an athletic position.

FIG. **97** illustrates a cross-sectional front view diagram of another embodiment of an athletic positioning sole/insole assembly that includes a sole **10**, an insole **12**, a rigid outer edge **362**, and padding 360. The insole **12** has a conventional insole shape or a shape corresponding to one of the athletic positioning shapes. The insole **12** may have an arch support

US 11,013,291 B2

29

integrated therein, where the arch support is shaped to compensate for one or more of flat feet, plantar fasciitis, high arches, pronation, supination, etc. In addition, the insole may be comprised of one or more of a graphite material, leather, a rigid material, a compressible material, etc.

The sole **10** includes a conventional shape or a shape corresponding to one of the athletic positioning shapes. In addition, the sole may be adjustable and may be comprised of a conventional sole material and/or one or more rigid materials. Note that the conventional sole material and the rigid materials are not mutually exclusive.

The sole **10** may further include an outsole (e.g., sport specific bottom) that includes an inner supporting wall **364** and may further include the rigid outer edge **362**. The outsole may be comprised of a conventional sole material and/or of one or more rigid materials. Regardless of the material, the inner supporting wall is, at least on the inside edge by the toe, substantially perpendicular to the slope of the insole/sole assembly to minimize pinching of the big toe and/or the ball-of-foot. Similarly, the rigid outer edge **362** (or wall) is, at least on the inside edge by the little toe, substantially perpendicular to the slope of the insole/sole assembly to provide a rigid surface to push against when a lateral force is applied (i.e., the horizontal or near horizontal force component of the foot force during an athletic move) and/or to minimize a "give" of the shoe (e.g., foot sliding in the shoe, which may detract from the athletic move). Note that there may be padding on the inside of the rigid outer wall and/or on the inside of the inside supporting wall.

Alternatively, the rigid outer edge **362** may be coupled to, or integrated into, the insole **12**. In this alternative, the outsole would further include an outer supporting wall **364**, which is outside of the rigid outer edge **362**. In this instance, both the rigid outer edge **362** and the outer supporting wall **364** provide a rigid surface to push against for the lateral force.

FIG. **98** illustrates a cross-sectional front view diagram of another embodiment of a sole/insole assembly that includes an athletic positioning sole **10** and an insole **12**. The insole **12** has a conventional insole shape and may be comprised of a compressible material. In addition, the insole may include an arch support integrated therein, where the arch support is shaped to compensate for one or more of flat feet, plantar fasciitis, high arches, pronation, supination, etc.

The sole **10** includes a shape corresponding to one of the athletic positioning shapes. In addition, the sole may be adjustable and may be comprised of a conventional sole material and/or one or more rigid materials. Note that the conventional sole material and the rigid materials are not mutually exclusive.

FIG. **99** illustrates a cross-sectional front view diagram of another embodiment of a shoe that includes an athletic positioning sole **10**, an insole **12**, and a shoe housing **372**. The sole **10** and insole **12** are similar to the sole **10** and insole **12** of FIG. **98**. The shoe housing **372** (e.g., the shoe upper) includes a decompressible material **370** (e.g., similar material to a compressible material, but its normal state is compressed as opposed to decompressed) on the inside of the shoe housing **372**.

When the shoe is place on a foot and with minimal foot force, the compressible material insole is not substantially compressed and the decompressible material is substantially compressed. When a foot force is applied (e.g., wearer of the shoe is standing, running, et.), the compressible insole compresses and, when the foot force is removed (e.g., foot off ground), the compressible insole decompresses. As the foot force varies from minimal force (e.g., foot off ground)

30

to maximal force (e.g., leg on ground while running), the compression of the compressible insole varies proportionally.

The compression and/or decompression of the decompressible material during the variations of the foot force depend on how the shoe housing is anchored **374** (e.g., mechanically coupled) to the sole/insole assembly. In this figure, the shoe housing **372** is anchored **374** to the top of the compressible material; as such the shoe housing moves with the compression and decompression of the compressible insole. The decompressible material, however, stays in the substantially compressed state.

FIG. **100** illustrates the shoe housing anchored to the rigid sole **374**. In this example, the shoe housing does not move with the compression and decompression of the compressible insole. Accordingly, the decompressible material decompresses as the compressible insole compresses and the decompressible material compresses as the compressible insole decompresses. In either of the examples of FIGS. **99** and **100**, the decompressible material facilitates a snug fit of the shoe, which may reduce energy loss during an athletic move that results from a loose fitting shoe.

FIGS. **101** and **102** illustrate a cross-sectional front view diagram of another embodiment of a sole/insole assembly that includes a dynamic athletic positioning sole-insole and a sport specific bottom (e.g., an outersole). The athletic positioning sole-insole has a shape corresponding to one of the athletic positioning shapes, which is adaptable based on the force applied.

As shown in FIG. **101**, when a downward force (e.g., approximately perpendicular to the sport specific bottom **190** or slightly off perpendicular from the outer edge to the inner edge) is applied to the insole/sole assembly during a forward or backward movement (e.g., running, walking, jumping, etc., in a forward or backward direction), the angle from the outside edge of the shoe to the inside edge of shoe is of a first value (e.g., Ø1). The first value of the angle may be in the range of near zero degrees to less than 10 degrees to simulate a more conventional insole/sole assembly for forward/backward movements. In addition, the angle between the big toe/inner ball of foot area and the heel may be in the range of near zero degrees to less than 10 degrees to simulate a more conventional insole/sole assembly for forward/backward movements.

As shown in FIG. **102**, when a force (e.g., off perpendicular from the inner edge to the outer edge) is applied to the insole/sole assembly during a lateral movement (e.g., pitching, hitting, making a cut while running, etc.), the angle from the outside edge of the shoe to the inside edge of shoe is of a second value (e.g., Ø2). The second value of the angle may be in the range of a fraction of a degree to 10-20 degrees (or more) to provide an athletic position for lateral movements. In addition, the angle between the big toe/inner ball of foot area and the heel may be in the range of a fraction of a degree to 10-20 degrees (or more) to provide an athletic position for lateral movements.

FIG. **103** illustrates a cross-sectional front view diagram of an embodiment of the varying athletic positioning sole/insole assembly of FIGS. **101** and **102**. The sole/insole assembly includes an elastic housing **380**, a plurality of support and pressure shifting panels **382**, and a liquid material **384**. The elastic housing **380** is comprised of an elastic material such as one or more of rubber, a synthetic material, plastic, etc. In addition, the elastic housing **380** may be more elastic at the outer edge of the sole/insole

US 11,013,291 B2

**31**

assembly (and towards the heel) and less elastic at the inner edge of the sole/insole assembly towards the big toe/inner ball of foot area.

In a no load, steady-state condition, the flaps of the panels are closed and the liquid material is approximately equally distributed in the chambers between the panels. Note that equal distribution of the liquid material (e.g., gel, water, an oil, etc.) may be volume based and/or based on substantially equal pressure applied on the panels. In this state, the sole/insole assembly has a shape corresponding to one of the athletic positioning shapes.

FIGS. 104 and 105 illustrate a side view diagram and a cross-sectional view diagram of an embodiment of a panel of the sole/insole assembly of FIG. 103. The panel includes a plurality of larger release holes 390, a plurality of larger release holes 392, a plurality of smaller release holes 394, and a plurality of smaller flaps 396. The panel 398 may be comprised of a semi rigid, elastic, and resilient material such as one or more of rubber, a synthetic material, plastic, etc.

The larger 392 and smaller flaps 396 are comprised of the substantially the same semi rigid, elastic, and resilient material as the panel and function to block flow of the liquid material through the corresponding release hole in one direction and enable flow of the liquid material through the corresponding release hole in the opposite direction. The size of the holes and/or the ratio between the sizes of the holes is dependent on the desired levels of flow of the liquid material in the given directions.

FIG. 106 illustrates a cross-sectional front view diagram of another embodiment of the sole/insole assembly of FIG. 103 under a force (e.g., due to a lateral movement) as shown. In this example, more force 400 is being applied at the big toe and inner ball of foot area than at the outer edge. This puts greater force on the chambers below the big toe and inner ball of foot area than in the chambers under the outer edge of the foot. Once the pressure between an inner chamber and an adjacent outer chamber exceeds a rigidity factor of the larger flaps (e.g., a measure of how much force is needed for the flap to open), the flaps open and the liquid material 384 flows through the corresponding larger holes 404 from the inner chamber to the adjacent outer chamber.

In this load condition, the panels under the big toe and ball of foot area are compressed. Conversely, the panels under the outer edge of the sole/insole assembly are expanded. In addition, since the elastic housing 380 is more elastic at the outer edge of the sole/insole assembly than at the inner edge, the liquid material 394 expands the outer chambers 404 more readily than the inner chambers 406. Accordingly, the angle form the outer edge to the inner edge increases with respect to the angle during the no load steady-state condition. To insure that the holes do not close during such forces, the holes may include grommets to hold their shape.

If too much pressure builds up in the outer chambers versus an adjacent inner chamber, one or more of the smaller flaps may open to allow the liquid material to flow to the adjacent inner chamber. Note that ratio between the larger holes and the smaller holes favors flow 410 of the liquid material from the inner chambers to the outer chambers. Further note that when the force is removed (e.g., return to a no load steady state), the larger flaps close and some of the smaller flaps open until the no load steady state condition is substantially achieved.

FIG. 107 illustrates a cross-sectional front view diagram of another embodiment of the sole/insole assembly of FIG. 103 under a force 400 (e.g., due to a forward or backward movement or on the outer edge of the shoe) as shown. In this example, less force 400 is being applied at the big toe and

**32**

inner ball of foot area than at the outer edge. This puts less force on the chambers below the big toe and inner ball of foot area than in the chambers under the outer edge of the foot. Once the pressure between an outer chamber and an adjacent inner chamber exceeds a rigidity factor of the larger flaps 382 (e.g., a measure of how much force is needed for the flap to open), the flaps open and the liquid material flows 410 through the corresponding smaller holes from the outer chamber to the adjacent inner chamber.

In this load condition, the panels under the big toe and ball of foot area are substantially uncompressed. Conversely, the panels under the outer edge of the sole/insole assembly are compressed. In addition, since the elastic housing 380 is more elastic at the outer edge of the sole/insole assembly than at the inner edge, the liquid material contracts the outer chambers less readily than the inner chambers. Accordingly, the angle form the outer edge to the inner edge decreases (or at least stays approximately the same) with respect to the angle during the no load steady-state condition.

If too much pressure builds up in the inner chambers versus an adjacent outer chamber, one or more of the larger flaps may open to allow the liquid material to flow to the adjacent outer chamber. Note that when the force is removed (e.g., return to a no load steady state), the smaller flaps close and some of the larger flaps open until the no load steady state condition is substantially achieved.

FIG. 108 illustrates a cross-sectional side view diagram of another embodiment of the sole/insole assembly of FIG. 103 in the no load steady state condition. From a side perspective, the sole/insole assembly includes the elastic housing 380, a plurality of support panels 420, the plurality of support and pressure shifting panels 382, and the liquid material 384. The plurality of support panels 420 is located under the heel platform and provides substantially equal support for the heel. In the heel section 21, the panels do not include release holes or flaps, so the liquid material 384 does not flow between the chambers of the heel section.

Under the support platform for the remainder of the foot, and in the no load, steady-state condition, the flaps of the panels are closed and the liquid material 384 is approximately equally distributed in the chambers between the panels. Note that equal distribution of the liquid material 384 (e.g., gel, water, an oil, etc.) may be volume based and/or based on substantially equal pressure applied on the panels. In this state, the sole/insole assembly has a shape corresponding to one of the athletic positioning shapes.

FIG. 109 illustrates a cross-sectional side view diagram of another embodiment of the sole 10/insole 12 assembly of FIG. 103 under a force 400 (e.g., due to a lateral movement or forward/backward movement) as shown. In this example, more force 400 is being applied at the big toe and ball of foot area than near the heel. This puts greater force on the chambers below the big toe and ball of foot area than in the chambers under the heel. Once the pressure between a forward chamber and an adjacent rearward chamber exceeds a rigidity factor of the larger flaps (e.g., a measure of how much force is needed for the flap to open), the flaps open and the liquid material 384 flows through the corresponding larger holes from the forward chamber to the adjacent rearward chamber.

In this load condition, the panels 382 under the big toe and ball of foot area are compressed. Conversely, the panels under the near heel section are expanded. In addition, since the elastic housing is more elastic at the near heel section of the sole/insole assembly than at the toe section 25, the liquid material 384 expands the rearward chambers more readily than the forward chambers. Accordingly, the angle form the

US 11,013,291 B2

33 34

near heel section to the toe section **25** increases with respect to the angle during the no load steady-state condition.

If too much pressure builds up in the rearward chambers versus an adjacent forward chamber, one or more of the smaller flaps may open to allow the liquid material **384** to flow to the adjacent forward chamber. Note that when the force **400** is removed (e.g., return to a no load steady state), the larger flaps close and some of the smaller flaps open until the no load steady state condition is substantially achieved.

FIG. **110** illustrates a cross-sectional top view diagram of another embodiment of the sole/insole assembly of FIG. **103**. The heel section **21** includes fixed chambers **430** that do not allow the liquid material **384** to flow between the heel section chambers. The remaining sections of the sole/insole assembly include chambers that have panels **382** that allow the liquid metal to flow between the chambers. To promote an athletic position, the panels are orientated such that the flow of the liquid material favors the direction of the arrow during a lateral movement.

FIG. **111** illustrates a cross-sectional heel view diagram of another embodiment of a varying positioning athletic positioning sole/insole assembly, which includes a sole **10**, an insole **12**, and a sport specific bottom **190**. The sole **10** may include a conventional sole design for a specific sport (or other use) or it may include one of the athletic positioning shapes. In addition, the sole may be comprised of a conventional sole material and/or one or more rigid materials. Note that the conventional sole material and the rigid materials are not mutually exclusive.

The insole **12** may have a conventional insole shape or a shape corresponding to one of the athletic positioning shapes. The insole may be adjustable and is comprised of one or more rigid materials, one or more recoil materials, and/or one or more compressible materials. The insole may be mechanically coupled to the sole or it may just rest on the sole (i.e., not glued, stitched, fused, etc.) and may further include an integrated arch support.

From the heel perspective, the sole/insole assembly further includes an inward slope from a near middle point to the inner edge, which has an angle (e.g., Ø1). The angle may be in the range of a fraction of a degree to about 10 degrees. When a forward and backward movement force is applied to the sole/insole assembly, the non-angled section primarily supports the heel, which remains substantially parallel to the bottom of the sole/insole assemble. When a lateral movement force is applied, the angled section at least partially supports the heel such that a greater inward angling of the foot is achieved during athletic positioning.

FIG. **112** illustrates a cross-sectional front view diagram of another embodiment of a varying positioning athletic positioning sole/insole assembly that includes an outersole, a sole-insole section, and an inner sole. The outersole may be a sport specific bottom, a casual shoe bottom, or a dress shoe bottom. The inner sole includes a rigid-flexible platform that may include a padding layer and/or an arch support layer.

The sole/insole section includes a rigid material section **142** and an easily compressible section **140**. The rigid material section is comprised of one or more rigid materials and has a shape corresponding to one of the athletic positioning shapes. The easily compressible section is comprised of one or more easily compressible materials (e.g., foam, memory foam, soft rubber, a housing filled with a liquid material, etc.) and has a mating shape to that of the rigid material section **142** such that, under a no load condition, the combination of the rigid material section and the easily

compressible material section provide a conventional sole shape or a slight athletic positioning shape (e.g., angles less than a few degrees).

Under a forward or backward movement force **440**, the easily compressible material compresses slightly, such that the sole/insole assembly substantially maintains its no load shape. This condition is achieved by having more of the force **400** supported by the flat section of the rigid material section than the angled section.

FIG. **113** illustrates a cross-sectional front view diagram of another embodiment of a varying positioning athletic positioning sole/insole assembly of FIG. **112** under a lateral movement force **442**. In this diagram, the angled section of the rigid material **142** is supporting more of the force than that being supported by the flat section such that the easily compressible material **140** compresses and the inner sole tilts. The tilting of the inner sole facilitates an athletic positioning. Note that the inner sole may be somewhat flexible to allow it to conform to the athletic positioning shape.

FIG. **114** illustrates a cross-sectional front view diagram of another embodiment of a varying positioning athletic positioning sole/insole assembly that includes an outersole, a sole-insole section, and an inner sole. The outersole may be a sport specific bottom, a casual shoe bottom, or a dress shoe bottom. The inner sole includes a rigid-flexible platform that may include a padding layer and/or an arch support layer.

The sole-insole section includes a rigid material section **142** and an easily compressible section **140**. The rigid material section **142** is comprised of one or more rigid materials and has a basic shape corresponding to one of the athletic positioning shapes, but has two angles for the angled support platform. The easily compressible section **140** is comprised of one or more easily compressible materials (e.g., foam, memory foam, soft rubber, a housing filled with a liquid material, etc.) and has a mating shape to that of the rigid material section such that, under a no load condition, the combination of the rigid material section and the easily compressible material section provide a conventional sole shape or a slight athletic positioning shape (e.g., angles less than a few degrees).

Under a forward or backward movement force **440**, the easily compressible material **140** compresses slightly, such that the sole/insole assembly substantially maintains its no load shape. This condition is achieved by having more of the force supported by the flat section of the rigid material section **142** than the angled section.

FIG. **115** illustrates a cross-sectional front view diagram of another embodiment of a varying positioning athletic positioning sole/insole assembly of FIG. **114** under a lateral movement force **442**. In this diagram, the angled sections of the rigid material are supporting more of the force than the flat section such that the easily compressible material **140** compresses and the inner sole tilts. The more lateral movement force the greater the tilt of the inner sole. The tilting of the inner sole facilitates an athletic positioning.

FIGS. **116-118** illustrate a side view diagram, a front view diagram, and an isometric view diagram of an embodiment of a training shoe that includes an athletic positioning sole. The sole **10** includes an angled notch portion to facilitate achieving the desired athletic position. The angles of the angled notch portion may be greater than the angles of an insole/sole assembly to accentuate training the body to achieve a desired athletic positioning.

FIGS. **119-121** illustrate a side view diagram, a front view diagram, and a bottom view diagram of another embodiment

US 11,013,291 B2

35

of a training shoe that includes an athletic positioning sole. The sole **10** includes an athletic positioning shape to facilitate achieving the desired athletic position. The angles of the athletic positioning shape may be greater than the angles of an insole/sole assembly to accentuate training the body to achieve a desired athletic positioning.

FIGS. **122** and **123** illustrate a side view diagram and a front view diagram of an embodiment of baseball spikes that include an athletic positioning pattern. The baseball spikes include an insole/sole assembly, an outersole, and an upper shoe (not shown). The insole/sole assembly includes a sole **10** and an insole **12**. The sole **10** may include a conventional sole design or it may include one of the athletic positioning shapes. In addition, the sole **10** may be comprised of a conventional sole material and/or one or more rigid materials. Note that the conventional sole material and the rigid materials are not mutually exclusive.

The insole **12** may have a conventional insole shape or a shape corresponding to one of the athletic positioning shapes. The insole may be adjustable and is comprised of one or more rigid materials, one or more recoil materials, and/or one or more compressible materials. The insole may be mechanically coupled to the sole or it may just rest on the sole (i.e., not glued, stitched, fused, etc.) and may further include an integrated arch support.

The spikes may have differing heights to form one of the athletic positioning shapes. Accordingly, the spikes underneath the heel are the longest and the spike or spikes underneath the big toe and/or inner ball of foot are the shortest. The other spikes are of a length between the longest and shorted depending on their position. Note that the spikes may be metal spikes, plastic cleats, changeable plastic cleats, and/or a combination thereof. Further note that the same concept applies to football cleats, soccer cleats, golf shoes, track shoes, and any other sport shoes that include cleats and/or spikes.

FIG. **124** illustrates a bottom view diagram of another embodiment of baseball spikes that include spike pattern for the drive leg of a pitcher. The spike pattern may also include the athletic positioning pattern of FIGS. **122** and **123**. The baseball spikes may also include the sole/insole assembly of FIGS. **122** and **123**.

The pitcher drive leg spike pattern includes two or three spikes aligned with the big toe and the inner ball of the foot. This row of spikes may be used to engage the pitching rubber such that multiple spikes are engaging the rubber. The pitcher drive leg spike pattern further includes two or three spikes along the outer edge of the toe and ball of foot area. These spikes may be linearly aligned, may be positioned along a line that outlines the outer edge of the toes and ball of foot, or may be positioned in another manner. A set of heel spikes may be positioned in a conventional manner. Note that the pitcher's drive leg spike pattern does not include a spike at the top of the shoe under the middle toe(s). Further note that the spikes may be metal spikes and/or plastic cleats.

FIG. **125** illustrates a bottom view diagram of another embodiment of baseball spikes that includes a spike pattern for the plant leg of a pitcher. The spike pattern may also include the athletic positioning pattern of FIGS. **122** and **123**. The baseball spikes may also include the sole/insole assembly of FIGS. **122** and **123**.

The spike pattern for the plant leg of pitcher includes a conventional heel spike configuration and a ball of foot and toe pattern to firmly plant the spikes into the pitching mound. The ball of foot and toe spike pattern may be as shown.

36

Note that a pair of baseball spikes may include outer-soles that allow for the spike pattern to be changed depending on whether the wearer is left-handed or right-handed. For example, a left-handed pitcher would configure the spike pattern of FIG. **124** for his/her left foot and the spike pattern of FIG. **125** for his/her right foot. Conversely, a right-handed pitcher would configure the spike pattern of FIG. **125** for his/her right foot and the spike pattern of FIG. **125** for his/her left foot.

FIGS. **126** and **127** illustrate heel view diagrams of another embodiment of baseball spikes of FIGS. **122-125** engaging a pitching rubber **460**. As shown in FIG. **126**, the row of spikes **462** under the big toe and inner ball of foot area is engaging the rubber. As shown in FIG. **127**, the outer row of spikes **462** is engaging the rubber **460**. Note that the angles of the spike pattern of FIGS. **122** and **123** may be adjusted depending on whether the inner or outer row of spikes **462** is used to engage the rubber. For instance, if the inner row of spikes are used to engage the rubber **460**, the angles of the spike pattern may be less than when the outer row of spikes **462** are used since the rubber adds to achieving the desired athletic positioning when the inner row of spikes **462** are engaging the rubber **460**.

FIG. **128** illustrates a diagram of an embodiment of a spike for baseball spikes. The baseball spikes may include a spike pattern of one or more of FIGS. **122-127** and may further include the sole/insole assembly of FIGS. **122** and **123**. In this embodiment, one or more of the spikes **462** that engage the rubber **460** includes a notch to facilitate a secure engagement with the rubber **460**. The notch may be along a major edge of the spike **462** (e.g., a rear view of the spike is shown in the present figure). Alternatively, the spike may include one or more sides (forming an L or a C shape from a top perspective) where one or more of the sides include the notch.

In another embodiment, the spike pattern of FIG. **124** further includes one or more spikes **462** that are perpendicular to the spikes at the big toe and/or ball of foot. The perpendicular spike(s) include a notch that is aligned with the inner row of spikes **462** to further improve engagement with the rubber **460**.

FIG. **129** illustrates a cross-section front view diagram of another embodiment of an insertable sole/insole assembly that may be inserted into a pair of sport specific shoes (e.g., baseball spikes). The insertable sole/insole assembly includes a sole **10**, an insole **12**, and may further include an arch support. The sole **10** may include a conventional sole design for a specific sport (or other use) or it may include one of the athletic positioning shapes discussed herein. In addition, the sole **10** may be comprised of a conventional sole material and/or one or more rigid materials. Note that the conventional sole material and the rigid materials are not mutually exclusive.

The insole **12** includes a conventional insole shape or it has a shape corresponding to one of the athletic positioning shapes. The insole **12** may be adjustable and is comprised of one or more rigid materials, one or more recoil materials, and/or one or more compressible materials. The insole **12** may be mechanically coupled to the sole **10** or it may just rest on the sole **10** (i.e., not glued, stitched, fused, etc.). The arch support may be integrated into the athletic positioning insole or it may be a separate piece that is mechanically coupled to the insole or rests on the insole. The insertable sole/insole assembly may be used in combination with one or more of the heel attachments of FIGS. **130-139** to modify a conventional pair of baseball spikes into athletic positioning baseball spikes.

US 11,013,291 B2

37                                                                    38

FIGS. **130-132** illustrate a side view diagram and a bottom view diagram of an embodiment of an athletic positioning heel attachment for baseball spikes. The heel attachment **472** includes a height, width, and depth to raise the heel of the baseball spikes with respect to the toe of the spikes by 5-20 mm. In addition, the heel attachment **472** may include one or more notches or holes to clear one or more of the spikes on the heel section **470** of the baseball spikes. Further, the heel attachment **472** may be comprised of one or more of the rigid materials and may be mechanically coupled (e.g., glued, stitched, riveted, fused, etc.) to the heel of the baseband spikes.

FIG. **133** illustrates a bottom view diagram of another embodiment of an athletic positioning attachment for baseball spikes that attaches to the outer edge of the ball of foot and toe section of the baseball spikes. The athletic positioning attachment **480** has a shape corresponding to the non-heel section of one of the athletic positioning shapes. In addition, the athletic positioning attachment may include one or more notches or holes to clear one or more spikes of the baseball spikes. Further, the athletic positioning attachment may be comprised of one or more of the rigid materials and may be mechanically coupled (e.g., glued, stitched, riveted, fused, etc.) to the heel of the baseband spikes.

FIG. **134** illustrates a heel view diagram of another embodiment of an athletic positioning attachment for baseball spikes. In this diagram, the athletic positioning attachment **490** is attached to a pitcher's drive leg baseball spike to provide a desired athletic positioning of the drive leg.

FIG. **135** illustrates a side view diagram of another embodiment of a heel attachment **472** and an athletic positioning attachment **490** attached to one of a pair of baseball spikes. The heel **472** and athletic positioning attachments **490** may be separate attachments as previously discussed with reference to FIGS. **130-134**. Alternatively, the attachments may be a single attachment as discussed below.

FIGS. **136-138** illustrate a bottom view diagram, an inside view diagram, and an outside view diagram of an embodiment of an athletic positioning attachment for baseball spikes. The attachment **500** may have a shape corresponding to one of the athletic positioning shapes and may be comprised of one or more rigid materials. In addition, the attachment **500** may be mechanically coupled (e.g., glued, stitched, riveted, fused, etc.) to the outer-sole of the baseband spikes and may include one or more notches to provide clearance for one or more spikes.

FIG. **139** illustrates a topological view diagram of an embodiment of an athletic positioning attachment of FIGS. **136-138**. The attachment has a topology that ranges from a thickness of 1-4 mm under the ball of foot to 10-20 mm under the heel.

FIG. **140** illustrates an isometric view diagram of an embodiment of a pitching training aid that includes a platform **510**, a push-off platform that has one of the athletic positioning shapes, and a plurality of anchoring cleats **514**. In an example, the training aid has dimensions that include a height (h**1**) of 20-50 mm, a second height (h**3**) of 5-20 mm, a width of 75-125 mm, a length of 250-350 mm, and corresponding angles (Ø**2**, Ø**3**, and Ø**4**).

In use, the pitching training aid is placed in front of the rubber and secured into the pitching mound via the anchoring cleats. The pitcher places his/her drive leg shoe on the training aid **512** (e.g., on the push-off platform) such that his/her big toe and/or ball of foot is positioned at the lowest point the training aid and the heel is positioned at a higher point. This will help place the pitcher's drive leg to be in an athletic position.

FIG. **141** illustrates an isometric view diagram of another embodiment of a pitching training aid that includes one of the athletic positioning shapes, a notch for engaging the rubber (no notch shown), and a plurality of anchoring cleats **514**. In an example, the training aid has dimensions that include a height (h**1**) of 20-50 mm, a second height (h**3**) of 5-20 mm, a width of 75-125 mm, a length of 250-350 mm, and corresponding angles (Ø**2**, Ø**3**, and Ø**4**).

In use, the pitching training aid is placed such that the notch engages the front edge of the rubber. The training aid is secured the pitching mound via the anchoring cleats **514**. The pitcher places his/her drive leg shoe on the training aid **512** such that his/her big toe and/or ball of foot is positioned at the lowest point the training aid and the heel is positioned at a higher point.

FIG. **142** illustrates an isometric view diagram of an embodiment of a pitching rubber that includes a left-handed side and a right-handed side. Each side includes one of the athletic positioning shapes to facilitate achieving an athletic position for pitching. The pitching rubber may further include a ledge to ensure a proper height for engaging the athletic positioning ends of the rubber.

FIG. **143** illustrates an isometric view diagram of another embodiment of a pitching rubber that includes a left-handed middle section and a right-handed middle section. Each middle section includes one of the athletic positioning shapes to facilitate achieving an athletic position for pitching. The pitching rubber may further include a ledge to ensure a proper height for engaging the athletic positioning ends of the rubber.

FIGS. **144** and **145** illustrate a top view diagram and a cross-section front view diagram of an embodiment of a shoe that includes an athletic positioning insole/sole assembly, an upper shoe **534**, one or more tightening sections, and one or more securing mechanisms **526**. The upper shoe **534** includes a toe cover section, sides, and an Achilles heel section. The one or more tightening sections include one or more flaps (one shown), where each flap includes one or more securing tabs attached thereto. A flap **532** may be comprised of a similar material as a tongue on a conventional shoe and/or of a similar material as at least a portion of the upper shoe **534**.

The upper shoe **534** is attached to the one or more tightening sections via a hinged coupling mechanism **524** (e.g., a flexible and durable material mechanically coupling (e.g., stitched, glued, fused, stapled, riveted, etc.) the upper shoe **534** to the tightening section, a fabric hinge, a plastic and/or rubber hinge, etc.). The one or more securing mechanisms **526** (e.g., Velcro, buckles, shoe laces, hook and eyelets, clasps, etc.) include one mating element mechanically coupled to the vertical component of the outer-sole and/or to the sole/insole assembly on the inside edge of the shoe and another mating element mechanically coupled to the securing tabs **530** of the tightening section.

In use, the tightening section **532** is open to allow the wearer to easily insert his/her foot. Once the foot is placed within the shoe, the wearer pulls the tightening section **532** over the top of his/her foot. Due to the sole/insole assembly, the outer edge of the foot is higher than the inside edge (especially towards the toes and ball of foot areas) and the heel is higher than the toes and ball of foot areas. With this orientation of the foot, applying a force **400** from the outside edge to the inside edge while closing and fastening the tightening section **532** to the securing mechanism **526** provides a desired snug fit and may further promote the athletic positioning. Padding within the shoe provides added comfort.

US 11,013,291 B2

39 40

FIG. **146** illustrates a side view diagram of an embodiment of the shoe of FIGS. **144** and **145** with the one or more tightening sections **532** (e.g., pull over top) securely fastened to the one or more securing mechanisms **326**, which are securely mounted on the vertical outer-sole section on the inside edge of the shoe. With the tightening section **532** securely fastened, it is applying a force from the outer edge of the shoe to the inner edge of the shoe, which provides the desired snug fit and promotes the athletic positioning.

FIGS. **147** and **148** illustrate side view diagrams of another embodiment of a shoe that includes an athletic positioning insole/sole assembly, an upper shoe, one or more tightening sections **532**, and one or more securing mechanisms **526**. The securing mechanism **526**(s) includes an anchoring mechanism **548**, a first set of hoops **560**, a second set of hoops **546**, a shoelace **544** (which are shown in FIG. **147**), and a hook section (which is shown in FIG. **148**).

The first set of hoops **550** (which may be eyelets, holes with grommets, etc.) is secured to the tightening section **532** and the second set of hoops **546** is secured to the sole and outersole and is horizontal offset from the first set of hoops. The shoelace **544** is woven through the sets of hooks and is anchored at one by the anchoring mechanism **548** (e.g., stitching, riveting, gluing, etc.) to the sole, outersole, or the toe box cover. The shoelace **544**, which may have some to no elasticity, includes a holding tab **540** and a hook **560** (or eyelet **564**) at its other end. The hook section **560** (FIG. **148**) includes a plurality of hooks **560** arranged in a pattern (e.g., linearly aligned, aligned in an upward angle, aligned in a downward angle, equally spaced, unequally spaced, etc.) and includes a cover with a Velcro **568** (or other) securing tab.

In use, the wearer provides slack to the shoelace **544** such that the tightening section **532** can be opened enough to enable the wearer to insert his/her foot into the shoe. In this position, the first set of hoops **546** is vertically offset from the second set of hoops **550**. Once the foot is in the shoe, the wearer pulls the shoelace **544** via the holding tab **542**, which causes the first set of hoops **546** to be pulled downward towards the second set of hoops **550**. This motion causes the tightening section **532** to tighten around the foot. Once the wearer has achieved the desired snug fit, he/she couples the eyelet **564** of the shoelace **544** on one of the hooks **560** (FIG. **148**) to maintain the present fit of the shoe. The wearer then secures the hook cover **562** over the hooks **560**. To remove the shoe, the wearer performs the process in reverse.

FIG. **149** illustrates a side view diagram of another embodiment of shoe that includes an athletic positioning insole/sole assembly, an upper shoe, one or more tightening sections **532**, and one or more securing mechanisms **526**. The securing mechanism(s) **526** includes anchoring mechanisms **548**, a first set of hoops **576**, a second set of hoops **578**, a third set of hoops **580**, a first shoelace **582**, a second shoelace **584**, a first hook section **570**, and a second hook section **572**.

The first set of hoops **576** (which may be eyelets, holes with grommets, etc.) is secured to the tightening section **532**; the second set of hoops **578** is free floating; and the third set of hoops **580** is secured to the sole or outersole. The first shoelace **582** is woven through the first **570** and second sets of hooks **572** and is anchored at one by the first anchoring mechanism **548** to the sole, outersole, or the toe box cover. The second shoelace **584** is woven through the second **578** and third sets of hooks **580** and is anchored at one by the second anchoring mechanism **548** to the sole, outersole, or the toe box cover.

Each of the shoelaces, which may have some to no elasticity, includes a holding tab and a hook **564** (or eyelet) at its other end. Each of the hook sections **560** includes a plurality of hooks arranged in a pattern (e.g., linearly aligned, aligned in an upward angle, aligned in a downward angle, equally spaced, unequally spaced, etc.). A shoe may further include a cover that covers the hook sections.

In use, the wearer provides slack to the shoelaces such that the tightening section **532** can be opened enough to enable the wearer to insert his/her foot into the shoe. In this position, the first set of hoops **576** is vertically offset from the second set of hoops **578** which are vertically offset from the third set of hoops **580**. Once the foot is in the shoe, the wearer pulls the second shoelace **584** via the holding tab, which causes the second set of hoops **578** to be pulled downward towards the third set of hoops **580**. The wearer then pulls (or pulls contemporaneously) the first shoe via its holding tab, which causes the first set of hoops **576** to be pulled downward toward the second **578** and third set of hoops **580**. These motions cause the tightening section to tighten around the foot. Once the wearer has achieved the desired snug fit, he/she couples the eyelets of the shoelaces on hooks **570** of the respective hook sections to maintain the present fit of the shoe. The wearer then secures the hook cover **562** over the hook sections. To remove the shoe, the wearer performs the process in reverse.

FIG. **150** illustrates an isometric view diagram of another embodiment of shoe that includes an athletic positioning insole/sole assembly, an upper shoe **590**, one or more tightening sections **532**, and one or more securing mechanisms **526**. The securing mechanism **526** may be any one or a combination of the securing mechanisms previously discussed. The tightening section **532** is shown as being an integral part of the upper shoe **590** to include one or more flaps **532** that pull over the top of the shoe towards the in step. The upper shoe **590** is further shown to include a tongue **592**.

In use, the wearer unsecures the pull over flap (s) **532** from the securing mechanisms **526** or loosens the pull over flaps **532** from the securing mechanisms **526** depending on the type of the securing mechanism. In this condition, the wearer inserts his/her foot into the shoe and positions the tongue **592**, if needed. Once the foot is inserted into the shoe, the wearer pulls the pull over flap(s) **532** and secures it/them using the securing mechanisms **526**.

A shoe (sport, dress, casual, etc.) may be implemented using one or more of the concepts presented with reference to the preceding figures. For instance, a shoe may include a combination of concepts discussed with reference to different figures even if the discussion of one figure did not specifically mentioned that the concept(s) it is presenting can be combined with one or more concepts discussed with reference to another figure. In addition, one or more of the concepts presented with reference to one or more of the figures may be used in a stand alone athletic positioning insole, a standalone athletic positioning attachment, a standalone training aid, and/or in a combination thereof. Further, the concepts presented in the preceding figures may be diagramed for left footwear (e.g., sole, insole, bottom, sock, shoe, etc.) or right footwear. Regardless of which footed footwear is illustrated, the concepts apply equally to left footed footwear and to right footed footwear. Still further, a sole/insole assembly (i.e., a sole and an insole that individually or collectively have an athletic positioning shape) may be incorporated into any type of shoe along with other shoe parts (e.g., an outersole (e.g., a sport specific bottom), a upper shoe, a toe cover, etc.).

US 11,013,291 B2

**41**

As may be used herein, the terms "substantially" and "approximately" provides an industry-accepted tolerance for its corresponding term and/or relativity between items. Such an industry-accepted tolerance ranges from less than one percent to fifty percent and corresponds to, but is not limited to, component values, integrated circuit process variations, temperature variations, rise and fall times, and/or thermal noise. Such relativity between items ranges from a difference of a few percent to magnitude differences. As may also be used herein, the term(s) "operably coupled to", "coupled to", and/or "coupling" includes direct coupling between items and/or indirect coupling between items via an intervening item (e.g., an item includes, but is not limited to, a component, an element, a circuit, and/or a module) where, for indirect coupling, the intervening item does not modify the information of a signal but may adjust its current level, voltage level, and/or power level. As may further be used herein, inferred coupling (i.e., where one element is coupled to another element by inference) includes direct and indirect coupling between two items in the same manner as "coupled to". As may even further be used herein, the term "operable to" or "operably coupled to" indicates that an item includes one or more of power connections, input(s), output(s), etc., to perform, when activated, one or more its corresponding functions and may further include inferred coupling to one or more other items. As may still further be used herein, the term "associated with", includes direct and/or indirect coupling of separate items and/or one item being embedded within another item. As may be used herein, the term "compares favorably", indicates that a comparison between two or more items, signals, etc., provides a desired relationship. For example, when the desired relationship is that signal **1** has a greater magnitude than signal **2**, a favorable comparison may be achieved when the magnitude of signal **1** is greater than that of signal **2** or when the magnitude of signal **2** is less than that of signal **1**.

As may also be used herein, the terms "processing module", "processing circuit", and/or "processing unit" may be a single processing device or a plurality of processing devices. Such a processing device may be a microprocessor, micro-controller, digital signal processor, microcomputer, central processing unit, field programmable gate array, programmable logic device, state machine, logic circuitry, analog circuitry, digital circuitry, and/or any device that manipulates signals (analog and/or digital) based on hard coding of the circuitry and/or operational instructions. The processing module, module, processing circuit, and/or processing unit may be, or further include, memory and/or an integrated memory element, which may be a single memory device, a plurality of memory devices, and/or embedded circuitry of another processing module, module, processing circuit, and/or processing unit. Such a memory device may be a read-only memory, random access memory, volatile memory, non-volatile memory, static memory, dynamic memory, flash memory, cache memory, and/or any device that stores digital information. Note that if the processing module, module, processing circuit, and/or processing unit includes more than one processing device, the processing devices may be centrally located (e.g., directly coupled together via a wired and/or wireless bus structure) or may be distributedly located (e.g., cloud computing via indirect coupling via a local area network and/or a wide area network). Further note that if the processing module, module, processing circuit, and/or processing unit implements one or more of its functions via a state machine, analog circuitry, digital circuitry, and/or logic circuitry, the memory and/or memory element storing the corresponding opera-

**42**

tional instructions may be embedded within, or external to, the circuitry comprising the state machine, analog circuitry, digital circuitry, and/or logic circuitry. Still further note that, the memory element may store, and the processing module, module, processing circuit, and/or processing unit executes, hard coded and/or operational instructions corresponding to at least some of the steps and/or functions illustrated in one or more of the Figures. Such a memory device or memory element can be included in an article of manufacture.

The present invention has been described above with the aid of method steps illustrating the performance of specified functions and relationships thereof. The boundaries and sequence of these functional building blocks and method steps have been arbitrarily defined herein for convenience of description. Alternate boundaries and sequences can be defined so long as the specified functions and relationships are appropriately performed. Any such alternate boundaries or sequences are thus within the scope and spirit of the claimed invention. Further, the boundaries of these functional building blocks have been arbitrarily defined for convenience of description. Alternate boundaries could be defined as long as the certain significant functions are appropriately performed. Similarly, flow diagram blocks may also have been arbitrarily defined herein to illustrate certain significant functionality. To the extent used, the flow diagram block boundaries and sequence could have been defined otherwise and still perform the certain significant functionality. Such alternate definitions of both functional building blocks and flow diagram blocks and sequences are thus within the scope and spirit of the claimed invention. One of average skill in the art will also recognize that the functional building blocks, and other illustrative blocks, modules and components herein, can be implemented as illustrated or by discrete components, application specific integrated circuits, processors executing appropriate software and the like or any combination thereof.

The present invention may have also been described, at least in part, in terms of one or more embodiments. An embodiment of the present invention is used herein to illustrate the present invention, an aspect thereof, a feature thereof, a concept thereof, and/or an example thereof. A physical embodiment of an apparatus, an article of manufacture, a machine, and/or of a process that embodies the present invention may include one or more of the aspects, features, concepts, examples, etc., described with reference to one or more of the embodiments discussed herein. Further, from figure to figure, the embodiments may incorporate the same or similarly named functions, steps, modules, etc., that may use the same or different reference numbers and, as such, the functions, steps, modules, etc., may be the same or similar functions, steps, modules, etc., or different ones.

Unless specifically stated to the contra, signals to, from, and/or between elements in a figure of any of the figures presented herein may be analog or digital, continuous time or discrete time, and single-ended or differential. For instance, if a signal path is shown as a single-ended path, it also represents a differential signal path. Similarly, if a signal path is shown as a differential path, it also represents a single-ended signal path. While one or more particular architectures are described herein, other architectures can likewise be implemented that use one or more data buses not expressly shown, direct connectivity between elements, and/or indirect coupling between other elements as recognized by one of average skill in the art.

The term "module" is used in the description of the various embodiments of the present invention. A module includes a processing module, a functional block, hardware,

US 11,013,291 B2

43

and/or software stored on memory for performing one or more functions as may be described herein. Note that, if the module is implemented via hardware, the hardware may operate independently and/or in conjunction software and/or firmware. As used herein, a module may contain one or more sub-modules, each of which may be one or more modules.

While particular combinations of various functions and features of the present invention have been expressly described herein, other combinations of these features and functions are likewise possible. The present invention is not limited by the particular examples disclosed herein and expressly incorporates these other combinations.

What is claimed is:
**1**. A shoe comprises:
an upper section;
a midsole coupled to the upper section;
an insole positioned proximal to the midsole and within the upper section; and
a bottom outsole coupled to the midsole, wherein a combination of the midsole, the insole, and the bottom outsole form an athletic positioning shape, wherein the athletic positioning shape has:
  a first height at an inside edge and at an outside edge of the shoe along a heel section of the shoe,
  a second height on the outside edge of the shoe at a toe section of the shoe,
  a third height on the inside edge of the shoe at the toe section of the shoe, and
  the first height being greater than the second height and the second height being greater than the third height, wherein a first slope is formed by the first height and the second height, wherein a second sloped is formed by the first height and the third height, and
  wherein a third slope is formed by the second height and the third height.
**2**. The shoe of claim **1** further comprises:
the athletic positioning shape including the heel section, a mid-foot section, and a toe section, wherein the

44

mid-foot section is between the heel section and the toe section, and wherein the heel section has the first height throughout.
**3**. The shoe of claim **2** further comprises:
a fourth height at the outside edge of the shoe at a transition from the mid-foot section to the toe section, wherein the fourth height is greater than the second height and wherein the fourth height is less than the first height.
**4**. The shoe of claim **3** further comprises:
a fifth height at the inside edge of the shoe at the transition from the mid-foot section to the toe section, wherein the fifth height is greater than the third height and wherein the fifth height is less than the first height and less than the fourth height.
**5**. The shoe of claim **2** further comprises:
a fourth height at the inside edge of the shoe at the transition from the mid-foot section to the toe section, wherein the fourth height is greater than the third height and wherein the fourth height is less than the first height.
**6**. The shoe of claim **1** further comprises:
the first slope is a first linear slope;
the second slope is a second linear slope; and
the third slope is a third linear slope.
**7**. The shoe of claim **1** further comprises:
the first slope is a first non-linear slope;
the second slope is a second non-linear slope; and
the third slope is a third non-linear slope.
**8**. The shoe of claim **1** further comprises:
the second height including an insole second height component, a midsole second height component, and a bottom outsole second height component; and
the third height including an insole third height component, a midsole third height component, and a bottom outsole third height component, wherein the bottom outsole third height component is greater than the bottom outsole second height component.

*    *    *    *    *

# EXHIBIT C

# UNDER ARMOUR AND STEPHEN CURRY ENTER LONG-TERM PARTNERSHIP

USA - English ▾

NEWS PROVIDED BY
**Under Armour, Inc.** ➔
30 Mar, 2023, 10:30 ET

*The next chapter will push the boundaries of athletic performance and prioritize the impact that sport has on communities globally – while growing Under Armour and Curry Brand together.*

BALTIMORE, Md., March 30, 2023 /PRNewswire/ -- Under Armour, Inc. (NYSE: UA, UAA) today announced that it is strengthening its partnership with Golden State Warriors point guard and four-time NBA Champion Stephen Curry. The enhanced partnership is designed to capture market share, fuel business growth and create new business opportunities on a global basis. This next chapter of the partnership will build upon the success and accomplishments from the past decade to continue driving product solutions and innovation, impacting communities across the globe, and growing Under Armour and Curry Brand together.

Continue Reading
⌄



Stephen Curry and Kevin Plank, March 2023.

Stephen's new role as President of Curry Brand will enhance his ability to drive athlete insights, product development, and strategic business and marketing endeavors. Since 2013, he's helped propel industry-leading signature launches and provided key insights on Under Armour product technologies such as UA Charged, UA HOVR®, UA Warp and UA Flow. In this next phase of the partnership, Under Armour and Stephen will elevate this commitment across categories—from basketball to golf, women, youth, and sportstyle—delivering product solutions that help athletes perform at the highest level. Stephen will also assume a broad advisory role where his sphere of impact will strengthen brand love, recruitment, and present opportunities across categories to reach and expand Under Armour's athlete roster.

"Stephen is one of the greatest talents of our generation," said Kevin Plank, Executive Chair and Brand Chief, Under Armour. "He is an integral part of the Under Armour family, and we are excited and inspired by this next stage in our partnership. At his core, Stephen embodies what it means to be an Under Armour athlete, and we feel fortunate to take the next step with him in continuing to empower those who strive for more, together."

Under Armour and Stephen have released ten signature shoes in the decade since the partnership began, each with a unique design that harkens back to memorable moments throughout Stephen's career and his ascension in the NBA. With the launch of the Curry Flow 10 this past fall, Stephen became only the ninth athlete in history, and the first Under Armour athlete, to release ten different signature shoes within his lineup. In 2020, Stephen and Under Armour introduced UA Flow, a best-in-class cushioning technology that has helped take his signature shoes, and his game, to the next level.

"If the past ten years have shown me anything, it's that Under Armour and I can build great things together," said Stephen Curry. "It's all about impacting athletes and creating products that perform and resonate with them, and Under Armour does it best. In 2013, Under Armour bet on me and I bet on them, and I'm all in on taking this next step together."

The partnership also includes increased funding for community impact efforts—creating opportunity, access, and equity for the next generation of athletes. Curry Brand, which launched in 2020, built purpose into its bottom line. Now, just over two years later, Under Armour, Stephen and Curry Brand have already refurbished ten courts, trained 2,500 coaches, supported 77 programs, and impacted more than 72,000 youth athletes—more than halfway to the goal of renovating 20 safe places to play, training 15,000 coaches and supporting 125 programs by 2025 to impact 100,000 youth.

"I am beyond excited to be joining Under Armour at this pivotal time, especially with the heat and influence that Stephen will bring for us. I look forward to working closely with Stephen and the Curry team as we focus on the next chapter of accelerated growth across the Under Armour Brand," said Stephanie Linnartz, President and CEO, Under Armour.

Under Armour and Stephen have been steadfast in the pursuit of empowering the next generation of athletes. Driven by shared values, a focus on performance and style, and a commitment to community, this partnership renewal will ensure the mission endures for years to come.

"Belief is a big part of who I am on and off the court. I believe in Under Armour and Curry Brand, the team now in place, and what we're doing together. We share a vision for a big future ahead," said Curry.

**About Under Armour**

Under Armour, Inc., headquartered in Baltimore, Maryland, is a leading inventor, marketer, and distributor of branded athletic performance apparel, footwear, and accessories. Designed to empower human performance, Under Armour's innovative products and experiences are engineered to make athletes better. For further information, please visit http://about.underarmour.com.

**About Curry Brand**

A partnership between Stephen Curry and Under Armour, Curry Brand is a purpose-led performance brand with a mission to ensure every young person has equitable access to sport, providing solutions that positively impact youth sports in under-resourced communities. It aims to provide youth with new apparel and equipment, access to mentors and coaches, and safe places to play. Curry Brand features footwear, apparel, and accessories across multiple categories including basketball and golf. Learn more at currybrand.com.

**About Octagon**

Under Armour worked diligently with Stephen's longtime representatives at Octagon to structure this multifaceted deal. Octagon is the preeminent talent management, integrated marketing, and creative agency in global sports and entertainment. The agency creates distinctive marketing campaigns for some of the largest brands and Fortune 500 companies across the globe and represents more than 900 of the most prominent and influential athletes, talent, and properties in the world.

SOURCE Under Armour, Inc.



# PRN Top Stories Newsletters

Sign up to get PRN's top stories and curated news delivered to your inbox weekly!

Enter Your Email

Select Country

Submit

By signing up you agree to receive content from us.
Our newsletters contain tracking pixels to help us deliver unique content based on each subscriber's engagement and interests. For more information on how we will use your data to ensure we send you relevant content please visit our PRN Consumer Newsletter Privacy Notice. You can withdraw your consent at any time in the footer of every email you'll receive.

# EXHIBIT D

# EXHIBIT I

Case 2:23-cv-00103-RJS-DBP Document 184-15 Filed 05/23/24 Page 139 of 468 PageID #: 1031

≡ LOGIN **FAST COMPANY** SUBSCRIBE 🔍

ESIGN | TECH | WORK LIFE | NEWS | IMPACT | PODCASTS | VIDEO | INNOVATION FESTIVAL |

10-07-22

# Stephen Curry drops his 10th signature shoe with Under Armour

"It's a true partnership, but that doesn't mean it's always going to be perfect."



[Photo: Under Armour]



BY **ELIZABETH SEGRAN**
7 MINUTE READ

It's been a hell of a summer for Stephen Curry.

In June, he led the Golden State Warriors to victory, scoring his fourth championship ring and the finals MVP award, confirming his place as an NBA legend. In September, he inked a lifetime deal with Under

Armour reportedly worth more than $1 billion. And today, he drops his latest sneaker with the athletic wear brand, the Curry Flow 10.



[Photo: Elsa/Getty Images]

The sneaker is a milestone and marks nearly a decade that the 34-year-old has been signed to Under Armour, a period that has been critical for both parties: Curry has skyrocketed to meteoric success, while Under Armour has struggled.

In the mid-2010s, Under Armour was the second-largest activewear brand in the United States by sales, second only to Nike. Since then, it has faced lawsuits from shareholders and universities; the government is investigating its accounting practices; its corporate culture has come under fire; and its sales have plummeted. It's now fallen into fourth place, behind Nike, Adidas, and Puma. And sales of the Curry signature shoes, which were meant to buoy the business, have fluctuated over the years; the shoe designs have failed to excite sneakerheads and, at times, been mocked mercilessly.

"These shoes that we've built together tell a lot of stories," Curry says. "There have been a lot of amazing moments and I've won a lot of games. It's a true partnership that [I've had with Under Armour], but that doesn't mean it's always going to be perfect."

So one of the big questions in the world of sportwear is why one of the most beloved athletes of our time, with unlimited business opportunities at his fingertips, has chosen to stay committed to Under Armour.

Case 3:23-cv-00118-RRB-DJ2-1   Document 14-1   Filed 05/23/23   Page 141 of 468



[Photo: Under Armour]

## WHEN NIKE LOST A LEGEND

Curry joined the NBA right out of college and spent the first four years of his professional career as a Nike-sponsored athlete. Given Curry's ambitions, it made sense for him to continue working with Nike in the years that followed, since the company had engineered the most successful partnership with an athlete of all time. In 1984, Nike joined forces with Michael Jordan to launch the Air Jordan sneakers and then the Jordan Brand, which continues to generate hundreds of millions of dollars annually for Jordan, who has equity in the business.

When Curry was 25, his Nike contract expired, rendering him a free agent. And according to *Sports Illustrated*, Curry attended a pitch meeting that made it clear Nike was not serious about him. Nike's representative had left Kevin Durant's name on the PowerPoint presentation and mispronounced Curry's name (he goes by "Steph-*en*," not "Steph-*on*"). So Curry shopped around, taking meetings with everyone from Adidas to Skechers, which had just invested in boutique performance sneaker brand Brandblack.

But Curry says that Under Armour stood out from the pack because the company's executives believed in his potential. "I'd been playing pretty well and getting better every year, but I hadn't made an All-Star team yet," Curry says. "It was kind of overwhelming because you could talk yourself into a lot of different avenues with these different companies. I wanted to align with a company that would allow me to level up and take my basketball career forward."

And what won Curry over was Under Armour's promise to launch his own sneaker line early in his career. In 2013, Curry signed the deal, with Under Armour paying him about $4 million a year. (Nike had offered only $2.5 million.) "It was about the opportunity to establish a sustainable signature business," he says. "It was an opportunity to bet on myself and build something from scratch."



[Photo: Under Armour]

## THE SHIFTING POWER DYNAMICS

At the time, Under Armour wielded the power in the relationship: Its sales were growing quickly and its stock was up. But it didn't take long for that dynamic to shift. In 2015, Curry launched his first signature sneaker—the Curry 1—and also won his first NBA championship. The shoes sold out immediately.

As Curry's star rose in the years that followed, Under Armour prominently featured him on billboards and TV spots, effectively making him the face of the brand. The company promised to build a separate business around him, bringing on a former executive from Nike who helped launch the Jordan brand. And Under Armour gave Curry more involvement in the creation of the shoes. "I look at Stephen not just as the muse but the client," says Tom Luedecke, Under Armour's design director of footwear innovation. "You want the client to be super happy. And if he's happy, the shoe will most likely resonate with any ballplayer."

LOGIN   FAST COMPANY   SUBSCRIBE

ESIGN   TECH   WORK LIFE   NEWS   IMPACT   PODCASTS   VIDEO   INNOVATION FESTIVAL



[Photo: Under Armour]

Curry says that despite his grueling schedule, he remains intimately involved with the creation of each sneaker in his line—from choosing colors that reflect his fashion sensibilities to picking materials that will improve performance—since he wears the sneakers on the court. When he experienced ankle injuries, he worked with Under Armour designers to adapt the shoe. "A lot of it had to do with the height of the collar of the shoe and how it was tailored to fit my foot, to give me stability and reduce ankle injuries," Curry says. "You have to love the (design) process because it's hard, tedious work."

After the success of the Curry 1, sales of the Curry 2 and 3 were lackluster, with sneakers quickly ending up on clearance racks; some called them ugly and boring. Since then, the popularity of Curry's signature sneakers has fluctuated. The Curry 8 and 9 were well reviewed by sites like Highsnobiety and the Hoops Geek, largely for their innovative technical features, like soles that grip the floor without causing a squeak. Indeed, Under Armour has prioritized performance in its design process, while Nike, Adidas, and Reebok have expanded into creating fashion-forward shoes to feed the athleisure trend. Some analysts believe this has contributed to Under Armour's overall decline, and may explain why the Curry sneakers haven't had the wide appeal of other signature lines.

## WHAT LIES AHEAD

Under Armour has made missteps that nearly jeopardized its relationship with Curry, according to *The New York Times*. In 2017, for instance, Curry took issue with Under Armour's then-CEO, Kevin Plank,

calling President Donald Trump "a real asset" to the country, prompting Plank to issue a front-page newspaper ad saying his comments did not reflect the views of Under Armour.



[Photo: Under Armour]

In a sign of how seriously Under Armour takes its relationship with Curry—and how vital Curry is to Under Armour's success—the company has continuously taken steps to win him over. In 2020, Under Armour expanded Curry's purview within the company by launching Curry Brand, which goes beyond signature sneakers. The line gave Curry an opportunity to create apparel and footwear across different sports, including golf, another passion of his. And it gave him his own logo. "It features the 'S' and a 'C' in his name, but it also has another flourish above it, referring to his belief in a higher power," says Steve Segears, senior merchant for the Curry Brand at Under Armour.

And according to *Rolling Stone* reporter Matt Sullivan, Curry signed a lifetime deal with Under Armour that is worth more than a billion dollars. The contract likely includes equity in the company, which was a condition of his earlier contract. This deal puts Curry ahead of other top-tier athletes like James Harden, who earns around $200 million from Adidas, and Kevin Durant, who earns an estimated $300 million from Nike. But it also means that Curry is bound to Under Armour's fate, which is a risky proposition given the company's missteps.

Even as Curry racks up championship wins and continues to transform the sport of basketball, he's thinking about his legacy. By sticking by Under Armour through the rocky years, he's built a store of goodwill at the company that has allowed him to pursue his goals, particularly his philanthropic

Case 2:23-cv-00106-RJS-DBP    Document 104-14    Filed 05/23/24    Page 145 of 468    PageID 46810 37

ambitions. "When we first spoke to Steph, he said he wanted to create the Tom... ...otwear, in that he wanted the shoes to give back to... ...ars says. "We're... ...elves on that mandate."



[Photo: Under Armour]

As part of Curry Brand, Under Armour has committed to devoting a portion of the sales to supporting causes that are important to Curry, including sponsoring Curry Camp, now in its seventh year. These programs are often very personal to Curry. For instance, the company has just refurbished a basketball court across the street from Curry's alma mater, Davidson College in North Carolina. "I volunteered as a student athlete on campus in an after-school program that services kids in that area," Curry says. "Our strategy around these programs falls under me directly. It's about the impact I want this brand to make beyond putting sneakers on the market."

There doesn't seem to be a path for Curry Brand to reach the status of Nike's Jordan Brand. But Curry still believes that his best shot at cementing his legacy with a brand lies with Under Armour, a company that bet on him before he was a star and a place where he has clout. As one of the company's best assets, Curry can play a role in lifting Under Armour's prospects. "Ten signature shoes later, we seen highs and lows," Curry says of his relationship with Under Armour. "We've learned difficult lessons about business and how to continue to build in spite of setbacks. I have no regrets."

*Now accepting applications for Most Innovative Companies.*
*Apply by October 6 for your chance to be featured!*

LOGIN                    FAST COMPANY                    SUBSCRIBE

ESIGN      TECH      WORK LIFE      NEWS      IMPACT      PODCASTS      VIDEO      INNOVATION FESTIVAL



**The latest innovations in design brought to you every weekday.**

Email *

**SIGN UP**

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Privacy Policy

## ABOUT THE AUTHOR

Elizabeth Segran, Ph.D., is a senior staff writer at Fast Company. She lives in Cambridge, Massachusetts More

# TECH

**TECH**
Arm IPO: Stock is set to be priced, begin trading on the Nasdaq. Here's the latest

**TECH**
Duckbill blends AI and human intelligence for personal assistant service

**TECH**
We judge new Apple products the wrong way. The iPhone 15 proves it

# NEWS

**NEWS**
See this map of states with the worst tippers—one of the wealthiest tops the list

FAST COMPANY
LOGIN                                                                    SUBSCRIBE
DESIGN    TECH    WORK LIFE    NEWS    IMPACT    PODCASTS    VIDEO    INNOVATION FESTIVAL

The Taylor Swift reporter job is what happens when America's obsessions with work and culture collide

**NEWS**

Leaders, your Gen Z and millennial employees might quit in 2024. Here's why

# CO.DESIGN

**CO.DESIGN**

Could a Birkenstock IPO change the beloved sandal?

**CO.DESIGN**

As Firefly leaves beta, Adobe promises bonuses to creators who trained its AI

**CO.DESIGN**

Apple killed the mute button and left us with this mess

# WORK LIFE

**WORK LIFE**

How the Army's pay structure inspired this CEO to introduce pay transparency

**WORK LIFE**

How the pay gap between employees and CEOs impacts workers, according to experts

**WORK LIFE**

'Fake it till you make it' is bad advice. Here's how to grow beyond performative confidence and establish real gravitas



Fast Company & Inc © 2023 Mansueto Ventures, LLC

Advertise    Careers    Privacy Policy

Terms    Do Not Sell My Data    Notice of Collection

Permissions    Help Center    About Us    Site Map

# EXHIBIT E

Case 3:23-mc-80324-LJC          Document 11-4          Filed 01/12/24          Page 149 of 468

HOME  ›  SPORTS

# Steph Curry will only wear shoes that are loud

Cork Gaines  Apr 16, 2023, 1:52 PM EDT



**Steph Curry**  Ezra Shaw/Getty Images

- **Steph Curry has an unusual demand for Under Armour when they are making him shoes — they must be loud.**

- **Curry's shoes must first pass "the squeak test."**

- **Curry's desire for shoes that are extra squeaky serves a function as it gives him confidence that they are tacky enough.**

---

INSIDER **TODAY**   NEW LOOK

Sign up to get the inside scoop on today's biggest stories in markets, tech, and business — delivered daily. **Read preview**



[ Enter your email ]            [ Sign up ]

By clicking "Sign Up", you accept our Terms of Service and Privacy Policy. You can opt-out at any time.

Advertisement

Jump to

Main content
Search
Account



Stephen Curry took some social media flak in the past for his shoes,
which, at times, have been considered boring. Those giggles have
died down with newer models, but one thing is still the same: they
are loud.

Yes, loud. As in, the shoes squeak loudly on the court, and that is by
design.

According to two people who work at Under Armour, the squeak is
one of the most important features for Curry.

Kort Neumann was the lead designer for the Curry 3, and during an
interview with ThePostGame, he noted that Curry is heavily
involved in the design of the shoes and explained the things that
Curry demands in his shoes.

Advertisement



☰  🔍                    **BUSINESS**          Log in    Subscribe
                        **INSIDER**

"He likes comfort," Neumann told ThePostGame. "He loves the
squeak of traction on the court. He really likes that squeak."

Likewise, Ron Johnson, a
senior product line manager
for basketball footwear at
Under Armour, also noted in an
interview with Complex just
how important squeak is to
Curry, noting that any shoe
design has to pass "the squeak
test."


Ezra Shaw/Getty Images

"If he's not hearing 'squeak' as soon as he steps on the court, it's not
good enough," Johnson said.

Jump to
Main content
Search
Account

As for *why* the squeak is so crucial to Curry, it does serve a function.

Advertisement



According to Neumann, "It's kind of an indicator for him that [the shoe] sticks in the ground."

For a player who is so dependent on movement and creating shots, it is easy to imagine why the tackiness would be valuable. And for Curry, the sound gives him that reassurance.

*This story was originally posted in 2019 and has been updated.*

**Read next**

**Watch:**



( NBA )    ( Shoes )

Tab9la Feed

**These May Be the Coziest Slippers In Existence**
Need a pair of swoon-worthy slippers this year? Bombas has them all, from ultra-pillowy pairs to something a little lighter you can wear year-round. Best of all, every purchase gives ...
Bombas | Sponsored

**Meet Volt, the world's first indoor and outdoor pizza oven.**
From the world's No.1 Pizza Oven company - Ooni Volt Electric Pizza Oven has landed!
Ooni Pizza Ovens | Sponsored    [ Learn More ]

**Jason Momoa's Marriage is More Bizarre Than You Thought**
Lisa Bonet's relationship and marriage to Jason Momoa seemed perfect from the outside looking in... until we learned what really happened behind the scenes.
Cooking4All | Sponsored    [ Read More ]

Jump to
   Main content
   Search
   Account

**'The View' hosts say Travis Kelce's interview about Taylor Swift raises 'red flags'**

Insider

**Here's what we know so far from Matthew Perry's recently released death certificate**

Insider

**Free Holiday Gift**

*Offer expires 12/31/23 11:59 PM CT. Exclusions apply. See Details.

YETI Coolers | Sponsored

Shop Now

**Say Goodbye to Neuropathy: Experts Stunned by Incredible Device**

Health Insight Journal | Sponsored

Learn More

**Chuck Norris In His 80s Says Try This Once a Day for More Energy**

Americamorningsupply.com | Sponsored

Watch now

* Copyright © 2023 Insider Inc. All rights reserved. Registration on or use of this site constitutes acceptance of our Terms of Service and Privacy Policy .

Contact Us | Masthead | Sitemap | Disclaimer | Accessibility | Commerce Policy | Advertising Policies | Coupons | Made in NYC

| Jobs @ Business Insider

Stock quotes by finanzen.net | Reprints & Permissions

Your Privacy Choices

International Editions:   INTL | AS | AT | DE | ES | IN | JP | MX | NL | PL

Jump to

Main content

Search

Account

Jump to

Main content
Search
Account

# EXHIBIT F

12/13/23, 7:25 PM
Case 3:23-mc-80324-LJC          Document 1-1      Filed 01/12/24      Page 156 of 468
Inside the design process of the Curry 5 | HoopsHype

HOOPSHYPE

# Inside the design process of the Curry 5

192
SHARES

SHARE          TWEET          EMAIL

By Drew Ruiz | May 18, 2018

Powered by AnyClip



NOW PLAYING

The Pulse is the nex…    The DMP Air Jordan …    Who will meet in the…    The A Ma M

**Dave Dombrow** took three things into consideration when he began the designing process of the Curry 5, **Stephen Curry's** fifth signature sneaker, from Under Armour: weight, fit and traction. For a player like Curry, who's known for mixing up defenders or stopping on a dime to make 35-foot 3-pointers look

Inside the design process of the Curry 5 | HoopsHype



HOOPSHYPE

**MOST POPULAR**



**2024 NBA free agent rankings: Top players available next summer**

BASKETBALL
5 months/ 685 shares



**Trade Value Rankings 8.0: The Top 100 in the NBA**

BASKETBALL
2 days/ 424 shares



**Top NBA trade candidates eligible December 15 for 2023-24 season**

BULLS
2 days



**Ranking: The Top 100 players in the NBA for 2023-24**

BASKETBALL
2 months

**NBA Twitter reacts to Draymond Green's ejection vs. Suns: 'Draymond's most memorable NBA moments will not involve basketball highlights'**

SOCIAL MEDIA
20 hours/ 192 shares

what one the league's most lethal players needed to continue to perform at the highest level before the shoe was unveiled earlier this year.

To honor Curry's 30th birthday and his latest sneaker, Under Armour released 314 pairs of the Curry 5 to celebrate Pi Day on March 14. The sneaker drew heavy inspiration around "Squaring the circle," a term used to describe the mathematical analogy and doing the impossible, something Curry's defined during his nine-year career. He recently debuted another colorway that features a white knit base and multicolor overlay. The shoe also features an EVA cushioning that delivers underfoot responsiveness along with a speed plate and flex zones in the midsole and outsole to help Curry stay light.

HoopsHype caught up with Dombrow to discuss the designing process, working with Curry, the evolution of the Curry line and more.

**What's the design process like when you're working on a performance model like the Curry 5?**

**Dave Dombrow:** First thing I would say is we've been working with Steph for a while now, so we have a general sense of what he's looking for. We start to talk about it and discuss. The quick next step is to get wherever Steph is and meet with him and start to really pull from what he's looking for from a design side and a function side. We start right away and that's always something Stephen says that we might've not taken into account. That's the first step – how quick can we get a meeting with him and make sure we're headed in the right direction.



Curry 5 Wired Different

**Was there anything specific Steph mentioned he wanted this sneaker to have?**

**DD:** Lightweight was a big thing. How do we continue to evolve and get better and how do we do that? One way we did we looked at new ways to build the shoe, the Curry 5, and that led to us actually getting a bit lower on the shoe than we've been in previous past years. It borders on a high-low. Lightweight is one; locked in is another and that led us to combine a knit called Anafoam, which is this technology we've used in the past [on the Curry 1], but we kind of remixed in a different way on this shoe, so that would be able to provide the lock in. And the last thing that's always important to Curry is traction, right? How to optimize traction and make sure that we're given the patterns that work the best for him on-court? Those would be the three things – lightweight, locked in and traction.





**Trade rumor rankings: Zach LaVine, Pascal Siakam and more**

BASKETBALL

11 hours/ 192 shares



**PJ Tucker: 'I want to be able to go to a good team that I can be able to help'**

MAIN RUMORS

2 days



Terms of Service

Privacy Policy

Your California Privacy Rights/Privacy Policy

Do No Sell My Info/Cookie Policy

Manage Push Notifications

Powered by WordPress VIP



**How involved is Steph throughout these projects?**

**DD:** Steph is fully involved from start to finish. When I've worked with a few different athletes throughout my career everybody's different, but Stephen is pretty highly involved along the way, during the entire process. There's definitely a meeting in the beginning and that's any pre-actual designs and then there's prototype meetings where he's shown an early sample and there's other meetings where he's looking at stuff that's a bit more finished, and then there's a meeting after that. Some of the meetings have to do on the functional side or aesthetic and designing and color side and storytelling side. But there's quite a few and they happen all over the place. Sometimes we might be in Oakland; other times he might be on the road and we might have the meeting wherever it's more convenient for him.

**Will there be a high-top version or will this sneaker be strictly a low?**

**DD:** I call it a high-low, but this is the Curry 5 so it's definitely towards the low side.

**You've worked on previous models for Steph before. What's been the best part?**

**DD:** The best part is when you're working with someone like Steph and you're always trying to up our game to another level. When you're working with someone who's super involved and very articulate about what he wants and what he doesn't want, it's refreshing because you can actually get somewhere new where you yourself or as a team might not have gotten. I think that's the refreshing part – his involvement and it's great to pull off a story. Stephen's very multi-dimensional in his life. Basketball's a huge part of his life, but there's many other things that are a big part of his life as well. We're kind of able to see all those aspects of his life on some level and start to pull ideas from that and it kind of sends us off in different directions. It's really refreshing and he's a great human being at the end of the day as well.

Search      HOOPSHYPE



**What's your favorite part of the shoe?**

**DD:** My favorite part of the shoe is that this is the design story … so I'll quickly tell it. This shoe came out of Stephen's birthday, which is on 3-14. 3-14 also happens to be the number for Pi. And so this idea around the Pi Day shoe goes back to this idea of an impossible number. That goes back to Stephen and being wired different and he exceeds expectations of the impossible. Interestingly enough, this idea of Pi has references to circles and circles are associated with Pi. There's this cool metaphor [used for Pi] that's called "squaring the circle" and it's this idea of trying to do the impossible. When you look at the shoe, you almost see this half circle – kind of the design line – so we embraced this idea of Pi and equated it to the circle and we used that to drive the design aesthetic both aesthetically and functionally. From the designer, that's kind of the purist thing, right? We took the inspiration of Pi Day and then we used it to drive aesthetically and functionally through. If you know that story and you're looking at the lateral movement of the shoe, it comes through quite clear. And then there's all these hidden details – the Pi symbol in the knit. You don't see it first, but you see it if you look. There's a bunch of other hidden details as well. A part of me just loves this idea that it's driven off this Pi inspiration. [laughs]

**Steph's currently on his fifth signature sneaker. What's it been like to see the evolution of the Curry line over the years?**

**DD:** It's great actually. It's wonderful and really interesting that we've been able to take components from the 1 all the way up to the 5, and you can see that there's actually aspects of different shoes within. There's aspects of the 4 actually in the 5 and even going back to the 1 in the Anafoam. It's just been done in a different way and that's kind of our approach. We're going to keep evolving, keep getting better and keep responding to what Stephen needs. If I look back at all of them, to see that there's actually an evolution and they have all to share this linked DNA, which is a pretty cool thing.

12/13/23, 7:25 PM
Inside the design process of the Curry 5 | HoopsHype



*The Curry 5 is now available on* **SC-V5.com** *for $130. Images courtesy of Under Armour.*

Interview, Sneakers, Top, Under Armour, Stephen Curry, Golden State Warriors

## Related podcasts

**THE HOOPSHYPE PODCAST...**
Top NBA Trade Candidates Eligible after December 15 for the 2023-24 Season

**THE HOOPSHYPE PODCAST...**
Warriors Rumors: Draymond Green, Jordan Poole, Chris Paul, Jonathan Kuminga, Klay...

**THE HOOPSHYPE PODCAST...**
NBA Rumors: Jaylen Brown, Lauri Markkanen, Austin Reaves, Sixers, Rockets, Heat, Suns, Thunder,...

### These May Be the Coziest Slippers In Existence
Need a pair of swoon-worthy slippers this year? Bombas has them all, from ultra-pillowy pairs to something a little lighter you can wear year-round. Best of all, ever...
Bombas                                          |                                    Sponsored

### Free Holiday Gift
*Offer expires 12/31/23 11:59 PM CT. Exclusions apply. See Details.
YETI Coolers                                    |              Sponsored    Shop Now

### Rob Gronkowski Chooses These Shoes As His Favorite
Shoes Much More Comfortable Than Traditional Dress Shoes. Italian Leather and Running Shoe Technology Providing First Class Comfort All Day Long.
Wolf & Shepherd                                 |              Sponsored    Learn More

### Your Search for the Softest Slippers Ends Here
Bombas                                          |              Sponsored    Shop Now

---

YETI Coolers                              |                    Sponsored    Learn More

### No More Free Returns? Amazon Releases New Fees

Amazon's new fee calls into question the era of free online returns. (Here's what you need to know)

Online Shopping Tools                     |                              Sponsored

---

### Meet Volt, the world's first indoor and outdoor pizza oven.

From the world's No.1 Pizza Oven company - Ooni Volt Electric Pizza Oven has landed!

Ooni Pizza Ovens                          |                    Sponsored    Learn More

## RELATED ARTICLES

*13hr ago*
### Klay Thompson: 'I've been playing like crap'

*1hr ago*
### Draymond Green expected to be suspended

*13hr ago*
### Draymond Green ejected again after hitting Jusuf Nurkic in the face

## LATEST

**MAIN RUMORS**
### Drew Peterson to Celtics
*December 13, 2023*

**MAIN RUMORS**
### Knicks to sign Taj Gibson
*December 13, 2023*

12/13/23, 7:25 PM
Case 3:23-mc-80324-LJC    Document 1    Filed 01/12/24    Page 162 of 468
Inside the design process of the Curry 5 - HoopsHype



HOOPSHYPE

**MAIN RUMORS**

Draymond Green expected to be suspended

*December 13, 2023*

**MAIN RUMORS**

Kevin Durant upgraded to probable, Suns' Big 3 to potentially debut tonight

*December 13, 2023*

**MAIN RUMORS**

Warriors' contract extension offer to Klay Thompson no longer on the table?

*December 13, 2023*

**MAIN RUMORS**

Nick Young: Draymond Green is a cheap shot guy but he tends to target Europeans, he's only messing with foreigners

*December 13, 2023*

262
shares

**MAIN RUMORS**

Nets could be in the mix for Donovan Mitchell?

*December 13, 2023*

111
shares

**MAIN RUMORS**

Pascal Siakam leaving Raptors next summer?

*December 13, 2023*

**MAIN RUMORS**

Draymond Green ejected again after hitting Jusuf Nurkic in the face

*December 13, 2023*

**MAIN RUMORS**

Draymond Green: I do apologize to Jusuf Nurkic. I didn't intend to hit him

*December 13, 2023*

FOLLOW HH!



| | Like HoopsHype |
| | Follow HoopsHype |

**podcast**
*Hear HH writers out loud*

LATEST PODCAST ❯

❮ MORE HOOPSHYPE

EXHIBIT G

# EXHIBIT H

Case 2:23-cv-30198-JJTQ74-LDO Documenten 1 Filed Introducing the Caryw Flow 2 Pa6e Page ID #681023



Curry Flow 8 Intro FW20

12.04.2020

# INTRODUCING THE CURRY FLOW

Unveiling the First-Ever Signature Design from Curry Brand, and Under Armour's<br>Most Technically Innovative Basketball Shoe Yet

Eight is regarded as a highly auspicious number—in some cultures it is said to convey positivity and success. So, one might say that the release of the Curry Flow 8 signals an auspicious future for the newly minted Curry Brand, Under Armour's first legacy performance brand to build impact into its bottom line.

The Curry Flow 8 is the first sneaker to be launched under Curry Brand. And, while it will carry on a legacy of boundary-pushing performance innovation, Curry's eighth



The silhouette marks the introduction of an industry-changing cushioning platform, called UA Flow. UA Flow is positioned to shift the company and the entire sports apparel industry. The Curry Flow 8 effectively disrupts the design of a traditional basketball shoe by completely eliminating the rubber outsole, bringing unparalleled traction, lightweight performance ground-contact cushioning and grippy on-court feel.

# "WHEN WE SAW HOW STICKY THIS MATERIAL WAS ON HARDWOOD, WE KNEW THIS WAS GOING TO BE GROUNDBREAKING…"

Fred Dojan, Under Armour Innovation VP of Footwear Development

During development, UA Flow and the Curry Flow 8 endured 13 rounds of weartesting and 10 rounds of biomechanical testing with more than 100 athletes, including 35 elite college and high school basketball players, proving to be Under Armour's highest performing ground-contact cushioning technology. Through the more than 1,500 hours of extensive testing, UA optimized the properties of the unique foam to make the Curry Flow 8 the brand's best performing basketball shoe to-date.



"When we saw how sticky this material was on hardwood, we knew this was going to be groundbreaking," said Fred Dojan, Under Armour Innovation's VP of Footwear Development. "I've proudly spent 20+ years working in product innovation creating the best technology available for athletes. This is the most excited I've been about the opportunity and potential of new technology in a very long time."



UA Flow and the Curry Flow 8 took more than three years to develop. It was a
collaborative effort between Dow and multiple UA teams including Innovation, Product
Design, Biomechanics, Athlete and Consumer Insights groups. During the journey, the
development team leaned on informative athlete insights that challenged sacrificing
traction and the ability to feel the court for the benefits of cushioning and
responsiveness. With Dow, which also helped deliver UA's proprietary UA HOVR™
cushioning, UA dialed in on energy return, shock absorption and traction to enhance the
court feel, cushioning and speed of movement without sacrificing durability. To achieve
this, UA Innovation reversed the engineering, and designed the UA Flow footwear from
flexibility to stability, instead of stability to flexibility—bucking traditional industry
standards.

## "WE PUSHED SO HARD TO MAKE THIS HAPPEN. THE UA TEAM MOVED MOUNTAINS TO BRING THIS INNOVATION TO LIFE. I CAN'T TELL YOU HOW GOOD THIS FEELS ON MY FEET AND I'M HYPED TO WEAR IT FOR YEARS TO COME."

Stephen Curry

SHARE







Pictured here is an upcoming colorway of the Curry Flow 8



UA Flow is made from a single "unisole" foam material—a direct challenge to most midsoles which are usually made of two or three parts with outsoles made of rubber. The Under Armour Innovation and Footwear Design teams started with the unique foam and then added structure and stability to it to ultimately create a holistic system around the foot of the basketball player.

Tom Luedecke, Under Armour Innovation's Director of Footwear Design, has worked closely with Stephen since designing the Curry 2. Luedecke explained that the system the team built around the UA Flow cushioning is precisely designed to give a locked-in feeling around the foot.



Luedecke. He added that because UA Flow technology is so unique, the Curry Flow 8 was designed differently than the way traditional basketball sneakers are made. "This system is completely built the opposite way from the ground up. We started with a soft, flexible foam with no outsole and added just the right amount of stability into it for Stephen's game."

Another first of UA Flow and the Curry Flow 8 is an unreal grip that offers no skidding, no slipping, and no squeaking. Because it grips the court better, UA Flow technology allows players to stop and start on a dime, a precise advantage to leave defenders reaching.

"How I judge a shoe's traction has always been about the squeak. And I used to think squeak was a good thing. The technology in Flow is crazy because it's silent, there is literally no squeak," Stephen said of his latest signature sneaker. "And that's because there's no air between the shoe and the court. It's hands down the grippiest shoe I've ever worn; it's the real deal."

The innovative technology of the UA Flow and the Curry Flow 8 provide game-changing athlete benefits and tech features including:

- **TRACTION:** UA Flow contributes amazing ground traction on-court to the Curry Flow 8 with abrasion resistance similar to standard rubber, with no skidding, no slipping, and no squeaking on the hardwood.
- **COMFORT:** The upper features two layers that work dynamically and independently, which allows the foot to move more freely while still being protected.
- **COURT FEEL:** With the Curry Flow 8, cushioning doesn't sacrifice court feel. While the underfoot feeling is unique at first, it won't take long for you to feel at one with the court.
- **INTENTIONAL DESIGN:** UA Flow discarded unnecessary weight by eliminating the need for a rubber outsole, which usually adds up to 2 oz. of weight. The Curry Flow



compromising durability, protection, and performance.

"From the moment I tried on an early prototype, I immediately wanted UA Flow tech in the Curry 8–knowing it would be the first shoe from Curry Brand. I've been hype since day 1," said Curry. "I'm excited to get back on the court and compete in them, and for other athletes to get in on the magic as well."

The Curry Flow 8 will release globally on currybrand.com, at UA Brand Houses and at select retail partners for $160 USD on December 11.



*For more information on Curry Brand visit the UA Newsroom, www.currybrand.com, and @currybrand on Instagram.*

## MORE FROM UA NEWS







## Under Armour Publishes FY2023 Sustainability & Impact Report

Under Armour, Inc. today published its FY2023 Sustainability & Impact Report, providing…

## Under Armour Announces as Chief Design Officer

Today, Under Armour is proud to announce veteran John Varvatos wi…

Previous    1 of 67    Next

**About UA**

Our Company

Purpose

Stories

Investors

**Additional Resources**

Help Center

Order Tracking

Promos & Offers

Gift Cards

Returns

Shipping & Delivery

Store Locator

Size Charts

UA Apps



UA Social



© 2023 Under Armour® Inc.  Privacy Policy  /  Terms & Conditions  /  CA Supply Chains Act

EXHIBIT H







10.04.2023

# THE FUTURE OF CURRY STARTS NOW

Stephen Curry and Curry Brand, powered by Under Armour, release the 11th edition of Stephen's signature shoe line in celebration of the Future of Curry

Fifteen years into his career, Stephen Curry is at the top of his game. Highly regarded as one of basketball's best, a player as dynamic as Stephen needs a shoe that evolves with him and keeps getting better, just as he does – enter the Curry 11, which is Stephen's newest signature shoe and his fourth release under Curry Brand.

On Friday, October 13, Stephen, Curry Brand, and Under Armour will release the 11th iteration in his signature shoe portfolio, marking a monumental milestone that puts Stephen and Under Armour in an elite class of signature shoe lines alongside other basketball greats. Leveraging a futuristic design that celebrates the Future of Curry and his everlasting impact on basketball culture, the Curry 11 boasts a bold and disruptive flair, with the technology needed to fuel hoopers' performance on the court.





# "MY PARTNERSHIP WITH UNDER ARMOUR IS ALL ABOUT PUSHING BOUNDARIES, AND THAT'S EXACTLY WHAT WE'VE DONE WITH THE CURRY 11."

Stephen Curry, Basketball Professional and President of Curry Brand at Under Armour

"To be on the 11th signature shoe is an honor and something I get really excited about – unveiling what we have been working on, allowing people from all over the world and the next generation to be a part of the story. When designing this shoe, we wanted athletes to have the ultimate experience on and off the court – both when it comes to comfort and to traction – and the Curry 11 does just that. Nodding to the 'Future of Curry,' this shoe is designed to set the season's tone for what is in store for Curry Brand. I know I have a lot left on the court and Curry Brand itself is truly just getting started," said Stephen Curry.

Pulling inspiration from the wonders of what a modernized future could look like, this release speaks to the lasting impact Stephen will have on future generations of hoopers across the globe for decades to come and the limitless possibilities in store for Curry Brand.

For the first time, the Curry 11 includes dual-density UA Flow technology, allowing the shoe to have a softer top loaded piece, providing athletes with the ultimate comfort underneath. The Curry 11 design also implements a segmented plate that helps athletes maintain stability throughout the midfoot and underfoot with more flexibility at the forefoot. Curry 11's upper insole was upgraded from the Curry Flow 10 to include Under Armour's proprietary Warp technology. It's unlike any other shoe on the market, just like there is no other 3-point shooter out there like Chef Curry.



In 2023, Stephen and Under Armour surpassed over a decade of changing the game for good together, announcing a long-term contract extension in March 2023 and deeper involvement from Stephen across Curry Brand and the UA business at large. Curry Brand operates on the commitment to give back to the next generation of youth athletes. Since its launch, Curry Brand has impacted over 75,000 youth around the world focusing on three impact pillars: places, people, and programs -- well over halfway to Curry Brand's goal of impacting 100,000 youth by 2025.

"If the past 10+ years have shown us anything, it's that Stephen Curry's potential truly is limitless," said Ryan Drew, Vice President of Curry Brand.

## "THE FUTURE OF CURRY BRAND IS BRIGHT, AND OUR TEAM IS EXCITED FOR BALLPLAYERS AND CONSUMERS TO GET THE CURRY 11 ON THEIR FEET TO SEE AND EXPERIENCE FOR



**LEVEL."**

Ryan Drew, Vice President of Curry Brand




The 'Future Curry' Curry 11 will be released globally on UA.com and in select Brand Houses in a collection alongside a Curry 2 FloTro and a limited line of apparel. UA Rewards members will have the opportunity to get first dibs on the release 24 hours before it hits shelves.

## "UNDER ARMOUR HAS GIVEN ME THE PLATFORM TO MAKE MY MARK ON THIS INDUSTRY AND REVOLUTIONIZE THE SNEAKER GAME, ONE SIGNATURE SHOE AT A TIME."

Stephen Curry, Basketball Professional and President of Curry Brand at Under Armour

"Eleven shoes? Not many people have been able to have that experience. Curry 11 marks the start of our next chapter, where we're taking a daring and disruptive approach on the court, paying tribute to some of my favorite moments over the course of my career, while also collaborating with talented partners who share the same fire in creating a powerful identity for the future of Curry Brand," said Stephen Curry.

The Curry 11 is just the start of an exciting rollout of footwear from Curry Brand and Under Armour this season. Hoopers can expect no shortage of Curry 11, Retro, and FloTro

See below for a look into the future of what's to come for the Curry 11, and stay locked on Instagram @CurryBrand for more details:



**10/13: Future Curry**



**10/27: Domaine Curry**



**11/11: Tuff Crowd**



**11/27: Bruce Lee 'Fire'**



**12/15: Dub Nation**



**1/5: Bruce Lee 'Wind'**



**1/5: Bruce Lee 'Future Dragon'**







UA Apps     UA Social

About UA

Additional Resources

© 2023 Under Armour® Inc.   Privacy Policy  /  Terms & Conditions  /  CA Supply Chains Act

# EXHIBIT I



# ANNUAL REPORT

## LETTER FROM THE CEO

JUNE 27, 2023

**DEAR SHAREHOLDERS,**

As an athlete and sports enthusiast, I have always admired the Under Armour brand and what it stands for – a hard-earned, unique reputation for grit, strength, and innovation. After spending my first several months at the company meeting with athletes, customers, investors, and teammates, my enthusiasm and confidence in this brand have grown exponentially. I believe the potential for Under Armour is even more significant than I initially imagined, and I am excited and energized for what comes next.

Reflecting on fiscal 2023, as we navigated an increasingly uncertain macroeconomic and industry backdrop, Under Armour delivered 3 percent revenue growth, reaching $5.9 billion. And despite a decline in gross margin, driven primarily by a highly promotional environment and supply chain impacts, including higher freight and product costs, we delivered $0.84 of diluted earnings per share. We also ended the year with lower-than-expected inventory growth, $712 million of cash on hand, and, over the past year and a half, have bought $425 million of Under Armour class C stock under the company's share repurchase program.

This past year also saw strong brand momentum, exemplified by the announcement of our stronger partnership with Stephen Curry – a crucial catalyst for Under Armour as we drive and prioritize the impact of sport on communities worldwide.

We are also proud of the re-launch of Protect This House, a ubiquitous ethos of Under Armour that has driven positive and inspiring responses from our athletes and customers. We are also energized by the launch of the UA SlipSpeed heel-up/heel-down footwear platform, including our versatile training sneakers, which bring together design, engineering, storytelling, and an 'it' factor wrapped in a solution only Under Armour can create.

As we work into our next chapter, I am confident that we have a strong foundation, the right plans, and a brand capable of delivering sustainable, profitable growth over the long term. In this respect, we must increase our focus, execution, and accountability. It is with that spirit that I have set three priorities based on my assessment of Under Armour's current strengths and opportunities. This is about three big things over the next three years – appropriately called "Protect This House 3" – which is meant to drive clarity and business alignment across Under Armour:

1. **Drive Global Brand Heat with a Focus on the United States.** Under Armour has a globally recognized brand and strong franchises, including compression apparel like ColdGear and HeatGear, trusted by the highest-level athletes in sport. We are one of few brands that can be found on the fields of play worldwide at the highest levels of competition. Yet, we need to pull in our fair share of market growth. Conversion should be more active, especially in the United States, where consumers are aware of and engaged with the Under Armour brand at the highest level. Globally, we're assessing how our products, athletes, and marketing strategies are – or are not – breaking through to reach our target consumers. With love for a brand that plays considerably larger than the business – I am confident that simplification and doing more with less in our brand activations will be an outstanding unlock to generate excitement and increase conversion towards greater top-line growth.

2. **Deliver Elevated Design and Products with a Focus on Footwear, Women, and Sportstyle.** Undoubtedly, we offer industry-leading performance innovations for athletes, yet we can extend our reach even further. Under Armour has a significant growth opportunity to expand our existing offerings and partnerships and to deliver more premium products, particularly in footwear, our women's business, and Sportstyle. To do so, we have solicited help from sneaker and branding experts who will add industry-proven design horsepower. We also have exceptional women's products. However, there is an opportunity to deliver more consistently for our female athletes and cut through the competition. Finally, we are focusing energy and resources on our evolving Sportstyle offering, a broadening of our product aperture that embodies the intersection of style, design, and performance.

3. **Grow U.S. Sales While Leveraging Continued Growth in Our International Business.** Fiscal 2023 saw strong results in EMEA and Asia-Pacific, and while we have made solid progress in the quality of our business in the United States, there's still significant potential to drive growth in our home market. In addition to driving brand heat and delivering best-in-class products, Under Armour will focus on driving productivity in our direct retail and digital channels and expanding our 'better' and 'best' wholesale footprint to create a dramatically improved consumer experience with an emphasis on exceptional service, inspiration, and premium experience. We have a significant opportunity to elevate our brand and showcase it in the best presentation possible in the United States, and we are focused on doing so.

These priorities are a starting point as we work to unlock Under Armour's potential for improved results – all of which are engineered to drive revenue growth, expand margins, elevate our brand, and deliver exemplary service to whomever we serve, both inside and outside our business – continuously identifying tangible ways to get better.

This also applies to our approach to protecting the planet and our efforts to reduce harmful environmental impacts while respecting the rights and improving the lives of our teammates and suppliers' workers. Our latest Sustainability & Impact Report outlines 23 goals and targets across three key pillars – Products, Home Field, and Team. From how we create our products to our workplace, interactions with suppliers, and relationships with key stakeholders worldwide, I am inspired every day by the efforts of our team to reach our objectives while being transparent about our progress, goals, and opportunities as a purpose-driven brand.

Under Armour's purpose in serving athletes is distinct within our culture and aligned with Kevin Plank's vision. As an incredible thought partner, I look forward to working with Kevin and the entire global team as we continue building into the next chapter for this iconic brand.

I love and believe in Under Armour, and I couldn't be more excited to lead this fantastic company toward realizing its full potential and the vision we all have for it. As we move forward – now is the time for bold decisions and distinct actions that yield results.

We are operating with our eyes wide open and know the urgency of the work ahead of us. Our renewed strategic focus on world-class execution and increased accountability across all levels of the organization is front and center in our efforts to drive Under Armour toward more robust, profitable growth over the long term. Our athletes, teammates, shareholders, and brand deserve it.

Thank you for your continued support of our brand and our business.

*Stephanie C. Linnartz*

**STEPHANIE C. LINNARTZ**
President & Chief Executive Officer

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# Form 10-K

---

(Mark One)

☑   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

   **For the fiscal year ended March 31, 2023**

or

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

   **For the transition period from to**

**Commission File No. 001-33202**

# UNDER ARMOUR, INC.

**(Exact name of registrant as specified in its charter)**

---

| **Maryland** | | **52-1990078** |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | | **(I.R.S. Employer Identification No.)** |
| **1020 Hull Street** | | |
| **Baltimore, Maryland 21230** | | **(410) 468-2512** |
| **(Address of principal executive offices) (Zip Code)** | | **(Registrant's telephone number, including area code)** |

Securities registered pursuant to Section 12(b) of the Act:

| **Class A Common Stock** | **UAA** | **New York Stock Exchange** |
|---|---|---|
| **Class C Common Stock** | **UA** | **New York Stock Exchange** |
| (Title of each class) | (Trading Symbols) | (Name of each exchange on which registered) |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☐   No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes   ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☑ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☑

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☑

As of September 30, 2022, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the registrant's Class A Common Stock and Class C Common Stock held by non-affiliates was $1,250,424,223 and $1,147,881,110, respectively.

As of May 15, 2023 there were 188,704,689 shares of Class A Common Stock, 34,450,000 shares of Class B Convertible Common Stock and 221,441,390 shares of Class C Common Stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of Under Armour, Inc.'s Proxy Statement for the Annual Meeting of Stockholders to be held on August 29, 2023 are incorporated by reference in Part III of this Annual Report on Form 10-K.

**UNDER ARMOUR, INC.**

**ANNUAL REPORT ON FORM 10-K**
**TABLE OF CONTENTS**

**PART I**

| | | |
|---|---|---|
| | Forward Looking Statements | 1 |
| Item 1. | Business | 2 |
| | General | 2 |
| | Products | 3 |
| | Marketing and Promotion | 3 |
| | Sales and Distribution | 4 |
| | Product Design and Development | 5 |
| | Sourcing, Manufacturing and Quality Assurance | 5 |
| | Inventory Management | 6 |
| | Intellectual Property | 6 |
| | Competition | 7 |
| | Sustainability | 7 |
| | Human Capital Management | 8 |
| | Information About Our Executive Officers | 10 |
| | Available Information | 11 |
| Item 1A. | Risk Factors | 11 |
| Item 1B. | Unresolved Staff Comments | 25 |
| Item 2. | Properties | 25 |
| Item 3. | Legal Proceedings | 26 |
| Item 4. | Mine Safety Disclosures | 26 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 26 |
| Item 6. | Reserved | 27 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 27 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 43 |
| Item 8. | Financial Statements and Supplementary Data | 46 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 89 |
| Item 9A. | Controls and Procedures | 89 |
| Item 9B. | Other Information | 89 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspection | 90 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 90 |
| Item 11. | Executive Compensation | 90 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 90 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 90 |
| Item 14. | Principal Accountant Fees and Services | 90 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 91 |
| Item 16. | Form 10-K Summary | 95 |
| **SIGNATURES** | | 96 |

## PART I. FINANCIAL INFORMATION

**FORWARD-LOOKING STATEMENTS**

Some of the statements contained in this Annual Report on Form 10-K constitute forward-looking statements. Forward-looking statements relate to expectations, beliefs, projections, future plans and strategies, anticipated events or trends and similar expressions concerning matters that are not historical facts, such as statements regarding our share repurchase program, our future financial condition or results of operations, our prospects and strategies for future growth, the impact of the COVID-19 pandemic on our business, expectations regarding promotional activities, freight, product cost pressures and foreign currency impacts, the impact of global economic conditions and inflation on our results of operations, the development and introduction of new products, the implementation of our marketing and branding strategies, and the future benefits and opportunities from significant investments. In many cases, you can identify forward-looking statements by terms such as "may," "will," "could," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "outlook," "potential" or the negative of these terms or other comparable terminology.

The forward-looking statements contained in this Annual Report on Form 10-K reflect our current views about future events and are subject to risks, uncertainties, assumptions and changes in circumstances that may cause events or our actual activities or results to differ significantly from those expressed in any forward-looking statement. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future events, results, actions, levels of activity, performance or achievements. Readers are cautioned not to place undue reliance on these forward-looking statements. A number of important factors could cause actual results to differ materially from those indicated by these forward-looking statements, including, but not limited to, those factors described in "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" herein. These factors include without limitation:

- changes in general economic or market conditions, including increasing inflation, that could affect overall consumer spending or our industry;

- the impact of the COVID-19 pandemic on our industry and our business, financial condition and results of operations, including impacts on the global supply chain;

- failure of our suppliers, manufacturers or logistics providers to produce or deliver our products in a timely or cost-effective manner;

- labor or other disruptions at ports or our suppliers or manufacturers;

- increased competition causing us to lose market share or reduce the prices of our products or to increase our marketing efforts significantly;

- fluctuations in the costs of raw materials and commodities we use in our products and our supply chain (including labor);

- changes to the financial health of our customers;

- our ability to successfully execute our long-term strategies;

- our ability to effectively develop and launch new, innovative and updated products;

- our ability to accurately forecast consumer shopping and engagement preferences and consumer demand for our products and manage our inventory in response to changing demands;

- loss of key customers, suppliers or manufacturers;

- our ability to effectively market and maintain a positive brand image;

- our ability to further expand our business globally and to drive brand awareness and consumer acceptance of our products in other countries;

- our ability to manage the increasingly complex operations of our global business;

- the impact of global events beyond our control, including military conflict;

- our ability to successfully manage or realize expected results from significant transactions and investments;

- our ability to effectively meet the expectations of our stakeholders with respect to environmental, social and governance practices;

- the availability, integration and effective operation of information systems and other technology, as well as any potential interruption of such systems or technology;

- any disruptions, delays or deficiencies in the design, implementation or application of our global operating and financial reporting information technology system;

- our ability to attract key talent and retain the services of our senior management and other key employees;

- our ability to effectively drive operational efficiency in our business and realize expected benefits from restructuring plans;

- our ability to access capital and financing required to manage our business on terms acceptable to us;

- our ability to accurately anticipate and respond to seasonal or quarterly fluctuations in our operating results;

- risks related to foreign currency exchange rate fluctuations;

- our ability to comply with existing trade and other regulations, and the potential impact of new trade, tariff and tax regulations on our profitability;

- risks related to data security or privacy breaches; and

- our potential exposure to litigation and other proceedings.


The forward-looking statements contained in this Annual Report on Form 10-K reflect our views and assumptions only as of the date of this Annual Report on Form 10-K. We undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which the statement is made or to reflect the occurrence of unanticipated events.


*Throughout this Annual Report on Form 10-K: (i) the term "Fiscal 2024" means our fiscal year beginning on April 1, 2023 and ending March 31, 2024; (ii) the term "Fiscal 2023" means our fiscal year beginning on April 1, 2022 and ended March 31, 2023; (iii) the term "Transition Period" means the period beginning on January 1, 2022 and ended March 31, 2022; (iii) the term "Fiscal 2021" means our fiscal year beginning on January 1, 2021 and ended December 31, 2021; and (iv) the term "Fiscal 2020" means our fiscal year beginning on January 1, 2020 and ended December 31, 2020. Our Consolidated Financial Statements are presented in U.S. dollars. As used in this report, the terms "we," "our," "us," "Under Armour" and the "Company" refer to Under Armour, Inc. and its subsidiaries unless the context indicates otherwise.*


## ITEM 1. BUSINESS

### General

Our principal business activities are developing, marketing and distributing branded performance apparel, footwear and accessories for men, women and youth. Our performance products are engineered in many designs and styles for use in nearly every climate and are worn worldwide by athletes at all levels, from youth to professional, on various playing fields around the globe and by consumers with active lifestyles.

We generate net revenues from the sale of our products globally to national, regional, independent and specialty wholesalers and distributors. We also generate net revenue from the sale of our products through our direct-to-consumer sales channel, which includes our owned Brand and Factory House stores and e-commerce websites. We plan to continue to grow our business over the long-term through increased sales of our apparel, footwear and accessories; growth in our direct-to-consumer sales channel; and expansion of our wholesale distribution. We believe that achievement of our long-term growth objectives depends, in part, on our ability to execute strategic initiatives in key areas including our wholesale, footwear, women's and direct-to-consumer businesses. Additionally, our digital strategy is focused on supporting these long-term objectives, emphasizing connection and engagement with our consumers through multiple digital touchpoints.

We were incorporated as a Maryland corporation in 1996. We have registered trademarks around the globe, including UNDER ARMOUR®, HEATGEAR®, COLDGEAR®, HOVR® and the Under Armour UA Logo ⧖®, and we have applied to register many other trademarks. This Annual Report on Form 10-K also contains additional trademarks and tradenames of our Company and our subsidiaries. All trademarks and trade names appearing in this Annual Report on Form 10-K are the property of their respective holders.

**Products**

Our product offerings consist of apparel, footwear and accessories for men, women and youth. We market our products at multiple price levels and provide consumers with products that we believe are superior to non-performance-oriented athletic products. Our products are primarily designed for athletic and active occasions, though many of our products can be worn or used in casual occasions. In Fiscal 2023, sales of apparel, footwear and accessories represented 66%, 25% and 7% of net revenues, respectively. Licensing arrangements represented 2% of net revenues. Refer to Note 11 to the Consolidated Financial Statements for net revenues by product category.

*Apparel*

Our apparel is offered in a variety of styles and fits to enhance comfort and mobility, support active movement, regulate body temperature and improve performance regardless of weather conditions. Our apparel is engineered to replace non-performance fabrics in athletics and fitness applications with innovation and technologies designed and merchandised with various techniques and styles. Our apparel comes in three primary fit types: compression (tight fit), fitted (athletic fit) and loose (relaxed fit). Our mission is to make athletes better, and we aim to innovate our technical apparel products to provide performance benefits, such as creating breathable warmth, helping the body stay cool and dry in hotter-than-normal conditions; harnessing the body's energy to help fight fatigue; adapting to each athlete's unique body shape to improve fit and comfort and prevent slippage; and providing protection against rain while maintaining breathability.

These types of innovations and technologies, embedded in many of our apparel products, include: COLDGEAR®, COLDGEAR INFRARED®, HEATGEAR®, UA Iso-Chill™, UA RUSH™, UA SMARTFORM™ and UA STORM™.

*Footwear*

Footwear includes products for running, training, basketball, cleated sports, recovery and outdoor applications. Our footwear is built with the mindset of making athletes better through differentiated and industry leading cushioning technologies such as Charged Cushioning®, UA Flow™, HOVR® and UA Micro G®. These cushioning platforms provide athletes with plush underfoot and improved ground feel, enhanced responsiveness and lightweight solutions. We also incorporate advanced materials and innovative consumer-centric constructions to enhance performance.

*Accessories*

Accessories primarily includes the sale of athletic performance gloves, bags, headwear, socks and sports masks. Some of our accessories include the technologies mentioned above and are designed with advanced fabrications to provide the same level of performance as our other products.

*License*

We have agreements with licensees to develop certain Under Armour apparel, footwear, accessories and equipment. To maintain consistent brand quality, performance and compliance standards, our product, marketing, sales and quality assurance teams are involved in all steps of the design and go-to-market process. During Fiscal 2023, our licensees offered collegiate apparel and accessories, baby and youth apparel, team uniforms, socks, water bottles, eyewear and other specific hard goods equipment that feature performance advantages and functionality like our other product offerings.

**Marketing and Promotion**

We currently focus on marketing our products to consumers primarily for use in athletics, fitness, and training activities, emphasizing our ability to support the needs of our athletes at all moments of their day. We seek to drive consumer demand by building brand awareness that our products deliver advantages to help athletes perform better.

*Sports Marketing*

Our marketing and promotion strategy begins with providing and selling our products to high-performing athletes and teams at the high school, collegiate and professional levels. We execute this strategy through outfitting agreements, professional, club and collegiate sponsorship, individual athlete and influencer agreements and by providing and selling our products directly to teams and individual athletes. We also seek to sponsor and host consumer events to drive awareness and brand authenticity from a grassroots level by hosting combines, camps and clinics for young athletes in a variety of sports. As a result, our products are seen on the field and the court, and

by various consumer audiences through the internet, television, magazines and live sporting events. This exposure helps us establish on-field authenticity as consumers can see our products being worn by high-performing athletes.

We are the official outfitter of athletic teams in several high-profile collegiate conferences and professional sport organizations, supporting the athletes on and off the field. We sponsor and sell our products to international sports teams, which helps drive brand awareness in various countries and regions worldwide. Further, we leverage our relationships with athletes, teams, leagues and youth experiences in our global and regional marketing and promotions.

*Media*

We feature our products in a variety of national digital, broadcast, and print media outlets. We also utilize social media to engage consumers and promote connectivity with our brand and products while engaging with our consumers throughout their day.

*Retail Presentation*

Our retail marketing strategy is focused on increasing floor space dedicated to our products within our major wholesale accounts and elevating the presentation of our products within our Brand and Factory House retail stores. A key component of our strategy to secure prime floor space within our major wholesale accounts is the design of Under Armour point of sale displays and concept shops, which enhance our brand's presentation by creating a shop-in-shop approach using dedicated space—including flooring, lighting, walls, displays and images—exclusively for our products through which we create an exciting environment for the consumer to experience and learn about our brand.


**Sales and Distribution**

The majority of our sales are generated through wholesale channels, including national and regional sporting goods chains, independent and specialty retailers, department store chains, mono-branded Under Armour retail stores in certain international markets, institutional athletic departments and leagues and teams. In various countries where we do not have direct sales operations, we sell our products to independent distributors or engage licensees to sell our products.

We also sell our products directly to consumers through our global network of Brand and Factory House stores and e-commerce websites. Factory House store products are specifically designed for sale in our Factory House stores and serve an important role in our overall inventory management by allowing us to sell a portion of excess, discontinued and out-of-season products, while maintaining the pricing integrity of our brand in our other distribution channels. Consumers experience a premium expression of our brand through our Brand House stores while having broader access to our performance products. In Fiscal 2023, sales through our wholesale, direct-to-consumer and licensing channels represented 59%, 38% and 2% of net revenues, respectively.

Our primary business operates in four geographic segments: (i) North America, comprising the United States and Canada, (ii) Europe, the Middle East and Africa ("EMEA"), (iii) Asia-Pacific, and (iv) Latin America. These geographic segments operate predominantly in one industry: developing, marketing and distributing branded performance apparel, footwear and accessories. Refer to Note 19 to the Consolidated Financial Statements for net revenues by segment.

Corporate Other consists primarily of (i) operating results related to our MapMyFitness digital platform, which includes MapMyRun® and MapMyRide® (collectively "MMR"), and other digital business opportunities; (ii) general and administrative expenses not allocated to an operating segment, including expenses associated with centrally managed departments such as global marketing, global IT, global supply chain and innovation, and other corporate support functions; (iii) restructuring and restructuring related charges; and (iv) certain foreign currency hedge gains and losses.

Our North America segment accounted for approximately 65% of our net revenues for Fiscal 2023, while our EMEA, Asia-Pacific and Latin America segments combined represented approximately 34%. For Fiscal 2023, no single customer accounted for more than 10% of the Company's net revenues.

*North America*

We sell our apparel, footwear and accessories in North America through wholesale and direct-to-consumer channels. Net revenues generated from the sales of our products in the United States were $3.5 billion for Fiscal 2023.

Our direct-to-consumer sales are generated through our Brand and Factory House stores and e-commerce website. As of March 31, 2023, in North America, we had 176 Factory House stores primarily located in outlet centers and 18 Brand House stores throughout the United States and Canada. Consumers can also purchase our products directly from our e-commerce website.

In addition, we earn license revenues in North America based on our licensees' sales of collegiate apparel and accessories, as well as other licensed products.

We distribute the majority of our products to our North American wholesale customers and our own retail stores and e-commerce channels from distribution facilities we lease and operate in California, Maryland and Tennessee. In addition, we distribute our products in North America through third-party logistics providers with primary locations in Canada, New Jersey and Florida. In some instances, we arrange to have products shipped directly to customer-designated facilities from the factories that manufacture our products.

*EMEA*

We sell our apparel, footwear and accessories in EMEA primarily through wholesale customers and independent distributors, along with e-commerce websites and Brand and Factory House stores we operate within Europe. We also sell our branded products to various sports clubs and teams in Europe. We generally distribute our products to our retail customers and e-commerce consumers in Europe through a third-party logistics provider in the Netherlands and a bonded warehouse in the United Kingdom. We sell our apparel, footwear and accessories through independent distributors in the Middle East and Africa.

*Asia-Pacific*

We sell our apparel, footwear and accessories products in China, South Korea, Australia, Singapore, Malaysia and Thailand through stores operated by our distribution and wholesale partners, along with e-commerce websites and Brand and Factory House stores that we own and operate. We also sell our products to distributors in New Zealand, Taiwan, Hong Kong, India and other countries in Southeast Asia where we do not have direct sales operations. We distribute our products in Asia-Pacific through third-party logistics providers based in Hong Kong, China, South Korea, Australia and Singapore.

We have a license agreement with a partner in Japan, which produces, markets and sells our branded apparel, footwear and accessories. Our branded products are sold in this market to large sporting goods retailers, independent specialty stores, professional sports teams and licensee-owned retail stores. We hold a non-controlling stake in our partner.

*Latin America*

In Fiscal 2021, we transitioned away from direct sales operations to distributors in several countries within the Latin America region. We currently sell our apparel, footwear and accessories in Mexico through wholesale and direct-to-consumer channels. In countries where we no longer have direct sales operations, such as Chile, Argentina, Colombia and Brazil, we distribute our products through independent distributors, sourced primarily through our international distribution hub in Panama.


## Product Design and Development

Our products are developed by internal product development teams and manufactured with technical fabrications produced by third parties. This approach enables us to select and create superior, technically advanced materials, curated to our specifications, while focusing our product development efforts on style, performance and fit.

We seek to deliver superior performance in all products, with a mission to make athletes better. Our developers proactively identify opportunities to create and improve performance products that meet the evolving needs of our consumers. We design products with consumer-valued technologies, utilizing color, texture and fabrication to enhance consumer perception and understanding of product use and benefits.

Our product teams also work closely with our sports marketing and sales teams and with professional, collegiate and varsity athletes to identify product developments, trends and determine market needs.


## Sourcing, Manufacturing and Quality Assurance

Many specialty fabrics and other raw materials used in our apparel products are technically advanced products produced by third parties. The fabric and other raw materials used to manufacture our apparel products

are sourced by our contracted manufacturers from a limited number of suppliers pre-approved by us. In Fiscal 2023, our top five suppliers provided approximately 38% of the fabric used in our apparel and accessories. These fabric suppliers have primary locations in Taiwan, China, Turkey and Malaysia. The fabrics used by our suppliers and manufacturers are primarily synthetic and involve raw materials, including petroleum-based products that may be subject to price fluctuations and shortages. We also use cotton as a blended fabric in some of our apparel products. Cotton is a commodity that is subject to price fluctuations and supply shortages. Additionally, our footwear uses raw materials sourced from a diverse base of third-party suppliers. This includes chemicals and petroleum-based components such as rubber that are also subject to price fluctuations and supply shortages.

Substantially all of our products are manufactured by unaffiliated manufacturers. In Fiscal 2023, our apparel and accessories products were manufactured by 33 primary contract manufacturers, operating in 20 countries, with approximately 59% of our apparel and accessories products manufactured in Jordan, Vietnam, Cambodia and Malaysia. Of our 33 primary contract manufacturers, ten produced approximately 62% of our apparel and accessories products. In Fiscal 2023, substantially all of our footwear products were manufactured by eight primary contract manufacturers, operating primarily in Vietnam, Indonesia and China.

All of our manufacturers across all product divisions are evaluated for quality systems, social compliance and financial strength by our internal teams before being selected and on an ongoing basis. Where appropriate, we strive to qualify multiple manufacturers for particular product types and fabrications. We also seek vendors that can perform multiple manufacturing stages, such as procuring raw materials and providing finished products, which helps us control our cost of goods sold. We enter into various agreements with our contract manufacturers, including non-disclosure and confidentiality agreements. We require that manufacturers adhere to our supplier code of conduct regarding manufacturing quality, working conditions and other social, labor and sustainability-related matters. However, we do not have any long term agreements requiring us to utilize any particular manufacturer, and no manufacturer is required to produce our products for the long term. We have subsidiaries strategically located near our key partners to support our manufacturing, quality assurance and sourcing efforts.

## Inventory Management

Inventory management is important to the financial condition and operating results of our business. We manage our inventory levels based on existing orders, anticipated sales and the rapid delivery requirements of our customers. Our inventory strategy is focused on meeting consumer demand while improving our inventory efficiency over the long term by putting systems and processes in place to improve our inventory management. These systems and processes, including our global operating and financial reporting information technology system, are designed to improve forecasting and supply planning capabilities. In addition, we strive to enhance our inventory performance by focusing on adding discipline around product purchasing, reducing production lead time and improving planning and execution for selling excess inventory through our Factory House stores and other liquidation channels.

Our practice, and the general practice in the apparel, footwear and accessory industry, is to offer retail customers the right to return defective or improperly shipped merchandise. From time to time, when introducing new products, which often requires large initial launch shipments, we commence production before receiving orders for those products.

## Intellectual Property

We own the material trademarks used in connection with the marketing, distribution and sale of our products in the United States and in key international markets where our products are currently sold or manufactured. Our major trademarks include the UA Logo ✻⊞® and UNDER ARMOUR®, both of which are registered in the United States, Canada, Mexico, the United Kingdom, the European Union, Japan, China and numerous other countries. We also own trademark registrations for other trademarks including, among others, UA®, ARMOUR®, HEATGEAR®, COLDGEAR®, PROTECT THIS HOUSE®, I WILL®, and many trademarks that incorporate the term ARMOUR such as ARMOUR FLEECE® and ARMOUR BRA$^{TM}$. We also own registrations to protect our connected fitness branding such as MapMyFitness® and associated MapMy marks. We own domain names for our primary trademarks (most notably underarmour.com and ua.com) and hold copyright registrations for several commercials, as well as for certain artwork. We intend to continue to strategically register, both domestically and internationally, trademarks and copyrights we utilize today and those we develop in the future. We will continue to aggressively police our trademarks and pursue those who infringe, both domestically and internationally.

We believe the distinctive trademarks we use in connection with our products are important in building our brand image and distinguishing our products from those of others. These trademarks are among our most valuable assets. In addition to our distinctive trademarks, we also place significant value on our trade dress, which is the overall image and appearance of our products, and we believe our trade dress helps to distinguish our products in the marketplace. We also have copyright protection covering various designs and other original works.

We apply for, own and maintain utility and design patents that protect certain technologies, materials, manufacturing processes, product features and industrial and aesthetic designs. These patents cover various footwear, apparel, accessories, equipment and digital applications. However, we traditionally have had limited patent protection on some of the technology, materials and processes used in the manufacture of our products. In addition, patents are important with respect to our innovative products and investments. As we continue to expand and drive innovation in our products, we seek patent protection on products, features and concepts we believe to be strategic and important to our business. We will continue to file patent applications where we deem appropriate to protect our new products, innovations and designs that align with our corporate strategy.

## Competition

The market for performance apparel, footwear and accessories is highly competitive and includes many new competitors as well as increased competition from established companies expanding their production and marketing of performance products. Our most direct competitors include, among others, NIKE, Adidas, Puma and lululemon athletica, which are large apparel and footwear companies with strong worldwide brand recognition and significantly greater resources than us. Within our international markets, we also compete with local brands that may have stronger brand recognition regionally. Many of the fabrics and technology used in manufacturing our products are not unique to us, and we own a limited number of fabric or process patents. We also compete with other manufacturers, including those specializing in performance apparel and footwear, and private label offerings of certain retailers, including some of our wholesale customers.

In addition, we must compete with others for purchasing decisions, as well as limited floor space at retailers. We believe we have been successful in this area because of the relationships we have developed and the strong sales of our products. However, if retailers earn higher margins from our competitors' products or their own private label offerings, they may favor the display and sale of those products.

We believe we have been able to compete successfully because of our brand image and recognition, the performance and quality of our products and our selective distribution policies. We also believe our focus on athletic performance product style and merchandising differentiates us from our competition. In the future we expect to compete for consumer preferences and may face greater competition on pricing. This may favor larger competitors with lower production costs per unit that can spread the effect of price discounts across a larger array of products and across a larger customer base than ours. The purchasing decisions of consumers for our products often reflect highly subjective preferences that can be influenced by many factors, including advertising, media, product sponsorships, product improvements, preferences for inclusive products and brands and changing styles and trends.

## Sustainability

At Under Armour, our mission is to make athletes better. Our sustainability strategy sets forth our long-term commitment to finding new ways to drive performance through sustainable innovations that not only deliver a better product for athletes, but also a better world. Our sustainability strategy is centered around three interconnected pillars—products, home field and team. Within these pillars, our strategy focuses on enabling materials innovation to bring about a more circular system, leaving our planet and shared spaces bettered by our presence. Additionally, our strategy focuses on championing diversity, equity and inclusion and human rights within our company, with our suppliers and their workers and in communities across our entire supply chain.

We have always been focused on product innovation, and we are challenging ourselves to be more innovative to improve our existing materials and to create new materials that meet our athletes' expectations—all while using circular design principles to expand our products' sustainability attributes and while reducing the impact of our design, development and manufacturing processes on the environment. We are exploring more ways to use digital technology to elevate the experience of our customers and consumers while also reducing the impact of our operations on the environment. Increasingly, we are working with our supply chain to embed sustainable practices, and be mindful about the sustainability profiles of key raw materials.

In Fiscal 2021, we publicly announced certain environmental and sustainability goals for 2025, 2030 and 2050 that focus on reducing our greenhouse gas emissions and increasing our annual sourcing of renewable electricity in our owned and operated facilities. In Fiscal 2023, we published our 2021 Sustainability & Impact Report, which can be found on our website. Aligned with Global Reporting Initiative and Sustainable Accounting Standard Board industry standards, our 2021 Sustainability & Impact Report outlines our 23 goals and targets across the three pillars of our sustainability strategy and describes our progress toward a more sustainable future.

**Human Capital Management**

Under Armour is led by its purpose—*We Empower Those Who Strive for More*—and our teammates, who bring their different backgrounds, experiences and perspectives, are central to driving our long-term success as an organization and brand. Consistent with our purpose, we believe that our brand is stronger when our collective team is fully engaged and working together to support our athletes around the world. We also believe that having an engaged, diverse and committed workforce not only enhances our culture, it drives our business success, ultimately helping us to deliver the most innovative products that make athletes better. Our human capital management strategy is therefore focused on creating an inclusive workplace where our teammates can thrive by attracting, developing and retaining talent through a competitive total rewards program, numerous development opportunities and a diverse, inclusive and engaging work environment.

As of March 31, 2023, we had approximately 15,000 teammates worldwide, including approximately 10,000 in our Brand and Factory House stores and approximately 1,400 at our distribution facilities. Approximately 7,400 of our teammates were full-time. Of our approximately 7,400 part-time teammates, approximately 6% were seasonal teammates. Our total number of teammates fluctuates throughout the year, with a significant increase in seasonal teammates during the third quarter of each fiscal year.

*Diversity, Equity and Inclusion*

Our commitment to diversity, equity and inclusion starts at the top with a highly skilled and diverse Board of Directors. Our Board of Directors has ongoing oversight of our human capital management strategies and programs and regularly reviews our progress towards achieving our diversity, equity and inclusion goals.

We have set measurable, time-bound goals for improving diversity amongst our team, including a commitment to increase the number of historically underrepresented teammates throughout the levels of leadership within our organization. These goals are publicly outlined on our corporate website, where we also publish our representation statistics annually. We are also committed to continuing to increase representation of women in key areas of our business particularly in leadership, commercial and technical roles globally. Our annual incentive plan for all teammates, including executives, incorporates performance measures in furtherance of our diversity, equity and inclusion goals.

As of March 31, 2023:

- the race and ethnicity of our teammate population in the United States, including teammates in our Brand and Factory House stores and our distribution facilities, was 47% White, 24% Hispanic or Latino, 17% Black or African American, 8% Asian and 4% other;

- the race and ethnicity of our "director" level and above positions in the United States was 75% White, 5% Hispanic or Latino, 9% Black or African American, 8% Asian and 3% other; and

- 53% of our global teammates were women, and women represented 42% of our "director" level and above positions globally.

In addition to building a more diverse team, we believe fostering an inclusive and ethical culture is key to our values and who we are as an organization. We believe open lines of communication are critical to fostering this environment. This starts with "tone at the top" and we emphasize the importance of our Code of Conduct and encourage our teammates to "speak-up" when they have concerns and provide multiple reporting mechanisms for them to do so. We require unconscious bias training for all of our corporate teammates and our retail and distribution facility leadership, including training focused on promoting diversity during our new-hire interview process. In Fiscal 2023, we continued a company-wide virtual series to facilitate meaningful conversations on anti-racism and social justice issues. For our senior leadership, we require mandatory training on cultural competency and building inclusive environments. In addition to our broader professional development programs described more fully below, we also invest in programs specifically for our historically underrepresented and women teammates to improve retention and advancement. We currently have nine teammate-led Teammate Resource Groups, which amplify business initiatives, provide networking opportunities, support community outreach and promote cultural awareness. In addition, we have an internal diversity, equity and inclusion council, known as the Global T.E.A.M.

(Teammate Equity and Accountability Movement) Council, which consists of "director" level and above corporate teammates and focuses on fostering a diverse and inclusive work environment across our organization.

*Total Rewards*

Our total rewards strategy is focused on providing market competitive and internally equitable total rewards packages that allow us to attract, engage and retain a talented, diverse and inclusive workforce. In determining our compensation practices, we focus on offering competitive pay that is based on market data with packages that appropriately reflect roles and geographic locations and are transparently communicated. We believe in "pay for performance" and seek to design plans and programs to support a culture of high performance where we reward what is accomplished and how. We are also committed to achieving pay equity within all teammate populations, and with the assistance of third-party experts, conduct an annual review of pay equity and market comparison data. When we identify opportunities, we take prompt actions to close any gaps.

Our total rewards programs, which are outlined on the careers page of our corporate website, are aimed at the varying health, financial and home-life needs of our teammates. In the United States, where approximately 65% of our workforce is located, in addition to market-competitive pay and broad-based bonuses, our full-time teammates are eligible for healthcare benefits; health savings accounts; flexible spending accounts; retirement savings plan; paid time off; caregiver leave; adoption assistance; child and adult care resources; flexible work schedules; short and long term disability; life and accident insurance; tuition assistance; fitness benefits at on-site gyms or eligible fitness programs; commuter benefits; Under Armour merchandise discounts; and a Work-Life Assistance Program. We have implemented a hybrid working model where many of our global corporate teammates are designated as in-office for a certain number of days each week and remote for the remainder, allowing us to provide our teammates flexibility while still achieving our objectives. We believe in promoting alignment between our teammates and stockholders. As such, these teammates are also eligible to participate in our Employee Stock Purchase Plan, and corporate teammates within our "director" level and above positions receive restricted stock unit awards as a key component of their total compensation package. Outside of the United States, we provide similarly competitive benefit packages to those of our U.S. teammates but tailored to market-specific practices and needs.

We believe that giving back to the communities where we live and work is central to our culture. In addition to competitive time off benefits, our full-time teammates also receive 40 hours of additional paid time off each year for personal volunteer activities performed during working hours.

*Talent Development and Engagement*

Our purpose of empowering those who strive for more is embodied in our commitment to helping our teammates develop their skills, grow their careers and achieve their goals. We believe our investment in these areas enhances our teammate engagement, improves the efficiency and productivity of our work and ultimately drives better results for our business. We prioritize and invest in a wide range of training and development opportunities for teammates at all levels, including through both online and instructor-led internal and external programs. All of our teammates have access to an online learning platform and knowledge database, Armour U, which offers an extensive, regularly updated library of seminars on a variety of topics. We provide our corporate teammates two meeting-free days per year designated to focusing on professional development. We also offer resources to support individual development planning, including emphasizing development opportunities as part of teammates' annual goal setting process.

We invest in developing the leadership strength and capabilities of people-leaders at all levels. We leverage assessments, mentoring, executive coaching, and interactive training programs across a variety of leadership topics to improve leadership effectiveness and drive the performance of our team. Additionally, through our succession planning efforts, we further focus on talent development for key roles within our organization.

We believe these efforts keep our teammates engaged and motivated to do their best work. However, competition for employees in our industry is intense, and we regularly collect feedback to better understand and improve our teammate experience and identify opportunities to continually strengthen our culture. See "Risk Factors —Business and Operational Risks—Our future success is substantially dependent on the continued service of our senior management and other key employees, and our continued ability to attract and retain highly talented new team members" included in Item 1A of this Annual Report on Form 10-K.

*Health and Safety*

We prioritize the health, safety and overall well-being of our teammates. We have policies and trainings in place to ensure a safe workplace environment across our organization, such as our crisis management plan, which prepares us to respond to critical incidents, including those involving our teammates. Throughout the COVID-19 pandemic, we continued to invest in the health and safety of our teammates by implementing COVID-19 protection

and prevention measures at our distribution houses, Brand and Factory House retail stores and corporate offices, as well as providing a variety of additional physical, emotional and mental well-being resources.

**Information About Our Executive Officers**

Our executive officers are:

| Name | Age | Position |
|------|-----|----------|
| Kevin Plank | 50 | Executive Chair and Brand Chief |
| Stephanie Linnartz | 55 | President and Chief Executive Officer |
| Colin Browne | 58 | Chief Operating Officer |
| David Bergman | 50 | Chief Financial Officer |
| David Baxter | 56 | President of the Americas |
| Lisa Collier | 58 | Chief Product Officer |
| Tchernavia Rocker | 49 | Chief People and Administrative Officer |
| Mehri Shadman-Valavi | 41 | Chief Legal Officer and Corporate Secretary |

*Kevin Plank* has been Executive Chair and Brand Chief since January 2020. Prior to that, he served as Chief Executive Officer and Chair of the Board of Directors from 1996, when he founded our Company, to 2019, President from 1996 to July 2008 and August 2010 to July 2017. Mr. Plank also serves on the Board of Directors of the National Football Foundation and College Hall of Fame, Inc., and is a member of the Board of Trustees of the University of Maryland College Park Foundation.

*Stephanie Linnartz* has been President and Chief Executive Officer and a member of our Board of Directors since February 2023. Before joining Under Armour, Ms. Linnartz served as the President of Marriott International, Inc. beginning in February 2021. Prior to her role as President, she served as Marriott's Group President Consumer Operations, Technology and Emerging Businesses from 2020 to 2021, and as Marriott's Executive Vice President and Global Chief Commercial Officer from 2013 to 2019. Ms. Linnartz joined Marriott as a financial analyst in 1997, and held several positions in finance before moving into sales and marketing. Ms. Linnartz also serves on the Board of Directors of The Home Depot, Inc. and is a member of its Audit and Leadership Development & Compensation Committees.

*Colin Browne* has been Chief Operating Officer since February 2020. He served as interim President and Chief Executive Officer from June 2022 through February 2023. Previously, he served as Chief Supply Chain Officer from July 2017 to January 2020 and President of Global Sourcing from September 2016 to June 2017. Prior to joining our Company, he served as Vice President and Managing Director for VF Corporation, leading its sourcing and product supply organization in Asia and Africa from November 2013 to August 2016 and as Vice President of Footwear Sourcing from November 2011 to October 2013. Prior thereto, Mr. Browne served as Executive Vice President of Footwear and Accessories for Li and Fung Group LTD from September 2010 to November 2011 and Chief Executive Officer, Asia for Pentland Brands PLC from April 2006 to January 2010. Mr. Browne has over 25 years of experience leading sourcing efforts for large brands.

*David Bergman* has been Chief Financial Officer since November 2017. Mr. Bergman joined our Company in 2004 and has served in various Finance and Accounting leadership roles for the Company, including Corporate Controller from 2006 to October 2014, Vice President of Finance and Corporate Controller from November 2014 to January 2016, Senior Vice President, Corporate Finance from February 2016 to January 2017, and acting Chief Financial Officer from February 2017 to November 2017. Prior to joining the Company, Mr. Bergman worked as a C.P.A. within the audit and assurance practices at Ernst & Young LLP and Arthur Andersen LLP.

*David Baxter* has been President of the Americas since October 2022 and served as SVP, North America Wholesale from April 2020 to October 2022. Before joining Under Armour, Mr. Baxter served as President and CEO of LIDS Sports Group from June 2016 through February 2019. From March 2010 through June 2014, he was Vice President of adidas's America's Sport Performance division, where he directed the North American product and marketing strategies for sport performance categories, and prior to that oversaw all of adidas and Reebok's sports licensed businesses with the major U.S. professional sports leagues. Prior to that, Mr. Baxter spent nine years at Reebok, where he held various roles, including key leadership roles within Reebok's on-field and sports licensed divisions. Earlier in his career, he held various senior level sales positions at Logo Athletic.

*Lisa Collier* has been Chief Product Officer since April 2020. Prior to joining our Company, Ms. Collier served as President, Chief Executive Officer and Chairman of NYDJ (Not Your Daughter's Jeans) from June 2016 to

January 2020. Prior thereto, Ms. Collier served as Executive Vice President and President of Global Dockers Brand of Levi Strauss & Company from July 2013 to May 2016 and as Chief Transformation Officer from October 2013 to January 2015. Ms. Collier also served as Senior Vice President of Product Development and Innovation across all brands from 2012 to 2013, Senior Vice President Global Dockers Merchandising, Licensing, Supply Chain from 2010 to 2012, as Managing Director and General Manager of Levi Strauss Australia and New Zealand from 2007 to 2011, and prior to that in various other leadership roles at Levi Strauss & Company. Ms. Collier served in various leadership roles at Sunrise Brands (formerly Tarrant Apparel Group) from 1999 to 2003. She also served in various merchandising positions at The Limited from 1987 to 1999 and started her career in retail and apparel at Hess's Department Store.

*Tchernavia Rocker* has been Chief People and Administrative Officer since June 2020. Prior to that she served as Chief People and Culture Officer from February 2019 to May 2020. Prior to joining our Company, she served more than 18 years in Human Resources leadership roles at Harley-Davidson, Inc., most recently as Vice President and Chief Human Resources Officer from June 2016 through January 2019, as General Manager, Human Resources from January 2012 through May 2016, and in various other Human Resources leadership positions since joining the company in 2000. Prior to that, she served in various HR and operations roles at Goodyear Dunlop North America Tire Inc.

*Mehri Shadman* has been Chief Legal Officer and Corporate Secretary since October 2022. Ms. Shadman joined Under Armour in 2013 and served as Assistant Corporate Secretary from January 2017 to October 2022. Most recently she held the role of Deputy General Counsel, Corporate and Risk, overseeing the corporate legal, global ethics and compliance, data privacy, and enterprise risk management functions, and served as Vice President within the legal department from March 2019 through October 2022. Prior to that, she served as Senior Director, Managing Counsel, Corporate Affairs from January 2017 to February 2019. Before joining Under Armour, Ms. Shadman began her career as an associate at a large international law firm, in its capital markets practice.

## Available Information

We will make available free of charge on or through our website at https://about.underarmour.com/ our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") as soon as reasonably practicable after we electronically file these materials with the Securities and Exchange Commission. We also post on this website our key corporate governance documents, including our board committee charters, our corporate governance guidelines and our code of conduct and ethics.

## ITEM 1A. RISK FACTORS

Our results of operations and financial condition could be adversely affected by numerous risks. You should carefully consider the risk factors detailed below in conjunction with the other information contained in this Annual Report on Form 10-K. Should any of these risks actually materialize, our business, financial condition, results of operations and future prospects could be negatively impacted.

### Economic and Industry Risks

**Our business depends on consumer purchases of discretionary items, which can be negatively impacted during an economic downturn or periods of inflation. This could materially impact our sales, profitability and financial condition.**

Many of our products may be considered discretionary items for consumers. Many factors impact discretionary spending, including general economic conditions, unemployment, the availability of consumer credit and inflationary pressures and consumer confidence in future economic conditions. Global and U.S. economic conditions continue to be uncertain, particularly in light of rising interest rates, recession fears and instability in the U.S. banking system. Consumer purchases of discretionary items tend to decline during recessionary periods when disposable income is lower or during other periods of economic instability or uncertainty, which may lead to declines in sales and slow our long-term growth expectations. Any near or long-term economic disruptions in markets where we sell our products, particularly in the United States, China or other key markets, may materially harm our sales, profitability and financial condition and our prospects for growth.

**The COVID-19 pandemic has caused and may continue to cause significant disruption in our industry, which has and may continue to materially impact our business, financial condition and results of operations.**

Our business has been and may continue to be materially impacted by the COVID-19 pandemic, which has negatively affected the U.S. and global economies, disrupted global supply chains and financial markets, and led to significant travel and business restrictions, including mandatory closures, orders to "shelter-in-place" and restrictions on how businesses operate. The pandemic had an adverse impact on our business and results of operations, particularly in Fiscal 2020, and although conditions improved during Fiscal 2021, the Transition Period and Fiscal 2023, adverse impacts may continue. The extent of the impact of the COVID-19 pandemic on our business and financial performance will depend on future developments, including any resurgences, which are uncertain and cannot be predicted.

During Fiscal 2020, the COVID-19 pandemic resulted in temporary closures of our retail stores and the stores of our wholesale customers where our products are sold, reduced consumer traffic and consumer spending, temporary layoffs of certain employees in our North America retail stores and distribution centers and incremental operating expenses from adopting preventative health and safety measures in our stores, distribution centers and corporate offices. These negative impacts may continue or resurface depending on the ongoing development of the virus and related responses including resurgences and the impact of variants. For example, during Fiscal 2023, ongoing impacts of the COVID-19 pandemic in China caused labor disruptions resulting in temporary closures of our Brand and Factory House stores, distribution centers and corporate facilities, as well as negatively impacted consumer traffic and demand. Although, as of March 31, 2023, substantially all of our Brand and Factory House stores, distribution centers and corporate facilities in China were open, we may continue to experience varying degrees of volatility, business disruptions and periods of closure, which may continue to negatively impact our financial results.

The disruption caused by the pandemic has and may continue to disrupt the operations of our business partners, including our customers, suppliers, and vendors, and the financial condition of certain of our partners has been and could again be significantly impacted. Additionally, the COVID-19 pandemic has caused and may continue to cause global logistical challenges, including increased freight costs, shipping container shortages, transportation delays, labor shortages and port congestion. While we continue to see improvements across our supply chain, these challenges have and may continue to negatively impact our partners and our business, including by disrupting our inventory flow, requiring us to incur increased freight costs and requiring us to cancel or delay sales to some of our customers. This has and may continue to negatively impact our net revenues, gross margin, net income and results of operations.

The COVID-19 pandemic and resulting economic disruption also led to significant volatility in the capital markets and adversely impacted our stock price. While we have taken measures to maintain our operations and preserve and enhance our access to liquidity, our cash generated from operations was negatively impacted during certain periods of the pandemic and future cash flows may be further impacted by the ongoing development of the pandemic. If we are unable to effectively manage our spending in response to the pandemic, our profitability may be negatively impacted.

The impact of the COVID-19 pandemic may also exacerbate other risks discussed below, any of which could have a material effect on us. Though we continue to monitor the latest developments regarding the COVID-19 pandemic closely, we are unable to predict the extent of any continued impact of the pandemic on our business, operations and financial condition due to the uncertainty of future developments, including the impact of resurgences, and additional impacts may arise that we are not aware of currently.

**We operate in highly competitive markets and the size and resources of some of our competitors may allow them to compete more effectively than we can, resulting in a loss of our market share and a decrease in our net revenues and gross profit.**

The market for performance apparel, footwear and accessories is highly competitive and includes many new competitors, as well as increased competition from established companies expanding their production and marketing of performance products. Many of our competitors are large apparel and footwear companies with strong worldwide brand recognition. Within our international markets, we also compete with local brands that may have strong brand recognition amongst consumers within particular regions. Due to the fragmented nature of the industry, we also compete with other manufacturers, including those specializing in products similar to ours and private label offerings of certain retailers, including some of our wholesale customers. Many of our competitors have significant competitive advantages, including greater financial, distribution, marketing, digital and other resources; longer

operating histories; better brand recognition among consumers; more experience in global markets; greater ability to invest in technology, the digital consumer experience and innovations around sustainability; and greater economies of scale. In addition, our competitors have long-term relationships with our key retail customers that are potentially more important to those customers because of the significantly larger volume and product mix that our competitors sell to them. As a result, these competitors may be better equipped than we are to influence consumer preferences or otherwise increase their market share by quickly adapting to changes in customer requirements or consumer preferences, discounting excess inventory that has been written down or written off, devoting resources to the marketing and sale of their products, including significant advertising, media placement, partnerships and product endorsement, adopting aggressive pricing policies and engaging in lengthy and costly intellectual property and other disputes.

In addition, while one of our growth strategies has been to increase floor space for our products in retail stores and in certain markets expand our distribution to other retailers, retailers have limited resources and floor space, and we must compete with others to develop relationships with them. Increased competition could result in reductions in floor space in retail locations or reductions in sales or reductions in the prices of our products, and if retailers have better sell through or earn greater margins from our competitors' products, they may favor the display and sale of those products. Our inability to compete successfully against our competitors and maintain our gross margin could have a negative effect on our brand image and a material adverse effect on our business, financial condition and results of operations.

**Our profitability may decline or our growth may be negatively impacted as a result of increasing pressure on pricing.**

Our industry is subject to significant pricing pressure caused by many factors, including intense competition, consolidation in the retail industry, pressure from retailers to reduce the costs of products, the amount of excess inventory in the marketplace and changes in consumer demand. These factors may cause us to reduce our prices to retailers and consumers or engage in more promotional activity than we anticipate, which could negatively impact our margins and cause our profitability to decline if we are unable to offset price reductions with comparable reductions in our operating costs. Ongoing and sustained promotional activities could negatively impact our brand image. On the other hand, if we are unwilling to engage in promotional activity on a scale similar to that of our competitors, for instance, to protect our premium brand positioning, and unable to simultaneously offset declining promotional activity with increased sales at premium price points, our ability to achieve short-term growth targets may be negatively impacted, which could have a material adverse effect on our results of operations, financial condition and the price of our stock.

**Fluctuations in the cost of raw materials and commodities we use in our products and costs related to our supply chain could negatively affect our operating results.**

The fabrics used by our suppliers and manufacturers are made of raw materials including petroleum-based products and cotton. Significant price fluctuations, including due to inflation, or shortages in petroleum or other raw materials can materially adversely affect our cost of goods sold. In addition, certain of our manufacturers are subject to government regulations related to wage rates, and therefore the labor costs to produce our products may fluctuate. The cost of transporting our products for distribution and sale is also subject to fluctuation due in large part to the price of oil. Because most of our products are manufactured abroad, our products must be transported by third parties over large geographical distances and an increase in the price of oil can significantly increase costs. Manufacturing delays or unexpected transportation delays, such as those caused by COVID-19 related global logistics challenges, have caused and may continue to cause us to rely more heavily on airfreight to achieve timely delivery to our customers. These factors have and may continue to significantly increase our freight costs. Any of these fluctuations may increase our cost of products and have an adverse effect on our profit margins, results of operations and financial condition.

**Our financial results and ability to grow our business may be negatively impacted by global events beyond our control.**

We operate retail, distribution and warehousing facilities and offices around the world and substantially all of our manufacturers are located outside of the United States. We are subject to numerous risks and global events beyond our control which could negatively impact consumer spending or the operations of us or our customers or business partners, and therefore our results of operations, including: political or labor unrest; military conflict (such as the ongoing conflict between Russia and Ukraine); terrorism; public health crises, disease epidemics or pandemics (such as COVID-19); natural disasters and extreme weather conditions, which may increase in

frequency and severity due to climate change; economic instability resulting in the disruption of trade from foreign countries; the imposition of new laws, regulations and rules, including those relating to sustainability and climate change, data privacy, labor conditions, minimum wage, quality and safety standards and disease epidemics or other public health concerns; changes in trade policy or actions of foreign or U.S. governmental authorities impacting trade and foreign investment, particularly during periods of heightened tension between U.S. and foreign governments, including the imposition of new import limitations, duties, tariffs, anti-dumping penalties, trade restrictions or restrictions on the transfer of funds; inflation; and changes in local economic conditions in countries where our stores, customers, manufacturers and suppliers are located.

These risks could hamper our ability to sell products, negatively affect the ability of our manufacturers to produce or deliver our products or procure materials and increase our cost of doing business generally, any of which could have an adverse effect on our results of operations, profitability, cash flows and financial condition. In the event that one or more of these factors make it undesirable or impractical for us to conduct business in a particular country, our business could be adversely affected.

### *Business and Operational Risks*

**We derive a substantial portion of our sales from large wholesale customers. If the financial condition of our customers declines, our financial condition and results of operations could be adversely impacted.**

In Fiscal 2023, sales through our wholesale channel represented approximately 59% of our net revenues. We extend credit to our wholesale customers based on an assessment of a customer's financial condition, generally without requiring collateral or getting customer insurance against non-collection. We face increased risk of order reduction or cancellation and around collectibility when dealing with financially ailing customers or customers struggling with economic uncertainty. As a result of the COVID-19 pandemic, many of our wholesale customers throughout the world had to temporarily close their stores or operate their stores under significant restrictions and experienced reduced consumer traffic and purchasing, which resulted in lower sales and cancellations of orders of our products. If our wholesale customers again experience significant disruptions, this could result in reductions or cancellations of orders or late or extended payment terms to us, which could negatively impact our results of operations. In addition, during weak economic conditions, such as periods of high inflation and recessionary fears, customers may be more cautious with orders or may slow investments necessary to maintain a high quality in-store experience for consumers, which may result in lower sales of our products. Furthermore, a slowing economy in our key markets or a continued decline in consumer purchases of sporting goods generally could have an adverse effect on the financial health of our company.

From time to time, certain of our customers have experienced financial difficulties and we have been unable to collect all or a portion of the amounts owed to us. To the extent one or more of our customers experience significant financial difficulty, bankruptcy, insolvency or cease operations, this could have a material adverse effect on our sales, our ability to collect on receivables and our financial condition and results of operations.

**We may not successfully execute our long-term strategies, which may negatively impact our results of operations.**

Our ability to realize our long-term growth objectives depends, in part, on our ability to successfully execute strategic initiatives in key areas including our wholesale, footwear, women's and direct-to-consumer businesses. With respect to our direct-to-consumer business, our growth depends on our ability to continue to successfully grow our digital offerings and experiences throughout the world, expand our global network of Brand and Factory House stores and continue to increase our product offerings and market share in footwear successfully. Our ability to invest in these growth initiatives could be negatively impacted if we again experience significant market disruption due to COVID-19 or other significant events, particularly if our North America business, which represented 65% of our total net revenues in Fiscal 2023, does not grow sufficiently. In addition, as we expand our global network of Brand and Factory House stores, if we are unable to operate our stores profitably, our financial results could be impacted, or we could be required to recognize impairment charges. Our long-term strategy also depends on our ability to successfully drive expansion of our gross margins, manage and leverage our cost structure and drive return on our investments. If we cannot effectively execute our long-term growth strategies while managing costs effectively, our business could be negatively impacted and we may not achieve our expected results of operations.

**If we are unable to anticipate consumer preferences, successfully develop and introduce new, innovative and updated products or engage our consumers, or if consumer preferences shift away from performance products, our sales, net revenues and profitability may be negatively impacted.**

Our success depends on our ability to identify and originate product trends and anticipate and react to changing consumer demands in a timely manner. All of our products are subject to changing consumer preferences that shift rapidly and cannot be predicted with certainty. In addition, consumers are increasingly focused on the environmental and social practices of brands, including the sustainability of the products sold. Our ability to adequately react to and address consumer preferences depends in part upon our continued ability to develop and introduce innovative, high-quality products and to optimize available consumer data. In addition, long lead times for certain of our products may make it hard for us to respond quickly to changes in consumer demands. Accordingly, our new products may not receive consumer acceptance. From time to time, we may also introduce limited run or specialized products that may increase our sales in the near term, but that may fail to maintain sustained consumer demand. If consumers are not convinced performance apparel, footwear and accessories are a better choice than, and worth the additional cost over, traditional alternatives, sales of performance products may not grow or may decline. We also must successfully design and market our performance products for use by consumers in casual occasions. If we are unable to effectively anticipate and respond to consumer preferences as a result of any of these factors, our brand image could be negatively impacted, and our sales, net revenues, profitability and long-term growth plans may be negatively impacted.

**Consumer shopping and engagement preferences and shifts in distribution channels continue to evolve and if we fail to adapt accordingly our results of operations or future growth could be negatively impacted.**

Consumer preferences regarding the shopping experience and how to engage with brands continue to rapidly evolve. We sell our products through a variety of channels, including through wholesale customers and distribution partners, as well as our own direct-to-consumer business consisting of our Brand and Factory House stores and e-commerce platforms. If we or our wholesale customers do not provide consumers with an attractive in-store experience, our brand image and results of operations could be negatively impacted. In addition, as part of our growth strategy, we are investing significantly in enhancing our online platform capabilities, implementing systems to evolve towards a more omni-channel approach to service our consumers and establishing and growing consumer loyalty programs in certain regions. We are also investing in capabilities and tools to drive higher digital engagement with our consumers and create new digital experiences. If we do not successfully execute this strategy or continue to provide an engaging, reliable and user-friendly digital commerce platform or digital experiences that attract consumers, our brand image, and results of operations, as well as our opportunities for future growth, could be negatively impacted.

**A decline in sales to, or the loss of, one or more of our key customers could result in a material loss of net revenues and negatively impact our prospects for growth.**

We generate a significant portion of our wholesale revenues from sales to our largest customers. We currently do not enter into long-term sales contracts with our key customers, relying instead on our relationships with these customers and on our position in the marketplace. As a result, we face the risk that these key customers may not increase their business with us as we expect, or may significantly decrease their business with us or terminate their relationship with us. The failure to increase or maintain our sales to these customers as much as we anticipate would have a negative impact on our growth prospects and any decrease or loss of these key customers' business could result in a material decrease in our net revenues and net income or loss. In addition, our customers continue to experience ongoing industry consolidation, particularly in the sports specialty sector. As this consolidation continues, it increases the risk that if any one customer significantly reduces their purchases of our products, we may be unable to find sufficient alternative customers to continue to grow our net revenues, or our net revenues may decline materially. In addition, we may from time to time exit relationships with certain wholesale customers to further drive our premium brand position or for other reasons. This may negatively impact our net revenues if we are unable to replace those sales with additional sales to our other customers or direct sales to consumers.

**The value of our brand and sales of our products could be diminished if we are associated with negative publicity.**

Our business could be adversely impacted if negative publicity regarding our brand, our company or our business partners diminishes the appeal of our brand to consumers. For example, while we require our suppliers, manufacturers and licensees of our products to operate their businesses in compliance with applicable laws and

regulations, as well as the social and other standards and policies we impose on them, including our code of conduct, we do not control the conduct of these third parties. A violation, or alleged violation of our policies, labor laws or other laws could interrupt or otherwise disrupt our sourcing or damage our brand image. Negative publicity regarding production methods, alleged practices or workplace or related conditions of any of our suppliers, manufacturers or licensees could adversely affect our reputation and sales and force us to locate alternative suppliers, manufacturers or licensees. The risk that our business partners may not act in accordance with our expectations may be exacerbated in markets where our direct sales, supply chain or logistics operations are not as widespread. In addition, we have sponsorship contracts with a variety of athletes, teams and leagues, and many athletes and teams use our products. From time to time, we also enter into collaborative arrangements with athletes, designers or other partners. Negative publicity regarding these partners could negatively impact our brand image and result in diminished loyalty to our brand, regardless of whether such claims are accurate. Furthermore, social media can potentially accelerate and increase the scope of negative publicity. This could diminish the value of our proprietary rights or harm our reputation or have a negative effect on our sales and results of operations.

**We must successfully manage the increasingly complex operations of our global business, including continued expansion in certain markets where we have limited brand recognition, or our business and results of operations may be negatively impacted.**

Part of our growth strategy depends on our continued expansion outside of North America, and we have limited brand recognition and operating experience in certain regions. We must continue to successfully manage the operational difficulties associated with expanding our business to meet increased consumer demand throughout the world. We have limited experience with regulatory requirements and market practices in certain regions outside of North America, and may face difficulties expanding into and successfully operating in those markets, including differences in regulatory environments, labor and market practices, and difficulties in keeping abreast of market, business and technical developments and consumers' tastes and preferences. We must also continually evaluate the need to expand critical functions in our business, including sales and marketing, product development and distribution functions, our management information systems and other processes and technology. We may not manage these efforts cost-effectively or these efforts could increase the strain on our existing resources. If we experience difficulties in supporting the growth of our business, we could experience an erosion of our brand image or operational challenges leading to a decrease in net revenues and results from operations.

**Our results of operations could be materially harmed if we are unable to accurately forecast demand for our products.**

To ensure adequate inventory supply, we must forecast inventory needs and place orders with our manufacturers based on estimated future demand for particular products, and before firm orders are placed by our wholesale customers. In addition, a portion of our net revenues may be generated by at-once orders for immediate delivery to wholesale customers, particularly during the last two quarters of the calendar year, which historically has been our peak season. If we fail to accurately forecast customer demand we may experience excess inventory levels or a shortage of product to deliver to our wholesale customers or for our direct-to-consumer channel. Excess inventory may result in inventory write-downs or write-offs or sales at discounted prices or in less preferred distribution channels, negatively impacting gross margin. On the other hand, if we underestimate the demand for our products, our manufacturers may not be able to produce products to meet our customer requirements, resulting in delays in the shipment of our products and our ability to recognize revenue, lost sales, as well as damage to our reputation and wholesale and consumer relationships.

Factors that could affect our ability to accurately forecast demand for our products include: changing consumer demand for our products; product introductions by competitors; unanticipated changes in general market or economic conditions or other factors, which may result in cancellations of advance orders or a reduction or increase in the rate of reorders or at-once orders placed by retailers; the impact on consumer demand due to unseasonable weather conditions, which may become more frequent or severe as a result of climate change; and terrorism or acts of war, or the threat thereof, political or labor instability or unrest or public health concerns and disease epidemics, such as the current COVID-19 pandemic.

The difficulty in forecasting demand also makes it difficult to estimate our future results of operations and financial condition from period to period. A failure to accurately predict the level of demand for our products could adversely impact our profitability or cause us not to achieve our expected financial results.

**We rely on third-party suppliers and manufacturers to provide raw materials for and to produce our products, and we have limited control over these suppliers and manufacturers and may not be able to obtain quality products on a timely basis or in sufficient quantity.**

Many of the materials used in our products are technically advanced products developed by third parties and may be available, in the short-term, from a very limited number of sources. Substantially all of our products are manufactured by unaffiliated manufacturers, and, in Fiscal 2023, ten manufacturers produced approximately 65% of our apparel and accessories products, and six produced substantially all of our footwear products. We have no long-term contracts with our suppliers or manufacturing sources, and we compete with other companies for fabrics, raw materials and production capacity.

A number of factors may require us to seek alternative or additional suppliers, which we may not be able to do in a timely or cost-effective manner. We may experience a significant disruption in the supply of fabrics or raw materials from current sources or, in the event of a disruption, we may be unable to locate alternative materials suppliers of comparable quality at an acceptable price, or at all. Moreover, our suppliers may not be able to fill our orders in a timely manner depending on market conditions or increased demand for product. For example, in Fiscal 2021, certain of our manufacturers experienced significant financial and operational disruption due to COVID-19, including in key sourcing countries.

We have historically provided supply chain finance support to certain of our supply chain partners. In the past, the financial markets supporting supply chain finance programs experienced disruption that resulted in a temporary disruption to our program and challenged the cash flow and liquidity of our partners. While we worked with our partners through the disruption and have re-established a supply chain finance program, there can be no guarantee that such disruption will not occur again. Additionally, if one or more of our suppliers were to experience significant financial difficulty, bankruptcy, insolvency or cease operations, or failed to comply with applicable labor or other laws, we may be required to seek alternative suppliers.

 In addition, if we lose or need to replace an existing manufacturer or supplier as a result of adverse economic conditions or other reasons, additional supplies of fabrics or raw materials or additional manufacturing capacity may not be available when required on terms that are acceptable to us, or at all, or suppliers or manufacturers may not be able to allocate sufficient capacity to us in order to meet our requirements. Even if we are able to expand existing or find new manufacturing or fabric sources, we may encounter delays in production and added costs as a result of the time it takes to train our suppliers and manufacturers on our methods, products and quality control standards. Any delays, interruption or increased costs in the supply of fabric or manufacture of our products could have an adverse effect on our ability to meet retail customer and consumer demand for our products and result in lower net revenues and net income (or higher net loss) both in the short and long term.

We have occasionally received, and may in the future continue to receive, shipments of product that fail to conform to our quality control standards. If we are unable to obtain replacement products in a timely manner, we risk the loss of net revenues resulting from the inability to sell those products and related increased administrative and shipping costs. In addition, because we do not control our manufacturers, products that fail to meet our standards or other unauthorized products could end up in the marketplace without our knowledge, which could harm our brand and our reputation in the marketplace.

**Labor or other disruptions at ports or our suppliers or manufacturers may adversely affect our business.**

Our business depends on our ability to source and distribute products in a timely and cost effective manner. As a result, we rely on the free flow of goods through open and operational ports worldwide and on a consistent basis from our suppliers and manufacturers. Labor disputes and disruptions at various ports or at our suppliers or manufacturers could create significant risks for our business, particularly if these disputes result in work slowdowns, decreased operations, lockouts, strikes or other disruptions during our peak importing or manufacturing seasons. For example, the COVID-19 pandemic caused delays and disruptions at ports due to workforce decreases, shipping backlogs and capacity constraints, container shortages and other disruptions, which resulted in slower than planned deliveries of inventory and delayed sales to customers. Significant delays or disruption in receiving and distributing our products, has had, and may again have, an adverse effect on our business, including canceled orders by customers, unanticipated inventory accumulation or shortages, increased expense (including air freight) to deliver our products and reduced net revenues and net income or higher net loss.

**If we fail to successfully manage or realize expected results from significant transactions or investments, or if we are required to recognize an impairment of our goodwill or other intangible assets, it may have an adverse effect on our results of operations and financial position.**

From time to time, we may engage in acquisition opportunities we believe are complementary to our business and brand. Integrating acquired businesses can require significant efforts and resources, which could divert management attention from more profitable business operations. From time to time we have also disposed of certain assets where we did not think our activities aligned to our operating model. If we fail to successfully integrate acquired businesses or effectively manage dispositions, we may not realize the financial benefits or other synergies we anticipated. In addition, in connection with our acquisitions, we may record goodwill or other intangible assets. We have recognized goodwill impairment charges in the past, and additional goodwill impairment charges could have an adverse effect on our results of operations and financial position. Additionally, from time to time, we may invest in business infrastructure, new businesses and expansion of existing businesses, such as the expansion of our network of Brand and Factory House stores and our distribution facilities, implementing our global operating and financial reporting information technology system, supporting our digital strategy (including our e-commerce platform and loyalty programs), or supporting our corporate infrastructure (including the development of our new global headquarters located in the Baltimore Peninsula, an area of Baltimore previously referred to as Port Covington). These investments require substantial cash investments and management attention, and infrastructure investments may also divert funds from other potential business opportunities. We believe cost effective investments are essential to business growth and profitability. The failure of any significant investment to provide the returns or synergies we expect could adversely affect our financial results.

**Climate change and an increased focus on sustainability issues, including those related to climate change, human rights and diversity, equity and inclusion, may have an adverse effect on our brand, sales of our products and our results of operations.**

There are concerns that increased levels of greenhouse gases in the atmosphere have caused, and may continue to cause, increases in global temperatures, changes in weather patterns and an increase in the frequency and severity of natural disasters and extreme weather events. Climate change has the potential to impact our business in numerous ways. These concerns may impact consumer preferences and, if we fail to adapt accordingly, consumer demand for our product. The physical impacts of climate change, such as an increase in the frequency and severity of storms and flooding, may increase volatility in the supply chain, which could affect the availability, quality and cost of raw materials, and disruption to the production and distribution of our products. In addition, governmental authorities in various countries have proposed, and are likely to continue to propose, legislation and regulation to reduce or mitigate the impacts of climate change. Various countries and regions are following different approaches to the regulation of climate change, which could increase the complexity of, and potential cost related to complying with, such regulations. Any of the foregoing may require us to make additional investments. Failure to monitor, adapt, build resilience and develop solutions against the physical and transitional impacts from climate change may negatively impact our brand and reputation, sales of our products and our results of operations.

Certain customers, consumers, investors and other stakeholders are increasingly focusing on the sustainability and human rights practices of companies, including those related to climate change and diversity, equity and inclusion. If our sustainability and human rights practices do not meet such stakeholder expectations and standards, which continue to evolve, our brand and reputation could be negatively impacted. We have published, and may continue to publish, a sustainability report and other information describing our practices, targets and commitments on a variety of sustainability and human rights matters, including relating to our actions to address climate change, environmental targets and compliance, social and labor policies and practices, human capital management matters (including those relating to diversity, equity and inclusion) and the materials and manufacturing of our products. It is possible that stakeholders may not be satisfied with such disclosures, our sustainability and human rights practices, targets or commitments or the speed or success of their adoption. We may incur additional costs, face market and technological barriers, require additional resources or change investment decisions, which may require us to adjust or restate some or all of our targets and commitments. Any failure, or perceived failure, to meet stakeholder expectations or our targets or commitments could harm our reputation, negatively impact our employee retention or have a negative effect on our sales and results of operations.

**The costs and return on our investments for our sports marketing sponsorships may become more challenging and this could impact the value of our brand image.**

A key element of our marketing strategy has been to create a link in the consumer market between our products and professional, collegiate and young athletes. We have developed licensing and sponsorship agreements with a variety of sports teams and athletes at the collegiate and professional level to be their official supplier of performance apparel and footwear. We have also developed licensing agreements to be an official supplier of footwear and/or performance apparel to a variety of professional sports leagues and clubs. However, as competition in the performance apparel and footwear industry has increased, the costs associated with athlete sponsorships and official supplier licensing agreements, including the costs of obtaining and retaining these sponsorships and agreements, have varied and at times increased greatly. If we are unable to maintain our current association with professional athletes, teams and leagues, or to do so at a reasonable cost, we could lose the on-field authenticity associated with our products, and we may be required to modify and substantially increase our marketing investments.

**If we encounter problems with our distribution system, our ability to deliver our products to the market could be adversely affected.**

We rely on a limited number of distribution facilities for our product distribution. Our distribution facilities utilize computer controlled and automated equipment, which means the operations are complicated and may be subject to a number of risks related to security or computer viruses or malware, the proper operation of software and hardware, power interruptions or other system failures. In addition, because many of our products are distributed from a limited number of locations, our operations could also be interrupted by severe weather conditions, floods, fires or other natural disasters in these locations, as well as labor or other operational difficulties or interruptions, including public health crises or disease epidemics. We maintain business interruption insurance, but it may not adequately protect us from the adverse effects that could be caused by significant disruptions in our distribution facilities or from all types of events causing such disruptions. Significant disruptions could lead to loss of customers or an erosion of our brand image. In addition, our distribution capacity is dependent on the timely performance of services by third parties. This includes the shipping of product to and from our distribution facilities, as well as partnering with third-party distribution facilities in certain regions where we do not maintain our own facilities. From time to time, certain of our partners have experienced and may continue to experience disruptions to their operations, including cyber-related disruptions and disruptions related to the COVID-19 pandemic. If we or our partners encounter such problems, our results of operations, as well as our ability to meet customer expectations, manage inventory, complete sales and achieve objectives for operating efficiencies could be materially adversely affected.

**We rely significantly on information technology and any failure, inadequacy or interruption of that technology could harm our ability to effectively operate our business.**

We rely on our own and our vendors' information technology throughout our business operations, including to design, forecast and order product, manage and maintain our inventory and internal reports, manage sales and distribution, operate our e-commerce website and mobile applications, process transactions, manage retail operations and other key business activities. We also communicate electronically throughout the world with our employees and with third parties, such as customers, suppliers, vendors and consumers. Our operations are dependent on the reliable performance of these systems and technologies and their underlying technical infrastructure, which incorporate complex software. Any of these information systems could fail or experience a service interruption for a number of reasons, including computer viruses, ransomware or other malware, programming errors, hacking or other unlawful activities, disasters or a failure to properly maintain system redundancy or protect, repair, maintain or upgrade the systems. For example, in Fiscal 2021, a remote code execution vulnerability in Apache log4j was identified as affecting large amounts of systems worldwide, including ours. We have not experienced any material operational disruptions related to this event.

From time to time we have experienced, and may continue to experience, operational disruption due to attacks on our systems and those of our vendors. Although we maintain certain business continuity plans, there can be no assurance that our business continuity plans, or those of our vendors, will anticipate all material risks that may arise or will effectively resolve the issues in a timely manner or adequately protect us from the adverse effects that could be caused by significant disruptions in key information technology. The failure of these systems to operate effectively or to integrate with other systems, or a breach in security of these systems could cause delays in product fulfillment and reduced efficiency of our operations, lost sales, the exposure of sensitive business or personal information and damage to the reputation of our brand. Depending on the system and scope of disruption,

in some instances a service interruption or shutdown could have a material adverse impact on our operating activities or results of operations. Remediation and repair of any failure, problem or breach of our key systems or known potential vulnerabilities could require significant capital investments, as well as divert resources and management attention from key projects or initiatives. While we have purchased cybersecurity insurance, there can be no assurance that the coverage would be adequate in relation to any incurred losses. Moreover, as cyber attacks increase in frequency and magnitude, we may be unable to obtain cybersecurity insurance in amounts and on terms we view as appropriate for our operations.

We also heavily rely on information systems to process financial and accounting information for financial reporting purposes. If we experience any significant disruption to our financial information systems that we are unable to mitigate, our ability to timely report our financial results could be impacted, which could negatively impact our stock price.

**Our future success is substantially dependent on the continued service of our senior management and other key employees, and our continued ability to attract and retain highly talented new team members.**

Our future success is substantially dependent on the continued service of our senior management, particularly Kevin Plank, our founder, Executive Chair and Brand Chief, Stephanie Linnartz, our President and Chief Executive Officer, other top executives and key employees who have substantial experience and expertise in our business, including product creation, innovation, sales, marketing, supply chain, informational technology, operational and other support personnel. The loss of the services of our senior management or other key employees could make it more difficult to successfully operate our business and achieve our business goals and could result in harm to key customer relationships, loss of key information, expertise or know-how and unanticipated recruitment and training costs. Changes in our senior management can also disrupt our business. The failure to successfully transition and assimilate key employees could adversely affect our results of operations.

In addition, to profitably grow our business and manage our operations, we will need to continue to attract, retain and motivate highly talented management and other employees with a range of skills, backgrounds and experiences. Competition for experienced and well-qualified employees in our industry is intense and we may not be successful in attracting and retaining such personnel. Additionally, changes to our current and future office environments, adoption of new work models and requirements about when or how often employees work on-site or remotely may fail to meet the expectations of our employees and present new challenges. As certain jobs and employers increasingly operate remotely, traditional geographic competition for talent may change in ways that cannot be fully predicted at this time. If we are unable to attract, retain and motivate management and other employees with the necessary skills, we may not be able to grow or successfully operate our business and achieve our long-term objectives. In addition, we have invested significant time and resources in building, maintaining and evolving our company culture and our values, which we believe to be critical to our future success. Failure to maintain and continue to evolve our culture could negatively affect our ability to attract, retain and motivate talented management and employees and to achieve our long-term objectives.

**We may not fully realize the expected benefits of our restructuring plans or other operating or cost-saving initiatives, which may negatively impact our profitability.**

Since 2017, we have executed three separate restructuring plans designed to more closely align our financial resources against the critical priorities of our business and rebalance our cost base to further improve future profitability and cash flow generation. We have also implemented several changes to our operating model and continue to refine our operating model in response to business and market conditions. We may not achieve the operational improvements and efficiencies that we targeted in our restructuring plans and operating model changes, which could adversely impact our results of operations and financial condition. Implementing any restructuring plan or operating model change presents significant potential risks including, among others, higher than anticipated implementation costs, management distraction from ongoing business activities, failure to maintain adequate controls and procedures while executing our restructuring plans and operating model changes, damage to our reputation and brand image and workforce attrition beyond planned reductions. If we fail to achieve targeted operating improvements and/or cost reductions, our profitability and results of operations could be negatively impacted, which may be dilutive to our earnings in the short term.

*Financial Risks*

**Our credit agreement contains financial covenants, and both our credit agreement and debt securities contain other restrictions on our actions, which could limit our operational flexibility or otherwise adversely affect our financial condition.**

We have, from time to time, financed our liquidity needs in part from borrowings made under our credit facility and the issuance of debt securities. Our Senior Notes limit our ability to, subject to certain significant exceptions, incur secured debt and engage in sale leaseback transactions. Our amended credit agreement contains negative covenants that, subject to significant exceptions limit our ability, among other things to incur additional indebtedness, make restricted payments, sell or dispose of assets, pledge assets as security, make investments, loans, advances, guarantees and acquisitions, undergo fundamental changes and enter into transactions with affiliates. In addition, we must maintain a certain leverage ratio and interest coverage ratio as defined in the amended credit agreement. Our ability to continue to borrow amounts under our amended credit agreement is limited by continued compliance with these financial covenants, and in the past we have amended our credit agreement to provide certain relief from and revisions to our financial covenants for specified periods to provide us with sufficient access to liquidity during those periods. Failure to comply with these operating or financial covenants could result from, among other things, changes in our results of operations or general economic conditions. These covenants may restrict our ability to engage in transactions that would otherwise be in our best interests. Failure to comply with any of the covenants under the amended credit agreement or our Senior Notes could result in a default, which could negatively impact our access to liquidity.

In addition, the amended credit agreement includes a cross default provision whereby an event of default under certain other debt obligations (including our debt securities) will be considered an event of default under the amended credit agreement. If an event of default occurs, the commitments of the lenders under the amended credit agreement may be terminated and the maturity of amounts owed may be accelerated. Our debt securities include a cross acceleration provision which provides that the acceleration of certain other debt obligations (including our credit agreement) will be considered an event of default under our debt securities and, subject to certain time and notice periods, give bondholders the right to accelerate our debt securities.

**We may need to raise additional capital to manage and grow our business, and we may not be able to raise capital on terms acceptable to us or at all.**

Managing and growing our business will require significant cash outlays and capital expenditures and commitments. We have utilized cash on hand and cash generated from operations, accessed our credit facility and issued debt securities as sources of liquidity. For example, during the first and second quarters of Fiscal 2020, our cash generated from operations was negatively impacted due to widespread temporary store closures as a result of the COVID-19 pandemic. As of March 31, 2023, our cash and cash equivalents totaled $712 million. However, if in future periods our cash on hand, cash generated from operations and availability under our credit agreement are not sufficient to meet our cash requirements, we will need to seek additional capital, potentially through debt or equity financing, to fund our operations and future growth, and we may be unable to obtain debt or equity financing on favorable terms or at all. Our ability to access the credit and capital markets in the future as a source of liquidity, and the borrowing costs associated with such financing, are dependent upon market conditions and our credit rating and outlook. Our credit ratings have been downgraded in the past, and we cannot assure that we will be able to maintain our current ratings, which could increase our cost of borrowing in the future. In addition, equity financing may be on terms that are dilutive or potentially dilutive to our stockholders, and the prices at which new investors would be willing to purchase our securities may be lower than the current price per share of our common stock. The holders of new securities may also have rights, preferences or privileges which are senior to those of existing holders of common stock. If new sources of financing are required, but are insufficient or unavailable, we will be required to modify our growth and operating plans based on available funding, if any, which would harm our ability to grow our business.

**Our operating results are subject to seasonal and quarterly variations in our net revenues and income from operations, which could adversely affect the price of our publicly traded common stock.**

We have experienced, and expect to continue to experience, seasonal and quarterly variations in our net revenues and income or loss from operations. The majority of our net revenues are historically generated during the last two quarters of the calendar year. Our quarterly results of operations may also fluctuate significantly as a result of a variety of other factors, including the timing of our customer orders, our ability to timely delivery, the timing of marketing expenses and changes in our product mix. As a result of these seasonal and quarterly fluctuations, we

believe that comparisons of our operating results between different quarters within a single year are not necessarily meaningful and that these comparisons cannot be relied upon as indicators of our future performance. Any seasonal or quarterly fluctuations that we report in the future may not match the expectations of market analysts and investors. This could cause the price of our publicly traded stock to fluctuate significantly.

**Our results of operations are affected by the performance of our equity investments, over which we do not exercise control.**

We maintain certain minority investments, and may in the future invest in additional minority investments, which we account for under the equity method, and are required to recognize our allocable share of its net income or loss in our Consolidated Financial Statements. Our results of operations are affected by the performance of these businesses, over which we do not exercise control, and our net income or loss may be negatively impacted by losses realized by these investments. For example, we have previously recognized losses related to our Japanese licensee's business. We are also required to regularly review our investments for impairment, and an impairment charge may result from the occurrence of adverse events or management decisions that impact the fair value or estimated future cash flows to be generated from our investments. In addition, to the extent our Japanese licensee continues to experience challenges in the performance of its business, we may not continue to realize the license revenues from our Japanese licensee in line with its past results, which could negatively impact our net revenues and results of operations. Furthermore, based on its financial performance, our ability to recover our investment in the long term may be limited.

**Our financial results could be adversely impacted by currency exchange rate fluctuations.**

During Fiscal 2023, we generated approximately 34% of our consolidated net revenues outside the United States. As our international business grows, our results of operations could be adversely impacted by changes in foreign currency exchange rates. Revenues and certain expenses in markets outside of the United States are recognized in local foreign currencies, and we are exposed to potential gains or losses from the translation of those amounts into U.S. dollars for consolidation into our financial statements. These amounts can be material. Similarly, we are exposed to gains and losses resulting from currency exchange rate fluctuations on transactions generated by our foreign subsidiaries in currencies other than their local currencies. In addition, the business of our independent manufacturers may also be disrupted by currency exchange rate fluctuations by making their purchases of raw materials more expensive and more difficult to finance. From time to time, our results of operations have been, and may continue to be, adversely impacted by foreign currency exchange rate fluctuations. In addition, we have previously designated cash flow hedges against certain forecasted transactions. If we determine that such a transaction is no longer probable to occur in the time period we expected, we are required to de-designate the hedging relationship and immediately recognize the derivative instrument gain or loss in our earnings. From time to time, global macroeconomic factors, such as the ongoing impacts of COVID-19, have caused and may continue to cause uncertainty in forecasted cash flows, which has resulted and may in the future result in the de-designation of certain hedged transactions.

*Legal, Regulatory and Compliance Risks*

**Our business is subject to a wide array of laws and regulations, and our failure to comply with these requirements could lead to investigations or actions by government regulators, increased expense or reputational damage.**

Our business is subject to a wide array of laws and regulations, including those addressing consumer protection, safety, labeling, distribution, importation, sustainability and environmental matters, labor and human rights matters, the marketing and sale of our products, data privacy and other matters. These requirements are enforced by various federal agencies, including the Federal Trade Commission, Consumer Product Safety Commission and state attorneys general in the United States, as well as by various other federal, state, provincial, local and international regulatory authorities in the locations in which our products are distributed or sold. If we fail to comply with these regulations, we could become subject to significant penalties or claims or be required to stop selling or otherwise recall products, which could negatively impact our results of operations and disrupt our ability to conduct our business, as well as damage our brand image with consumers. In addition, the adoption of new legislation, regulations or industry standards, including related to data privacy, sustainability and climate change, or changes in the interpretation of existing regulations may result in significant unanticipated compliance costs or

discontinuation of product sales and may impair the marketing of our products, resulting in significant loss of net revenues.

Our international operations are also subject to compliance with the U.S. Foreign Corrupt Practices Act, or FCPA, and U.S. sanctions laws, as well as other anti-bribery and sanctions laws of foreign jurisdictions where we conduct business. Although we have policies and procedures to address compliance with the FCPA and similar laws and sanctions requirements, there can be no assurance that all of our employees, contractors, agents and other partners will not take actions in violations of our policies or that our procedures will effectively mitigate against such risks. Any such violation could subject us to sanctions or other penalties that could negatively affect our reputation, business and operating results.

We must also comply with increasingly complex and evolving regulatory standards throughout the world enacted to protect personal information and other data, including the General Data Protection Regulation, the ePrivacy Directive, the California Consumer Privacy Act of 2018, the California Privacy Rights Act, state privacy laws in Virginia, Utah, Connecticut and Colorado and the Personal Information Protection Law in China. These laws and related regulations impact our ability to engage with our consumers, and some of these privacy laws prohibit the transfer of personal information to certain other jurisdictions. Compliance with existing laws and regulations can be costly and could negatively impact our profitability. Moreover, data privacy laws and regulations continue to evolve and it may be costly for us to adjust our operations to comply with new requirements. Regulatory bodies throughout the world have increased enforcement efforts against companies who fail to comply with privacy requirements. Failure to comply with these regulatory standards could result in a violation of data privacy laws and regulations and subject us to legal proceedings against us by governmental entities or others, imposition of fines by governmental authorities, negative publicity and damage to our brand image, all of which could have a negative impact on our profitability.

**Data security or privacy breaches could damage our reputation, cause us to incur additional expense, expose us to litigation and adversely affect our business and results of operations.**

We collect proprietary business information and personally identifiable information in connection with digital marketing, digital commerce, our in-store payment processing systems and our digital business (including our MapMyFitness platform). We collect and store a variety of information regarding our consumers, and on some of our platforms allow users to share their personal information with each other and with third parties. We also rely on third parties for the operation of certain of our e-commerce websites, and do not control these service providers. Like other companies in our industry, we have in the past experienced, and we expect to continue to experience, cyberattacks, including phishing, cyber fraud incidents and other attempts to gain unauthorized access to our systems. These attempted attacks have increased throughout the COVID-19 pandemic and with our implementation of a hybrid work model for many of our global corporate employees. There can be no assurance that these attacks will not have a material impact in the future. Any breach of our data security or that of our service providers could result in an unauthorized release or transfer of customer, consumer, vendor or employee information, or the loss of money, valuable business data or cause a disruption in our business. These events could give rise to unwanted media attention, damage our reputation, damage our customer, consumer or user relationships and result in lost sales, fines or lawsuits. We may also be required to expend significant capital and other resources to protect against or respond to or alleviate problems caused by a security breach, which could negatively impact our results of operations.

**Changes in tax laws and unanticipated tax liabilities could adversely affect our effective income tax rate and profitability.**

We are subject to income taxes in the United States and numerous foreign jurisdictions. Our effective income tax rate could be adversely affected in the future by a number of factors, including changes in the mix of earnings in countries with differing statutory tax rates, changes in the valuation of deferred tax assets and liabilities, changes in tax laws and regulations or their interpretations and application, the outcome of income tax audits in various jurisdictions around the world, and any repatriation of non-U.S. earnings for which we have not previously provided applicable foreign withholding taxes, certain U.S. state income taxes, or foreign exchange rate impacts.

Moreover, we also engage in multiple types of intercompany transactions, and our allocation of profits and losses among us and our subsidiaries through our intercompany transfer pricing arrangements are subject to review by the Internal Revenue Service and foreign tax authorities. Although we believe we have clearly reflected the economics of these transactions in accordance with current rules and regulations, which are generally consistent with the arms-length standard, and the proper documentation is in place, tax authorities may propose and sustain adjustments that could result in changes that may materially impact our tax provision.

Additionally, many countries have implemented legislation and other guidance to align their international tax rules with the Organization for Economic Co-operation and Development's ("OECD") Base Erosion and Profit Shifting ("BEPS") recommendations and action plan, which aim to standardize and modernize global corporate tax policy and include changes to cross-border tax, transfer pricing documentation rules and nexus-based tax incentive practices. As a result of this heightened scrutiny, we may experience an increase in income tax audits. In addition, prior decisions by tax authorities regarding treatments and positions of corporate income taxes could be subject to enforcement activities and/or legislative investigation, which could also result in changes in tax policies or prior tax rulings. Any such activities may result in the taxes we previously paid being subject to change, which could have a material adverse impact on our tax provision.

The OECD has issued rules intended to provide governments new taxing rights over the digital economy and specific digital services ("Pillar One"), as well as the implementation of a global minimum tax ("Pillar Two"). Many countries in which we have operations are required to, or voluntarily plan to, implement Pillar Two taxes. For example, we have operations in the European Union, where member states are required to enact Pillar Two taxes by December 31, 2023, and in South Korea, which has enacted Pillar Two taxes effective for fiscal years beginning on or after January 1, 2024. The enactment of Pillar One and Pillar Two taxes in jurisdictions where we have operations could have a material adverse impact on our global transfer pricing arrangements, tax provision, cash tax liability, effective tax rate and profitability.

**Failure to protect our intellectual property rights, or our conflict with the rights of others, could damage our brand, weaken our competitive position and negatively impact our results of operations.**

Our success depends in large part on our brand image. We currently rely on a combination of copyright, trademark, trade dress, patent, anti-counterfeiting and unfair competition laws, confidentiality procedures and licensing arrangements to establish and protect our intellectual property rights. Despite our strategic enforcement efforts, we may not be able to prevent adequately infringement of our trademarks and proprietary rights by others, including imitation of our products and misappropriation of our brand, and intellectual property protection may be unavailable or limited in some jurisdictions. In addition, intellectual property rights in the technology, fabrics and processes used to manufacture the majority of our products are generally owned or controlled by our suppliers and are generally not unique to us, and our current and future competitors are able to manufacture and sell products with performance characteristics and fabrications similar to certain of our products.

From time to time, we have brought claims relating to the enforcement of our intellectual property rights against others or have discovered unauthorized products in the marketplace that are either counterfeit reproductions of our products or unauthorized irregulars that do not meet our quality control standards. If we fail to protect, maintain and enforce our intellectual property rights, the value of our brand could decrease and our competitive position may suffer. In addition, from time to time others may seek to enforce infringement claims against us. Successful infringement claims against us could result in significant monetary liability or prevent us from selling or providing some of our products. The resolution of such claims may require us to pull product from the market, redesign our products, license rights belonging to third parties or cease using those rights altogether. Any of these events could harm our business and have a material adverse effect on our results of operations and financial condition.

**We are the subject of a number of ongoing legal proceedings that have resulted in significant expense, and adverse developments in our ongoing proceedings and/or future legal proceedings could have a material adverse effect on our business, reputation, financial condition, results of operations or stock price.**

We are actively involved in a variety of litigation and other legal matters and may be subject to additional litigations, investigations, arbitration proceedings, audits, regulatory inquiries and similar actions, including matters related to commercial disputes, intellectual property, employment, securities laws, disclosures, environmental, tax, accounting, insurance coverage, class action and product liability, as well as trade, regulatory and other claims related to our business and our industry, which we refer to collectively as legal proceedings. For example, we are subject to an ongoing securities class action proceeding regarding our prior disclosures (including regarding the use of "pull forward" sales) and derivative complaints regarding related matters, as well as past related party transactions, among other legal proceedings. Refer to Note 9 to our Consolidated Financial Statements of this Annual Report on Form 10-K for additional information regarding these specific matters.

Legal proceedings in general, and securities and class action litigation and regulatory investigations in particular, can be expensive and disruptive. We cannot predict the outcome of any particular legal proceeding, or whether ongoing legal proceedings will be resolved favorably or ultimately result in charges or material damages, fines or other penalties. Our insurance may not cover all claims that may be asserted against us, and we are unable

to predict how long the legal proceedings to which we are currently subject will continue. An unfavorable outcome of any legal proceeding may have a material adverse impact on our business, financial condition and results of operations or our stock price. Any legal proceeding could negatively impact our reputation among our customers or our shareholders. Furthermore, publicity surrounding ongoing legal proceedings, even if resolved favorably for us, could result in additional legal proceedings against us, as well as damage our brand image.

### *Risks Related to our Common Stock*

**Kevin Plank, our Executive Chair and Brand Chief, controls the majority of the voting power of our common stock.**

Our Class A common stock has one vote per share, our Class B common stock has 10 votes per share and our Class C common stock has no voting rights (except in limited circumstances). Our Executive Chair and Brand Chief, Kevin Plank, beneficially owns all outstanding shares of Class B common stock. As a result, Mr. Plank has the majority voting control and is able to direct the election of all of the members of our Board of Directors and other matters we submit to a vote of our stockholders. Under certain circumstances, the Class B common stock automatically converts to Class A common stock, which would also result in the conversion of our Class C common stock into Class A common stock. As specified in our charter, these circumstances include when Mr. Plank beneficially owns less than 15.0% of the total number of shares of Class A and Class B common stock outstanding, if Mr. Plank were to resign as an Approved Executive Officer of the Company (or was otherwise terminated for cause) or if Mr. Plank sells more than a specified number of any class of our common stock within a one-year period. This concentration of voting control may have various effects including, but not limited to, delaying or preventing a change of control or allowing us to take action that the majority of our stockholders do not otherwise support. In addition, we utilize shares of our Class C common stock to fund employee equity incentive programs and may do so in connection with future stock-based acquisition transactions, which could prolong the duration of Mr. Plank's voting control.

**The trading prices for our Class A and Class C common stock may differ and fluctuate from time to time.**

The trading prices of our Class A and Class C common stock may differ and fluctuate from time to time in response to various factors, some of which are beyond our control. These factors may include, among others, overall performance of the equity markets and the economy as a whole, variations in our quarterly results of operations or those of our competitors, our ability to meet our published guidance and securities analyst expectations, or recommendations by securities analysts. In addition, our non-voting Class C common stock has traded at a discount to our Class A common stock, and there can be no assurance that this will not continue.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

Not applicable.

## ITEM 2. PROPERTIES

The following includes a summary of the principal properties that we own or lease as of March 31, 2023.

Our principal executive and administrative offices are located at an office complex in Baltimore, Maryland, the majority of which we own and a portion of which we lease. We also own office space and undeveloped acreage in the Baltimore Peninsula, an area of Baltimore, Maryland previously referred to as Port Covington, which we are in the process of renovating and further developing. We expect to move our principal executive and administrative offices to this location by late 2024. For each of our EMEA, Latin America and Asia-Pacific headquarters, we lease office space.

We lease our primary distribution facilities, which are located in Sparrows Point, Maryland, Mount Juliet, Tennessee and Rialto, California. Combined, these facilities represent approximately 3.5 million square feet of facility space. These leases expire at various dates, with the earliest lease termination date occurring in December 2027. We believe our distribution facilities and space available through our third-party logistics providers will be adequate to meet our short term needs.

In addition, as of March 31, 2023, we leased 439 Brand and Factory House stores located primarily in the United States, China, Canada, Mexico, Korea, Chile, Australia, the United Kingdom, and Malaysia with lease

termination dates occurring in 2023 through 2035. We also lease additional office space for sales, quality assurance and sourcing, marketing and administrative functions. We anticipate that we will be able to extend these leases that expire in the near future on satisfactory terms or relocate to other locations.

## ITEM 3. LEGAL PROCEEDINGS

From time to time, we have been involved in litigation and other proceedings, including matters related to commercial disputes and intellectual property, as well as trade, regulatory and other claims related to our business. See Note 9 to our Consolidated Financial Statements for information on certain legal proceedings, which is incorporated by reference herein.

## ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.

PART II.

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

Under Armour's Class A Common Stock and Class C Common Stock are traded on the New York Stock Exchange ("NYSE") under the symbols "UAA" and "UA", respectively. As of May 15, 2023, there were 2,306 record holders of our Class A Common Stock, 5 record holders of Class B Convertible Common Stock which are beneficially owned by our Executive Chair and Brand Chief, Kevin A. Plank, and 1,578 record holders of our Class C Common Stock.

Our Class A Common Stock was listed on the NYSE under the symbol "UA" until December 6, 2016 and under the symbol "UAA" since December 7, 2016. Prior to November 18, 2005, there was no public market for our Class A Common Stock. Our Class C Common Stock was listed on the NYSE under the symbol "UA.C" since its initial issuance on April 8, 2016 until December 6, 2016 and under the symbol "UA" since December 7, 2016.

### Unregistered Sales of Equity Securities and Use of Proceeds

The following table sets forth the Company's repurchases of Class C Common Stock during the quarter ended March 31, 2023 under the two-year $500 million share repurchase program authorized by our Board of Directors in February 2022.

| Period | Total Number of Shares Purchased | Average Price Paid per Share | | Total Number of Shares Purchased as Part of a Publicly Announced Program | Approximately Dollar Value of Shares that May Yet be Purchased Under the Program (in millions) | |
|---|---|---|---|---|---|---|
| 01/01/2023 to 01/31/2023 | 1,049,821 | $ | 9.14 | 1,049,821 | $ | 75.0 |
| 02/01/2023 to 02/28/2023 | — | $ | — | — | $ | 75.0 |
| 03/01/2023 to 03/31/2023 | — | $ | — | — | $ | 75.0 |

### Dividends

No cash dividends were declared or paid during Fiscal 2023, Fiscal 2021, Fiscal 2020 or the Transition Period on any class of our common stock. We currently anticipate we will retain future earnings for use in our business. As a result, we do not anticipate paying any cash dividends in the foreseeable future. However, if we were to consider declaring a cash dividend to our stockholders, we may be limited in our ability to do so under our credit facility. Refer to "Financial Position, Capital Resources and Liquidity" within Management's Discussion and Analysis and Note 8 to the Consolidated Financial Statements for a further discussion of our credit facility.

### Stock Compensation Plans

See Item 12 "Security Ownership of Certain beneficial Owners and Management and Related Stockholder Matters" for information regarding our equity compensation plans.

**Stock Performance Graph**

The stock performance graph below compares cumulative total return on Under Armour, Inc. Class A Common Stock to the cumulative total return of the S&P 500 Index and S&P 500 Apparel, Accessories and Luxury Goods Index from December 31, 2017 through March 31, 2023. The graph assumes an initial investment of $100 in Under Armour and each index as of December 31, 2017 and reinvestment of any dividends. The performance shown on the graph below is not intended to forecast or be indicative of possible future performance of our common stock.



| | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 3/31/2022 | 3/31/2023 |
|---|---|---|---|---|---|---|---|
| Under Armour, Inc. | $ 100.00 | $ 122.45 | $ 149.69 | $ 118.99 | $ 146.85 | $ 117.94 | $ 65.76 |
| S&P 500 | $ 100.00 | $ 95.62 | $ 125.72 | $ 148.85 | $ 191.58 | $ 182.77 | $ 168.65 |
| S&P 500 Apparel, Accessories & Luxury Goods | $ 100.00 | $ 84.24 | $ 103.82 | $ 93.06 | $ 98.71 | $ 81.67 | $ 56.59 |

## ITEM 6. [RESERVED]

Not applicable.

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is intended to help readers understand our results of operations and financial condition, and is provided as a supplement to, and should be read in conjunction with, our Consolidated Financial Statements and the accompanying Notes to our Consolidated Financial Statements under Part II, Item 8 and the information contained elsewhere in this Annual Report on Form 10-K under the captions "Business" and "Risk Factors".*

*This Annual Report on Form 10-K, including this MD&A, contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, Section 21E of the U.S. Securities Exchange Act of 1934, as amended (the Exchange Act), and Section 27A of the U.S. Securities Act of 1933, as amended ("the Securities Act"), and is subject to the safe harbors created by those sections. All statements other than statements of historical facts are statements that could be deemed forward-looking statements. See "Forward Looking Statements."*

*All dollar and percentage comparisons made herein refer to Fiscal 2023 compared with the twelve months ended March 31, 2022, unless otherwise noted. Please refer to Part II, Item 7 of our Annual Report on Form 10-K, filed with the Securities Exchange Commission ("SEC") on February 23, 2022, for a comparative discussion of our Fiscal 2021 financial results as compared to Fiscal 2020, which is incorporated by reference herein.*

## Fiscal Year End Change

As previously disclosed, we changed our fiscal year end from December 31 to March 31, effective for the fiscal year beginning April 1, 2022. Our current fiscal year began on April 1, 2022 and ended on March 31, 2023 ("Fiscal 2023"). We refer to the period beginning on January 1, 2022 and ending on March 31, 2022 as the "Transition Period". We filed a Transition Report on Form 10-QT that included financial information for the Transition Period with the SEC on May 9, 2022. Our 2021 fiscal year began on January 1, 2021 and ended on December 31, 2021 ("Fiscal 2021"). There was no Fiscal 2022.

We have presented the twelve months ended March 31, 2022 as a comparison to our results for Fiscal 2023 as we believe this comparison is more meaningful to a reader's understanding of our Fiscal 2023 results of operations than a comparison to Fiscal 2021. A comparison of the three-months ended March 31, 2022 to the three-months ended March 31, 2021 may be found in Part I, Item 2, of our Transition Report on Form 10-QT for the three-months ended March 31, 2022 filed with the SEC on May 9, 2022.

The following tables have been included to help readers better understand how the statement of operations and statement of cash flows for the twelve months ended March 31, 2022 were derived.

| (In thousands) | Year ended December 31, 2021 | Deduct: Three Months ended March 31, 2021 | Add: Three Months Ended March 31, 2022 | Twelve months ended March 31, 2022 |
|---|---|---|---|---|
| Net revenues | $ 5,683,466 | $ 1,257,195 | $ 1,300,945 | $ 5,727,216 |
| Cost of goods sold | 2,821,967 | 628,554 | 695,781 | 2,889,194 |
| Gross profit | 2,861,499 | 628,641 | 605,164 | 2,838,022 |
| Selling, general and administrative expenses | 2,334,691 | 514,638 | 594,446 | 2,414,499 |
| Restructuring and impairment charges | 40,518 | 7,113 | 56,674 | 90,079 |
| Income (loss) from operations | 486,290 | 106,890 | (45,956) | 333,444 |
| Interest income (expense), net | (44,300) | (14,137) | (6,154) | (36,317) |
| Other income (expense), net | (51,113) | (7,180) | (51) | (43,984) |
| Income (loss) before income taxes | 390,877 | 85,573 | (52,161) | 253,143 |
| Income tax expense (benefit) | 32,072 | 9,881 | 8,181 | 30,372 |
| Income (loss) from equity method investments | 1,255 | 2,060 | 732 | (73) |
| Net income (loss) | $ 360,060 | $ 77,752 | $ (59,610) | $ 222,698 |

| (In thousands) | Year ended December 31, 2021 | Deduct: Three Months ended March 31, 2021 | Add: Three Months Ended March 31, 2022 | Twelve months ended March 31, 2022 |
|---|---|---|---|---|
| Net cash provided by (used in): | | | | |
| Operating activities | $ 664,829 | $ (150,588) | $ (321,443) | $ 493,974 |
| Investing activities | (68,346) | (7,904) | (39,923) | (100,365) |
| Financing activities | (418,737) | (3,443) | (310,512) | (725,806) |
| Effect of exchange rate changes on cash and cash equivalents | (23,391) | (6,900) | 11,134 | (5,357) |
| Net increase (decrease) in cash and cash equivalents | $ 154,355 | $ (168,835) | $ (660,744) | $ (337,554) |

## OVERVIEW

We are a leading developer, marketer, and distributor of branded performance apparel, footwear, and accessories. Our brand's moisture-wicking fabrications are engineered in various designs and styles for wear in nearly every climate to provide a performance alternative to traditional products. Our products are sold worldwide

and worn by athletes at all levels, from youth to professional, on playing fields around the globe, and by consumers with active lifestyles.

Strategically and operationally, we remain focused on driving premium brand-right growth and improved profitability. We plan to continue to grow our business over the long-term through increased sales of our apparel, footwear and accessories; growth in our direct-to-consumer sales channel; and expansion of our wholesale distribution. We believe that achievement of our long-term growth objectives depends, in part, on our ability to execute strategic initiatives in key areas including our wholesale, footwear, women's and direct-to-consumer businesses. Additionally, our digital strategy is focused on supporting these long-term objectives, emphasizing connection and engagement with our consumers through multiple digital touchpoints.

During Fiscal 2023, we faced a challenging retail environment that included higher promotions and discounting related to industry-wide elevated inventory balances, ongoing COVID-19 related impacts in China and further negative impacts from changes in foreign currency rates.

## Fiscal 2023 Performance

Financial highlights for Fiscal 2023 as compared to the twelve months ended March 31, 2022 include:

- Total net revenues increased 3.1%.

- Within our channels, wholesale revenue increased 5.9% and direct-to-consumer revenue decreased 2.5%.

- Within our product categories, apparel revenue decreased 0.9%, footwear revenue increased 16.3%, and accessories revenue decreased 7.4%.

- Net revenue in Europe, the Middle East and Africa ("EMEA"), Latin America and Asia-Pacific increased 13.2%, 10.7% and 2.7%, respectively, while revenue decreased 0.6% in North America.

- Gross margin decreased 470 basis points to 44.9%.

- Selling, general and administrative expenses decreased 2.0%.

## COVID-19 Update

The COVID-19 pandemic has caused, and may continue to cause, disruption and volatility in our business and in the businesses of our wholesale customers, licensing partners, suppliers, logistics providers and vendors.

During Fiscal 2023, we continued to experience COVID-19 related impacts, including global logistical challenges, such as increased freight costs and transportation delays, and labor disruptions in China, which caused temporary closures of our Brand and Factory House stores, distribution centers and corporate facilities in China and negatively impacted consumer traffic and demand. As of March 31, 2023, we continue to see improvements across our supply chain, including progress towards a return to pre-pandemic production efficiency and improving freight costs, and all of our Brand and Factory House stores, distribution centers and corporate facilities in China were open. However, the ongoing impacts of the COVID-19 pandemic negatively impacted our financial results for Fiscal 2023, and we cannot predict how the COVID-19 pandemic may impact our business and results of operations in Fiscal 2024.

For a more complete discussion of the COVID-19 related risks facing our business, refer to our "Risk Factors" section included in Item 1A of this Annual Report on Form 10-K.

## Effects of Inflation and Other Global Events

Macroeconomic factors, such as inflationary pressures and fluctuations in foreign currency exchange rates have and may continue to impact our business. We continue to monitor these factors and the potential impacts they may have on our financial results, including product input costs, freight costs and consumer discretionary spending and therefore consumer demand for our products. We also continue to monitor the broader impacts of the Russia Ukraine conflict on the global economy, including its effect on inflationary pressures and the price of oil globally.

See "Risk Factors—Economic and Industry Risks—*Our business depends on consumer purchases of discretionary items, which can be negatively impacted during an economic downturn or periods of inflation. This could materially impact our sales, profitability and financial condition*"; "—*Fluctuations in the cost of raw materials and commodities we use in our products and costs related to our supply chain could negatively affect our operating results*"; "—*Our financial results and ability to grow our business may be negatively impacted by global events beyond our control*"; and "—Financial Risks—*Our financial results could be adversely impacted by currency exchange rate fluctuations*" included in Item 1A of this Annual Report on Form 10-K.

**RESULTS OF OPERATIONS**

The following tables set forth key components of our results of operations for the periods indicated, both in dollars and as a percentage of net revenues:

| *(In thousands)* | Year ended March 31, 2023 | Twelve months ended March 31, 2022 |
|---|---|---|
| Net revenues | $ 5,903,636 | $ 5,727,216 |
| Cost of goods sold | 3,254,296 | 2,889,194 |
| Gross profit | 2,649,340 | 2,838,022 |
| Selling, general and administrative expenses | 2,365,529 | 2,414,499 |
| Restructuring and impairment charges | — | 90,079 |
| Income (loss) from operations | 283,811 | 333,444 |
| Interest income (expense), net | (12,826) | (36,317) |
| Other income (expense), net | 16,780 | (43,984) |
| Income (loss) before income taxes | 287,765 | 253,143 |
| Income tax expense (benefit) | (101,046) | 30,372 |
| Income (loss) from equity method investments | (2,042) | (73) |
| Net income (loss) | $ 386,769 | $ 222,698 |

| *(As a percentage of net revenues)* | Year ended March 31, 2023 | Twelve months ended March 31, 2022 |
|---|---|---|
| Net revenues | 100.0 % | 100.0 % |
| Cost of goods sold | 55.1 % | 50.4 % |
| Gross profit | 44.9 % | 49.6 % |
| Selling, general and administrative expenses | 40.1 % | 42.2 % |
| Restructuring and impairment charges | — % | 1.6 % |
| Income (loss) from operations | 4.8 % | 5.8 % |
| Interest income (expense), net | (0.2)% | (0.6)% |
| Other income (expense), net | 0.3 % | (0.8)% |
| Income (loss) before income taxes | 4.9 % | 4.4 % |
| Income tax expense (benefit) | (1.7)% | 0.5 % |
| Loss from equity method investment | — % | — % |
| Net income (loss) | 6.6 % | 3.9 % |

**Revenues**

Net revenues consist of net sales, license revenues, and revenues from digital subscriptions, other digital business opportunities and advertising. Net sales consist of sales from apparel, footwear and accessories products. Our license revenues primarily consist of fees paid to us by licensees in exchange for the use of our trademarks on their products. The following tables summarize net revenues by product category and distribution channel for the periods indicated:

| (In thousands) | Year ended March 31, 2023 | Twelve months ended March 31, 2022 | Change $ | Change %[1] |
|---|---|---|---|---|
| **Net Revenues by Product Category** | | | | |
| Apparel[2] | $ 3,871,638 | $ 3,907,812 | $ (36,174) | (0.9)% |
| Footwear | 1,455,265 | 1,251,776 | 203,489 | 16.3 % |
| Accessories | 408,521 | 441,301 | (32,780) | (7.4)% |
| Net Sales | 5,735,424 | 5,600,889 | 134,535 | 2.4 % |
| License revenues | 116,746 | 117,568 | (822) | (0.7)% |
| Corporate Other[3] | 51,466 | 8,759 | 42,707 | N/M |
| Total net revenues | $ 5,903,636 | $ 5,727,216 | $ 176,420 | 3.1 % |
| | | | | |
| **Net Revenues by Distribution Channel** | | | | |
| Wholesale | $ 3,468,126 | $ 3,275,341 | $ 192,785 | 5.9 % |
| Direct-to-consumer[2] | 2,267,298 | 2,325,548 | (58,250) | (2.5)% |
| Net Sales | 5,735,424 | 5,600,889 | 134,535 | 2.4 % |
| License revenues | 116,746 | 117,568 | (822) | (0.7)% |
| Corporate Other[3] | 51,466 | 8,759 | 42,707 | N/M |
| Total net revenues | $ 5,903,636 | $ 5,727,216 | $ 176,420 | 3.1 % |

[1] "N/M" = not meaningful

[2] During the Fiscal 2023, we recognized approximately $10.1 million of revenue relating to gift cards not expected to be redeemed ("breakage"), which was previously included in contract liabilities. Refer to Note 11 of the Consolidated Financial Statements for additional details.

[3] Corporate Other primarily includes foreign currency hedge gains and losses related to revenues generated by entities within our operating segments but managed through our central foreign exchange risk management program, as well as subscription revenues from MMR and revenue from other digital business opportunities.

**Net sales**

Net sales increased by $134.5 million, or 2.4%, to $5,735.4 million during Fiscal 2023, from $5,600.9 million during the twelve months ended March 31, 2022. Apparel decreased primarily due to lower average selling prices, resulting from higher discounts and promotions and the impact of foreign exchange rates, partially offset by higher unit sales and favorable channel mix. Additionally, apparel was positively impacted by the recognition of breakage relating to gift cards, as described in the table above. Footwear increased primarily due to higher unit sales which benefited from better product availability, partially offset by the impact of foreign exchange rates and unfavorable channel mix. Accessories decreased primarily due to lower average selling prices, the impact of foreign exchange rates and unfavorable channel mix. From a channel perspective, the increase in net sales was due to an increase in wholesale, partially offset by a decrease in direct-to-consumer.

**License revenues**

License revenues decreased by $0.8 million or 0.7%, to $116.7 million during Fiscal 2023, from $117.6 million during the twelve months ended March 31, 2022. This was primarily due to lower revenues from our Japanese licensee, partially offset by higher revenues from our licensing partners in the North America region.

**Gross Profit**

Cost of goods sold consists primarily of product costs, inbound freight and duty costs, outbound freight costs, handling costs to make products floor-ready to customer specifications, royalty payments to endorsers based on a predetermined percentage of sales of selected products, and write downs for inventory obsolescence. In general, as a percentage of net revenues, we expect cost of goods sold associated with our apparel and accessories to be lower than that of our footwear. A limited portion of cost of goods sold is associated with digital

subscription and advertising revenues, primarily website hosting costs, and no cost of goods sold is associated with our license revenues.

We include outbound freight costs associated with shipping goods to customers as cost of goods sold; however, we include the majority of outbound handling costs as a component of selling, general and administrative expenses. As a result, our gross profit may not be comparable to that of other companies that include outbound handling costs in their cost of goods sold. Outbound handling costs include costs associated with preparing goods to ship to customers and certain costs to operate our distribution facilities. These costs were $79.5 million in Fiscal 2023 (twelve months ended March 31, 2022: $76.9 million).

Gross profit decreased by $188.7 million to $2,649.3 million during Fiscal 2023, from $2,838.0 million during the twelve months ended March 31, 2022. Gross profit as a percentage of net revenues, or gross margin, decreased to 44.9% from 49.6%. This decrease in gross margin of 470 basis points was primarily driven by negative impacts of approximately:

- 170 basis points from higher promotions and discounting within our direct-to-consumer channel and unfavorable pricing of sales to the off-price channel;

- 130 basis points of supply chain impact mainly due to higher product input costs and freight costs;

- 70 basis points from unfavorable channel impacts;

- 50 basis points from changes in foreign currency;

- 30 basis points from unfavorable product mix due to the strength of footwear sales; and

- 20 basis points from unfavorable regional mix.

We expect higher discounting and promotional activities and elevated product input costs to continue to negatively impact our gross margin in the near term.

### Selling, General and Administrative Expenses

Our selling, general and administrative expenses consist of costs related to marketing, selling, product innovation and supply chain, and corporate services. We consolidate our selling, general and administrative expenses into two primary categories: marketing and other. The other category is the sum of our selling, product innovation and supply chain, and corporate services categories. The marketing category consists primarily of sports and brand marketing, media, and retail presentation. Sports and brand marketing includes professional, club and collegiate sponsorship agreements, individual athlete and influencer agreements, and providing and selling products directly to teams and individual athletes. Media includes digital, broadcast, and print media outlets, including social and mobile media. Retail presentation includes sales displays and concept shops and depreciation expense specific to our in-store fixture programs. Our marketing costs are an important driver of our growth.

| (In thousands) | Year ended March 31, 2023 | Twelve months ended March 31, 2022 | Change $ | Change % |
|---|---|---|---|---|
| Selling, General and Administrative Expenses | $ 2,365,529 | $ 2,414,499 | $ (48,970) | (2.0)% |

Selling, general and administrative expenses decreased by $49.0 million, or 2.0%, during Fiscal 2023 as compared to the twelve months ended March 31, 2022. Within selling, general and administrative expense:

- Marketing costs decreased $65.3 million or 9.6%, due to lower marketing activity during the period. As a percentage of net revenues, marketing costs decreased to 10.5% from 11.9%.

- Other costs increased $16.4 million or 0.9%, primarily driven by higher salaries, other selling expenses, litigation accrual, travel expenses and facility-related expenses, partially offset by lower incentive compensation expenses and lower consulting expenses. As a percentage of net revenues, other costs decreased to 29.6% from 30.2%.

As a percentage of net revenues, selling, general and administrative expenses decreased to 40.1% during Fiscal 2023 as compared to 42.2% during the twelve months ended March 31, 2022.

**Restructuring and Impairment Charges**

| (In thousands) | Year ended March 31, 2023 | | Twelve months ended March 31, 2022 | | Change $ | | Change % |
|---|---|---|---|---|---|---|---|
| Restructuring and Impairment Charges | $ | — | $ | 90,079 | $ | (90,079) | (100.0)% |

Restructuring and impairment charges within our operating expenses were $90.1 million during the twelve months ended March 31, 2022. No charges were recorded during Fiscal 2023. See Note 12 to our Consolidated Financial Statements.

**Interest Expense, net**

Interest expense, net is primarily comprised of interest incurred on our debt facilities, offset by interest income earned on our cash and cash equivalents.

| (In thousands) | Year ended March 31, 2023 | | Twelve months ended March 31, 2022 | | Change $ | | Change % |
|---|---|---|---|---|---|---|---|
| Interest expense, net | $ | 12,826 | $ | 36,317 | $ | (23,491) | (64.7)% |

Interest expense, net decreased by $23.5 million to $12.8 million during Fiscal 2023. This was primarily due to an increase in interest income as a result of higher interest rates and a reduction in interest expense on our Convertible Senior Notes as a result of repurchasing approximately $419.1 million in aggregate principal amount during the twelve months ended March 31, 2022. See Note 8 to our Consolidated Financial Statements.

**Other Income (Expense), net**

Other income (expense), net primarily consists of unrealized and realized gains and losses on our foreign currency derivative financial instruments, and unrealized and realized gains and losses on adjustments that arise from fluctuations in foreign currency exchange rates relating to transactions generated by our international subsidiaries. Other income (expense), net also includes rent expense relating to lease assets held solely for sublet purposes, primarily the lease related to our New York City, 5th Avenue location.

| (In thousands) | Year ended March 31, 2023 | | Twelve months ended March 31, 2022 | | Change $ | | Change % |
|---|---|---|---|---|---|---|---|
| Other income (expense), net | $ | 16,780 | $ | (43,984) | $ | 60,764 | 138.2 % |

Other income (expense), net increased by $60.8 million to income of $16.8 million during Fiscal 2023. This was primarily due to a loss of $58.5 million that was recognized during the twelve months ended March 31, 2022 upon the extinguishment of $419.1 million in principal amount of our Convertible Senior Notes. Additionally, other income increased during Fiscal 2023, due to a $10 million higher earnout recorded in connection with the sale of the MyFitnessPal platform. These increases were offset by losses on foreign currency hedges of $5.9 million and losses from changes in foreign currency exchange rates of $2.4 million.

**Income Tax Expense (Benefit)**

| (In thousands) | Year ended March 31, 2023 | | Twelve months ended March 31, 2022 | | Change $ | | Change % |
|---|---|---|---|---|---|---|---|
| Income tax expense (benefit) | $ | (101,046) | $ | 30,372 | $ | (131,418) | (432.7)% |

During Fiscal 2023, income tax expense decreased $131.4 million resulting in an income tax benefit of $101.0 million from an income tax expense of $30.4 million during the twelve months ended March 31, 2022. The change was primarily due to the recognition of an income tax benefit from the release of the U.S. federal valuation allowance on beginning of year deferred tax assets.

On August 16, 2022, the Inflation Reduction Act (the "Act") was enacted and signed into law in the United States. The Act contains a number of revisions to the Internal Revenue Code, including a 15% corporate minimum tax and a 1% excise tax on corporate stock repurchases in tax years beginning after December 31, 2022. We do not expect these tax provisions to have a material impact to our consolidated financial statements.

**SEGMENT RESULTS OF OPERATIONS**

Our operating segments are based on how our Chief Operating Decision Maker ("CODM") makes decisions about allocating resources and assessing performance. Our segments are defined by geographic regions, including North America, EMEA, Asia-Pacific, and Latin America.

We exclude certain corporate items from our segment profitability measures. We report these items within Corporate Other, which is designed to provide increased transparency and comparability of our operating segments' performance. Corporate Other consists primarily of (i) operating results related to our MMR platforms and other digital business opportunities; (ii) general and administrative expenses not allocated to an operating segment, including expenses associated with centrally managed departments which include global marketing, global IT, global supply chain and innovation, and other corporate support functions; (iii) restructuring and restructuring related charges; and (iv) certain foreign currency hedge gains and losses.

The net revenues and operating income (loss) associated with our segments are summarized in the following tables.

**Net Revenues**

| (In thousands) | Year ended March 31, 2023 | | Twelve months ended March 31, 2022 | | Change $ | | Change %[1] |
|---|---|---|---|---|---|---|---|
| North America [2] | $ | 3,820,993 | $ | 3,845,746 | $ | (24,753) | (0.6)% |
| EMEA | | 992,624 | | 876,684 | | 115,940 | 13.2 % |
| Asia-Pacific | | 825,338 | | 803,450 | | 21,888 | 2.7 % |
| Latin America | | 213,215 | | 192,577 | | 20,638 | 10.7 % |
| Corporate Other [3] | | 51,466 | | 8,759 | | 42,707 | N/M |
| Total net revenues | $ | 5,903,636 | $ | 5,727,216 | $ | 176,420 | 3.1 % |

[1] "N/M" = not meaningful

[2] During Fiscal 2023, we recognized approximately $10.1 million of revenue relating to gift cards not expected to be redeemed ("breakage"), which was previously included in contract liabilities. Refer to Note 11 of the Consolidated Financial Statements for additional details.

[3] Corporate Other primarily includes foreign currency hedge gains and losses related to revenues generated by entities within our operating segments but managed through our central foreign exchange risk management program, as well as subscription revenues from MMR and revenue from other digital business opportunities.

The increase in total net revenues for Fiscal 2023, compared to the twelve months ended March 31, 2022, was driven by the following:

- Net revenues in our North America region decreased by $24.8 million, or 0.6%, to $3,821.0 million from $3,845.7 million. This was driven by a decrease in both our direct-to-consumer channel, which includes the recognition of breakage relating to gift cards as described in the table above, and our wholesale channel, partially offset by an increase in license revenues. Within our direct-to-consumer channel, net revenues were lower due to a decrease in owned and operated retail store sales, partially offset by an increase in e-commerce sales.

- Net revenues in our EMEA region increased by $115.9 million, or 13.2%, to $992.6 million from $876.7 million. This was primarily driven by an increase in both our wholesale channel and direct-to-consumer channel. Within our direct-to-consumer channel, net revenues increased in both owned and operated retail store sales and e-commerce sales. Net revenues in our EMEA region were also negatively impacted by changes in foreign exchange rates.

- Net revenues in our Asia-Pacific region increased by $21.9 million, or 2.7%, to $825.3 million from $803.5 million. This was driven by an increase in our wholesale channel, partially offset by a decrease in our direct-to-consumer channel and a decrease in license revenues from our Japanese licensee. Within our direct-to-consumer channel, net revenues were lower due to decreases in both e-commerce and owned and operated retail store sales, which were negatively impacted by COVID-19 related restrictions and limitations in China. Net revenues in our Asia-Pacific region were also negatively impacted by changes in foreign exchange rates.

- Net revenues in our Latin America region increased by $20.6 million, or 10.7%, to $213.2 million from $192.6 million. This was primarily driven by an increase in our wholesale channel, as we have moved to a distributor operating model for certain countries within this region. Within our direct-to-consumer channel,

net revenues were slightly higher due to increases in both owned and operated retail store sales and e-commerce sales.

- Net revenues in our Corporate Other non-operating segment increased by $42.7 million to $51.5 million from $8.8 million. This was primarily driven by foreign currency hedge gains related to revenues generated by entities within our operating segments, but managed through our central foreign exchange risk management program.

**Operating Income (loss)**

| *(In thousands)* | Year ended March 31, 2023 | Twelve months ended March 31, 2022 | Change $ | Change % |
|---|---|---|---|---|
| North America | $ 734,881 | $ 915,615 | $ (180,734) | (19.7)% |
| EMEA | 112,161 | 136,252 | (24,091) | (17.7)% |
| Asia-Pacific | 100,276 | 91,862 | 8,414 | 9.2 % |
| Latin America | 23,487 | 27,274 | (3,787) | (13.9)% |
| Corporate Other [1] | (686,994) | (837,559) | 150,565 | 18.0 % |
| Total operating income (loss) | $ 283,811 | $ 333,444 | $ (49,633) | (14.9)% |

[1] Corporate Other primarily includes foreign currency hedge gains and losses related to revenues generated by entities within our operating segments but managed through our central foreign exchange risk management program, as well as subscription revenues from MMR and revenue from other digital business opportunities. Corporate Other also includes expenses related to our central supporting functions.

The decrease in total operating income for Fiscal 2023, compared to the twelve months ended March 31, 2022, was primarily driven by the following:

- Operating income in our North America region decreased by $180.7 million to $734.9 million from $915.6 million. This was primarily due to a decline in gross profit and higher distribution and selling expenses, partially offset by lower marketing-related expenses. The decline in gross profit was driven by higher product input and freight costs, increased promotions and discounting and lower net revenues as discussed above.

- Operating income in our EMEA region decreased by $24.1 million to $112.2 million from $136.3 million. This was primarily due to a decline in gross profit, higher distribution and selling expenses and higher bad debt expense, partially offset by lower marketing-related expenses. The decline in gross profit was driven by unfavorable channel mix, partially offset by higher net revenues as discussed above.

- Operating income in our Asia-Pacific region increased by $8.4 million to $100.3 million from $91.9 million. This was primarily due to a decrease in marketing-related expenses, consulting expenses and facility-related expenses, partially offset by a decline in gross profit. The decline in gross profit was driven by increased promotions and discounting, partially offset by higher net revenues as discussed above.

- Operating income in our Latin America region decreased by $3.8 million to $23.5 million from $27.3 million. This was primarily due to higher freight and distribution costs, partially offset by higher net revenues.

- Operating loss in our Corporate Other non-operating segment decreased by $150.6 million to $687.0 million from $837.6 million. This was primarily due to gains from foreign currency hedges, lower incentive compensation expenses and no further restructuring charges, partially offset by an increase in salaries expenses and litigation expenses.

**LIQUIDITY AND CAPITAL RESOURCES**

Our cash requirements have principally been for working capital and capital expenditures. We fund our working capital, primarily inventory, and capital investments from cash flows from operating activities, cash and cash equivalents on hand, and borrowings available under our credit and long term debt facilities. Our working capital requirements generally reflect the seasonality in our business as we historically recognize the majority of our net revenues in the last two quarters of the calendar year. Our capital investments have generally included expanding our in-store fixture and branded concept shop program, improvements and expansion of our distribution and corporate facilities, including construction of our new global headquarters, leasehold improvements to our Brand and Factory House stores, and investment and improvements in information technology systems. Our inventory strategy is focused on continuing to meet consumer demand while improving our inventory efficiency over the long

term by putting systems and processes in place to improve our inventory management. These systems and processes are designed to improve our forecasting and supply planning capabilities. In addition, we strive to enhance our inventory performance by focusing on adding discipline around product purchasing, reducing production lead time and improving planning and execution for selling excess inventory through our Factory House stores and other liquidation channels.

As of March 31, 2023, we had approximately $711.9 million of cash and cash equivalents. We believe our cash and cash equivalents on hand, cash from operations, our ability to reduce our expenditures as needed, borrowings available to us under our amended credit agreement, our ability to access the capital markets, and other financing alternatives are adequate to meet our liquidity needs and capital expenditure requirements for at least the next twelve months. In addition, from time to time, based on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors and subject to compliance with applicable laws and regulations, we may seek to utilize cash on hand, borrowings or raise capital to retire, repurchase or redeem our debt securities, repay debt, repurchase shares of our common stock or otherwise enter into similar transactions to support our capital structure and business or utilize excess cash flow on a strategic basis. For example, as described below, in February 2022, our Board of Directors authorized the repurchase of up to $500 million of our Class C Common Stock over the following two years and, subsequently, during the Transition Period and Fiscal 2023, we entered into agreements related to accelerated share repurchase transactions to repurchase $425 million of our Class C Common Stock.

If there are unexpected material impacts to our business in future periods from COVID-19 or other global macroeconomic factors and we need to raise or conserve additional cash to fund our operations, we may consider additional alternatives similar to those we used in Fiscal 2020, including further reducing our expenditures, changing our investment strategies, reducing compensation costs, including through temporary reductions in pay and layoffs, limiting certain marketing and capital expenditures, and negotiating, extending or delaying payment terms with our customers and vendors. In addition, we may seek alternative sources of liquidity, including but not limited to, accessing the capital markets, sale leaseback transactions or other sales of assets, or other alternative financing measures. However, instability in, or tightening of the capital markets, could adversely affect our ability to access the capital markets on terms acceptable to us or at all. Although we believe we have adequate sources of liquidity over the long term, a prolonged or more severe economic recession, inflationary pressure, or a slow recovery could adversely affect our business and liquidity and could require us to take certain of the liquidity preserving actions described above.

As of March 31, 2023, $396.5 million or approximately 56% of cash and cash equivalents was held by our foreign subsidiaries. Based on the capital and liquidity needs of our foreign operations, we intend to indefinitely reinvest these funds outside the United States. In addition, our United States operations do not require the repatriation of these funds to meet our currently projected liquidity needs. Should we require additional capital in the United States, we may borrow in the United States or elect to repatriate indefinitely reinvested foreign funds. If we were to repatriate indefinitely reinvested foreign funds, we would be required to accrue and pay certain taxes upon repatriation, including foreign withholding taxes and certain U.S. state taxes and recognized foreign exchange rate impacts. Determination of the unrecorded deferred tax liability that would be incurred if such amounts were repatriated is not practicable.

Refer to our "Risk Factors" section included in Item 1A of this Annual Report on Form 10-K.

**Share Repurchase Program**

On February 23, 2022, our Board of Directors authorized us to repurchase up to $500 million (exclusive of fees and commissions) of outstanding shares of our Class C Common Stock over the following two years. The Class C Common Stock may be repurchased from time to time at prevailing prices in the open market, through plans designed to comply with Rule 10b5-1 under the Securities Exchange Act of 1934, as amended, via private purchases through forward, derivative, accelerated share repurchase transactions or otherwise, subject to applicable regulatory restrictions on volume, pricing and timing. The timing and amount of any repurchases will depend on market conditions, our financial condition, results of operations, liquidity and other factors.

Pursuant to the previously disclosed accelerated share repurchase transactions that we entered into in February 2022, May 2022, August 2022 and November 2022 (the "ASR Agreements"), we repurchased 18.7 million and 16.2 million shares of Class C Common Stock, which were immediately retired, during Fiscal 2023 and the Transition Period, respectively. As a result, $174.0 million was recorded to retained earnings to reflect the difference between the market price of the Class C Common Stock repurchased and its par value during Fiscal 2023 (Transition Period: $240.0 million).

As of the date of this Annual Report on Form 10-K, we have repurchased a total of $425 million or 34.9 million outstanding shares of our Class C Common Stock under the share repurchase program.

## Contractual Commitments

We lease warehouse space, office facilities, space for our Brand and Factory House stores and certain equipment under non-cancelable operating leases. The leases expire at various dates through 2035, excluding extensions at our option, and include provisions for rental adjustments. In addition, this table includes executed lease agreements for Brand and Factory House stores that we did not yet occupy as of March 31, 2023. The operating leases generally contain renewal provisions for varying periods of time. Our significant contractual obligations and commitments as of March 31, 2023 are summarized in the following table:

| | Payments Due by Period | | | | |
|---|---|---|---|---|---|
| (In thousands) | Total | Less Than 1 Year | 1 to 3 Years | 3 to 5 Years | More Than 5 Years |
| Long term debt obligations [1] | $ 750,990 | $ 20,714 | $ 120,526 | $ 609,750 | $ — |
| Operating Lease obligations [2] | 1,027,700 | 176,218 | 290,688 | 199,724 | 361,070 |
| Product purchase obligations [3] | 1,161,097 | 1,161,097 | — | — | — |
| Sponsorships and other [4] | 412,425 | 83,342 | 189,758 | 40,575 | 98,750 |
| Total future minimum payments | $ 3,352,212 | $ 1,441,371 | $ 600,972 | $ 850,049 | $ 459,820 |

[1] Includes estimated interest payments based on applicable fixed interest rates as of March 31, 2023, timing of scheduled payments, and the term of the debt obligations.

[2] Includes the minimum payments for lease obligations. The lease obligations do not include any contingent rent expense we may incur at our Brand and Factory house stores based on future sales above a specified minimum or payments made for maintenance, insurance and real estate taxes. Contingent rent expense was $14.2 million for Fiscal 2023.

[3] We generally place orders with our manufacturers at least three to four months in advance of expected future sales. The amounts listed for product purchase obligations primarily represent our open production purchase orders with our manufacturers for our apparel, footwear and accessories, including expected inbound freight, duties and other costs. These open purchase orders specify fixed or minimum quantities of products at determinable prices. The product purchase obligations also includes fabric commitments with our suppliers, which secure a portion of our material needs for future seasons. The reported amounts exclude product purchase liabilities included in accounts payable as of March 31, 2023.

[4] Includes sponsorships with professional teams, professional leagues, colleges and universities, individual athletes, athletic events and other marketing commitments in order to promote our brand. Some of these sponsorship agreements provide for additional performance incentives and product supply obligations. It is not possible to determine how much we will spend on product supply obligations on an annual basis as contracts generally do not stipulate specific cash amounts to be spent on products. The amount of product provided to these sponsorships depends on many factors including general playing conditions, the number of sporting events in which they participate and our decisions regarding product and marketing initiatives. In addition, it is not possible to determine the performance incentive amounts we may be required to pay under these agreements as they are primarily subject to certain performance based and other variables. The amounts listed above are the fixed minimum amounts required to be paid under these sponsorship agreements. Additionally, these amounts include minimum guaranteed royalty payments to endorsers and licensors based upon a predetermined percent of sales of particular products.

The table above excludes a liability of $58.8 million for uncertain tax positions, inclusive of related interest and penalties, as the Company is unable to reasonably estimate the timing an amount of future cash settlement. Refer to Note 17 to the Consolidated Financial Statements for a further discussion of our uncertain tax positions.

## Cash Flows

The following table presents the major components of our cash flows provided by and used in operating, investing and financing activities for the periods presented:

| (In thousands) | Year ended March 31, 2023 | Twelve months ended March 31, 2022 | Change $ |
|---|---|---|---|
| Net cash provided by (used in): | | | |
| Operating activities | $ (9,914) | $ 493,974 | $ (503,888) |
| Investing activities | (152,796) | (100,365) | (52,431) |
| Financing activities | (126,375) | (725,806) | 599,431 |
| Effect of exchange rate changes on cash and cash equivalents | (5,315) | (5,357) | 42 |
| Net increase (decrease) in cash and cash equivalents | $ (294,400) | $ (337,554) | $ 43,154 |

### Operating Activities

Cash flows from operating activities decreased by $503.9 million, as compared to the twelve months ended March 31, 2022, primarily driven by a decrease in net income before the impact of non-cash items of $54.0 million and a decrease from changes in working capital of $449.9 million.

The changes in working capital were due to the following outflows:

- $411.3 million from changes in inventories;

- $140.7 million from changes in other non-current assets;

- $69.5 million from changes in accounts receivable; and

- $20.3 million from changes in prepaid expenses and other current assets.

These outflows were partially offset by the following working capital inflows:

- $127.6 million from changes in accrued expenses and other liabilities;

- $33.2 million from changes in customer refund liabilities;

- $26.4 million from changes in accounts payable; and

- $5.0 million from changes in income taxes payable and receivable, net.

### Investing Activities

Cash flows used in investing activities increased by $52.4 million, as compared to the twelve months ended March 31, 2022. This was primarily due to an increase in capital expenditures, partially offset by the collection of the year one earn-out previously recorded in connection with the sale of the MyFitnessPal platform.

Total capital expenditures during Fiscal 2023 were $187.8 million, or approximately 3% of net revenues, representing an $86.6 million increase from $101.2 million during the twelve months ended March 31, 2022. During Fiscal 2021, we reduced capital expenditures in response to ongoing uncertainty related to COVID-19. Our long-term operating principle for capital expenditures is to spend between 3% and 5% of annual net revenues as we invest in our global direct-to-consumer, e-Commerce and digital businesses, information technology systems, distribution centers and our global offices, including our new global headquarters in the Baltimore Peninsula, an area of Baltimore, Maryland, previously referred to as Port Covington. During Fiscal 2023, we incurred capital expenditures of $68.1 million relating to the construction of our new global headquarters. As previously disclosed, our plans for our new headquarters have been designed in line with our long-term sustainability strategy and include a commitment to reduce greenhouse gas emissions and increase sourcing of renewable electricity in our owned and operated facilities. We expect a portion of our capital expenditures over the next few years to include investments incorporating sustainable and intelligent building design features into this facility.

### Financing Activities

Cash flows used in financing activities decreased by $599.4 million, as compared to the twelve months ended March 31, 2022. During the twelve months ended March 31, 2022, we paid $506.3 million to certain exchanging holders for the exchange of approximately $419.1 million in aggregate principal amount of our 1.50% Convertible Senior Notes. Concurrently with these exchanges we terminated certain capped call agreements and in exchange received approximately $91.7 million. For more details, see discussion below under "1.50% Convertible Senior Notes". Additionally, during Fiscal 2023 and the twelve months ended March 31, 2022, we paid $125.0 million and $300.0 million, respectively, to repurchase shares of our Class C Common Stock through accelerated share repurchase programs. For more details, see discussion above under "Share Repurchase Program".

## Capital Resources

### Credit Facility

On March 8, 2019, we entered into an amended and restated credit agreement by and among us, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, and the other lenders and arrangers party thereto (the "credit agreement"). In May 2020, May 2021 and December 2021, we entered into the first, second and third amendments to the credit agreement, respectively (the credit agreement as amended and the "amended credit agreement" or the "revolving credit facility"). The amended credit agreement provides for revolving credit commitments of $1.1 billion and has a term that ends on December 3, 2026, with permitted extensions under certain circumstances. As of March 31, 2023 and March 31, 2022, there were no amounts outstanding under the revolving credit facility.

At our request and a lender's consent, commitments under the amended credit agreement may be increased by up to $300.0 million in aggregate, subject to certain conditions as set forth in the amended credit agreement. Incremental borrowings are uncommitted and the availability thereof will depend on market conditions at the time we seek to incur such borrowings.

Borrowings, if any, under the revolving credit facility have maturities of less than one year. Up to $50.0 million of the facility may be used for the issuance of letters of credit. As of March 31, 2023, there was $4.4 million of letters of credit outstanding (March 31, 2022: $4.5 million).

Our obligations under the amended credit agreement are guaranteed by certain domestic significant subsidiaries of Under Armour, Inc., subject to customary exceptions (the "subsidiary guarantors") and primarily secured by a first-priority security interest in substantially all of the assets of Under Armour, Inc. and the subsidiary guarantors, excluding real property, capital stock in and debt of subsidiaries of Under Armour, Inc. holding certain real property and other customary exceptions. The amended credit agreement provides for the permanent fall away of guarantees and collateral upon our achievement of investment grade rating from two rating agencies.

The amended credit agreement contains negative covenants that, subject to significant exceptions, limit our ability to, among other things: incur additional secured and unsecured indebtedness; pledge the assets as security; make investments, loans, advances, guarantees and acquisitions (including investments in and loans to non-guarantor subsidiaries); undergo fundamental changes; sell assets outside the ordinary course of business; enter into transactions with affiliates; and make restricted payments.

We are also required to maintain a ratio of consolidated EBITDA, to consolidated interest expense of not less than 3.50 to 1.0 (the "interest coverage covenant") and we are not permitted to allow the ratio of consolidated total indebtedness to consolidated EBITDA to be greater than 3.25 to 1.0 (the "leverage covenant"), as described in more detail in the amended credit agreement. As of March 31, 2023, we were in compliance with the applicable covenants.

In addition, the amended credit agreement contains events of default that are customary for a facility of this nature, and includes a cross default provision whereby an event of default under other material indebtedness, as defined in the amended credit agreement, will be considered an event of default under the amended credit agreement.

The amended credit agreement implements SOFR as the replacement of LIBOR as a benchmark interest rate for the U.S. dollar borrowings (and analogous benchmark rate replacements for borrowings in Yen, Canadian dollars, Pound Sterling and Euro). Borrowings under the amended credit agreement bear interest at a rate per annum equal to, at our option, either (a) an alternate base rate (for borrowings in U.S. dollars), (b) a term rate (for borrowings in U.S. dollars, Euros, Japanese Yen or Canadian dollars) or (c) a "risk free" rate (for borrowings in U.S. dollars or Pounds Sterling), plus in each case an applicable margin. The applicable margin for loans will be adjusted by reference to a grid (the "pricing grid") based on the leverage ratio of consolidated total indebtedness to consolidated EBITDA and ranges between 1.00% to 1.75% (or, in the case of alternate base rate loans 0.00% to 0.75%). We will also pay a commitment fee determined in accordance with the pricing grid on the average daily unused amount of the revolving credit facility and certain fees with respect to letters of credit. As of March 31, 2023, the commitment fee was 17.5 basis points.

**1.50% Convertible Senior Notes**

In May 2020, we issued $500.0 million aggregate principal amount of 1.50% convertible senior notes due 2024 (the "Convertible Senior Notes"). The Convertible Senior Notes bear interest at the fixed rate of 1.50% per annum, payable semiannually in arrears on June 1 and December 1 of each year, beginning December 1, 2020. The Convertible Senior Notes will mature on June 1, 2024, unless earlier converted in accordance with their terms, redeemed in accordance with their terms or repurchased.

The net proceeds from the offering (including the net proceeds from the exercise of the over-allotment option) were $488.8 million, after deducting the initial purchasers' discount and estimated offering expenses that we paid, of which we used $47.9 million to pay the cost of the capped call transactions described below. We utilized $439.9 million to repay indebtedness that was outstanding under our revolving credit facility at the time, and to pay related fees and expenses.

The Convertible Senior Notes are not secured and are not guaranteed by any of our subsidiaries. The indenture governing the Convertible Senior Notes does not contain any financial or operating covenants or restrictions on the payments of dividends, the incurrence of indebtedness or the issuance or repurchase of securities by us or any of our subsidiaries.

During Fiscal 2021, we entered into exchange agreements with certain holders of the Convertible Senior Notes, who agreed to exchange approximately $419.1 million in aggregate principal amount of the Convertible Senior Notes for cash and/or shares of our Class C Common Stock, plus payment for accrued and unpaid interest (the "Exchanges"). In connection with the Exchanges, we paid approximately $507.0 million cash and issued approximately 18.8 million shares of the Company's Class C Common Stock to the exchanging holders. Additionally, we recognized losses on debt extinguishment of $58.5 million during Fiscal 2021, within Other Income (Expense), net on our Consolidated Statements of Operations. Following the Exchanges, approximately $80.9 million aggregate principal amount of the Convertible Senior Notes remain outstanding as of March 31, 2023.

The Convertible Senior Notes are convertible into cash, shares of our Class C Common Stock or a combination of cash and shares of Class C Common Stock, at our election, as described further below. The initial conversion rate is 101.8589 shares of our Class C Common Stock per $1,000 principal amount of Convertible Senior Notes (equivalent to an initial conversion price of approximately $9.82 per share of Class C Common Stock), subject to adjustment if certain events occur. Prior to the close of business on the business day immediately preceding January 1, 2024, holders may (at their option) convert their Convertible Senior Notes only upon satisfaction of one or more of the following conditions:

- during any calendar quarter commencing after the calendar quarter ended on September 30, 2020 (and only during such calendar quarter), if the last reported sale price of our Class C Common Stock for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day;

- during the five business day period after any five consecutive trading day period (the "measurement period") in which the trading price per $1,000 principal amount of Convertible Senior Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of our Class C Common Stock and the conversion rate on each such trading day;

- upon the occurrence of specified corporate events or distributions on our Class C Common Stock; or

- if we call any Convertible Senior Notes for redemption prior to the close of business on the business day immediately preceding January 1, 2024.

On or after January 1, 2024, until the close of business on the second scheduled trading day immediately preceding the maturity date, holders may convert all or any portion of their Convertible Senior Notes at the conversion rate at any time irrespective of the foregoing conditions.

Beginning on December 6, 2022, we may redeem for cash all or any part of the Convertible Senior Notes, at our option, if the last reported sale price of our Class C Common Stock has been at least 130% of the conversion price then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which we provide notice of redemption at a redemption price equal to 100% of the aggregate principal amount of the Convertible Senior Notes to be redeemed, plus accrued and unpaid interest to, but excluding, the redemption date.

If we undergo a fundamental change (as defined in the indenture governing the Convertible Senior Notes) prior to the maturity date, subject to certain conditions, holders may require us to repurchase for cash all or any portion of their Convertible Senior Notes in principal amounts of $1,000 or an integral multiple thereof at a price which will be equal to 100% of the aggregate principal amount of the Convertible Senior Notes to be repurchased, plus accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

Concurrently with the offering of the Convertible Senior Notes, we entered into privately negotiated capped call transactions with JPMorgan Chase Bank, National Association, HSBC Bank USA, National Association, and Citibank, N.A. (the "option counterparties"). The capped call transactions are expected generally to reduce potential dilution to our Class C Common Stock upon any conversion of Convertible Senior Notes and/or offset any cash payments we are required to make in excess of the aggregate principal amount of converted Convertible Senior Notes upon any conversion thereof, as the case may be, with such reduction and/or offset subject to a cap based on the cap price. The cap price of the capped call transactions is initially $13.4750 per share of our Class C Common Stock, representing a premium of 75% above the last reported sale price of our Class C Common Stock on May 21, 2020, and is subject to certain adjustments under the terms of the capped call transactions.

During Fiscal 2021, concurrently with the Exchanges, we entered into, with each of the option counterparties, termination agreements relating to a number of options corresponding to the number of Convertible Senior Notes exchanged. Pursuant to such termination agreements, each of the option counterparties paid us a

cash settlement amount in respect of the portion of capped call transactions being terminated. We received approximately $91.7 million in connection with such termination agreements related to the Exchanges.

The Convertible Senior Notes contain a cash conversion feature. Prior to the adoption of Accounting Standards Update ("ASU") No. 2020-06 "Debt - Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging - Contracts in Entity's Own Equity (Subtopic 815-40)" ("ASU 2020-06"), we had separated it into liability and equity components. We valued the liability component based on its borrowing rate for a similar debt instrument that does not contain a conversion feature. The equity component, which was recognized as a debt discount, was valued as the difference between the face value of the Convertible Senior Notes and the fair value of the liability component.

We adopted ASU 2020-06 on January 1, 2022 using the modified retrospective method. As a result, the Convertible Senior Notes are no longer accounted for as separate liability and equity components, but rather a single liability. See Note 2 to the Condensed Consolidated Financial Statements included in Part I of our Transition Report on Form 10-QT for the three months ended March 31, 2022 for more details.

**3.250% Senior Notes**

In June 2016, we issued $600.0 million aggregate principal amount of 3.250% senior unsecured notes due June 15, 2026 (the "Senior Notes"). The proceeds were used to pay down amounts outstanding under the revolving credit facility, at the time. The Senior Notes bear interest at the fixed rate of 3.250% per annum, payable semi-annually on June 15 and December 15 beginning December 15, 2016. Prior to March 15, 2026 (three months prior to the maturity date of the Notes), we may redeem some or all of the Senior Notes at any time or from time to time at a redemption price equal to the greater of 100% of the principal amount of the Senior Notes to be redeemed or a "make-whole" amount applicable to such Senior Notes as described in the indenture governing the Senior Notes, plus accrued and unpaid interest to, but excluding, the redemption date.

The indenture governing the Senior Notes contains covenants, including limitations that restrict our ability and the ability of certain of our subsidiaries to create or incur secured indebtedness and enter into sale and leaseback transactions and our ability to consolidate, merge or transfer all or substantially all of our properties or assets to another person, in each case subject to material exceptions described in the indenture.

## CRITICAL ACCOUNTING ESTIMATES AND ASSUMPTIONS

Our Consolidated Financial Statements have been prepared in accordance with U.S. GAAP. To prepare these financial statements, we must make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, as well as the disclosures of contingent assets and liabilities. Our estimates are often based on complex judgments, probabilities and assumptions that management believes to be reasonable, but that are inherently uncertain and unpredictable. It is also possible that other professionals, applying reasonable judgment to the same facts and circumstances, could develop and support a range of alternative estimated amounts. Actual results could be significantly different from these estimates.

*Revenue Recognition*

We recognize revenue pursuant to Accounting Standards Codification 606 ("ASC 606"). The amount of revenue recognized considers terms of sale that create variability in the amount of consideration that we ultimately expect to be entitled to in exchange for the products or services and is subject to an overall constraint that a significant revenue reversal will not occur in future periods.

We record reductions to revenue at the time of the transaction for estimated customer returns, allowances, markdowns and discounts. We base these estimates on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by us. The actual amount of customer returns and allowances, which are inherently uncertain, may differ from our estimates. If we determine that actual or expected returns or allowances are significantly higher or lower than the reserves we established, we would record a reduction or increase, as appropriate, to net sales in the period in which we make such a determination. Provisions for customer specific discounts are based on contractual obligations with certain major customers. Reserves for returns, allowances, markdowns and discounts are included within customer refund liability and the value of inventory associated with reserves for sales returns are included within prepaid expenses and other current assets on the Consolidated Balance Sheets. As of March 31, 2023 and 2022, there were $160.5 million and $159.6 million, respectively, in reserves for returns, allowances, markdowns and discounts within customer refund liability and $40.7 million and $44.3 million, respectively, as the estimated value of inventory associated with the reserves for sales returns within prepaid expenses and other current assets on the Consolidated Balance Sheets.

*Allowance for Doubtful Accounts*

We make ongoing estimates relating to the collectability of accounts receivable and maintain an allowance for estimated losses resulting from the inability of our customers to make required payments. In determining the amount of the reserve, we consider historical levels of credit losses and significant economic developments within the retail environment that could impact the ability of our customers to pay outstanding balances and make judgments about the creditworthiness of significant customers based on ongoing credit evaluations. Because we cannot predict future changes in the financial stability of our customers, actual future losses from uncollectible accounts may differ from estimates. If the financial condition of customers were to deteriorate, resulting in their inability to make payments, a larger reserve might be required. In the event we determine a smaller or larger reserve is appropriate, we would record a benefit or charge to selling, general and administrative expense in the period in which such a determination was made. As of March 31, 2023 and 2022, the allowance for doubtful accounts was $10.8 million and $7.1 million, respectively.

*Inventory Valuation and Reserves*

Inventories consist primarily of finished goods. Costs of finished goods inventories include all costs incurred to bring inventory to its current condition, including inbound freight, duties and other costs. We value our inventory at standard cost which approximates landed cost, using the first-in, first-out method of cost determination. Net realizable value is estimated based upon assumptions made about future demand and retail market conditions. If we determine that the estimated net realizable value of our inventory is less than the carrying value of such inventory, we record a charge to cost of goods sold to reflect the lower of cost or net realizable value. If actual market conditions are less favorable than those that we projected, further adjustments may be required that would increase the cost of goods sold in the period in which such a determination was made. As of March 31, 2023 and 2022, the inventory reserve was $34.8 million and $26.8 million, respectively.

*Goodwill, Intangible Assets and Long-Lived Assets*

Goodwill and intangible assets are recorded at their estimated fair values at the date of acquisition and are allocated to the reporting units that are expected to receive the related benefits. Goodwill and indefinite lived intangible assets are not amortized and are required to be tested for impairment at least annually or sooner whenever events or changes in circumstances indicate that it is more likely than not that the fair value of the reporting unit is less than its carrying amount. In conducting an annual impairment test, we first review qualitative factors to determine whether it is more likely than not that the fair value of the reporting unit is less than its carrying amount. If factors indicate that is the case, we perform the goodwill impairment test. We compare the fair value of the reporting unit with its carrying amount. We estimate fair value using the discounted cash flows model, under the income approach, which indicates the fair value of the reporting unit based on the present value of the cash flows that we expect the reporting unit to generate in the future. Our significant estimates in the discounted cash flows model include: our weighted average cost of capital, long-term rate of growth and profitability of the reporting unit's business, and working capital effects. If the carrying amount of a reporting unit exceeds its fair value, goodwill is impaired to the extent that the carrying value exceeds the fair value of the reporting unit.

*Income Taxes*

Income taxes are accounted for under the asset and liability method. Deferred income tax assets and liabilities are established for temporary differences between the financial reporting basis and the tax basis of our assets and liabilities at tax rates expected to be in effect when such assets or liabilities are realized or settled. Deferred income tax assets are reduced by valuation allowances when necessary. We have made the policy election to record any liability associated with Global Intangible Low Taxed Income ("GILTI") in the period in which it is incurred.

Income taxes include the largest amount of tax benefit for an uncertain tax position that is more likely than not to be sustained upon audit based on the technical merits of the tax position. Settlements with tax authorities, the expiration of statutes of limitations for particular tax positions or obtaining new information on particular tax positions may cause a change to the effective tax rate. We recognize accrued interest and penalties related to unrecognized tax benefits in the provision for income taxes on the Consolidated Statement of Operations.

Assessing whether deferred tax assets are realizable requires significant judgment. We consider all available positive and negative evidence, including historical operating performance and expectations of future operating performance. The ultimate realization of deferred tax assets is often dependent upon future taxable income and therefore can be uncertain. To the extent we believe it is more likely than not that all or some portion of the asset will not be realized, valuation allowances are established against our deferred tax assets, which increase income tax expense in the period when such a determination is made.

A significant portion of our deferred tax assets relate to U.S. federal and state taxing jurisdictions. Realization of these deferred tax assets is dependent on future U.S. pre-tax earnings. In evaluating the recoverability of these deferred tax assets as of March 31, 2023, we have considered all available evidence, both positive and negative, including but not limited to the following:

Positive

- Current year pre-tax earnings including positive financial taxable income in the U.S. federal jurisdiction.

- Prior three-year cumulative positive financial taxable income in the U.S. federal jurisdiction.

- Forecasted future positive financial taxable income in the U.S.

- No material definite lived tax attributes (excluding capital loss) subject to expiration in the near short term.

- No history of U.S. federal and material state tax attributes expiring unused.

- Available prudent and feasible tax planning strategies.

Negative

- Prior three-year cumulative financial taxable loss in the U.S. state jurisdictions.

- Inherent challenges in forecasting sufficient future U.S. state pre-tax earnings to overcome existing cumulative losses in prior years.

- Existing definite life state attributes related to credits and net operating losses.

As of March 31, 2023, we believe that the weight of the positive evidence outweighs the negative evidence regarding the realization of our U.S. federal deferred tax assets, resulting in the release of the corresponding valuation allowances in the fourth quarter of the Fiscal 2023. The release of U.S. federal valuation allowance (excluding capital losses) resulted in a material benefit to income tax expense and net income in the period. As of March 31, 2023, for U.S. states, we believe the weight of the negative evidence continues to outweigh the positive evidence regarding the realization of the state deferred tax assets and have maintained a valuation allowance against these assets. Our current forecast for the U.S. indicates that there is a possibility that within the next 12 months, sufficient positive evidence may become available to reach a conclusion that a portion of the U.S state valuation allowance will no longer be required. The actualization of these forecasted results may result in a reversal of a portion of previously recorded U.S state valuation allowances in the United States. The release of valuation allowances would result in a benefit to income tax expense in the period the release is recorded. The timing and amount are subject to change based on the actual profitability that we are able to actually achieve in the United States.

As of each reporting date, management considers new evidence, both positive and negative, that could affect its view of the future realization of deferred tax assets. We will continue to evaluate our ability to realize our net deferred tax assets on a quarterly basis.

*Stock-Based Compensation*

The assumptions used in calculating the fair value of stock-based compensation awards represent management's best estimates, but the estimates involve inherent uncertainties and the application of management judgment. In addition, compensation expense for performance-based awards is recorded over the related service period when achievement of the performance targets is deemed probable, which requires management judgment.

**Summary of Significant Account Policies**

Refer to Note 2 of our Consolidated Financial Statements, included in this Annual Report on Form 10-K, for a summary of our significant accounting policies and our assessment of recently issued accounting standards.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

*Foreign Currency and Interest Rate Risk*

We are exposed to global market risks, including the effects of changes in foreign currency and interest rates. We use derivative instruments to manage financial exposures that occur in the normal course of business and do not hold or issue derivatives for trading or speculative purposes.

We may elect to designate certain derivatives as hedging instruments under U.S. GAAP. We formally document all relationships between designated hedging instruments and hedged items, as well as our risk management objectives and strategies for undertaking hedged transactions. This process includes linking all derivatives designated as hedges to forecasted cash flows and assessing, both at inception and on an ongoing basis, the effectiveness of the hedging relationships.

Our foreign exchange risk management program consists of designated cash flow hedges and undesignated hedges. As of March 31, 2023, we had hedge instruments, primarily for British Pound/U.S. Dollar, U.S. Dollar/Chinese Renminbi, Euro/U.S. Dollar, U.S. Dollar/Canadian Dollar, U.S. Dollar/Mexican Peso and U.S. Dollar/South Korean Won currency pairs. All derivatives are recognized on the Consolidated Balance Sheets at fair value and classified based on the instruments maturity dates. The table below provides information about our foreign currency forward exchange agreements for the currencies listed above and presents the notional amounts and weighted average exchange rates by contractual maturity dates:

| (In thousands) | Fiscal year ending March 31, | | | | | | Fair Value as of | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2024 | 2025 | 2026 | 2027 | 2028 and There-after | Total | March 31, 2023 | March 31, 2022 | December 31, 2021 |
| **On-Balance Sheet Financial Instruments** | | | | | | | | | |
| **USD Functional Currency** | | | | | | | | | |
| EUR Notional | $ 91,046 | $ 22,218 | $ — | $ — | $ — | $ 113,264 | $ (3,263) | $ 2,238 | $ 4,447 |
| Weighted Average Exchange Rate | 1.07 | 1.05 | | | | 1.07 | | | |
| GBP Notional | 213,437 | 43,741 | — | — | — | 257,178 | 6,024 | 8,764 | 3,270 |
| Weighted Average Exchange Rate | 1.29 | 1.19 | | | | 1.27 | | | |
| **CNY Functional Currency** | | | | | | | | | |
| USD Notional | 121,935 | 35,842 | — | — | — | 157,777 | 2,461 | (7,691) | (6,090) |
| Weighted Average Exchange Rate | 6.65 | 6.75 | | | | 6.67 | | | |
| **CAD Functional Currency** | | | | | | | | | |
| USD Notional | 71,318 | 32,491 | — | — | — | 103,809 | 3,538 | (775) | (343) |
| Weighted Average Exchange Rate | 1.29 | 1.32 | | | | 1.30 | | | |
| **MXN Functional Currency** | | | | | | | | | |
| USD Notional | 75,527 | 15,568 | — | — | — | 91,095 | (15,271) | (2,917) | (237) |
| Weighted Average Exchange Rate | 22.00 | 22.58 | | | | 22.10 | | | |
| **KRW Functional Currency** | | | | | | | | | |
| USD Notional | 25,561 | 16,714 | — | — | — | 42,275 | 646 | (1,790) | — |
| Weighted Average Exchange Rate | 1,234.64 | 1,310.96 | | | | 1,264.82 | | | |

We currently generate a majority of our consolidated net revenues in the United States, and the reporting currency for our Consolidated Financial Statements is the U.S. dollar. As our net revenues and expenses generated outside of the United States increase, our results of operations could be adversely impacted by changes in foreign currency exchange rates. For example, as we recognize foreign revenues in local foreign currencies and if the U.S. dollar strengthens, it could have a negative impact on our foreign revenues upon translation of those results into the U.S. dollar upon consolidation of our financial statements. In addition, we are exposed to gains and losses resulting from fluctuations in foreign currency exchange rates relating to transactions generated by our international subsidiaries in currencies other than their local currencies. These gains and losses are driven by non-functional currency generated revenue, non-functional currency inventory purchases, investments in U.S. dollar denominated available-for-sale debt securities, and certain other intercompany transactions. As of March 31, 2023, the aggregate notional value of our outstanding cash flow hedges was $799.7 million, with contract maturities ranging from one to twenty-four months.

In order to maintain liquidity and fund business operations, we may enter into long term debt arrangements with various lenders which bear a range of fixed and variable rates of interest. The nature and amount of our long term debt can be expected to vary as a result of future business requirements, market conditions and other factors.

We may elect to enter into interest rate swap contracts to reduce the impact associated with interest rate fluctuations from time to time. Our interest rate swap contracts are accounted for as cash flow hedges.

For contracts designated as cash flow hedges, the changes in fair value are reported as other comprehensive income and are recognized in current earnings in the period or periods during which the hedged transaction affects current earnings. One of the criteria for this accounting treatment is the notional value of these derivative contracts should not be in excess of specifically identified anticipated transactions. By their very nature, our estimates of the anticipated transactions may fluctuate over time and may ultimately vary from actual transactions. When anticipated transaction estimates or actual transaction amounts decline below hedged levels, or if it is no longer probable a forecasted transaction will occur by the end of the originally specified time period or within an additional two-month period of time, we are required to reclassify the cumulative change in fair value of the over-hedged portion of the related hedge contract from Other comprehensive income (loss) to Other expense, net during the period in which the decrease occurs.

We enter into derivative contracts with major financial institutions with investment grade credit ratings and are exposed to credit losses in the event of non-performance by these financial institutions. This credit risk is generally limited to the unrealized gains in the derivative contracts. However, we monitor the credit quality of these financial institutions and consider the risk of counterparty default to be minimal. Although we have entered into foreign currency contracts to minimize some of the impact of foreign currency exchange rate fluctuations on future cash flows, we cannot be assured that foreign currency exchange rate fluctuations will not have a material adverse impact on our financial condition and results of operations.

*Credit Risk*

We are exposed to credit risk primarily on our accounts receivable. We provide credit to customers in the ordinary course of business and perform ongoing credit evaluations. We believe that our exposure to concentrations of credit risk with respect to trade receivables is largely mitigated by our customer base. We believe that our allowance for doubtful accounts is sufficient to cover customer credit risks as of March 31, 2023. Refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations - Critical Accounting Policies and Estimates - Allowance for Doubtful Accounts" for a further discussion on our policies.

*Inflation*

Inflationary pressures have and may continue to adversely affect our operating results. We continue to monitor these factors and the potential impacts they may have on our financial results, including product input costs, freight costs and consumer discretionary spending and therefore consumer demand on our products. See our "Risk Factors—Economic and Industry Risks—*Our business depends on consumer purchases of discretionary items, which can be negatively impacted during an economic downturn or periods of inflation. This could materially impact our sales, profitability and financial condition*" included in Item 1A of this Annual Report on Form 10-K.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**Report of Management on Internal Control Over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. We conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in 2013. This evaluation included review of the documentation of controls, evaluation of the design effectiveness of controls, testing of the operating effectiveness of controls and a conclusion on this evaluation. Based on our evaluation, we have concluded that our internal control over financial reporting was effective as of March 31, 2023.

The effectiveness of our internal control over financial reporting as of March 31, 2023, has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.

| /s/ STEPHANIE C. LINNARTZ | President and Chief Executive Officer |
|---|---|
| **Stephanie C. Linnartz** | |

| /s/ DAVID E. BERGMAN | Chief Financial Officer |
|---|---|
| **David E. Bergman** | |

Dated: May 24, 2023

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of Under Armour, Inc.

### Opinions on the Financial Statements and Internal Control over Financial Reporting

We have audited the accompanying consolidated balance sheets of Under Armour, Inc. and its subsidiaries (the "Company") as of March 31, 2023, March 31, 2022 and December 31, 2021, and the related consolidated statements of operations, of comprehensive income (loss), of stockholders' equity and of cash flows for the year ended March 31, 2023, for the three months ended March 31, 2022 and for the years ended December 31, 2021 and 2020, including the related notes and schedule of valuation and qualifying accounts for the year ended March 31, 2023, for the three months ended March 31, 2022 and for the years ended December 31, 2021 and 2020 listed in the index appearing under Item 15(a)(2) (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of March 31, 2023, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of March 31, 2023, March 31, 2022 and December 31, 2021, and the results of its operations and its cash flows for the year ended March 31, 2023, for the three months ended March 31, 2022 and for the years ended December 31, 2021 and 2020 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of March 31, 2023, based on criteria established in Internal Control - Integrated Framework (2013) issued by the COSO.

### Basis for Opinions

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Report of Management on Internal Control over Financial Reporting. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

### Definition and Limitations of Internal Control over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail,

accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

### *Critical Audit Matters*

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that (i) relates to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Reserve for Customer Returns*

As described in Note 2 to the consolidated financial statements, the Company recorded $160.5 million as of March 31, 2023 in reserves for returns, allowances, markdowns and discounts within customer refund liability. Management bases its estimates of the reserve for customer returns on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by the Company.

The principal considerations for our determination that performing procedures relating to the reserve for customer returns is a critical audit matter are (i) the significant judgment by management in developing the estimate of reserve for customer returns,  and (ii) a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating management's significant assumption related to the amount of outstanding returns that have not yet been received by the Company.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's estimate of the reserve for customer returns, including the assumption related to the outstanding returns that have not yet been received by the Company. These procedures also included, among others, testing management's process for developing the customer returns reserve; evaluating the appropriateness of the method; testing the completeness, accuracy, and relevance of underlying data used in the estimate; and evaluating the reasonableness of management's significant assumption related to the amount of outstanding returns that have not yet been received by the Company. Evaluating management's significant assumption related to outstanding returns that have not yet been received by the Company involved evaluating whether the assumption used by management was reasonable considering (i) historical rates of customer returns; (ii) specific identification of outstanding returns; and (iii) whether these assumptions were consistent with evidence obtained in other areas of the audit.

/s/ PricewaterhouseCoopers LLP

Baltimore, Maryland

May 24, 2023

We have served as the Company's auditor since 2003.

**Under Armour, Inc. and Subsidiaries**

**Consolidated Balance Sheets**
**(In thousands, except share data)**

| | March 31, 2023 | March 31, 2022 | December 31, 2021 |
|---|---|---|---|
| **Assets** | | | |
| Current assets | | | |
| Cash and cash equivalents | $ 711,910 | $ 1,009,139 | $ 1,669,453 |
| Accounts receivable, net (Note 3) | 759,860 | 702,197 | 569,014 |
| Inventories | 1,190,253 | 824,455 | 811,410 |
| Prepaid expenses and other current assets, net | 297,563 | 297,034 | 286,422 |
| Total current assets | 2,959,586 | 2,832,825 | 3,336,299 |
| Property and equipment, net (Note 4) | 672,736 | 601,365 | 607,226 |
| Operating lease right-of-use assets (Note 5) | 489,306 | 420,397 | 448,364 |
| Goodwill (Note 6) | 481,992 | 491,508 | 495,215 |
| Intangible assets, net (Note 7) | 8,940 | 10,580 | 11,010 |
| Deferred income taxes (Note 17) | 186,167 | 20,141 | 17,812 |
| Other long-term assets | 58,356 | 76,016 | 75,470 |
| Total assets | $ 4,857,083 | $ 4,452,832 | $ 4,991,396 |
| **Liabilities and Stockholders' Equity** | | | |
| Current liabilities | | | |
| Accounts payable | $ 649,116 | $ 560,331 | $ 613,307 |
| Accrued expenses | 354,643 | 317,963 | 460,165 |
| Customer refund liabilities (Note 11) | 160,533 | 159,628 | 164,294 |
| Operating lease liabilities (Note 5) | 140,990 | 134,833 | 138,664 |
| Other current liabilities | 51,609 | 125,840 | 73,746 |
| Total current liabilities | 1,356,891 | 1,298,595 | 1,450,176 |
| Long term debt, net of current maturities (Note 8) | 674,478 | 672,286 | 662,531 |
| Operating lease liabilities, non-current (Note 5) | 705,713 | 668,983 | 703,111 |
| Other long-term liabilities | 121,598 | 84,014 | 86,584 |
| Total liabilities | 2,858,680 | 2,723,878 | 2,902,402 |
| Stockholders' equity (Note 10) | | | |
| Class A Common Stock, $0.0003 1/3 par value; 400,000,000 shares authorized as of March 31, 2023, March 31, 2022 and December 31, 2021; 188,704,689 shares issued and outstanding as of March 31, 2023 (March 31, 2022: 188,668,560 and December 31, 2021: 188,650,987) | 63 | 63 | 63 |
| Class B Convertible Common Stock, $0.0003 1/3 par value; 34,450,000 shares authorized, issued and outstanding as of March 31, 2023, March 31, 2022 and December 31, 2021 | 11 | 11 | 11 |
| Class C Common Stock, $0.0003 1/3 par value; 400,000,000 shares authorized as of March 31, 2023, March 31, 2022 and December 31, 2021; 221,346,517 shares issued and outstanding as of March 31, 2023 (March 31, 2022: 238,472,217 and December 31, 2021: 253,161,064) | 73 | 79 | 84 |
| Additional paid-in capital | 1,136,536 | 1,046,961 | 1,108,613 |
| Retained earnings | 929,562 | 721,926 | 1,027,833 |
| Accumulated other comprehensive income (loss) | (67,842) | (40,086) | (47,610) |
| Total stockholders' equity | 1,998,403 | 1,728,954 | 2,088,994 |
| Total liabilities and stockholders' equity | $ 4,857,083 | $ 4,452,832 | $ 4,991,396 |

Commitments and Contingencies (Note 9)
Related Party Transactions (Note 20)

See accompanying notes.

**Under Armour, Inc. and Subsidiaries**

**Consolidated Statements of Operations**
**(In thousands, except per share amounts)**

| | Year Ended March 31, 2023 | Three Months Ended March 31, 2022 (Transition Period) | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
|---|---|---|---|---|
| Net revenues | $ 5,903,636 | $ 1,300,945 | $ 5,683,466 | $ 4,474,667 |
| Cost of goods sold | 3,254,296 | 695,781 | 2,821,967 | 2,314,572 |
| Gross profit | 2,649,340 | 605,164 | 2,861,499 | 2,160,095 |
| Selling, general and administrative expenses | 2,365,529 | 594,446 | 2,334,691 | 2,171,934 |
| Restructuring and impairment charges | — | 56,674 | 40,518 | 601,599 |
| Income (loss) from operations | 283,811 | (45,956) | 486,290 | (613,438) |
| Interest income (expense), net | (12,826) | (6,154) | (44,300) | (47,259) |
| Other income (expense), net | 16,780 | (51) | (51,113) | 168,153 |
| Income (loss) before income taxes | 287,765 | (52,161) | 390,877 | (492,544) |
| Income tax expense (benefit) | (101,046) | 8,181 | 32,072 | 49,387 |
| Income (loss) from equity method investments | (2,042) | 732 | 1,255 | (7,246) |
| Net income (loss) | $ 386,769 | $ (59,610) | $ 360,060 | $ (549,177) |
| | | | | |
| Basic net income (loss) per share of Class A, B and C common stock (Note 18) | $ 0.86 | $ (0.13) | $ 0.77 | $ (1.21) |
| Diluted net income (loss) per share of Class A, B and C common stock (Note 18) | $ 0.84 | $ (0.13) | $ 0.77 | $ (1.21) |
| | | | | |
| **Weighted average common shares outstanding Class A, B and C common stock** | | | | |
| Basic | 451,426 | 471,425 | 465,504 | 454,089 |
| Diluted | 461,509 | 471,425 | 468,644 | 454,089 |

See accompanying notes.

**Under Armour, Inc. and Subsidiaries**

**Consolidated Statements of Comprehensive Income (Loss)**
**(In thousands)**

| | Year Ended March 31, 2023 | | Three Months Ended March 31, 2022 (Transition Period) | | Year Ended December 31, 2021 | | Year Ended December 31, 2020 |
|---|---|---|---|---|---|---|---|
| Net income (loss) | $ | 386,769 | $ | (59,610) | $ | 360,060 | $ (549,177) |
| Other comprehensive income (loss): | | | | | | | |
| Foreign currency translation adjustment | | (10,402) | | 7,045 | | (6,552) | (5,060) |
| Unrealized gain (loss) on cash flow hedges, net of tax benefit (expense) of $6,241, $(909), $(5,725) and $1,791 for the year ended March 31, 2023, three months ended March 31, 2022 and years ended December 31, 2021, 2020, respectively. | | 1,473 | | 758 | | 18,603 | (18,075) |
| Gain (loss) on intra-entity foreign currency transactions | | (18,827) | | (279) | | (476) | 14,715 |
| Total other comprehensive income (loss) | | (27,756) | | 7,524 | | 11,575 | (8,420) |
| Comprehensive income (loss) | $ | 359,013 | $ | (52,086) | $ | 371,635 | $ (557,597) |

See accompanying notes.

51

**Under Armour, Inc. and Subsidiaries**

**Consolidated Statements of Stockholders' Equity**

**(In thousands)**

| | Class A Common Stock | | Class B Convertible Common Stock | | Class C Common Stock | | Additional Paid-in-Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Total Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| **Balance as of December 31, 2019** | 188,290 | $  62 | 34,450 | $  11 | 229,028 | $  76 | $ 973,717 | $1,226,986 | $  (50,765) | $ 2,150,087 |
| Exercise of stock options | 148 | — | — | — | 136 | — | 517 | — | — | 517 |
| Shares withheld in consideration of employee tax obligations relative to stock-based compensation arrangements | (1) | — | — | — | (262) | — | — | (3,954) | — | (3,954) |
| Issuance of Class A Common Stock, net of forfeitures | 166 | — | — | — | — | — | — | — | — | — |
| Issuance of Class C Common Stock, net of forfeitures | — | — | — | — | 3,052 | 1 | 4,225 | — | — | 4,226 |
| Equity component value of convertible note issuance, net | — | — | — | — | — | — | 40,644 | — | — | 40,644 |
| Stock-based compensation expense | — | — | — | — | — | — | 42,070 | — | — | 42,070 |
| Comprehensive income (loss) | — | — | — | — | — | — | — | (549,177) | (8,420) | (557,597) |
| **Balance as of December 31, 2020** | 188,603 | $  62 | 34,450 | $  11 | 231,954 | $  77 | $1,061,173 | $  673,855 | $  (59,185) | $ 1,675,993 |
| Exercise of stock options | 6 | — | — | — | 7 | — | 23 | — | — | 23 |
| Shares withheld in consideration of employee tax obligations relative to stock-based compensation arrangements | — | — | — | — | (291) | — | — | (6,082) | — | (6,082) |
| Issuance of Class A Common Stock, net of forfeitures | 42 | 1 | — | — | — | — | — | — | — | 1 |
| Issuance of Class C Common Stock, net of forfeitures | — | — | — | — | 21,491 | 7 | 3,623 | — | — | 3,630 |
| Stock-based compensation expense | — | — | — | — | — | — | 43,794 | — | — | 43,794 |
| Comprehensive income (loss) | — | — | — | — | — | — | — | 360,060 | 11,575 | 371,635 |
| **Balance as of December 31, 2021** | 188,651 | $  63 | 34,450 | $  11 | 253,161 | $  84 | $1,108,613 | $1,027,833 | $  (47,610) | $ 2,088,994 |
| Adoption of ASU 2020-06 | — | — | — | — | — | — | (14,351) | 5,144 | — | (9,207) |
| Shares withheld in consideration of employee tax obligations relative to stock-based compensation arrangements | — | — | — | — | — | — | — | (11,446) | — | (11,446) |
| Class C Common Stock repurchased | — | — | — | — | (16,151) | (5) | (60,000) | (239,995) | — | (300,000) |
| Issuance of Class A Common Stock, net of forfeitures | 18 | — | — | — | — | — | — | — | — | — |
| Issuance of Class C Common Stock, net of forfeitures | — | — | — | — | 1,462 | — | 935 | — | — | 935 |
| Stock-based compensation expense | — | — | — | — | — | — | 11,764 | — | — | 11,764 |
| Comprehensive income (loss) | — | — | — | — | — | — | — | (59,610) | 7,524 | (52,086) |
| **Balance as of March 31, 2022** | 188,669 | $  63 | 34,450 | $  11 | 238,472 | $  79 | $1,046,961 | $  721,926 | $  (40,086) | $ 1,728,954 |
| Exercise of stock options | — | — | — | — | — | — | — | — | — | — |
| Shares withheld in consideration of employee tax obligations relative to stock-based compensation arrangements | — | — | — | — | — | — | — | (5,151) | — | (5,151) |
| Class C Common Stock repurchased | — | — | — | — | (18,725) | (6) | 48,988 | (173,982) | — | (125,000) |
| Issuance of Class A Common Stock, net of forfeitures | 36 | — | — | — | — | — | — | — | — | — |
| Issuance of Class C Common Stock, net of forfeitures | — | — | — | — | 1,600 | — | 3,776 | — | — | 3,776 |
| Stock-based compensation expense | — | — | — | — | — | — | 36,811 | — | — | 36,811 |
| Comprehensive income (loss) | — | — | — | — | — | — | — | 386,769 | (27,756) | 359,013 |
| **Balance as of March 31, 2023** | 188,705 | $  63 | 34,450 | $  11 | 221,347 | $  73 | $1,136,536 | $  929,562 | $  (67,842) | $ 1,998,403 |

See accompanying notes.

**Under Armour, Inc. and Subsidiaries**

**Consolidated Statements of Cash Flows**
(In thousands)

| | Year Ended March 31, 2023 | Three Months Ended March 31, 2022 (Transition Period) | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
|---|---|---|---|---|
| **Cash flows from operating activities** | | | | |
| Net income (loss) | $ 386,769 | $ (59,610) | $ 360,060 | $ (549,177) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities | | | | |
| Depreciation and amortization | 137,620 | 34,960 | 141,144 | 164,984 |
| Unrealized foreign currency exchange rate (gain) loss | (8,463) | (8,585) | 18,877 | (9,295) |
| Loss on extinguishment of senior convertible notes | — | — | 58,526 | — |
| Loss on disposal of property and equipment | 2,619 | 1,604 | 4,468 | 3,740 |
| Gain on sale of the MyFitnessPal platform | — | — | — | (179,318) |
| Non-cash restructuring and impairment charges | 1,959 | (1,871) | 26,938 | 470,543 |
| Amortization of bond premium and debt issuance costs | 2,192 | 549 | 16,891 | 12,070 |
| Stock-based compensation | 36,811 | 11,764 | 43,794 | 42,070 |
| Deferred income taxes | (152,403) | (2,500) | (2,642) | 43,992 |
| Changes in reserves and allowances | 11,696 | (5,250) | (25,766) | 10,347 |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable | (62,162) | (131,988) | (31,153) | 167,614 |
| Inventories | (373,714) | (6,425) | 93,287 | 15,306 |
| Prepaid expenses and other assets | (36,652) | (4,326) | 10,224 | 18,603 |
| Other non-current assets | (52,795) | 27,628 | 79,782 | (259,735) |
| Accounts payable | 77,558 | (54,970) | 26,027 | (40,673) |
| Accrued expenses and other liabilities | 12,081 | (122,589) | (114,794) | 318,532 |
| Customer refund liability | 851 | (4,398) | (38,861) | (19,250) |
| Income taxes payable and receivable | 6,119 | 4,564 | (1,973) | 2,511 |
| Net cash provided by (used in) operating activities | (9,914) | (321,443) | 664,829 | 212,864 |
| **Cash flows from investing activities** | | | | |
| Purchases of property and equipment | (187,796) | (39,923) | (69,759) | (92,291) |
| Sale of property and equipment | — | — | 1,413 | — |
| Earn-out from the sale of MyFitnessPal platform | 35,000 | — | — | — |
| Sale of MyFitnessPal platform | — | — | — | 198,916 |
| Purchase of businesses | — | — | — | (40,280) |
| Net cash provided by (used in) investing activities | (152,796) | (39,923) | (68,346) | 66,345 |
| **Cash flows from financing activities** | | | | |
| Proceeds from long-term debt and revolving credit facility | — | — | — | 1,288,753 |
| Payments on long-term debt and revolving credit facility | — | — | (506,280) | (800,000) |
| Proceeds from capped call | — | — | 91,722 | — |
| Purchase of capped call | — | — | — | (47,850) |
| Common shares repurchased | (125,000) | (300,000) | — | — |
| Employee taxes paid for shares withheld for income taxes | (5,151) | (11,446) | (5,983) | (3,675) |
| Proceeds from exercise of stock options and other stock issuances | 3,776 | 934 | 3,688 | 4,744 |
| Payments of debt financing costs | — | — | (1,884) | (5,219) |
| Other financing fees | — | — | — | 100 |
| Net cash provided by (used in) financing activities | (126,375) | (310,512) | (418,737) | 436,853 |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | (5,315) | 11,134 | (23,391) | 16,445 |
| Net increase (decrease) in cash, cash equivalents and restricted cash | (294,400) | (660,744) | 154,355 | 732,507 |
| **Cash, cash equivalents and restricted cash** | | | | |
| Beginning of period | 1,022,126 | 1,682,870 | 1,528,515 | 796,008 |
| End of period | $ 727,726 | $ 1,022,126 | $ 1,682,870 | $ 1,528,515 |

**Under Armour, Inc. and Subsidiaries**

**Consolidated Statements of Cash Flows**
**(In thousands)**

| | Year Ended March 31, 2023 | Three Months Ended March 31, 2022 (Transition Period) | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
|---|---|---|---|---|
| **Non-cash investing and financing activities** | | | | |
| Change in accrual for property and equipment | $ 7,581 | $ (23,533) | $ 19,214 | $ (13,875) |
| **Other supplemental information** | | | | |
| Cash paid (received) for income taxes, net of refunds | $ 28,542 | $ 6,851 | $ 42,623 | $ 24,443 |
| Cash paid (received) for interest, net of capitalized interest | $ 19,218 | $ 7,120 | $ 25,226 | $ 28,626 |

| Reconciliation of cash, cash equivalents and restricted cash | March 31, 2023 | March 31, 2022 | December 31, 2021 | December 31, 2020 |
|---|---|---|---|---|
| Cash and cash equivalents | $ 711,910 | $ 1,009,139 | $ 1,669,453 | $ 1,517,361 |
| Restricted cash | 15,816 | 12,987 | 13,417 | 11,154 |
| Total cash, cash equivalents and restricted cash | $ 727,726 | $ 1,022,126 | $ 1,682,870 | $ 1,528,515 |

See accompanying notes.

**Under Armour, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements**
**(Tabular amounts in thousands, except share and per share data)**

## NOTE 1. DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION

**Business**

Under Armour, Inc. (together with its wholly owned subsidiaries, the "Company") is a developer, marketer and distributor of branded athletic performance apparel, footwear and accessories. The Company creates products engineered to make athletes better with a vision to inspire performance solutions you never knew you needed and can't imagine living without. The Company's products are made, sold and worn worldwide.

**Fiscal Year End Change**

As previously disclosed, the Company changed its fiscal year end from December 31 to March 31, effective for the fiscal year beginning April 1, 2022. The Company's current fiscal year began on April 1, 2022 and ended on March 31, 2023 ("Fiscal 2023"). This Annual Report on Form 10-K refers to the period beginning on January 1, 2022 and ending March 31, 2022 as the "Transition Period". The Company filed a Transition Report on Form 10-QT that included financial information for the Transition Period with the SEC on May 9, 2022. The Company's 2021 fiscal year began on January 1, 2021 and ended on December 31, 2021 ("Fiscal 2021"). There was no Fiscal 2022.

**Basis of Presentation**

The accompanying Consolidated Financial Statements are presented in U.S. Dollars and include the accounts of Under Armour, Inc. and its wholly owned subsidiaries and were prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). Intercompany balances and transactions were eliminated upon consolidation. Throughout this Annual Report on Form 10-K, in addition to the terms Fiscal 2023, Transition Period and Fiscal 2021 which are defined above, the term "Fiscal 2020" means the Company's fiscal year beginning January 1, 2020 and ended December 31, 2020.

*Reclassifications*

As previously disclosed, beginning in the first quarter of Fiscal 2021, the Company no longer reports Connected Fitness as a discrete reportable segment. Where applicable, all prior periods that used to separately reflect financial information about the Connected Fitness business have been recast to be included within the Corporate Other reportable segment, in order to conform with current period presentation. Such reclassifications did not affect total consolidated net revenues, consolidated income from operations or consolidated net income.

Additionally, certain prior period comparative amounts in Note 17 and Note 18 have been reclassified to conform to the current period presentation. Such reclassifications were not material and did not not affect the consolidated financial statements.

**Management Estimates and COVID-19 Update**

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates, judgments, and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the Consolidated Financial Statements and the reported amounts of revenues and expenses during the reporting period. These estimates, judgments and assumptions are evaluated on an on-going basis. The Company bases its estimates on historical experience and on various other assumptions that it believes are reasonable at that time; however, actual results could differ from these estimates.

As the impacts of major global events, including the COVID-19 pandemic, continue to evolve, estimates and assumptions about future events and their effects cannot be determined with certainty and therefore require increased judgment. The extent to which the evolving events impact the Company's financial statements will depend on a number of factors including, but not limited to, any new information that may emerge concerning the severity of these major events and the actions that governments around the world may take in response. While the Company believes it has made appropriate accounting estimates and assumptions based on the facts and circumstances available as of this reporting date, the Company may experience further impacts based on long-term effects on the Company's customers and the countries in which the Company operates. Please see the risk factors discussed in Part I, Item 1A "Risk Factors" of this Annual Report on Form 10-K.

**NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Cash, Cash Equivalents and Restricted Cash**

In accordance with Accounting Standards Codification ("ASC") Topic 305 "Cash and Cash Equivalents", the Company considers all highly liquid investments with an original maturity of three months or less at the date of purchase to be cash and cash equivalents. The Company's restricted cash is reserved for cash collateral held for standby letters of credit and payments related to claims for its captive insurance program, which is included in prepaid expenses and other current assets on the Company's Consolidated Balance Sheets.

**Concentration of Credit Risk**

Financial instruments that subject the Company to significant concentration of credit risk consist primarily of accounts receivable. The majority of the Company's accounts receivable is due from large wholesale customers. As of March 31, 2023, no single customer accounted for more than 10% of the Company's accounts receivable balance. As of March 31, 2022 and December 31, 2021, one customer accounted for more than 10% of the Company's accounts receivable balance. For Fiscal 2023, no single customer accounted for more than 10% of the Company's net revenues. For Fiscal 2021, one customer within the North America region accounted for approximately 11% of the Company's net revenues. For Fiscal 2020 and the Transition Period, no single customer accounted for more than 10% of the Company's net revenues.

**Accounts Receivable and Credit Losses - Allowance for Doubtful Accounts**

The Company is exposed to credit losses primarily through customer receivables associated with the sale of products within the Company's wholesale channel and through credit card receivables associated with the sale of products within the Company's direct-to-consumer channel, recorded within accounts receivable, net on the Company's Consolidated Balance Sheets. The Company also has other receivables, including receivables from licensing arrangements recorded in prepaid expenses and other current assets on the Company's Consolidated Balance Sheets.

Credit is extended to wholesale customers based on a credit review. The credit review considers each customer's financial condition, including a review of the customer's established credit rating or, if an established credit rating is not available, then the Company's assessment of the customer's creditworthiness is based on their financial statements, local industry practices, and business strategy. A credit limit and invoice terms are established for each customer based on the outcome of this review. To mitigate credit risk from the wholesale channel, the Company may require customers to provide security in the form of guarantees, letters of credit, deposits, collateral or prepayment. Further, to mitigate certain risk from other wholesale customers, the Company has acquired specific trade accounts receivable insurance policies.

The allowance for doubtful accounts is based on the Company's assessment of the collectability of customer accounts receivable. In accordance with ASC Topic 326 "Financial Instruments - Credit Losses", the Company makes ongoing estimates relating to the collectability of accounts receivable and records an allowance for estimated losses expected from the inability of its customers to make required payments. The Company establishes expected credit losses by evaluating historical levels of credit losses, current economic conditions that may affect a customer's ability to pay, and creditworthiness of significant customers. These inputs are used to determine a range of expected credit losses and an allowance is recorded within the range. Accounts receivable are written off when there is no reasonable expectation of recovery.

**Inventories**

Inventories consist primarily of finished goods. Costs of finished goods inventories include all costs incurred to bring inventory to its current condition, including inbound freight, duties and other costs. In accordance with ASC Topic 330 "Inventory", the Company values its inventory at standard cost which approximates landed cost, using the first-in, first-out method of cost determination. Net realizable value is estimated based upon assumptions made about future demand and retail market conditions. If the Company determines that the estimated net realizable value of its inventory is less than the carrying value of such inventory, it records a charge to cost of goods sold to reflect the lower of cost or net realizable value. If actual market conditions are less favorable than those projected by the Company, further adjustments may be required that would increase the cost of goods sold in the period in which such a determination was made.

**Property and Equipment**

In accordance with ASC Topic 360 "Property, Plant and Equipment", property and equipment are stated at cost less accumulated depreciation. The Company includes the cost associated with software customized for internal use within Property and Equipment on the Company's Consolidated Balance Sheets. Property and equipment is depreciated using the straight-line method over the estimated useful lives of the assets, as follows:

| | Years |
|---|---|
| Furniture, fixtures and displays, office equipment, software and plant equipment [1] | 3 to 10 |
| Site improvements, buildings and building equipment | 10 to 35 |
| Leasehold and tenant improvements | Shorter of the remaining lease term or related asset life |

[1] The cost of in-store apparel and footwear fixtures and displays are capitalized as part of "furniture, fixtures and displays", and depreciated over three years.

The Company periodically reviews its assets' estimated useful lives based upon actual experience and expected future utilization. A change in useful life is treated as a change in accounting estimate and is applied prospectively.

The Company capitalizes the cost of interest for long term property and equipment projects based on the Company's weighted average borrowing rates in place while the projects are in progress. Capitalized interest was $3.1 million as of March 31, 2023 (March 31, 2022: $1.1 million; December 31, 2021: $1.2 million).

Upon retirement or disposition of property and equipment, the cost and accumulated depreciation are removed from the accounts and any resulting gain or loss is reflected in selling, general and administrative expenses for that period. Major additions and betterments are capitalized to the asset accounts while maintenance and repairs are expensed as incurred.

**Leases**

The Company enters into operating leases domestically and internationally to lease certain warehouse space, office facilities, space for its Brand and Factory House stores, and certain equipment under non-cancelable operating leases. The leases expire at various dates through 2035, excluding extensions at the Company's option, and include provisions for rental adjustments.

In accordance with ASC Topic 842 "Leases", the Company accounts for a contract as a lease when it has the right to direct the use of the asset for a period of time while obtaining substantially all of the asset's economic benefits. The Company determines the initial classification and measurement of its right-of-use ("ROU") assets and lease liabilities at the lease commencement date and thereafter if modified. ROU assets represent the Company's right to control the underlying assets under lease, over the contractual term. ROU assets and lease liabilities are recognized on the Consolidated Balance Sheets based on the present value of future minimum lease payments to be made over the lease term. ROU assets and lease liabilities are established on the Company's Consolidated Balance Sheets for leases with an expected term greater than one year. Short-term lease payments were not material for Fiscal 2023, Fiscal 2021, Fiscal 2020 and the Transition Period.

As the rate implicit in a lease is not readily determinable, the Company uses its secured incremental borrowing rate to determine the present value of the lease payments. The Company calculates the incremental borrowing rate based on the current market yield curve and adjusts for foreign currency impacts for international leases.

Fixed lease costs are included in the recognition of ROU assets and lease liabilities. Variable lease costs are not included in the measurement of the lease liability. These variable lease payments are recognized in the Consolidated Statements of Operations in the period in which the obligation for those payments is incurred. Variable lease payments primarily consist of payments dependent on sales in Brand and Factory House stores. The Company has elected to combine lease and non-lease components in the determination of lease costs for its leases. The lease liability includes lease payments related to options to extend or renew the lease term only if the Company is reasonably certain to exercise those options.

**Goodwill, Intangible Assets and Long-Lived Assets**

Goodwill and intangible assets are recorded at their estimated fair values at the date of acquisition and are allocated to the reporting units that are expected to receive the related benefits. Goodwill and indefinite lived intangible assets are not amortized and, in accordance with ASC Topic 350-20 "Goodwill", are required to be tested for impairment at least annually or sooner whenever events or changes in circumstances indicate that it is more

likely than not that the fair value of the reporting unit is less than its carrying amount. In conducting an annual impairment test, the Company first reviews qualitative factors to determine whether it is more likely than not that the fair value of the reporting unit is less than its carrying amount. If factors indicate that is the case, the Company performs the goodwill impairment test. The Company compares the fair value of the reporting unit with its carrying amount. The Company estimates fair value using the discounted cash flows model, under the income approach, which indicates the fair value of the reporting unit based on the present value of the cash flows that the Company expects the reporting unit to generate in the future. The Company's significant estimates in the discounted cash flows model include: the Company's weighted average cost of capital, long-term rate of growth and profitability of the reporting unit's business, and working capital effects. If the carrying amount of a reporting unit exceeds its fair value, goodwill is impaired to the extent that the carrying value exceeds the fair value of the reporting unit. The Company performs its annual impairment testing in the fourth quarter of each fiscal year. No goodwill impairments were recorded during Fiscal 2023, Fiscal 2021 or the Transition Period. During Fiscal 2020, as a result of the impacts of COVID-19, the Company determined that sufficient indicators existed to trigger an interim goodwill impairment analysis for all of the Company's reporting units. The Company recognized goodwill impairment charges of $51.6 million for the Latin America reporting unit and the Canada reporting unit, which is within the North America operating segment.

The Company continually evaluates whether events and circumstances have occurred that indicate the remaining estimated useful life of long-lived assets may warrant revision or that the remaining balance may not be recoverable. These factors may include a significant deterioration of operating results, changes in business plans, or changes in anticipated cash flows. When factors indicate that an asset should be evaluated for possible impairment, the Company reviews long-lived assets to assess recoverability from future operations using undiscounted cash flows. If future undiscounted cash flows are less than the carrying value, an impairment is recognized in earnings to the extent that the carrying value exceeds fair value.

During Fiscal 2023, the Company performed an impairment analysis on its long-lived assets, including retail stores at an individual store level and determined that certain long-lived assets had net carrying values that exceeded their estimated undiscounted future cash flows. Accordingly, the Company estimated the fair values of these long-lived assets based on their market rent assessments or discounted cash flows and compared these estimated fair values to the net carrying values. The significant estimates used in the fair value methodology, which are based on Level 3 inputs, include: the Company's expectations for future operations and projected cash flows, including net revenue, gross profit and operating expenses and market conditions, including estimated market rent. As a result, the Company recorded $2.0 million of long-lived asset impairment charges within selling, general and administrative expenses on the Consolidated Statements of Operations and as a reduction to the related asset balances on the Consolidated Balance Sheets. The long-lived asset impairment charges for Fiscal 2023 are included within the Company's operating segments as follows: $1.4 million recorded in North America and $0.6 million recorded in Asia-Pacific.

During Fiscal 2021, the Company recorded $2.0 million of long-lived asset impairment charges within selling, general and administrative expenses on the Consolidated Statements of Operations and as a reduction to the related asset balances on the Consolidated Balance Sheets. During Fiscal 2020, as a result of the impacts of COVID-19, the Company recorded $89.7 million of long-lived asset impairment charges as part of the Company's restructuring and impairment charges on the Consolidated Statements of Operations. Additionally, in connection with the Company's 2020 restructuring plan, the Company recognized $1.7 million and $290.8 million of long-lived asset impairment charges related to the Company's New York City flagship store during Fiscal 2021 and Fiscal 2020, respectively. Refer to Note 12 for a further discussion of the restructuring and related impairment charges.There were no impairment charges taken during the Transition Period.

## Accrued Expenses

Accrued expenses consisted of the following:

| | As of March 31, 2023 | As of March 31, 2022 | As of December 31, 2021 |
|---|---|---|---|
| Accrued compensation and benefits | $        66,742 | $        69,361 | $        151,887 |
| Accrued marketing | 39,832 | 41,854 | 58,754 |
| Accrued royalties | 25,415 | 17,262 | 16,386 |
| Accrued taxes | 26,297 | 20,055 | 35,588 |
| Forward currency contract liabilities | 28,067 | 12,303 | 13,193 |
| Other | 168,290 | 157,128 | 184,357 |
| Total Accrued Expenses | $        354,643 | $        317,963 | $        460,165 |

**Revenue Recognition**

The Company recognizes revenue in accordance with ASC Topic 606 "Revenue from Contracts with Customers". Net revenues primarily consist of net sales of apparel, footwear and accessories, license revenues and revenues from digital subscriptions, advertising and other digital business.

The Company recognizes revenue when it satisfies its performance obligations by transferring control of promised products or services to its customers, which occurs either at a point in time or over time, depending on when the customer obtains the ability to direct the use of and obtain substantially all of the remaining benefits from the products or services. The amount of revenue recognized considers terms of sale that create variability in the amount of consideration that the Company ultimately expects to be entitled to in exchange for the products or services and is subject to an overall constraint that a significant revenue reversal will not occur in future periods. Sales taxes imposed on the Company's revenues from product sales are presented on a net basis on the Consolidated Statements of Operations, and therefore do not impact net revenues or costs of goods sold.

Revenue transactions associated with the sale of apparel, footwear, and accessories, comprise a single performance obligation, which consists of the sale of products to customers either through wholesale or direct-to-consumer channels. The Company satisfies the performance obligation and records revenues when transfer of control has passed to the customer, based on the terms of sale. In the Company's wholesale channel, transfer of control is based upon shipment under free on board shipping point for most goods or upon receipt by the customer depending on the country of the sale and the agreement with the customer. The Company may also ship product directly from its supplier to wholesale customers and recognize revenue when the product is delivered to and accepted by the customer. In the Company's direct-to-consumer channel, transfer of control takes place at the point of sale for Brand and Factory House customers and upon shipment to substantially all e-commerce customers. Payment terms for wholesale transactions are established in accordance with local and industry practices. Payment is generally required within 30 to 60 days of shipment to or receipt by the wholesale customer in the United States, and generally within 60 to 90 days of shipment to or receipt by the wholesale customer internationally. From time to time, based on market circumstances, the Company does grant certain customers with longer than average payment terms. Payment is generally due at the time of sale for direct-to-consumer transactions.

Gift cards issued to customers by the Company are recorded as contract liabilities until they are redeemed, at which point revenue is recognized. During the year-ended March 31, 2023, the Company completed an assessment of its process for estimating revenue recognized for gift card balances not expected to be redeemed ("breakage"). Based on the assessment, which included analyzing historical gift card redemption data, the Company has determined that substantially all of its gift cards are redeemed within 24 months of issuance, and after 24 months the likelihood of a gift card being redeemed is remote. Therefore, to the extent that it does not have a legal obligation to remit the value of such unredeemed gift cards to the relevant jurisdiction as unclaimed or abandoned property, the Company recognizes gift card breakage at that time when the likelihood of the gift card being redeemed is remote, which the Company has determined to be 24 months following its issuance.

The Company offers customer loyalty programs in which customers earn points based on purchases and other promotional activities that can be redeemed for discounts on future purchases or other rewards. A contract liability is estimated based on the standalone selling price of benefits earned by customers through the programs and the related redemption experience under the programs. The value of each point earned is recorded as deferred revenue and is included within accrued expenses on the Consolidated Balance Sheets.

Revenue from the Company's licensing arrangements is recognized over time during the period that licensees are provided access to the Company's trademarks and benefit from such access through their sales of licensed products. These arrangements require licensees to pay a sales-based royalty, which for most arrangements may be subject to a contractually guaranteed minimum royalty amount. Payments are generally due quarterly. The Company recognizes revenue for sales-based royalty arrangements (including those for which the royalty exceeds any contractually guaranteed minimum royalty amount) as licensed products are sold by the licensee. If a sales-based royalty is not ultimately expected to exceed a contractually guaranteed minimum royalty amount, the minimum is recognized as revenue over the contractual period, if all other criteria of revenue recognition have been met. This sales-based output measure of progress and pattern of recognition best represents the value transferred to the licensee over the term of the arrangement, as well as the amount of consideration that the Company is entitled to receive in exchange for providing access to its trademarks.

Revenue from digital subscriptions is recognized on a gross basis and is recognized over the term of the subscription. The Company receives payments in advance of revenue recognition for subscriptions and these payments are recorded as contract liabilities in the Company's Consolidated Balance Sheets. Commissions related to subscription revenue are capitalized and recognized over the subscription period, which are included in selling,

general and administrative expense in the Consolidated Statements of Operations. Revenue from digital advertising is recognized as the Company satisfies performance obligations pursuant to customer insertion orders.

The Company records reductions to revenue for estimated customer returns, allowances, markdowns, and discounts. The Company bases its estimates on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by the Company. The actual amount of customer returns and allowances, which is inherently uncertain, may differ from the Company's estimates. If the Company determines that actual or expected returns or allowances are significantly higher or lower than the reserves it established, it would record a reduction or increase, as appropriate, to net sales in the period in which it makes such a determination. Provisions for customer specific discounts are based on negotiated arrangements with certain major customers. Reserves for returns, allowances, markdowns, and discounts are included within customer refund liability and the value of inventory associated with reserves for sales returns are included within prepaid expenses and other current assets on the Consolidated Balance Sheets. At a minimum, the Company reviews and refines these estimates on a quarterly basis.

The Company has made a policy election to account for shipping and handling activities that occur after the customer has obtained control of a good as a fulfillment cost rather than an additional promised service. Additionally, the Company has elected not to disclose certain information related to unsatisfied performance obligations for subscriptions for its MMR platforms, as they have an original expected length of one year or less.

## Shipping and Handling Costs

The Company charges customers shipping and handling fees based on contractual terms, which are recorded in net revenues. The Company incurs freight costs associated with shipping goods to customers. These costs are recorded as a component of cost of goods sold.

The Company also incurs outbound handling costs associated with preparing goods to ship to customers and certain costs to operate the Company's distribution facilities. These costs are recorded as a component of selling, general and administrative expenses. For Fiscal 2023, these costs totaled $79.5 million (Fiscal 2021: $82.9 million; Fiscal 2020: $80.5 million; Transition Period: $17.3 million).

## Advertising Costs

Advertising costs are charged to selling, general and administrative expenses. Advertising production costs are expensed the first time an advertisement related to such production costs is run. Media placement costs are expensed in the month during which the advertisement appears, and costs related to event sponsorships are expensed when the event occurs. In addition, advertising costs include sponsorship expenses. Accounting for sponsorship payments is based upon specific contract provisions and the payments are generally expensed uniformly over the term of the contract after recording expense related to specific performance incentives once they are deemed probable. Advertising expense, including amortization of in-store marketing fixtures and displays, was $618.3 million for Fiscal 2023 (Fiscal 2021: $649.2 million; Fiscal 2020: $550.4 million; Transition Period: $173.2 million). As of March 31, 2023, prepaid advertising costs were $41.8 million (March 31, 2022: $30.3 million; December 31, 2021: $22.4 million).

## Income Taxes

In accordance with ASC Topic 740 "Income Taxes," income taxes are accounted for under the asset and liability method. Deferred income tax assets and liabilities are established for temporary differences between the financial reporting basis and the tax basis of the Company's assets and liabilities at tax rates expected to be in effect when such assets or liabilities are realized or settled. Deferred income tax assets are reduced by valuation allowances when necessary. The Company has made the policy election to record any liability associated with Global Intangible Low Tax Income ("GILTI") in the period in which it is incurred.

Assessing whether deferred tax assets are realizable requires significant judgment. The Company considers all available positive and negative evidence, including historical operating performance and expectations of future operating performance. The ultimate realization of deferred tax assets is often dependent upon future taxable income and therefore can be uncertain. To the extent the Company believes it is more likely than not that all or some portion of the asset will not be realized, valuation allowances are established against the Company's deferred tax assets, which increase income tax expense in the period when such a determination is made.

Income taxes include the largest amount of tax benefit for an uncertain tax position that is more likely than not to be sustained upon audit based on the technical merits of the tax position. Settlements with tax authorities, the expiration of statutes of limitations for particular tax positions or obtaining new information on particular tax positions

may cause a change to the effective tax rate. The Company recognizes accrued interest and penalties related to unrecognized tax benefits in the provision for income taxes line on the Consolidated Statements of Operations.

## Earnings per Share

Basic earnings per common share is computed by dividing net income available to common stockholders for the period by the weighted average number of common shares outstanding during the period. Any stock-based compensation awards that are determined to be participating securities, which are stock-based compensation awards that entitle the holders to receive dividends prior to vesting, are included in the calculation of basic earnings per share using the two class method. Diluted earnings per common share is computed by dividing net income available to common stockholders for the period by the diluted weighted average common shares outstanding during the period. Diluted earnings per share reflects the potential dilution from common shares issuable through stock options, warrants, restricted stock units, other equity awards and the Company's 1.50% convertible senior notes due 2024. Refer to Note 18 for a further discussion of earnings per share.

## Equity Method Investment

The Company has a common stock investment of 29.5% in its Japanese licensee. The Company accounts for its investment in its licensee under the equity method, given it has the ability to exercise significant influence, but not control, over the entity. The Company recorded its allocable share of its Japanese licensee's net income (loss) of $(2.5) million for Fiscal 2023, (Fiscal 2021: $1.8 million; Fiscal 2020: $3.5 million; Transition Period: $0.9 million) within income (loss) from equity method investment on the Consolidated Statements of Operations and as an adjustment to the invested balance within other long term assets on the Consolidated Balance Sheets. As of March 31, 2023, the carrying value of the Company's investment in its Japanese licensee was $0.3 million (March 31, 2022: $2.7 million; December 31, 2021: $1.8 million).

In connection with the license agreement with the Japanese licensee, the Company recorded license revenues of $36.8 million for Fiscal 2023 (Fiscal 2021: $42.4 million; Fiscal 2020: $40.1 million; Transition Period: $9.9 million). As of March 31, 2023, the Company had $7.6 million in licensing receivables outstanding, recorded in the prepaid expenses and other current assets line item within the Company's Consolidated Balance Sheets (March 31, 2022: $8.9 million; December 31, 2021: $17.1 million).

On March 2, 2020, as part of the Company's acquisition of Triple Pte. Ltd., the Company assumed 49.5% of common stock ownership in UA Sports (Thailand) Co., Ltd. ("UA Sports Thailand"). The Company accounts for its investment in UA Sports Thailand under the equity method, given it has the ability to exercise significant influence, but not control, over UA Sports Thailand. For Fiscal 2023, the Company recorded the allocable share of UA Sports Thailand's net income (loss) of $0.8 million (Fiscal 2021: $(0.6) million; Fiscal 2020: $(1.1) million; Transition Period: $(0.2) million) within income (loss) from equity method investment on the Consolidated Statements of Operations and as an adjustment to the invested balance within other long term assets on the Consolidated Balance Sheets. As of March 31, 2023, the carrying value of the Company's investment in UA Sports Thailand was $5.9 million (March 31, 2022: $5.7 million; December 31, 2021: $5.0 million).

## Stock-Based Compensation

The Company accounts for stock-based compensation in accordance with ASC Topic 718 "Compensation - Stock Compensation", which requires all stock-based compensation awards granted to be measured at fair value and recognized as an expense in the financial statements over the service period. In addition, this guidance requires that excess tax benefits related to stock-based compensation awards be reflected as operating cash flows.

The Company uses the Black-Scholes option-pricing model to estimate the fair market value of stock option awards and grant date fair value for other awards. The Company uses the "simplified method" to estimate the expected life of options, as permitted by accounting guidance. The "simplified method" calculates the expected life of a stock option equal to the time from grant to the midpoint between the vesting date and contractual term, taking into account all vesting tranches. The risk free interest rate is based on the yield for the U.S. Treasury bill with a maturity equal to the expected life of the stock option. Expected volatility is based on the Company's historical average. Compensation expense is recognized net of forfeitures on a straight-line basis over the total vesting period, which is the implied requisite service period. Compensation expense for performance-based awards is recorded over the implied requisite service period when achievement of the performance target is deemed probable.

The Company issues new shares of Class A Common Stock and Class C Common Stock upon exercise of stock options, grant of restricted stock or share unit conversion. Refer to Note 14 for further details on stock-based compensation.

**Fair Value of Financial Instruments**

The carrying amounts shown for the Company's cash and cash equivalents, accounts receivable and accounts payable approximate fair value because of the short term maturity of those instruments. As of March 31, 2023, the fair value of the Company's 3.250% Senior Notes were $553.9 million (March 31, 2022: $580.0 million; December 31, 2021: $619.9 million). The fair value of the Company's 1.50% Convertible Senior Notes, was $85.8 million as of March 31, 2023 (March 31, 2022: $126.6 million; December 31, 2021: $149.6 million). The fair value of the Company's other long term debt approximates its carrying value based on the variable nature of interest rates and current market rates available to the Company. The fair value of a foreign currency contract is based on the net difference between the U.S. dollars to be received or paid at the contracts' settlement date and the U.S. dollar value of the foreign currency to be sold or purchased at the current exchange rate. The fair value of an interest rate swap contract is based on the net difference between the fixed interest to be paid and variable interest to be received over the term of the contract based on current market rates.

**Derivatives and Hedging Activities**

The Company uses derivative financial instruments in the form of foreign currency and interest rate swap contracts to minimize the risk associated with foreign currency exchange rate and interest rate fluctuations. The Company accounts for derivative financial instruments in accordance with ASC Topic 815 "Derivatives and Hedging". This guidance establishes accounting and reporting standards for derivative financial instruments and requires all derivatives to be recognized as either assets or liabilities on the balance sheet and to be measured at fair value. Unrealized derivative gain positions are recorded as other current assets or other long term assets, and unrealized derivative loss positions are recorded as other current liabilities or other long term liabilities, depending on the derivative financial instrument's maturity date.

For contracts designated as cash flow hedges, changes in fair value are reported as other comprehensive income and are recognized in current earnings in the period or periods during which the hedged transaction affects current earnings. One of the criteria for this accounting treatment is the notional value of these derivative contracts should not be in excess of specifically identified anticipated transactions. By their very nature, the Company's estimates of the anticipated transactions may fluctuate over time and may ultimately vary from actual transactions. When anticipated transaction estimates or actual transaction amounts decline below hedged levels, or if it is no longer probable a forecasted transaction will occur by the end of the originally specified time period or within an additional two-month period of time, the Company is required to reclassify the cumulative change in fair value of the over-hedged portion of the related hedge contract from Other comprehensive income (loss) to Other expense, net during the period in which the decrease occurs. The Company does not enter into derivative financial instruments for speculative or trading purposes.

**Foreign Currency Translation and Transactions**

The functional currency for each of the Company's wholly owned foreign subsidiaries is generally the applicable local currency. In accordance with ASC Topic 830 "Foreign Currency Matters", the translation of foreign currencies into U.S. dollars is performed for assets and liabilities using current foreign currency exchange rates in effect at the balance sheet date and for revenue and expense accounts using average foreign currency exchange rates during the period. Capital accounts are translated at historical foreign currency exchange rates. Translation gains and losses are included in stockholders' equity as a component of accumulated other comprehensive income. Adjustments that arise from foreign currency exchange rate changes on transactions, primarily driven by intercompany transactions, denominated in a currency other than the functional currency are included in other expense, net on the Consolidated Statements of Operations.

**Recently Adopted Account Pronouncements**

The Company assesses the applicability and impact of all Accounting Standard Updates ("ASUs"). There were no ASUs adopted during Fiscal 2023.

**Recently Issued Accounting Pronouncements**

In September 2022, the Financial Accounting Standards Board ("FASB") issued ASU 2022-04 "Liabilities - Supplier Finance Programs (Subtopic 405-50)" ("ASU 2022-04") which requires entities to disclose the key terms of supplier finance programs used in connection with the purchase of goods and services along with information about their obligations under these programs, including a rollforward of those obligations. The Company adopted ASU 2022-04 on April 1, 2023 on a retrospective basis, except for the amendments relating to the rollforward requirement, which are required to be adopted on April 1, 2024 on a prospective basis. The adoption did not have a material impact on the Company's Consolidated Financial Statements and related disclosures.

## NOTE 3. ALLOWANCE FOR DOUBTFUL ACCOUNTS

The Company's allowance for doubtful accounts was established with information available as of March 31, 2023, including reasonable and supportable estimates of future risk. The following table illustrates the activity in the Company's allowance for doubtful accounts:

| | Allowance for doubtful accounts - within accounts receivable, net | Allowance for doubtful accounts - within prepaid expenses and other current assets [1] |
|---|---|---|
| Balance as of December 31, 2020 | $ 20,350 | $ 7,029 |
| Increases (decreases) to costs and expenses | (3,821) | — |
| Write-offs, net of recoveries | (9,401) | — |
| Balance as of December 31, 2021 | $ 7,128 | $ 7,029 |
| Increases (decreases) to costs and expenses | (36) | — |
| Write-offs, net of recoveries | 21 | — |
| Balance as of March 31, 2022 | $ 7,113 | $ 7,029 |
| Increases (decreases) to costs and expenses | 5,193 | |
| Write-offs, net of recoveries | (1,493) | (6,802) |
| Balance as of March 31, 2023 | $ 10,813 | $ 227 |

[1] Includes an allowance pertaining to a royalty receivable.

## NOTE 4. PROPERTY AND EQUIPMENT, NET

Property and equipment consisted of the following:

| | As of March 31, 2023 | As of March 31, 2022 | As of December 31, 2021 |
|---|---|---|---|
| Leasehold and tenant improvements | $ 462,721 | $ 461,394 | $ 462,588 |
| Furniture, fixtures and displays | 289,539 | 263,749 | 259,534 |
| Buildings | 48,632 | 48,382 | 48,382 |
| Software | 380,586 | 339,722 | 333,560 |
| Office equipment | 132,301 | 132,452 | 132,629 |
| Plant equipment | 178,194 | 178,188 | 178,187 |
| Land | 83,626 | 83,626 | 83,626 |
| Construction in progress [1] | 143,243 | 64,869 | 52,598 |
| Other | 17,837 | 5,751 | 5,545 |
| Subtotal property and equipment | 1,736,679 | 1,578,133 | 1,556,649 |
| Accumulated depreciation | (1,063,943) | (976,768) | (949,423) |
| Property and equipment, net | $ 672,736 | $ 601,365 | $ 607,226 |

[1] Construction in progress primarily includes costs incurred for construction of corporate offices, software systems, leasehold improvements and in-store fixtures and displays not yet placed in use.

Depreciation expense related to property and equipment was $135.7 million for Fiscal 2023 (Fiscal 2021: $139.2 million; Fiscal 2020: $154.4 million; Transition Period: $34.5 million).

## NOTE 5. LEASES

The Company enters into operating leases domestically and internationally to lease certain warehouse space, office facilities, space for its Brand and Factory House stores, and certain equipment under non-cancelable operating leases. The leases expire at various dates through 2035, excluding extensions at the Company's option, and include provisions for rental adjustments. Short-term lease payments were not material for Fiscal 2023, Fiscal 2021, Fiscal 2020 or the Transition Period.

**Lease Costs and Other Information**

The Company recognizes lease expense on a straight-line basis over the lease term. The following table illustrates operating and variable lease costs, included in selling, general and administrative expenses within the Company's Consolidated Statements of Operations, for the periods indicated:

| | Year Ended March 31, 2023 | Three Months Ended March 31, 2022 (Transition Period) | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
|---|---|---|---|---|
| Operating lease costs | $ 148,760 | $ 36,699 | $ 142,965 | $ 147,390 |
| Variable lease costs | $ 14,177 | $ 3,759 | $ 16,115 | $ 9,293 |

There are no residual value guarantees that exist, and there are no restrictions or covenants imposed by leases. The Company rents or subleases excess office facilities and warehouse space to third parties. Sublease income is not material.

The weighted average remaining lease term and discount rate for the periods indicated below were as follows:

| | As of March 31, 2023 | As of March 31, 2022 | As of December 31, 2021 |
|---|---|---|---|
| Weighted average remaining lease term (in years) | 8.03 | 8.69 | 8.73 |
| Weighted average discount rate | 4.69 % | 3.72 % | 3.72 % |

**Supplemental Cash Flow Information**

The following table presents supplemental information relating to cash flow arising from lease transactions:

| | Year Ended March 31, 2023 | Three Months Ended March 31, 2022 (Transition Period) | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
|---|---|---|---|---|
| Operating cash outflows from operating leases | $ 167,774 | $ 43,903 | $ 177,391 | $ 155,990 |
| Leased assets obtained in exchange for new operating lease liabilities | $ 181,080 | $ (892) | $ 28,244 | $ 390,957 |

**Maturity of Lease Liabilities**

The following table presents the future minimum lease payments under the Company's operating lease liabilities as of March 31, 2023:

| Fiscal year ending March 31, | |
|---|---|
| 2024 | $ 175,002 |
| 2025 | 160,326 |
| 2026 | 127,319 |
| 2027 | 107,147 |
| 2028 | 89,890 |
| 2029 and thereafter | 355,135 |
| **Total lease payments** | $ 1,014,819 |
| Less: Interest | 168,116 |
| **Total present value of lease liabilities** | $ 846,703 |

As of March 31, 2023, the Company has additional operating lease obligations that have not yet commenced of approximately $13.0 million, which are not reflected in the table above.

## NOTE 6. GOODWILL

The following table summarizes changes in the carrying amount of the Company's goodwill by reportable segment as of the periods indicated:

| | North America | EMEA | Asia-Pacific | Latin America | Total |
|---|---|---|---|---|---|
| Balance as of December 31, 2020 | $ 301,523 | $ 113,037 | $ 87,654 | $ — | $ 502,214 |
| Effect of currency translation adjustment | (152) | (5,296) | (1,551) | — | (6,999) |
| Balance as of December 31, 2021 | $ 301,371 | $ 107,741 | $ 86,103 | $ — | $ 495,215 |
| Effect of currency translation adjustment | — | (2,688) | (1,019) | — | (3,707) |
| Balance as of March 31, 2022 | $ 301,371 | $ 105,053 | $ 85,084 | $ — | $ 491,508 |
| Effect of currency translation adjustment | — | (3,957) | (5,559) | — | (9,516) |
| Balance as of March 31, 2023 | $ 301,371 | $ 101,096 | $ 79,525 | $ — | $ 481,992 |

There were no goodwill impairments recorded during Fiscal 2023, Fiscal 2021 or the Transition Period.

## NOTE 7. INTANGIBLE ASSETS, NET

The following tables summarize the Company's intangible assets as of the periods indicated:

| | Useful Lives from Date of Acquisitions (in years) | As of March 31, 2023 | | |
|---|---|---|---|---|
| | | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Intangible assets subject to amortization: | | | | |
| Technology | 5-7 | $ 2,536 | $ (2,503) | $ 33 |
| Customer relationships | 2-6 | 8,711 | (4,377) | 4,334 |
| Lease-related intangible assets | 1-15 | 1,664 | (1,542) | 122 |
| Total | | $ 12,911 | $ (8,422) | $ 4,489 |
| Indefinite-lived intangible assets | | | | 4,451 |
| Intangible assets, net | | | | $ 8,940 |

| | Useful Lives from Date of Acquisitions (in years) | As of March 31, 2022 | | |
|---|---|---|---|---|
| | | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Intangible assets subject to amortization: | | | | |
| Technology | 5-7 | $ 2,536 | $ (2,103) | $ 433 |
| Customer relationships | 2-6 | 8,552 | (2,893) | 5,659 |
| Lease-related intangible assets | 1-15 | 9,112 | (8,892) | 220 |
| Other | 5-10 | 475 | (427) | 48 |
| Total | | $ 20,675 | $ (14,315) | $ 6,360 |
| Indefinite-lived intangible assets | | | | 4,220 |
| Intangible assets, net | | | | $ 10,580 |

| | Useful Lives from Date of Acquisitions (in years) | As of December 31, 2021 | | |
| --- | --- | --- | --- | --- |
| | | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Intangible assets subject to amortization: | | | | |
| Technology | 5-7 | $ 2,536 | $ (2,003) | $ 533 |
| Customer relationships | 2-6 | 8,567 | (2,552) | 6,015 |
| Lease-related intangible assets | 1-15 | 8,852 | (8,602) | 250 |
| Other | 5-10 | 475 | (415) | 60 |
| Total | | $ 20,430 | $ (13,572) | $ 6,858 |
| Indefinite-lived intangible assets | | | | 4,152 |
| Intangible assets, net | | | | $ 11,010 |

Amortization expense, which is included in selling, general and administrative expenses, was $1.9 million for Fiscal 2023 (Fiscal 2021: $2.0 million; Fiscal 2020: $7.0 million; Transition Period: $0.5 million).

During Fiscal 2023, the Company reduced the gross carrying amount and related accumulated amortization of certain of its lease-related and other intangible assets by $8.3 million as a result of such assets being fully amortized and no longer in use.

The following is the estimated amortization expense for the Company's intangible assets as of March 31, 2023:

| Fiscal year ending March 31, | |
| --- | --- |
| 2024 | $ 1,561 |
| 2025 | 1,522 |
| 2026 | 1,397 |
| 2027 | 9 |
| 2028 and thereafter | — |
| Total amortization expense of intangible assets | $ 4,489 |

## NOTE 8. CREDIT FACILITY AND OTHER LONG TERM DEBT

The Company's outstanding debt consisted of the following:

| | As of March 31, 2023 | As of March 31, 2022 | As of December 31, 2021 |
| --- | --- | --- | --- |
| 1.50% Convertible Senior Notes due 2024 | $ 80,919 | $ 80,919 | $ 80,919 |
| 3.25% Senior Notes due 2026 | 600,000 | 600,000 | 600,000 |
| Total principal payments due | 680,919 | 680,919 | 680,919 |
| | | | |
| Unamortized debt discount on Convertible Senior Notes[1] | — | — | (9,207) |
| Unamortized debt discount on Senior Notes | (814) | (1,067) | (1,131) |
| Unamortized debt issuance costs - Convertible Senior Notes | (267) | (677) | (779) |
| Unamortized debt issuance costs - Senior Notes | (1,728) | (2,266) | (2,401) |
| Unamortized debt issuance costs - Credit facility | (3,632) | (4,623) | (4,870) |
| Total amount outstanding | 674,478 | 672,286 | 662,531 |
| Less: | | | |
| **Current portion of long-term debt:** | | | |
| Credit Facility borrowings | — | — | — |
| **Non-current portion of long-term debt** | $ 674,478 | $ 672,286 | $ 662,531 |

[1] The Company adopted ASU 2020-06, effective January 1, 2022 using the modified retrospective transition approach. As a result of this adoption, the Company derecognized the remaining unamortized debt discount on Convertible Senior Notes and recorded a cumulative effect adjustment to retained earnings.

**Credit Facility**

On March 8, 2019, the Company entered into an amended and restated credit agreement by and among the Company, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, and the other lenders and arrangers party thereto (the "credit agreement"). In May 2020, May 2021 and December 2021, the Company entered into the first, second and third amendments to the credit agreement, respectively (the credit agreement as amended, the "amended credit agreement" or the "revolving credit facility"). The amended credit agreement provides for revolving credit commitments of $1.1 billion and has a term that ends on December 3, 2026, with permitted extensions under certain circumstances. As of March 31, 2023, March 31, 2022 and December 31, 2021, there were no amounts outstanding under the revolving credit facility.

At the Company's request and a lender's consent, commitments under the amended credit agreement may be increased by up to $300.0 million in aggregate, subject to certain conditions as set forth in the amended credit agreement. Incremental borrowings are uncommitted and the availability thereof will depend on market conditions at the time the Company seeks to incur such borrowings.

Borrowings, if any, under the revolving credit facility have maturities of less than one year. Up to $50.0 million of the facility may be used for the issuance of letters of credit. As of March 31, 2023, there were $4.4 million of letters of credit outstanding (March 31, 2022: $4.5 million; December 31, 2021: $4.3 million).

The obligations of the Company under the amended credit agreement are guaranteed by certain domestic significant subsidiaries of Under Armour, Inc., subject to customary exceptions (the "subsidiary guarantors") and primarily secured by a first-priority security interest in substantially all of the assets of Under Armour, Inc. and the subsidiary guarantors, excluding real property, capital stock in and debt of subsidiaries of Under Armour, Inc. holding certain real property and other customary exceptions. The amended credit agreement provides for the permanent fall away of guarantees and collateral upon the Company's achievement of investment grade rating from two rating agencies.

The amended credit agreement contains negative covenants that, subject to significant exceptions, limit the Company's ability to, among other things: incur additional secured and unsecured indebtedness; pledge the assets as security; make investments, loans, advances, guarantees and acquisitions (including investments in and loans to non-guarantor subsidiaries); undergo fundamental changes; sell assets outside the ordinary course of business; enter into transactions with affiliates; and make restricted payments.

The Company is also required to maintain a ratio of consolidated EBITDA, to consolidated interest expense of not less than 3.50 to 1.0 (the "interest coverage covenant") and the Company is not permitted to allow the ratio of consolidated total indebtedness to consolidated EBITDA to be greater than 3.25 to 1.0 (the "leverage covenant"), as described in more detail in the amended credit agreement. As of March 31, 2023, the Company was in compliance with the applicable covenants.

In addition, the amended credit agreement contains events of default that are customary for a facility of this nature, and includes a cross default provision whereby an event of default under other material indebtedness, as defined in the amended credit agreement, will be considered an event of default under the amended credit agreement.

The amended credit agreement implements SOFR as the replacement of LIBOR as a benchmark interest rate for U.S. dollar borrowings (and analogous benchmark rate replacements for borrowings in Yen, Canadian dollars, Pound Sterling and Euro). Borrowings under the amended credit agreement bear interest at a rate per annum equal to, at the Company's option, either (a) an alternate base rate (for borrowings in U.S. dollars), (b) a term rate (for borrowings in U.S. dollars, Euro, Japanese Yen or Canadian dollars) or (c) a "risk free" rate (for borrowings in U.S. dollars or Pounds Sterling), plus in each case an applicable margin. The applicable margin for loans will be adjusted by reference to a grid (the "pricing grid") based on the leverage ratio of consolidated total indebtedness to consolidated EBITDA and ranges between 1.00% to 1.75% (or, in the case of alternate base loans, 0.00% to 0.75%). The Company will also pay a commitment fee determined in accordance with the pricing grid on the average daily unused amount of the revolving credit facility and certain fees with respect to letters of credit. As of March 31, 2023, the commitment fee was 17.5 basis points.

**1.50% Convertible Senior Notes**

In May 2020, the Company issued $500.0 million aggregate principal amount of 1.50% convertible senior notes due 2024 (the "Convertible Senior Notes"). The Convertible Senior Notes bear interest at the fixed rate of 1.50% per annum, payable semiannually in arrears on June 1 and December 1 of each year, beginning December 1, 2020. The Convertible Senior Notes will mature on June 1, 2024, unless earlier converted in accordance with

their terms, redeemed in accordance with their terms or repurchased.

The net proceeds from the offering (including the net proceeds from the exercise of the over-allotment option) were $488.8 million, after deducting the initial purchasers' discount and estimated offering expenses paid by the Company, of which the Company used $47.9 million to pay the cost of the capped call transactions described below. The Company utilized $439.9 million to repay indebtedness that was outstanding under its revolving credit facility at the time, and to pay related fees and expenses.

The Convertible Senior Notes are not secured and are not guaranteed by any of the Company's subsidiaries. The indenture governing the Convertible Senior Notes does not contain any financial or operating covenants or restrictions on the payments of dividends, the incurrence of indebtedness or the issuance or repurchase of securities by the Company or any of its subsidiaries.

During Fiscal 2021, the Company entered into exchange agreements with certain holders of the Convertible Senior Notes, who agreed to exchange approximately $419.1 million in aggregate principal amount of the Convertible Senior Notes for cash and/or shares of the Company's Class C Common Stock, plus payment for accrued and unpaid interest (the "Exchanges"). In connection with the Exchanges, the Company paid approximately $507.0 million cash and issued approximately 18.8 million shares of the Company's Class C Common Stock to the exchanging holders. Additionally, the Company recognized losses on debt extinguishment of $58.5 million during Fiscal 2021, within Other Income (Expense), net on the Company's Consolidated Statements of Operations. Following the Exchanges, approximately $80.9 million aggregate principal amount of the Convertible Senior Notes remain outstanding as of March 31, 2023.

The Convertible Senior Notes are convertible into cash, shares of the Company's Class C Common Stock or a combination of cash and shares of Class C Common Stock, at the Company's election, as described further below. The initial conversion rate is 101.8589 shares of the Company's Class C Common Stock per $1,000 principal amount of Convertible Senior Notes (equivalent to an initial conversion price of approximately $9.82 per share of Class C Common Stock), subject to adjustment if certain events occur. Prior to the close of business on the business day immediately preceding January 1, 2024, holders may (at their option) convert their Convertible Senior Notes only upon satisfaction of one or more of the following conditions:

- during any calendar quarter commencing after the calendar quarter ended on September 30, 2020 (and only during such calendar quarter), if the last reported sale price of the Company's Class C Common Stock for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day;

- during the five business day period after any five consecutive trading day period (the "measurement period") in which the trading price per $1,000 principal amount of Convertible Senior Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of the Company's Class C Common Stock and the conversion rate on each such trading day;

- upon the occurrence of specified corporate events or distributions on the Company's Class C Common Stock; or

- if the Company calls any Convertible Senior Notes for redemption prior to the close of business on the business day immediately preceding January 1, 2024.

On or after January 1, 2024, until the close of business on the second scheduled trading day immediately preceding the maturity date, holders may convert all or any portion of their Convertible Senior Notes at the conversion rate at any time irrespective of the foregoing conditions.

Beginning on December 6, 2022, the Company may redeem for cash all or any part of the Convertible Senior Notes, at its option, if the last reported sale price of the Company's Class C Common Stock has been at least 130% of the conversion price then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which the Company provides notice of redemption at a redemption price equal to 100% of the aggregate principal amount of the Convertible Senior Notes to be redeemed, plus accrued and unpaid interest to, but excluding, the redemption date.

If the Company undergoes a fundamental change (as defined in the indenture governing the Convertible Senior Notes) prior to the maturity date, subject to certain conditions, holders may require the Company to repurchase for cash all or any portion of their Convertible Senior Notes in principal amounts of $1,000 or an integral multiple thereof at a price which will be equal to 100% of the aggregate principal amount of the Convertible Senior

Notes to be repurchased, plus accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

Concurrently with the offering of the Convertible Senior Notes, the Company entered into privately negotiated capped call transactions with JPMorgan Chase Bank, National Association, HSBC Bank USA, National Association, and Citibank, N.A. (the "option counterparties"). The capped call transactions are expected generally to reduce potential dilution to the Company's Class C Common Stock upon any conversion of Convertible Senior Notes and/or offset any cash payments the Company is required to make in excess of the aggregate principal amount of converted Convertible Senior Notes upon any conversion thereof, as the case may be, with such reduction and/or offset subject to a cap based on the cap price. The cap price of the capped call transactions is initially $13.4750 per share of the Company's Class C Common Stock, representing a premium of 75% above the last reported sale price of the Company's Class C Common Stock on May 21, 2020, and is subject to certain adjustments under the terms of the capped call transactions.

During Fiscal 2021, concurrently with the Exchanges, the Company entered into, with each of the option counterparties, termination agreements relating to a number of options corresponding to the number of Convertible Senior Notes exchanged. Pursuant to such termination agreements, each of the option counterparties paid the Company a cash settlement amount in respect of the portion of capped call transactions being terminated. The Company received approximately $91.7 million in connection with such termination agreements related to the Exchanges.

The Convertible Senior Notes contain a cash conversion feature. Prior to the adoption of ASU 2020-06, the Company had separated it into liability and equity components. The Company valued the liability component based on its borrowing rate for a similar debt instrument that does not contain a conversion feature. The equity component, which was recognized as a debt discount, was valued as the difference between the face value of the Convertible Senior Notes and the fair value of the liability component.

The Company adopted ASU 2020-06 on January 1, 2022 using the modified retrospective method. As a result, the Convertible Senior Notes are no longer accounted for as separate liability and equity components, but rather a single liability. See Note 2 to the Condensed Consolidated Financial Statements included in Part I of the Company's Transition Report of Form 10-QT for the three months ended March 31, 2022 for more details.

**3.250% Senior Notes**

In June 2016, the Company issued $600.0 million aggregate principal amount of 3.250% senior unsecured notes due June 15, 2026 (the "Senior Notes"). The Senior Notes bear interest at the fixed rate of 3.250% per annum, payable semi-annually on June 15 and December 15 beginning December 15, 2016. The Company may redeem some or all of the Senior Notes at any time, or from time to time, at redemption prices described in the indenture governing the Senior Notes. The indenture governing the Senior Notes contains negative covenants that limit the Company's ability to engage in certain transactions and are subject to material exceptions described in the indenture. The Company incurred and deferred $5.4 million in financing costs in connection with the Senior Notes.

**Interest Expense**

Interest expense includes amortization of deferred financing costs, bank fees, capital and built-to-suit lease interest and interest expense under the credit and other long term debt facilities. Interest expense, net was $12.8 million for Fiscal 2023 (Fiscal 2021: $44.3 million; Fiscal 2020: $47.3 million; Transition Period: $6.2 million).

**Maturity of Long Term Debt**

The following are the scheduled maturities of long term debt as of March 31, 2023:

| Fiscal year ending March 31, | | |
|---|---|---:|
| 2024 | $ | — |
| 2025 | | 80,919 |
| 2026 | | — |
| 2027 | | 600,000 |
| 2028 | | — |
| 2029 and thereafter | | — |
| Total scheduled maturities of long term debt | $ | 680,919 |
| | | |
| Current maturities of long term debt | $ | — |

The Company monitors the financial health and stability of its lenders under the credit and other long term debt facilities, however during any period of significant instability in the credit markets, lenders could be negatively impacted in their ability to perform under these facilities.

## NOTE 9. COMMITMENTS AND CONTINGENCIES

*Sports Marketing and Other Commitments*

Within the normal course of business, the Company enters into contractual commitments in order to promote the Company's brand and products. These commitments include sponsorship agreements with teams and athletes on the collegiate and professional levels, official supplier agreements, athletic event sponsorships and other marketing commitments. The following is a schedule of the Company's future minimum payments under its sponsorship and other marketing agreements as of March 31, 2023:

| Fiscal year ending March 31, | | |
|---|---|---:|
| 2024 | $ | 83,342 |
| 2025 | | 142,396 |
| 2026 | | 47,362 |
| 2027 | | 23,867 |
| 2028 | | 16,708 |
| 2029 and thereafter | | 98,750 |
| Total future minimum sponsorship and other payments | $ | 412,425 |

The amounts listed above are the minimum compensation obligations and guaranteed royalty fees required to be paid under the Company's sponsorship and other marketing agreements. The amounts listed above do not include additional performance incentives and product supply obligations provided under the agreements. It is not possible to determine how much the Company will spend on product supply obligations on an annual basis as contracts generally do not stipulate specific cash amounts to be spent on products. The amount of product provided to the sponsorships depends on many factors including general playing conditions, the number of sporting events in which they participate and the Company's decisions regarding product and marketing initiatives. In addition, the costs to design, develop, source and purchase the products furnished to the endorsers are incurred over a period of time and are not necessarily tracked separately from similar costs incurred for products sold to customers.

*Other*

In connection with various contracts and agreements, the Company has agreed to indemnify counterparties against certain third party claims relating to the infringement of intellectual property rights and other items. Generally, such indemnification obligations do not apply in situations in which the counterparties are grossly negligent, engage in willful misconduct, or act in bad faith. Based on the Company's historical experience and the estimated probability of future loss, the Company has determined that the fair value of such indemnifications is not material to its consolidated financial position or results of operations.

From time to time, the Company is involved in litigation and other proceedings, including matters related to commercial and intellectual property disputes, as well as trade, regulatory and other claims related to its business. Other than as described below, the Company believes that all current proceedings are routine in nature and incidental to the conduct of its business. However, the matters described below, if decided adversely to or settled by

the Company, could result, individually or in the aggregate, in a liability material to the Company's consolidated financial position, results of operations or cash flows.

**In re Under Armour Securities Litigation**

On March 23, 2017, three separate securities cases previously filed against the Company in the United States District Court for the District of Maryland (the "District Court") were consolidated under the caption In re Under Armour Securities Litigation, Case No. 17-cv-00388-RDB (the "Consolidated Securities Action"). On November 6 and December 17, 2019, two additional putative securities class actions were filed in the District Court against the Company and certain of its current and former executives (captioned Patel v. Under Armour, Inc., No. 1:19-cv-03209-RDB ("Patel"), and Waronker v. Under Armour, Inc., No. 1:19-cv-03581-RDB ("Waronker"), respectively). On September 14, 2020, the District Court issued an order that, among other things, consolidated the Patel and Waronker cases into the Consolidated Securities Action.

The operative complaint (the Third Amended Complaint or the "TAC") in the Consolidated Securities Action, was filed on October 14, 2020. The TAC asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), against the Company and Mr. Plank and under Section 20A of the Exchange Act against Mr. Plank. The TAC alleges that the defendants supposedly concealed purportedly declining consumer demand for certain of the Company's products between the third quarter of 2015 and the fourth quarter of 2016 by making allegedly false and misleading statements regarding the Company's performance and future prospects and by engaging in undisclosed and allegedly improper sales and accounting practices, including shifting sales between quarterly periods allegedly to appear healthier. The TAC also alleges that the defendants purportedly failed to disclose that the Company was under investigation by and cooperating with the U.S. Department of Justice ("DOJ") and the U.S. Securities and Exchange Commission (the "SEC") since July 2017. The class period identified in the TAC is September 16, 2015 through November 1, 2019.

Discovery in the Consolidated Securities Action commenced on June 4, 2021 and is currently ongoing. On July 23, 2021, the Company and Mr. Plank filed an answer to the TAC denying all allegations of wrongdoing and asserting affirmative defenses to the claims asserted in the TAC. On December 1, 2021, the plaintiffs filed a motion seeking, among other things, certification of the class they are seeking to represent in the Consolidated Securities Action. On September 29, 2022, the court granted the plaintiffs' class certification motion.

The Company continues to believe that the claims asserted in the Consolidated Securities Action are without merit and intends to defend the lawsuit vigorously.

**State Court Derivative Complaints**

In June and July 2018, two purported stockholder derivative complaints were filed in Maryland state court (in cases captioned Kenney v. Plank, et al. (filed June 29, 2018) and Luger v. Plank, et al. (filed July 26, 2018), respectively). The cases were consolidated on October 19, 2018 under the caption Kenney v. Plank, et. al. The consolidated complaint in the Kenney matter names Mr. Plank, certain other current and former members of the Company's Board of Directors, certain former Company executives, and Sagamore Development Company, LLC ("Sagamore") as defendants, and names the Company as a nominal defendant. The consolidated complaint asserts breach of fiduciary duty, unjust enrichment, and corporate waste claims against the individual defendants and asserts a claim against Sagamore for aiding and abetting certain of the alleged breaches of fiduciary duty. The consolidated complaint seeks damages on behalf of the Company and certain corporate governance related actions.

The consolidated complaint includes allegations challenging, among other things, the Company's disclosures related to growth and consumer demand for certain of the Company's products, as well as stock sales by certain individual defendants. The consolidated complaint also makes allegations related to the Company's 2016 purchase from entities controlled by Mr. Plank (through Sagamore) of certain parcels of land to accommodate the Company's growth needs, which was approved by the Audit Committee of the Company's Board of Directors in accordance with the Company's policy on transactions with related persons.

On March 29, 2019, the court in the consolidated Kenney action granted the Company's and the defendants' motion to stay that case pending the outcome of both the Consolidated Securities Action and an earlier-filed derivative action asserting similar claims to those asserted in the Kenney action relating to the Company's purchase of parcels in the Baltimore Peninsula, an area of Baltimore previously referred to as Port Covington (which derivative action has since been dismissed in its entirety).

Prior to the filing of the derivative complaints in Kenney v. Plank, et al. and Luger v. Plank, et al., both of the purported stockholders had sent the Company's Board of Directors a letter demanding that the Company pursue claims similar to the claims asserted in the derivative complaints. Following an investigation, a majority of

disinterested and independent directors of the Company determined that the claims should not be pursued by the Company and both of these purported stockholders were informed of that determination.

In 2020, two additional purported shareholder derivative complaints were filed in Maryland state court, in cases captioned Cordell v. Plank, et al. (filed August 11, 2020) and Salo v. Plank, et al. (filed October 21, 2020), respectively.

Prior to the filing of the derivative complaints in these two actions, neither of the purported stockholders made a demand that the Company's Board of Directors pursue the claims asserted in the complaints. In October 2021, the court issued an order (i) consolidating the Cordell and Salo actions with the consolidated Kenney action into a single consolidated derivative action (the "Consolidated State Derivative Action"); (ii) designating the Kenney action as the lead case; and (iii) specifying that the scheduling order in the Kenney action shall control the Consolidated State Derivative Action.

The Company believes that the claims asserted in the Consolidated State Derivative Action are without merit and intends to defend this matter vigorously. However, because of the inherent uncertainty as to the outcome of this proceeding, the Company is unable at this time to estimate the possible impact of the outcome of this matter.

## Federal Court Derivative Complaints

On January 27, 2021, the District Court entered an order consolidating for all purposes four separate stockholder derivative cases that previously had been filed in the court. On February 2, 2023, the District Court issued an order appointing Balraj Paul and Anthony Viskovich as lead plaintiffs ("Derivative Lead Plaintiffs"), appointing counsel for the Derivative Lead Plaintiffs as lead counsel, and recaptioning the consolidated case as Paul et al. v. Plank et al. (the "Federal Court Derivative Action"). Prior to their filing derivative complaints, both of the Derivative Lead Plaintiffs had sent the Company's Board of Directors a letter demanding that the Company pursue claims similar to the claims asserted in the derivative complaints. Following an investigation, a majority of disinterested and independent directors of the Company determined that the claims should not be pursued by the Company, and the Derivative Lead Plaintiffs were informed of that determination.

On March 16, 2023, the District Court issued an order granting a motion for voluntary dismissal without prejudice that had been filed by the plaintiff in one of the four derivative cases who had not been appointed as a lead plaintiff. The other three consolidated derivative cases remain pending as part of the Federal Court Derivative Action.

On April 24, 2023, the Derivative Lead Plaintiffs designated an operative complaint in the Federal Court Derivative Action. The operative complaint names Mr. Plank, certain other current and former members of the Company's Board of Directors and certain former Company executives as defendants, and names the Company as a nominal defendant. It asserts allegations similar to those in the TAC filed in the Consolidated Securities Action matter discussed above, including allegations challenging (i) the Company's disclosures related to growth and consumer demand for certain of the Company's products; (ii) the Company's practice of shifting sales between quarterly periods supposedly to appear healthier and its purported failure to disclose that practice; (iii) the Company's internal controls with respect to revenue recognition and inventory management; and (iv) the Company's supposed failure to timely disclose investigations by the SEC and DOJ. The operative complaint asserts breach of fiduciary duty and unjust enrichment claims against the defendants, and asserts a contribution claim under the federal securities laws against certain defendants. It seeks damages on behalf of the Company and certain corporate governance related actions. The deadline for the Company and the defendants to respond to the operative complaint is June 23, 2023.

The Company believes that the claims asserted in the Federal Court Derivative Action are without merit and intends to defend this matter vigorously. However, because of the inherent uncertainty as to the outcome of this proceeding, the Company is unable at this time to estimate the possible impact of the outcome of this matter.

## Contingencies

In accordance with Accounting Standards Codification ("ASC") Topic 450 "Contingencies" ("Topic 450"), the Company establishes accruals for contingencies when (i) the Company believes it is probable that a loss will be incurred and (ii) the amount of the loss can be reasonably estimated. If the reasonable estimate is a range, the Company will accrue the best estimate in that range; where no best estimate can be determined, the Company will accrue the minimum. As of March 31, 2023, the Company has estimated its liability and recorded $20 million in respect of certain ongoing legal proceedings summarized above. The timing of the resolution is unknown and the amount of loss ultimately incurred in connection with these matters may be substantially higher or lower than the amount accrued for these matters, and the Company expects a portion of the loss, if any is incurred, to be covered

by the Company's insurance. Legal proceedings for which no accrual has been established are disclosed to the extent required by ASC 450.

In addition, in connection with the matters described above and previously disclosed government investigations, the Company provided notice of claims under multiple director and officer liability insurance policy periods. With respect to one policy period, a lawsuit was filed against the Company by certain of its insurance carriers seeking a declaration that no further amounts will be payable with respect to that policy period and with respect to one carrier, reimbursement for $10 million in defense and investigation costs previously paid to the Company. On April 26, 2023, the Company and one of its insurance carriers resolved the dispute related to that carrier's claims for a declaration that no further amounts would be payable and seeking reimbursement of previously paid amounts. The resolution resulted in no reimbursement payable by the Company. The other carriers remaining in the case continue to seek a declaration that no further amounts will be payable with respect to that policy period. The timing of the resolution is unknown for the remaining claims in this matter.

From time to time, the Company's view regarding probability of loss with respect to outstanding legal proceedings will change, proceedings for which the Company is able to estimate a loss or range of loss will change, and the estimates themselves will change. In addition, while many matters presented in financial disclosures involve significant judgment and may be subject to significant uncertainties, estimates with respect to legal proceedings are subject to particular uncertainties. Other than as described above, the Company believes that all current proceedings are routine in nature and incidental to the conduct of its business. However, the matters described above, if decided adversely to or settled by the Company, could result, individually or in the aggregate, in a liability material to the Company's consolidated financial position, results of operations or cash flows.

## NOTE 10. STOCKHOLDERS' EQUITY

The Company's Class A Common Stock and Class B Convertible Common Stock have an authorized number of 400.0 million shares and 34.45 million shares, respectively, and each have a par value of $0.0003 1/3 per share as of March 31, 2023. Holders of Class A Common Stock and Class B Convertible Common Stock have identical rights, including liquidation preferences, except that the holders of Class A Common Stock are entitled to one vote per share and holders of Class B Convertible Common Stock are entitled to 10 votes per share on all matters submitted to a stockholder vote. Class B Convertible Common Stock may only be held by Kevin Plank, the Company's founder, Executive Chair and Brand Chief, or a related party of Mr. Plank, as defined in the Company's charter. As a result, Mr. Plank has a majority voting control over the Company. Upon the transfer of shares of Class B Convertible Stock to a person other than Mr. Plank or a related party of Mr. Plank, the shares automatically convert into shares of Class A Common Stock on a one-for-one basis. In addition, all of the outstanding shares of Class B Convertible Common Stock will automatically convert into shares of Class A Common Stock on a one-for-one basis upon the death or disability of Mr. Plank or on the record date for any stockholders' meeting upon which the shares of Class A Common Stock and Class B Convertible Common Stock beneficially owned by Mr. Plank is less than 15% of the total shares of Class A Common Stock and Class B Convertible Common Stock outstanding or upon the other events specified in the Class C Articles Supplementary to the Company's charter as documented below. Holders of the Company's common stock are entitled to receive dividends when and if authorized and declared out of assets legally available for the payment of dividends.

The Company's Class C Common Stock has an authorized number of 400.0 million shares and has a par value of $0.0003 1/3 per share as of March 31, 2023. The terms of the Class C Common Stock are substantially identical to those of the Company's Class A Common Stock, except that the Class C Common Stock has no voting rights (except in limited circumstances), will automatically convert into Class A Common Stock under certain circumstances and includes provisions intended to ensure equal treatment of Class C Common Stock and Class B Common Stock in certain corporate transactions, such as mergers, consolidations, statutory share exchanges, conversions or negotiated tender offers, and including consideration incidental to these transactions.

### Share Repurchase Program

On February 23, 2022, the Company's Board of Directors authorized the Company to repurchase up to $500 million (exclusive of fees and commissions) of outstanding shares of the Company's Class C Common Stock over the next two years. The Class C Common Stock may be repurchased from time to time at prevailing prices in the open market, through plans designed to comply with Rule 10b5-1 under the Securities Exchange Act of 1934, as amended, via private purchases through forward, derivative, accelerated share repurchase transactions or otherwise, subject to applicable regulatory restrictions on volume, pricing and timing. The timing and amount of any repurchases will depend on market conditions, the Company's financial condition, results of operations, liquidity and other factors.

Pursuant to the previously disclosed accelerated share repurchase transactions that the Company entered into in February 2022, May 2022, August 2022 and November 2022 (the "ASR Agreements"), the Company repurchased 18.7 million and 16.2 million shares of Class C Common Stock, which were immediately retired, during Fiscal 2023 and the Transition Period, respectively. As a result, $174.0 million was recorded to retained earnings to reflect the difference between the market price of the Class C Common Stock repurchased and its par value during Fiscal 2023 (Transition Period: $240.0 million).

As of the date of this Annual Report on Form 10-K, the Company has repurchased a total of $425 million or 34.9 million outstanding shares of its Class C Common Stock under its share repurchase program.

## NOTE 11. REVENUES

The following tables summarize the Company's net revenues by product category and distribution channels:

| | | Year Ended March 31, 2023 | | Three Months Ended March 31, 2022 (Transition Period) | | Year Ended December 31, 2021 | | Year Ended December 31, 2020 |
|---|---|---|---|---|---|---|---|---|
| Apparel | $ | 3,871,638 | $ | 876,604 | $ | 3,841,249 | $ | 2,882,562 |
| Footwear | | 1,455,265 | | 296,696 | | 1,264,127 | | 934,333 |
| Accessories | | 408,521 | | 96,803 | | 461,894 | | 414,082 |
| *Net Sales* | | 5,735,424 | | 1,270,103 | | 5,567,270 | | 4,230,977 |
| License revenues | | 116,746 | | 26,602 | | 112,623 | | 105,779 |
| Corporate Other | | 51,466 | | 4,240 | | 3,573 | | 137,911 |
| *Total net revenues* | $ | 5,903,636 | $ | 1,300,945 | $ | 5,683,466 | $ | 4,474,667 |

| | | Year Ended March 31, 2023 | | Three Months Ended March 31, 2022 (Transition Period) | | Year Ended December 31, 2021 | | Year Ended December 31, 2020 |
|---|---|---|---|---|---|---|---|---|
| Wholesale | $ | 3,468,126 | $ | 829,179 | $ | 3,245,749 | $ | 2,383,353 |
| Direct-to-consumer | | 2,267,298 | | 440,924 | | 2,321,521 | | 1,847,624 |
| *Net Sales* | | 5,735,424 | | 1,270,103 | | 5,567,270 | | 4,230,977 |
| License revenues | | 116,746 | | 26,602 | | 112,623 | | 105,779 |
| Corporate Other | | 51,466 | | 4,240 | | 3,573 | | 137,911 |
| *Total net revenues* | $ | 5,903,636 | $ | 1,300,945 | $ | 5,683,466 | $ | 4,474,667 |

The Company records reductions to revenue for estimated customer returns, allowances, markdowns and discounts. These reserves are included within customer refund liability and the value of the inventory associated with reserves for sales returns are included within prepaid expenses and other current assets on the Consolidated Balance Sheets. The following table presents the customer refund liability, as well as the associated value of inventory for the periods indicated:

| | | As of March 31, 2023 | | As of March 31, 2022 | | As of December 31, 2021 |
|---|---|---|---|---|---|---|
| Customer refund liability | $ | 160,533 | $ | 159,628 | $ | 164,294 |
| Inventory associated with reserves for sales returns | $ | 40,661 | $ | 44,291 | $ | 47,569 |

## Contract Liabilities

Contract liabilities are recorded when a customer pays consideration, or the Company has a right to an amount of consideration that is unconditional, before the transfer of a good or service to the customer, and thus represent the Company's obligation to transfer the good or service to the customer at a future date. The Company's contract liabilities primarily consist of payments received in advance of revenue recognition for subscriptions for the Company's digital fitness applications and royalty arrangements which are in in other current and other long-term liabilities, and gift cards, included in accrued expenses on the Company's Consolidated Balance Sheets. As of March 31, 2023, contract liabilities were $25.9 million (March 31, 2022: $35.3 million; December 31, 2021: $39.1 million).

During Fiscal 2023, the Company completed an assessment of its process for estimating revenue recognized for gift card balances not expected to be redeemed ("breakage"). Based on the assessment, which included analyzing historical gift card redemption data, the Company has determined that substantially all of its gift cards are redeemed within 24 months of issuance, and after 24 months the likelihood of a gift card being redeemed is remote. Therefore, to the extent that it does not have a legal obligation to remit the value of such unredeemed gift cards to the relevant jurisdiction as unclaimed or abandoned property, the Company recognizes gift card breakage at that time when the likelihood of the gift card being redeemed is remote, which the Company has determined to be 24 months following its issuance. As a result, the Company recognized approximately $10.1 million of revenue during Fiscal 2023, that was previously included in contract liabilities, which benefited net income by $10.1 million, or $0.02 per share of Class A, B and C Common Stock.

For Fiscal 2023, including the breakage discussed above, the Company recognized approximately $19.3 million, of revenue that was previously included in contract liabilities as of March 31, 2022. For Fiscal 2021, the Company recognized approximately $21.5 million of revenue that was previously included in contract liabilities as of December 31, 2020. For the Transition Period, the Company recognized $5.0 million of revenue that was previously included in contract liabilities as of December 31, 2021. The change in the contract liabilities balance primarily results from the timing differences between the Company's satisfaction of performance obligations and the customer's payment, and with respect to Fiscal 2023, the breakage discussed above.

## NOTE 12. RESTRUCTURING AND RELATED IMPAIRMENT CHARGES

During Fiscal 2020, the Company's Board of Directors approved a restructuring plan ranging between $550 million to $600 million in costs (the "2020 restructuring plan") designed to rebalance the Company's cost base to further improve profitability and cash flow generation. The Company concluded the 2020 restructuring plan during the Transition Period.

Restructuring and related impairment charges and recoveries require the Company to make certain judgments and estimates regarding the amount and timing as to when these charges or recoveries occur. The estimated liability could change subsequent to its recognition, requiring adjustments to the expense and the liability recorded. On a quarterly basis, the Company conducts an evaluation of the related liabilities and expenses and revises its assumptions and estimates as appropriate, as new or updated information becomes available. No adjustments to expense were recorded during Fiscal 2023.

All restructuring and related impairment charges are included in the Company's Corporate Other segment. A summary of the activity in the restructuring reserve related to the Company's 2020 restructuring plan, as well as prior restructuring plans in 2018 and 2017 are as follows:

| | Employee Related Costs | Contract Exit Costs | Other Restructuring Related Costs |
|---|---|---|---|
| Balance as of December 31, 2020 | $ 12,868 | $ 61,642 | $ 6,098 |
| Net additions (recoveries) charged to expense | (1,655) | 17,814 | (1,494) |
| Cash payments | (5,473) | (47,486) | (6,078) |
| Foreign exchange and other | (2,192) | (565) | 120 |
| Balance as of December 31, 2021 | $ 3,548 | $ 31,405 | $ (1,354) |
| Net additions (recoveries) charged to expense | (10) | 58,555 | (1,871) |
| Cash payments | (955) | (9,280) | — |
| Foreign exchange and other | 89 | (2,443) | 3,225 |
| Balance as of March 31, 2022 | $ 2,672 | $ 78,237 | $ — |
| Net additions (recoveries) charged to expense | — | — | — |
| Cash payments | (1,057) | (76,287) | — |
| Foreign exchange and other | (659) | (1,832) | — |
| Balance as of March 31, 2023 | $ 956 | $ 118 | $ — |

**NOTE 13. OTHER EMPLOYEE BENEFITS**

The Company offers a 401(k) Deferred Compensation Plan for the benefit of eligible employees. Employee contributions are voluntary and subject to Internal Revenue Service limitations. The Company matches a portion of the participant's contribution and recorded expense for Fiscal 2023 of $11.6 million (Fiscal 2021: $8.9 million; Fiscal 2020: $5.4 million; Transition Period: $6.1 million)

In addition, the Company offers the Under Armour, Inc. Deferred Compensation Plan which allows a select group of management or highly compensated employees, as approved by the Human Capital and Compensation Committee of the Board of Directors, to make an annual base salary and/or bonus deferral for each year. As of March 31, 2023, the Deferred Compensation Plan obligations were $14.1 million (March 31, 2022: $14.2 million; December 31, 2021: $14.5 million) and were included in other long term liabilities on the Consolidated Balance Sheets.

The Company established a Rabbi Trust to fund obligations to participants in the Deferred Compensation Plan. As of March 31, 2023, the assets held in the Rabbi Trust were trust owned life insurance ("TOLI") policies with cash-surrender values of $7.7 million (March 31, 2022: $8.4 million; December 31, 2021: $9.0 million). These assets are consolidated and are included in other long term assets on the Consolidated Balance Sheets. Refer to Note 15 for a discussion of the fair value measurements of the assets held in the Rabbi Trust and the Deferred Compensation Plan obligations.

**NOTE 14. STOCK BASED COMPENSATION**

The Under Armour, Inc. Third Amended and Restated 2005 Omnibus Long-Term Incentive Plan as amended (the "2005 Plan") provides for the issuance of stock options, restricted stock, restricted stock units and other equity awards to officers, directors, key employees and other persons. The 2005 Plan terminates in 2029. As of March 31, 2023, 8.3 million Class A shares and 23.9 million Class C shares are available for future grants of awards under the 2005 Plan.

**Awards Granted to Employees and Non-Employee Directors**

Total stock-based compensation expense associated with awards granted to employees and non-employee directors for Fiscal 2023 was $36.8 million (Fiscal 2021: $43.8 million; Fiscal 2020: $42.1 million; Transition Period: $11.8 million). The related tax benefits, excluding consideration of valuation allowances, were $6.3 million for Fiscal 2023 (Fiscal 2021: $8.2 million; Fiscal 2020: $9.0 million; Transition Period: $2.0 million). The valuation allowances associated with these benefits were $1.2 million for Fiscal 2023 (Fiscal 2021: $7.2 million; Fiscal 2020: $9.0 million; Transition Period: $1.0 million) As of March 31, 2023, the Company had $70.4 million of unrecognized compensation expense related to these awards expected to be recognized over a weighted average period of 2.06 years. Refer to "Stock Options" and "Restricted Stock and Restricted Stock Unit Awards" below for further information on these awards.

A summary of each of these plans is as follows:

*Employee Stock Compensation Plan*

Stock options, restricted stock and restricted stock unit awards under the 2005 Plan generally vest ratably over a period of two to five years. The contractual term for stock options is generally 10 years from the date of grant. The Company generally receives a tax deduction for any ordinary income recognized by a participant in respect to an award under the 2005 Plan.

*Non-Employee Director Compensation Plan*

The Company's Non-Employee Director Compensation Plan (the "Director Compensation Plan") provides for cash compensation and equity awards to non-employee directors of the Company under the 2005 Plan. Non-employee directors have the option to defer the value of their annual cash retainers as deferred stock units in accordance with the Under Armour, Inc. Non-Employee Deferred Stock Unit Plan (the "DSU Plan"). Each new non-employee director receives an award of restricted stock units upon the initial election to the Board of Directors, with the units covering stock valued at $100 thousand on the grant date and vesting in three equal annual installments. In addition, each non-employee director receives, following each annual stockholders' meeting, a grant under the 2005 Plan of restricted stock units covering stock valued at $150 thousand on the grant date. However, in May 2022, following the 2022 annual stockholders' meeting, each non-employee director received a grant under the 2005 plan of restricted stock units covering stock valued at $187.5 thousand to account for the Company's change in fiscal year. Each award vests 100% on the date of the next annual stockholders' meeting following the grant date.

The receipt of the shares otherwise deliverable upon vesting of the restricted stock units automatically defers into deferred stock units under the DSU Plan. Under the DSU Plan each deferred stock unit represents the Company's obligation to issue one share of the Company's Class A or Class C Common Stock with the shares delivered six months following the termination of the director's service. The Company had 0.8 million deferred stock units outstanding as of March 31, 2023.

*Employee Stock Purchase Plan*

The Company's Employee Stock Purchase Plan (the "ESPP") allows for the purchase of Class A Common Stock and Class C Common Stock by all eligible employees at a 15% discount from fair market value subject to certain limits as defined in the ESPP. As of March 31, 2023, 2.7 million Class A shares and 1.1 million Class C shares are available for future purchases under the ESPP. During Fiscal 2023, 536.0 thousand Class C shares were purchased under the ESPP (Fiscal 2021: 234.7 thousand; Fiscal 2020: 482.9 thousand; Transition Period: 69.8 thousand).

## Awards granted to Marketing Partners

In addition to the plans discussed above, the Company may also, from time to time, issue deferred stock units or restricted stock units to certain of our marketing partners in connection with their entering into endorsement and other marketing services agreements with us. The terms of each agreement set forth the number of units to be granted and the delivery dates for the shares, which range over a multi-year period, depending on the contract.

Total stock-based compensation expense related to these awards for Fiscal 2023 was $3.3 million (Fiscal 2021: $3.5 million; Fiscal 2020: $3.5 million; Transition Period: $0.8 million). As of March 31, 2023, we had $4.3 million of unrecognized compensation expense associated with these awards expected to be recognized over a weighted average period of 1.68 years.

As previously disclosed, on April 3, 2023, subsequent to the fiscal year end, the Company issued an award of restricted stock units for 8.8 million shares of the Company's Class C common stock to an entity affiliated with professional basketball player Stephen Curry. The award was issued in connection with Mr. Curry's entry into a stock unit agreement and an Under Armour, Inc. Athlete Product, Brand, Ambassador, and Endorsement Agreement with the Company, pursuant to which Mr. Curry is continuing his relationship with the Company.

## Summary by Award Classification:

*Stock Options*

No stock options were granted during Fiscal 2023, Fiscal 2021 or the Transition Period. The weighted average fair value of stock options granted in Fiscal 2020 was $6.61. The fair value of each stock option granted is estimated on the date of grant using the Black-Scholes option-pricing model with the following weighted average assumptions:

| | Year Ended March 31, 2023 | Three Months Ended March 31, 2022 (Transition Period) | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
|---|---|---|---|---|
| Risk-free interest rate | n/a | n/a | n/a | 1.5 % |
| Average expected life in years | n/a | n/a | n/a | 6.25 |
| Expected volatility | n/a | n/a | n/a | 43.1 % |
| Expected dividend yield | n/a | n/a | n/a | — % |

A summary of the Company's stock options activity for the year ended March 31, 2023 is presented below:

| | Number of Stock Options | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (Years) | | Total Intrinsic Value |
|---|---|---|---|---|---|---|
| Outstanding at March 31, 2022 | 1,578 | $ | 19.44 | 5.82 | $ | 217 |
| Granted, at fair market value | — | | — | — | | — |
| Exercised | — | | — | — | | — |
| Forfeited | — | | — | — | | — |
| Outstanding at March 31, 2023 | 1,578 | $ | 19.44 | 4.82 | $ | — |
| Options exercisable at March 31, 2023 | 1,503 | $ | 19.66 | 4.72 | $ | — |

No stock options were exercised during Fiscal 2023 or the Transition Period. For Fiscal 2021 and Fiscal 2020, the intrinsic value of stock options exercised was $0.2 million and $4.5 million, respectively. The income tax benefits related to stock options exercised, excluding consideration of valuation allowances were $0.0 million and $1.2 million for Fiscal 2021 and Fiscal 2020, respectively.

*Restricted Stock and Restricted Stock Unit Awards*

A summary of the Company's restricted stock and restricted stock unit awards activity for the year ended March 31, 2023 is presented below:

| | Number of Restricted Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Outstanding at March 31, 2022 | 7,807 | $ | 16.57 |
| Granted | 3,759 | | 8.75 |
| Forfeited | (2,002) | | 14.88 |
| Vested | (1,906) | | 17.53 |
| Outstanding at March 31, 2023 | 7,658 | $ | 13.01 |

The awards outstanding at March 31, 2023 in the table above includes 1.1 million performance-based restricted stock units that were awarded to certain executives and key employees during Fiscal 2023 under the 2005 Plan. The performance-based restricted stock units awarded have a weighted average fair value of $9.13 and have vesting that is tied to the achievement of certain combined annual revenue and operating income targets. The Company deemed the achievement of certain of these targets probable and recorded $1.4 million of stock-based compensation expense related to these awards during Fiscal 2023. The Company assesses the probability of the achievement of the remaining revenue and operating income targets at the end of each reporting period and based on that assessment cumulative adjustments may be recorded in future periods.

## NOTE 15. FAIR VALUE MEASUREMENTS

Fair value is defined as the price that would be received to sell an asset or the exit price that would be paid to transfer a liability in an orderly transaction between market participants at the measurement date. The fair value accounting guidance outlines a valuation framework, creates a fair value hierarchy in order to increase the consistency and comparability of fair value measurements and the related disclosures, and prioritizes the inputs used in measuring fair value as follows:

Level 1:    Observable inputs such as quoted prices in active markets;

Level 2:    Inputs, other than quoted prices in active markets, that are observable either directly or indirectly; and

Level 3:    Unobservable inputs for which there is little or no market data, which require the reporting entity to develop its own assumptions.

*Financial assets and liabilities measured at fair value on a recurring basis*

The Company's financial assets (liabilities) measured at fair value on a recurring basis consisted of the following types of instruments as of the following periods:

| | March 31, 2023 | | | March 31, 2022 | | | December 31, 2021 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Level 1 | Level 2 | Level 3 | Level 1 | Level 2 | Level 3 |
| Derivative foreign currency contracts (see Note 16) | $ — | $ (3,127) | $ — | $ — | $ 988 | $ — | $ — | $ 631 | $ — |
| TOLI policies held by the Rabbi Trust (see Note 13) | $ — | $ 7,691 | $ — | $ — | $ 8,379 | $ — | $ — | $ 9,008 | $ — |
| Deferred Compensation Plan obligations (see Note 13) | $ — | $(14,082) | $ — | $ — | $(14,230) | $ — | $ — | $(14,489) | $ — |

Fair values of the financial assets and liabilities listed above are determined using inputs that use as their basis readily observable market data that are actively quoted and are validated through external sources, including third-party pricing services and brokers. The foreign currency contracts represent unrealized gains and losses on derivative contracts, which is the net difference between the U.S. dollar value to be received or paid at the contracts' settlement date and the U.S. dollar value of the foreign currency to be sold or purchased at the current market exchange rate. The fair value of the TOLI policies held by the Rabbi Trust are based on the cash-surrender value of the life insurance policies, which are invested primarily in mutual funds and a separately managed fixed income fund. These investments are initially made in the same funds and purchased in substantially the same amounts as the selected investments of participants in the Under Armour, Inc. Deferred Compensation Plan (the "Deferred Compensation Plan"), which represent the underlying liabilities to participants in the Deferred Compensation Plan. Liabilities under the Deferred Compensation Plan are recorded at amounts due to participants, based on the fair value of participants' selected investments.

The fair value of long term debt is estimated based upon quoted prices for similar instruments or quoted prices for identical instruments in inactive markets (Level 2).

As of March 31, 2023, the fair value of the Convertible Senior Notes was $85.8 million (March 31, 2022: $126.6 million; December 31, 2021: $149.6 million).

As of March 31, 2023, the fair value of the Senior Notes was $553.9 million (March 31, 2022: $580.0 million; December 31, 2021: $619.9 million).

*Assets and liabilities measured at fair value on a non-recurring basis*

Certain assets are not remeasured to fair value on an ongoing basis but are subject to fair value adjustments only in certain circumstances. These assets can include long-lived assets and goodwill that have been reduced to fair value when impaired. Assets that are written down to fair value when impaired are not subsequently adjusted to fair value unless further impairment occurs.

## NOTE 16. RISK MANAGEMENT AND DERIVATIVES

The Company is exposed to global market risks, including the effects of changes in foreign currency and interest rates. The Company uses derivative instruments to manage financial exposures that occur in the normal course of business and does not hold or issue derivatives for trading or speculative purposes.

The Company may elect to designate certain derivatives as hedging instruments under U.S. GAAP. The Company formally documents all relationships between designated hedging instruments and hedged items, as well as its risk management objectives and strategies for undertaking hedge transactions. This process includes linking all derivatives designated as hedges to forecasted cash flows and assessing, both at inception and on an ongoing basis, the effectiveness of the hedging relationships.

The Company's foreign exchange risk management program consists of designated cash flow hedges and undesignated hedges. As of March 31, 2023, the Company has hedge instruments primarily for:

- British Pound/U.S. Dollar;

- U.S. Dollar/Chinese Renminbi;

- Euro/U.S. Dollar;

- U.S. Dollar/Canadian Dollar;
- U.S. Dollar/Mexican Peso; and
- U.S. Dollar/Korean Won.

All derivatives are recognized on the Consolidated Balance Sheets at fair value and classified based on the instrument's maturity date.

The following table presents the fair values of derivative instruments within the Consolidated Balance Sheets. Refer to Note 15 of the Consolidated Financial Statements for a discussion of the fair value measurements.

| | Balance Sheet Classification | March 31, 2023 | March 31, 2022 | December 31, 2021 |
|---|---|---|---|---|
| **Derivatives designated as hedging instruments under ASC 815** | | | | |
| Foreign currency contracts | Other current assets | $ 22,473 | $ 11,561 | $ 7,488 |
| Foreign currency contracts | Other long term assets | 619 | 2,730 | 2,887 |
| Total derivative assets designated as hedging instruments | | $ 23,092 | $ 14,291 | $ 10,375 |
| | | | | |
| Foreign currency contracts | Other current liabilities | $ 21,622 | $ 11,209 | $ 8,663 |
| Foreign currency contracts | Other long term liabilities | 5,769 | 3,645 | 779 |
| Total derivative liabilities designated as hedging instruments | | $ 27,391 | $ 14,854 | $ 9,442 |
| | | | | |
| **Derivatives not designated as hedging instruments under ASC 815** | | | | |
| Foreign currency contracts | Other current assets | $ 3,408 | $ 4,412 | $ 1,999 |
| Total derivative assets not designated as hedging instruments | | $ 3,408 | $ 4,412 | $ 1,999 |
| | | | | |
| Foreign currency contracts | Other current liabilities | $ 6,563 | $ 1,213 | $ 4,648 |
| Foreign currency contracts | Other long term liabilities | $ 4 | $ — | $ — |
| Total derivative liabilities not designated as hedging instruments | | $ 6,567 | $ 1,213 | $ 4,648 |

The following table presents the amounts in the Consolidated Statements of Operations in which the effects of cash flow hedges are recorded and the effects of cash flow hedge activity on these line items:

| | Year Ended March 31, 2023 | | Three Months Ended March 31, 2022 (Transition Period) | | Year Ended December 31, 2021 | | Year Ended December 31, 2020 | |
|---|---|---|---|---|---|---|---|---|
| | Total | Amount of Gain (Loss) on Cash Flow Hedge Activity | Total | Amount of Gain (Loss) on Cash Flow Hedge Activity | Total | Amount of Gain (Loss) on Cash Flow Hedge Activity | Total | Amount of Gain (Loss) on Cash Flow Hedge Activity |
| Net revenues | $5,903,636 | $ 44,492 | $1,300,945 | $ 2,049 | $5,683,466 | $ (6,410) | $4,474,667 | $ 2,098 |
| Cost of goods sold | $3,254,296 | $ 2,016 | $ 695,781 | $ (2,903) | $2,821,967 | $ (11,825) | $2,314,572 | $ 9,516 |
| Interest income (expense), net | $ (12,826) | $ (37) | $ (6,154) | $ (9) | $ (44,300) | $ (37) | $ (47,259) | $ (36) |
| Other income (expense), net | $ 16,780 | $ — | $ (51) | $ — | $ (51,113) | $ — | $ 168,153 | $ 25 |

The following tables present the amounts affecting the Consolidated Statements of Comprehensive Income (Loss):

| | Balance as of March 31, 2022 | Amount of gain (loss) recognized in other comprehensive income (loss) on derivatives | Amount of gain (loss) reclassified from other comprehensive income (loss) into income | Balance as of March 31, 2023 |
|---|---|---|---|---|
| **Derivatives designated as cash flow hedges** | | | | |
| Foreign currency contracts | $ 41 | $ 41,703 | $ 46,508 | $ (4,764) |
| Interest rate swaps | (495) | — | (37) | (458) |
| Total designated as cash flow hedges | $ (454) | $ 41,703 | $ 46,471 | $ (5,222) |

| | Balance as of December 31, 2021 | Amount of gain (loss) recognized in other comprehensive income (loss) on derivatives | Amount of gain (loss) reclassified from other comprehensive income (loss) into income | Balance as of March 31, 2022 |
|---|---|---|---|---|
| **Derivatives designated as cash flow hedges** | | | | |
| Foreign currency contracts | $ (1,617) | $ 804 | $ (854) | $ 41 |
| Interest rate swaps | (504) | — | (9) | (495) |
| Total designated as cash flow hedges | $ (2,121) | $ 804 | $ (863) | $ (454) |

| | Balance as of December 31, 2020 | Amount of gain (loss) recognized in other comprehensive income (loss) on derivatives | Amount of gain (loss) reclassified from other comprehensive income (loss) into income | Balance as of December 31, 2021 |
|---|---|---|---|---|
| **Derivatives designated as cash flow hedges** | | | | |
| Foreign currency contracts | $ (25,908) | $ 6,056 | $ (18,235) | $ (1,617) |
| Interest rate swaps | (541) | — | (37) | (504) |
| Total designated as cash flow hedges | $ (26,449) | $ 6,056 | $ (18,272) | $ (2,121) |

| | Balance as of December 31, 2019 | Amount of gain (loss) recognized in other comprehensive income (loss) on derivatives | Amount of gain (loss) reclassified from other comprehensive income (loss) into income | Balance as of December 31, 2020 |
|---|---|---|---|---|
| **Derivatives designated as cash flow hedges** | | | | |
| Foreign currency contracts | $ (6,005) | $ (8,336) | $ 11,567 | $ (25,908) |
| Interest rate swaps | (577) | — | (36) | (541) |
| Total designated as cash flow hedges | $ (6,582) | $ (8,336) | $ 11,531 | $ (26,449) |

The following table presents the amounts in the Consolidated Statements of Operations in which the effects of undesignated derivative instruments are recorded and the effects of fair value hedge activity on these line items:

| | Year Ended March 31, 2023 | | Three Months Ended March 31, 2022 (Transition Period) | | Year Ended December 31, 2021 | | Year Ended December 31, 2020 | |
|---|---|---|---|---|---|---|---|---|
| | Total | Amount of Gain (Loss) on Fair Value Hedge Activity | Total | Amount of Gain (Loss) on Fair Value Hedge Activity | Total | Amount of Gain (Loss) on Fair Value Hedge Activity | Total | Amount of Gain (Loss) on Fair Value Hedge Activity |
| Other income (expense), net | $ 16,780 | $ (7,200) | $ (51) | $ 4,481 | $ (51,113) | $ (8,502) | $ 168,153 | $ (2,173) |

**Cash Flow Hedges**

The Company is exposed to gains and losses resulting from fluctuations in foreign currency exchange rates relating to transactions generated by its international subsidiaries in currencies other than their local currencies. These gains and losses are driven by non-functional currency generated revenue, non-functional currency inventory purchases, investments in U.S. Dollar denominated available-for-sale debt securities, and certain other intercompany transactions. The Company enters into foreign currency contracts to reduce the risk associated with the foreign currency exchange rate fluctuations on these transactions. Certain contracts are designated as cash flow hedges. As of March 31, 2023, the aggregate notional value of the Company's outstanding cash flow hedges was $799.7 million (as March 31, 2022: $1,096.5 million; December 31, 2021: $556.5 million) of which contract maturities ranging from one to twenty-four months.

The Company may enter into long term debt arrangements with various lenders which bear a range of fixed and variable rates of interest. The nature and amount of the Company's long term debt can be expected to vary as a result of future business requirements, market conditions and other factors. The Company may elect to enter into interest rate swap contracts to reduce the impact associated with interest rate fluctuations. The interest rate swap contracts are accounted for as cash flow hedges. Refer to Note 8 of the Consolidated Financial Statements for a discussion of long term debt.

For contracts designated as cash flow hedges, the changes in fair value are reported as other comprehensive income (loss) and are recognized in current earnings in the period or periods during which the hedged transaction affects current earnings. Effective hedge results are classified in the Consolidated Statements of Operations in the same manner as the underlying exposure.

In March 2023, the Company unwound and de-designated certain derivative instruments previously designated as cash flow hedges. The pre-tax gain of $2.3 million, which had been recorded in other comprehensive income prior to the de-designation of the derivative instruments, was recognized in earnings during the period.

**Undesignated Derivative Instruments**

The Company has entered into foreign exchange forward contracts to mitigate the change in fair value of specific assets and liabilities on the Consolidated Balance Sheets. Undesignated instruments are recorded at fair value as a derivative asset or liability on the Consolidated Balance Sheets with their corresponding change in fair value recognized in other expense, net, together with the re-measurement gain or loss from the hedged balance sheet position. As of March 31, 2023, the total notional value of the Company's outstanding undesignated derivative instruments was $396.7 million (March 31, 2022: $228.4 million; December 31, 2021: $258.2 million).

**Credit Risk**

The Company enters into derivative contracts with major financial institutions with investment grade credit ratings and is exposed to credit losses in the event of non-performance by these financial institutions. This credit risk is generally limited to the unrealized gains in the derivative contracts. However, the Company monitors the credit quality of these financial institutions and considers the risk of counterparty default to be minimal.

## NOTE 17. PROVISION FOR INCOME TAXES

Income (loss) before income taxes is as follows:

| (In thousands) | Year Ended March 31, 2023 | Three Months Ended March 31, 2022 (Transition Period) | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
|---|---|---|---|---|
| Income (loss) before income taxes | | | | |
| United States | $ 27,650 | $ (88,789) | $ 191,201 | $ (478,465) |
| Foreign | 260,115 | 36,628 | 199,676 | (14,079) |
| Total | $ 287,765 | $ (52,161) | $ 390,877 | $ (492,544) |

The components of the income tax expense (benefit) consisted of the following:

| (In thousands) | Year Ended March 31, 2023 | Three Months Ended March 31, 2022 (Transition Period) | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
|---|---|---|---|---|
| **Current** | | | | |
| Federal | $ 18,483 | $ 331 | $ (2,454) | $ (30,047) |
| State | 3,771 | 99 | 864 | 34 |
| Foreign | 29,103 | 10,251 | 36,304 | 16,720 |
| | 51,357 | 10,681 | 34,714 | (13,293) |
| **Deferred** | | | | |
| Federal | (159,277) | 159 | 5,148 | 50,620 |
| State | 215 | (4) | (3,645) | 587 |
| Foreign | 6,659 | (2,655) | (4,145) | 11,473 |
| | (152,403) | (2,500) | (2,642) | 62,680 |
| Income tax expense (benefit) | $ (101,046) | $ 8,181 | $ 32,072 | $ 49,387 |

A reconciliation from the U.S. statutory federal income tax rate to the effective income tax rate is as follows:

| | Year Ended March 31, 2023 | | Three Months Ended March 31, 2022 (Transition Period) | | Year Ended December 31, 2021 | | Year Ended December 31, 2020 | |
|---|---|---|---|---|---|---|---|---|
| U.S. federal statutory income tax rate | $ 60,431 | 21.0 % | $ (10,954) | 21.0 % | $ 82,086 | 21.0 % | $ (103,434) | 21.0 % |
| State taxes, net of federal tax impact | 8,800 | 3.0 % | (5,314) | 10.2 % | 23,508 | 6.0 % | (29,341) | 6.0 % |
| Effect of foreign earnings | (2,019) | (0.7)% | (361) | 0.7 % | (10,697) | (2.7)% | (762) | 0.2 % |
| Permanent tax benefits/ nondeductible expenses | (9,330) | (3.2)% | (900) | 1.7 % | (12,343) | (3.2)% | 15,993 | (3.2)% |
| Permanent tax benefits/ nondeductible losses - divestitures | — | — % | (552) | 1.1 % | 7,317 | 1.9 % | (118,321) | 24.0 % |
| Unrecognized tax benefits | 11,560 | 4.0 % | 750 | (1.4)% | 9,813 | 1.1 % | 2,260 | (0.5)% |
| Impacts related to U.S. Tax Act | — | — % | — | — % | — | — % | (13,987) | 2.8 % |
| Valuation allowance | (170,414) | (59.2)% | 26,223 | (50.3)% | (63,418) | (14.9)% | 302,575 | (61.4)% |
| Other | (74) | — % | (711) | 1.3 % | (4,194) | (1.1)% | (5,596) | 1.1 % |
| Effective income tax rate | $ (101,046) | (35.1)% | $ 8,181 | (15.7)% | $ 32,072 | 8.2 % | $ 49,387 | (10.0)% |

For Fiscal 2023 the Company recorded an income tax benefit of $101.0 million compared to income tax expense of $8.2 million and $32.1 million in the periods ending March 31, 2022, and December 31, 2021, respectively. The change was primarily due to the recognition of an income tax benefit from the release of the U.S. federal valuation on beginning of year deferred tax assets in the period ending March 31, 2023. In the period ending March 31, 2022, additional valuation allowances were recorded for the U.S. and for the period ended December 31, 2021, the income tax benefits for the reduction in U.S. valuation allowances was limited to the current period earnings.

On August 16, 2022, the Inflation Reduction Act (the "Act") was enacted and signed into law in the United States. The Act contains a number of revisions to the Internal Revenue Code, including a 15% corporate minimum tax and a 1% excise tax on corporate stock repurchases in tax years beginning after December 31, 2022. The Company does not expect these tax provisions to have a material impact to the consolidated financial statements.

Deferred tax assets and liabilities consisted of the following:

| (In thousands) | March 31, 2023 | March 31, 2022 | December 31, 2021 |
|---|---|---|---|
| **Deferred tax assets** | | | |
| Operating lease liabilities | $ 213,381 | $ 191,342 | $ 197,682 |
| U.S. Federal and State Capital Loss | 45,099 | 57,200 | 57,097 |
| Reserves and accrued liabilities | 44,401 | 61,846 | 41,943 |
| Capitalized research expenditures | 35,539 | 8,646 | — |
| Inventory | 33,768 | 18,862 | 26,860 |
| Foreign net operating loss carry-forwards | 33,492 | 38,069 | 33,875 |
| Intangible assets | 22,923 | 25,935 | 26,281 |
| U.S. state net operating loss | 13,708 | 17,438 | 16,636 |
| Allowance for doubtful accounts and sales return reserves | 13,112 | 15,168 | 14,940 |
| Foreign tax credits | 9,522 | 9,423 | 8,606 |
| Stock-based compensation | 8,076 | 6,299 | 11,301 |
| Deductions limited by income | 5,957 | 6,083 | 3,288 |
| U.S. tax credits | 4,567 | 7,970 | 7,273 |
| Convertible debt instruments | 725 | 1,196 | — |
| Other | 8,674 | 8,896 | 5,490 |
| Total deferred tax assets | 492,944 | 474,373 | 451,272 |
| Less: valuation allowance | (175,185) | (350,610) | (318,221) |
| Total net deferred tax assets | $ 317,759 | $ 123,763 | $ 133,051 |
| | | | |
| **Deferred tax liabilities** | | | |
| Right-of-use asset | $ (122,286) | $ (93,541) | $ (98,085) |
| Convertible debt instruments | — | — | (1,066) |
| Prepaid expenses | (4,875) | (8,012) | (8,356) |
| Property, plant and equipment | (3,862) | (1,913) | (7,018) |
| Other | (1,888) | (2,042) | (3,743) |
| Total deferred tax liabilities | (132,911) | (105,508) | (118,268) |
| Total deferred tax assets, net | $ 184,848 | $ 18,255 | $ 14,783 |

All deferred tax assets and liabilities are classified as non-current on the Consolidated Balance Sheets as of March 31, 2023, March 31, 2022 and December 31, 2021. In evaluating its ability to realize the net deferred tax assets, the Company considered all available positive and negative evidence, including its past operating results and the forecast of future market growth, forecasted earnings, future taxable income, and prudent and feasible tax planning strategies. The assumptions utilized in determining future taxable income require significant judgment and actual operating results in future years could differ from the Company's current assumptions, judgments and estimates.

A significant portion of the Company's deferred tax assets relate to U.S. federal and state taxing jurisdictions. Realization of these deferred tax assets is dependent on future U.S. pre-tax earnings. In evaluating the recoverability of these deferred tax assets as of March 31, 2023, the Company has considered all available evidence, both positive and negative, including but not limited to the following:

Positive

• Current year pre-tax earnings including positive financial taxable income in the U.S. federal jurisdiction.

• Prior three-year cumulative positive financial taxable income in the U.S. federal jurisdiction.

• Forecasted future positive financial taxable income in the U.S.

• No material definite lived tax attributes (excluding capital loss) subject to expiration in the near short term.

• No history of U.S. federal and material state tax attributes expiring unused.

• Available prudent and feasible tax planning strategies.

Negative

- Prior three-year cumulative financial taxable loss in the U.S. state jurisdiction.

- Inherent challenges in forecasting sufficient future state pre-tax earnings to overcome existing cumulative losses in prior years.

- Existing definite life state attributes related to credits and net operating losses.

As of March 31, 2023, the Company believes that the weight of the positive evidence outweighs the negative evidence regarding the realization of the Company's U.S. federal deferred tax assets, resulting in the release of the corresponding valuation allowance. The release of valuation allowance (excluding capital losses) resulted in a material benefit to income tax expense and net income in the period. As of March 31, 2023, for U.S states the Company believes the weight of the negative evidence continues to outweigh the positive evidence regarding the realization of the state deferred tax assets and the Company has maintained a valuation allowance against these assets. The Company's current forecast for the U.S. indicates that there is a possibility that within the next 12 months, sufficient positive evidence may become available to reach a conclusion that a portion of the U.S state valuation allowance will no longer be required. The actualization of these forecasted results may result in a reversal of a portion of previously recorded U.S state valuation allowances in the United States. The release of valuation allowances would result in a benefit to income tax expense in the period the release is recorded. The timing and amount are subject to change based on the actual profitability that the Company is able to actually achieve in the United States. The Company also continues to maintain a valuation allowance against its net deferred income tax assets in certain foreign tax jurisdictions and will evaluate its ability to realize its net deferred tax assets on a quarterly basis.

As of each reporting date, management considers new evidence, both positive and negative, that could affect its view of the future realization of deferred tax assets. The Company will continue to evaluate our ability to realize our net deferred tax assets on a quarterly basis.

As of March 31, 2023, the Company had $13.7 million in deferred tax assets associated with $261.5 million in state net operating loss carryforwards and $4.6 million in deferred tax assets associated with state tax credits, the majority of which are definite lived. Certain definite lived state net operating losses and state tax credits will begin to expire within ten to twenty years. The Company had $45.1 million in deferred tax assets associated with federal and state capital loss carryforwards of $176.8 million, which, if unused, will expire in two years. The Company is not able to forecast the utilization of the deferred tax assets associated with state net operating loss carryforwards, the deferred tax assets associated with federal and state capital loss carryforwards, and a majority of the deferred tax assets associated with state tax credits and has recorded a valuation allowance of $63.1 million against these deferred tax assets.

As of March 31, 2023, the Company had $38.4 million in deferred tax assets associated with approximately $177.6 million in foreign net operating loss carryforwards and $9.5 million in deferred tax assets associated with foreign tax credit carryforwards. While the majority of the foreign net operating loss carryforwards and foreign tax credit carryforwards have an indefinite carryforward period, certain are definite lived, expected to expire within three to fifteen years. Additionally, the Company is not able to forecast the utilization of a majority of the deferred tax assets associated with foreign net operating loss carryforwards, foreign tax credit carryforwards and certain other foreign deferred tax assets and has recorded a valuation allowance of $68.9 million against these foreign deferred tax assets.

As of March 31, 2023, approximately $396.5 million of cash and cash equivalents was held by the Company's non-U.S. subsidiaries whose cumulative undistributed earnings total $1.3 billion. The Tax Cuts and Jobs Act of 2017 imposed U.S. federal tax on all post-1986 foreign unrepatriated earnings accumulated through December 31, 2017. The portion of these earnings not subject to U.S. federal income tax as part of the one-time transition tax should, in general, not be subject to U.S. federal income tax. The Company will continue to permanently reinvest these earnings, as well as future earnings from its foreign subsidiaries, to fund international growth and operations. If the Company was to repatriate indefinitely reinvested foreign funds, it would still be required to accrue and pay certain taxes upon repatriation, including foreign withholding taxes and certain U.S. state taxes and recognized foreign exchange rate impacts. Determination of the unrecorded deferred tax liability that would be incurred if such amounts were repatriated is not practicable.

The following table represents a reconciliation of the Company's total unrecognized tax benefits balances, excluding interest and penalties.

| (In thousands) | Year Ended March 31, 2023 | Three Months Ended March 31, 2022 (Transition Period) | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
|---|---|---|---|---|
| Beginning of period | $ 49,842 | $ 49,125 | $ 40,314 | $ 41,194 |
| Increases as a result of tax positions taken in a prior period | 4,987 | 159 | 6,713 | 1,738 |
| Decreases as a result of tax positions taken in a prior period | (598) | (37) | (332) | (2,309) |
| Increases as a result of tax positions taken during the current period | 4,594 | 595 | 2,430 | 2,142 |
| Decreases as a result of settlements during the current period | — | — | — | (1,500) |
| Reductions as a result of divestiture | — | — | — | (951) |
| End of period | $ 58,825 | $ 49,842 | $ 49,125 | $ 40,314 |

As of March 31, 2023, the total liability for unrecognized tax benefits was approximately $67.2 million (March 31, 2022: $55.6 million; December 31, 2021: $54.6 million) including $8.5 million for the accrual of interest and penalties (March 31, 2022: $5.7 million; December 31, 2021: $5.5 million).

For Fiscal 2023, the Company recorded $2.7 million for the accrual of interest and penalties within the provision for income taxes on its Consolidated Statements of Operations (Fiscal 2021: $1.2 million; Fiscal 2020: $1.2 million; Transition Period: $0.2 million).

As of March 31, 2023, $50.3 million of unrecognized tax benefits, excluding interest and penalties, would impact the Company's effective tax rate if recognized. Also included in the balance are unrecognized tax benefits of $6.6 million that, if recognized, would result in adjustments to other tax accounts, primarily valuation allowances on deferred tax assets.

The Company files income tax returns in the U.S. federal jurisdiction and various state and foreign jurisdictions. The Company is currently under audit by the U.S. Internal Revenue Service for the years 2015 through 2020. The majority of the Company's other returns for years before 2017 are no longer subject to U.S. federal, state and local or foreign income tax examinations by tax authorities.

The total amount of unrecognized tax benefits relating to the Company's tax positions is subject to change based on future events including, but not limited to, the settlements of ongoing tax audits and assessments and the expiration of applicable statutes of limitations. Although the outcomes and timing of such events are highly uncertain, the Company does not anticipate that the balance of gross unrecognized tax benefits, excluding interest and penalties, will change significantly during the next twelve months. However, changes in the occurrence, expected outcomes, and timing of such events could cause the Company's current estimate to change materially in the future.

## NOTE 18. EARNINGS PER SHARE

The following represents a reconciliation from basic net income (loss) per share to diluted net income (loss) per share:

| | Year Ended March 31, 2023 | Three Months Ended March 31, 2022 (Transition Period) | Year Ended December 31, 2021[1] | Year Ended December 31, 2020 |
|---|---|---|---|---|
| **Numerator** | | | | |
| Net income (loss) - Basic | $ 386,769 | $ (59,610) | $ 360,060 | $ (549,177) |
| Interest on Convertible Senior Notes due 2024, net of tax [2] | 899 | — | — | — |
| Net income (loss) - Diluted | $ 387,668 | $ (59,610) | $ 360,060 | $ (549,177) |
| **Denominator** | | | | |
| Weighted average common shares outstanding Class A, B and C - Basic | 451,426 | 471,425 | 465,504 | 454,089 |
| Dilutive effect of Class A, B, and C securities [2] | 1,841 | — | 3,035 | — |
| Dilutive effect of Convertible Senior Notes due 2024 [2] | 8,242 | — | 105 | — |
| Weighted average common shares and dilutive securities outstanding Class A, B, and C | 461,509 | 471,425 | 468,644 | 454,089 |
| | | | | |
| Class A and Class C securities excluded as anti-dilutive [3] | 6,989 | 6,539 | 1,578 | 6,364 |
| | | | | |
| Basic net income (loss) per share of Class A, B and C common stock | $ 0.86 | $ (0.13) | $ 0.77 | $ (1.21) |
| Diluted net income (loss) per share of Class A, B and C common stock | $ 0.84 | $ (0.13) | $ 0.77 | $ (1.21) |

[1] The Company adopted Accounting Standard Update No. 2020-06 "Debt - Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging - Contracts in Entity's Own Equity (Subtopic 815-40)" (ASU 2020-06) on January 1, 2022 using the modified retrospective transition approach. As a result, prior period comparatives have not been restated to conform to current period presentation.

[2] Effects of potentially dilutive securities are presented only in periods in which they are dilutive. No stock options, restricted stock units, or effects from the Convertible Senior Notes due 2024 are included in the computation of diluted earnings per share during periods when the Company is in the net loss position, as their effect would be anti-dilutive.

[3] Represents stock options and restricted stock units of Class A and Class C Common Stock outstanding that were excluded from the computation of diluted earnings per share because their effect would have been anti-dilutive.

## NOTE 19. SEGMENT DATA

The Company's operating segments are based on how the Chief Operating Decision Maker ("CODM") makes decisions about allocating resources and assessing performance. As such, the CODM receives discrete financial information for the Company's principal business by geographic region based on the Company's strategy of being a global brand. These geographic regions include North America, Europe, the Middle East and Africa ("EMEA"), Asia-Pacific and Latin America. Each geographic segment operates exclusively in one industry: the development, marketing and distribution of branded performance apparel, footwear and accessories. Total expenditures for additions to long-lived assets are not disclosed as this information is not regularly provided to the CODM.

The Company excludes certain corporate items from its segment profitability measures. The Company reports these items within Corporate Other, which is designed to provide increased transparency and comparability of the Company's operating segments' performance. Corporate Other consists primarily of (i) operating results related to MMR platforms and other digital business opportunities; (ii) general and administrative expenses not allocated to an operating segment, including expenses associated with centrally managed departments which include global marketing, global IT, global supply chain and innovation, and other corporate support functions; (iii) restructuring and restructuring related charges; and (iv) certain foreign currency hedge gains and losses.

The following tables summarize the Company's net revenues and operating income (loss) by its geographic segments. Intercompany balances were eliminated for separate disclosure:

| | Year Ended March 31, 2023 | Three Months Ended March 31, 2022 (Transition Period) | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
|---|---|---|---|---|
| **Net revenues** | | | | |
| North America | $ 3,820,993 | $ 841,101 | $ 3,810,372 | $ 2,944,978 |
| EMEA | 992,624 | 228,056 | 842,511 | 598,296 |
| Asia-Pacific | 825,338 | 181,908 | 831,762 | 628,657 |
| Latin America | 213,215 | 45,640 | 195,248 | 164,825 |
| Corporate Other | 51,466 | 4,240 | 3,573 | 137,911 |
| *Total net revenues* | $ 5,903,636 | $ 1,300,945 | $ 5,683,466 | $ 4,474,667 |

| | Year Ended March 31, 2023 | Three Months Ended March 31, 2022 (Transition Period) | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
|---|---|---|---|---|
| **Operating income (loss)** | | | | |
| North America | $ 734,881 | $ 154,084 | $ 972,093 | $ 474,584 |
| EMEA | 112,161 | 30,336 | 132,602 | 60,592 |
| Asia-Pacific | 100,276 | 5,464 | 132,911 | 2 |
| Latin America | 23,487 | 6,343 | 22,388 | (42,790) |
| Corporate Other | (686,994) | (242,183) | (773,704) | (1,105,826) |
| *Total operating income (loss)* | 283,811 | (45,956) | 486,290 | (613,438) |
| Interest expense, net | (12,826) | (6,154) | (44,300) | (47,259) |
| Other income (expense), net | 16,780 | (51) | (51,113) | 168,153 |
| *Income (loss) before income taxes* | $ 287,765 | $ (52,161) | $ 390,877 | $ (492,544) |

Long-lived assets are primarily composed of property and equipment, net and operating lease right-of-use assets. The Company's long-lived assets by geographic area were as follows:

| | March 31, 2023 | March 31, 2022 | December 31, 2021 |
|---|---|---|---|
| **Long-lived assets** | | | |
| United States | $ 921,845 | $ 787,806 | $ 801,130 |
| Canada | 15,671 | 20,756 | 21,094 |
| Total North America | 937,516 | 808,562 | 822,224 |
| Other foreign countries | 224,526 | 213,200 | 233,366 |
| Total long-lived assets | $ 1,162,042 | $ 1,021,762 | $ 1,055,590 |

## NOTE 20. RELATED PARTY TRANSACTIONS

The Company has an operating lease agreement with an entity controlled by the Company's Executive Chair and Brand Chief to lease an aircraft for business purposes. The Company recorded $2.0 million for lease payments to the entity for its use of the aircraft during Fiscal 2023, of which $0.6 million remained payable as of March 31, 2023 (Fiscal 2021: $2.0 million; Fiscal 2020: $2.0 million; Transition Period: $0.5 million). The Company determined the lease payments were at fair market lease rates.

In June 2016, the Company purchased parcels of land from an entity controlled by the Company's Executive Chair and Brand Chief, to be utilized to expand the Company's corporate headquarters to accommodate its growth needs. The purchase price for these parcels totaled $70.3 million. The Company determined that the purchase price for the land represented the fair market value of the parcels and approximated the cost to the seller to purchase and develop the parcels, including costs related to the termination of a lease encumbering the parcels.

In connection with the purchase of these parcels, the parties entered into an agreement in September 2016 and a supplement thereto in May 2022, pursuant to which the parties will share the burden of any special taxes

arising due to infrastructure projects in the surrounding area. The allocation to the Company is based on the expected benefits to the Company's parcels from these projects. No amounts were owed by either party under this agreement as of March 31, 2023.

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

Management's Annual Report on Internal control over Financial Reporting is included in Item 8 of this Annual Report on Form 10-K.

### Changes in Internal Controls

We have assessed the impact on changes to our internal controls over financial reporting, and conclude that there have been no changes in our internal control over financial reporting, as defined in Exchange Act Rules 13a-15(f) and 15d-15(f), during the most recent fiscal quarter that have materially affected, or that are reasonably likely to materially affect our internal controls over financial reporting. We have not experienced any material impact to our internal controls over financial reporting despite the fact that a significant number of our employees have transitioned to a hybrid work environment. We continue to monitor and assess impacts of hybrid work on our control environment and control activities in order to minimize the impact on the design and operating effectiveness of our controls.

We have implemented a new e-commerce order management system in North America. In connection with this implementation and resulting business process changes, we did not make any material changes to the design and operation of our internal controls over financial reporting.

## ITEM 9B. OTHER INFORMATION

On May 23, 2023, the Board of Directors of the Company approved and adopted certain amendments (the "Amendments") to the Company's Bylaws (the "Bylaws" and, as amended, the "Amended Bylaws"), which became effective immediately.

The Amendments update various provisions of the Bylaws to require parties proposing a nominee for election of a director to comply with the universal proxy rules recently adopted by the U.S. Securities and Exchange Commission. In addition, the Amendments update the Bylaws' proxy and advance notice provisions, specifically, the notice required thereby, to require, among other things: (i) certain representations with respect to the solicitation intentions of a proposing stockholder; (ii) additional representations regarding the willingness and ability of a proposed nominee to serve on the Board, if elected; and (iii) that advance notice of any nomination or proposal of other business contain all information that would be required to be disclosed in a proxy statement or other filing required to be made in connection with the solicitation of proxies in support of such nominee or proposal pursuant to Regulation 14A of the Securities Exchange Act of 1934, as well as disclosure of any substantial direct or indirect interests of the proposing stockholder, persons acting in concert with the stockholder and any proposed nominee in the Company, other than by virtue of ownership of Company stock. The Amendments also clarify that a stockholder may not nominate more individuals than there are directors to be elected or substitute or replace a proposed

nominee without compliance with the requirements for nomination in the bylaws, including compliance with applicable deadlines.

The Amendments also update the title of "chairman" to "chair" and remove gendered language throughout the Bylaws, make various other conforming and technical changes including clarification of the duties of the inspector of elections and the powers of the chair of a stockholder meeting and update provisions relating to virtual meetings to align with changes to the Maryland General Corporation Law statutory language.

The foregoing summary does not purport to be complete and is qualified in its entirety by reference to the full text of the Amended Bylaws, a copy of which is attached hereto as Exhibit 3.03 and incorporated herein by reference.

## ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS

Not applicable.

## PART III.

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The information required by this Item regarding directors is incorporated herein by reference from the 2023 Proxy Statement, under the headings "Election of Directors," "Corporate Governance and Related Matters - Board Meetings and Committees." Information required by this Item regarding executive officers is included under "Executive Officers" in Part 1 of this Annual Report on Form 10-K.

### Code of Ethics

We have a written code of ethics and business conduct in place that applies to all our employees, including our principal executive officer, principal financial officer, and principal accounting officer and controller. A copy of our code of ethics and business conduct is available on our website: https://about.underarmour.com/investor-relations/governance. We are required to disclose any change to, or waiver from, our code of ethics and business policy for our senior financial officers. We intend to use our website as a method of disseminating this disclosure as permitted by applicable SEC rules.

## ITEM 11. INFORMATION ABOUT OUR EXECUTIVE COMPENSATION

The information required by this Item is incorporated by reference herein from the 2023 Proxy Statement under the headings "Corporate Governance and Related Matters - Compensation of Directors," and "Executive Compensation."

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information required by this Item is incorporated by reference herein from the 2023 Proxy Statement under the headings "Security Ownership of Management and Certain Beneficial Owners of Shares" and "Equity Compensation Plan Information."

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required by this Item is incorporated by reference herein from the 2023 Proxy Statement under the heading "Transactions with Related Persons" and "Corporate Governance and Related Matters - Independence of Directors."

## ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information required by this Item is incorporated by reference herein from the 2023 Proxy Statement under the heading "Independent Auditors."

## PART IV.

### ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

a. The following documents are filed as part of this Annual Report on Form 10-K:

| 1. Financial Statements: | |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID 238) | 47 |
| Consolidated Balance Sheets as of March 31, 2023, March 31, 2022 and December 31, 2021 | 49 |
| Consolidated Statements of Operations for the Year March 31, 2023, the Three Months Ended March 31, 2022, and the Years Ended December 31, 2021 and 2020 | 50 |
| Consolidated Statements of Comprehensive Income (Loss) for the Year Ended March 31, 2023, the Three Months Ended March 31, 2022, and the Years Ended December 31, 2021 and 2020 | 51 |
| Consolidated Statements of Stockholders' Equity for the Year Ended March 31, 2023, the Three Months Ended March 31, 2022, and the Years Ended December 31, 2021, and 2020 | 52 |
| Consolidated Statements of Cash Flows for the Year Ended March 31, 2023, the Three Months Ended March 31, 2022, and the Years Ended December 31, 2021, and 2020 | 53 |
| Notes to the Audited Consolidated Financial Statements | 55 |

| 2. Financial Statement Schedule | |
|---|---|
| Schedule II—Valuation and Qualifying Accounts | 97 |

All other schedules are omitted because they are not applicable or the required information is shown in the Consolidated Financial Statements or notes thereto.

### 3. Exhibits

The following exhibits are incorporated by reference or filed herewith.

| Exhibit No. | |
|---|---|
| 3.01 | Amended and Restated Articles of Incorporation. |
| 3.02 | Articles Supplementary setting forth the terms of the Class C Common Stock, dated June 15, 2015 (incorporated by reference to Appendix F to the Preliminary Proxy Statement filed by the Company on June 15, 2015). |
| 3.03 | Amended and Restated Bylaws of Under Armour, Inc. (effective May 23, 2023). |
| 4.01 | Description of the Company's Securities Registered Pursuant to Section 12 of the Exchange Act (incorporated by reference to Exhibit 4.01 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2020, filed on February 24, 2021). |
| 4.02 | Indenture, dated as of June 13, 2016, between the Company and Wilmington Trust, National Association, as trustee (incorporated by reference to Exhibit 4.1 of the Company's Current Report on Form 8-K filed on June 13, 2016). |
| 4.03 | First Supplemental Indenture, dated as of June 13, 2016, relating to the 3.250% Senior Notes due 2026, between the Company and Wilmington Trust, National Association, as trustee, and the Form of 3.250% Senior Notes due 2026 (incorporated by reference to Exhibit 4.2 of the Company's Current Report on Form 8-K filed on June 13, 2016). |
| 4.04 | Indenture, dated as of May 27, 2020, relating to the Company's 1.50% Convertible Senior Notes due 2024, between the Company and Wilmington Trust, National Association, as Trustee and the Form of 1.50% Convertible Senior Notes due 2024 (incorporated by reference to Exhibit 4.1 of the Company's Current Report on Form 8-K filed on May 28, 2020). |
| 10.01 | Credit Agreement, dated March 8, 2019, by and among the Company, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, PNC Bank, National Association, as syndication agent and the other lenders and arrangers party thereto (incorporated by reference to Exhibit 10.01 of the Company's Current Report on Form 8-K filed on March 8, 2019). |

| Exhibit No. | |
|---|---|
| 10.02 | Amendment No. 1, dated May 12, 2020, to the Amended and Restated Credit Agreement, dated March 8, 2019, by and among the Company, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, and the other lenders and arrangers party thereto (incorporated by reference to Exhibit 10.01 of the Company's Current Report on Form 8-K filed on May 12, 2020). |
| 10.03 | Amendment No. 2, dated May 17, 2021, to the Amended and Restated Credit Agreement dated March 8, 2019, by and among the Company, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, and the other lenders and arrangers party thereto (incorporated by reference to Exhibit 10.01 of the Company's Current Report on Form 8-K filed on May 19, 2021). |
| 10.04 | Amendment No. 3, dated December 3, 2021, to the Amended and Restated Credit Agreement, dated March 8, 2019, by and among the Company, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, and the other lenders and arrangers party thereto (incorporated by reference to Exhibit 10.01 of the Company's Current Report on Form 8-K filed on December 8, 2021). |
| 10.05 | Technical Modification, dated February 24, 2023, to the Amended and Restated Credit Agreement, dated March 8, 2019, by and among the Company, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, and the other lenders and arrangers party thereto. |
| 10.06 | Form of Capped Call Confirmation (incorporated by reference to Exhibit 10.1 of the Company's Current Report on Form 8-K filed on May 28, 2020). |
| 10.07 | Form of Accelerated Share Repurchase Agreement (incorporated by reference to Exhibit 10.1 of the Company's Current Report on Form 8-K filed on February 25, 2022). |
| 10.08 | Under Armour, Inc. Amended and Restated Executive Incentive Compensation Plan (incorporated by reference to Exhibit 10.01 of the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2022, filed on August 4, 2022).* |
| 10.09 | Under Armour, Inc. Amended and Restated Deferred Compensation Plan (incorporated by reference to Exhibit 10.10 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2018, filed on February 22, 2019).* |
| 10.10 | Under Armour, Inc. Executive Change in Control Severance Plan.* |
| 10.11 | Under Armour, Inc. Executive Severance Program.* |
| 10.12 | Under Armour, Inc. Third Amended and Restated 2005 Omnibus Long-Term Incentive Plan (the "2005 Plan") (incorporated by reference to Exhibit 10.01 of the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2019, filed on August 1, 2019).* |
| 10.13 | Form of Non-Qualified Stock Option Grant Agreement under the 2005 Plan between the Company and Kevin Plank (incorporated by reference to Exhibit 10.06 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019, filed on February 26, 2020).* |
| 10.14 | Form of Non-Qualified Stock Option Grant Agreement under the 2005 Plan between the Company and Kevin Plank (incorporated by reference to Exhibit 10.13 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2018, filed on February 22, 2019).* |
| 10.15 | Form of Annual Restricted Stock Unit Grant Agreement under the 2005 Plan (incorporated by reference to Exhibit 10.12 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021, filed on February 23, 2022).* |
| 10.16 | Form of Annual Restricted Stock Unit Grant Agreement under the 2005 Plan.* |
| 10.17 | Form of Special Restricted Stock Unit Grant Agreement under the 2005 Plan.* |
| 10.18 | Form of Performance-Based Restricted Stock Unit Agreement under the 2005 Plan (incorporated by reference to Exhibit 10.02 of the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2022, filed on August 4, 2022).* |
| 10.19 | Form of Special Restricted Stock Unit Grant Agreement under the 2005 Plan (incorporated by reference to Exhibit 10.13 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021, filed on February 23, 2022).* |
| 10.20 | Form of Restricted Stock Unit Grant Agreement under the 2005 Plan (incorporated by reference to Exhibit 10.08 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019, filed on February 26, 2020).* |
| 10.21 | Form of Restricted Stock Unit Grant Agreement under the 2005 Plan (incorporated by reference to Exhibit 10.14 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017, filed on February 28, 2018).* |

| Exhibit No. | |
|---|---|
| 10.22 | Form of Performance-Based Stock Option Grant Agreement under the 2005 Plan (incorporated by reference to Exhibit 10.16 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017, filed on February 28, 2018).* |
| 10.23 | Form of Employee Confidentiality, Non-Competition and Non-Solicitation Agreement by and between certain executives of the Company.* |
| 10.24 | Under Armour, Inc. Fiscal 2024 Non-Employee Director Compensation Plan (the "Director Compensation Plan").* |
| 10.25 | Form of Initial Restricted Stock Unit Grant under the Director Compensation Plan (incorporated by reference to Exhibit 10.1 of the Company's Current Report on Form 8-K filed on June 6, 2006).* |
| 10.26 | Form of Annual Restricted Stock Unit Grant under the Director Compensation Plan (incorporated by reference to Exhibit 10.06 of the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, filed on August 4, 2011).* |
| 10.27 | Under Armour, Inc. 2006 Non-Employee Director Deferred Stock Unit Plan (the "Director DSU Plan") (incorporated by reference to Exhibit 10.02 of the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2010, filed on May 5, 2010).* |
| 10.28 | Amendment One to the Director DSU Plan (incorporated by reference to Exhibit 10.23 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2010, filed on February 24, 2011).* |
| 10.29 | Amendment Two to the Director DSU Plan (incorporated by reference to Exhibit 10.02 of the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2016, filed on August 3, 2016).* |
| 10.30 | Amendment Three to the Director DSU Plan (incorporated by reference to Exhibit 10.22 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019, filed on February 26, 2020).* |
| 10.31 | Employee Confidentiality, Non-Competition and Non-Solicitation Agreement by and between Patrik Frisk and the Company (incorporated by reference to Exhibit 10.01 of the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2018, filed on May 9, 2018).* |
| 10.32 | First Amendment to Employee Confidentiality, Non-Competition and Non-Solicitation Agreement, dated June 30, 2021, by and between Patrik Frisk and the Company (incorporated by reference to Exhibit 10.03 of the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2021, filed on August 5, 2021).* |
| 10.33 | Separation Agreement between the Company and Patrik Frisk dated May 17, 2022, including General Release and Form of Consulting Agreement (incorporated by reference to Exhibit 10.01 of the Company's Current Report on Form 8-K filed on May 18, 2022).* |
| 10.34 | Confidentiality, Non-Competition and Non-Solicitation Agreement, dated June 15, 2015, between the Company and Kevin Plank (the "Plank Non-Compete Agreement") (incorporated by reference to Appendix E to the Preliminary Proxy Statement filed by Under Armour, Inc. on June 15, 2015).* |
| 10.35 | First Amendment to the Plank Non-Compete Agreement, dated April 7, 2016 (incorporated by reference to Exhibit 10.03 of the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2016, filed on April 29, 2016).* |
| 10.36 | Form of Separation Agreement between the Company and Stephanie Pugliese, including General Release (incorporated by reference to Exhibit 10.03 of the Company's Quarterly Report of Form 10-Q for the quarter ended September 30, 2022, filed on November 8, 2022).* |
| 10.37 | Employment Offer Letter (including specific contractual obligations), dated December 14, 2022, by and between Stephanie C. Linnartz and the Company (incorporated by reference to Exhibit 10.01 of the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 2022, filed on February 8, 2023)* |
| 10.38 | Special Restricted Stock Unit Agreement under the 2005 Plan, dated February 27, 2023, between the Company and Stephanie C. Linnartz.* |
| 21.01 | List of Subsidiaries. |
| 23.01 | Consent of PricewaterhouseCoopers LLP. |
| 31.01 | Section 302 Chief Executive Officer Certification. |
| 31.02 | Section 302 Chief Financial Officer Certification. |
| 32.01 | Section 906 Chief Executive Officer Certification. |
| 32.02 | Section 906 Chief Financial Officer Certification. |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |

| Exhibit No. | |
|---|---|
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

_____

\*   Management contract or a compensatory plan or arrangement required to be filed as an Exhibit pursuant to Item 15(b) of Form 10-K.

**ITEM 16. FORM 10-K SUMMARY**

None.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

UNDER ARMOUR, INC.

By:   /s/ STEPHANIE C. LINNARTZ
_____
Stephanie C. Linnartz
*President and Chief Executive Officer*

Date: May 24, 2023

Pursuant to the requirements of the Securities Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the date indicated.

| | |
|---|---|
| /s/ STEPHANIE C. LINNARTZ | President and Chief Executive Officer (principal executive officer) |
| Stephanie C. Linnartz | |
| /s/ DAVID E. BERGMAN | Chief Financial Officer (principal financial officer) |
| David E. Bergman | |
| /s/ ADITYA MAHESHWARI | Senior Vice President and Chief Accounting Officer (principal accounting officer) |
| Aditya Maheshwari | |
| /s/ KEVIN A. PLANK | Executive Chair and Brand Chief |
| Kevin A. Plank | |
| /s/ DOUGLAS E. COLTHARP | Director |
| Douglas E. Coltharp | |
| /s/ JERRI L. DEVARD | Director |
| Jerri L. DeVard | |
| /s/ MOHAMED A. EL-ERIAN | Director |
| Mohamed A. El-Erian | |
| /s/ CAROLYN N. EVERSON | Director |
| Carolyn N. Everson | |
| /s/ DAVID W. GIBBS | Director |
| David W. Gibbs | |
| /s/ KAREN W. KATZ | Director |
| Karen W. Katz | |
| /s/ ERIC T. OLSON | Director |
| Eric T. Olson | |
| /s/ PATRICK W. WHITESELL | Director |
| Patrick W. Whitesell | |

Dated: May 24, 2023

Schedule II

Valuation and Qualifying Accounts

(In thousands)

| Description | Balance at Beginning of Year | Charged to Costs and Expenses | Write-Offs Net of Recoveries | Balance at End of Year |
|---|---|---|---|---|
| **Allowance for doubtful accounts** | | | | |
| For the year ended March 31, 2023 | $ 7,113 | $ 5,193 | $ (1,493) | $ 10,813 |
| For the three months ended March 31, 2022 (Transition Period) | 7,128 | (36) | 21 | 7,113 |
| For the year ended December 31, 2021 | 20,350 | (3,821) | (9,401) | 7,128 |
| For the year ended December 31, 2020 | 15,082 | 10,456 | (5,188) | 20,350 |
| **Sales returns and allowances** | | | | |
| For the year ended March 31, 2023 | $ 70,136 | $ (125,816) | $ 125,871 | $ 70,191 |
| For the three months ended March 31, 2022 (Transition Period) | 69,070 | (23,649) | 24,715 | 70,136 |
| For the year ended December 31, 2021 | 94,179 | (96,632) | 71,523 | 69,070 |
| For the year ended December 31, 2020 | 98,652 | (431,253) | 426,780 | 94,179 |
| **Deferred tax asset valuation allowance** | | | | |
| For the year ended March 31, 2023 | $ 350,610 | $ 5,338 | $ (180,763) | $ 175,185 |
| For the three months ended March 31, 2022 (Transition Period) | 318,221 | 33,743 | (1,354) | 350,610 |
| For the year ended December 31, 2021 | 388,431 | 12,605 | (82,815) | 318,221 |
| For the year ended December 31, 2020 | 101,997 | 291,887 | (5,453) | 388,431 |

# KEY FINANCIALS[1]



### NET REVENUE BY PRODUCT
(PERCENT OF FY23 TOTAL)

- 66%
- 25%
- 7%
- 2%
- 1%

■ Apparel   ■ Licensing
■ Footwear   ■ Corporate Other
■ Accessories

### NET REVENUE BY REGION
(PERCENT OF FY23 TOTAL)

- 65%
- 17%
- 14%
- 4%
- 1%

■ North America   ■ EMEA
■ Latin America   ■ Corporate Other
■ Asia Pacific

### NET REVENUE BY CHANNEL
(PERCENT OF FY23 TOTAL)

- 59%
- 38%
- 2%
- 1%

■ Wholesale   ■ Licensing
■ Direct to Consumer   ■ Corporate Other



### NET REVENUE
($ IN BILLIONS)

| FY18 | FY19 | FY20 | FY21 | FY23 |
|------|------|------|------|------|
| $5.2 | $5.3 | $4.5 | $5.7 | $5.9 |



### GROSS MARGIN[2]
(PERCENT OF REVENUE)

| FY18[2] | FY19 | FY20[2] | FY21[2] | FY23 |
|------|------|------|------|------|
| 45.5% | 46.9% | 48.6% | 50.4% | 44.9% |



### INCOME FROM OPERATIONS[3]
($ IN MILLIONS & PERCENT OF REVENUE)

| FY18[3] | FY19 | FY20[3] | FY21[3] | FY23[3] |
|------|------|------|------|------|
| $179 | $237 | $1 | $527 | $304 |
| 3.4% | 4.5% | 0.0% | 9.3% | 5.1% |

1   Following a transition quarter (January 1 to March 31, 2022), Under Armour changed its fiscal year-end from December 31 to March 31, beginning its fiscal 2023 (FY23) on April 1, 2022. Accordingly, the company did not have a fiscal 2022 nor are the prior fiscal years presented in these charts directly comparable twelve-month periods to FY23. Please see the company's Form 10-K for the most recent comparable prior twelve-month periods related to FY23.

2   Adjusted basis: Excludes 0.1%, 0.3% and 0.4% of restructuring impacts in FY21, FY20 and FY18, respectively; GAAP Basis 50.3%, 48.3% and 45.1% for FY21, FY20 and FY18, respectively.

3   Adjusted basis: Excludes $20M litigation reserve in FY23 and excludes $41M, $614M and $204M of restructuring and impairment impacts in FY21, FY20 and FY18 respectively; GAAP Basis $284M, $486M, ($613M) and ($25M) for FY23, FY21, FY20 and FY18 respectively.

UNDER ARMOUR

# BOARD OF DIRECTORS



**KEVIN A. PLANK**
Executive Chair and
Brand Chief

**CAROLYN N. EVERSON**
Senior Advisor for Permira;
Former Vice President, Global
Business Group of Meta





**STEPHANIE C. LINNARTZ**
President and
Chief Executive Officer

**DAVID W. GIBBS**
Chief Executive Officer of
Yum! Brands, Inc.





**DOUGLAS E. COLTHARP**
Executive Vice President
and Chief Financial Officer,
Encompass Health Corporation

**KAREN W. KATZ**
Former President and Chief
Executive Officer, Nieman
Marcus Group LTD LLC





**JERRI L. DEVARD**
Former Executive Vice
President, Chief Customer
Officer of Office Depot, Inc.

**ERIC T. OLSON**
Admiral U.S. Navy (Retired)
and Former Commander, U.S.
Special Operations Command





**MOHAMED A. EL-ERIAN**
Former Chief Executive Officer
and Co-Chief Investment Officer
of PIMCO

**PATRICK W. WHITESELL**
Executive Chairman of
Endeavor Holdings Group



EXHIBIT J

# EXHIBIT G

Subscribe for $1

NBA    NBA Draft    Teams    ···

Storylines to watch    40 games to watch in 2023-24    NBA position group rankings    Latest edition of The Bounce

# Steph Curry receives $75 million in Under Armour shares as part of compensation to remain company ambassador



By Mike Vorkunov    Apr 7, 2023

[Golden State Warriors](#) star [Steph Curry](#) received a large grant of shares in Under Armour this week from the company worth $75 million as part of the compensation package he will receive in becoming the president of Under Armour's Curry Brand and his furthered role as an ambassador for the Baltimore-based apparel company. Here's what you need to know:

- Curry received 8,823,530 restricted stock units of Under Armour common stock on April 3. It is valued, the company said, at $75 million as of the end of that day the grant was made. The company disclosed this in a public SEC filing.
- Curry and Under Armour announced a new long-term partnership last week. It could become a lifetime deal if certain revenue targets are met.
- The new contract is expected to run past the end of his playing career. Curry 34, has been with Under Armour since 2013. The $75 million award will vest in two installments, contingent on him remaining with the company. The first installment will vest in 2029 and the second in 2034.

## Why It Matters

This filing makes public at least some of Curry's deal with the company, though the $75 million stock payment is only a portion of the compensation Curry will receive for his increased role with Under Armour.

ADVERTISEMENT

National

Boxing

Bundesliga

Champions League

Championship

College Football

Copa del Rey

Culture

Europa League

European Championship

FA Cup

Fantasy Baseball

Fantasy Basketball

Fantasy Football

Fantasy Hockey

Fantasy Premier League

Formula 1

Gaming

Golf

International Soccer

La Liga

League Cup

League One

League Two

LNH

Men's College Basketball

Men's World Cup

Mixed Martial Arts

9/13/23, 5:3... Case 2:23-cv-00932-JHC Document 189-8 Filed 01/31/24 Page 295 of 468 ... to The Athletic

MLB
MLS
Motorsports
NBA
NFL
NHL
NWSL
Olympics
Opinion
Premier League
Scottish Premiership
Serie A
Soccer
Sports Betting
Sports Business
Tennis
UK Women's Football
WNBA
Women's College Basketball
Women's Euros
Women's Hockey
Women's World Cup
NCAA Women's Basketball
The Athletic Ink
Podcasts
Headlines
Real Time

US

Arizona
Atlanta
Baltimore
Bay Area
Boston
Buffalo
Carolina
Chicago
Cincinnati
Cleveland
Columbus
Dallas
Denver
Detroit
Houston
Indiana
Jacksonville
Kansas City
Las Vegas
Los Angeles
Memphis
Miami
Minnesota
Nashville
New Orleans
New York
Oklahoma
Oregon
Orlando
Philadelphia
Pittsburgh
Sacramento

San Antonio

San Diego

Seattle

St. Louis

Tampa Bay

Utah

Washington DC

Wisconsin

Canada

Calgary

Edmonton

Montreal

Montréal (français)

Ottawa

Toronto

Vancouver

Winnipeg

Partners

Tickets by StubHub

Subscribe

Start Subscription

Buy a Gift

Student Discount

Group Subscriptions

HQ

About Us

Careers

Code of Conduct

Editorial Guidelines

Business Inquiries

Press Inquiries

Support

FAQ

Forgot Password?

Redeem Gift

Contact Us

Terms of Service

Newsletters

The Pulse

The Bounce

The Windup

Prime Tire

Full Time

Until Saturday

©2023 The Athletic Media Company. All rights reserved.

Privacy Policy

Support

Sitemap




# EXHIBIT K

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| ATHALONZ, LLC, | § | |
| | § | Case No.: 2:23-cv-00193-JRG |
| *Plaintiff*, | § | |
| | § | **DEMAND FOR JURY TRIAL** |
| v. | § | |
| | § | |
| UNDER ARMOUR, INC., | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

**PLAINTIFF'S MOTION TO COMPEL COMPLIANCE WITH DISCOVERY ORDER**

## **<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION ............................................................................................ 1

II.   BACKGROUND ............................................................................................. 2

III.  ARGUMENT ................................................................................................... 3

      A.    UA Must Immediately Produce Sales Information for the Accused Products. ...... 3

      B.    UA Must Produce Other Relevant Documents by a Date Certain. ......................... 4

      C.    UA Must Produce Relevant Documents Related to the Athletes that Sponsor the
            Accused Products. ................................................................................................ 5

      D.    UA Must Pay Athalonz's Fees and Expenses in Bringing This Motion. ................ 7

IV.   CONCLUSION ................................................................................................ 7

## I.   INTRODUCTION

Plaintiff Athalonz, LLC ("Athalonz") moves to compel Defendant Under Armour, Inc. ("UA") to comply with its obligations under Paragraph 3 of the Discovery Order and produce relevant documents it has so far withheld.  Athalonz has repeatedly sought narrow, targeted discovery in this case, identifying specific categories of documents for UA to produce weeks in advance of the Court's October 19 deadline for additional disclosures.  Despite Athalonz's best efforts, in the six weeks since the deadline for document production, UA has stonewalled discovery.  UA has produced less than a hundred documents to date, most of which are simply public screenshots from its website, and has refused a date certain for any future productions.

Athalonz primarily seeks the Court's assistance in securing UA's compliance with the Court's orders.  UA has not produced even the most basic sales information or other routine, relevant categories of documents.  These documents should have been produced on October 19, but were not produced then, and still have not been produced now, six weeks later.  Significantly, UA does not dispute that it must produce these documents—the dispute is when it will do so.  Athalonz does not intend to burden the Court with unnecessary motions, but UA has made clear that it will unilaterally decide when it wants to produce documents, repeatedly refusing to provide a date certain for production other than noting it would be before the Court could rule on a motion to compel.  That is not how discovery should work.  Athalonz respectfully requests the Court order immediate production of sales information and the other agreed categories of documents within one week of the Court's order on this motion.

The only documents actually in dispute relate to UA's athletes that sponsor the Accused Products—Stephen Curry, Jordan Spieth, and Bryce Harper ("sponsored athletes").  Extensive public documentation from UA itself highlights the significant role each of the sponsored athletes has played in the marketing of the Accused Products, the importance of UA's contracts with these

athletes, and the athletes' role the design and development of the Accused Products, making them clearly relevant to this dispute. UA does not actually dispute that the athletes played a relevant role—but it has refused to produce its contracts with the sponsored athletes and other documents relating to their role in the design, development, and marketing of the Accused Products, all of which are relevant to many issues in the case. Athalonz seeks to compel these documents.

Finally, Athalonz also requests that the Court order UA to pay Athalonz's reasonable fees and expenses in bringing this motion under Rule 37(a)(5), even if UA ultimately produces the requested documents before the Court resolves this motion. UA's discovery delay tactics should not be rewarded—the Federal Rules are designed to prevent exactly what UA has done here.

## II.    BACKGROUND

October 19, 2023 was the deadline to produce "all documents, electronically stored information, and tangible things in the possession, custody, or control of the party that are relevant to the pleaded claims or defenses involved in this action." Dkt. 34 ¶ 3(b); Dkt. 35 at 5 (setting deadline for Initial and Additional Disclosures at October 19). Two weeks before that date, Athalonz sent UA a letter identifying 18 targeted categories of documents that it expected in UA's initial production. On October 19, despite Athalonz's requests, UA produced only 98 documents, most of which were publicly available screenshots from its own website, and almost none of which were responsive to the categories Athalonz requested. After reviewing UA's deficient production, Athalonz sent another letter on October 26, explaining in detail why UA's production failed to satisfy its discovery obligations and highlighting particular documents or categories of documents within the 18 categories previously requested were missing. The parties exchanged over a dozen further letters and emails in the weeks that followed and met and conferred before Athalonz filed this motion. To date, UA has still not produced any additional documents nor provided a date certain for any further production, even where it has agreed to produce some document categories.

III.    ARGUMENT

Federal Rule of Civil Procedure 26(b)(1) permits discovery into "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." The Court's Discovery Order (Dkt. 34) requires the parties to produce discovery without requests for production, and also makes clear that "[a] party is not excused from the requirements of this Discovery Order because it has not fully completed its investigation of the case[.]" *Id.* ¶ 10. "Once the moving party establishes that the materials requested are within the scope of permissible discovery, the burden shifts to the party resisting discovery to show why the discovery is irrelevant, overly broad, or unduly burdensome or oppressive, and thus should not be permitted." *EVS Codec Techs., LLC v. OnePlus Tech. (Shenzhen) Co.*, 2020 WL 6365514, at \*1 (E.D. Tex. Apr. 9, 2020). Federal Rule of Civil Procedure 37(a)(5)(A) provides that the Court must award reasonable fees and expenses in bringing a motion to compel, both if the motion is granted and if the disclosure or requested discovery is provided after the motion was filed, absent mitigating circumstances not present here. *See Weatherford Tech. Holdings, LLC v. Tesco Corp.*, 2018 WL 4620634, at \*2 (E.D. Tex. Apr. 27, 2018) (citations omitted).

In this case, most of the relief Athalonz seeks is simply compliance with the Court's October 19 order that UA has unilaterally ignored. Beyond that, Athalonz seeks discovery of narrow, relevant categories of information related to the sponsored athletes, and UA cannot meet its burden to resist this discovery. Athalonz also requests the Court order UA to pay Athalonz's reasonable fees and expenses in bringing this motion.

   A.    **UA Must Immediately Produce Sales Information for the Accused Products.**

Athalonz first moves to compel immediate production of UA's sales information for the Accused Products. UA simply has no excuse for its failure to timely produce sales information— there is no dispute that this information is relevant or that it was not produced either by the October

3

19 deadline as required or in the six weeks after that deadline came and went, despite Athalonz's repeated protests. Indeed, Athalonz identified the specific, targeted sales information it sought on October 4, weeks before the Court's deadline: U.S. monthly sales information for each Accused Product, including information sufficient to show sales revenue, quantities, profitability, costs, and margins, beginning from the date the first Asserted Patent issued (June 2020). Sales information is particularly critical for Athalonz's damages theories and is necessary to Athalonz's ability to move discovery in this case forward.

UA has never disputed relevance and has never claimed burden; it just unilaterally decided it was not going to comply with the Court's October 19 deadline. UA's vague claims that it was "working to compile the sales information" (November 2), or "working diligently to gather and produce these additional documents, and will do so in a reasonable time frame" (November 7 and November 13) are insufficient. The Discovery Order explicitly prohibits these arguments from justifying non-production: "**No Excuses.** A party is not excused from the requirements of this Discovery Order because it has not fully completed its investigation of the case[.]" Dkt. 34 ¶ 10. Indeed, UA's true intention was clear on the parties' meet and confer (November 21)—that it could decide when to produce documents because it would do so before the Court could rule on a motion to compel. The Court should grant this motion and discourage such gamesmanship.

### B. UA Must Produce Other Relevant Documents by a Date Certain.

In addition to sales information, Athalonz also moves to compel a date certain for UA to produce other categories of documents, none of which UA has disputed are relevant. Through the parties' extensive correspondence, UA has agreed to produce the following categories of documents but has continued to refuse to provide a date for production:

- Documents that identify any code name, internal name, project name, marketing name, or version number associated with the Accused Products.

- Documents that identify the date the Accused Products were first sold in the United States, and the date they were discontinued, if applicable.

- Internal specifications, business or marketing plans, promotional materials, development or testing documents for the Accused Products.

- Documents related to Athalonz, its products, or its patents.

UA cannot continue to delay production of these relevant documents. The Court's standing orders exist for a reason—to give the parties strict, early deadlines so the parties can focus their efforts on follow up discovery and disputes that really matter. *See also Weatherford*, 2018 WL 4620634, at *3 (discussing the importance of compliance with the Discovery and Docket Control Orders). Unfortunately, UA simply ignored the Court's October 19 order. Athalonz requests the Court order UA to produce these documents within one week of the Court's order.

### C.  UA Must Produce Relevant Documents Related to the Athletes that Sponsor the Accused Products.

Athalonz seeks targeted discovery related to UA's athletes that sponsor the Accused Products. In particular, NBA player Stephen Curry, professional golfer Jordan Spieth, and MLB player Bryce Harper collectively sponsor more than half of the Accused Products by number, and likely a far higher percentage by revenue. Extensive public documentation from UA highlights the role they played not only in the marketing and promotion of the Accused Products, but also in the design and development of the Accused Products, making the sponsored athletes relevant to this dispute. *See, e.g.*, Dkt. 19-9, -10, -11, -14, -15, -22. Given the importance of UA's relationship with the sponsored athletes, Athalonz identified two specific, targeted categories of discovery:

- Contracts, draft agreements, and communications related to each athlete's role as a sponsor of the Accused Products, including documents sufficient to show the amount and terms of payment from Under Armour to each athlete.

- Documents related to each athlete's involvement in the design, development, testing, marketing, advertising, promotion, and/or sale of the Accused Products.

Despite these narrow requests, UA has refused to produce the first category altogether, and has

unilaterally and inappropriately limited the scope of the second.

**Sponsored Athlete Contracts.** UA's contracts with the sponsored athletes are relevant. First, they relate to Athalonz's damages theories and the value of Athalonz's patented technology. These contracts will show the amount UA pays to the sponsored athletes to market and promote the Accused Products—information that goes to the value of Athalonz's patents embodied by those products—and may also include information relating to the sponsored athletes' role in the design and development of the Accused Products. Beyond that, Athalonz expects that the contracts will be used to rebut arguments from UA that the Accused Products are only successful because they are sponsored by the athletes, not because of Athalonz's patented technology. UA also cannot meet its burden to resist this discovery. *See EVS Codec*, 2020 WL 6365514, at *1. There is no burden on UA in producing these few standalone documents—UA even touts their existence in its public annual reports. *See* Ex. 1 (UA 2023 10K referencing Mr. Curry's "Under Armour, Inc. Athlete Product, Brand, Ambassador, and Endorsement Agreement"). The discovery is not broad or oppressive, and any concerns about confidentiality are satisfied by the Court's protective order.

**Design/Development Documents.** The dispute regarding design and development documents is narrow—UA claims it only has to produce documents related to the "accused features of the Accused Products, i.e. the shape and materials of the shoe sole" and can exclude documents relating to the athletes' role in designing and developing the Accused Products generally. That limitation is improper—the claims of the Asserted Patents unambiguously cover the entire accused UA shoes, and are not limited to only the shape and materials of the shoe sole. *See, e.g.*, Dkt. 23-5 (claim 5, "a shoe comprises"); 23-6 (claim 1); 23-7 (claim 1); 23-8 (claim 1); 23-14 (claim 1). Documents related to other features of the Accused Products are highly relevant to many issues in the case, including infringement and damages. *E.g.*, *ICON Health & Fitness,*

*Inc. v. Horizon Fitness, Inc.*, 2009 WL 10677745, at *3-5 (E.D. Tex. Mar. 16, 2009) (ordering production of all documents relating to the design of the accused products and to marketing "or other testimonials by [defendant's] representatives"). Similarly, documents related to these sponsored athletes' involvement in the marketing, promotion, and/or sale of the Accused Products generally are clearly relevant—UA's attempt to limit its production to only documents related to the shoe sole is inappropriate. Again, UA has identified no burden in producing any of these documents and has failed to meet its burden of showing the documents should not be produced.

**D.  UA Must Pay Athalonz's Fees and Expenses in Bringing This Motion.**

Finally, Athalonz requests the Court order UA to pay its fees and expenses in bringing this motion. As set forth above, UA unilaterally and unapologetically ignored the Court's October 19 deadline to produce documents, despite agreeing that most of what Athalonz requested was relevant and repeating that it would produce documents "in a reasonable time frame." To be clear, blowing the deadline by six weeks and continuing to refuse to provide an indication of a date for production is not "reasonable," it is precisely the type of excuse the Discovery Order discourages. Dkt. 34 ¶ 10; *see Weatherford*, 2018 WL 4620634, at *2 (E.D. Tex. Apr. 27, 2018) (granting fees in bringing a motion to compel); *Mayes v. Simpson*, 2016 WL 8223976, at *3 (E.D. Tex. Jan. 12, 2016) (same, noting "award of expenses is mandatory in circumstances such as these."). UA's conduct is a clear delay tactic—it admitted so much during the parties' meet and confer when it refused to provide a date certain for production other than noting it would be before the Court could rule on a motion to compel. Even if UA does produce these agreed documents before the Court rules, Rule 37 mandates awarding fees, not only "if the motion is granted" but also "if the disclosure or requested discovery is provided after the motion was filed."

**IV.  CONCLUSION**

For the reasons stated above, Athalonz respectfully requests that the Court grant its motion.

Dated: November 29, 2023

Respectfully submitted,

/s/ Melissa R. Smith

Christine E. Lehman (pro hac vice)
clehman@reichmanjorgensen.com
Connor S. Houghton (pro hac vice)
choughton@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN
& FELDBERG LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 894-7310
Facsimile: (650) 560-3501

Michael Matulewicz-Crowley
mmatulewicz-
crowley@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN
& FELDBERG LLP
400 Madison Avenue, Suite 14D
New York, NY 10017
(332) 208-7170

Taylor N. Mauze (TX Bar No. 24102161)
tmauze@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN
& FELDBERG LLP
901 S. Mopac Expressway
Bldg. 1, Ste. 300
Austin, TX 78756
Telephone: (650) 623-1401
Facsimile: (650) 650-3501

Melissa R. Smith
State Bar No. 24001351
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
Email: melissa@gillamsmithlaw.com

**Attorneys for Plaintiff**
**Athalonz, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service, including counsel for Under Armour, are being served on November 29, 2023 with a copy of this document via the Court's CM/ECF system.

*/s/ Melissa R. Smith*
Melissa R. Smith

## CERTIFICATE OF CONFERENCE

On November 21, 2023, lead and local counsel for Athalonz spoke with lead and local counsel for Under Armour regarding the relief requested herein. Counsel for Under Armour refused to provide a date certain for production of any documents, and indicated it opposed the relief requested.

*/s/ Melissa R. Smith*
Melissa R. Smith

# EXHIBIT L

| | |
|---|---|
| **From:** | Cimino, Frank C., Jr. |
| **To:** | Christine E. Lehman; Woodworth, Megan S.; Thad Heartfield; Bugg, Robert E. |
| **Cc:** | Melissa Smith; RJ_Athalonz Under Armour; Connor Houghton |
| **Subject:** | RE: Athalonz/Under Armour - Notice of Subpoena |
| **Date:** | Tuesday, November 21, 2023 3:32:15 PM |

**CAUTION: EXTERNAL SENDER**

Christine,

Received.  As noted, we object to the return dates, but will get back to you shortly.  Best regards, F.

---

**From:** Christine E. Lehman <clehman@reichmanjorgensen.com>
**Sent:** Tuesday, November 21, 2023 3:27 PM
**To:** Woodworth, Megan S. <MSWoodworth@Venable.com>; Thad Heartfield
<thad@heartfieldlawfirm.com>; Cimino, Frank C., Jr. <FCCimino@Venable.com>; Bugg, Robert E.
<REBugg@Venable.com>
**Cc:** Melissa Smith <Melissa@gillamsmithlaw.com>; RJ_Athalonz Under Armour
<RJ_AthalonzUnderArmour@reichmanjorgensen.com>; Connor Houghton
<choughton@reichmanjorgensen.com>
**Subject:** RE: Athalonz/Under Armour - Notice of Subpoena

Counsel,
Thank you for agreeing to accept service of the subpoena to Mr. Curry.  Another courtesy copy is
attached.

Christine

---

**From:** Connor Houghton <choughton@reichmanjorgensen.com>
**Sent:** Friday, November 17, 2023 12:22 PM
**To:** Woodworth, Megan S. <MSWoodworth@Venable.com>; Thad Heartfield
<thad@heartfieldlawfirm.com>; Cimino, Frank C., Jr. <FCCimino@Venable.com>; Bugg, Robert E.
<REBugg@Venable.com>
**Cc:** Melissa Smith <Melissa@gillamsmithlaw.com>; RJ_Athalonz Under Armour
<RJ_AthalonzUnderArmour@reichmanjorgensen.com>
**Subject:** Athalonz/Under Armour - Notice of Subpoena

Counsel,

Pursuant to FRCP 45(a)(4), Athalonz provides notice that it intends to serve the attached subpoena
today.

Thank you,
Connor

Connor S. Houghton
**REICHMAN JORGENSEN LEHMAN & FELDBERG LLP**

1909 K Street, NW
Suite 800
Washington, D.C. 20006
(202) 894-7315

*NOTICE: This transmission is intended only for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately via reply e-mail, and then destroy all instances of this communication. Thank you.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

EXHIBIT M

# GOLDEN STATE WARRIORS



2023-24 SEASON

PRESENTED BY
KAISER PERMANENTE

## JANUARY 2024

| SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|
| DEC 31 | 1 | ★ 2 ORL 7:00P | 3 | ★ 4 DEN 7:00P | 5 DET 7:00P | 6 |
| TOR 5:30P 7 | 8 | ● 9 | ▲ 10 NOP 7:00P | 11 | CHI 5:00P 12 | ★ 13 MIL 5:00P |
| 14 | MEM 3:00P 15 | 16 | UTA 6:00P 17 | 18 | ★ 19 DAL 7:00P | 20 |
| 21 | 22 | 23 | ATL 24 4:00P | ● SAC 25 7:00P | 26 | ■ 27 LAL 5:30P |
| 28 | 29 | PHI 30 7:00P | 31 | | | |

## OCTOBER 2023

| SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | PRESEASON LAL 5:30P 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | PRESEASON LAL 14 |
| PRESEASON SAC 6:00P 15 | 16 | 17 | PRESEASON SAC 7:00P 18 | 19 | PRESEASON SAS 7:00P 20 | 21 |
| 22 | 23 | ● 24 PHX 7:00P | 25 | 26 | SAC 7:00P 27 | 28 |
| HOU 4:00P 29 | ★ 30 NOP 5:00P | 31 | | | | |

## NOVEMBER 2023

| SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | SAC 7:00P | ● OKC 5:00P | 3 | 4 |
| CLE 3:00P 5 | DET 4:00P 6 | 7 | DEN 7:00P 8 | 9 | ★ CLE 5:30P 10 | 11 |
| MIN 5:30P 12 | 13 | ■ MIN 7:00P 14 | 15 | ★ OKC 7:00P 16 | 17 | OKC 5:30P 18 |
| 19 | HOU 7:00P 20 | 21 | PHX 7:00P 22 | 23 | ■ SAS 7:00P 24 | 25 |
| 26 | 27 | ● ■ SAC 7:00P 28 | 29 | LAC 7:00P 30 | | |

## DECEMBER 2023

| SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|
| | | | | | 1 LAC 1:00P | 2 |
| 3 | IN-SEASON TOURNAMENT QUARTERFINALS 4 | IN-SEASON TOURNAMENT QUARTERFINALS 5 | REGULAR SEASON 6 | IN-SEASON TOURNAMENT SEMIFINALS 7 | REGULAR SEASON 8 | IN-SEASON TOURNAMENT CHAMPIONSHIP 9 |
| 10 | 11 | PHX 7:00P 12 | 13 | LAC 7:00P 14 | 15 | BKN 5:30P 16 |
| POR 6:00P 17 | 18 | ● BOS 7:00P 19 | 20 | 21 | ▲ WAS 7:00P 22 | POR 5:30P 23 |
| 24 | ■ ▲ 25 DEN 11:30A | 26 | 27 | ★ MIA 7:00P 28 | 29 | DAL 5:30P 30 |

## FEBRUARY 2024

| SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|
| | | | | 1 | MEM 5:00P 2 | ATL 4:30P 3 |
| 4 | ★ BKN 4:30P 5 | 6 | PHI 4:00P 7 | IND 4:00P 8 | 9 | ▲ PHX 5:30P 10 |
| 11 | UTA 6:00P 12 | 13 | ★ LAC 7:00P 14 | 15 | 16 | 17 |
| ALL-STAR GAME INDIANA 18 | 19 | 20 | 21 | LAL 7:00P 22 | CHA 7:00P 23 | 24 |
| DEN 4:00P 25 | 26 | WAS 4:00P 27 | 28 | NYK 4:30P 29 | | |

## MARCH 2024

| SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|
| | | | | | TOR 4:30P 1 | 2 |
| BOS 12:30P 3 | 4 | ▲ MIL 7:00P 5 | CHI 7:00P 6 | 7 | 8 | SAS 5:30P 9 |
| 10 | ★ SAS 5:00P 11 | 12 | DAL 5:30P 13 | 14 | 15 | LAL 1:00P 16 |
| 17 | ▲ NYK 7:00P 18 | 19 | MEM 7:00P 20 | 21 | IND 7:00P 22 | 23 |
| MIN 4:00P 24 | 25 | MIA 4:00P 26 | ORL 4:00P 27 | 28 | CHA 4:00P 29 | 30 |

## APRIL 2024

| SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|
| ★ MAR 31 SAS 4:00P | 1 | DAL 4:30P 2 | 3 | HOU 5:00P 4 | 5 | 6 |
| UTA 5:30P 7 | 8 | LAL 7:00P 9 | 10 | POR 7:00P 11 | NOP 7:00P 12 | 13 |
| UTA 12:30P 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

HOME GAMES

NBA & DATE/TBD GAMES

ABC    ESPN

NBC SPORTS BAY AREA



ALL GAMES BROADCAST ON 95.7 THE GAME. ALL TIMES PACIFIC.

FOR TICKET INFORMATION OR ACCESSIBLE SEATING QUESTIONS,
PLEASE CALL 888-GSW-HOOP OR VISIT WARRIORS.COM

# EXHIBIT N



# Warriors Announce Additions to Regular Season Schedule

**November 28, 2023** 11:54 PM PST



The Golden State Warriors will host the Portland Trail Blazers on Wednesday, December 6 at Chase Center (7 p.m. PST) and will travel to Oklahoma City to face the Thunder on Friday, December 8 (5 p.m. PST), the NBA announced. Both games will be televised on NBC Sports Bay Area and air on 95.7 The Game.

Tickets for the regular season home game on December 6 are available here. The first 10,000 fans in attendance for Wednesday's game against the Trail Blazers will receive a Draymond Green

**Cookie Policy**

**I Accept**

We use cookies to provide you with the best online experience. If you continue browsing, we consider that you accept our **Cookie Policy**, and also agree to the terms of our **Privacy Policy** and **Terms of Use**.





**Draymond Green Broadcaster Bobblehead Reaction**
[Green] Oh, that's fire.

11d                                                                    00:00:42

The Warriors are one of 22 teams that did not qualify for the In-Season Tournament Quarterfinals and will play a pair of regular season games to complete the team's 82-game schedule. Golden State finished the In-Season Tournament with a 2-2 record, finishing third in Group C.

Tags

DRAYMOND GREEN ▲

## Cookie Policy

We use cookies to provide you with the best online experience. If you continue browsing, we consider that you accept our **Cookie Policy**, and also agree to the terms of our **Privacy Policy** and **Terms of Use**.

# EXHIBIT O

| | |
|---|---|
| **From:** | Bugg, Robert E. |
| **To:** | Connor Houghton; Melissa Smith; RJ_Athalonz Under Armour |
| **Cc:** | Cimino, Frank C., Jr.; Woodworth, Megan S. |
| **Subject:** | Athalonz: Curry Subpoena |
| **Date:** | Friday, December 1, 2023 4:15:47 PM |
| **Attachments:** | Objections and Responses to Athalonz"s Subpoena (12.1.2023).pdf |

**CAUTION: EXTERNAL SENDER**

Counsel,

Mr. Curry's response to Athalonz's subpoena is attached.  We will be filing a motion to quash in the Northern District of California on his behalf in the next 7-10 days as the subpoena is unduly burdensome and seeks information and documents that are: (1) irrelevant; (2) not proportional to the needs of the case; and/or (3) more readily and properly obtained directly from Under Armour. As previously discussed, Mr. Curry objects to the dates requested for the production of documents and for his deposition.  We assume they were only placeholders given the very short response time that occurred over the Thanksgiving holiday.  If the court denies Mr. Curry's Motion to Quash, we can discuss next steps at that time.

Let us know if you would like to discuss.

Regards,

Robert E. Bugg, Esq. | Venable LLP
t 212.370.6241 | f 212.307.5598
151 W. 42nd Street, 49th Floor, New York, NY 10036

REBugg@Venable.com | www.Venable.com

*************************************************************************
This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.
*************************************************************************

EXHIBIT P

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| ATHALONZ, LLC, | § | |
| | § | |
| *Plaintiff,* | § | Case No. 2:23-cv-00193 JRG |
| | § | |
| v. | § | |
| | § | |
| UNDER ARMOUR, INC., | § | |
| | § | |
| *Defendant.* | § | |

## NON-PARTY WARDELL STEPHEN CURRY II'S OBJECTIONS AND RESPONSES TO ATHALONZ, LLC'S SUBPOENA

Wardell Stephen Curry II ("Curry"), by counsel and pursuant to Rules 26, 30, and 45 of the Federal Rules of Civil Procedure, hereby objects and responds to Athalonz's Subpoena to Wardell Stephen Curry II ("Subpoena") and accompanying Document Requests served by Defendant Athalonz, LLC ("Athalonz").

Curry is a non-party to this action. Based on review of the pleadings, Curry understands that Athalonz and Under Armour, Inc. ("Under Armour") are engaged in a patent infringement action. Federal Rule of Civil Procedure 45(d)(1) requires that Athalonz "take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena." The Subpoena does not comply with Rule 45. Indeed, courts routinely quash subpoenas that: "(i) fail[] to allow a reasonable amount of time to comply; . . . (iii) require[] disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subject[] a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A).

1

## CURRY'S GENERAL OBJECTIONS TO ATHALONZ'S DOCUMENT REQUESTS

Curry objects to the Subpoena's requests for the production of documents as imposing an undue burden and because the potential harm caused by the production outweighs the benefit. A subpoena imposes an undue burden on a party when it is overbroad or seeks information irrelevant to the case. While only one criterion is required, the Subpoena to Curry violates both. *See e.g.*, Fed. R. Civ. P. 26(b)(2)(C) (courts "must limit the frequency or extent of discovery" if "the burden or expense of the proposed discovery outweighs its likely benefit"). In addition, the Subpoena requests information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, and the common interest privilege.

First, the Subpoena improperly requests production of irrelevant documents. The claims and defenses at issue in this case center on Under Armour's alleged use of Athalonz's patent claims regarding the shape and materials of the accused Curry shoe soles. Athalonz's requests are irrelevant to the extent they do not pertain to the allegedly infringing features of the accused products.

Second, to the extent these documents are deemed relevant to the claims and defenses in this case, the requests are still overbroad because Under Armour is the proper party to produce the relevant responsive documents. Athalonz has articulated no need for Curry to produce the same documents Under Armour has already agreed to produce in response to Athalonz's requests. Athalonz should not burden a non-party with duplicative requests via a subpoena, but should instead request and pursue production from Under Armour as the more convenient and appropriate source as a party to this litigation. *Genus Lifesciences Inc. v. Lannett Co.*, No. 18-cv-07603-WHO, 2019 U.S. Dist. LEXIS 222550, at *13 (N.D. Cal. Dec. 30, 2019) (granting motion to quash subpoena where the requested documents "can be obtained from the opposing party [] in a way that would be more convenient and less burdensome"). To the extent Athalonz seeks material that

2

Under Armour may not possess, for example, Athalonz's request for all documents and communications relating to Curry's role as President of the Curry Brand at Under Armour (*see* Request No. 5), that requested discovery is not proper because it is not targeted to the claims and defenses in this patent infringement action. *Kirschner v. Klemons*, No. 99 CIV. 4828 (RCC), 2005 WL 1214330, at *2 (S.D.N.Y. May 19, 2005) (A subpoena that "pursues material with little apparent or likely relevance to the subject matter" is "likely to be quashed as unreasonable even where the burden of compliance would not be onerous.").

Further, as one of the National Basketball Association's ("NBA") top players, who has been voted as the Most Valuable Player twice ("MVP")—in fact, the first player ever to be unanimously selected as the NBA's MVP—and as a four-time NBA championship winner, Curry must adhere to a demanding in-season schedule that includes over 60 games between December 1, 2023 and the end of the regular season on April 14, 2024, over half of which are "away" games that necessitate substantial cross-country travel before and after the game. In addition, Curry must adhere to a strict training program, and is obligated to attend a multitude of other events, including appearances and other obligations in connection with his endorsements, sponsorships, and charitable endeavors. While the Subpoena is improper generally, it is especially burdensome and harassing in light of the considerable disruption it would cause to Curry's in-season team schedule, as well as training, career, professional and family commitments. Indeed, the Subpoena is unduly burdensome, as essentially the same responsive, non-privileged documents can be made available from Under Armour, and in light of Curry's minimal relevance to the claims and defenses of the case—*i.e.*, Under Armour's alleged infringement. Furthermore, any requests for Curry's testimony are likewise improper due to Curry's irrelevance to the claims and defenses at issue and based on the undue burden and harassing nature of the requests to non-party Curry.

3

Furthermore, Curry objects to the Subpoena's requests for the production of documents as not allowing sufficient time to comply with the requests. The overly broad and over-inclusive nature of the requests (e.g., all documents referring to the market for basketball shoes) would yield a vast number of documents. It is certainly burdensome to require a non-party to review a volume of documents like this, most of which likely would be irrelevant to the issues in the case. Furthermore, requiring Curry to review and produce the overly broadly requested documents in accordance with the Subpoena's December 1, 2023 deadline—a mere seven business days after service—imposes an undue burden on Curry. *Gordon v. Sonar Capital Mgmt. LLC*, No. C 15-80080 LB, 2015 U.S. Dist. LEXIS 32047, at *5 (N.D. Cal. Mar. 15, 2015) ("The question of whether the time to comply with a subpoena is a fact-specific inquiry; courts generally have found that fewer than ten days is not reasonable."); *Free Stream Media*, 2017 WL 6209309, at *4 ("[The subpoenaed non-party] had fewer than ten days to comply with the subpoena, a period of time that courts in [the Northern District of California] have found to be presumptively unreasonable."); *Natera, Inc. v. Caredx, Inc.*, No. 23-mc-80117-LJC, 2023 U.S. Dist. LEXIS 95161, at *8-9 (N.D. Cal. May 31, 2023).

Finally, the Subpoena seeks documents and electronically-stored information with no time period limitation, which alone is improper. *Meier v. UHS of Del., Inc.*, No. 18-CV-00615, 2021 WL 1226619, at *6 (E.D. Tex. Apr. 1, 2021) ("Facially overbroad subpoenas include those [where] . . . the period covered by the requests is unlimited.") (internal revisions and quotations omitted).

### **CURRY'S SPECIFIC OBJECTIONS AND RESPONSES TO ATHALONZ'S REQUESTS**

**REQUEST NO. 1:** All Documents or communications that describe or refer to this Litigation, the Asserted Patents, or the Athalonz Products.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 1:** Curry objects to this Request as overly broad, unduly burdensome, not proportional to the claims and defenses in this litigation, and indefinite as to scope and time period.  Curry further objects to this Request to the extent it seeks documents not in his possession, custody or control and to the extent these documents are already in Athalonz's possession as produced by Under Armour, other entities or witnesses, or which are publicly available.  Any non-privileged documents responsive to this Request would be in Under Armour's possession; therefore, discovery should be requested from Under Armour, the proper party, not non-party Curry.  Curry further objects to this Request to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine, and the common interest privilege.

Subject to and without waiving the foregoing objections, Curry is unaware of any documents or communications concerning this Litigation, the Asserted Patents, or the Athalonz Products, aside from the Subpoena he received from Athalonz served on November 21, 2023.

**REQUEST NO. 2:** All Documents or communications that describe or refer to Athalonz.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 2:** Curry objects to this Request as overly broad, unduly burdensome, not proportional to the claims and defenses in this litigation, and indefinite as to scope and time period.  Curry further objects to this Request to the extent it seeks documents not in his possession, custody or control and to the extent these documents are already in Athalonz's possession as produced by Under Armour, other entities or witnesses, or which are publicly available.  Any non-privileged documents responsive to this Request would be in Under Armour's possession; therefore, discovery should be requested from Under Armour, the proper party, not non-party Curry.  Curry further objects to this Request to the extent it seeks

information protected by the attorney-client privilege, the work-product doctrine, and the common interest privilege.

Subject to and without waiving the foregoing objections, Curry is unaware of any documents or communications concerning Athalonz, aside from the Subpoena he received from Athalonz served on November 21, 2023.

**REQUEST NO. 3:** All Documents or communications that describe, refer, or otherwise relate to Your role in the design, development, and testing of the Accused Curry Products.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 3:** Curry objects to this Request as overly broad, unduly burdensome, not proportional to the claims and defenses in this litigation, and indefinite as to scope and time period. Curry further objects to this Request as unlikely to lead to the discovery of information relating to the claims or defenses at issue in this case. Curry further objects to this Request to the extent it seeks documents not in his possession, custody or control and to the extent these documents are already in Athalonz's possession as produced by Under Armour, other entities or witnesses, or which are publicly available. Any non-privileged documents responsive to this Request would be in Under Armour's possession; therefore, discovery should be requested from Under Armour, the proper party, not non-party Curry. Curry further objects to this Request to the extent Curry is not responsible for the design, development, and testing of the accused features of the Accused Curry Products. Curry further objects to this Request as irrelevant to the extent it seeks documents and communications unrelated to the accused features of the Accused Curry Products. Curry further objects to this Request to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine, and the common interest privilege.

**REQUEST NO. 4:** All Documents or communications that describe, refer, or otherwise relate to Your role in the marketing, advertising, promotion, and/or sale of the Accused Curry Products.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 4:** Curry objects to this Request as overly broad, unduly burdensome, not proportional to the claims and defenses in this litigation, and indefinite as to scope and time period. Curry further objects to this Request to the extent it seeks documents not in his possession, custody or control and to the extent these documents are already in Athalonz's possession as produced by Under Armour, other entities or witnesses, or which are publicly available. Any non-privileged documents responsive to this Request would be in Under Armour's possession; therefore, discovery should be requested from Under Armour, the proper party, not non-party Curry. Curry further objects to this Request as irrelevant to the extent it seeks documents and communications unrelated to the accused features of the Accused Curry Products. Curry further objects to this Request to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine, and the common interest privilege.

**REQUEST NO. 5:** All Documents or communications that describe, refer, or otherwise relate to Your role as President of the Curry Brand at Under Armour, including the terms of any agreements with Under Amour relating to that role.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 5:** Curry objects to this Request as overly broad, unduly burdensome, not proportional to the claims and defenses in this litigation, and indefinite as to scope and time period. Curry further objects to this Request as unlikely to lead to the discovery of information relating to the claims or defenses at issue in this case. Curry further objects to this Request to the extent it seeks documents not in his possession, custody or control and to the extent these documents are already in Athalonz's possession as produced by Under Armour, other entities or witnesses, or which are publicly available. Any non-privileged

7

documents responsive to this Request would be in Under Armour's possession; therefore, discovery should be requested from Under Armour, the proper party, not non-party Curry. Curry further objects to this Request as irrelevant to the extent it seeks documents and communications unrelated to the accused features of the Accused Curry Products. Curry further objects to this Request to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine, and the common interest privilege.

**REQUEST NO. 6:** All Documents or communications that describe, refer, or otherwise relate to the value or benefits of the Accused Curry Products, particularly as compared to other Under Armour basketball shoes or other basketball shoes available on the market.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 6:** Curry objects to this Request as overly broad, unduly burdensome, not proportional to the claims and defenses in this litigation, and indefinite as to scope and time period. Curry further objects to this Request to the extent it seeks documents not in his possession, custody or control and to the extent these documents are already in Athalonz's possession as produced by Under Armour, other entities or witnesses, or which are publicly available. Any non-privileged documents responsive to this Request would be in Under Armour's possession; therefore, discovery should be requested from Under Armour, the proper party, not non-party Curry. Curry further objects to this Request to the extent Curry is not responsible for assessing the value or benefits of the Accused Curry Products, particularly as compared to other Under Armour basketball shoes or other basketball shoes available on the market. Curry further objects to this Request as irrelevant to the extent it seeks documents and communications unrelated to the accused features of the Accused Curry Products. Curry further objects to this Request to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine, and the common interest privilege.

8

**REQUEST NO. 7:** All Documents or communications that describe or refer to the market for basketball shoes in the United States.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 7:** Curry objects to this Request as overly broad, unduly burdensome, not proportional to the claims and defenses in this litigation, and indefinite as to scope and time period.  Curry further objects to this Request to the extent it seeks documents not in his possession, custody or control and to the extent these documents are already in Athalonz's possession as produced by Under Armour, other entities or witnesses, or which are publicly available.  Any non-privileged documents responsive to this Request would be in Under Armour's possession; therefore, discovery should be requested from Under Armour, the proper party, not non-party Curry.  Curry further objects to this Request to the extent Curry is not responsible for assessing the market for basketball shoes in the United States.  Curry further objects to this Request as irrelevant to the extent it seeks documents and communications unrelated to the accused features of the Accused Curry Products.  Curry further objects to this Request to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine, and the common interest privilege.

**REQUEST NO. 8:** All Documents or communications that describe or refer to sales of the Accused Curry Products, including documents discussing pricing, margins, costs, strategies for sales, as well as comparing sales of the Accused Curry Products against sales of other Under Armour basketball shoes or competitive basketball shoes.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 8:** Curry objects to this Request as overly broad, unduly burdensome, not proportional to the claims and defenses in this litigation, and indefinite as to scope and time period.  Curry further objects to this Request to the extent it seeks documents not in his possession, custody or control and to the extent these documents are

already in Athalonz's possession as produced by Under Armour, other entities or witnesses, or which are publicly available. Any non-privileged documents responsive to this Request would be in Under Armour's possession; therefore, discovery should be requested from Under Armour, the proper party, not non-party Curry. Curry further objects to this Request to the extent Curry is not responsible for sales of the Accused Curry Products, including pricing, margins, costs, strategies for sales, as well as for comparing sales of the Accused Curry Products against sales of other Under Armour basketball shoes or competitive basketball shoes. Curry further objects to this Request as irrelevant to the extent it seeks documents and communications unrelated to the accused features of the Accused Curry Products. Curry further objects to this Request to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine, and the common interest privilege.

**REQUEST NO. 9:** All contracts, draft agreements, and communications related to Your role as a sponsor of the Accused Curry Products, including documents sufficient to show the amount and terms of payment You receive from Under Armour. This request includes but is not limited to a copy of the Under Armour, Inc. Athlete Product, Brand, Ambassador, and Endorsement Agreement entered into in 2023 between Curry and Under Armour.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 9:** Curry objects to this Request as overly broad, unduly burdensome, not proportional to the claims and defenses in this litigation, and indefinite as to scope and time period. Curry further objects to this Request as unlikely to lead to the discovery of information relating to the claims or defenses at issue in this case. Curry further objects to this Request to the extent it seeks documents not in his possession, custody or control and to the extent these documents are already in Athalonz's possession as produced by Under Armour, other entities or witnesses, or which are publicly available. Any non-privileged

10

documents responsive to this Request would be in Under Armour's possession; therefore, discovery should be requested from Under Armour, the proper party, not non-party Curry. Curry further objects to this Request as irrelevant to the extent it seeks documents and communications unrelated to the accused features of the Accused Curry Products. Curry further objects to this Request to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine, and the common interest privilege.

**REQUEST NO. 10:** All Documents and communications related to any agreements or potential agreements relating to the Litigation between You and Under Armour or Venable LLP.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 10:** Curry objects to this Request as overly broad, unduly burdensome, not proportional to the claims and defenses in this litigation, and indefinite as to scope and time period. Curry further objects to this Request as unlikely to lead to the discovery of information relating to the claims or defenses at issue in this case. Curry further objects to this Request to the extent it seeks documents not in his possession, custody or control and to the extent these documents are already in Athalonz's possession as produced by Under Armour, other entities or witnesses, or which are publicly available. Any non-privileged documents responsive to this Request would be in Under Armour's possession; therefore, discovery should be requested from Under Armour, the proper party, not non-party Curry. Curry further objects to this Request to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine, and the common interest privilege.

Dated: December 1, 2023

Respectfully submitted,

*/s/ Frank C. Cimino, Jr.*

Frank C. Cimino, Jr.
Megan S. Woodworth
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC  20001
202.344.4569
202.344.8300 – Facsimile
fccimino@Venable.com
mswoodworth@Venable.com

Robert E. Bugg
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
New York, NY  10020
212.370.6241
212.307.5598 – Facsimile
rebugg@Venable.com

*ATTORNEYS FOR THIRD-PARTY*
*STEPHEN CURRY II*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of December, 2023, a copy of Non-Party Wardell Stephen Curry II's Objections and Responses to Athalonz, LLC's Subpoena were served via electronic mail upon:

> Taylor N. Mauze (TX Bar No. 24102161)
> tmauze@reichmanjorgensen.com
> REICHMAN JORGENSEN LEHMAN
> & FELDBERG LLP
> 7500 Rialto Blvd., Suite 1-250
> Austin, TX 78735
> Telephone: (650) 623-1401
> Facsimile: (650) 650-3501
>
> Christine E. Lehman (pro hac vice)
> clehman@reichmanjorgensen.com
> Connor S. Houghton (pro hac vice)
> choughton@reichmanjorgensen.com
> REICHMAN JORGENSEN LEHMAN
> & FELDBERG LLP
> 1909 K Street, NW, Suite 800
> Washington, DC 20006
> Telephone: (202) 894-7310
> Facsimile: (650) 560-3501
>
> Melissa R. Smith
> State Bar No. 24001351
> GILLAM & SMITH, LLP
> 303 South Washington Avenue
> Marshall, Texas 75670
> Telephone: (903) 934-8450
> Facsimile: (903) 934-9257
> Email: melissa@gillamsmithlaw.com

*Attorneys for Plaintiff Athalonz, LLC*

*/s/  Robert E. Bugg*

Robert E. Bugg

EXHIBIT Q

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

––––––––––––––––

# SCHEDULE 14A INFORMATION

**Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934**

––––––––––––––––

Filed by the Registrant  ☑                Filed by a Party other than the Registrant  ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☑    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material under §240.14a-12

# UNDER ARMOUR, INC.
**(Name of registrant as specified in its charter)**

**(Name of person(s) filing proxy statement, if other than the registrant)**

Payment of Filing Fee (Check the appropriate box):

☑    No fee required

☐    Fee paid previously with preliminary materials

☐    Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11

**Table of Contents**



**UNDER ARMOUR, INC.**
**NOTICE OF 2023 ANNUAL MEETING OF STOCKHOLDERS**
**To Be Held August 29, 2023**

Notice is hereby given that the Annual Meeting of Stockholders of Under Armour, Inc. will be held on Tuesday, August 29, 2023 at 10:00 a.m., Eastern Time, online at www.virtualshareholdermeeting.com/UAA2023 to consider and vote on the following matters:

1. To elect ten directors nominated by the Board of Directors to serve until the next Annual Meeting of Stockholders and until their respective successors are elected and qualified;

2. To approve, on an advisory basis, our executive compensation;

3. To approve, on an advisory basis, the frequency of future advisory votes on our executive compensation;

4. To approve our Fourth Amended and Restated 2005 Omnibus Long-Term Incentive Plan to increase the number of shares of Class C Common Stock reserved for issuance, among other changes; and

5. To ratify the appointment of PricewaterhouseCoopers LLP as our independent registered public accounting firm for fiscal year ending March 31, 2024.

We will also transact any other business that may properly come before the meeting or any adjournment or postponement thereof.

Our Board of Directors recommends that you vote "FOR" the election of the ten nominees to the Board of Directors listed in the accompanying proxy statement, "FOR" the approval of our executive compensation, for "ONE YEAR" as the frequency of future advisory votes on our executive compensation, "FOR" the approval of our Fourth Amended and Restated 2005 Omnibus Long-Term Incentive Plan and "FOR" the ratification of the appointment of PricewaterhouseCoopers LLP as our independent registered public accounting firm.

Only holders of record of Class A Common Stock or Class B Common Stock as of the close of business on June 5, 2023 are entitled to notice of, or to vote at, the Annual Meeting and any adjournment or postponement thereof. Holders of Class C Common Stock have no voting power as to any items of business that may properly be brought before the Annual Meeting.

All stockholders are cordially invited to attend the Annual Meeting, which will be conducted online only via a live webcast. We believe a virtual Annual Meeting enables increased stockholder participation from locations around the world, and maintains a lower cost to our stockholders and our company, as compared to an in-person meeting. During the virtual meeting, holders of our Class A Common Stock and Class B Common Stock may ask questions and will have the opportunity to vote to the same extent as they would at an in-person meeting of stockholders. Holders of our Class C Common Stock may participate in the virtual Annual Meeting in a view-only format and will not be able to submit questions during the meeting or vote on any matter to be considered at the Annual Meeting. However, in advance of the meeting, holders of our Class C Common Stock may submit questions by contacting Investor Relations through the Under Armour website. We will respond to as many inquiries at the Annual Meeting as time allows.

If you plan to attend the Annual Meeting, you will need the 16-digit control number included in your Notice, on your proxy card or on the instructions that accompany your proxy materials. If you are a holder of Class C Common Stock, you may attend the Annual Meeting without a 16-digit control number by following the instructions in your Notice of Internet Availability of Proxy Materials or on the instructions that accompany your proxy materials. The Annual Meeting will begin promptly at 10:00 a.m., Eastern Time. Online check-in will begin at 9:45 a.m., Eastern Time, and you should allow ample time for the online check-in procedures.

Whether or not you intend to attend the virtual Annual Meeting, please vote your shares promptly by following the voting instructions you have received.

By Order of the Board of Directors

Mehri Shadman
*Chief Legal Officer and Corporate Secretary*

Baltimore, Maryland
June 27, 2023

Table of Contents

**OUR**
# PURPOSE

**WE EMPOWER THOSE**
**WHO STRIVE FOR MORE.**

**OUR**
# MISSION

**TO INSPIRE YOU WITH PERFORMANCE SOLUTIONS YOU NEVER**
**KNEW YOU NEEDED AND CAN'T IMAGINE LIVING WITHOUT.**

———

**OUR**
# VISION

**UNDER ARMOUR MAKES YOU BETTER.**

———

**OUR**
# VALUES







Table of Contents

## Table of Contents

General Information                                                                                    1

Security Ownership of Management and Certain Beneficial Owners of Shares                               6

**PROPOSAL 1 - ELECTION OF DIRECTORS**                                                                **10**
    Overview of Director Nominees                                                   10
    Nominees for Election at the Annual Meeting                                     12

Corporate Governance and Related Matters                                                              18
    Corporate Governance Highlights                                                 18
    Board Leadership Structure                                                      18
    Independence of Directors                                                       18
    Board Meetings and Committees                                                   19
    Stockholders Meeting Attendance                                                 22
    Identifying and Evaluating Director Candidates                                  22
    Role of Board in Risk Oversight                                                 23
    Availability of Corporate Governance Information                                25
    Stock Ownership Guidelines                                                      26
    Communication with Directors                                                    26
    Indemnification of Directors in Derivative Actions                              26

Compensation of Directors                                                                             27

Executive Compensation - Compensation Discussion and Analysis                                         30
    Executive Summary                                                               30
    Executive Compensation Features                                                 33
    Objectives and Elements of our Compensation Program                             33
    Compensation Decision-Making Process                                            34
    Components of Our Fiscal Year 2023 Compensation Program                         36
    Other Compensation Practices                                                    42
    Human Capital and Compensation Committee Report                                 45

Executive Compensation Tables                                                                         46
    Fiscal Year 2023 Summary Compensation Table                                     46
    Grants of Plan-Based Awards for Fiscal Year 2023                                49
    Employment Agreements                                                           50
    Outstanding Equity Awards at 2023 Fiscal Year-End                               50
    Option Exercises and Stock Vested in Fiscal Year 2023                           51
    Nonqualified Deferred Compensation for Fiscal Year 2023                         52
    Retirement Plans                                                                53
    Potential Payments Upon Termination of Employment or Change in Control          53
    CEO Pay Ratio                                                                   58
    Pay Versus Performance                                                          60

**PROPOSAL 2 - ADVISORY APPROVAL OF OUR EXECUTIVE COMPENSATION**                                      **64**

**PROPOSAL 3 - ADVISORY VOTE ON THE FREQUENCY OF FUTURE ADVISORY VOTES ON OUR EXECUTIVE**             **65**
**COMPENSATION**

Equity Compensation Plan Information                                                                   66

Transactions with Related Persons                                                                      67

**Table of Contents**

| | |
|---|---|
| **PROPOSAL 4 - APPROVAL OF FOURTH AMENDED AND RESTATED 2005 OMNIBUS LONG-TERM INCENTIVE PLAN** | **69** |
| Independent Auditors | 80 |
| Audit Committee Report | 82 |
| **PROPOSAL 5 - RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM** | **83** |
| Stockholder Proposals | 84 |
| Appendix A - Fourth Amended and Restated 2005 Omnibus Long-Term Incentive Plan (Showing Changes from Current Plan) | A-i |
| Appendix B - Reconciliation of Non-GAAP Financial Measures | B-1 |

**Table of Contents**

**UNDER ARMOUR, INC.**
**PROXY STATEMENT**
**ANNUAL MEETING OF STOCKHOLDERS**
**Tuesday, August 29, 2023**

# GENERAL INFORMATION

This Proxy Statement is being provided to solicit proxies on behalf of the Board of Directors of Under Armour, Inc. for use at the Annual Meeting of Stockholders and any adjournment or postponement thereof. The Annual Meeting is to be held on Tuesday, August 29, 2023, at 10:00 a.m., Eastern Time, online at www.virtualshareholdermeeting.com/UAA2023. We expect to first send or give stockholders this Proxy Statement, together with our Fiscal Year 2023 Annual Report to Stockholders, on June 30, 2023.

Our principal offices are located at 1020 Hull Street, Baltimore, Maryland 21230. In this Proxy Statement, we refer to Under Armour, Inc. as "Under Armour," "we," "us," "our" and "company." Website references throughout this document are provided for convenience only, and the content on the referenced websites is not incorporated by reference into this document.

As previously disclosed, our Board of Directors approved a change in our fiscal year end from December 31 to March 31, effective for the fiscal year beginning April 1, 2022. In this Proxy Statement, we refer to the three-month period that began on January 1, 2022 and ended on March 31, 2022 as the "transition period" or "2022 TP." Our most recently completed fiscal year was the twelve-month period that began on April 1, 2022 and ended on March 31, 2023, which we refer to as "fiscal year 2023" or "FY2023." Our fiscal year 2021 began on January 1, 2021 and ended on December 31, 2021 and our fiscal year 2020 began on January 1, 2020 and ended on December 31, 2020. There was no fiscal year 2022.

## Internet Availability of Proxy Materials

Pursuant to rules of the Securities and Exchange Commission (the "SEC"), we are making our proxy materials available to our stockholders electronically over the Internet rather than mailing the proxy materials. Accordingly, we are sending a Notice of Internet Availability of Proxy Materials to holders of our Class A Common Stock and Class B Common Stock. All stockholders will have the ability to access the proxy materials, including this Proxy Statement and our Fiscal Year 2023 Annual Report to Stockholders, on the website referred to in the notice or to request a printed set of the proxy materials. Instructions on how to access the proxy materials over the Internet or to request a printed copy may be found on the notice. In addition, stockholders may request to receive proxy materials in printed form by mail or electronically by email on an ongoing basis.

The SEC rules require us to notify all stockholders, including those stockholders to whom we have mailed proxy materials, of the availability of our proxy materials over the Internet.

**Important Notice Regarding the Availability of Proxy Materials**
**for the Stockholder Meeting to be held on August 29, 2023**

**Our Proxy Statement and Fiscal Year 2023 Annual Report to Stockholders are available at**

**https://about.underarmour.com/en/investors/press-releases--events---presentations/annual-stockholder-meeting.html**

1



**Table of Contents**

## Who May Vote

Only holders of record of our Class A Common Stock, which we refer to as Class A Stock, and holders of record of our Class B Convertible Common Stock, which we refer to as Class B Stock, at the close of business on June 5, 2023, or the Record Date, will be entitled to notice of, and to vote at, the Annual Meeting. On the Record Date, 188,704,689 shares of Class A Stock and 34,450,000 shares of Class B Stock were issued and outstanding. Each share of Class A Stock entitles the holder to cast one vote on each matter to be considered at the Annual Meeting and each share of Class B Stock entitles the holder to cast ten votes on each matter to be considered at the Annual Meeting. Holders of Class A Stock and holders of Class B Stock will vote together as a single class on all matters.

Stockholders are not allowed to cumulate their votes in the election of the directors. Holders of our Class C Common Stock, which we refer to as Class C Stock, have no voting power as to any items of business that will be voted on at the Annual Meeting.

## What Constitutes a Quorum

Stockholders may not take action at a meeting unless there is a quorum present at the meeting. Holders of Class A Stock and Class B Stock entitled to cast a majority of all the votes entitled to be cast at the Annual Meeting, represented in person (virtually) or by proxy, constitute a quorum for the transaction of business at the Annual Meeting.

## Vote Required

The election of each director requires a plurality of the votes cast at the Annual Meeting. The approval of our executive compensation, the approval of our Fourth Amended and Restated 2005 Omnibus Long-Term Incentive Plan, which we refer to as the Amended 2005 Plan, and the ratification of the appointment of our independent registered public accounting firm each requires the affirmative vote of a majority of the votes cast at the Annual Meeting.

With respect to the vote on the frequency of future advisory votes on our executive compensation, you are not voting to approve or disapprove the proposal. Rather, you are voting to indicate your preference as to the frequency of future advisory votes on our executive compensation. The option of one year, two years or three years that receives a majority of all the votes cast on this proposal will be the frequency for the advisory vote on executive compensation that has been recommended by stockholders. In the event that no option receives a majority of the votes cast, we will consider the option that receives the most votes to be the option selected by stockholders. Our Board of Directors will take into consideration the outcome of the vote in setting a policy with respect to the frequency of future advisory votes on our executive compensation.

## Voting Process

Shares for which proxies are properly executed and returned will be voted at the Annual Meeting in accordance with the directions given or, in the absence of directions, will be voted "FOR" the election of the ten nominees to the Board of Directors named in this Proxy Statement, "FOR" the advisory approval of our executive compensation, for "ONE YEAR" as the advisory vote on the frequency of future advisory votes on our executive compensation, "FOR" the approval of our Fourth Amended and Restated 2005 Omnibus Long-Term Incentive Plan and "FOR" the ratification of the appointment of our independent registered public accounting firm. It is not expected that any other matters will be brought before the Annual Meeting. If, however, other matters are properly presented, the persons named as proxies in the proxy card will vote in accordance with their discretion with respect to such matters.

2



**Table of Contents**

The manner in which your shares may be voted depends on how your shares are held. If you are the record holder of your shares, meaning you appear as the stockholder of your shares on the records of our stock transfer agent, you vote your shares directly through one of the methods described below. If you own shares in street name, meaning you are a beneficial owner with your shares held through a bank or brokerage firm, you instruct your bank or brokerage firm how to vote your shares through the methods described on the voting instruction form provided by your bank or brokerage firm.

## How to Vote

Holders of our Class A Stock and Class B Stock as of the Record Date may vote their shares by one of the following methods.

*Internet*

To vote your shares by Internet, please visit the website listed on your Notice of Internet Availability of Proxy Materials, or the enclosed proxy card or voting instruction form, and follow the on-screen instructions. You will need the control number included on your Notice of Internet Availability of Proxy Materials, proxy card or voting instruction form. If you vote by Internet, you do not need to mail your proxy card or voting instruction form.

*Telephone*

If you received a paper proxy card or voting instruction form and would like to vote your shares by telephone, please follow the instructions on the proxy card or voting instruction form. If you vote by telephone, you do not need to mail your proxy card or voting instruction form.

*Mail*

If you received a paper proxy card or voting instruction form and would like to vote your shares by mail, please follow the instructions on the proxy card or voting instruction form. Please be sure to sign and date your proxy card. If you do not sign your proxy card, your votes cannot be counted. Mail your proxy card or voting instruction form in the pre-addressed, postage-paid envelope.

*In Person (Virtually)*

You may also attend the Annual Meeting and vote in person, electronically. If you own your stock in street name and wish to vote your shares electronically at the Annual Meeting, you must obtain a "legal proxy" from the bank or brokerage firm that holds your shares. You should contact your bank or brokerage account representative to obtain a legal proxy. However, to ensure your shares are represented, we ask that you vote your shares by Internet, telephone or mail, even if you plan to attend the meeting.

## Participation in the Annual Meeting

All stockholders are cordially invited to attend the Annual Meeting, which will be conducted online only via a live webcast. We believe a virtual Annual Meeting enables increased stockholder participation from locations around the world, and maintains a lower cost to our stockholders and our company, as compared to an in-person meeting. You can access the virtual annual meeting at the meeting time at www.virtualshareholdermeeting.com/UAA2023. The virtual meeting has been designed to provide the same rights to participate as you would have at an in-person meeting.

Holders of our Class A Stock, Class B Stock and Class C Stock may attend the virtual Annual Meeting. During the virtual meeting, holders of our Class A Stock and Class B Stock may ask questions and will have the opportunity to vote to the same extent as they would at an in-person meeting of stockholders. However, holders of our Class C Stock may participate in the virtual Annual Meeting in a view-only format and will not be able to submit questions during the meeting or vote on

3



**Table of Contents**

any matter to be considered at the Annual Meeting. However, in advance of the meeting, holders of our Class C Stock may submit questions by contacting Investor Relations through the Under Armour website. We will respond to as many inquiries at the Annual Meeting as time allows.

The Annual Meeting will begin promptly at 10:00 a.m., Eastern Time. Online check-in will begin at 9:45 a.m., Eastern Time, and you should allow ample time for the online check-in procedures. If you plan to attend the Annual Meeting, you will need the 16-digit control number included in your Notice of Internet Availability of Proxy Materials, on your proxy card or on the instructions that accompany your proxy materials. If you are a holder of Class C Stock, you may attend the Annual Meeting without a 16-digit control number by following the instructions in your Notice of Internet Availability of Proxy Materials or on the instructions that accompany your proxy materials. If any difficulties are encountered while accessing the virtual meeting, contact the technical support number that will be posted on the virtual meeting log-in page. Technical support will be available beginning at the check-in time and will remain available until the meeting has ended.

## Revocation

If you are the record holder of your shares, you may revoke or cancel a previously granted proxy at any time before the Annual Meeting by delivering to the Secretary of Under Armour at 1020 Hull Street, Baltimore, Maryland 21230, a written notice of revocation or a duly executed proxy bearing a later date, or by attending the Annual Meeting and voting in person electronically. Any stockholder owning shares in street name may change or revoke previously given voting instructions by contacting the bank or brokerage firm holding the shares or by obtaining a legal proxy from the bank or brokerage firm and voting in person electronically at the Annual Meeting. Your attendance at the meeting does not revoke your proxy. Your last vote, prior to or at the Annual Meeting, is the vote that will be counted.

## Abstentions and Broker Non-Votes

Shares held by stockholders present at the Annual Meeting in person (virtually) or by proxy who do not vote on a matter and ballots or proxies marked "abstain" or "withheld" on a matter will be counted as present at the meeting for quorum purposes, but will not be considered votes cast on the matter.

If your shares are held in street name through a bank or broker and you do not provide voting instructions before the Annual Meeting, your bank or broker may vote your shares under certain circumstances in accordance with the New York Stock Exchange rules governing banks and brokers. These circumstances include "routine matters," such as the ratification of the appointment of our independent registered public accounting firm described in this Proxy Statement. Thus, if you do not vote your shares with respect to these matters, your bank or broker may vote your shares on your behalf or leave your shares unvoted.

The election of directors, the advisory approval of our executive compensation, the advisory vote on the frequency of future advisory votes on our executive compensation and the amendment and restatement of our 2005 Omnibus Long-Term Incentive Plan are not considered "routine matters." Thus, if you do not vote your shares with respect to any of these matters, your bank or broker may not vote the shares, and your shares will be left unvoted on the matter.

"Broker non-votes" (which are shares represented by proxies, received from a bank or broker, that are not voted on a matter because the bank or broker did not receive voting instructions from the beneficial owner) will be treated the same as abstentions, which means they will be present at the Annual Meeting and counted toward the quorum, but they will not be counted as votes cast on the matter. Abstentions and broker non-votes will not have an effect on any of the proposals at this meeting because they will not be counted as votes cast.



**Table of Contents**

## Householding

The SEC permits us to send a single set of proxy materials to any household at which two or more stockholders reside, unless contrary instructions have been received, but only if we provide advance notice and follow certain procedures. This process, referred to as householding, reduces the volume of duplicate information and reduces printing and mailing expenses. We have not instituted householding for stockholders of record. Certain brokerage firms may have instituted householding for beneficial owners of our common stock held through brokerage firms. If your family has multiple accounts holding our shares, you may have already received a householding notice from your broker. Please contact your broker directly if you have any questions or require additional copies of the proxy materials. The broker will arrange for delivery of a separate copy of this Proxy Statement or our Annual Report promptly upon your written or oral request. You may decide at any time to revoke your decision to household and begin receiving multiple copies.

## Solicitation of Proxies

We pay the cost of soliciting proxies for the Annual Meeting. We solicit by mail and arrangements are made with brokerage houses and other custodians, nominees and fiduciaries to send proxy materials to beneficial owners. Upon request, we will reimburse them for their reasonable expenses. In addition, our directors, officers and employees may solicit proxies, either personally or by telephone, facsimile or written or electronic mail. Stockholders are requested to return their proxies without delay.



Table of Contents

# SECURITY OWNERSHIP OF MANAGEMENT AND CERTAIN BENEFICIAL OWNERS OF SHARES

The following table sets forth certain information known to us regarding the beneficial ownership of shares of our common stock by:

- each current director and nominee for director;

- our named executive officers included in the Fiscal Year 2023 Summary Compensation Table;

- all of our directors and executive officers as a group; and

- each person, or group of affiliated persons, known to us to beneficially own more than 5% of any class of our outstanding shares of Class A Stock.

Except as otherwise set forth in the footnotes below, the address of each beneficial owner is c/o Under Armour, Inc., 1020 Hull Street, Baltimore, Maryland 21230, and, to our knowledge, each person has sole voting and investment power over the shares shown as beneficially owned. Unless otherwise noted, the information is stated as of June 5, 2023, the Record Date for the Annual Meeting. No shares in this table held by our directors or executive officers are pledged as security. The table below does not include restricted stock unit, or RSU, awards with shares issuable more than 60 days from June 5, 2023, stock options exercisable more than 60 days from June 5, 2023, or any RSUs or stock options with performance based vesting conditions that have not yet been satisfied. With respect to our 5% stockholders, the table below does not present their ownership of our Class C Stock due to its non-voting status.

| Beneficial Owner | Class A and Class B Stock | | Class C Stock | | Percentage of Voting Power(3) |
| | Beneficially Owned Shares(1) | Percentage of Shares of Class Outstanding(2) | Beneficially Owned Shares(1) | Percentage of Shares of Class Outstanding | |
| --- | --- | --- | --- | --- | --- |
| Kevin A. Plank (4)(5) | 34,742,229 | 15.6% | 18,041,333 | 8.1% | 64.7% |
| Stephanie C. Linnartz (6) | 90 | * | 0 | * | * |
| Douglas E. Coltharp (7)(8) | 98,914 | * | 99,279 | * | * |
| Jerri L. DeVard (7) | 1,200 | * | 0 | * | * |
| Mohamed A. El-Erian (7) | 11,650 | * | 3,675 | * | * |
| Carolyn N. Everson (7) | 0 | | 0 | * | * |
| David W. Gibbs (7)(9) | 0 | * | 50,000 | * | * |
| Karen W. Katz (7)(10) | 2,000 | * | 2,014 | * | * |
| Eric T. Olson (7) | 0 | * | 0 | * | * |
| Patrick W. Whitesell (7) | 0 | * | 0 | * | * |
| David Bergman (11) | 26,835 | * | 222,109 | * | * |
| Colin Browne (12) | 0 | * | 255,857 | * | * |
| Tchernavia Rocker (13) | 0 | * | 38,005 | * | * |
| Patrik Frisk (14) | 0 | * | 447,685 | * | * |
| Massimo Baratto (15) | 0 | * | 85,215 | * | * |
| Stephanie Pugliese (16) | 0 | * | 141,293 | * | * |
| All Executive Officers and Directors as a Group (7)(17) | 34,884,488 | 15.6% | 18,866,912 | 8.4% | 64.7% |
| 5% *Stockholders* | | | | | |
| BlackRock, Inc. (18) | 17,152,820 | 7.7% | | | 3.2% |
| The Vanguard Group (19) | 16,805,998 | 7.5% | | | 3.2% |
| State Street Corporation (20) | 10,402,743 | 4.7% | | | 2.0% |

\*     Less than 1% of the shares.



**Table of Contents**

(1) Includes any stock options exercisable within 60 days of June 5, 2023 or shares issuable within 60 days of June 5, 2023 upon the vesting of RSUs.

(2) The percentage of outstanding figures take into account the 34,450,000 shares of outstanding Class B Stock held, directly or indirectly, by Mr. Plank. These shares of Class B Stock may be converted under certain circumstances, including at the option of Mr. Plank, into shares of Class A Stock. If the shares of Class B Stock are not counted, the percentage of outstanding Class A Stock owned is as follows: Mr. Plank, less than one percent; all executive officers and directors as a group, less than one percent; BlackRock, Inc., 9.1%; The Vanguard Group, 8.9%; and State Street Corporation 5.5%.

(3) Each share of Class A Stock has one vote, and each share of Class B Stock has ten votes. The percentage of voting power reflects the combined effects of both Class A Stock and Class B Stock. Our Class C Stock is non-voting.

(4) Includes 181,608 shares of Class A Stock beneficially owned by Mr. Plank, and 110,621 stock options for Class A Stock that are currently exercisable. Mr. Plank's shares of Class A Stock are held by a limited liability company controlled by Mr. Plank and he holds sole voting and investment power over these shares. In addition, Mr. Plank beneficially owns 34,450,000 shares of Class B Stock indirectly, of which 29,510,624 shares of Class B Stock are held by two limited liability companies controlled by Mr. Plank and he has sole voting and investment power over these shares. With respect to the remaining 4,939,376 of these shares of Class B Stock, 1,803,400 shares are held by two limited liability companies of which Mr. Plank is a member. Mr. Plank's wife has been appointed as the manager of these two limited liability companies, and has voting control and investment power over the shares held by these companies. The remaining 3,135,976 shares of Class B Stock are held by an irrevocable trust, of which Mr. Plank is the grantor and has the ability to replace the trustee. Thomas J. Sippel, a former director of the company, has been appointed trustee of the trust and has voting control over the shares held by the trust and shares investment power with Mr. Plank. Because the 34,450,000 shares of Class B Stock beneficially owned by Mr. Plank, which are all the shares of Class B Stock outstanding, are convertible into shares of Class A Stock on a one-for-one basis under certain circumstances, including at the option of Mr. Plank, he is also deemed to be the beneficial owner of 34,450,000 shares of Class A Stock into which the Class B Stock may be converted.

(5) Includes 1,391,890 stock options for Class C Stock that are currently exercisable. In addition, Mr. Plank beneficially owns an additional 16,649,443 shares of Class C Stock, and as detailed in Note (4) above, Mr. Plank's wife has investment power over 1,765,845 of these shares, and Mr. Plank shares investment power with the trustee of the trust described in Note (4) over 3,107,880 of these shares. Does not include RSUs for 482,451 shares of Class C Stock.

(6) Does not include RSUs for 1,860,304 shares of Class C Stock.



Table of Contents

(7) Does not include deferred stock units, or DSUs, for shares of either Class A Stock or Class C Stock, or RSUs for shares of Class C Stock held by non-management directors. The RSUs will be converted into DSUs for Class C Stock on a one-for-one basis upon vesting. The DSUs will be settled in shares of our Class A Stock or Class C Stock, as applicable, on a one-for-one basis six months after the director leaves the Board, or sooner upon death or disability. As of the Record Date, the non-management directors held the following amounts of DSUs and RSUs:

| Name | Class A DSUs | Class C DSUs | Class C RSUs |
|---|---|---|---|
| Douglas E. Coltharp | 54,820 | 159,089 | 20,403 |
| Jerri L. DeVard | 0 | 76,316 | 20,403 |
| Mohamed A. El-Erian | 0 | 75,721 | 20,403 |
| Carolyn N. Everson | 0 | 1,569 | 16,786 |
| David W. Gibbs | 0 | 23,831 | 23,695 |
| Karen W. Katz | 5,121 | 98,276 | 20,403 |
| Eric T. Olson | 13,758 | 95,589 | 20,403 |
| Patrick W. Whitesell | 0 | 1,569 | 16,786 |

(8) Includes 22,914 shares of Class A Stock owned by an irrevocable trust of which Mr. Coltharp's wife is the trustee and his two children are the beneficiaries (the "Coltharp Trust"), 75,000 shares owned by a spousal lifetime access trust of which Mr. Coltharp is the trustee and spousal beneficiary (the "Coltharp 2021 Trust") and 1,000 shares held by two Uniform Transfer to Minors Act accounts and 22,741 shares of Class C Stock owned by the Coltharp Trust, 75,532 shares owned by the Coltharp 2021 Trust and 1,006 shares held by two Uniform Transfer to Minors Act accounts.

(9) Shares of Class C Stock are held in trust.

(10) Shares of Class A Stock and Class C Stock are held in trust.

(11) Does not include RSUs for 245,791 shares of Class C Stock.

(12) Does not include RSUs for 371,014 shares of Class C Stock.

(13) Does not include RSUs for 278,451 shares of Class C Stock.

(14) Shares of Class C Stock are held in trust. As previously disclosed and discussed below, on May 31, 2022, Mr. Frisk stepped down from his role as President and Chief Executive Officer and a member of the company's Board of Directors. He continued to serve as an advisor to the company through September 1, 2022. Upon his departure from the company in September 2022, Mr. Frisk forfeited all unvested equity awards.

(15) As discussed below, Mr. Baratto left the company on May 19, 2023. Upon his departure from the company, Mr. Baratto forfeited all unvested equity awards.

(16) As previously disclosed and discussed below, on October 24, 2022, Ms. Pugliese stepped down from her role as President, Americas. She continued to serve as an advisor to the company through March 3, 2023. Upon her departure from the company, Ms. Pugliese forfeited all unvested equity awards.

(17) Includes shares shown as beneficially owned by the directors and executive officers as a group (16 persons). Does not include shares beneficially owned by Mr. Frisk, Mr. Baratto or Ms. Pugliese, who were no longer employed by the company as of June 5, 2023. Does not include RSUs and DSUs for 4,364,170 shares of Class C Stock. Does not include DSUs for 73,699 shares of Class A Stock.

(18) According to their report on Schedule 13G, as of December 31, 2022, BlackRock, Inc., or BlackRock, and certain affiliates of BlackRock, were deemed to beneficially own in the aggregate 17,152,820 shares of our Class A Stock. According to the Schedule 13G, the reporting persons



**Table of Contents**

had sole power to vote 16,714,541 shares and no power to vote 438,279 shares, and sole power to dispose of all of these shares. The principal business address of BlackRock is 55 East 52nd Street, New York, New York 10055.

(19)  According to their report on Schedule 13G, as of December 30, 2022, The Vanguard Group, or Vanguard, and certain affiliates of Vanguard, were deemed to beneficially own in the aggregate 16,805,998 shares of our Class A Stock. According to the Schedule 13G, the reporting persons had shared power to vote 77,772 shares and no power to vote 16,728,226 shares and sole power to dispose of 16,531,409 shares and shared power to dispose of 274,589 shares. The principal business address of Vanguard is 100 Vanguard Boulevard, Malvern, Pennsylvania 19355.

(20)  According to their report on Schedule 13G, as of December 31, 2022, State Street Corporation, or State Street, and certain affiliates of State Street, were deemed to beneficially own in the aggregate 10,402,743 shares of our Class A Stock. According to the Schedule 13G, the reporting persons had shared power to vote 4,824,890 shares and no power to vote 5,577,853 shares and shared power to dispose of all of these shares. The principal business address of State Street is One Lincoln Street, Boston, Massachusetts 02111.

9

**UNDER ARMOUR.**

**Table of Contents**

# ELECTION OF DIRECTORS
**(PROPOSAL 1)**

Ten directors will be elected at the 2023 Annual Meeting to hold office until their successors are elected and qualified. There are ten nominees for election, each of whom is currently a member of our Board of Directors. Unless otherwise specified, the proxies received will be voted for the election of the following persons:

| Name | Position at Under Armour, Inc. | Independent |
|---|---|---|
| Kevin A. Plank | Executive Chair and Brand Chief | No |
| Douglas E. Coltharp | Director | ✓ |
| Jerri L. DeVard | Director | ✓ |
| Mohamed A. El-Erian | Lead Director | ✓ |
| Carolyn N. Everson | Director | ✓ |
| David W. Gibbs | Director | ✓ |
| Karen W. Katz | Director | ✓ |
| Stephanie C. Linnartz | President and Chief Executive Officer | No |
| Eric T. Olson | Director | ✓ |
| Patrick W. Whitesell | Director | ✓ |

## Overview of Director Nominees

We view the effectiveness of our Board of Directors through an individual and collective lens. We endeavor to have a Board that represents a range of experiences, skills and attributes and embodies principles of diversity, including gender, race and ethnicity. We believe each director nominee contributes to this goal, as described below in the biographies included in "Nominees for Election at the Annual Meeting." For additional information about how we identify and evaluate nominees for director, see "Corporate Governance and Related Matters—Identifying and Evaluating Director Candidates" below.

*Snapshot of Director Nominees*



10

**UNDER ARMOUR.**

**Table of Contents**

**Board Racial and Ethnic Diversity**



**Non-Management Director Tenure**



*Skills and Experiences of Director Nominees*

Our Corporate Governance and Sustainability Committee and Board consider the following key experiences, skills and attributes when recommending a candidate to serve on our Board:

✓ Executive Leadership and Strategy Experience: Directors who have served or currently serve as CEOs or in other senior leadership roles at other organizations are uniquely positioned to advise, support and oversee our management team to achieve strategic priorities and long-term objectives and contribute practical insight into business strategy.

✓ Retail Industry Experience: Directors who have experience in the retail industry contribute a deep understanding of our fundamental business needs and industry risks.

✓ Technology, Digital and eCommerce Experience: Directors with experience in digital and technology, including managing cybersecurity risk and developing and overseeing eCommerce operations and strategy or loyalty programs, provide critical perspective regarding our digital business strategies, technology resources and infrastructure and essential risk management functions.

✓ Marketing, Branding and Media Experience: Our brand's strength and reputation and our connection with consumers is fundamental to our business and our strategy. Directors with consumer or brand marketing and media experience provide critical insights to our Board.

✓ Financial Expertise: We place high importance on financial discipline, accurate financial reporting and robust financial controls and compliance, and value directors with an understanding of finance and financial reporting processes, as well as experience with mergers, acquisitions and strategic business transactions. We seek to have multiple directors who qualify as audit committee financial experts or are otherwise financially literate.

✓ International Experience: Directors with exposure to and experience in global markets and/or diverse organizational structures, business environments and cultural perspectives (whether through the private or public sector) offer unique insight into our increasingly complex and expanding global operations.

✓ Public Company Board Experience: Directors who have served or currently serve on other public company boards provide essential perspective with respect to board operations and dynamics, prioritizing stockholder interests and corporate governance best practices, including related to executive compensation, risk management and oversight of strategic, operational and compliance-related matters.



**Table of Contents**

We believe that the ten director nominees together provide diverse and relevant experiences to comprise a Board that is well-positioned to provide effective oversight of our company, as illustrated in the following table. A check mark indicates a specific area of focus or expertise on which the Board particularly relies. Not having a check mark does not mean the director does not possess that qualification or skill. Our directors' biographies describe each director's background and relevant experience in more detail below.

| Skills & Experiences | Plank | Coltharp | DeVard | El-Erian | Everson | Gibbs | Katz | Linnartz | Olson | Whitesell | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Executive Leadership and Strategy Experience | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 10 |
| Retail Industry Experience | ✓ | ✓ | ✓ | | | | ✓ | | | | 4 |
| Technology, Digital and eCommerce Experience | ✓ | | ✓ | | ✓ | | ✓ | ✓ | ✓ | | 6 |
| Marketing, Branding and Media Experience | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 9 |
| Financial Expertise | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 8 |
| International Experience | ✓ | | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | | 7 |
| Public Company Board Experience | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 9 |

# Nominees for Election at the Annual Meeting



*Director since our founding*
*Age: 50*

**Founder, Executive Chair and Brand Chief**

### Kevin A. Plank
**Executive Chair and Brand Chief of Under Armour, Inc.**

Mr. Plank became Under Armour's Executive Chair and Brand Chief in January 2020, after serving as Chief Executive Officer and Chairman of the Board of Directors from 1996 to 2019, and President from 1996 to July 2008 and August 2010 to July 2017. Mr. Plank also serves on the Board of Directors of the National Football Foundation and College Hall of Fame, Inc., and is a member of the Board of Trustees of the University of Maryland College Park Foundation.

As our founder, Brand Chief and controlling stockholder since our inception in 1996 and as the driving force behind our innovative products and our brand, Mr. Plank is uniquely qualified to serve on and lead our Board given his experience, knowledge of our industry and business and strategic vision and insight.



**Table of Contents**



*Director since
December 2004
Age: 62*

**Independent**

*Board Committees:*

- *Audit (Chair)*
- *Finance and Capital Planning (Chair)*

### Douglas E. Coltharp
**Executive Vice President and Chief Financial Officer of Encompass Health Corporation**

Since May 2010, Mr. Coltharp has served as Executive Vice President and Chief Financial Officer of Encompass Health Corporation (formerly HealthSouth Corporation). Before that, Mr. Coltharp served as a partner at Arlington Capital Advisors and Arlington Investment Partners, a Birmingham, Alabama based financial advisory and private equity business from May 2007 to April 2010 and as Executive Vice President and Chief Financial Officer of Saks Incorporated and its predecessor organization from 1996 to May 2007.

Mr. Coltharp's qualifications to serve on our Board include his financial expertise and past executive leadership experience in the consumer retail sector, including 11 years as Chief Financial Officer of Saks Incorporated, a leading publicly traded consumer retailer, and his more recent executive leadership experience as Executive Vice President and Chief Financial Officer of a large publicly traded company, Encompass Health Corporation.



*Director since
May 2017
Age: 65*

**Independent**

*Board Committees:*

- *Corporate Governance and Sustainability*
- *Human Capital and Compensation*

### Jerri L. DeVard
**Former Executive Vice President, Chief Customer Officer of Office Depot, Inc.**

Ms. DeVard served as Executive Vice President, Chief Customer Officer of Office Depot, Inc. from January 2018 to March 2020, leading their eCommerce and Customer Service functions and Marketing and Communications and as Executive Vice President and Chief Marketing Officer from September 2017 to December 2017. Before that, Ms. DeVard served as Senior Vice President and Chief Marketing Officer of The ADT Corporation, a leading provider of home and business security services, from March 2014 through May 2016. From July 2012 to March 2014, she was Principal of DeVard Marketing Group, a firm specializing in advertising, branding, communications and marketing strategies. Before that, she served as Executive Vice President of Marketing for Nokia. Ms. DeVard served in a number of senior marketing roles throughout her career, including as Senior Vice President of Marketing and Senior Vice President, Marketing Communications and Brand Management of Verizon Communications, Inc., Chief Marketing Officer of the e-Consumer business at Citibank N.A. and other senior marketing positions at Revlon Inc., Harrah's Entertainment, the NFL's Minnesota Vikings and the Pillsbury Company. In 2021, Ms. DeVard founded the Black Executive CMO Alliance (BECA), an alliance designed to champion corporate diversity and help build the next generation of C-suite marketing executives. Ms. DeVard currently serves on the Board of Directors of Cars.com and is a member of its Compensation and ESG Committees; on the Board of Directors of Root, Inc. and is a member of its Nominating and Corporate Governance Committee; and on the Board of Directors of Dow Inc. and is a member of its Audit and Environment, Health, Safety and Technology Committees. Ms. DeVard previously served on the Board of Directors of Focus Impact Acquisition Corp. from October 2021 to January 2022.

Ms. DeVard's qualifications to serve on our Board include her broad-based and significant experience in marketing and branding and digital and eCommerce, as well as her executive leadership experience with a number of large global brands.



**Table of Contents**



*Director since October 2018*
*Age: 64*

**Independent**

**Lead Director**

*Board Committees:*
- *Audit*
- *Finance and Capital Planning*

### Mohamed A. El-Erian
**Former Chief Executive Officer and Co-Chief Investment Officer of PIMCO**

Dr. El-Erian served as CEO and Co-Chief Investment Officer of PIMCO, one of the world's premier global investment management firms, from December 2007 to March 2014. He currently serves as Chief Economic Advisor of Allianz, the corporate parent of PIMCO, a role he has held since March 2014, and is the President of Queens' College, Cambridge. Dr. El-Erian joined PIMCO in 1999 as a senior member of the portfolio management and investment strategy group. In February 2006, he became president and CEO of Harvard Management Company, the entity responsible for managing the university's endowment, before returning to PIMCO in December 2007 to serve as co-CEO and co-CIO. From December 2012 to January 2017, he was chair of the U.S. President's Global Development Council. Previously, he was a managing director at Salomon Smith Barney/Citigroup in London and worked at the International Monetary Fund for 15 years, rising to the position of Deputy Director. He serves as non-executive director of Barclays plc and is a member of its Board Risk and Board Nomination Committees. He is a trustee of the National Bureau of Economic Research and a columnist for Bloomberg and a contributing editor at the Financial Times.

Dr. El-Erian's qualifications to serve on our Board include his financial expertise, his significant international, macroeconomic and government experience and his executive leadership experience gained through his past roles, including as CEO and Co-Chief Investment Officer of PIMCO.



*Director since February 2023*
*Age: 51*

**Independent**

*Board Committees:*
- *Corporate Governance and Sustainability*
- *Audit*

### Carolyn N. Everson
**Senior Advisor for Permira; Former Vice President, Global Business Group of Meta**

Ms. Everson has served since January 2023 as a Senior Advisor for Permira, a private equity firm focused on technology and consumer brands. Before joining Permira, she served as President of Instacart from September to December 2021; before that, she was Vice President of the Global Business Group, at Meta Platforms, Inc., from March 2011 to June 2021. Before joining Meta, Ms. Everson held leadership positions in advertising at Microsoft Corporate and MTV Networks Company. Ms. Everson serves on the Board of Directors of The Walt Disney Company and is a member of its Talent and Compensation Committee and on the Board of Directors of The Coca-Cola Company and is a member of its Talent and Compensation Committee. Ms. Everson previously served on the Board of Directors of The Hertz Corporation from 2013 to 2018 and on the Board of Directors of Hertz Global Holdings, Inc. from 2016 to 2018. She also serves on the boards of Villanova University, the Humane Society of the United States, and Columbia Medical School. In addition, she is a member of the Council of Foreign Relations. Ms. Everson earned a bachelor's degree in liberal arts and communications from Villanova University and a master's degree in business administration from Harvard Business School.

Ms. Everson's qualifications to serve on our Board include her executive leadership experience in consumer facing technology and media companies, her financial expertise, her experience in marketing and branding and her public company board experience.

14



**Table of Contents**



*Director since
September 2021
Age: 60*

**Independent**

*Board Committees:*

• *Human Capital and
Compensation (Chair)*

### David W. Gibbs
**Chief Executive Officer of Yum! Brands, Inc.**

Mr. Gibbs serves as Chief Executive Officer of Yum! Brands, Inc. ("YUM"), a position he has held since January 2020, and has served as a member of YUM's Board of Directors since November 2019. Before that, he served as President and Chief Operating Officer from August 2019 to December 2019, as President, Chief Financial Officer and Chief Operating Officer from January 2019 to August 2019 and as President and Chief Financial Officer from May 2016 to December 2018. Before these positions, he served as Chief Executive Officer of Pizza Hut Division from January 2015 to April 2016. From January 2014 to December 2014, Mr. Gibbs served as President of Pizza Hut U.S. Before these positions, Mr. Gibbs served as President and Chief Financial Officer of Yum! Restaurants International, Inc. ("YRI") from May 2012 through December 2013. Mr. Gibbs served as Chief Financial Officer of YRI from January 2011 to April 2012. He served as Chief Financial Officer of Pizza Hut U.S. from September 2005 to December 2010. From March 2016 to January 2020, Mr. Gibbs served on the Board of Directors of Sally Beauty Holdings, Inc.

Mr. Gibbs' qualifications to serve on our Board include his financial expertise, international experience and his executive leadership experience with Yum! Brands, including his current role as Chief Executive Officer and his prior roles as President, Chief Operating Officer and Chief Financial Officer.



*Director since
October 2014
Age: 66*

**Independent**

*Board Committees:*

• *Corporate Governance
and Sustainability*

• *Finance and Capital
Planning*

### Karen W. Katz
**Former President and Chief Executive Officer of Neiman Marcus Group LTD LLC**

Ms. Katz served as interim CEO of Intermix, an omni-channel women's fashion business, from May 2022 through November 2022. Previously, she served as President and CEO of Neiman Marcus Group LTD LLC, one of the world's leading luxury and fashion retailers, from 2010 to February 2018. Having joined Neiman Marcus in 1985, Ms. Katz served in key executive and leadership roles in the company's merchant, stores and eCommerce organizations as Executive Vice President—Stores, a member of the Office of the Chairman of Neiman Marcus Group, and President, Neiman Marcus Online, and President and CEO, Neiman Marcus Stores. Ms. Katz serves on the Board of Directors of Humana Inc. and is the chair of its Nominating, Governance & Sustainability and Technology Committees and on the Board of Directors of The RealReal, Inc. and is a member of its Audit Committee. Ms. Katz previously served on the Board of Directors of Casper Sleep from April 2019 to January 2022.

Ms. Katz's qualifications to serve on our Board include her digital and eCommerce experience and her executive leadership experience in the consumer retail sector with Neiman Marcus Group, including as President and Chief Executive Officer.

15



**Table of Contents**



*Director since*
*February 2023*
*Age: 55*

**President and Chief Executive Officer**

### Stephanie C. Linnartz
**President and Chief Executive Officer of Under Armour, Inc.**

Ms. Linnartz has been President and Chief Executive Officer and a member of our Board of Directors since February 2023. Before joining Under Armour, Ms. Linnartz served as the President of Marriott International, Inc. beginning in February 2021. Prior to her role as President, she served as Marriott's Group President Consumer Operations, Technology and Emerging Businesses from 2020 to 2021, and as Marriott's Executive Vice President and Global Chief Commercial Officer from 2013 to 2019. Ms. Linnartz joined Marriott as a financial analyst in 1997, and held several positions in finance before moving into sales and marketing. Ms. Linnartz also serves on the Board of Directors of The Home Depot, Inc. and is a member of its Audit and Leadership Development & Compensation Committees.

Ms. Linnartz's qualifications to serve on our Board include her extensive leadership experience at Marriott, her public company board experience, her experience in marketing and branding, her digital and international experience and serving as our current CEO.



*Director since*
*July 2012*
*Age: 71*

**Independent**

*Board Committees:*
• *Corporate Governance and Sustainability (Chair)*

### Eric T. Olson
**Admiral U.S. Navy (Retired) and former Commander of U.S. Special Operations Command**

Admiral Olson retired from the United States Navy in 2011 as an Admiral after 38 years of military service. He served in special operations units throughout his career, during which he earned a Master's Degree in National Security Affairs and was awarded several decorations for leadership and valor including the Defense Distinguished Service Medal and the Silver Star. Admiral Olson's career culminated as the head of the United States Special Operations Command from July 2007 to August 2011, where he was responsible for the mission readiness of all Army, Navy, Air Force, and Marine Corps special operations forces. In this capacity, he led over 60,000 people and managed an annual budget in excess of ten billion dollars. Admiral Olson served as Chief Executive Officer of HANS Premium Water, a clean water solution for homes, from June 2019 to May 2020. He has served as President and Managing Member of ETO Group, LLC since September 2011, supporting a wide range of private and public sector organizations. Admiral Olson serves on the Board of Directors of Iridium Communications, Inc. and is Chair of its Compensation Committee and on the Board of Directors of Sarcos Technology & Robotics Corp and is a member of its Audit and Compensation Committees. Admiral Olson also serves as Chairman Emeritus of the non-profit Special Operations Warrior Foundation.

Admiral Olson's qualifications to serve on our Board include his experience in technology and his significant government and leadership experience as an Admiral in the United States Navy, including his management of a large and complex organization as head of the United States Special Operations Command.



**Table of Contents**



*Director since
February 2023
Age: 58*

**Independent**

*Board Committees:*

- *Human Capital and
Compensation*

### Patrick W. Whitesell
**Executive Chairman of Endeavor Holdings Group**

Mr. Whitesell has served since October 2017 as Executive Chairman of Endeavor Group Holdings, a global sports and entertainment company composed of industry-leading entities including entertainment agency WME; sports, fashion, events and media company IMG; and premier mixed martial arts organization UFC. Mr. Whitesell also serves on the Board of Directors of Endeavor. Previously, Mr. Whitesell served as Endeavor's Co-Chief Executive Officer, following his role as Co-Chief Executive Officer of WME. Mr. Whitesell is a graduate of Luther College.

Mr. Whitesell's qualifications to serve on our Board include his executive leadership experience, including as the current Executive Chairman of Endeavor Group Holdings and the prior Co-Chief Executive Officer, and his experience in marketing, branding and talent management.

The election of each director requires a plurality of the votes cast at the Annual Meeting.

**The Board of Directors recommends that you vote "FOR" the election of the ten nominees for director.**

17

**UNDER ARMOUR.**

**Table of Contents**

# CORPORATE GOVERNANCE AND RELATED MATTERS

## Corporate Governance Highlights

Our Board of Directors has a long-standing commitment to sound and effective corporate governance, which begins with and fully reflects our Purpose and Values, set forth at the beginning of this Proxy Statement. Our strong corporate governance practices, including those highlighted below, are codified in our Corporate Governance Guidelines and other key governance documents, and demonstrate the commitment of our Board of Directors to enabling an effective structure to support the successful oversight of our business and long-term objectives:

✓ Separate Chair and CEO

✓ Lead independent director

✓ Majority independent Board

✓ Fully independent Board committees

✓ Regular executive sessions of non-management directors

✓ Risk oversight

✓ Full access to management and internal and external auditors

✓ Board and committees have authority to engage independent advisors as they deem appropriate

✓ Board oversight of succession planning for the CEO and other senior management

✓ Annual Board and committee self-evaluation

## Board Leadership Structure

Our governing documents provide our Board of Directors discretion to combine or separate the positions of Chair and Chief Executive Officer as it may deem appropriate in light of prevailing circumstances. Currently, Kevin Plank serves as our Executive Chair and Brand Chief, and Stephanie Linnartz serves as our President and Chief Executive Officer and a member of the Board. We believe that the current separation of the roles of Chair and Chief Executive Officer is appropriate given our company's strategic and operational priorities. This structure allows the Chief Executive Officer to focus on our company's business, operations and strategy, while continuing to leverage the Chair's experience, perspective and vision.

To further strengthen our corporate governance structure and provide independent oversight of our company, on an annual basis our non-management directors elect an independent director to serve as Lead Director. Dr. El-Erian has been elected to serve as our Lead Director. He acts as a liaison between our Board's non-management directors and Mr. Plank, Ms. Linnartz and the other members of our management team, chairs regular executive sessions of the Board without Mr. Plank and Ms. Linnartz present and performs other functions as requested by the non-management directors.

## Independence of Directors

Our Board of Directors currently consists of ten directors, eight (80%) of which are independent non-management directors. The Board has determined that the following eight directors, each of which is standing for election at our 2023 Annual Meeting, are independent under the corporate governance

18



Table of Contents

listing standards of the New York Stock Exchange, or NYSE: Douglas E. Coltharp, Jerri L. DeVard, Mohamed A. El-Erian, Carolyn N. Everson, David W. Gibbs, Karen W. Katz, Eric T. Olson and Patrick W. Whitesell. Mr. Plank and Ms. Linnartz are not independent because they are our Executive Chair and Brand Chief and President and Chief Executive Officer, respectively.

Our charter includes additional factors for the Board to consider when determining whether a director will be "independent" under the NYSE standards. Specifically, the Board must consider whether any independent directors have any material financial or service relationship with Mr. Plank or any of his family members. The Board has considered these factors and determined that none of the independent directors have any such relationships. A copy of our charter that includes these requirements is available through our corporate website, https://about.underarmour.com/, under "Investors—Corporate Governance."

## Board Meetings and Committees

Our Board meets regularly throughout the year. During fiscal year 2023, there were nine meetings of the Board and several committee meetings as noted in the table below. In fiscal year 2023, all directors attended at least 75% of the aggregate meetings of the Board and the committees of which they were members during that period. In accordance with our Corporate Governance Guidelines, our non-management directors also meet in executive sessions without management at each regularly scheduled Board meeting.

Our Board has the following four standing committees: an Audit Committee, a Human Capital and Compensation Committee, a Corporate Governance and Sustainability Committee and a Finance and Capital Planning Committee. The table below provides current the membership and meeting information for fiscal year 2023 for each of these committees.

| Name | Audit Committee | Human Capital and Compensation Committee | Corporate Governance and Sustainability Committee | Finance and Capital Planning Committee |
|---|---|---|---|---|
| Douglas E. Coltharp | **C** | | | **C** |
| Jerri L. DeVard | | ✓ | ✓ | |
| Mohamed A. El-Erian | ✓ | | | ✓ |
| Carolyn N. Everson(1)(2) | ✓ | | ✓ | |
| David W. Gibbs(2)(3) | | **C** | | |
| Karen W. Katz | | | ✓ | ✓ |
| Eric T. Olson | | | **C** | |
| Patrick W. Whitesell(1) | | ✓ | | |
| **Total Meetings in Fiscal Year 2023** | **7** | **8** | **6** | **4** |

✓ = Committee Member
**C** = Committee Chair

(1)   Ms. Everson and Mr. Whitesell were appointed to our Board on February 1, 2023 and became a member of the Corporate Governance and Sustainability Committee and the Human Capital and Compensation Committee, respectively, effective March 1, 2023.



**Table of Contents**

(2)   Mr. Gibbs was a member of the Audit Committee during the transition period and fiscal year 2023. Ms. Everson replaced Mr. Gibbs as a member of the Audit Committee effective June 1, 2023.

(3)   Harvey L. Sanders, a long-standing independent director who served on our Board since November 2004 and as the chair of the Human Capital and Compensation Committee, retired from our Board effective March 31, 2023. Following his retirement, Mr. Gibbs, who had been a member of the Human Capital and Compensation Committee, was appointed chair of the committee effective April 1, 2023.

The functions performed by these standing committees are summarized below and are set forth in more detail in their charters. The complete text of the charters for each standing committee can be found on our corporate website, https://about.underarmour.com/, under "Investors—Corporate Governance." The Board has determined that each member of the Audit, Human Capital and Compensation and Corporate Governance and Sustainability Committees is independent as required under NYSE listing standards and our charter. Each member of the Finance and Capital Planning Committee is also independent.

From time to time, our Board may designate ad hoc committees to assist in carrying out its responsibilities. During fiscal year 2023, the Board established a CEO Search Committee for the sole purpose of identifying and recommending a new President and Chief Executive Officer upon the departure of former President and Chief Executive Officer Patrik Frisk on May 31, 2022. Ms. Katz served as the chair of the CEO Search Committee and Mr. Gibbs and Admiral Olson served as members of the committee.

## Audit Committee

The Audit Committee assists the Board of Directors with oversight of matters relating to accounting, internal control, auditing, financial reporting, risk and legal and regulatory compliance. The committee oversees the audit and other services provided by our independent registered public accounting firm, and is directly responsible for the appointment, independence, qualifications, compensation and oversight of the independent registered public accounting firm, which reports directly to the committee. The committee also oversees the company's internal audit function and the chief audit executive, who reports directly to the committee. In addition, the committee oversees risks related to information technology use and protection, including cybersecurity and data privacy. The Audit Committee Report for fiscal year 2023 is included in this Proxy Statement under "Audit Committee Report."

The Board has determined that all of the committee members are independent and financially literate, and that Mr. Coltharp and Dr. El-Erian qualify as "audit committee financial experts" under SEC rules and NYSE listing standards.

## Human Capital and Compensation Committee

The Human Capital and Compensation Committee approves the compensation of our Chief Executive Officer, or CEO, and our other executive officers, administers our executive benefit plans, including the granting of awards under our equity incentive plans, and advises the Board on director compensation. The committee also oversees our company's key human capital management strategies and programs, including relating to diversity, equity and inclusion. Throughout fiscal year 2023, the Human Capital and Compensation Committee received briefings on and discussed a variety of human capital management topics, including strategies and metrics related to diversity, equity and inclusion, our employee engagement survey and leadership development.

Our CEO, Executive Chair and Brand Chief and other senior executives evaluate the performance of our executive officers and make recommendations to the Human Capital and Compensation



Table of Contents

Committee concerning their compensation. The committee considers these evaluations and recommendations, and its evaluation of the Executive Chair and Brand Chief and the CEO in determining the compensation of our Executive Chair and Brand Chief, CEO and our other executive officers.

The Human Capital and Compensation Committee is also primarily responsible for reviewing and assessing risks arising from our compensation policies and practices. In May 2023, the committee conducted, with the assistance of management, a risk assessment of our compensation policies and practices, which included a review of our material compensation programs, the structure and nature of these programs, the short-term and long-term performance incentive targets used in these programs and how they relate to our business plans and creating stockholder value, corporate governance policies with respect to our compensation programs, including our stock ownership guidelines, and other aspects of our compensation programs. Based on this review and assessment, the committee concluded that the risks related to our compensation policies and practices are not reasonably likely to have a material adverse effect on our company.

Pursuant to its charter, the Human Capital and Compensation Committee has the authority to obtain advice and assistance from advisors, including compensation consultants. In fiscal year 2023, the committee engaged the services of an independent compensation consultant, Willis Towers Watson, or WTW, to provide executive compensation consulting services to the committee. This independent consultant reports directly to the committee and the committee retains sole authority to retain and terminate the consulting relationship. In carrying out its responsibilities, the independent consultant collaborates with management to obtain data, provide background on compensation programs and practices and clarify pertinent information. The committee obtained from the independent consultant competitive market data on compensation for executives to assess generally the competitiveness of our executive compensation. The competitive market data was based on a peer group and WTW's published industry survey data. The committee generally has not relied on the independent consultant to determine or recommend the amount or form of executive compensation.

Additional information concerning the processes and procedures for considering and determining executive officer compensation is included in the "Compensation Discussion and Analysis" section of this Proxy Statement. The Human Capital and Compensation Committee Report for fiscal year 2023 is included under the "Human Capital and Compensation Committee Report" section of this Proxy Statement.

A description of the compensation program for our non-management directors, including updates to the program for our upcoming fiscal year, is included below under the "—Compensation of Directors" section of this Proxy Statement.

## Corporate Governance and Sustainability Committee

The Corporate Governance and Sustainability Committee identifies individuals qualified to become members of our Board of Directors, recommends candidates for election or reelection to our Board, oversees the evaluation of our Board and advises our Board regarding committee composition and structure and other corporate governance matters, including reevaluating our Corporate Governance Guidelines on an annual basis. The committee also oversees our company's significant strategies, programs, policies and practices relating to sustainability (including environmental and human rights issues and impacts) and corporate responsibility. Throughout fiscal year 2023, the committee received quarterly briefings from our Chief Sustainability Officer on a variety of topics, including related to our company's sustainability strategy, progress with respect to our sustainability targets and commitments and various sustainability related projects and initiatives. The committee also reviewed our 2021 Sustainability & Impact Report prior to its publication in September 2022.



**Table of Contents**

*Finance and Capital Planning Committee*

The Finance and Capital Planning Committee assists our Board in overseeing our company's financial and capital investment policies, planning and activities, including matters relating to our capital structure and liquidity, hedging and foreign currency transactions, use of cash, acquisitions and divestitures and capital projects.

## Stockholders Meeting Attendance

Directors are encouraged to attend annual meetings of stockholders, but we have no specific policy requiring directors' attendance at such meetings. All of our directors who were directors at that time attended our 2022 Annual Meeting of Stockholders.

## Identifying and Evaluating Director Candidates

The Corporate Governance and Sustainability Committee recommends to the Board candidates to fill vacancies or for election or reelection to the Board. The Board then appoints new Board members to fill vacancies or nominates candidates each year for election or reelection by stockholders. The committee does not have a specific written policy or process regarding the nominations of directors, nor does it maintain minimum standards for director nominees other than as set forth in the committee's charter as described below.

The Corporate Governance and Sustainability Committee's charter requires the committee to establish criteria for selecting new directors, which reflects at a minimum a candidate's strength of character, judgment, business experience, specific areas of expertise, factors relating to the composition of the Board, including its size and structure, and principles of diversity, including gender, race and ethnicity. The committee also considers the statutory requirements applicable to the composition of the Board and its committees, including the NYSE's independence requirements. The committee considers each candidate's experiences, skills and attributes relative to what skills and experiences can best contribute to our Board's effective operation, particularly in light of our company's evolving needs and long-term strategy. We believe the nominees for election to the Board contribute a wide range of experiences, skills and attributes to comprise a Board that is well-positioned to provide effective oversight of our company, as illustrated above in each director's biography set forth in "Election of Directors—Nominees for Election at the Annual Meeting" and the charts included in "Election of Directors—Overview of Director Nominees."

The Board has not established term limits for directors because of the concern that term limits may deprive the company and its stockholders of the contribution of directors who have developed valuable insights into the company and its operations over time. The tenure of our non-management directors ranges from less than one to eighteen years, with an average tenure of 6.5 years. We have added at least one new independent director in four of the last six years, including two in fiscal year 2023. We believe the tenure of our Board members provides an appropriate balance of expertise, experience, continuity and perspective that serves the best interests of our stockholders. Our Corporate Governance Guidelines do provide that a director is expected not to stand for reelection after the age of 75. For additional information regarding the age and tenure of the ten director nominees for election at the Annual Meeting, see "Election of Directors."

The Corporate Governance and Sustainability Committee does not have a formal policy with respect to considering diversity, including gender, race and ethnicity, in identifying director nominees. Consistent with the committee's charter, when identifying director nominees, the committee considers general principles of diversity, and does so in the broadest sense, considering diversity in terms of business leadership, experience, industry background and geography, as well as gender, race and



**Table of Contents**

ethnicity. However, the committee and the Board believe that considering gender, racial and ethnic diversity is consistent with creating a Board that best serves our company's needs and the interests of our stockholders, and they are important factors considered when identifying individuals for Board membership. The committee strives for directors who represent a mix of backgrounds and experiences that will enhance the quality of the Board's deliberations and oversight of our business, and we hope to continue to attract directors with a broader range of backgrounds and experiences. For additional information regarding the diversity of the ten director nominees for election at the Annual Meeting, see "Election of Directors—Overview of Director Nominees."

The Corporate Governance and Sustainability Committee periodically considers criteria for identifying possible new director candidates as needed, in consultation with the Chair of the Board and other Board members and management, including the CEO, and works with management and other Board members in recruiting new candidates. Candidates identified through this process are considered by the full committee for possible recommendation to the Board. From time to time, the committee uses the services of a third-party search firm to assist it in identifying and screening candidates. Ms. Everson and Mr. Whitesell were elected to the Board in February 2023. Mr. Plank, our Executive Chair and Brand Chief and largest stockholder, recommended Ms. Everson and Mr. Whitesell to our Corporate Governance and Sustainability Committee for consideration, after which each candidate was subsequently vetted by a third-party search firm. Ms. Everson and Mr. Whitesell were both unanimously recommended by the Corporate Governance and Sustainability Committee for nomination.

In addition, the Corporate Governance and Sustainability Committee will consider director candidates suggested by stockholders. Any stockholder who wishes to recommend a director candidate for consideration by the committee may do so by submitting the candidate's name and qualifications to the committee's chairperson. See "—Communications with Directors" below for how to communicate with the chair of the committee. Our Bylaws include requirements for direct nominations by a stockholder of persons for election to our Board. These requirements are described under "Stockholder Proposals" at the end of this Proxy Statement.

# Role of Board in Risk Oversight

Our Board of Directors is responsible for overseeing our management team's overall approach to risk management. Our Board of Directors regularly reviews our financial and strategic plans and objectives, including the risks that may affect the achievement of these plans and objectives, and receives regular reports from our Chief Executive Officer, Chief Financial Officer, Chief Legal Officer and other key executive officers regarding various enterprise risk matters. In accordance with our Corporate Governance Guidelines, our non-management directors also meet at least once each year in executive session with our Chair and Chief Executive Officer to review succession planning for our Chief Executive Officer and other senior executive positions.

In addition, our Board of Directors has delegated to each Board committee primary responsibility to oversee the management of risks that fall within their respective areas of responsibility, as described further below. In performing this function, each Board committee has full access to management, as well as the ability to engage independent outside advisors. At each Board meeting, the chairperson of each Board committee and the Corporate Secretary report on the applicable committee's activities, including risk management, which provides an opportunity to discuss significant risks with the full Board.

- *Audit Committee:* Under its charter, the Audit Committee's responsibilities include inquiring of management and our independent registered public accounting firm about significant financial risks or exposures, the company's processes and policies for risk assessment and the steps

23



**Table of Contents**

management has taken to mitigate these risks to the company. The committee receives periodic reports from management on our enterprise risk management program and our risk mitigation efforts. The committee also oversees our legal and regulatory compliance programs, which includes receiving periodic reports from management on our global ethics and compliance program and reviewing our company's code of conduct. In addition, the committee oversees our internal audit function, as well as risks related to information technology use and protection, including cybersecurity and data privacy, as described in more detail below.

- *Human Capital and Compensation Committee:* The Human Capital and Compensation Committee has the responsibility to review risks related to our compensation policies and practices, which includes conducting an annual compensation risk assessment. The committee also oversees risks related to our company's key human capital management strategies and programs, including relating to diversity, equity and inclusion.

- *Corporate Governance and Sustainability Committee:* The Corporate Governance and Sustainability Committee oversees risks relating to our corporate governance policies, practices and structure. The committee also oversees risks related to sustainability, including environmental and human rights issues and impacts.

- *Finance and Capital Planning Committee:* The Finance and Capital Planning Committee oversees certain financial matters and risks relating to our capital structure and liquidity, hedging and foreign currency transactions, acquisitions and divestitures and significant capital projects.

## Cybersecurity Risk Management

Cybersecurity is a critical component of risk management at Under Armour. Our Board of Directors has delegated primary responsibility to oversee the management of cybersecurity risks to the Audit Committee. The committee receives regular reports regarding our cybersecurity risks, with two briefings by senior management annually and periodic updates as appropriate. Our global cybersecurity team, led by our Chief Information Security Officer, coordinates an annual external network penetration test, as well as security audits of certain systems as appropriate. We require that all employees with access to our corporate systems complete an annual cybersecurity and data privacy training. We regularly conduct training events with various business teams to educate our employees on business-critical cybersecurity risks. In addition, as part of our Payment Card Industry compliance, we require all relevant employees to complete annual role-based training on protecting payment devices and payment card information. Our training program also includes multiple phishing awareness campaigns throughout the year for all employees with system access. To further drive preparedness and awareness, we conduct annual tabletop exercises with our executive team focused on cybersecurity risks and business continuity. We regularly evaluate our privacy notices, policies and procedures surrounding our handling and control of personal data and the systems we have in place to help protect us from cybersecurity or personal data incidents or breaches. We also maintain an information security insurance policy, which insures against liability for data incidents or breaches and other technology related exposures.

## Sustainability Oversight

We are a purpose-led, values-based organization. Our Purpose—We Empower Those Who Strive for More—articulates why Under Armour exists. Our Values, which are listed at the beginning of this Proxy Statement, capture the beliefs and behaviors that shape our culture and define how we operate as a company and global citizen. Our Purpose and Values, including Act Sustainably and Stand for Equality, steer the ambitions we set as an organization, the questions we ask to guide our strategy and planning, the decisions we make for our culture and brand and the actions we take, including with respect to environmental and social issues and how we engage in related governance.



**Table of Contents**

Our Board of Directors has delegated to our Corporate Governance and Sustainability Committee oversight of our significant sustainability strategies, programs, policies and practices. The committee receives quarterly updates from our Chief Sustainability Officer on these matters, and reviews and approves significant sustainability and corporate responsibility policies and reports.

Our corporate sustainability strategy is based on responsible business practices, including a commitment to sustainability and human rights and addressing related opportunities and risks. Our sustainability strategies and goals are reviewed and approved by our President and Chief Executive Officer, our Executive Leadership Team and our Sustainability Leadership Council, composed of our Chief Sustainability Officer, Chief Financial Officer, Chief Operating Officer, Chief Product Officer, Chief Legal Officer and Chief People and Administrative Officer. Our Sustainability team, led by our Chief Sustainability Officer, is responsible for formulating our sustainability strategy, leading its integration into the business and managing our sustainability program, which addresses environmental (including climate change) and human rights issues and impacts and leads engagement regarding related due diligence and business integration. We also have a cross-functional task force consisting of leaders from an array of teams across our business that discusses and collaborates on key sustainability issues and initiatives to ensure holistic oversight, consideration and analysis of sustainability across our company.

We encourage you to learn more about our sustainability initiatives by reviewing our 2021 Sustainability & Impact Report, available at our corporate website, https://about.underarmour.com/, under "Purpose—Sustainability—Reporting & Governance."

*Diversity, Equity and Inclusion Oversight*

Our commitment to diversity, equity and inclusion starts with our Board of Directors and its ongoing commitment to considering principles of diversity, including gender, race and ethnicity, in identifying new director candidates, as described in "Identifying and Evaluating Director Candidates" above. Our Board has delegated to our Human Capital and Compensation Committee oversight of our key human capital management strategies and programs, including with respect to diversity, equity and inclusion. The committee regularly reviews our progress towards achieving our diversity, equity and inclusion goals.

Our Purpose challenges us continually to protect and evolve our culture. Our Values reflect our foundational belief that having an engaged, diverse and committed workforce enhances our culture and drives our business success, ultimately helping us deliver the most innovative products that make athletes better. We have set measurable, time-bound goals for improving diversity among our team, including a commitment to increase the number of historically underrepresented employees throughout our leadership levels. We are also committed to increasing representation of women in our business's critical areas, particularly in leadership, commercial and technical roles globally. These goals are publicly outlined on our corporate website, https://about.underarmour.com/, under "Purpose—Diversity, Equity & Inclusion," where we also publish our representation statistics annually. Our annual incentive plan for all employees, including our executives as described below in "Executive Compensation—Compensation Discussion and Analysis—Components of Our Fiscal Year 2023 Compensation Program," incorporates performance measures to further our diversity, equity and inclusion goals.

# Availability of Corporate Governance Information

For additional information on our corporate governance, including Board committee charters, our Corporate Governance Guidelines and our code of business conduct and ethics, visit our corporate website, https://about.underarmour.com/, under "Investors—Corporate Governance."

25



**Table of Contents**

## Stock Ownership Guidelines

Our Board of Directors has adopted stock ownership guidelines to align the financial interests of our company's executives and non-management directors with the interests of our stockholders. The guidelines currently provide that executive officers should own company stock with a value at least equal to six times the annual base salary for the Chief Executive Officer, three times annual base salary for Executive Vice Presidents and one times annual base salary for all other executive officers, in each case based on the average closing price of our stock for the prior fiscal year. The guidelines also provide that non-management directors should own company stock with a value at least equal to five times the amount of the annual retainer paid to directors. Executive officers are expected to achieve the stock ownership levels under these guidelines within five years of their hire or promotion to executive officer and non-management directors within five years of joining our Board. The equity that qualifies for determining stock ownership levels under the guidelines includes owned shares, deferred stock units held pursuant to the Non-Employee Directors Deferred Stock Unit Plan (described below) and shares issuable with respect to unvested, time based restricted stock units, but excludes unearned shares issuable with respect to unvested, performance based restricted stock units and unexercised options (or any portion thereof, such as the current "in the money" value). The company's stock ownership guidelines can be found on our corporate website, https://about.underarmour.com/, under "Investors—Corporate Governance."

All executive officers and non-management directors are either in compliance with the guidelines as of the last measuring date or are new to their roles within the last five years and so are not yet required to have achieved the applicable stock ownership levels. We anticipate such executive officers and non-management directors will be in compliance with the guidelines within the required time frame.

## Communication with Directors

If stockholders or other interested parties wish to communicate with non-management directors, they should write to Under Armour, Inc., Attention: Corporate Secretary, 1020 Hull Street, Baltimore, Maryland 21230. Further information concerning contacting our Board is available through our corporate website, https://about.underarmour.com/, under "Investors—Corporate Governance."

## Indemnification of Directors in Derivative Actions

Under the Maryland General Corporation Law (the "MGCL"), we are required to report to stockholders in this Proxy Statement certain information regarding the indemnification or advancement of expenses to members of our Board. As disclosed in our Annual Report on Form 10-K for the fiscal year ended March 31, 2023, certain of our directors and officers have been named as defendants in certain derivative actions brought against the company (the "derivative actions"). Under our Bylaws and the MGCL, our directors and officers may be entitled to indemnification and advancement of legal expenses in certain circumstances in connection with these derivative actions. As the legal representation of our directors other than Mr. Plank and Mr. Frisk is currently combined with the legal representation of our company, we have not advanced or reimbursed expenses of any of our directors other than Mr. Plank and Mr. Frisk to date. During the transition period and fiscal year 2023, we advanced approximately $38,652 and $6,048 of legal expenses for Mr. Plank and Mr. Frisk, respectively.

26



**Table of Contents**

# COMPENSATION OF DIRECTORS

*Retainers*

The compensation arrangement for non-management directors during the transition period and fiscal year 2023 was as follows:

| | Transition Period | FY2023 |
|---|---|---|
| Annual Retainer for each Director | $ 18,750 | $75,000 |
| Annual Retainer for Committee Chairs | | |
| Audit Committee | $ 6,250 | $25,000 |
| Human Capital and Compensation Committee | $ 5,625 | $22,500 |
| Corporate Governance and Sustainability Committee | $ 5,000 | $20,000 |
| Finance and Capital Planning Committee | $ 5,000 | $20,000 |
| Annual Retainer for Committee Members | $ 2,500 | $10,000 |
| Annual Retainer for Lead Director | $ 18,750 | $75,000 |

As previously disclosed, our Board of Directors approved a change in our fiscal year end from December 31 to March 31, effective for the fiscal year beginning April 1, 2022. Following a three-month transition period (January 1, 2022—March 31, 2022), our fiscal year 2023 ran from April 1, 2022 through March 31, 2023. Consequently, there was no fiscal year 2022. To account for our change in fiscal year end, the Human Capital and Compensation Committee recommended, and the Board of Directors approved, amendments to the company's Non-Employee Director Compensation Plan, effective January 1, 2022, to align the plan year with our new fiscal year and to compensate the non-management directors for their service on our Board during the transition period.

The cash retainers are payable in quarterly installments in arrears and directors have the option to defer the cash retainers into deferred stock units pursuant to the Non-Employee Directors Deferred Stock Unit Plan. Beginning with the second quarter of 2016, we began issuing deferred stock units for shares of our Class C Stock rather than our Class A Stock. Deferred stock units will be settled in shares of our Class A Stock or Class C Stock (as applicable) on a one-for-one basis six months after the director leaves the Board, or sooner upon death or disability. During fiscal year 2023, we did not pay separate fees for attendance at any Board or standing committee meetings.

As described above, during fiscal year 2023, the Board established an ad hoc CEO Search Committee, consisting of one chairperson and two members, for the sole purpose of identifying and recommending a new President and Chief Executive Officer. As compensation for serving on the CEO Search Committee, each committee member received a one-time fee of $10,000 and the committee chair received a one-time fee of $20,000. The fees were paid on January 3, 2023, following the successful selection of our new President and Chief Executive Officer, Stephanie Linnartz.

*Equity Awards*

Non-management directors also receive the following equity awards:

- Upon initial election to the Board, an award of restricted stock units for shares of Class C Stock valued (on the grant date) at $100,000 with the units vesting in three equal annual installments.

- An annual award of restricted stock units for shares of Class C Stock granted following each Annual Meeting of Stockholders with the units vesting in full at the following year's Annual Meeting of Stockholders. In a typical twelve-month fiscal year, this annual award is valued on the grant date at $150,000. Following the 2022 Annual Meeting of Stockholders, to

27



Table of Contents

compensate the non-management directors for their service on our Board during the transition period, the annual award was valued on the grant date at $187,500.

The restricted stock units vest upon the director's death or disability or upon a change in control of Under Armour. The restricted stock units are forfeited if the director leaves the Board for any other reason prior to the scheduled vesting term. Upon vesting of the restricted stock units, the restricted stock units are converted into deferred stock units with the shares delivered six months after the director leaves the Board, or sooner upon death or disability.

The table below sets forth information concerning the compensation of our non-management directors for the transition period and for fiscal year 2023.

### Director Compensation for the Transition Period and Fiscal Year 2023

| | Transition Period | | | Fiscal Year 2023 | | |
|---|---|---|---|---|---|---|
| Name | Fees Earned or Paid in Cash ($)(1) | Stock Awards ($)(2)(3) | Total ($) | Fees Earned or Paid in Cash ($)(1) | Stock Awards ($)(2)(3) | Total ($) |
| Douglas E. Coltharp | 30,000 | — | 30,000 | 120,000 | 187,500 | 307,500 |
| Jerri L. DeVard | 23,750 | — | 23,750 | 95,000 | 187,500 | 282,500 |
| Mohamed A. El-Erian | 42,500 | — | 42,500 | 170,000 | 187,500 | 357,500 |
| Carolyn N. Everson(4) | — | — | — | 13,333 | 187,500 | 200,833 |
| David W. Gibbs | 23,750 | — | 23,750 | 105,000 | 187,500 | 292,500 |
| Karen W. Katz | 23,750 | — | 23,750 | 115,000 | 187,500 | 302,500 |
| Westley Moore(5) | 21,250 | — | 21,250 | 51,508 | — | 51,508 |
| Eric T. Olson | 23,750 | — | 23,750 | 105,000 | 187,500 | 292,500 |
| Harvey L. Sanders(6) | 24,375 | — | 24,375 | 97,500 | — | 97,500 |
| Patrick W. Whitesell(4) | — | — | — | 13,333 | 187,500 | 200,833 |

_____

(1)  Non-management directors may elect to defer cash retainers into deferred stock units pursuant to the Non-Employee Directors Deferred Stock Unit Plan as described above. The table below sets forth the amount of cash deferred and the number of deferred stock units of Class C Stock received for those directors who made this election.

| | Transition Period | | Fiscal Year 2023 | |
|---|---|---|---|---|
| Name | Cash Deferred ($) | Deferred Stock Units (#) | Cash Deferred ($) | Deferred Stock Units (#) |
| Douglas E. Coltharp | 30,000 | 1,949 | 120,000 | 15,547 |
| Jerri L. DeVard | — | — | — | — |
| Mohamed A. El-Erian | 23,750 | 1,543 | 95,000 | 12,308 |
| Carolyn N. Everson(4) | — | — | 13,333 | 1,569 |
| David W. Gibbs | 23,750 | 1,543 | 105,000 | 13,433 |
| Karen W. Katz | 18,750 | 1,218 | 75,000 | 9,717 |
| Westley Moore(5) | 2,500 | 162 | 5,000 | 720 |
| Eric T. Olson | — | — | — | — |
| Harvey L. Sanders(6) | 24,375 | 1,584 | 73,125 | 9,764 |
| Patrick W. Whitesell(4) | — | — | 13,333 | 1,569 |

(2)  The amount in this column reflects the aggregate grant date fair value in accordance with applicable accounting guidance of the Class C Stock awards granted during fiscal year 2023. As of March 31, 2023, each of Mr. Coltharp, Ms. DeVard, Dr. El-Erian, Ms. Katz and Admiral Olson held restricted stock units for 20,402.61 shares of Class C Stock, which amount represents restricted stock units granted pursuant to the annual equity award following the 2022 Annual Meeting of Stockholders. As of March 31, 2023, Mr. Gibbs held restricted stock units for 23,694.79 shares of Class C Stock, which amount also includes restricted stock units awarded when he was

28



Table of Contents

appointed to the Board in September 2021. Ms. Everson and Mr. Whitesell joined our Board effective February 1, 2023 and hold restricted stock units for 16,786.03 shares of Class C Stock as of March 31, 2023, which amount represents restricted stock units granted pursuant to an initial equity award upon being appointed to the Board and a prorated annual equity award. Mr. Moore and Mr. Sanders resigned from our Board effective November 9, 2022 and March 31, 2023, respectively, and so forfeited the annual equity award granted following the 2022 Annual Meeting of Stockholders and, in the case of Mr. Moore, the unvested restricted stock units awarded when he was appointed to the Board in October 2020.

(3)  We have disclosed the assumptions made in the valuation of the stock awards in "Stock-Based Compensation" under Note 14 to the Consolidated Financial Statements included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2023.

(4)  Ms. Everson and Mr. Whitesell were appointed to our Board of Directors effective February 1, 2023. On March 1, 2023, Ms. Everson became a member of the Corporate Governance and Sustainability Committee and Mr. Whitesell became a member of the Human Capital and Compensation Committee.

(5)  Mr. Moore served on our Board of Directors and as a member of the Corporate Governance and Sustainability Committee through November 9, 2022, when, as previously disclosed, he stepped down from our Board due to his successful election to Governor of the State of Maryland. Shares underlying Mr. Moore's deferred stock units were delivered to him six months after his departure from our Board, in accordance with their terms.

(6)  As previously disclosed, Mr. Sanders retired from our Board of Directors on March 31, 2023. During the transition period and fiscal year 2023, he served as chair of the Human Capital and Compensation Committee. Shares underlying Mr. Sanders' deferred stock units will be delivered to him six months after his departure from our Board, in accordance with their terms.

## *Update to Director Compensation for Fiscal Year 2024*

As discussed above, the Human Capital and Compensation Committee advises the Board on director compensation. The current levels of compensation for our non-employee directors have been in place since January 1, 2021. In February 2023, management researched director compensation practices of the companies in our peer group (described further below) and reviewed the data with the Human Capital and Compensation Committee. Following this review, the committee and the Board believed that certain elements of our director compensation were not in line with competitive practices and that increases or decreases were appropriate to bring our director compensation more in line with director compensation in our industry. Therefore, the committee recommended and the Board approved, effective April 1, 2023, the following changes to our director compensation:

- an increase in the annual retainer for each non-employee director to $90,000 (from $75,000);

- an increase in the annual retainer for the chair of the Audit Committee to $30,000 (from $25,000);

- an increase in the annual retainer for the chair of the Human Capital and Compensation Committee to $25,000 (from $22,500);

- an increase in the annual retainer for the chair of the Corporate Governance and Sustainability Committee to $22,500 (from $20,000);

- an increase in the annual retainer for the chair of the Finance and Capital Planning Committee to $22,500 (from $20,000); and

- a decrease in the annual retainer for the lead director to $50,000 (from $75,000).

The committee did not recommend any changes to the annual retainer for each committee member, the initial equity award for each non-employee director or the annual equity award for each non-employee director.

29



**Table of Contents**

# EXECUTIVE COMPENSATION

## Compensation Discussion and Analysis

The following is a discussion and analysis of our compensation policies and decisions regarding the fiscal year 2023 compensation for our executive officers named in the compensation tables in this Proxy Statement.

### Executive Summary

We faced a challenging macroeconomic and retail environment in fiscal year 2023 that included negative impacts from changes in foreign currency rates and inflationary pressures, higher promotions and discounting related to industry-wide elevated inventory balances and ongoing COVID-19 related impacts in China. This led to net revenue growth of 3%, a lower growth rate than we had initially anticipated at the start of the year. Despite these challenges, we worked to effectively manage our expenses throughout the year, with selling, general and administrative expenses down by 2%, as we continued to focus on operating efficiency and profitability.

Our executive compensation programs in fiscal year 2023 were designed to require our executives to deliver results consistent with our annual operating plan, with a continued focus on improving efficiency and driving profitability, and advancing our long-term efforts to continue to grow our brand. As discussed in more detail below, we achieved the threshold level of performance for the financial targets in our fiscal year 2023 annual cash incentive plan, resulting in a significant reduction to incentive award amounts for our named executive officers (achieving 39% of the target level of performance). In addition, while the performance period for our fiscal year 2023 performance based equity awards is ongoing, based primarily on our income from operations and net revenue results for fiscal year 2023 and our initial operating plan for fiscal year 2024, we currently expect achievement of these awards to be below the target level of performance.

*Management Changes*

We experienced significant changes to our executive management team during fiscal year 2023. In May 2022, we announced that effective June 1, 2022, Patrik Frisk would step down from his role as President and Chief Executive Officer of the company and as a member of the company's Board of Directors, and Colin Browne, our Chief Operating Officer, would assume the role of interim President and Chief Executive Officer while our Board of Directors conducted a comprehensive search of internal and external candidates. To support the transition, Mr. Frisk remained with the company as an advisor through September 1, 2022, and thereafter has continued to provide consulting services. In December 2022, we announced that effective February 27, 2023, our Board of Directors appointed Stephanie Linnartz, who most recently served as the President of Marriott International, Inc., as the President and Chief Executive Officer of the company and a member of the company's Board of Directors.

In addition, we announced the departure of two additional executive officers. In September 2022, we announced that Stephanie Pugliese, President of the Americas, would be stepping down from her role at the end of October 2022, and David Baxter would succeed her. In March 2023, we internally announced that Massimo Baratto, Chief Consumer Officer, would be leaving the company in May 2023, and we began a public search for his successor.

*Fiscal Year End Change*

As previously disclosed, our Board of Directors approved a change in our fiscal year end from December 31 to March 31, effective for the fiscal year beginning April 1, 2022. In this Proxy Statement, we refer to the three-month period that began on January 1, 2022 and ended on March 31, 2022 as the

30



**Table of Contents**

"transition period" or "2022 TP." Our most recently completed fiscal year was the twelve-month period that began on April 1, 2022 and ended on March 31, 2023, which we refer to as "fiscal year 2023" or "FY2023." Our fiscal year 2021 began on January 1, 2021 and ended on December 31, 2021 and our fiscal year 2020 began on January 1, 2020 and ended on December 31, 2020. There was no fiscal year 2022. The change in fiscal year end impacted the design and timing of the approval of certain elements of our executive compensation program, as further described in the sections below.

*Executive Compensation Program Changes for Fiscal Year 2023*

In fiscal year 2020 and 2021, the design of our executive compensation program was significantly influenced by the unprecedented impacts of the COVID-19 pandemic on the macroeconomic economy, our industry and our business. Given the impact of COVID-19 on our ability to reliably forecast our sales and profitability and the ongoing uncertainty on our business and our industry, for fiscal year 2020 and 2021, management recommended, and the Human Capital and Compensation Committee approved, granting 100% time based annual equity awards with no "stretch" opportunity. For fiscal year 2023, management recommended, and the committee approved, returning to our historical practice of granting 50% time based and 50% performance based awards for the annual equity award program. Key changes to our annual equity award program implemented for fiscal year 2023 include the following:



| What We Changed for Annual Equity Awards: | Why We Changed It: |
|---|---|
| Re-established use of performance based restricted stock units as a component of annual equity award program (as compared to only time based awards in 2020 and 2021) | Returns to the company's long-standing, pre-pandemic practice of aligning pay for performance, while promoting retention, maintaining alignment with stockholders and continuing to require strong financial performance |
| Extended length of performance period to three years (as compared to pre-pandemic practice of two years) | Aligns length of performance period with market practices |
| Re-established dual metrics of net revenue and adjusted operating income | Emphasizes the importance of overall growth in our business, with a continued emphasis on profitability |
| Established cliff-vesting for performance based awards at the end of the performance period (as compared to pre-pandemic practice of vesting in three annual tranches if performance target is met) | Aligns vesting design with market practices, while continuing to maintain alignment with stockholders |
| Changed the vesting period of annual time based restricted stock unit awards to three annual tranches (as compared to four annual tranches previously) | Aligns vesting design with market practices, while continuing to maintain alignment with stockholders |

*Fiscal Year 2023 Performance and Compensation Highlights*

For fiscal year 2023, a substantial portion of the annual compensation potential for our executive officers was tied to the performance of our company, primarily through:

- our annual cash incentive plan, with awards earned based primarily on our financial performance in fiscal year 2023; and
- our annual equity award program, which were in the form of 50% time based and 50% performance based restricted stock unit awards, where the value ultimately realized by our executives depends on our long-term financial performance.

31



Table of Contents

Our adjusted operating income reached $330.1 million ($283.8 million on a GAAP basis), and our currency neutral net revenue reached $5.99 billion ($5.90 billion on a GAAP basis), in each case meeting the threshold levels of performance set forth under our fiscal year 2023 annual cash incentive plan (the threshold adjusted operating income and revenue targets were set at $330 million and $5.98 billion, respectively). The performance targets for the performance based equity awards granted in fiscal year 2023 were based on net revenue and adjusted operating income targets consistent with our long-term financial plan at the start of fiscal year 2023. As discussed in more detail below, given our results in fiscal year 2023 and our initial annual operating plan for fiscal year 2024, we currently expect these awards to be earned below the target level of performance. See "—Components of Our Fiscal Year 2023 Compensation Program—Equity Awards—Annual Performance Based Awards and Time Based Equity Awards for Fiscal Year 2023."

Currency neutral net revenue amounts presented in this Proxy Statement generally refer to our GAAP net revenues, adjusted for gains or losses incurred due to changes in foreign currency exchange rates as compared with the foreign exchange rates used in our initial annual operating plan. Adjusted operating income amounts presented in this Proxy Statement generally refer to our GAAP operating income, adjusted for certain specified items considered when determining executive compensation. For purposes of determining executive compensation, our annual cash incentive plan specified certain adjustments that should be considered when evaluating performance against the targets, which would have the effect of further increasing adjusted operating income. These adjustments included items such as the impact of certain goodwill impairment charges, the impact of restructuring and other related charges, certain litigation related expense, foreign exchange losses and charges related to the write-down of our accounts receivable asset due to customer bankruptcies. For a reconciliation of currency neutral net revenue and adjusted operating income as set forth in this Proxy Statement to the nearest GAAP measure, see "Appendix B: Reconciliation of Non-GAAP Financial Measures."

*Advisory Vote to Approve Executive Compensation*

At our 2022 Annual Meeting of Stockholders, we held an advisory vote to approve executive compensation, commonly referred to as "say on pay." The Human Capital and Compensation Committee values the opinions expressed by stockholders in these votes. While these votes are advisory and non-binding, the Human Capital and Compensation Committee and the Board review the voting results and seek to determine the cause or causes of any significant negative voting result. Voting results provide little detail by themselves, and we may consult directly with stockholders to better understand issues and concerns not previously presented.

Our stockholders overwhelmingly approved our "say on pay" proposal at our 2022 Annual Meeting of Stockholders, with more than 97% of the votes cast voting to approve our executive compensation. The Human Capital and Compensation Committee reviewed the voting results and given the strong level of support, did not make any changes to our executive compensation program or principles in response to the vote. The Human Capital and Compensation Committee will continue to consider results from the annual "say on pay" advisory vote, including the results from the upcoming 2023 Annual Meeting of Stockholders, as well as other stockholder input, when reviewing executive compensation programs, principles and policies.

32



**Table of Contents**

## Executive Compensation Features

We believe our executive compensation programs incorporate best practices that seek to drive business performance and align our executives with stockholder interests:

| What We Do | What We Don't Do |
|---|---|
| ✓ Pay for performance by tying the majority of executive compensation to pre-established, quantifiable performance goals or our stock price | ✕ Employment agreements (unless required by local law) |
| ✓ Double trigger provisions for all equity awards | ✕ Pension or supplemental retirement plan |
| ✓ Balance of short- and long-term performance metrics | ✕ Guaranteed salary increases for executive officers |
| ✓ "Clawback" provisions in our annual cash incentive plan and long-term incentive plan | ✕ Inclusion of long-term incentive awards in severance benefit calculations |
| ✓ Independent executive compensation consultant | ✕ Contributions to the deferred compensation plan for any executive officer in the transition period or fiscal year 2023 |
| ✓ Stock ownership guidelines for executive officers | ✕ Permit hedging of Under Armour shares (with no director or officer having any shares pledged as security in the transition period or fiscal year 2023) |
| ✓ Conduct annual stockholder "say on pay" advisory vote | ✕ Allow recycling back into our equity plan of shares used for taxes or option exercises |
| | ✕ Provide excessive benefits and perquisites |

## Objectives and Elements of our Compensation Program

The overall objectives of our compensation program for our executive officers are to:

• Attract and retain highly qualified executives committed to our brand and our purpose;

• Reward performance and motivate our executives to build and grow our business profitably;

• Align the interests of our executives with the interests of our stockholders; and

• Provide competitive pay based on peer group and market data.

33



**Table of Contents**

During fiscal year 2023, the critical elements of our executive compensation program that are designed to help achieve these objectives are as follows:

| | Compensation Element | Purpose | Key Characteristics |
|---|---|---|---|
| **FIXED** | Base Salary | Compensate fairly and competitively to help us attract and retain highly qualified executives | Determined primarily by the level of responsibility and experience while also considering competitive market data |
| **AT RISK** | Annual Cash Incentive Awards | Reward executives for the achievement of near-term financial and strategic objectives and individual performance | Target cash incentive amount set as a percentage of base salary<br><br>Actual payout based on performance against pre-established financial and diversity, equity and inclusion targets and an individual performance factor |
| | Equity Awards | Directly link the interests of executives with stockholders, promote retention and reward strong performance to create long-term stockholder value | Reflects a combination of time based and performance based restricted stock units with the value of the awards directly tied to our stock price<br><br>Time based awards vest in three equal annual installments<br><br>Performance based awards vest only upon achievement of combined three-year net revenue and adjusted operating income targets; if achieved, these awards cliff vest at the end of the three-year performance period |

We offer limited benefits and perquisites to our executives and do not offer pension or other retirement plans, other than a 401(k) plan that is offered to our employees generally and a deferred compensation plan pursuant to which executives may defer certain compensation; however, we did not make any company contributions to this plan in the transition period or fiscal year 2023 for any executive officers. See "—Benefits and Perquisites" below. Our annual equity awards include provisions allowing the acceleration of all or a portion of unvested amounts upon retirement for employees that meet certain criteria based on age and years of service. None of our named executive officers currently meet these retirement eligibility criteria.

## Compensation Decision-Making Process

*Human Capital and Compensation Committee review process*

In early 2022, the Human Capital and Compensation Committee engaged the services of Willis Towers Watson ("WTW") to provide executive compensation consulting services. The committee obtained from WTW competitive market data on compensation for executives to generally assess the competitiveness of our executive compensation. The competitive market data was based on a peer group and published industry survey data from WTW's General Industry Executive Compensation and Retail/Wholesale Executive Compensation, among other surveys. The peer group was developed by management based on publicly traded companies within the apparel and footwear industries. Some of the companies within the peer group may compete with us for talent or compare our performance from time to time. The following companies were included in the peer group:

| Fiscal Year 2023 Peer Group | | |
|---|---|---|
| Bath & Body Works, Inc. (formerly L Brands Inc.) | Levi Strauss & Co. | Skechers U.S.A., Inc. |
| Capri Holdings Limited | lululemon athletica inc. | Tapestry, Inc. |
| Carters, Inc. | NIKE, Inc. | V.F. Corporation |
| Columbia Sportswear Company | PVH Corp. | Wolverine World Wide, Inc. |
| Hanesbrands Inc. | Ralph Lauren Corporation | |

The Human Capital and Compensation Committee did not target compensation at or near any particular percentile ranking within the peer group or industry survey data or otherwise use this competitive market data to determine the amount or form of executive compensation. Rather the

34



**Table of Contents**

committee used this data as a general assessment of the competitiveness of our executive compensation programs. The committee determined that our executive compensation was reasonable when compared to the peer group and industry data. As discussed throughout this Compensation Discussion and Analysis section, the committee considers many factors in determining executive compensation levels, including the executive's prior experience, the position and level of responsibility with our company, market competitiveness, and company, business unit and individual performance.

In May 2023, in conjunction with the review of performance against the fiscal year 2023 annual cash incentive plan targets and fiscal year 2024 salaries and annual equity awards for executive officers, the Human Capital and Compensation Committee reviewed tally sheets relating to executive officer compensation that were prepared by management. The tally sheets included summary compensation information for fiscal year 2020 through fiscal year 2023, including base salary, annual cash incentive awards and equity awards, and the value of unvested equity awards vesting in 2023 and future years.

The Human Capital and Compensation Committee reviewed similar tally sheet data in early 2022 in conjunction with the approval of fiscal year 2023 base salaries and annual equity awards for executive officers.

Historically, during the first quarter of each fiscal year, the Human Capital and Compensation Committee considers annual base salary adjustments, certifies performance under our prior year's performance based awards and approves the performance measures for the annual cash incentive award and any performance based equity awards for the current fiscal year and the grant of any annual equity awards. However, given the change in our fiscal year end, the committee considered and approved base salary adjustments and approved annual time based equity awards during the transition period. The committee then considered and approved performance measures and award amounts for the annual cash incentive awards during the first quarter of fiscal year 2023.

*Management's role in determining compensation*

As discussed throughout this Compensation Discussion and Analysis section, management makes recommendations to the Human Capital and Compensation Committee on base salaries, annual cash incentive awards, annual equity awards and other types of compensation for executive officers, other than our Executive Chair and Brand Chief, Mr. Plank, and our President and Chief Executive Officer, Ms. Linnartz. With respect to fiscal year 2023, in early 2022 Mr. Frisk, with input from other senior executives generally recommended the salaries, annual incentive awards and equity awards for our executive officers. Ms. Linnartz has similarly made recommendations for fiscal year 2024. The recommendations are based on an assessment of each executive's performance, including the performance of the business unit(s) for which the executive officer has responsibility and contributions made to the overall success of our business. Mr. Plank, our Executive Chair and Brand Chief, provided recommendations with respect to Mr. Frisk's fiscal year 2023 compensation to the committee based on his performance and the overall success of our business in the prior fiscal year.

Certain executives, including our Chief Executive Officer, our Chief People and Administrative Officer, our Vice President of Human Resources & Total Rewards, our Chief Financial Officer and our Chief Legal Officer and Corporate Secretary, have also been involved in recommendations on the design and framework for our annual cash incentive awards and our annual equity awards. These executives also attend meetings of the Human Capital and Compensation Committee from time to time. The committee generally approves salaries and annual incentive awards for executive officers in executive sessions of the committee without management present.



**Table of Contents**

# Components of Our Fiscal Year 2023 Compensation Program

## BASE SALARY

The Human Capital and Compensation Committee approves base salaries for our executive officers at levels it deems appropriate based primarily on the executive's level of responsibility, experience and competitive market data.

The following table summarizes the base salaries for our named executive officers approved by the Human Capital and Compensation Committee for fiscal year 2023:

| Named Executive | Title | FY2023 Base Salary |
|---|---|---|
| Stephanie Linnartz(1) | *President and Chief Executive Officer* | $1,300,000 |
| Kevin Plank | *Executive Chair and Brand Chief* | $ 500,000 |
| David Bergman | *Chief Financial Officer* | $ 750,000 |
| Colin Browne(2) | *Chief Operating Officer; Former Interim President and Chief Executive Officer* | $1,000,000 |
| Tchernavia Rocker | *Chief People and Administrative Officer* | $ 675,000 |
| Patrik Frisk(3) | *Former President and Chief Executive Officer* | $1,300,000 |
| Massimo Baratto(4) | *Former Chief Consumer Officer* | $ 750,000 |
| Stephanie Pugliese(5) | *Former President, Americas* | $ 750,000 |

(1)   Ms. Linnartz joined the company on February 27, 2023.

(2)   In connection with assuming the interim President and Chief Executive Officer role, the Human Capital and Compensation Committee approved an increase in Mr. Browne's fiscal year 2023 base salary from $775,000 to $1,000,000 effective June 1, 2022.

(3)   Mr. Frisk stepped down from the role of President and Chief Executive Officer on May 31, 2022.

(4)   Mr. Baratto assumed additional responsibilities in connection with the departure of Mr. Frisk, and the Human Capital and Compensation Committee approved an increase in Mr. Baratto's fiscal year 2023 base salary from $600,000 to $750,000 effective June 1, 2022. Mr. Baratto left the company in May 2023.

(5)   Ms. Pugliese stepped down from the role of President, Americas on October 24, 2022 and continued to serve as an advisor to the company through March 3, 2023.

Other than in connection with Mr. Browne's appointment as Interim President and Chief Executive Officer, the Human Capital and Compensation Committee did not increase any named executive officer's base salary in fiscal year 2023. In making this decision, the committee considered competitive market data on compensation for comparable positions from WTW's executive compensation market assessment, which includes surveys and proxy data.

## ANNUAL CASH INCENTIVE AWARD

### *Plan Design and Performance Measures*

We have an annual cash incentive plan for our executive officers pursuant to which executives are eligible for a cash incentive award based primarily on company performance during the year. In May 2022, we announced our financial expectations for fiscal year 2023, noting that we expected net revenue growth at 5 to 7 percent as compared to the comparable baseline period (April 1, 2021 to March 31, 2022), and adjusted operating income of $375 million to $400 million. The Human Capital and Compensation Committee considered these expectations when establishing targets under the annual cash incentive plan. The committee also considered the continued importance of our diversity, equity and inclusion efforts.



**Table of Contents**

Below is a summary of the targets considered in our annual cash incentive plan for fiscal year 2023, their relative weighting and our performance against each metric:

| Fiscal Year 2023 Annual Cash Incentive Plan | | | | | | |
|---|---|---|---|---|---|---|
| | _Weighting_ | _Description_ | _Threshold_ | _Target_ | _Maximum_ | _FY2023 Results_ |
| _Financial Targets_ | | | | | | |
| Adjusted Operating Income* | 60% | Weighting emphasizes the continued importance of profitability when determining ultimate award amounts | $330 million | $410 million | $460 million | $330 million |
| Currency Neutral Net Revenue** | 20% | Continued revenue growth considered a fundamental indicator of our business strength | $5,980 million | $6,140 million | $6,300 million | $5,987 million |
| _Diversity, Equity and Inclusion_ | 20% | | | | | |
| Organizational Education Achievements** | | Required accountability for completion of specified training and education requirements by corporate employees | 80% training completion by corporate employees based on program and level within the organization | 90% training completion by corporate employees based on program and level within the organization | 100% training completion by corporate employees based on program and level within the organization | Exceeded Target |
| Representation Improvements** | | Required improvement of representation metrics for women and underrepresented groups in the U.S. corporate employee population | 80% of specified target improvements at various levels within the organization | 100% of specified target improvements at various levels within the organization | 120% of specified target improvements at various levels within the organization | Between Threshold and Target |

\*     The Adjusted Operating Income targets above must include the funding for the incentive award amounts. As a result, in order to fund higher incentive award amounts above the threshold level, the company must have achieved Operating Income levels even higher than those shown above. Our actual GAAP reported Operating Income for fiscal year 2023 was approximately $283.8 million.

\*\*    The threshold Adjusted Operating Income goal must be met for the Currency Neutral Net Revenue and Diversity, Equity and Inclusion performance metrics to be funded for payout. If the Adjusted Operating Income payout is above threshold, but below target, the payout for the Currency Neutral Net Revenue and Diversity, Equity and Inclusion metrics cannot exceed 50% of the Adjusted Operating Income payout.

Our annual cash incentive plan for executives for fiscal year 2023 was based primarily on the financial and diversity, equity and inclusion targets described above. For the financial targets, each executive's performance was tied to overall company performance rather than individual business units. For executives in charge of certain business units, achievement of diversity, equity and inclusion targets is measured based on the individual business unit performance. For Mr. Plank, however, 100% of his incentive award was tied to the financial performance and diversity, equity and inclusion targets for the overall company. In addition, while the annual cash incentive award amounts are primarily determined based on the company-wide measures discussed above, the Human Capital and Compensation Committee also considers the individual performance of our executive officers, and may adjust up or down the annual cash incentive amounts based on individual performance during the year.



**Table of Contents**

Performance reviews are generally based on a qualitative assessment of performance and consider the executive's performance and the performance of the department or departments for which the executive has responsibility and the contributions the executive and department are making to the overall success of Under Armour.

Our annual cash incentive plan for executives for fiscal year 2023 was designed with two financial targets: adjusted operating income and net revenue. However, as world markets experienced significant volatility and the impact of foreign currency exchange rates began to negatively impact our net revenue during the first half of fiscal year 2023, management and the Human Capital and Compensation Committee (in consultation with WTW) began to discuss the related impacts on the net revenue performance measure for fiscal year 2023. Management highlighted a misalignment within the fiscal year 2023 annual cash incentive plan design, whereby the adjusted operating income target adjusted for the impact of foreign exchange rates, which is generally viewed as a macroeconomic factor outside of the control of our executives, but the net revenue target did not. The committee members agreed to defer considering the related impacts on net revenue until they had an opportunity to review the full fiscal year 2023 financial results. In May 2023, the committee met to review the fiscal year 2023 financial results and certify the achievement under the fiscal year 2023 executive incentive plan performance measures. WTW also attended this meeting, and the committee members discussed with management and WTW the impact of foreign currency exchange rates on our results for the fiscal year and general market practices with regard to compensation plan design in this regard. The committee also met in executive session to discuss further. In executive session, the committee determined to consider currency neutral net revenue as the second financial target in the fiscal year 2023 annual cash incentive plan rather than net revenue.

*Incentive Award Levels and Fiscal Year 2023 Results*

For fiscal year 2023, the Human Capital and Compensation Committee set the following award target levels under our annual cash incentive plan for our named executive officers based on achievement of the metrics outlined above:

| | Threshold | Target | Maximum |
|---|---|---|---|
| | *(Pays at 50% of Target)* | | *(Pays at 200% of Target)* |
| Chief Executive Officer | 82.5% of annual salary | 165% of annual salary | 330% of annual salary |
| Executive Chair and Brand Chief | $500,000 | $1,000,000 | $2,000,000 |
| Other Named Executive Officers | 37.5% of annual salary | 75% of annual salary | 150% of annual salary |

The Human Capital and Compensation Committee did not increase the annual cash incentive award target levels for fiscal year 2023 as compared to fiscal year 2021. To account for the fiscal year end change, each executive's fiscal year 2023 final earned annual cash incentive award was multiplied by 1.25 to compensate the executive for the transition period. There was no proration applied to any executive base salary to account for the shift in timing of the committee reviewing and approving base salary adjustments in May instead of February.

Between the threshold amount and the target amount of each metric, and the target amount and maximum amount of each metric, the company utilizes a sliding scale to determine the payout based on the amount of funding generated by the incremental adjusted operating income dollars, revenue dollars, percentage of organizational education achievements or percentage of representation improvements. The annual incentive amounts for all the named executive officers were set at the above levels in order to have a significant percentage of the executive officers' total compensation tied primarily to corporate performance. We believe tying a significant percentage of executive officers' total compensation to corporate performance supports our objective to motivate our executives to build and profitably grow our business.

38



Table of Contents

Upon his appointment to Interim President and Chief Executive Officer, Mr. Browne's annual cash incentive award target level increased to 165% of his annual base salary (prorated for the increase that took effect on June 1, 2022). Because Ms. Linnartz did not join the company until February 27, 2023, she was not eligible for a fiscal year 2023 annual cash incentive award. However, upon joining the company, Ms. Linnartz received a one-time sign-on cash bonus of $375,000, $175,000 of which was paid on February 27, 2023, and $200,000 of which will be paid on February 27, 2024, subject to her continued employment (other than in certain circumstances, including certain separations from service).

With respect to the financial targets, we achieved the threshold performance level, with adjusted operating income of $330.1 million and currency neutral net revenue of $5,986.6 million. With respect to the diversity, equity and inclusion targets, overall company performance exceeded the target performance level for the organizational educational metric, but was between the threshold and target level for the representation improvement metric. For those named executive officers whose achievement of the representation improvement metric was measured based on individual business unit performance, performance was also between the threshold and target performance level, except with respect to Mr. Browne, whose individual business unit achievement for the representation improvement metric exceeded the target performance level. As noted above, because adjusted operating income met the threshold level but was below target, the payout for the diversity, equity and inclusion metrics were capped as to not exceed 50% of the adjusted operating income payout.

Based on these performance conditions, the Human Capital and Compensation Committee approved fiscal year 2023 annual cash incentive award amounts for the named executive officers at 39% of the target level of performance.

The annual cash incentive award for our executives is primarily determined based on the performance measures discussed above. However, the Human Capital and Compensation Committee considers the overall performance of our CEO and the other executive officers, and may adjust the annual incentive amounts based on individual performance during the year. Performance reviews are generally based on a qualitative assessment of performance and consider the executive's performance and the performance of the department or departments for which the executive has responsibility, as well as the contributions the executive and department are making to the overall success of Under Armour. The CEO makes recommendations to the committee for adjustments for executives, if any, and the committee decides whether any adjustment is warranted for the CEO in an executive session without the CEO present. For fiscal year 2023, Ms. Rocker received an individual performance adjustment to her annual cash incentive award, resulting in her final award amount multiplied by 1.25 (or 125% of the amount). This was based on her exceptional performance and leadership during a period of significant management turnover. Due to Mr. Baratto's announced departure from the company, the committee did not assess his performance as his fiscal year 2023 bonus was paid pursuant to the Under Armour, Inc. Executive Severance Program, which as described below assigns a departing executive assumes a predetermined performance rating resulting in his final award amount being multiplied by .85 (or 85% of the amount).

For the annual cash incentive amounts paid to the named executive officers, see the "Fiscal Year 2023 Summary Compensation Table" below.

## EQUITY AWARDS

Management and the Human Capital and Compensation Committee believe equity awards are an essential component of executive compensation and serve to better align the interests of our executives with those of our stockholders.

The Human Capital and Compensation Committee approves equity awards under our Third Amended and Restated 2005 Omnibus Long-Term Incentive Plan, as amended (the "2005 Plan"). The

39



**Table of Contents**

purpose of the 2005 Plan is to enhance our ability to attract and retain highly qualified executives and other persons and to motivate them to improve our business results and earnings for the long-term by providing them with equity holdings in Under Armour. While the committee has the discretion under the terms of the plan to issue awards for shares of our Class A Stock, the committee has used only our Class C Stock for equity compensation in recent years.

*Annual Equity Awards for Fiscal Year 2023*

As discussed above, historically, the mix of annual equity awards granted to our executives has been 50% time based and 50% performance based. In response to the impacts of COVID-19 on our business, in 2020 and 2021, the Human Capital and Compensation Committee approved temporary changes to the design of our annual equity award program to provide for 100% time based annual equity awards. For fiscal year 2023, management recommended, and the committee approved, returning to our historical practice of granted 50% time based and 50% performance based restricted stock unit awards for the annual equity award program. The following provides a summary of the fiscal year 2023 annual equity award program for our named executive officers:

| 50% Time Based Awards | Represents 50% of the total grant date fair value of annual equity awards |
| | Vests in three equal annual installments beginning in May 2023 |
| | Promotes long-term retention of executives and alignment with stockholder interests |

| 50% Performance Based Awards | Represents 50% of the total grant date fair value of annual equity awards |
| | 3-year combined net revenue and adjusted operating income targets, with payouts ranging from 25% to 200% based on the performance level achieved; if threshold performance level is not achieved, awards will be forfeited |
| Up to additional 50% of "Maximum" Value | If performance metrics are achieved, awards vest in full in May 2025 |
| | Emphasizes and incentivizes financial performance by providing upside potential for stronger growth and profitability |
| | Further promotes long-term retention of executives and alignment with stockholder interests |

Employees receiving equity awards under the 2005 Plan are chosen primarily based on their position and responsibilities within the company. The amount of the equity award to each employee is generally tiered based on the employee's level within the company and competitive market practices, and for executive officers the Human Capital and Compensation Committee considered the mix of equity awards as part of the total compensation for executives. Employees at the Senior Vice President level and above receive 50% of their annual equity awards granted in the form of time based restricted stock units and 50% granted in the form of performance based restricted stock units, while equity-eligible employees below the Senior Vice President level receive 100% of their annual equity awards granted in the form of time based restricted stock units.

With respect to Mr. Bergman, in February 2022, based on relevant market data management recommended, and the Human Capital and Compensation Committee approved, an annual equity award target with a grant date fair value of $1,500,000 for fiscal year 2023 (with 50% granted in the form of time based restricted stock units and 50% in the form of performance based restricted stock units), as compared to his annual equity award target value of $1,250,000 for the prior year.



Table of Contents

With respect to Mr. Browne, in February 2022, based on relevant market data management recommended, and the Human Capital and Compensation Committee approved, an annual equity award with a grant date fair value of $1,750,000 for fiscal year 2023 (with 50% granted in the form of time based restricted stock units and 50% in the form of performance based restricted stock units) in his role as Chief Operating Officer, as compared to his annual equity award target value of $1,250,000 for the prior year. In May 2022, in connection with Mr. Browne's appointment as interim President and Chief Executive Officer, the committee approved an additional annual equity award with a grant date fair value of $3,000,000 (with the same mix of time based and performance based restricted stock units).

Because Ms. Linnartz did not join the company until February 27, 2023, she was not granted a fiscal year 2023 annual equity award.

With respect to each of the other named executive officers, the committee recommended an annual equity award target with the same grant date fair value as the prior year (with 50% granted in the form of time based restricted stock units and 50% in the form of performance based restricted stock units). These equity awards are included in the "Grants of Plan-Based Awards for Fiscal Year 2023" table below. Mr. Frisk and Ms. Pugliese forfeited all of their fiscal year 2023 annual equity awards upon their departures. Mr. Baratto remained with the company through the first vesting date of the fiscal year 2023 annual time based awards, but otherwise forfeited all remaining amounts.

While the performance period for the fiscal year 2023 performance based restricted stock unit awards remains ongoing, based on our financial results for fiscal year 2023 and our initial operating plan for fiscal year 2024, these awards are currently expected to be earned below the target level based on the current performance targets. Our performance in fiscal years 2024 and 2025 will ultimately determine what portion, if any, of these awards are ultimately earned.

*Time Based Equity Awards*

From time to time management recommends, and the Human Capital and Compensation Committee approves, other time based restricted stock unit awards to certain of our executive officers, typically in connection with the officer joining our company, a change in the scope of the officer's responsibilities, or to ensure that the officer's financial interests are sufficiently aligned with the interests of our stockholders. In determining the amount of these awards, management and the committee considered primarily the executive's position and level of responsibility within our company, as well as the retention and long-term incentive value of the award.

In February 2022, management recommended, and the committee approved, a time based restricted stock unit award with a grant date fair value of $750,000 to be awarded to Mr. Bergman. The award will vest in two equal installments in February 2024 and February 2025, subject to continued employment. In considering this award, the committee considered the value of Mr. Bergman's outstanding unvested equity awards and the criticality of Mr. Bergman's role to the company's financial performance.

In May 2022 in connection with the announcement of Mr. Frisk's departure, management recommended, and the committee approved, time based restricted stock unit awards with grant date fair values of $750,000 to be awarded to each of Mr. Baratto and Ms. Rocker. Each of the awards vest in two equal installments in May 2024 and May 2025, subject to continued employment. In considering this award, the committee considered the importance of retaining each executive through the transition in leadership of the company. Following his departure from the company on May 19, 2023, Mr. Baratto forfeited this award.

41



**Table of Contents**

In February 2023, in connection with her appointment as President and Chief Executive Officer, the committee approved a sign-on time based restricted stock unit award with a grant date fair value of $11,000,000 for Ms. Linnartz, which vests in three equal annual installments, subject to her continued employment through each vesting date. In the event of her termination without cause, resignation for good reason, or death or disability prior to the first vesting date, she will receive cash equal to $11,000,000 and forfeit the award in its entirety or, following the first vesting date, accelerated vesting of any unvested amounts.

These equity awards are included in the "Grants of Plan-Based Awards for Fiscal Year 2023" table below.

### BENEFITS AND PERQUISITES

We have no defined benefit pension plan or any type of supplemental retirement plan for executives. We have a deferred compensation plan to provide senior management, including executive officers, with a way to save on a tax-deferred basis for retirement and other needs. The plan allows for company contributions in certain limited cases. See "Nonqualified Deferred Compensation" for a description of this plan and the balances under the plan for the named executive officers. We did not make any company contributions to the plan in the transition period or fiscal year 2023 for any named executive officer.

Executive officers are eligible to participate in our broad-based benefit plans available to employees generally, including a 401(k) plan and Employee Stock Purchase Plan.

We pay the premiums for supplemental long-term disability insurance for our executive officers. The standard benefit offered to all employees provides long-term disability insurance equal to 50% of their salary, with the ability for the employee to elect to pay the premiums for up to an additional 16.66% of their salary (for 66.66% in total). The benefit is capped at a maximum benefit of $12,500 per month. The cap results in a lower percentage of salary paid for executive officers under the standard benefit. The supplemental policy for our named executive officers provides additional coverage of up to $20,000 per month. We do not provide any tax gross-up to our executive officers to cover the income taxes incurred as a result of our paying the premiums on these policies.

We maintain a lease of a corporate aircraft for business purposes. In light of health and safety concerns due to COVID-19, the Human Capital and Compensation Committee approved personal use of the aircraft by Mr. Frisk for up to $250,000 of aggregate incremental cost to the company over the 15-month period between January 1, 2021 and March 31, 2022 without requiring reimbursement. The committee then approved Mr. Frisk's continued personal use of the aircraft for a reasonable amount, with the committee monitoring the use on a quarterly basis. His personal use of the aircraft was primarily in connection with travel to and from our global corporate headquarters. Mr. Frisk's family was permitted to accompany him on any such personal trips. We provided a tax gross-up to Mr. Frisk with respect to the taxable income attributed to his use of the aircraft. Following his departure from the company, the committee has not approved personal use of the aircraft without requiring reimbursement for any other named executive officer, including Mr. Browne and Ms. Linnartz.

## Other Compensation Practices

### EQUITY GRANT PRACTICES

During the transition period and fiscal year 2023, equity awards were generally granted to executive officers at one of our regularly scheduled Human Capital and Compensation Committee meetings. Our practice is to grant restricted stock units with a grant date fair value based on the closing market price of our common stock on the grant date. In years where stock options are granted, our practice is to grant stock options with an exercise price equal to the closing market price of our



**Table of Contents**

common stock on the grant date. We have not had any program, plan or practice to select stock option or restricted stock unit grant dates for executive officers in coordination with the release of material non-public information in order to create value for the executive when the stock price increases over the exercise price for the stock option.

## HEDGING AND PLEDGING

As part of our insider trading policy, our board has adopted prohibitions against specified individuals from engaging in hedging transactions of Under Armour stock. This policy applies to all of our employees, officers and directors, as well as their spouses, minor children, relatives and other persons who live with them, and any trusts, estates or other entities over which they exercise control or in which they have any beneficial interest. Persons subject to the policy are prohibited from effecting short sales of our securities. Our insider trading policy defines a short sale as a sale involving securities the seller does not own at the time of the sale or, if owned by the seller, securities that will be delivered on a delayed basis beyond the customary settlement date. Our insider trading policy also prohibits purchases or sales of derivative securities, such as puts and calls, relating to our stock. While our policy does not prohibit pledging our securities, none of our directors or executive officers has any shares pledged as security.

## EXECUTIVE SEVERANCE

### *Executive Severance Program*

We provide severance benefits to all of our executives (other than Mr. Plank) in connection with a termination without cause (or, with respect to the Chief Executive Officer only, resignation for good reason) occurring other than in connection with a change in control though the Under Armour, Inc. Executive Severance Program (the "Severance Plan"), which was adopted by the Human Capital and Compensation Committee in November 2022. Under the Severance Plan, if an executive's employment is terminated without Cause, or if the Chief Executive Officer resigns for Good Reason, the executive is entitled to a lump-sum payment of: (i) the executive's annual base salary multiplied by 2, in the case of the Chief Executive Officer, 1.5, in the case of an executive vice president, or 1, in the case of a senior vice president; (ii) a pro-rated annual cash incentive award based on our company's actual performance for the year (subject to the executive having been employed through at least the first six months of the year, with payment delivered in the following year concurrently with payments to all employees and the individual performance based on the average individual performance multiplier of the middle performance rating for the plan year); (iii) fully paid premiums for medical and dental benefits for a period of 24 months, in the case of the Chief Executive Officer, 18 months, in the case of an executive vice president, or 12 months, in the case of a senior vice president; and (iv) a cash payment to be applied to career transition support services. The executive must agree not to compete against the company for one year (or, in the case of the Chief Executive Officer, two years) to receive these benefits. The Severance Plan is described in further detail below under "Executive Compensation Tables—Potential Payments Upon Termination of Employment or Change in Control."

### *Executive Change in Control Severance Plan*

Previously, we had a change in control severance agreement with each of our executives other than our Executive Chair and Brand Chief, Mr. Plank. In November 2022, the Human Capital and Compensation Committee adopted the Under Armour, Inc. Executive Change in Control Severance Plan (as amended, the "CIC Severance Plan"), of which all of our executives except Mr. Plank are participants. The purpose of the CIC Severance Plan is to ensure that we are able to receive and rely upon the executive's advice as to the best interest of the company and our stockholders in connection with a change in control without concern that the executive might be distracted, or his or her advice may be affected by the personal uncertainties and risks created by a change in control. The CIC Severance Plan provides severance only following a change in control and only if the executive's

43



**Table of Contents**

employment is terminated without cause or the executive leaves for good reason within two years after the change in control or within three months before but in connection with the change in control, generally referred to as a "double trigger." The CIC Severance Plan does not provide for a tax gross-up. The primary benefit offered under the CIC Severance Plan is severance in an amount equal to the sum of (x) the executive's annual base salary for the current year plus (y) the executive's target annual cash incentive award, multiplied by (i) 1.5, in the case of an executive vice president or (ii) 2, in the case of the Chief Executive Officer. The executive forfeits her or his annual cash incentive award for the year in which the employment ends. The executive must agree not to compete against the company for one year to receive these benefits. The CIC Severance Plan is described in further detail below under "Executive Compensation Tables—Potential Payments Upon Termination of Employment or Change in Control."

### Separation of Patrik Frisk

As described above, in May 2022, we announced that Patrik Frisk would step down from his role as President and Chief Executive Officer of the company and as a member of the company's Board of Directors on May 31, 2022. To support the transition, Mr. Frisk remained with the company as an advisor through September 1, 2022, and thereafter has continued to provided consulting services. In connection with his separation from the company, the company and Mr. Frisk entered into a separation agreement, which provided for (i) $6,890,000 in separation payments (equal to two times the sum of Mr. Frisk's then-current base salary plus his target annual cash incentive award (at the then-current target of 165% of his current base salary)), (ii) $38,000 to reimburse Mr. Frisk for 18 times the then-current monthly premium cost for COBRA continuation coverage under the company's health insurance plans, as well as potential outplacement services, (iii) $200,000 to reimburse Mr. Frisk for potential costs incurred in connection with his relocation from the Baltimore area, (iv) $102,925 in respect of accrued but unused paid time off in accordance with the company's paid time off policies and (v) payment of personal income tax preparation services for the 2021 and 2022 tax years, consistent with past practice. Between September 2022 and March 2023, he also received $758,333 in consulting fees pursuant to a previously disclosed consulting agreement. Upon his departure, Mr. Frisk was not eligible to receive a fiscal year 2023 annual cash incentive award and he forfeited all of his unvested equity awards.

### Separation of Stephanie Pugliese

As described above, in September 2022, we announced that Stephanie Pugliese, President of the Americas, would be stepping down from her role effective October 24, 2022. Ms. Pugliese continued to serve as an advisor to the company through March 3, 2023. In connection with her separation from the company, the company and Ms. Pugliese entered into a separation agreement, which provided for (i) $1,968,750 in separation payments (equal to one and a half times the sum of Ms. Pugliese's then-current base salary plus her target annual cash incentive award (at the then-current target of 75% of her current base salary)), (ii) $35,959 to reimburse Ms. Pugliese for 18 times the then-current monthly premium cost for COBRA continuation coverage under the company's health insurance plans based on Ms. Pugliese's coverage elections as in effect on her separation date, as well as potential outplacement services and (iii) $30,808 in respect of accrued but unused paid time off in accordance with the company's paid time off policies. Upon her departure, Ms. Pugliese was not eligible to receive a fiscal year 2023 annual cash incentive award and she forfeited all of her unvested equity awards.

### Separation of Massimo Baratto

As described above, in March 2023, we internally announced that Massimo Baratto, Chief Consumer Officer, would be leaving the company effective May 19, 2023. Upon his separation from the company, Mr. Baratto received a lump-sum payment pursuant to the Severance Plan described above



**Table of Contents**

and as shown in the table below under "Executive Compensation Tables—Potential Payments Upon Termination of Employment or Change in Control." Upon his departure, he forfeited all of his unvested equity awards.

DEDUCTIBILITY OF EXECUTIVE COMPENSATION

In prior years, management and the Human Capital and Compensation Committee have reviewed and considered, as appropriate, the effect of limitations on deductibility for federal income tax purposes under Section 162(m) of the Internal Revenue Code of compensation in excess of $1 million that was paid to certain executive officers. The Tax Cuts and Jobs Act of 2017 repealed the exemption from the Section 162(m) deduction limit for performance based compensation, effective for taxable years beginning after December 31, 2017. As a result, all performance based compensation paid to our named executives is now included when determining compensation in excess of $1 million that generally will not be deductible. The Human Capital and Compensation Committee believes that the lost deduction on compensation payable in excess of the $1 million limitation for the named executive officers is not material relative to the benefit of attracting and retaining talented management. Accordingly, the Human Capital and Compensation Committee will continue to retain the discretion to pay compensation that is not deductible.

## Human Capital and Compensation Committee Report

The Human Capital and Compensation Committee has reviewed and discussed the Compensation Discussion and Analysis section of this Proxy Statement with Under Armour's management. Based on this review and discussion, the Human Capital and Compensation Committee recommended to the Board of Directors that the Compensation Discussion and Analysis be included in our Proxy Statement and be incorporated by reference into our Annual Report on Form 10-K for the fiscal year ended March 31, 2023, as filed with the SEC.

David W. Gibbs, Chair
Jerri L. DeVard
Patrick W. Whitesell

**UNDER ARMOUR.**

Table of Contents

# EXECUTIVE COMPENSATION TABLES

## Fiscal Year 2023 Summary Compensation Table

The following table sets forth information concerning compensation paid or accrued during fiscal year 2023, the three-month transition period from January 1, 2022 through March 31, 2022 (the "transition period" or "2022 TP"), fiscal year 2021 and fiscal year 2020 to the individuals who served as our Chief Executive Officer and Chief Financial Officer during fiscal year 2023, the other three most highly compensated executive officers who were serving as executive officers at the end of fiscal year 2023 and one additional former executive officer for whom disclosure would have been provided in this proxy statement but for the fact that the individual was not serving as an executive officer of the company at the end of fiscal year 2023. As noted above under the heading "Compensation Discussion and Analysis—Components of our Fiscal Year 2023 Compensation Program—Annual Cash Incentive Award—Incentive Award Levels and Fiscal Year 2023 Results," for fiscal year 2023, annual cash incentive award amounts were multiplied by 1.25 to address the change in fiscal year end. In addition, the fiscal year 2023 time based equity awards were granted in February 2022 and are included in the transition period in the table below, while the fiscal year 2023 performance based equity awards were granted in May 2022 and are included in fiscal year 2023 in the table below.

Certain salary and annual incentive plan compensation amounts may be deferred under our deferred compensation plan as discussed under "Nonqualified Deferred Compensation" below. There were significant reductions to compensation in 2020 in response to the COVID-19 pandemic that impact the year-over-year changes to compensation as discussed in our 2021 and 2022 Proxy Statements.

| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($)(1)(2) | Option Awards ($)(1)(2) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($)(3) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Stephanie Linnartz[4] | 2023 | 125,000 | 175,000 | 11,000,000 | — | — | — | 11,300,000 |
| *President and Chief Executive Officer* | 2022 TP | — | — | — | — | — | — | — |
| Kevin Plank | 2023 | 501,923 | — | 2,000,000 | — | 486,750 | 20,952 | 3,009,625 |
| *Executive Chair and Brand Chief* | 2022 TP | 123,077 | — | 2,000,000 | — | — | 7,571 | 2,130,648 |
| | 2021 | 372,385 | — | 4,000,000 | — | 1,875,000 | 18,729 | 6,266,114 |
| | 2020 | 26,000 | — | — | 2,000,000 | 1,000,000 | 10,429 | 3,036,429 |
| David Bergman | 2023 | 752,885 | — | 750,000 | — | 273,797 | 23,020 | 1,799,702 |
| *Chief Financial Officer* | 2022 TP | 184,615 | — | 1,500,000 | — | — | 10,315 | 1,694,930 |
| | 2021 | 732,500 | — | 1,250,000 | — | 1,019,128 | 18,836 | 3,020,464 |
| | 2020 | 590,610 | — | 937,500 | — | 317,104 | 16,219 | 1,861,434 |
| Colin Browne[5] | 2023 | 966,635 | — | 3,875,000 | — | 630,494 | 9,449 | 5,481,578 |
| *Chief Operating Officer; Former Interim* | 2022 TP | 190,769 | — | 875,000 | — | — | 4,207 | 1,069,976 |
| *President and Chief Executive Officer* | 2021 | 754,808 | — | 2,250,000 | — | 1,076,061 | 9,449 | 4,090,319 |
| | 2020 | 594,757 | — | 937,500 | — | 346,593 | 9,449 | 1,888,299 |
| Tchernavia Rocker[6] | 2023 | 677,596 | — | 1,375,000 | — | 308,021 | 20,778 | 2,381,395 |
| *Chief People and Administrative Officer* | 2022 TP | 166,154 | — | 625,000 | — | — | 14,461 | 805,615 |
| Patrik Frisk[7] | 2023 | 550,000 | — | — | — | — | 8,090,309 | 8,640,309 |
| *Former President and Chief Executive Officer* | 2022 TP | 320,000 | — | 3,500,000 | — | — | 158,714 | 3,978,714 |
| | 2021 | 1,286,539 | — | 10,000,000 | — | 3,985,004 | 273,370 | 15,544,913 |
| | 2020 | 1,088,221 | — | 5,250,000 | — | 937,500 | 104,594 | 7,380,315 |
| Massimo Baratto[8] | 2023 | 728,077 | — | 1,375,000 | — | 215,051 | 273,407 | 2,591,535 |
| *Former Chief Consumer Officer* | 2022 TP | 145,922 | — | 625,000 | — | — | 1,850 | 772,772 |
| Stephanie Pugliese[9] | 2023 | 706,731 | — | 625,000 | — | — | 2,110,929 | 3,442,660 |
| *Former President, Americas* | 2022 TP | 184,615 | — | 625,000 | — | — | 11,332 | 820,947 |
| | 2021 | 736,538 | — | 2,250,000 | — | 1,024,089 | 23,105 | 4,033,732 |
| | 2020 | 613,171 | — | 937,500 | — | 354,375 | 121,158 | 2,026,204 |

46

UNDER ARMOUR.

**Table of Contents**

---

(1)  Reflects the grant date fair value of all performance and time based restricted stock unit and stock option awards in accordance with SEC disclosure rules. As discussed above, the performance based awards granted in fiscal year 2023 included threshold, target and maximum levels of performance and are based on a combined three-year performance period, which includes fiscal years 2023, 2024 and 2025. With respect to performance based awards granted in fiscal year 2023, 100% of the target value is included in the table above, which was the amount we deemed probable when the awards were first granted.

In accordance with SEC disclosure rules, we are required to present the fair values of the fiscal year 2023 performance based awards at grant date assuming achievement at the highest level or "maximum" level of performance conditions for each of these awards (equal to 200% of the target value). The value of any time based awards are not included.

| Name | Fiscal Year 2023 Performance Based Awards ($) |
| --- | --- |
| Kevin Plank | 4,000,000 |
| David Bergman | 1,500,000 |
| Colin Browne | 4,750,000 |
| Tchernavia Rocker | 1,250,000 |
| Massimo Baratto | 1,250,000 |
| Stephanie Pugliese | 1,250,000 |

Ms. Linnartz joined the company on February 27, 2023 and therefore was not granted a fiscal year 2023 performance based award. Mr. Frisk stopped serving as the company's President and Chief Executive Officer on May 31, 2022 and therefore was not granted a fiscal year 2023 performance based award.

As discussed above and in our 2021 and 2022 Proxy Statements, due to the impact of COVID-19, no performance based awards were granted in 2020 or 2021. There were no performance based awards granted in the transition period.

(2)  Equity grants included in this table are further described above under the "Compensation Discussion and Analysis" or below in the "Grants of Plan-Based Awards for Fiscal Year 2023" or "Outstanding Equity Awards at 2023 Fiscal Year-End" tables. We have disclosed the assumptions made in the valuation of the stock and option awards in "Stock Based Compensation" under Note 14 to the Consolidated Financial Statements included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2023.

(3)  See the "Fiscal Year 2023 All Other Compensation" table below.

(4)  As previously disclosed, Ms. Linnartz joined the company as President and Chief Executive Officer on February 27, 2023. She will receive a base salary of $1,300,000 per year. Upon joining the company, she received a one-time sign-on cash bonus of $375,000, payable in two installments of (x) $175,000, which was paid on February 27, 2023, and (y) $200,000, which will be paid on February 27, 2024, subject to her continued employment (other than in certain circumstances, including certain separations from service). She also received a sign-on restricted stock unit grant under the 2005 Plan with a grant date fair value of $11,000,000, which vests in three equal annual installments, subject to her continued employment through each vesting date and subject to acceleration in connection with certain separations from services as described above under "Compensation Discussion and Analysis—Components of our Fiscal Year 2023 Compensation Program—Equity Awards—Time Based Equity Awards."

(5)  In connection with his appointment as interim President and Chief Executive Officer above under "Compensation Discussion and Analysis—Executive Summary—Management Changes," the Human Capital and Compensation Committee of the company's Board approved an increase in Mr. Browne's annual base salary for fiscal year 2023 from $775,000 to $1,000,000, and an increase to his target level annual cash incentive award from 75% to 165% of his base salary. In his role as Chief Operating Officer, Mr. Browne's total target annual equity award for fiscal year 2023 was $1,750,000, representing a mix of 50% time based restricted stock unit awards and 50% performance based restricted stock unit awards. In connection with his appointment as interim President and Chief Executive Officer, Mr. Browne was also granted an additional annual restricted stock unit award with a grant date fair value of $3,000,000, with the same mix of time and performance based vesting conditions.

(6)  Since Ms. Rocker was not a named executive officer in 2021 or 2020, we are only required to provide her fiscal year 2023 and transition period compensation.

(7)  As previously disclosed, on May 31, 2022, Mr. Frisk stepped down from the role of President and Chief Executive Officer and a member of the company's Board of Directors. He continued to serve as an advisor to the company through September 1, 2022. Upon his departure from the company in September 2022, Mr. Frisk forfeited the time based restricted stock unit award granted in the transition period in full.

(8)  Since Mr. Baratto was not a named executive officer in 2021 or 2020, we are only required to provide his fiscal year 2023 and transition period compensation. Mr. Baratto previously served as our Managing Director of Europe, Middle East and Africa (EMEA), and was appointed as the Chief Consumer Officer effective November 1, 2021. He relocated from Europe to the United States on April 1, 2022, at which time his fiscal year 2023 annual base salary increased from EUR €518,895 to USD $600,000. His salary during the transition period was paid in Euros, and is converted to United States Dollars for purposes of the Summary Compensation Table using the exchange rate applied to the financial statements in our Transition Report on Form 10-Q for the quarter ended March 31, 2022. Mr. Baratto assumed additional responsibilities in connection with the departure of Mr. Frisk, and the Human Capital and Compensation Committee approved an increase in Mr. Baratto's fiscal year 2023 base salary to $750,000 effective June 1, 2022. Mr. Baratto left the company on May 19, 2023. Upon his departure from the company, Mr. Baratto forfeited any unvested restricted stock units in respect of the time and performance based restricted stock unit awards granted in the transition period and fiscal year 2023, respectively.

(9)  As previously disclosed, on October 24, 2022, Ms. Pugliese stepped down from the role o President, Americas. She continued to serve as an advisor to the company through March 3, 2023. Upon her departure from the company, Ms. Pugliese forfeited the time and performance based restricted stock unit awards granted in the transition period and fiscal year 2023, respectively, in full.

47



Table of Contents

**Fiscal Year 2023 All Other Compensation**

| Name | Fiscal Period | Insurance Premiums ($)(1) | Matching Contributions Under 401(k) Plan ($) | Other ($) | Tax Reimbursements ($)(2) |
|---|---|---|---|---|---|
| Stephanie Linnartz | FY2023 | — | — | — | — |
| | 2022 TP | — | — | — | — |
| Kevin Plank | FY2023 | 7,129 | 13,823 | — | — |
| | 2022 TP | 1,782 | 3,089 | 2,700 | — |
| David Bergman | FY2023 | 7,236 | 13,084 | 2,700 | — |
| | 2022 TP | 1,809 | 8,506 | — | — |
| Colin Browne | FY2023 | 9,449 | — | — | — |
| | 2022 TP | 2,362 | — | 1,845 | — |
| Tchernavia Rocker | FY2023 | 7,670 | 13,108 | — | — |
| | 2022 TP | 1,918 | 12,543 | — | — |
| Patrik Frisk | FY2023 | 2,300 | 3,200 | 8,042,158(3) | 42,651 |
| | 2022 TP | 1,380 | 12,644 | 144,690(4) | — |
| Massimo Baratto | FY2023 | 5,845 | 20,277 | 173,347(5) | 73,938 |
| | 2022 TP | — | — | 1,850 | — |
| Stephanie Pugliese | FY2023 | 8,405 | 8,634 | 2,072,385(6) | 21,505 |
| | 2022 TP | 2,101 | 9,231 | — | — |

_____

(1)   The insurance premiums are for supplemental disability insurance for the named executive officers. This insurance provides up to $20,000 per month in disability insurance until age 67 and supplements the disability insurance offered to employees generally, which provides a maximum of $10,000 per month during 2022 and $12,500 during 2023.

(2)   For Mr. Frisk, during fiscal year 2023, tax reimbursements include a gross-up amount to cover taxes on the tax services identified in Note (3) below. For Mr. Baratto and Ms. Pugliese, during fiscal year 2023, tax reimbursements include a gross-up amount to cover taxes on the relocation benefits identified in notes (5) and (6), respectively.

(3)   Includes aggregate incremental costs to the company of $52,900 for tax services, $7,230,925 in separation benefits as described above in "Compensation Discussion and Analysis—Other Compensation Practices—Executive Severance—Separation of Patrik Frisk" and $758,333 in consulting fees pursuant to a previously disclosed consulting agreement.

(4)   Includes aggregate incremental costs to the company of $144,690 for personal use of our corporate aircraft. The aggregate incremental cost to the company for personal use of our aircraft is calculated based on identifiable variable operating costs, which generally include the cost of fuel, crew travel expenses, catering and landing fees. Because our aircraft is leased primarily for business use based on a fixed monthly lease rate, we do not allocate any of the monthly lease rate or other fixed monthly costs that do not change based on usage. We believe that the use of this methodology is a reasonably accurate method for calculating the incremental operating costs. In addition, from time to time, family members of an executive may travel on our aircraft for personal reasons when the aircraft is already going to a specific destination for a business reason, which has minimal incremental cost to the company. When this occurs, only the direct variable costs associated with the additional passenger (for example, catering) are included in determining aggregate incremental cost to the company.

(5)   Includes $167,412 in relocation benefits and the aggregate incremental costs to the company for certain tax services and an executive health exam.

(6)   Includes $36,868 in relocation benefits and $2,035,517 in separation benefits as described above in "Compensation Discussion and Analysis—Other Compensation Practices—Executive Severance—Separation of Stephanie Pugliese."

48



**Table of Contents**

### Grants of Plan-Based Awards for Fiscal Year 2023

The following table contains information concerning: (1) possible payments to the named executive officers under our fiscal year 2023 annual cash incentive plan approved by the Human Capital and Compensation Committee in 2022; and (2) estimated equity award payouts to the named executive officers in the transition period and fiscal year 2023 under the 2005 Plan. All equity awards included in the table below were for shares of our Class C Stock.

| Name and Principal Position | Grant Date | Human Capital and Compensation Committee Approval Date | Estimated Possible Payouts Under Non-Equity Incentive Plan Awards(1) | | | Estimated Future Payouts Under Equity Incentive Plan Awards(2) | | | All Other Stock Awards: Number of Shares of Stock or Units(3) | Grant Date Fair Value of Stock and Option Awards(4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Threshold ($) | Target ($) | Maximum ($) | Threshold ($) | Target ($) | Maximum ($) | | |
| **Stephanie Linnartz** *President and Chief Executive Officer* | 2/27/2023 | 2/7/2023 | | | | | | | 1,288,057 | 11,000,000 |
| **Kevin Plank** *Executive Chair and Brand Chief* | | | 625,000 | 1,250,000 | 2,500,000 | | | | | |
| | 2/18/2022 | 2/18/2022 | | | | | | | 138,313 | 2,000,000 |
| | 5/26/2022 | 5/26/2022 | | | | 109,530 | 219,059 | 438,118 | | 2,000,000 |
| **David Bergman** *Chief Financial Officer* | | | 351,563 | 703,125 | 1,406,250 | | | | | |
| | 2/18/2022 | 2/18/2022 | | | | | | | 51,868 | 750,000 |
| | 2/18/2022 | 2/18/2022 | | | | | | | 51,868 | 750,000 |
| | 5/26/2022 | 5/26/2022 | | | | 41,074 | 82,147 | 164,294 | | 750,000 |
| **Colin Browne** *Chief Operating Officer; Former Interim President and Chief Executive Officer* | | | 809,572 | 1,619,145 | 3,238,290 | | | | | |
| | 2/18/2022 | 2/18/2022 | | | | | | | 60,512 | 875,000 |
| | 5/26/2022 | 5/26/2022 | | | | | | | 164,294 | 1,500,000 |
| | 5/26/2022 | 5/26/2022 | | | | 82,147 | 164,294 | 328,588 | | 1,500,000 |
| | 5/26/2022 | 5/26/2022 | | | | 47,919 | 95,838 | 191,676 | | 875,000 |
| **Tchernavia Rocker** *Chief People and Administrative Officer* | | | 316,406 | 632,813 | 1,265,625 | | | | | |
| | 2/18/2022 | 2/18/2022 | | | | | | | 43,223 | 625,000 |
| | 5/26/2022 | 5/26/2022 | | | | | | | 82,147 | 750,000 |
| | 5/26/2022 | 5/26/2022 | | | | 34,228 | 68,456 | 136,912 | | 750,000 |
| **Patrik Frisk** *Former President and Chief Executive Officer* | | | 1,340,625 | 2,681,250 | 5,362,500 | | | | | |
| | 2/18/2022 | 2/18/2022 | | | | | | | 242,048 | 3,500,000 |
| **Massimo Baratto** *Former Chief Consumer Officer* | | | 326,716 | 653,431 | 1,306,863 | | | | | |
| | 2/18/2022 | 2/18/2022 | | | | | | | 43,223 | 625,000 |
| | 5/26/2022 | 5/26/2022 | | | | | | | 82,147 | 750,000 |
| | 5/26/2022 | 5/26/2022 | | | | 34,228 | 68,456 | 136,912 | | 625,000 |
| **Stephanie Pugliese** *Former President, Americas* | | | 351,563 | 703,125 | 1,406,250 | | | | | |
| | 2/18/2022 | 2/18/2022 | | | | | | | 43,223 | 625,000 |
| | 5/26/2022 | 5/26/2022 | | | | 34,228 | 68,456 | 136,912 | | 625,000 |

(1) As more fully described in the "Compensation Discussion and Analysis" above, executives were eligible for a possible cash award for fiscal year 2023 pursuant to our annual cash incentive plan based primarily on corporate performance. The threshold, target and maximum amounts in the table reflect the possible incentive awards based on corporate performance. The target incentive award for Mr. Browne was 165% of his base salary in fiscal year 2023 (prorated for the increase that took effect on June 1, 2022); the target incentive award for Mr. Plank was 200% of his base salary in fiscal year 2023; and for the other named executives, the target incentive award was 75% of their base salaries in fiscal year 2023 (prorated, in the case of Mr. Baratto, for the increases that took effect on April 1, 2022 and June 1, 2022). To account for the change in fiscal year and the transition period, each fiscal year 2023 annual cash incentive award is multiplied by 1.25. The threshold, target and maximum amounts shown in the table above include this 1.25 multiplier. The threshold and maximum incentive awards were 50% and 200% of the target award amount, respectively. Upon their departure from the company, Mr. Frisk and Ms. Pugliese became ineligible to receive a fiscal year 2023 annual cash incentive award. Mr. Baratto received his fiscal year 2023 annual cash incentive award pursuant to the Severance Plan, as described above in "Compensation Discussion and Analysis—Other Compensation Practices—Executive Severance—Separation of Massimo Baratto."

(2) These performance based restricted stock unit awards vest based on the company achieving certain combined net revenue and adjusted operating income targets for fiscal years 2023, 2024 and 2025. The number of potential shares eligible to vest range from 25% of the target amount to 200% of the target amount depending on performance. Upon achievement of the performance requirements and subject to continued employment through the performance period, the award amount earned vests in full in May 2025. If the threshold level is not achieved, the awards will be forfeited. All of the shares vest sooner upon death or disability or upon an involuntary termination following a change in control of Under Armour. Dividend equivalents are not paid on performance based restricted stock. As discussed above under "Compensation Discussion and Analysis—Equity Awards—Annual Equity Awards for Fiscal Year 2023," we currently expect these awards to vest below the target level. Mr. Frisk and Ms. Pugliese forfeited these awards in full upon their departure from the company.

(3) As previously disclosed, Ms. Linnartz joined the company as President and Chief Executive Officer on February 27, 2023. She was not eligible for a fiscal year 2023 cash incentive award, and she was not granted a fiscal year 2023 annual time based or performance based restricted stock unit award. Upon joining the company, she received a sign-on restricted stock unit grant under the 2005 Plan with a grant date fair value of $11,000,000, which vests in three equal annual installments, subject to her continued employment through each vesting date and subject to acceleration in connection with certain separations from services as described above under "Compensation Discussion and Analysis—Components of our Fiscal Year 2023 Compensation Program—Equity Awards—Time Based Equity Awards." The Human Capital and Compensation Committee approved the sign-on award at its meeting on February 7, 2023 with a grant date of February 27, 2023, which was the day Ms. Linnartz joined the company.



Table of Contents

Due to the change in fiscal year, the annual time based restricted stock units for fiscal year 2023 were granted during the transition period, while the performance based restricted stock units were granted during fiscal year 2023. Apart from one of the awards granted to Mr. Bergman, all of the awards granted on February 18, 2022 and the award granted on May 26, 2022 to Mr. Browne are annual time based restricted stock unit awards, which vest in three equal annual installments beginning in May 2023, subject to continued employment. Mr. Frisk and Ms. Pugliese forfeited these awards in full upon their departure from the company. One of the awards granted to Mr. Bergman on February 18, 2022 with a grant date fair value of $750,000 vests in two equal installments in February 2025 and February 2026, subject to continued employment. The awards granted to Ms. Rocker and Mr. Baratto on May 26, 2022 with a grant date fair value of $750,000 vest in two equal installments in May 2025 and May 2026, subject to continued employment. Mr. Baratto forfeited this award in full upon his departure in May 2023.

All of the awards vest sooner upon death or disability or upon an involuntary termination following a change in control of Under Armour. Dividend equivalents are not paid on restricted stock units.

(4)     See Note (1) to the "Fiscal Year 2023 Summary Compensation Table" above for further information on the value and other terms of the performance based restricted stock units granted during fiscal year 2023.

## Employment Agreements

We have no employment agreements with any of our named executive officers.

## Outstanding Equity Awards at 2023 Fiscal Year-End

The following table contains information concerning unexercised stock options and restricted stock units that were not vested for the named executive officers as of March 31, 2023. All awards represent shares of our Class C Stock, except as otherwise noted. Mr. Frisk and Ms. Pugliese held no outstanding equity awards as of March 31, 2023 and are therefore excluded from the table.

| | | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Grant Date | Number of securities underlying unexercised options exercisable (#)(1)(2) | Number of securities underlying unexercised options unexercisable (#)(2) | Option exercise price ($) | Option expiration date | Number of shares or units of stock that have not vested (#)(3) | Market value of shares or units of stock that have not vested ($)(4) | Equity incentive plan awards: number of unearned shares, units or other rights that have not vested (#)(5) | Equity incentive plan awards: market or payout value of unearned shares, units or other rights that have not vested ($)(4) |
| Stephanie Linnartz | 2/27/2023 | | | | | 1,288,057 | 10,987,126 | | |
| Kevin Plank | 2/17/2015 | 111,404 | — | 35.94 | 2/14/2025 | | | | |
| | 2/17/2015 | 110,621 | — | 36.71 | 2/14/2025 | | | | |
| | 2/10/2017 | 244,799 | — | 19.04 | 2/08/2027 | | | | |
| | 2/20/2018 | 289,436 | — | 15.41 | 2/18/2028 | | | | |
| | 2/20/2018 | 289,436 | — | 15.41 | 2/18/2028 | | | | |
| | 2/19/2019 | 229,886 | — | 19.39 | 2/16/2029 | | | | |
| | 2/13/2020 | 226,929 | 75,643 | 15.13 | 2/10/2030 | | | | |
| | 2/11/2021 | | | | | 104,113 | 888,084 | | |
| | 2/18/2022 | | | | | 138,313 | 1,179,810 | | |
| | 5/26/2022 | | | | | | | 219,059 | 1,868,573 |
| Dave Bergman | 2/13/2020 | | | | | 10,328 | 88,098 | | |
| | 5/27/2020 | | | | | 9,181 | 78,314 | | |
| | 2/11/2021 | | | | | 32,536 | 277,532 | | |
| | 2/18/2022 | | | | | 51,868 | 442,434 | | |
| | 2/18/2022 | | | | | 51,868 | 442,434 | | |
| | 5/26/2022 | | | | | | | 82,147 | 700,714 |
| Colin Browne | 2/13/2020 | | | | | 10,328 | 88,098 | | |
| | 5/27/2020 | | | | | 9,181 | 78,314 | | |
| | 2/11/2021 | | | | | 58,564 | 499,551 | | |
| | 2/18/2022 | | | | | 60,512 | 516,167 | | |
| | 5/26/2022 | | | | | 164,294 | 1,401,428 | | |
| | 5/26/2022 | | | | | | | 164,294 | 1,401,428 |
| | 5/26/2022 | | | | | | | 95,838 | 817,498 |
| Tchernavia Rocker | 2/13/2020 | | | | | 10,328 | 88,098 | | |
| | 5/27/2020 | | | | | 9,181 | 78,314 | | |
| | 2/11/2021 | | | | | 58,564 | 499,551 | | |
| | 2/18/2022 | | | | | 43,223 | 368,692 | | |
| | 5/26/2022 | | | | | 82,147 | 700,714 | | |
| | 5/26/2022 | | | | | | | 68,456 | 583,930 |
| Massimo Baratto (6) | 2/13/2020 | | | | | 3,305 | 28,192 | | |
| | 5/27/2020 | | | | | 2,938 | 25,061 | | |
| | 2/11/2021 | | | | | 23,426 | 199,824 | | |
| | 2/18/2022 | | | | | 43,223 | 368,692 | | |
| | 5/26/2022 | | | | | 82,147 | 700,714 | | |
| | 5/26/2022 | | | | | | | 68,456 | 583,930 |

50



**Table of Contents**

(1)   The stock options granted on February 17, 2015 with the exercise price of $36.71 represent shares of our Class A Stock. Equity awards granted prior to April 2016 were for shares of our Class A stock. In April 2016, in connection with our recapitalization we paid a dividend to stockholders of record of one share of our Class C Stock for each share of Class A Stock and Class B Stock outstanding (the "Class C Dividend") and any equity awards granted thereafter were for shares of our Class C Stock. In accordance with the terms of the 2005 Plan, awards outstanding under the 2005 Plan for shares of our Class A Stock were adjusted on a one-for-one basis to provide for the issuance of an equal number of our Class C Stock. Following this adjustment, in June 2016 we paid a dividend to holders of our Class C Stock in the form of additional shares of Class C Stock (the "Adjustment Payment Dividend"). Pursuant to the 2005 Plan, awards outstanding under the 2005 Plan for shares of our Class C Stock were adjusted in accordance with the distribution ratio for the dividend. Accordingly, the stock options granted February 17, 2015 in the table above reflect these adjustments.

(2)   Awards in this column include both time based stock options and performance based stock options for which the performance conditions have been satisfied. The stock option award granted in 2020 becomes exercisable in one remaining installment in 2024. All of the unexercisable options are subject to continued employment and become exercisable sooner upon death or disability or, in certain circumstances, following a change in control of Under Armour.

(3)   Awards in this column include time based restricted stock units. Set forth below is a schedule of the vesting related to each grant date for the restricted stock units identified in this column. Vesting is subject to continued employment, except as noted below. All of the restricted stock units in this column vest sooner upon death or disability or, in certain circumstances, following a change in control of Under Armour.

| Grant Date | Vesting Schedule |
|---|---|
| 2/13/2020 | These time based restricted stock units vest in one remaining installment in February 2024. |
| 5/27/2020 | These time based restricted stock units vest in one remaining installment in February 2024. |
| 2/11/2021 | These time based restricted stock units vest in two remaining equal annual installments beginning February 2024. |
| 2/18/2022 | Except with respect to Mr. Bergman, these time based restricted stock units vest in three equal annual installments beginning in May 2023. With respect to Mr. Bergman, the first restricted stock units granted on 2/18/2022 vests in two equal annual installments in February 2024 and February 2025; the second restricted stock units granted on 2/18/2022 vests in three equal annual installments beginning in May 2023. |
| 5/26/2022 | With respect to Mr. Browne, these time based restricted stock units vest in three equal annual installments beginning in May 2023. With respect to Ms. Rocker and Mr. Baratto, these time based restricted stock units vest in three equal annual installments in May 2024 and May 2025. |
| 2/27/2023 | These time based restricted stock units vest in three equal annual installments beginning in February 2024, subject to acceleration in connection with certain separations from services as described above under "Compensation Discussion and Analysis—Components of our Fiscal Year 2023 Compensation Program—Equity Awards—Time Based Equity Awards." |

(4)   Based on $8.53 per share (the closing price of our Class C Stock on March 31, 2023).

(5)   Awards in this column include performance based restricted stock units for which the performance conditions have not yet been satisfied. The number of restricted stock units shown in this column reflect the target number of shares that could vest under these performance based awards. See Note (1) to the "Fiscal Year 2023 Summary Compensation Table" above for the performance based vesting terms of these restricted stock units.

(6)   Mr. Baratto left the company on May 19, 2023. Upon separating from the company, he forfeited all unvested restricted stock units outstanding as of his separation date.

**Option Exercises and Stock Vested in Fiscal Year 2023**

The table below sets forth information concerning the exercise of stock options and vesting of restricted stock units for each named executive officer during the transition period and fiscal year 2023.

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($)(1) |
| Stephanie Linnartz | — | — | — | — |
| Kevin Plank | — | — | 104,112 | 1,274,851 |
| David Bergman | — | — | 112,003 | 1,441,197 |
| Colin Browne | — | — | 163,818 | 2,075,668 |
| Tchernavia Rocker | — | — | 113,695 | 1,392,192 |
| Patrik Frisk | — | — | 434,610 | 5,933,396 |
| Massimo Baratto | — | — | 70,536 | 872,389 |
| Stephanie Pugliese | — | — | 97,578 | 1,194,843 |

(1)   Value realized is calculated by multiplying the number of shares vested by the closing price of our stock on the date of vesting.



Table of Contents

**Nonqualified Deferred Compensation For Fiscal Year 2023**

The table below sets forth information concerning our deferred compensation plan for each participating named executive officer during fiscal year 2023 and the transition period. Ms. Linnartz, Mr. Bergman, Mr. Browne, Mr. Frisk, Mr. Baratto and Ms. Pugliese did not participate in our deferred compensation plan during the transition period or fiscal year 2023 and are therefore excluded from the table.

| Name | Fiscal Period | Executive Contributions ($) | Registrant Contributions ($) | Aggregate Earnings ($) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at end of Fiscal Period ($) |
|---|---|---|---|---|---|---|
| Kevin Plank | FY2023 | — | — | (210,977) | — | 2,548,966 |
| | 2022 TP | — | — | (215,514) | — | 2,759,943 |
| Tchernavia Rocker | FY2023 | 67,500 | — | (40,000) | — | 516,272 |
| | 2022 TP | 201,348 | — | (3,975) | — | 488,772 |

The Human Capital and Compensation Committee oversees the plan. The plan allows a select group of management or highly compensated employees as approved by the committee to make annual base salary and annual incentive award deferrals.

Participating employees may elect to defer from 5% to 75% of their annual base salary and 5% to 90% of their annual incentive award. They generally must make salary deferral elections for a given year by December 31st of the prior year, and incentive award deferral elections for a given fiscal year by September 30th of the fiscal year for which annual incentive awards are earned. For example, to defer any fiscal year 2023 incentive award that might be payable in early fiscal year 2024, employees must have made an election by September 30, 2022. We allow one annual election period to capture the following year's deferral elections. Deferral elections cannot be changed or revoked except in very limited hardship circumstances as permitted under applicable law. Employees immediately vest in all amounts credited to their accounts.

The plan includes a "make whole" feature for employees who, due to participation in the plan, receive a reduction in the matching contribution under our 401(k) plan. A reduction occurs under the 401(k) plan because of the rule that prohibits the 401(k) plan from recognizing deferrals to a non-qualified plan, such as our deferred compensation plan, in the 401(k) plan's definition of compensation for matching contribution purposes. Under the plan feature, any amount that, because of these rules, cannot be contributed as a matching contribution to the 401(k) plan may be contributed instead to the deferred compensation plan for those participants employed on the last day of the year. Other than as described above, we make no other contributions to the plan.

We credit the deferred compensation accounts with earnings or losses based on the performance of one or more money market or mutual funds selected by the employee from several investment options offered under the plan. Employees may change their investment elections daily. We may contribute to a grantor trust to provide us with a source of funds for the benefits payable to participants under the plan. Trust assets are available to provide benefits under the plan unless Under Armour is bankrupt or insolvent.

The timing of distributions is based on elections made by the employees at the time of the initial deferral election. Employees can generally elect to receive a distribution from the plan at least three years after the year in which the deferral amount is actually deferred. Employees may elect to postpone the distribution date for a minimum of five years if they do so at least one year before the previously specified date (a "re-election deferral"). Employees may elect to receive a distribution upon a separation from service in a lump sum or in annual installments over a period of two to ten years, as



**Table of Contents**

selected by the employee at the time of deferral. Upon a separation from service, we pay distributions either in accordance with the employee's previous election or in a lump sum six months following such separation in accordance with the terms of the plan. Upon the death of an employee, we pay a distribution in a lump sum to the employee's beneficiary. Employees may not otherwise withdraw amounts from the plan except in the case of an unforeseeable financial emergency as defined in the plan.

**Retirement Plans**

We have no defined benefit pension plans or supplemental retirement plans for executives.

**Potential Payments Upon Termination of Employment or Change in Control**

The table provides an estimate of the payments and benefits that would be paid to our named executive officers in connection with any termination of employment or upon a change in control of Under Armour. The payments are calculated assuming the termination of employment or change in control occurred on March 31, 2023. Ms. Linnartz, Mr. Browne, Mr. Baratto, Mr. Bergman and Ms. Rocker are participants in the CIC Severance Plan and the Severance Plan. Mr. Plank is not eligible to participate under either plan.

The definitions of "change in control," "cause" and "good reason" and descriptions of the payments and benefits appear after the table. The table does not include amounts deferred under our deferred compensation plan. For a description of the distributions made under this plan upon termination of employment, see "Nonqualified Deferred Compensation" above. The value of all equity awards included in the table below assumes a price of $8.53 per share of our Class C Stock, which was the closing stock price on March 31, 2023.

The amounts included in the table below for Mr. Frisk and Ms. Pugliese disclose the severance payments and benefits actually provided by the company in connection with his and her separation from the company on September 1, 2022 and March 3, 2023, respectively. See "Compensation Discussion and Analysis—Other Compensation Practices—Executive Severance—Separation of Patrik Frisk" and "—Separation of Stephanie Pugliese."

53



**Table of Contents**

| Name | Cash Severance ($) | Benefits ($) | Vesting of Equity Awards ($) | Total ($) |
|---|---|---|---|---|
| **Stephanie Linnartz** | | | | |
| Change In Control Related | | | | |
| • Termination Without Cause or Resignation for Good Reason | 18,090,000 | 167,791 | — | 18,257,791 |
| Non-Change in Control Related | | | | |
| • Termination Without Cause or Resignation for Good Reason | 13,845,000 | 37,611 | — | 13,882,611 |
| • Any Reason with Under Armour Enforcing a Non-Compete | 780,000 | — | — | 780,000 |
| • Death or Disability | 200,000 | — | 10,987,126 | 11,187,126 |
| **Kevin Plank(1)** | | | | |
| Change In Control Related | | | | |
| • Termination Without Cause or Resignation for Good Reason | — | — | 3,936,467 | 3,936,467 |
| Non-Change in Control Related | | | | |
| • Death or Disability | — | — | 3,936,467 | 3,936,467 |
| **Dave Bergman** | | | | |
| Change In Control Related | | | | |
| • Termination Without Cause or Resignation for Good Reason | 1,968,750 | 101,828 | 2,029,526 | 4,100,104 |
| Non-Change in Control Related | | | | |
| • Termination Without Cause | 1,443,797 | 28,208 | — | 1,472,005 |
| • Any Reason with Under Armour Enforcing a Non-Compete | 450,000 | — | — | 450,000 |
| • Death or Disability | — | — | 2,029,526 | 2,029,526 |
| **Colin Browne** | | | | |
| Change In Control Related | | | | |
| • Termination Without Cause or Resignation for Good Reason | 3,975,000 | 138,331 | 4,802,484 | 8,915,815 |
| Non-Change in Control Related | | | | |
| • Termination Without Cause | 2,155,494 | 21,376 | — | 2,176,870 |
| • Any Reason with Under Armour Enforcing a Non-Compete | 600,000 | — | — | 600,000 |
| • Death or Disability | — | — | 4,802,484 | 4,802,484 |
| **Tchernavia Rocker** | | | | |
| Change In Control Related | | | | |
| • Termination Without Cause or Resignation for Good Reason | 1,771,875 | 79,109 | 2,319,298 | 4,170,282 |
| Non-Change in Control Related | | | | |
| • Termination Without Cause | 1,345,521 | 8,984 | — | 1,354,505 |
| • Any Reason with Under Armour Enforcing a Non-Compete | 405,000 | — | — | 405,000 |
| • Death or Disability | — | — | 2,319,298 | 2,319,298 |
| **Patrik Frisk** | | | | |
| • Separation on September 1, 2022 | 7,288,476 | 38,000 | — | 7,326,476 |
| **Massimo Baratto** | | | | |
| Change In Control Related | | | | |
| • Termination Without Cause or Resignation for Good Reason | 1,968,750 | 152,776 | 1,906,412 | 4,027,938 |
| Non-Change in Control Related | | | | |
| • Termination Without Cause(2) | 1,365,051 | 21,376 | — | 1,386,427 |
| • Any Reason with Under Armour Enforcing a Non-Compete | 450,000 | — | — | 450,000 |
| • Death or Disability | — | — | 1,906,412 | 1,906,412 |
| **Stephanie Pugliese** | | | | |
| • Separation on March 3, 2023 | 1,999,558 | 35,959 | — | 2,035,517 |

54



**Table of Contents**

(1)    As of March 31, 2023, certain of Mr. Plank's outstanding and unvested equity awards included stock options for our Class C Stock that had an exercise price that exceeded the price of our Class C Stock as of that date. Amounts for these stock options are not included in the table above.

(2)    As discussed above, Mr. Baratto left the company on May 19, 2023. Following his separation pursuant to the Severance Plan, he was provided the payments that appear in this row.

*Definitions*

In the CIC Severance Plan and for the equity awards, the term "Change in Control" is generally defined as:

- any person or entity becomes the beneficial owner, directly or indirectly, of securities of Under Armour representing 50% or more of the total voting power represented by Under Armour's then-outstanding voting securities, except for acquisitions by an Under Armour employee benefit plan or by Mr. Plank or his immediate family members;

- a change in the composition of our Board occurring within a two-year period, as a result of which fewer than a majority of the directors are incumbent directors;

- the consummation of a merger or consolidation of Under Armour with any other corporation, other than a merger or consolidation where our stockholders continue to have at least 50% of the total voting power in substantially the same proportion as prior to such merger or consolidation or where our directors continue to represent at least 50% of the directors of the surviving entity; or

- the consummation of the sale or disposition by us of all or substantially all of our assets.

In the CIC Severance Plan, the Severance Plan and for the equity awards, the term "Cause" is generally defined as:

- material misconduct or neglect in the performance of duties;

- any felony, an offense punishable by imprisonment, any offense involving material dishonesty, fraud, moral turpitude or immoral conduct, or any crime of sufficient importance to potentially discredit or adversely affect our ability to conduct our business;

- material breach of our code of conduct;

- any act that results in severe harm to us, excluding any act taken in good faith reasonably believed to be in our best interests; or

- material breach of the agreement and the related confidentiality, non-competition and non-solicitation agreement.

In the CIC Severance Plan and for the equity awards, the term "Good Reason" is generally defined as:

- a material diminishment in the scope of duties or responsibilities;

- a material reduction in base salary, bonus opportunity or a material reduction in the aggregate benefits or perquisites;

- a requirement to relocate more than 50 miles from the executive's primary place of business, or a significant increase in required travel;

- with respect to the CIC Severance Plan only, a failure by any successor to Under Armour to assume the CIC Severance Plan; or

- with respect to the CIC Severance Plan only, a material breach by Under Armour of any of the terms of the CIC Severance Plan.

55



**Table of Contents**

*Benefits and Payments*

*Upon a Change in Control*

All restricted stock units and stock options require a double trigger for vesting in connection with a Change in Control. Double-trigger vesting requires both a Change in Control and a termination of the award holder's employment without Cause or resignation by the executive for Good Reason in connection with that Change in Control for the vesting of unvested equity awards to accelerate.

*Upon termination of employment by the company without Cause or resignation by the executive for Good Reason in connection with a Change in Control*

Under the CIC Severance Plan, if the executive's employment is terminated without Cause or by the executive for Good Reason within the two years following a Change in Control or within three months before but in connection with a Change in Control, the executive would receive:

- any accrued but unpaid salary, any accrued and unpaid bonus earned by the executive for the fiscal year prior to the fiscal year in which the date of termination occurs and any accrued and unused vacation pay (no amounts assumed based on the termination date of March 31, 2023);

- a lump sum payment equal to the *sum* of (a) the annual base salary of the executive at the rate in effect immediately prior to the date of termination and (b) the executive's target annual cash incentive award for the fiscal year which includes the date of termination *multiplied by* (i) 1.5, in the case of an executive vice president or (ii) 2, in the case of the Chief Executive Officer; and

- for a period of up to one year after the date of termination, the continuation of certain medical, life insurance (assumed in this case the cost to our company to maintain current coverage upon separation) and other welfare benefits unless the executive becomes eligible for another employer's substantially similar benefits.

As a condition to the receipt of the lump sum payment and the continuation of benefits described above, the executive will be required to sign or reconfirm a confidentiality agreement and a one-year non-competition and non-solicitation agreement and execute a general release of claims against Under Armour and its affiliates. Mr. Plank is not a participant of the CIC Severance Plan.

In the event that the "golden parachute" excise tax provisions of the Internal Revenue Code (Sections 280G and 4999) are implicated because of any payments and benefits to be made and provided to an executive under the CIC Severance Plan, the company will not provide any tax gross-ups. Rather, the CIC Severance Plan provides for the executives to receive the greater of: (x) the largest portion of the payments and benefits that would result in no parachute excise tax under Sections 280G and 4999 of the Internal Revenue Code, or (y) the largest portion of the payments and benefits, up to and including the total, if the net after-excise-tax amount retained by the executive would exceed the amount in clause (x) above.

With respect to the Chief Executive Officer, the CIC Severance Plan specifies that if the Chief Executive Officer qualifies as eligible for severance pay and benefits under both the CIC Severance Plan and the Severance Plan, the company shall pay the Chief Executive Officer the better of the two severance payments and benefits thereunder.

56



**Table of Contents**

*Upon termination of employment by the company without Cause or, in the case of the Chief Executive Officer, resignation by the Chief Executive Officer for Good Reason*

Under the Severance Plan, if an executive's employment is terminated without Cause, or if the Chief Executive Officer resigns for Good Reason, the executive is entitled to a lump-sum payment of:

- the executive's annual base salary multiplied by 2, in the case of the Chief Executive Officer, 1.5, in the case of an executive vice president, or 1, in the case of a senior vice president;

- a pro-rated annual cash incentive award based on our company's actual performance for the year (subject to the executive having been employed through at least the first six months of the year, with payment delivered in the following year concurrently with payments to all employees and the individual performance based on the average individual performance multiplier of the middle performance rating for the plan year);

- a cash payment to be applied to career transition support services; and

- fully paid premiums for medical and dental benefits (assumed in this case the cost to our company to maintain current coverage upon separation) for a period of 24 months, in the case of the Chief Executive Officer, 18 months, in the case of an executive vice president, or 12 months, in the case of a senior vice president.

As a condition to the receipt of the lump sum payment, pro-rated annual cash incentive award and the continuation of benefits described above, the executive will be required to sign or reconfirm a confidentiality agreement and a non-competition and non-solicitation agreement for one year, in the case of an executive vice president or senior vice president, or two years, in the case of the Chief Executive Officer, and execute a general release of claims against Under Armour and its affiliates. Mr. Plank is not a participant of the Severance Plan.

With respect to the Severance Plan and Ms. Linnartz's sign-on equity award with a grant date fair value of $11,000,000, the Severance Plan and the equity award agreement include a specifically negotiated definition of "Good Reason" that is materially consistent with the definition of that term in the CIC Severance Plan, but also includes a reference to the duties and responsibilities outlined in Ms. Linnartz's offer letter and includes additional triggers such as the failure of the company to nominate Ms. Linnartz for election to serve as a members of the company's Board of Directors. The equity award agreement also provides that in the event that the company terminates Ms. Linnartz without Cause or she resigns for Good Reason (a) prior to February 27, 2024, Ms. Linnartz will receive $11,000,000 in a lump-sum cash payment, payable simultaneously with any amounts owed to Ms. Linnartz under the Severance Plan or (b) on or after February 27, 2024, any unvested restricted stock units pursuant to the sign-on award will immediately vest as of Ms. Linnartz's separation date. Upon joining the company, Ms. Linnartz also received a sign-on cash bonus of $375,000, payable in two installments of (x) $175,000, which was paid on February 27, 2023, and (y) $200,000, which will be paid on February 27, 2024, subject to her continued employment. However, in the event that the company terminates Ms. Linnartz without Cause or she resigns for Good Reason prior to February 27, 2024, Ms. Linnartz will receive the remaining $200,000 in a lump-sum cash payment, payable simultaneously with any amounts owed to Ms. Linnartz under the Severance Plan.

*Termination of employment for any reason with Under Armour enforcing a non-compete*

Executives generally may not compete for one year after termination of employment for any reason if we continue to pay 60% of their salary during this period.

*Disability*

All restricted stock units and stock options vest upon the executive's disability. In the case of performance based restricted stock units, in the event that the executive's disability occurs prior to the vesting date, 100% of the restricted stock units are deemed to have been earned.



**Table of Contents**

The named executive officers are covered by a supplemental long-term disability insurance policy that provides an additional benefit beyond the standard benefit offered to employees generally (which for 2023 is up to $12,500 monthly). If executives had become disabled, they would have received monthly supplemental disability insurance payments of $20,000 until age 67. Monthly disability payments are not included in the above table because they are paid under a disability insurance policy and not by Under Armour.

*Death*

All restricted stock units and stock options vest upon the executive's death. In the case of performance based restricted stock units, in the event that the executive's death occurs prior to the vesting date, 100% of the restricted stock units are deemed to have been earned.

# CEO Pay Ratio

Pursuant to SEC disclosure requirements, we are presenting the ratio of the annual total compensation for fiscal year 2023 for our Chief Executive Officer to that of the median of the annual total compensation for all of our employees (other than our Chief Executive Officer).

We most recently identified our median employee by examining the total cash compensation paid during our fiscal year 2021 to employees who were employed by Under Armour, Inc. or any of its consolidated subsidiaries on October 1, 2021 (excluding Mr. Frisk, our Chief Executive Officer at that time). This included our full-time, part-time and seasonal employees, subject to certain exceptions for employees in foreign jurisdictions as described below. We believe that total cash compensation reasonably reflects the annual compensation of our employee population, given the limited number of our employees receiving other forms of compensation (such as equity awards). We examined our internal payroll and similar records to determine the total cash compensation paid to our employees included in our calculations. For employees in foreign jurisdictions, we converted amounts paid in foreign currencies to U.S. dollars using the exchange rates we used to prepare our fiscal year 2021 annual financial statements.

Under the SEC's rules regarding this disclosure, a company is required to identify its median employee only once every three years so long as during the last prior fiscal year there has been no change to its employee population or employee compensation arrangements that it reasonably believes would result in a significant change in its pay ratio disclosure. We have not experienced any such changes since identifying our median employee, and so in accordance with the SEC's rules are using the median employee identified during fiscal year 2021 to calculate this year's ratio.

As of October 1, 2021, we had approximately 16,600 employees globally, with approximately 12,000 employees located in the United States and approximately 4,600 located outside the United States. Retail salespersons and distribution facility employees comprise the majority of our employees. To determine our median employee, we excluded employees located in certain foreign jurisdictions, as permitted by the SEC's disclosure rules. The excluded jurisdictions included the countries identified below, which represented approximately 4.7% of our total employee population:

| Excluded Jurisdiction | Approximate Number of Employees |
|---|---|
| Mexico | 264 |
| Republic of Korea | 199 |
| Singapore | 148 |
| Malaysia | 141 |
| Italy | 28 |
| Indonesia | 6 |
| **Total Excluded Employees** | **786** |

58



Table of Contents

For calculating the ratio in fiscal year 2023, we determined that our estimated median employee identified during fiscal year 2021 was a part-time employee who worked on average approximately 11 hours per week in one of our retail stores in Canada during fiscal year 2023, with total annual compensation of $9,031. This amount was paid in Canadian dollars, and converted to U.S. dollars using the exchange rate we used to prepare our fiscal year 2023 annual financial statements.

Because we had three individuals serve non-concurrently as Chief Executive Officer during fiscal year 2023, for calculating the ratio, we have combined the compensation received by each of Ms. Linnartz, Mr. Browne and Mr. Frisk for the period of time during which such individual served as Chief Executive Officer during fiscal year 2023, as shown in the table below and as permitted by Instruction 10 to Item 402(u) of Regulation S-K. Accordingly, the total annual compensation for our Chief Executive Officer was $16,868,343.

| Name and Principal Position | Time Period as CEO | Salary ($) | Bonus ($) | Stock Awards ($)(1)(2) | Option Awards ($)(1)(2) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($)(3) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Stephanie Linnartz | 2/27/2023 to 3/31/2023 | 125,000 | 175,000 | 11,000,000 | — | — | — | 11,300,000 |
| Colin Browne | 6/1/2022 to 2/26/2023 | 739,712 | — | 3,875,000 | — | 630,494 | 7,087 | 5,252,293 |
| Patrik Frisk | 4/1/2022 to 5/31/2022 | 215,000 | — | — | — | — | 101,050 | 316,050 |

_____

(1) See Note (1) to the "Fiscal Year 2023 Summary Compensation Table" above.

(2) See Note (2) to the "Fiscal Year 2023 Summary Compensation Table" above.

(3) For Mr. Browne, all other compensation includes insurance premiums for supplemental disability insurance paid during the time period in which Mr. Browne served as interim Chief Executive Officer. See the Fiscal Year 2023 All Other Compensation table above.

For Mr. Frisk, all other compensation includes $2,300 paid in insurance premiums for supplemental disability insurance, $3,200 in matching contributions made by the company to Mr. Frisk under the company's 401(k) plan, the aggregate incremental cost to the company of $52,900 for tax services and tax reimbursements include a gross-up amount to cover taxes on the tax services, in each case paid or received during the time period in which Mr. Frisk served as Chief Executive Officer. The severance payments and consulting fees included in the Fiscal Year 2023 All Other Compensation table above are not included in this table as they are not considered compensation provided to Mr. Frisk during the time in which he served as Chief Executive Officer.

Based on this information, the ratio of the total annual compensation for our CEO to our estimated median employee was approximately 1,868 to 1. As described above, because we had three individuals serve non-concurrently as Chief Executive Officer during fiscal year 2023, this ratio was calculated using the combined compensation received by each individual while she or he served as Chief Executive Officer, and therefore we do not believe this represents our CEO pay ratio of a typical year. In fiscal year 2021, the ratio of the total annual compensation for our CEO to our estimated median employee was approximately 1,485 to 1.

We believe this ratio represents a reasonable estimate calculated in a manner consistent with the SEC's disclosure requirements under Item 402(u) of Regulation S-K, which permit the use of estimates, assumptions and adjustments in connection with the identification of our median employee. Please note that due to the flexibility permitted by these rules in calculating this ratio, our ratio may not be comparable to CEO pay ratios presented by other companies.



Table of Contents

# Pay Versus Performance

Pursuant to SEC disclosure requirements, we are providing the following information about the relationship between "compensation actually paid" and certain measures of the company's financial performance. The tabular and narrative disclosures provided below are intended to be calculated in a manner consistent with the applicable SEC rules and may reflect reasonable estimates and assumptions where appropriate.

For further information concerning the company's pay-for-performance philosophy and how the Human Capital and Compensation Committee aligns executive compensation with the company's performance, refer to the section titled "Compensation Discussion and Analysis" above. The Human Capital and Compensation Committee did not consider the pay versus performance disclosure below in making its pay decisions for any of the years shown.

## Pay Versus Performance Table

The table below provides the "compensation actually paid" to our principal executive officers ("PEOs") and the average "compensation actually paid" to our other named executive officers ("Non-PEO NEOs"), as calculated by SEC rules, and certain financial performance measures, in each case, for our three most recently completed fiscal years and the transition period.

| | Summary Compensation Table Total for PEOs ($) | | | Compensation Actually Paid to PEO ($) | | | Average Summary Compensation Table Total for Non-PEO NEOs ($) | Average Compensation Actually Paid to Non-PEO NEOs ($) | Value of Initial Fixed $100 Investment Based on: | | Net Income ($ in thousands) | Adjusted Operating Income ($ in thousands) |
| | | | | | | | | | Company TSR ($) | Peer Group TSR ($) | | |
| Fiscal Year | Stephanie Linnartz | Colin Browne | Patrik Frisk | Stephanie Linnartz | Colin Browne | Patrik Frisk | | | | | | |
| (a) | | (b)(1) | | | (c)(2) | | (d)(1) | (e)(2) | (f)(3) | (g)(3) | (h)(4) | (i)(4)(5) |
| 2023 | 11,300,000 | 5,481,578 | 8,640,309 | 11,287,126 | 2,712,210 | (5,682,435) | 2,644,984 | (605,281) | 65.76 | 56.59 | 386,769 | 330,131 |
| 2022 TP | n/a | n/a | 3,978,714 | n/a | n/a | 1,444,574 | 1,215,815 | 397,558 | 117.94 | 81.67 | (59,610) | 10,718 |
| 2021 | n/a | n/a | 15,544,913 | n/a | n/a | 18,161,011 | 4,352,657 | 5,337,782 | 146.85 | 98.71 | 360,060 | 529,000 |
| 2020 | n/a | n/a | 7,380,315 | n/a | n/a | 3,524,442 | 2,203,092 | 509,851 | 118.99 | 93.06 | (549,177) | 537 |

(1)  Ms. Linnartz has served as our PEO since February 27, 2023. Mr. Browne served as our PEO from June 1, 2022 through February 26, 2023. Mr. Frisk served as our PEO from January 1 2020 through May 31, 2022. The individuals comprising the Non-PEO NEOs for each fiscal period presented are listed below.

| Fiscal Year 2023 | Transition Period | Fiscal Year 2021 | Fiscal Year 2020 |
|---|---|---|---|
| Kevin Plank | Kevin Plank | Kevin Plank | Kevin Plank |
| David Bergman | David Bergman | David Bergman | David Bergman |
| Massimo Baratto | Colin Browne | Colin Browne | Colin Browne |
| Stephanie Pugliese | Massimo Baratto | Stephanie Pugliese | Stephanie Pugliese |
| Tchernavia Rocker | Stephanie Pugliese | | |
| | Tchernavia Rocker | | |



Table of Contents

(2)  The values included in these columns for the "compensation actually paid" to each PEO and the average compensation actually paid to our Non-PEO NEOs have been calculated in accordance with Item 402(v) of Regulation S-K. For each fiscal period, the values included in the columns for the "compensation actually paid" to each PEO and the average "compensation actually paid" to our Non-PEO NEOs reflect the following adjustments to the values included in columns (b) and (d), respectively:

| | PEOs ($) | | | | | | Average for Non-PEO NEOs ($) | | | |
| | Stephanie Linnartz | Colin Browne | | Patrik Frisk | | | | | | |
| | FY2023 | FY2023 | FY2023 | 2022 TP | FY2021 | FY2020 | FY2023 | 2022 TP | FY2021 | FY2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Summary Compensation Table Total | 11,300,000 | 5,481,578 | 8,640,309 | 3,978,714 | 15,544,913 | 7,380,315 | 2,644,984 | 1,215,815 | 4,352,657 | 2,203,092 |
| **Adjustments to the Summary Compensation Total to Calculate Compensation Actually Paid** | | | | | | | | | | |
| Deduct: Grant date fair value of equity awards in fiscal year as reported in Summary Compensation Table | 11,000,000 | 3,875,000 | — | 3,500,000 | 10,000,000 | 5,250,000 | 1,225,000 | 1,041,667 | 2,437,500 | 1,203,125 |
| Add: Fair value of equity awards granted in covered fiscal year at end of year | 10,987,126 | 2,510,891 | — | 3,766,267 | 9,390,957 | 6,502,114 | 654,000 | 1,120,916 | 2,289,051 | 1,375,314 |
| Add: Change in fair value from end of prior fiscal year to vesting date for equity awards in prior fiscal years that vested during covered fiscal year | — | (431,006) | (680,607) | (967,082) | 1,491,113 | (1,339,806) | (290,807) | (174,198) | 239,671 | (204,231) |
| Add: Change in fair value from end of prior fiscal year to end of covered fiscal year for equity awards made in prior fiscal years that were unvested at end of covered fiscal year | — | (974,253) | — | (1,833,325) | 1,734,028 | (3,768,181) | (2,010,985) | (723,308) | 893,903 | (1,661,199) |
| Add For awards that are granted and vest in the same year the fair value as of the vesting date | — | — | — | — | — | — | — | — | — | — |
| Deduct: Fair value of equity awards forfeited in covered fiscal year determined at end of prior fiscal year | — | — | 13,642,137 | — | — | — | 377,473 | — | — | — |
| Add: Dividends or other earnings paid on equity awards in covered fiscal year prior to the vesting date that are not otherwise included in the total compensation for the covered fiscal year | — | — | — | — | — | — | — | — | — | — |
| **Compensation Actually Paid** | 11,287,126 | 2,712,210 | (5,682,435) | 1,444,574 | 18,161,011 | 3,524,442 | (605,281) | 397,558 | 5,337,782 | 509,851 |

(3)  "TSR" stands for Total Stockholder Return. The Peer Group TSR shown in this table uses the S&P 500 Apparel, Accessories & Luxury Goods Index, which we also use in the stock performance graph required by Item 201(e) of Regulation S-K for the years reflected in the table above. The dollar amounts in columns (f) and (g) represent the value at the end of the applicable year of an assumed $100 investment in the company's Class A Stock and the S&P 500 Apparel, Accessories & Luxury Goods Index, respectively, on the last trading day of 2019, assuming reinvestment of dividends.

(4)  Net income and adjusted operating income are rounded to the nearest hundred thousand.

(5)  Adjusted operating income is calculated as described in Appendix B.

61



Table of Contents

**Pay Versus Performance Relationship Descriptions**

    The following graphical comparisons describe the relationships between certain figures included in the Pay Versus Performance Table for each of fiscal year 2023, fiscal year 2021, fiscal year 2020 and the transition period, including comparisons between "compensation actually paid" to each PEO and our Non-PEO NEOs and (i) our cumulative TSR, (ii) the TSR of our Peer Group, (iii) our net income and (iv) our adjusted operating income.





62

**Table of Contents**



**Tabular List of Most Important Financial Performance Measures**

The following table presents the financial performance measures that the company considers to have been the most important in linking "compensation actually paid" to each PEO and other named executive officers for fiscal year 2023 to company performance. See "Compensation Disclosure and Analysis" and Appendix B for more information.

| Fiscal Year 2023 Financial Performance Measures |
|---|
| Adjusted Operating Income |
| Currency Neutral Net Revenue |
| Net Revenue |

63



**Table of Contents**

# ADVISORY APPROVAL OF OUR EXECUTIVE COMPENSATION
**(PROPOSAL 2)**

We provide stockholders with the opportunity to cast an annual advisory vote on executive compensation (commonly referred to as a "say on pay" proposal). This vote is on whether to approve the compensation of the named executive officers as disclosed in the "Executive Compensation" section of this Proxy Statement, including the Compensation Discussion and Analysis, the compensation tables and the related narrative. For a discussion of the results of our "say on pay" proposal from our 2022 Annual Meeting of Stockholders, please see "Executive Compensation—Compensation Discussion and Analysis—Executive Summary—Advisory Vote to Approve Executive Compensation."

While this advisory vote to approve executive compensation is non-binding, the Board and the Human Capital and Compensation Committee will review the voting results and seek to determine the cause or causes of any significant negative voting result. Voting results provide little detail by themselves, and we may consult directly with stockholders to better understand issues and concerns not previously presented. The Board and management understand that it is useful and appropriate to seek the views of our stockholders when considering the design and implementation of executive compensation programs.

The Board of Directors asks you to consider the following statement: Do you approve our executive compensation as described in the "Executive Compensation" section of this Proxy Statement, including the Compensation Discussion and Analysis, the compensation tables and other narrative executive compensation disclosures?

The approval of our executive compensation as described in the "Executive Compensation" section of this Proxy Statement, including the Compensation Discussion and Analysis, the compensation tables and other narrative executive compensation disclosures, requires the affirmative vote of a majority of the votes cast at the Annual Meeting.

**The Board of Directors recommends that you vote "FOR" the approval of our executive compensation.**

64



**Table of Contents**

# ADVISORY VOTE ON THE FREQUENCY OF FUTURE ADVISORY VOTES ON OUR EXECUTIVE COMPENSATION

**(PROPOSAL 3)**

As described in Proposal No. 2 above, the company's stockholders are being provided the opportunity to cast an advisory vote on our executive compensation program. The advisory vote on our executive compensation described in Proposal No. 2 above is referred to as a "say on pay vote."

Section 14A of the Securities Exchange Act of 1934 requires all publicly traded companies to provide stockholders the opportunity to cast an advisory, non-binding vote on how often we should include a say on pay vote in our proxy materials for future annual shareholder meetings (or any special shareholder meeting for which the company must include executive compensation information in the proxy statement for that meeting). Under this Proposal No. 3, stockholders may vote to have the say on pay vote every one year, every two years or every three years or abstain from voting.

We believe that say on pay votes should be conducted every year so that stockholders may annually express their views on our executive compensation program. The Human Capital and Compensation Committee, which administers our executive compensation program, values the opinions expressed by stockholders in these votes and will consider the outcome of these votes in making its decisions on our executive compensation.

**The Board of Directors recommends that you vote to hold say on pay votes every ONE YEAR.**

65



**Table of Contents**

# EQUITY COMPENSATION PLAN INFORMATION

The following table sets forth information concerning our equity compensation plans that authorize the issuance of shares of Class A and Class C Stock. The information is provided as of March 31, 2023:

| Plan Category | Class of Common Stock | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a) (c) |
|---|---|---|---|---|
| Equity compensation plans approved by security holders | Class A | 262,180 | 36.71 | 11,012,574 |
| Equity compensation plans approved by security holders | Class C | 9,809,381 | 18.14 | 25,061,943 |
| Equity compensation plans not approved by security holders | Class A | 51,565 | — | — |
| Equity compensation plans not approved by security holder | Class C | 51,927 | — | — |

The number of securities to be issued upon exercise of outstanding options, warrants and rights issued under equity compensation plans approved by security holders includes 16,440 Class A and 7,537,784 Class C restricted stock units and deferred stock units issued to employees, non-employees and directors of Under Armour; these restricted stock units and deferred stock units are not included in the weighted average exercise price calculation above.

The number of securities remaining available for future issuance as of March 31, 2023 includes 8,319,305 shares of our Class A Stock and 23,930,748 shares of our Class C Stock under our 2005 Plan and 2,695,329 shares of our Class A Stock and 1,131,195 shares of our Class C Stock under our Employee Stock Purchase Plan. In addition to securities issued upon the exercise of stock options, warrants and rights, our 2005 Plan authorizes the issuance of restricted and unrestricted shares of our Class A and Class C Stock and other equity awards. Refer to Note 14 to the Consolidated Financial Statements included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2023 for a description of the material features of these plans.

The number of securities issued upon exercise of outstanding options, warrants and rights issued under equity compensation plans not approved by security holders includes 51,565 shares of our Class A Stock and 51,927 shares of our Class C Stock issued in connection with the delivery of shares pursuant to deferred stock units granted to certain of our marketing partners. These deferred stock units are not included in the weighted average exercise price calculation above. The deferred stock units are issued to certain of our marketing partners in connection with their entering into endorsement and other marketing services agreements with us. The terms of each agreement set forth the number of deferred stock units to be granted and the delivery dates for the shares, which range from a one to ten year period, depending on the contract. The deferred stock units are non-forfeitable.

As previously disclosed, on April 3, 2023, subsequent to the fiscal year end, an award of restricted stock units for 8.8 million shares of our Class C Stock was issued under an equity compensation plan not approved by security holders to an entity affiliated with professional basketball player Stephen Curry. The award was issued in connection with Mr. Curry's entry into a stock unit agreement and an Under Armour, Inc. Athlete Product, Brand, Ambassador, and Endorsement Agreement with the company, pursuant to which Mr. Curry is continuing his relationship with the company. This award is not reflected in the table above.



**Table of Contents**

# TRANSACTIONS WITH RELATED PERSONS

In accordance with SEC disclosure requirements, we have presented below transactions in which we are a party that exceeded $120,000 in fiscal year 2023, and in which any of our related persons had or will have a direct or indirect material interest.

*Under Armour Corporate Offices*

In 2015, we entered into a lease with an entity controlled by Mr. Plank to lease industrial space located near our corporate headquarters in Baltimore, which we use as an innovation and manufacturing testing facility and for other business purposes. Given the location's proximity to our headquarters in Baltimore City, the use of this space provided a unique opportunity for us to build a state-of-the-art facility to accommodate our innovation needs. The lease covered 68,000 square feet and had a five-year term, with payments that began in April 2016. The annual lease rate was initially approximately $0.5 million, with the annual lease rate escalating 2.5% each year. Prior to entering this lease, we received an independent market rent appraisal, based on which we determined that the lease payments were below fair market lease rates. We also determined that the property's location and other favorable terms of the lease, such as renewal options and flexibility regarding the design of the space, provide us with overall terms that were both fair and reasonable to us and provided flexibility otherwise unavailable at alternative locations. In 2020, the Audit Committee approved an extension of this lease through June 2022, with annual lease payments of approximately $0.7 million, which continued to represent at or below fair market lease rates. The lease expired on June 30, 2022 in accordance with its terms. For fiscal year 2023 and the transition period, our total lease payments were approximately $267,300 and $313,200, respectively.

*Aircraft*

A company owned by Mr. Plank owns a jet aircraft. We have an operating lease agreement with the company to lease the aircraft when used by Mr. Plank or other persons for our business purposes. Pursuant to the operating lease agreement, we paid a fixed monthly lease payment of $166,667. Prior to entering into the operating lease agreement, we determined that the lease payment rate is at the fair market value lease rate for this aircraft based on a third-party appraisal, and the Audit Committee determined the lease terms were reasonable and that we would benefit from using the aircraft for company business. In February 2023, the Audit Committee approved an extension of this lease through June 2028, with an automatic one-year extension thereafter, with a fixed monthly lease payment of $145,300 under the terms of the amended operating lease agreement effective March 2023. Prior to entering into the amendment, we determined that the amended lease payment rate is at the fair market value lease rate for this aircraft based on a third-party appraisal, and the Audit Committee determined the lease terms were reasonable and that we would benefit from using the aircraft for company business. For fiscal year 2023 and the transition period, our total lease payments were approximately $2.0 million and $0.5 million, respectively.

*Policies and Procedures for Review and Approval of Transactions with Related Persons*

Our Corporate Governance Guidelines require that our Board of Directors approve any transaction involving Under Armour and a director or executive officer or entities controlled by a director or executive officer. The Board has delegated to the Audit Committee oversight and approval of these and other matters that may present conflicts of interest. The Board has adopted a formal written policy on transactions with related persons. Related persons are generally defined under SEC rules as our directors, executive officers, or stockholders owning at least five percent of our outstanding shares, or immediate family members of any of the foregoing. The policy provides that the Audit Committee shall conduct a reasonable prior review and provide oversight of all transactions with related persons where

67



Table of Contents

(i) the amount involved exceeds $120,000 and (ii) any related person has a direct or indirect material interest, as well as any material changes to such transactions, for potential conflicts of interest. The policy further provides that in determining whether to approve each proposed transaction, the committee may consider the following, among other factors it deems appropriate:

- whether the terms of the transaction are reasonable and fair to Under Armour and on the same basis as would apply if the transaction did not involve a related person;

- whether the transaction would impair the independence of a non-management director; and

- whether the transaction would present an improper conflict of interest, taking into account the size of the transaction, the materiality of a related person's direct or indirect interest in the transaction, and any other factors the committee deems relevant.

Pursuant to Section 314.00 of the NYSE Listed Company Manual, the committee will prohibit a transaction with a related person if it determines such transaction to be inconsistent with the interests of Under Armour and its stockholders. To the extent our employment of an immediate family member of a director, executive officer or five percent stockholder is considered a transaction with a related person, the policy provides that the committee has determined to pre-approve such employment if the executive officer, director or five percent stockholder does not participate in decisions regarding the hiring, performance evaluation or compensation of the family member.

68

**UNDER ARMOUR.**

**Table of Contents**

# APPROVAL OF FOURTH AMENDED AND RESTATED 2005 OMNIBUS LONG-TERM INCENTIVE PLAN

**(PROPOSAL 4)**

At the Annual Meeting of Stockholders held on May 9, 2019, our stockholders approved our existing Third Amended and Restated 2005 Omnibus Long-Term Incentive Plan, which we refer to as our "2005 Plan." The Board of Directors believes that it is advisable to amend and restate our 2005 Plan in order to, among other things, increase the shares of our Class C Stock available for issuance by an additional 17,000,000 shares and extend the term of the 2005 Plan, as discussed below. These changes will be incorporated in the Fourth Amended and Restated 2005 Omnibus Long-Term Incentive Plan (the "Amended 2005 Plan").

Our company believes the increase in the number of shares of Class C Stock reserved and available for awards under the Amended 2005 Plan, the extension of the term of the 2005 Plan, and the other proposed changes to the 2005 Plan are in the best interest of our company and our stockholders. Our company believes that equity-based awards are an important part of its overall compensation program and wants to ensure that there is a sufficient number of shares available to adequately incentivize its employees, directors and consultants. Therefore, the Board recommends that stockholders approve the Amended 2005 Plan.

In accordance with SEC disclosure requirements, the following is a description of the material features of the Amended 2005 Plan. The Amended 2005 Plan is set forth in its entirety as Appendix A to this Proxy Statement. The following description and summary are qualified in their entirety by reference to the plan document set forth on Appendix A.

Approval of Proposal 4 requires the affirmative "FOR" vote of the holders of a majority of the votes cast on the proposal at the Annual Meeting.

**Material Changes to the 2005 Plan**

In connection with this approval, the Board has recommended that the 2005 Plan be amended in the following respects, and to reflect such amendments in the new Amended 2005 Plan document:

- Increase the number of shares of Class C Stock reserved for issuance under the 2005 Plan by 17,000,000 shares (from 45,000,000 shares to 62,000,000 shares, which includes 17,332,195 shares authorized and available for issuance under the 2005 Plan and 17,000,000 additional shares authorized for issuance under the Amended 2005 Plan) (the number of shares of Class A Stock reserved for issuance under the 2005 Plan will not change);

- Extend the expiration date of the Amended 2005 Plan until June 13, 2033, which is the tenth anniversary of the date the Amended 2005 Plan was approved by the Board, subject to approval by stockholders;

- Expand how awards may be treated in connection with a "change in control," reorganization, merger or consolidation. In addition, in the event of a "change in control," awards that are "underwater" (that is, an option or stock appreciation right where the exercise price exceeds the fair market value of the stock underlying the award) may be cancelled without consideration;

- Eliminate certain "performance based compensation" provisions of the 2005 Plan that are no longer relevant as a result of 2017 legislative changes to Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code");

69



**Table of Contents**

- Increase (i) the maximum number of shares of stock with respect to which stock options or stock appreciation rights may be granted in any one person from 2,000,000 to 4,000,000 and (ii) the maximum number of shares of stock that may be granted under a performance based equity award to any one person in any calendar year from 1,000,000 to 2,000,000; and

- Make additional clarifying amendments, including (i) adding a default definition of "cause" which is consistent the definition from our current form of restricted stock unit award agreement and (ii) clarifying the powers and authorities of the Human Capital and Compensation Committee, as administrator of the Amended 2005 Plan.

If the Amended 2005 Plan is approved by the stockholders at the Annual Meeting, it will become immediately effective as of the date the Amended Plan was approved by the Board.

As of June 5, 2023, 8,319,305 shares of Class A Stock and 17,332,195 shares of our Class C Stock remained available for issuance of future awards under the 2005 Plan. While the Human Capital and Compensation Committee has the discretion under the terms of the 2005 Plan to issue awards for shares of our Class A Stock, the Human Capital and Compensation Committee currently intends to utilize only our Class C Stock for equity compensation. As of June 5, 2023, under the 2005 Plan, there were 12,279,495 and 1,000,142 shares of our Class C Stock subject to outstanding restricted stock units and performance based restricted stock units, respectively, and 1,467,533 shares of our Class C Stock subject to outstanding stock options, with a weighted average exercise price of $18.14 and a weighted average remaining contractual term of 4.95 years. In addition, as of June 5, 2023, under the 2005 Plan, there were 110,621 shares of our Class A Stock subject to outstanding stock options, with a weighted average exercise price of $36.71 and a weighted average remaining contractual term of 1.77 years, and 16,440 shares of our Class A stock subject to outstanding restricted stock units. Based on past trends and current expectations for possible future awards, we are recommending that an additional 17 million shares of Class C Stock be made available for issuance under the Amended 2005 Plan, sufficient to cover equity awards for the next several years. On June 5, 2023, the closing price of our Class A Stock and Class C Stock was $7.51 and $6.88, respectively.

Common measures for the use of stock incentive plans include the run rate and the overhang rate. The run rate measures the annual dilution from equity awards granted during a particular year. We calculate this based on all awards granted under the 2005 Plan in a given year as a percent of the weighted average of our shares of Class A, Class B, and Class C Stock outstanding in that year. Our run rates for fiscal year 2020, fiscal year 2021, the transition period and fiscal year 2023 were approximately 1.07%, 0.97%, 0.70% and 0.83%, respectively. In May 2023, the Human Capital and Compensation Committee approved time based equity compensation awards in the form of restricted stock units for approximately 6.9 million shares of Class C Stock. We believe these are reasonable levels. The run rate may increase in future years as the number of people in our company who are eligible to receive equity awards grows, and if we continue to have equity awards as an important component of compensation for our executives and other key employees to better align their interests with the interests of our stockholders. The overhang rate is a measure of potential dilution to stockholders. We calculate this based on all unissued shares under the 2005 Plan plus outstanding stock options and stock units as a percent of the total number of shares of our Class A, Class B, and Class C Stock outstanding. At the end of fiscal year 2023 (not including grants made in May 2023), our overhang rate was approximately 9.4%. With the increase in the number of shares reserved for issuance under the Amended 2005 Plan, our overhang rate at the end of fiscal year 2023 would have been 13.2%. We believe these are reasonable levels and provide us with the appropriate flexibility to ensure meaningful equity awards in future years to our executives and other key employees to better align their interests with the interests of our stockholders.



**Table of Contents**

In addition, the 2005 Plan is being amended to clarify that dividends and dividend equivalents in respect of any award under the Amended 2005 Plan will only be paid if and to the extent that the underlying award becomes vested (and will be forfeited if the award is forfeited).

**Summary of the Amended 2005 Plan**

*Purpose of Amended 2005 Plan.* The purpose of the Amended 2005 Plan is to enhance our ability to attract and retain highly qualified officers, directors, key employees and other persons, and to motivate such persons to serve our company and to use maximum effort to improve the business results and earnings of our company, by providing to such persons an opportunity to acquire or increase a direct proprietary interest in the operations and future success of our company.

*Administration of the Amended 2005 Plan.* Our Human Capital and Compensation Committee has such powers and authorities related to the administration of the Amended 2005 Plan as are consistent with our corporate governance documents and applicable law. Each Human Capital and Compensation Committee member will be a "non-employee director" within the meaning of the exemption under Rule 16b-3 of the Securities Exchange Act of 1934. Currently, our Human Capital and Compensation Committee is comprised of three directors who meet these independence requirements and who also qualify as independent directors under the corporate governance listing standards of the New York Stock Exchange, as well as the New York Stock Exchange's additional independence requirements for compensation committee members. The Human Capital and Compensation Committee has the authority to determine, among other things, who receives awards, what type of awards are granted, the number of shares of our stock subject to an award, the terms and conditions of each award and the form of each award agreement. The Human Capital and Compensation Committee has the authority to amend, modify or supplement the terms of any outstanding award, to interpret and administer the Amended 2005 Plan and any award agreement and to establish rules and regulations for the administration of the Amended 2005 Plan.

*Term of the Amended 2005 Plan.* Subject to shareholder approval, the Amended 2005 Plan will become effective on June 13, 2023 (the date of our Board's approval of the Amended 2005 Plan), and will terminate on June 13, 2033 (the ten-year anniversary of the effective date of the Amended 2005 Plan). Our 2005 Plan currently expires on March 22, 2029.

*Amendment and Termination.* Our Board may at any time amend, suspend, or terminate the Amended 2005 Plan as to any awards which have not been made. An amendment will be contingent on approval of our stockholders to the extent stated by our Board, required by applicable law or required by applicable stock exchange listing requirements. No awards will be made after termination of the Amended 2005 Plan. No amendment, suspension, or termination of the Amended 2005 Plan will, without the consent of the holder of the award, materially impair rights or obligations under an outstanding award. However, the Board may amend the Amended 2005 Plan and the Human Capital and Compensation Committee may amend an award or award agreement, either retroactively or prospectively, without consent, (i) in order to preserve or come within any exemptions from liability under Section 16(b) of the Securities Exchange Act of 1934, or (ii) if the Board or the Human Capital and Compensation Committee determines that such amendment either is required or advisable for our company, the Amended 2005 Plan or the award to satisfy, comply with or meet the requirements of any law, regulation, rule or accounting standard, or is not reasonably likely to significantly diminish the benefits provided under such award, or that such diminishment has been or will be adequately compensated.

*No Repricing of Stock Options or Stock Appreciation Rights.* The Amended 2005 Plan prohibits, without the approval of our stockholders, any amendment or modification of an outstanding stock option or stock appreciation right that reduces the exercise price of the award, either by lowering the



Table of Contents

exercise price or by canceling the outstanding award and granting a replacement award with a lower exercise price, or that otherwise would be treated as a repricing under the rules of the New York Stock Exchange or cause the award to be treated as deferred compensation subject to the limitations of Code Section 409A. The Amended 2005 Plan further prohibits, without the approval of our stockholders, the cash repurchase of an outstanding stock option or stock appreciation right when the fair market value of a share is lower than the exercise price of such stock option or stock appreciation right.

*Shares Available for Plan Awards.* As noted above, the maximum number of shares of our Class A Stock authorized for issuance under the 2005 Plan was 30,000,000, with 8,319,305 shares as of June 5, 2023 remaining available for issuance of future awards, and the maximum number of shares of our Class C Stock currently authorized for issuance under the 2005 Plan was 45,000,000, with 17,332,195 shares as of June 5, 2023 remaining available for issuance of future awards, subject to adjustment as provided in the Amended 2005 Plan. If the Amended 2005 Plan is approved by our stockholders, then the number of shares of Class C Stock authorized to be issued pursuant to awards under the Amended 2005 Plan will be increased to 62,000,000 shares, resulting in 34,332,195 shares remaining available for future awards. The number of shares of our Class A Stock available for issuance under the Amended 2005 Plan will not change from the number currently available under the 2005 Plan (i.e., 8,319,305 shares).

Any of the available shares may be issued pursuant to incentive stock options. The maximum number of shares of stock with respect to which stock options or stock appreciation rights may be granted in any calendar year to any one person is 4,000,000. Shares that are withheld from an award or surrendered in payment of any exercise price or taxes relating to the award will be treated as delivered and will reduce the shares available under the Amended 2005 Plan. Any shares covered by an award that are not purchased or are forfeited, settled in cash or otherwise terminated without delivery of shares to the award holder will be available for future grants under the Amended 2005 Plan. The number and class of shares available under the Amended 2005 Plan and/or subject to outstanding awards, as well as the maximum number of shares with respect to which stock options or stock appreciation rights may be granted in any calendar year to any one person, will be equitably adjusted in the event of various changes in the capitalization of our company. See "—Performance Awards" below for the maximum number of shares of stock that may be granted under a performance based equity award, other than an option or stock appreciation right, to any one person in any calendar year.

*Type of Awards.* The Amended 2005 Plan authorizes awards of stock options, stock appreciation rights, restricted stock, restricted stock units, unrestricted stock and unrestricted stock units and dividend equivalent rights, as well as performance based equity awards that are made subject to the attainment of performance goals over a performance period established by the Human Capital and Compensation Committee in its discretion.

*Eligibility and Participation.* Awards may be made to an employee, officer or director of our company or an affiliate of our company, or a consultant or adviser providing services to our company or an affiliate of our company, or any other individual whose participation is determined by the Human Capital and Compensation Committee to be in the best interests of our company. On March 31, 2023, we had approximately 15,000 employees.

*Minimum Vesting.* The Amended 2005 Plan provides that, with respect to any awards granted on or after the effective date of the 2005 Plan, those awards may not vest, in whole or in part, prior to the one-year anniversary of the date of grant, except that the Human Capital and Compensation Committee may provide in the award agreement that awards vest prior to such date in the event of the grantee's death or disability, or in connection with certain change in control transactions. Notwithstanding the foregoing, up to 5% of the shares of Class A and Class C Stock remaining

72



Table of Contents

available for issuance as of the effective date may be issued pursuant to awards subject to any, or no, vesting conditions, as the Human Capital and Compensation Committee determines appropriate. In addition, annual awards granted to our non-employee directors at any annual stockholders meeting may provide for vesting at the next annual stockholders meeting.

*Stock Options and Stock Appreciation Rights.* The Human Capital and Compensation Committee may award stock options, including incentive stock options and non-qualified stock options, and stock appreciation rights to eligible persons. The committee may award stock appreciation rights in tandem with or as a component of other awards or as stand-alone awards.

*Exercise Price of Stock Options and Stock Appreciation Rights.* The exercise price per share of a stock option or stock appreciation right will in no event be less than 100% (or 110% in the case of an incentive stock option issued to a person who owns more than 10% of the total combined voting power of all classes of our outstanding stock) of the fair market value per share of our Class A Stock or Class C Stock underlying the award on the grant date; provided that with respect to awards made in substitution for or in exchange for awards made by an entity we acquire, the exercise price does not need to be at least the fair market value on the date of the substitution or exchange. A stock appreciation right confers a right to receive, upon exercise, the excess of the fair market value of one share of our Class A Stock or Class C Stock, as applicable, on the date of exercise over the exercise price of the stock appreciation right. The exercise price of a stock appreciation right may not be less than the fair market value of a share of our Class A Stock or Class C Stock, as applicable, on the grant date. A stock appreciation right granted in tandem with an outstanding stock option following the grant date of such stock option may have a grant price that is equal to the stock option's exercise price; provided, however, that the stock appreciation right's exercise price may not be less than the fair market value of a share of our Class A Stock or Class C Stock, as applicable, on the grant date of the stock appreciation right.

*Vesting of Stock Options and Stock Appreciation Rights.* The Human Capital and Compensation Committee will determine when a stock option or stock appreciation right will become exercisable and the effect of termination of service on such award, and include such information in the award agreement.

*Special Limitations on Incentive Stock Options.* The Human Capital and Compensation Committee may award incentive stock options only to an employee of our company or a subsidiary corporation of our company and only to the extent that the aggregate fair market value (determined at the time the option is granted) of the shares of our Class A Stock or Class C Stock, as applicable, with respect to which all incentive stock options held by the employee become exercisable for the first time during any calendar year does not exceed $100,000.

*Exercise of Stock Options and Stock Appreciation Rights.* A stock option may be exercised by the delivery to us of written notice of exercise and payment in full of the exercise price (plus the amount of any taxes which we may be required to withhold). To the extent permitted under the award agreement, the payment may be made through cash, delivery of shares, broker assisted cashless exercises, net exercise or in any other form consistent with applicable law. The Human Capital and Compensation Committee has the discretion to determine the method or methods by which a stock appreciation right may be exercised.

*Expiration of Stock Options and Stock Appreciation Rights.* Stock options and stock appreciation rights will expire at such time as the Human Capital and Compensation Committee determines; provided, however that no stock option may be exercised more than ten years from the date of grant, or in the case of an incentive stock option held by a person that owns more than 10% of the total combined voting power of all classes of our outstanding stock, not more than five years from the date of grant.



**Table of Contents**

*Restricted Stock and Restricted Stock Units*. At the time a grant of restricted stock or restricted stock units is made, the Human Capital and Compensation Committee establishes the applicable "restricted period" and any restrictions in addition to or other than the expiration of such restricted period, including the satisfaction of any performance objectives. Unless the Human Capital and Compensation Committee otherwise stipulates in an award agreement, holders of restricted stock will have the right to vote such stock and the right to receive any dividends declared or paid with respect to such stock; provided, however, that any dividends will be subject to the same restrictions that apply to the underlying restricted stock and paid to the grantee (without interest) in accordance with the terms of the underlying restricted stock (if not forfeited). The Human Capital and Compensation Committee may provide that any such dividends paid must be reinvested in shares of stock. All distributions, if any, received by a holder of restricted stock as a result of any stock split, stock dividend, combination of shares, or other similar transaction will be subject to the restrictions applicable to the original grant. Holders of restricted stock units will have no rights as stockholders of our company. The Human Capital and Compensation Committee may provide that the holder of restricted stock units will be entitled to receive dividend equivalent rights, which may be deemed reinvested in additional restricted stock units; provided, however, that any dividend equivalent rights will be subject to the same restrictions that apply to the underlying restricted stock unit and paid to the grantee (without interest) in accordance with the terms of the underlying restricted stock unit award (if not forfeited).

Unless the Human Capital and Compensation Committee otherwise provides, upon the termination of a person's service, any restricted stock or restricted stock units held by the person that have not vested, or with respect to which all applicable restrictions and conditions have not lapsed, will immediately be deemed forfeited.

The Human Capital and Compensation Committee may grant restricted stock or restricted stock units to a person in respect of services rendered and other valid consideration, or in lieu of or in addition to any cash compensation due the person.

Upon the expiration or termination of any restricted period and the satisfaction of any other conditions prescribed by the Human Capital and Compensation Committee, the restrictions applicable to shares of restricted stock or restricted stock units will lapse. Restricted stock units may be settled in cash or stock as determined by the Human Capital and Compensation Committee and set forth in the award agreement.

*Unrestricted Stock Awards.* The Human Capital and Compensation Committee may grant or sell an unrestricted stock or unrestricted stock unit award to an eligible person in respect of services rendered and other valid consideration, or in lieu of or in addition to any cash compensation due the person.

*Dividend Equivalent Rights*. A dividend equivalent right is an award entitling a person to receive credits based on cash or stock distributions that would have been paid on the shares of our Class A Stock or Class C Stock, as applicable, if such shares had been issued to and held by the person. A dividend equivalent right may be granted as a component of another award (other than a stock option or stock appreciation right) or as a freestanding award. The terms and conditions of dividend equivalent rights will be specified in the award agreement. If a dividend equivalent right is granted as a component of another award, the dividend equivalent rights will be subject to the same restrictions that apply to the underlying award and paid to the grantee (without interest) in accordance with the terms of the underlying award (if not forfeited).

*Performance Awards.* Under the Amended 2005 Plan, our Human Capital and Compensation Committee may approve an equity award that is subject to the attainment of one or more performance goals. If an award is designated as a performance based award, the award will be contingent upon the



**Table of Contents**

achievement of pre-established, performance goals over a performance period established by the Human Capital and Compensation Committee. In establishing the performance goals, the committee may use one or more of the several business criteria listed in the Amended 2005 Plan, which include (but are not limited to) the following, and which may be applied to our company as a whole, and/or to specified subsidiaries or business units of our company: (1) total stockholder return; (2) such total stockholder return as compared to total return (on a comparable basis) of a publicly available index such as, but not limited to, a Standard & Poor's stock index; (3) net revenues; (4) net income; (5) earnings per share; (6) income from operations; (7) operating margin; (8) gross profit; (9) gross margin; (10) pretax earnings; (11) earnings before interest expense, taxes, depreciation and amortization; (12) return on equity; (13) return on capital; (14) return on investment; (15) return on assets; (16) working capital; (17) free cash flow; and (18) ratio of debt to stockholders' equity. Performance goals will be established in writing no later than 90 days after the commencement of the period of service to which the performance goal relates or such other date as determined by the Human Capital and Compensation Committee. The Human Capital and Compensation Committee may adjust the amount of the award that is earned based upon achievement of the performance goals. The Human Capital and Compensation Committee must certify prior to grant, exercise or settlement of the award that the performance goals were in fact satisfied.

The measurement of any performance goal may include or exclude any of the following events that occur during or otherwise impact a performance period: (a) asset write-downs; (b) litigation, claims, judgments or settlements; (c) the effect of changes in tax laws, accounting principles, or other laws or provisions affecting reported results; (d) any reorganization and restructuring programs or other corporate transactions; (e) extraordinary and/or nonrecurring items as described in our financial statements or notes thereto and/or in management's discussion and analysis of financial condition and results of operations, and in any case appearing in our annual report to stockholders for the applicable year; (f) acquisitions or divestitures; (g) foreign exchange gains and losses; and (h) such other exclusions or adjustments as the Human Capital and Compensation Committee specifies at the time the award is granted.

The maximum number of shares of stock that may be granted under a performance based equity award to any one person in any calendar year is 2,000,000, other than an option or stock appreciation right (which are subject to a 4,000,000 maximum). These limitations on the maximum number of shares of stock that may be granted under various awards will be equitably adjusted in the event of various changes in the capitalization of our company.

*Adjustment for Corporate Changes.* The Amended 2005 Plan provides that the Human Capital and Compensation Committee may specify the effect of a "change in control" (as defined in the Amended 2005 Plan), in an award agreement, which may include: accelerated vesting or lapse of restrictions, termination, cancellation, assumption, substitution or conversion of awards, as determined by the Human Capital and Compensation Committee. The Human Capital and Compensation Committee has generally provided that all restricted stock and restricted stock units and other equity awards will vest upon a change in control only if an employee is terminated without "cause" or for "good reason" (generally referred to as a "double trigger").

In the event of a recapitalization, reclassification, stock split, spin-off or other similar change affecting our stock, we will adjust proportionately and accordingly the number, class and kinds of shares for which awards may be made under the Amended 2005 Plan, including the maximum number of shares of Class A Stock or Class C Stock under a performance based equity award or with respect to which stock options or stock appreciation rights may be granted pursuant to the Amended 2005 Plan in any calendar year to any one person, and the exercise price, number, class and kind of shares for which awards are outstanding so that the proportionate interest of the person holding the award immediately following such event will, to the extent practicable, be the same as immediately before such event.

75



Table of Contents

If we undergo any reorganization, merger, or consolidation with one or more other entities and there is a continuation, assumption or substitution of awards in connection with the transaction, any award previously granted will apply to the securities to which a holder of the number of shares of stock subject to such award would have been entitled immediately following such transaction, with a corresponding proportionate adjustment of the exercise price per share (with respect to stock options and stock appreciation rights). If we undergo any such transaction and there is not a continuation, assumption or substitution of awards in connection with the transaction, then in the Human Capital and Compensation Committee's discretion, each award may be canceled in exchange for the same consideration that the person otherwise would receive as a stockholder in connection with the transaction (or cash equal to such consideration) if the person held the number of shares of stock, generally equal to the excess, if any of (i) the fair market value of a share of stock multiplied by the number of shares of stock subject to the vested portion of such award immediately before such transaction, minus (ii) the total exercise price or purchase price, if any, for such award.

However, in the event of a "change in control," reorganization, merger, or consolidation, if the per share exercise price of a stock option or stock appreciation right is equal to or greater than the fair market value of a share of stock, such stock option or stock appreciation right may be cancelled with no payment. Any stock, cash or other property or other award delivered in connection with a "change in control," reorganization, merger, or consolidation may contain such restrictions, if any, as the Human Capital and Compensation Committee deems appropriate, including to reflect any performance or other vesting conditions to which the award was subject and that did not lapse (and were not satisfied), that any amounts paid in respect of such award in connection with transaction be subject to any escrow, holdback or other contingency applicable to stockholders generally or otherwise made subject to such restrictions as the Human Capital and Compensation Committee deems appropriate in connection with the transaction.

*Clawback & Other Company Policies.* Awards under the Amended 2005 Plan will be subject to the company's policies and procedures governing the issuance or holding of stock as in effect from time to time, including, without limitation, its insider trading policy, stock ownership guidelines and clawback policy. In addition, the Amended 2005 Plan provides that any award subject to recovery under any law, government regulation or stock exchange listing requirement will be subject to such deductions and clawback as may be required to be made pursuant to such law, government regulation or stock exchange listing requirement (or any policy we adopt pursuant to any such law, government regulation or stock exchange listing requirement) and the Human Capital and Compensation Committee, in its sole and exclusive discretion, may require that any award recipient reimburse us for all or part of the amount of any payment in settlement of any award.

*Nontransferability of Awards.* Generally, only the person who received a stock option or stock appreciation right may exercise the award and no such award will be assignable or transferable other than by will or laws of descent and distribution. However, the Amended 2005 Plan permits the Human Capital and Compensation Committee to adopt procedures to allow an award recipient to designate a beneficiary to exercise the rights of the recipient and receive any distribution with respect to the awards upon the recipient's death, subject to the terms of the Amended 2005 Plan and the award agreement. In addition, if authorized in the award agreement, the person may transfer, not for value, all or part of the award (other than an incentive stock option) to certain family members. Neither restricted stock nor restricted stock units may be sold, transferred, assigned, pledged or otherwise encumbered or disposed of during the restricted period or prior to the satisfaction of any other restrictions prescribed by the Human Capital and Compensation Committee.

*Tax Withholding and Tax Offset Payments.* We will have the right to deduct from payments of any kind otherwise due to a person any federal, state, or local taxes of any kind required by law to be withheld with respect to the vesting of or other lapse of restrictions applicable to an award to such

76



**Table of Contents**

person, upon the issuance of any shares of stock upon the exercise of a stock option or stock appreciation right or pursuant to an award.

*Registration.* We intend to amend our existing registration statement on Form S-8 filed with the SEC with respect to the Amended 2005 Plan to cover shares issuable under the Amended 2005 Plan.

*Plan Benefits.* The following reflects grants made during the transition period, fiscal year 2023 and in May 2023 under the 2005 Plan. All future awards to directors, executive officers, and employees will be made at the discretion of the Human Capital and Compensation Committee. Therefore, we cannot determine future benefits for any other awards under the Amended 2005 Plan at this time.

| Name and Position | Number of Units(1) |
|---|---|
| Stephanie Linnartz, *President and Chief Executive Officer* | 1,860,304 |
| Kevin Plank, *Executive Chair and Brand Chief* | 643,496 |
| David Bergman, *Chief Financial Officer* | 293,180 |
| Colin Browne, *Chief Operating Officer; Former Interim President and Chief Executive Officer* | 628,000 |
| Tchernavia Rocker, *Chief People and Administrative Officer* | 283,240 |
| Patrik Frisk, *Former President and Chief Executive Officer* | 242,048 |
| Massimo Baratto, *Former Chief Consumer Officer* | 193,826 |
| Stephanie Pugliese, *Former President of the Americas* | 111,679 |
| Executive Group | 4,848,765 |
| Non-Executive Director Group | 277,712 |
| Non-Executive Officer Employee Group | 8,877,525 |

_____
(1)     Includes a combination of time based and performance based restricted stock unit awards. With respect to the performance based awards, vesting is tied to company performance. With respect to any performance based awards for which the performance period is not complete, the information in the table above reflects the number of performance awards assuming achievement of the target level of performance conditions for these performance awards. A portion of the awards granted during the transition period vested in May 2023.

*Federal Income Tax Consequences.* The following is a summary of the general federal income tax consequences to our company and to U.S. taxpayers of awards granted under the Amended 2005 Plan. The summary is based on the law as in effect on June 27, 2023. The rules concerning the federal income tax consequences of equity awards are highly technical. In addition, the applicable statutory provisions are subject to change and their application may vary in individual circumstances. Therefore, the following is designed to provide only a general understanding of the federal income tax consequences of equity awards under the Amended 2005 Plan. Moreover, it does not discuss state or local tax consequences, non-U.S. tax consequences that may apply.

*Non-Qualified Stock Options and Stock Appreciation Rights.* No taxable income is reportable when a non-qualified stock option or stock appreciation right is granted to a person. Upon exercise, generally, the person will have ordinary income equal to the fair market value of the underlying shares of our Class A or Class C Stock, as applicable, on the exercise date minus the exercise price. Any gain or loss upon the disposition of the stock received upon exercise will be a capital gain or loss to the person.

*Incentive Stock Options.* No taxable income is reportable when an incentive stock option is granted or exercised (except for persons who are subject to the alternative minimum tax, who may be required to recognize income in the year in which the incentive stock option is exercised). If the person exercises the incentive stock option and then sells the underlying shares of our Class A Stock or Class C Stock, as applicable, more than two years after the grant date and more than one year after the exercise date, the sale price minus the exercise price will be taxed as capital



Table of Contents

gain or loss. If the person exercises the incentive stock option and sells the shares before the end of the two- or one-year holding periods, then the person generally will have ordinary income at the time of the sale equal to the fair market value of the shares of our Class A Stock or Class C Stock, as applicable, on the exercise date (or the sale price, if less) minus the exercise price of the incentive stock option, and any additional gain on the sale will be treated as capital gain.

*Restricted Stock and Restricted Stock Units.* A person receiving restricted stock or restricted stock units generally will have taxable income at vesting or settlement of the award equal to the fair market value of the stock or the value of any cash (with respect to restricted stock units) delivered at that time. However, if the person timely elects under Code Section 83(b) to be taxed at grant on his or her restricted stock award, the person will have ordinary income at the time of grant equal to the fair market value on the grant date of the shares of our Class A Stock or Class C Stock, as applicable, received.

*Unrestricted Stock and Unrestricted Stock Units.* A person receiving an unrestricted stock or unrestricted stock unit award will have taxable income when the shares underlying the award are delivered equal to the fair market value of the shares on the delivery date.

*Tax Effect for Our Company.* We generally will receive a tax deduction for any ordinary income recognized by a person with respect to an award under the Amended 2005 Plan (for example, upon the vesting of a restricted stock unit or the exercise of a non-qualified stock option). In the case of incentive stock options that meet the holding period requirements described above, the person will not recognize ordinary income; therefore, we will not receive a deduction. Our deduction may also be limited by Internal Revenue Code Section 280G or Section 162(m).

Section 162(m) generally provides that a publicly traded corporation may not deduct compensation in excess of $1.0 million per year paid to the company's "covered employees." "Covered employee" includes (a) any individual who at any time during the taxable year is either our principal executive officer or principal financial officer, or an employee whose total compensation for the tax year is required to be reported to our shareholders because he or she is among the three highest compensated officers for the tax year (other than the principal executive officer or principal financial officer), and (b) any person who was a covered employee at any time after December 31, 2016. However, certain awards that qualified as "performance based compensation" under Section 162(m) were not subject to such $1.0 million limitation. The performance based compensation exception was eliminated by the Tax Act with respect to tax years beginning January 1, 2018; however, under a transition rule, compensation payable pursuant to a written binding contract that was in effect on November 2, 2017 and which is not materially modified after such date may still qualify for the performance based compensation exception. To the extent applicable to our existing contracts and awards, the Human Capital and Compensation Committee may avail itself of this transition rule. However, because of uncertainties as to the application and interpretation of the transition rule, no assurances can be given at this time that our existing contracts and awards, even if in place on November 2, 2017, will meet the requirements of the transition rule.

While the Human Capital and Compensation Committee is mindful of the benefit to our performance of full deductibility of compensation, the Human Capital and Compensation Committee believes that it should not be constrained by the requirements of Section 162(m) of the Code where those requirements would impair flexibility in compensating our executive officers in a manner that can best promote our corporate objectives and support our compensation philosophy. The Human Capital and Compensation Committee intends to continue to compensate our executive officers in a manner consistent with the best interests of the company and our shareholders.

78



Table of Contents

Section 409A of the Code imposes restrictions on nonqualified deferred compensation. Failure to satisfy these rules results in accelerated taxation, an additional tax to the holder of the amount equal to 20% of the deferred amount, and a possible interest charge. While certain awards under the Amended 2005 Plan could be subject to Section 409A of the Code, awards under the Amended 2005 Plan are intended to be exempt from, or to comply with, the requirements of Section 409A of the Code.

Approval of Proposal 4 requires the affirmative "FOR" vote of the holders of a majority of the votes cast on the proposal at the Annual Meeting.

**The Board of Directors recommends that you vote "FOR" approval of the Amended 2005 Plan.**

79

**UNDER ARMOUR.**

**Table of Contents**

# INDEPENDENT AUDITORS

The Audit Committee has selected PricewaterhouseCoopers LLP, or PwC, to continue as our independent registered public accounting firm for the fiscal year ending March 31, 2024. Representatives of PwC are expected to attend the Annual Meeting virtually. They will have an opportunity to make a statement if they so desire and they will respond to appropriate questions from stockholders.

## Fees

The fees billed by PwC for fiscal year 2023, the transition period, and fiscal year 2021 for services rendered to Under Armour were as follows:

|  | Fiscal Year 2023 (April 1, 2022 - March 31, 2023) | | Transition Period (January 1, 2022 - March 31, 2022) | | Fiscal Year 2021 (January 1, 2021 - December 31, 2021) | |
|---|---|---|---|---|---|---|
| Audit Fees | $ | 2,792,100 | $ | 554,000 | $ | 2,638,792 |
| Audit-Related Fees | | 26,800 | | 2,700 | | 7,360 |
| Tax Fees | | 1,060,424 | | 150,000 | | 861,000 |
| All Other Fees | | 6,650 | | — | | 7,000 |

**Audit Fees**

Audit fees are for the audit of our annual consolidated financial statements and our internal control over financial reporting, reviews of our quarterly financial statements and services normally provided by the independent registered public accounting firm in connection with statutory and regulatory filings or engagements.

**Audit-Related Fees**

When paid, audit-related fees are generally for assurance and related services that are reasonably related to the performance of the audit or review of our consolidated financial statements and are not included under "Audit Fees" above. For fiscal year 2023, audit-related fees were primarily related to assistance with the company's shelf registration statement, tax audit procedures and financial statement preparation related to certain of the company's subsidiaries. For the transition period and fiscal year 2021, audit-related fees were primarily related to assistance with financial statement preparation related to certain of the company's subsidiaries.

**Tax Fees**

When paid, tax fees are generally for tax planning and tax advice. For fiscal year 2023 and the transition period, tax fees primarily included assistance with transfer pricing and consulting services in connection with our corporate structure. For fiscal year 2021, tax fees primarily included assistance with transfer pricing, consulting services in connection with our corporate structure and customs services.

**All Other Fees**

All other fees relate to a subscription to an accounting research tool.

## Pre-Approval Policies and Procedures

As set forth in the Audit Committee's Charter, the Audit Committee approves in advance all services to be performed by our independent registered public accounting firm, including all audit and permissible non-audit services. The committee has adopted a written policy for such approvals. The policy requires that the committee specifically pre-approve the terms of the annual audit services



Table of Contents

engagement and may pre-approve, for up to one year in advance, particular types of permissible audit-related, tax and other non-audit services. The policy also provides that the services shall be described in sufficient detail as to the scope of services, fee and fee structure, and the impact on auditor independence. The policy states that, in exercising its pre-approval authority, the committee may consider whether the independent registered public accounting firm is best positioned to provide the most effective and efficient service, for reasons such as familiarity with our business, people, culture, accounting systems, risk profiles and other factors, and whether the service might enhance our ability to manage or control risk or improve audit quality. The policy also provides that the committee be mindful of the relationship between fees for audit and non-audit services. Under the policy, the committee may delegate pre-approval authority to one or more of its members and any pre-approval decisions will be reported to the full committee at its next scheduled meeting. The committee has delegated this pre-approval authority to the Chair of the committee.

81

**UNDER ARMOUR.**

**Table of Contents**

# AUDIT COMMITTEE REPORT

The primary role of the Audit Committee is oversight of matters relating to accounting, internal control, auditing, financial reporting, risk and legal and regulatory compliance. The Audit Committee oversees the audit and other services of our independent registered public accounting firm and is directly responsible for the appointment, independence, qualifications, compensation and oversight of the independent registered public accounting firm, which reports directly to the Audit Committee. Our management is responsible for the financial reporting process and preparation of quarterly and annual consolidated financial statements. Our independent registered public accounting firm is responsible for conducting audits and reviews of our consolidated financial statements and audits of our internal control over financial reporting.

The Audit Committee has reviewed and discussed our fiscal year 2023 audited consolidated financial statements with management and with our independent registered public accounting firm. The Audit Committee also has discussed with the independent registered public accounting firm the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB") and the SEC.

The Audit Committee also has received the written disclosures and the letter from our independent registered public accounting firm required by applicable requirements of the PCAOB regarding the independent registered public accounting firm's communications with the Audit Committee concerning independence, and has discussed with the independent registered public accounting firm its independence.

Based on the review and discussions referred to above and subject to the limitations on its role and responsibilities, the Audit Committee recommended to the Board that the fiscal year 2023 audited consolidated financial statements be included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2023 to be filed with the SEC. The Board of Directors approved this recommendation.

Douglas E. Coltharp, Chair
Mohamed A. El-Erian
David W. Gibbs

82



**Table of Contents**

# RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

**(PROPOSAL 5)**

Under the rules and regulations of the SEC, the Audit Committee is directly responsible for the appointment of our independent registered public accounting firm. The Audit Committee has appointed PricewaterhouseCoopers LLP, or PwC, as our independent registered public accounting firm to audit our consolidated financial statements and our internal control over financial reporting for the fiscal year ending March 31, 2024. PwC has served as our independent auditors since 2003. The services provided to us by PwC, along with the corresponding fees for fiscal year 2023, the transition period and fiscal year 2021, are described under the caption "Independent Auditors" in this Proxy Statement.

Stockholder ratification of the appointment of the independent registered public accounting firm is not required. We are asking stockholders to ratify the appointment because we believe it is a sound corporate governance practice. If our stockholders do not ratify the selection, the Audit Committee will consider whether or not to retain PwC, but may still retain them.

The ratification of the appointment of the independent registered public accounting firm requires the affirmative vote of a majority of the votes cast at the Annual Meeting.

**The Board of Directors recommends that you vote "FOR" the ratification of the appointment of PricewaterhouseCoopers LLP as our independent registered public accounting firm for the fiscal year ending March 31, 2024.**

83




**Table of Contents**

# STOCKHOLDER PROPOSALS

Our current Bylaws provide that in order for a stockholder to nominate a candidate for election as a director at our 2024 Annual Meeting, or for a stockholder to propose business for consideration at that meeting, written notice complying with the requirements set forth in our Bylaws generally must be delivered to the Secretary of Under Armour, Inc., at the company's principal executive office, not less than 120 days and no more than 150 days prior to the first anniversary of the date of mailing the notice for the preceding year's annual meeting. Therefore, a stockholder nomination or proposal intended to be considered at the 2024 Annual Meeting must be received by the Secretary after February 1, 2024, and no later than March 2, 2024.

In order for a stockholder to give timely notice for nominations for directors for inclusion on a universal proxy card in connection with our 2024 Annual Meeting, notice must be submitted by the same deadline as specified under the advance notice provisions of our Bylaws, and the stockholder must otherwise comply with Rule 14a-19(b) of the Exchange Act.

If a stockholder wishes to have their proposal considered for inclusion in the 2024 Proxy Statement pursuant to SEC Rule 14a-8, the Secretary of Under Armour, Inc. must receive it no later than March 2, 2024.

However, if we delay or advance mailing notice of the 2024 Annual Meeting of Stockholders by more than 30 days from the date of the first anniversary of the 2023 notice mailing, then such stockholder notice of nomination or proposal must be delivered to the Secretary of Under Armour not less than 120 days nor more than 150 days prior to the date of mailing of the notice for the 2024 Annual Meeting (or by the tenth day following the day on which we disclose the mailing date of notice for the 2024 Annual Meeting, if that date is later).

Stockholder proposals and director nominations to be included in our Proxy Statement must comply with our Bylaws, as well as applicable SEC rules (including SEC Rule 14a-8; see also Staff Legal Bulletin 14, which may be found at www.sec.gov).

84



**Table of Contents**

*Appendix A*

# UNDER ARMOUR, INC. FOURTH AMENDED AND RESTATED 2005 OMNIBUS LONG-TERM INCENTIVE PLAN (SHOWING CHANGES FROM CURRENT PLAN)

**UNDER ARMOUR, INC.**

**~~THIRD~~FOURTH AMENDED AND RESTATED**

**2005 OMNIBUS LONG-TERM INCENTIVE PLAN**

A-i



Table of Contents

**TABLE OF CONTENTS**

|      |      |      | Page |
|------|------|------|------|
| 1.   | PURPOSE | | A-~~1~~1 |
| 2.   | DEFINITIONS | | A-~~1~~1 |
| 3.   | ADMINISTRATION OF THE PLAN | | A-~~5~~4 |
|      | 3.1. | General | A-~~5~~4 |
|      | 3.2. | No Liability | A-~~6~~5 |
|      | 3.3. | Book Entry | A-~~6~~5 |
| 4.   | STOCK SUBJECT TO THE PLAN | | A-~~6~~5 |
| 5.   | EFFECTIVE DATE, DURATION AND AMENDMENTS | | A-~~7~~6 |
|      | 5.1. | Term | A-~~7~~6 |
|      | 5.2. | Amendment and Termination of the Plan | A-~~7~~6 |
| 6.   | AWARD ELIGIBILITY AND LIMITATIONS | | A-~~7~~6 |
|      | 6.1. | Service Providers and Other Persons | A-~~7~~6 |
|      | 6.2. | Successive Awards | A-6 |
|      | 6.3. | Stand-Alone, Additional, Tandem, and Substitute Awards | A-7 |
|      | 6.4. | Minimum Vesting Period | A-7 |
| 7.   | AWARD AGREEMENT | | A-7 |
| 8.   | TERMS AND CONDITIONS OF OPTIONS | | A-7 |
|      | 8.1. | Option Price | A-7 |
|      | 8.2. | Vesting | A-7 |
|      | 8.3. | Term | A-7 |
|      | 8.4. | Termination of Service | A-8 |
|      | 8.5. | Method of Exercise | A-8 |
|      | 8.6. | Rights of Holders of Options | A-8 |
|      | 8.7. | Delivery of Stock Certificates | A-8 |
|      | 8.8. | Transferability of Options | A-8 |
|      | 8.9. | Family Transfers | A-9 |
|      | 8.10. | Limitations on Incentive Stock Options | A-9 |
| 9.   | TERMS AND CONDITIONS OF STOCK APPRECIATION RIGHTS | | A-9 |
|      | 9.1. | Right to Payment | A-9 |
|      | 9.2. | Other Terms | A-9 |
| 10.  | TERMS AND CONDITIONS OF RESTRICTED STOCK AND RESTRICTED STOCK UNITS | | A-10 |
|      | 10.1. | Restrictions. | A-10 |
|      | 10.2. | Restricted Stock Certificates | A-10 |
|      | 10.3. | Rights of Holders of Restricted Stock | A-10 |

A-ii



**Table of Contents**

|  |  |  |  | Page |
|---|---|---|---|---|
| | 10.4. | Rights of Holders of Restricted Stock Units | | A-10 |
| | | 10.4.1. | Settlement of Restricted Stock Units | A-10 |
| | | 10.4.2. | Voting and Dividend Rights | A-10 |
| | | 10.4.3. | Creditor's Rights | A-11 |
| | 10.5. | Termination of Service | | A-11 |
| | 10.6. | Consideration | | A-11 |
| | 10.7. | Delivery of Stock | | A-11 |
| 11. | TERMS AND CONDITIONS OF UNRESTRICTED STOCK AWARDS | | | A-11 |
| 12. | FORM OF PAYMENT FOR AWARDS | | | A-11 |
| | 12.1. | General Rule | | A-11 |
| | 12.2. | Surrender of Stock | | A-11 |
| | 12.3. | Cashless Exercise | | A-12 |
| | 12.4. | Net Exercise | | A-12 |
| | 12.5. | Other Forms of Payment | | A-12 |
| 13. | TERMS AND CONDITIONS OF DIVIDEND EQUIVALENT RIGHTS | | | A-12 |
| | 13.1. | Dividend Equivalent Rights | | A-12 |
| | 13.2. | Termination of Service | | A-~~15~~12 |
| 14. | REQUIREMENTS OF LAW | | | A-~~15~~13 |
| | 14.1. | General | | A-~~15~~13 |
| | 14.2. | Rule 16b-3 | | A-13 |
| 15. | EFFECT OF CHANGES IN CAPITALIZATION | | | A-13 |
| | 15.1. | Changes in Stock | | A-13 |
| | 15.2. | Definition of Change in Control | | A-14 |
| | 15.3. | Effect of Change in Control | | A-15 |
| | 15.4. | Reorganization, Merger or Consolidation | | A-~~18~~15 |
| | 15.5. | Adjustments | | A-16 |
| | 15.6. | No Limitations on Company | | A-16 |
| 16. | GENERAL PROVISIONS | | | A-16 |
| | 16.1. | Disclaimer of Rights | | A-16 |
| | 16.2. | Nonexclusivity of the Plan | | A-17 |
| | 16.3. | Withholding Taxes | | A-17 |
| | 16.4. | Captions | | A-17 |
| | 16.5. | Other Provisions | | A-17 |
| | 16.6. | Number and Gender | | A-17 |
| | 16.7. | Severability | | A-17 |
| | 16.8. | Governing Law | | A-17 |
| | 16.9. | ~~Clawback Events~~Company Policies | | A-~~21~~18 |

UNDER ARMOUR.

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| 16.10. | Beneficiary Designation | | A-18 |
| 16.11. | Section 409A | | A-18 |
| 16.12. | Establishment of Sub-Plans | | A-19 |
| 17. | TERMS AND CONDITIONS OF PERFORMANCE AWARDS | | A-19 |
| 17.1. | Performance Awards | | A-19 |
| 17.2. | [RESERVED] | | A-19 |
| 17.3. | Performance Awards Qualifying as Performance-Based Compensation | | A-19 |
| | 17.3.1. | Performance Goals Generally | A-19 |
| | 17.3.2. | Business Criteria | A-20 |
| | 17.3.3. | Timing for Establishing Performance Goals | A-20 |
| | 17.3.4. | Adjustment of Performance-Based Compensation | A-20 |
| | 17.3.5. | Settlement of Performance Awards; Other Terms | A-20 |
| | 17.3.6. | Committee Certification | A-20 |
| | 17.3.7. | Annual Share Limits | A-21 |
| 17.4. | Written Determinations | | A-21 |
| 17.5. | Status of Section 17.3 Awards Under Section 162(m) of the Code | | A-2521 |

A-iv

**UNDER ARMOUR.**

**Table of Contents**

**UNDER ARMOUR, INC.**

~~THIRD~~FOURTH **AMENDED AND RESTATED**

**2005 OMNIBUS LONG-TERM INCENTIVE PLAN**

Under Armour, Inc., a Maryland corporation (the "Company"), sets forth herein the terms of its ~~Third~~Fourth Amended and Restated 2005 Omnibus Long-Term Incentive Plan (the "Plan"). Subject to shareholder approval, the Plan, as herein amended and restated, will become effective as of ~~March 22, 2019~~June 13, 2023 (the "Effective Date").

**1.    PURPOSE**

The Plan is intended to enhance the Company's and its Affiliates' (as defined herein) ability to attract and retain highly qualified officers, directors, key employees, and other persons, and to motivate such officers, directors, key employees, and other persons to serve the Company and its Affiliates and to expend maximum effort to improve the business results and earnings of the Company, by providing to such persons an opportunity to acquire or increase a direct proprietary interest in the operations and future success of the Company. To this end, the Plan provides for the grant of stock options, stock appreciation rights, restricted stock, restricted stock units, unrestricted stock and dividend equivalent rights. Any of these awards may, but need not, be made as performance incentives to reward attainment of annual or long-term performance goals in accordance with the terms hereof. Stock options granted under the Plan may be non-qualified stock options or incentive stock options, as provided herein.

**2.    DEFINITIONS**

For purposes of interpreting the Plan and related documents (including Award Agreements), the following definitions shall apply:

2.1    ""**Affiliate**" means any company or other trade or business that "controls," is "controlled by" or is "under common control" with the Company within the meaning of Rule 405 of Regulation C under the Securities Act, including, without limitation, any Subsidiary.

2.2    "**Award**" means a grant of an Option, Stock Appreciation Right, Restricted Stock, Restricted Stock Unit, Unrestricted Stock, or Dividend Equivalent Rights under the Plan.

2.3    "**Award Agreement**" means the written agreement between the Company and a Grantee that evidences and sets out the terms and conditions of an Award.

2.4    "**Board**" means the Board of Directors of the Company.

2.5    "**Cause**" means, unless otherwise provided in an Award Agreement, the occurrence of any of the following: (i) the Grantee's material misconduct or neglect in the performance of his or her duties; (ii) the Grantee's commission of any felony, offense punishable by imprisonment in a state or federal penitentiary, any offense, civil or criminal, involving material dishonesty, fraud, moral turpitude or immoral conduct or any crime of sufficient import to potentially discredit or adversely affect the Company's ability to conduct its business in the normal course; (iii) the Grantee's material breach of the Company's written Code of Conduct, as in effect from time to time; (iv) the Grantee's commission of any act that results in severe harm to the Company, excluding any act taken by the Grantee in good faith that he or she reasonably believed was in the best interests of the Company; or (v) the Grantee's material breach of any employee confidentiality, non-competition, non-solicitation by and between the Grantee and the Company. However, none of the foregoing events or conditions will constitute Cause unless the Company provides the Grantee with written notice of the event or condition and thirty (30) days to cure such event or condition (if curable) and the event or condition is not cured within such 30-day period.

A-1



**Table of Contents**

~~2.5~~2.6    "**Change in Control**" shall have the meaning set forth in **Section 15.2.**

~~2.6~~2.7    "**Class A Shares**" means the class A common stock, par value $.0003 1/3 per share, of the Company.

~~2.7~~2.8    "**Class C Shares**" means the class C common stock, par value $.0003 1/3 per share, of the Company.

~~2.8~~2.9    "**Code**" means the Internal Revenue Code of 1986, as now in effect or as hereafter amended.

~~2.9~~2.10    "**Committee**" means a committee of the Board comprised of at least two (2) members appointed by the Board. Each Committee member shall be a "non-employee director" within the meaning of the exemption under Rule 16b-3 of the Exchange Act; provided that with respect to any Award intended to qualify as "performance-based compensation" within the meaning of Section 162(m) of the Code, as amended by the Tax Cuts and Jobs Act, that is provided pursuant to a written binding contract which was in effect on November 2, 2017, and which was not modified in any material respect on or after such date, then each Committee member shall also be an "outside director" within the meaning of Section 162(m) of the Code.

~~2.10~~2.11    "**Company**" means Under Armour, Inc., a Maryland corporation, or any successor corporation.

~~2.11~~2.12    "**Disability**" means, unless otherwise stated in the applicable Award Agreement, a physical or mental condition of the Grantee with respect to which the Grantee is eligible for benefits under a long-term disability plan sponsored by the Company or an Affiliate or would be eligible if the Grantee had purchased coverage under such long-term disability plan; <u>provided</u>, <u>however</u>, that, with respect to rules regarding expiration of an Incentive Stock Option following termination of the Grantee's Service, Disability shall mean the Grantee is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than <u>twelve (12)</u> months.

~~2.12~~2.13    "**Dividend Equivalent Right**" means a right, granted to a Grantee under **Section 13** hereof, to receive cash, Stock~~, other Awards~~ or ~~other property~~<u>a combination thereof</u> equal in value to dividends paid with respect to a specified number of shares of Stock, or other periodic payments.

~~2.13~~2.14    [RESERVED]

~~2.14~~2.15    "**Exchange Act**" means the Securities Exchange Act of 1934, as now in effect or as hereafter amended.

~~2.15~~2.16    "**Fair Market Value**" means the value of a share of Stock, determined as follows: if on the grant date the Stock is listed on an established national or regional stock exchange, is admitted to quotation on The Nasdaq Stock Market, Inc. or is publicly traded on an established securities market, the Fair Market Value of a share of Stock shall be the closing price of the Stock on such exchange or in such market (if there is more than one such exchange or market, the Committee shall determine the appropriate exchange or market) on the grant date (or if there is no such reported closing price, the Fair Market Value shall be the mean between the highest bid and lowest asked prices or between the high and low sale prices on such trading day) or, if no sale of Stock is reported for such trading day, on the next preceding day on which any sale shall have been reported. If the Stock is not listed on such an exchange, quoted on such system or traded on such a market, Fair Market Value shall be the value of the Stock as determined by the Committee in good faith using a reasonable valuation method in accordance with Section 409A <u>and Section 422 </u>of the Code <u>if and to the extent applicable</u>.



**Table of Contents**

2.162.17     "**Family Member**" means a person who is a spouse, former spouse, child, stepchild, grandchild, parent, stepparent, grandparent, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother, sister, brother-in-law, or sister-in-law, including adoptive relationships, of the applicable individual, any person sharing the applicable individual's household (other than a tenant or employee), a trust in which any one or more of these persons have more than fifty percent (50%) of the beneficial interest, a foundation in which any one or more of these persons (or the applicable individual) control the management of assets, and any other entity in which one or more of these persons (or the applicable individual) own more than fifty percent (50%) of the voting interests.

2.172.18     "**Grantee**" means a person who receives or holds an Award under the Plan.

2.182.19     "**Incentive Stock Option**" means an "incentive stock option" within the meaning of Section 422 of the Code, or the corresponding provision of any subsequently enacted tax statute, as amended from time to time.

2.192.20     "**Non-qualified Stock Option**" means an Option that is not an Incentive Stock Option.

2.202.21     "**Option**" means an option to purchase one or more shares of Stock pursuant to the Plan.

2.212.22     "**Option Price**" means the exercise price for each share of Stock subject to an Option.

2.222.23     "**Plan**" means this ~~Third~~Fourth Amended and Restated Under Armour, Inc. 2005 Omnibus Long-Term Incentive Plan, as may be amended from time to time.

2.232.24     "**Purchase Price**" means the purchase price for each share of Stock pursuant to a grant of Restricted Stock or Unrestricted Stock.

2.25     -"**Prior Plan**" means the Third Amended and Restated 2005 Omnibus Long-Term Incentive Plan, effective March 22, 2019.

2.242.26     "**Restricted Stock**" means shares of Stock, awarded to a Grantee pursuant to **Section 10** hereof.

2.252.27     "**Restricted Stock Unit**" means a bookkeeping entry representing the equivalent of shares of Stock, awarded to a Grantee pursuant to **Section 10** hereof.

2.262.28     "**SAR Exercise Price**" means the per share exercise price of an SAR granted to a Grantee under **Section 9** hereof.

2.272.29     "**Section 409A**" shall mean Section 409A of the Code and the regulations and other binding guidance promulgated thereunder.

2.282.30     "**Securities Act**" means the Securities Act of 1933, as now in effect or as hereafter amended.

2.292.31     "**Service**" means service as a Service Provider to the Company or an Affiliate. Unless otherwise stated in the applicable Award Agreement, a Grantee's change in position or duties shall not result in interrupted or terminated Service, so long as such Grantee continues to be a Service Provider to the Company or an Affiliate; provided, however, if any Award governed by Section 409A is to be distributed on a termination of Service, then Service shall be terminated when the Grantee has a "separation from service" within the meaning of Section 409A. ~~Subject to the preceding sentence~~A Service Provider shall be deemed to incur a termination of Service if the Affiliate to which the Service Provider provides Services ceases to be an Affiliate of the Company. Subject to Section 409A, whether a termination of Service shall have occurred for purposes of the Plan shall be determined by the Committee, which determination shall be final, binding and conclusive.

A-3



Table of Contents

~~2.30~~2.32   "**Service Provider**" means an employee, officer or director of the Company or an Affiliate, or a consultant or adviser currently providing services to the Company or an Affiliate.

~~2.31~~2.33   "**Stock**" means, as applicable with respect to any Award, either Class A Shares or Class C Shares as designated in the applicable Award Agreement.

~~2.32~~2.34   "**Stock Appreciation Right**" or "**SAR**" means a right granted to a Grantee under **Section 9** hereof.

~~2.33~~2.35   "**Subsidiary**" means any "subsidiary corporation" of the Company within the meaning of Section 424(f) of the Code.

~~2.34~~2.36   "**Termination Date**" means the date upon which an Option shall terminate or expire, as set forth in **Section 8.3** hereof.

~~2.35~~2.37   "**Ten Percent Stockholder**" means an individual who owns more than ten percent (10%) of the total combined voting power of all classes of outstanding stock of the Company, its parent or any of its Subsidiaries. In determining stock ownership, the attribution rules of Section 424(d) of the Code shall be applied.

~~2.36~~2.38   "**Unrestricted Stock**" means an Award pursuant to **Section 11** hereof.

**3.    ADMINISTRATION OF THE PLAN**

**3.1.    General.**

The Committee shall have such powers and authorities related to the administration of the Plan as are consistent with the Company's certificate of incorporation and bylaws and applicable law. The Committee shall have full power and authority to take all actions and to make all determinations required or provided for under the Plan, any Award or any Award Agreement, and shall have full power and authority to take all such other actions and make all such other determinations not inconsistent with the specific terms and provisions of the Plan that the Committee deems to be necessary or appropriate to the administration of the Plan. The interpretation and construction by the Committee of any provision of the Plan, any Award or any Award Agreement shall be final, binding and conclusive. Without limitation, the Committee shall have full and final authority, subject to the other terms and conditions of the Plan, to:

(i)    designate Grantees,

(ii)    determine the type or types of Awards to be made to a Grantee,

(iii)    determine the number of shares of Stock and class of Stock to be subject to an Award,

(iv)    establish the terms and conditions of each Award (including, but not limited to, the Option Price of any Option, the SAR Exercise Price of any SAR, the nature and duration of any restriction or condition (or provision for lapse thereof) relating to the vesting, exercise, transfer, or forfeiture of an Award or the shares of Stock subject thereto, and any terms or conditions that may be necessary to qualify Options as Incentive Stock Options),

(v)    prescribe the form of each Award Agreement, ~~and~~

(vi)    amend, modify, waive or supplement the terms of any outstanding Award, including the authority, in order to effectuate the purposes of the Plan, to modify Awards to foreign nationals or

A-4



**Table of Contents**

individuals who are employed outside the United States to recognize differences in local law, tax policy, or custom~~.~~, and

(vii)     <u>prescribe forms, rules and procedures relating to the Plan and Awards and to otherwise do all things necessary or desirable to carry out the purposes of the Plan or any Award.</u>

<u>The determinations of the Committee under the Plan need not be uniform and may be made selectively among persons who are eligible to receive, or actually receive, Awards. Without limiting the generality of the foregoing, the Committee shall be entitled to make non-uniform and selective determinations, amendments and adjustments, and to enter into non-uniform and selective Award Agreements.</u>

Notwithstanding the foregoing, no amendment or modification may be made to an outstanding Option or SAR that (i) causes the Option or SAR to become subject to Section 409A, or (ii) without the approval of the stockholders of the Company, (a) reduces the Option Price or SAR Exercise Price, either by lowering the Option Price or SAR Exercise Price or by canceling the outstanding Option or SAR and granting a replacement Option or SAR with a lower Option Price or SAR Exercise Price, (b) would be treated as a re-pricing under the rules of The New York Stock Exchange or the otherwise applicable stock exchange, or (c) provides for the cash repurchase of Options or SARs when the Fair Market Value of a share of Stock is lower than the Option Price of such Option or the SAR Exercise Price of such SAR; provided, that, appropriate adjustments may be made to outstanding Options and SARs pursuant to **Section 15**.

### 3.2.    No Liability.

No member of the Board or of the Committee shall be liable for any action or determination made in good faith with respect to the Plan, any Award or Award Agreement.

### 3.3.    Book Entry.

Notwithstanding any other provision of this Plan to the contrary, the Company may elect to satisfy any requirement under this Plan for the delivery of stock certificates through the use of book-entry.

## 4.    STOCK SUBJECT TO THE PLAN

Subject to adjustment as provided in **Section 15**, from and after the Effective Date (a) the maximum number of shares of Class A Shares authorized under the Plan shall be 30,000,000,~~with 9,036,229~~<u>8,319,305</u> available for issuance under the Plan~~,~~ and (b) the maximum number of shares of Class C Shares authorized under the ~~Plan shall be 45~~<u>62</u>,000,000~~, with 25,867,239~~ <u>(such maximum consists of 17,332,195 shares authorized and</u> available for issuance under the <u>Prior Plan.</u> <u>immediately prior to the Effective Date and 17,000,000 additional shares authorized for issuance under the Plan).</u> All such shares of Stock available for issuance under the Plan shall be available for issuance pursuant to Incentive Stock Options. Subject to adjustment as provided in **Section 15** hereof, the maximum number of shares of Stock with respect to which Options or Stock Appreciation Rights may be granted pursuant to the Plan in any calendar year to any one Service Provider or other participant in the Plan shall be 2~~4~~.0 million. Stock issued or to be issued under the Plan shall be authorized but unissued shares; or, to the extent permitted by applicable la~~w~~, issued shares that have been reacquired by the Company.

The Committee may adopt reasonable counting procedures to ensure appropriate counting, avoid double counting (as, for example, in the case of tandem or substitute awards) and make adjustments in accordance with this **Section 4**. Subject to any limitations of the Code, the following shares of Stock subject to an Award shall not reduce the number of shares of Stock available for delivery in connection

A-5



**Table of Contents**

with future Awards under the Plan: (a) any shares of Stock that are subject to any Award which for any reason expires or is terminated, forfeited or canceled without having been fully exercised or satisfied, (b) any Award based on shares of Stock that is settled for cash, expires or otherwise terminates without the issuance of such Stock, and (c) Stock delivered under the Plan in connection with the continuation, assumption or substitution of Options and SARs pursuant to **Section 15.3 or 15.4**. To the extent that the Option Price of any Option granted under the Plan, or if pursuant to **Section 16.3** the withholding obligation of any Grantee with respect to an Option or other Award, is satisfied by tendering shares of Stock to the Company (by either actual delivery or by attestation) or by withholding shares of Stock, such shares of Stock shall be deemed to have been delivered for purposes of the limits set forth in this **Section 4**. Upon the exercise of a SAR, the total number of Shares subject to such exercise shall reduce the number of Shares available for delivery under the Plan.

## 5.    EFFECTIVE DATE, DURATION AND AMENDMENTS

### 5.1.    Term.

The Plan shall be effective as of the Effective Date. No further Awards may be made under the Plan on or after the ten (10) year anniversary of the Effective Date.

### 5.2.    Amendment and Termination of the Plan.

The Board may, at any time and from time to time, amend, suspend, or terminate the Plan as to any Awards which have not been made. An amendment shall be contingent on approval of the Company's stockholders to the extent stated by the Board, required by applicable law or required by applicable stock exchange listing requirements. No Awards shall be made after termination of the Plan. No amendment, suspension, or termination of the Plan shall, without the consent of the Grantee, materially impair rights or obligations under any Award theretofore awarded; underlined, however, that the Board may amend the Plan and the Committee may amend any Award or Award Agreement, either retroactively or prospectively, without the consent of the Grantee, (x) so as to preserve or come within any exemptions from liability under Section 16(b) of the Exchange Act, or (y) if the Board or the Committee determines in its discretion that such amendment either (I) is required or advisable for the Company, the Plan or the Award to satisfy, comply with or meet the requirements of any law, regulation, rule or accounting standard or (II) is not reasonably likely to significantly diminish the benefits provided under such Award, or that such diminishment has been or will be adequately compensated.

## 6.    AWARD ELIGIBILITY AND LIMITATIONS

### 6.1.    Service Providers and Other Persons.

Subject to this **Section 6**, Awards may be made to: (i) any Service Provider, including any Service Provider who is an officer or director of the Company or of any Affiliate, as the Committee shall determine and designate from time to time, and (ii) any other individual whose participation in the Plan is determined to be in the best interests of the Company by the Committee. Notwithstanding the foregoing, Incentive Stock Options may be granted only to employees of the Company or any Subsidiary.

### 6.2.    Successive Awards.

An eligible person may receive more than one Award, subject to such restrictions as are provided herein.

A-6



**Table of Contents**

### 6.3. Stand-Alone, Additional, Tandem, and Substitute Awards.

Awards may, in the discretion of the Committee, be granted either alone or in addition to, in tandem with, or in substitution or exchange for, any other Award or any award granted under another plan of the Company, any Affiliate, or any business entity acquired by the Company or an Affiliate, or any other right of a Grantee to receive payment from the Company or any Affiliate. Such additional, tandem, and substitute or exchange Awards may be granted at any time. If an Award is granted in substitution or exchange for another Award, the Committee shall have the right to require the surrender of such other Award in consideration for the grant of the new Award.

### 6.4. Minimum Vesting Period.

Any Award granted after the Effective Date shall be subject to a minimum vesting period of not less than one year from the date such award is granted; provided, however, that the foregoing minimum vesting period shall not apply in connection with (a) a Change in Control, (b) termination of the Grantee's service due to death or Disability, (c) Awards granted in substitution or exchange for an Award pursuant to **Section 6.3** hereof, so long as such substitute or exchange does not reduce the vesting period of the Award being replaced, (d) Awards granted to non-employee directors of the Company at any annual shareholder meeting which provide that such Awards will vest on the date of the next annual shareholder meeting, or (e) Awards which in the aggregate cover a number of shares of Stock not to exceed five percent (5%) of the total number of shares of Stock available for issuance under the Plan as of the Effective Date, as described in **Section 4** hereof.

## 7.    AWARD AGREEMENT

Each Award shall be evidenced by an Award Agreement, in such form or forms as the Committee shall from time to time determine. Award Agreements granted from time to time or at the same time need not contain similar provisions but shall be consistent with the terms of the Plan. Each Award Agreement evidencing an Award of Options shall specify whether such Options are intended to be Non-qualified Stock Options or Incentive Stock Options, and in the absence of such specification such options shall be deemed Non-qualified Stock Options.

## 8.    TERMS AND CONDITIONS OF OPTIONS

### 8.1.    Option Price.

The Option Price of each Option shall be fixed by the Committee and stated in the related Award Agreement. The Option Price of each Option shall be at least the Fair Market Value on the grant date of a share of Stock; provided, however, that (a) in the event that a Grantee is a Ten Percent Stockholder as of the grant date, the Option Price of an Option granted to such Grantee that is intended to be an Incentive Stock Option shall be not less than one hundred and ten percent (110%) of the Fair Market Value of a share of Stock on the grant date, and (b) with respect to Awards made in substitution for or in exchange for awards made by an entity acquired by the Company or an Affiliate, the Option Price does not need to be at least the Fair Market Value on the grant date.

### 8.2.    Vesting.

Subject to **Section 8.3** hereof, each Option shall become exercisable at such times and under such conditions as shall be determined by the Committee and stated in the Award Agreement. For purposes of this **Section 8.2**, fractional numbers of shares of Stock subject to an Option shall be rounded down to the next nearest whole number.

### 8.3.    Term.

Each Option shall terminate, and all rights to purchase shares of Stock thereunder shall cease, upon the expiration of ten (10) years from the grant date, or under such circumstances and on such

A-7



**Table of Contents**

date prior thereto as is set forth in the Plan or as may be fixed by the Committee and stated in the related Award Agreement (the "Termination Date"); <u>provided</u>, <u>however</u>, that in the event that the Grantee is a Ten Percent Stockholder, an Option granted to such Grantee that is intended to be an Incentive Stock Option at the grant date shall not be exercisable after the expiration of five (5) years from its grant date. An Award Agreement may provide that the period of time over which an Option (other than an Incentive Stock Option) may be exercised shall be automatically extended if on the scheduled expiration date of such Option the Grantee's exercise of such Option would violate an applicable law or the Grantee is subject to a "black-out" period; provided, however, that during such extended exercise period the Option may only be exercised to the extent the Option was exercisable in accordance with its terms immediately prior to such scheduled expiration date; provided further, however, that such extended exercise period shall end not later than thirty (30) days after the exercise of such Option first would no longer violate such law or be subject to such "black-out" period.

### 8.4. Termination of Service.

Each Award Agreement at the grant date shall set forth the extent to which the Grantee shall have the right to exercise the Option following termination of the Grantee's Service. Such provisions shall be determined in the sole discretion of the Committee, need not be uniform among all Options issued, and may reflect distinctions based on the reasons for termination of Service.

### 8.5. Method of Exercise.

An Option that is exercisable may be exercised by the Grantee's delivery to the Company of written notice of exercise on any business day, at the Company's principal office, on the form specified by the Company. Such notice shall specify the number of shares of Stock with respect to which the Option is being exercised and shall be accompanied by payment in full of the Option Price of the shares for which the Option is being exercised plus the amount (if any) of federal and/or other taxes which the Company may, in its judgment, be required to withhold with respect to an Award.

### 8.6. Rights of Holders of Options.

Unless otherwise stated in the related Award Agreement, an individual holding or exercising an Option shall have none of the rights of a stockholder (for example, the right to receive cash or dividend payments or distributions attributable to the subject shares of Stock or to direct the voting of the subject shares of Stock) until the shares of Stock covered thereby are fully paid and issued to ~~him~~the Grantee. Except as provided in **Section 15** hereof, no adjustment shall be made for dividends, distributions or other rights for which the record date is prior to the date of such issuance.

### 8.7. Delivery of Stock Certificates.

Promptly after the exercise of an Option by a Grantee and the payment in full of the Option Price and any applicable tax withholding, such Grantee shall be entitled, subject to **Section 3.3** hereof, to the issuance of a stock certificate or certificates evidencing his or her ownership of the shares of Stock subject to the Option.

### 8.8. Transferability of Options.

Except as provided in **Section 8.9**, during the lifetime of a Grantee, only the Grantee (or, in the event of legal incapacity or incompetence, the Grantee's guardian or legal representative) may exercise an Option. Except as provided in **Section 8.9**, no Option shall be assignable or transferable by the Grantee to whom it is granted, other than by will or the laws of descent and distribution.

A-8



Table of Contents

**8.9.    Family Transfers.**

If authorized in the applicable Award Agreement, a Grantee may transfer, not for value, all or part of an Option which is not an Incentive Stock Option to any Family Member. For the purpose of this **Section 8.9**, a "not for value" transfer is a transfer which is (i) a gift, (ii) a transfer under a domestic relations order in settlement of marital property rights, or (iii) a transfer to an entity in which more than fifty percent (50%) of the voting interests are owned by Family Members (or the Grantee) in exchange for an interest in that entity. Following a transfer under this **Section 8.9**, any such Option shall continue to be subject to the same terms and conditions as were applicable immediately prior to transfer. Subsequent transfers of transferred Options are prohibited except to Family Members of the original Grantee in accordance with this **Section 8.9** or by will or the laws of descent and distribution. Notwithstanding the foregoing, the Committee may also provide that Options may be transferred to persons other than Family Members. The events of termination of Service of **Section 8.4** hereof shall continue to be applied with respect to the original Grantee, following which the Option shall be exercisable by the transferee only to the extent, and for the periods specified, in **Section 8.4**.

**8.10.    Limitations on Incentive Stock Options.**

An Option shall constitute an Incentive Stock Option only (i) if the Grantee of such Option is an employee of the Company or any Subsidiary of the Company; (ii) to the extent specifically provided in the related Award Agreement; and (iii) to the extent that the aggregate Fair Market Value (determined at the time the Option is granted) of the shares of Stock with respect to which all Incentive Stock Options held by such Grantee become exercisable for the first time during any calendar year (under the Plan and all other plans of the Grantee's employer and its Affiliates) does not exceed $100,000. This limitation shall be applied by taking Options into account in the order in which they were granted.

## 9.    TERMS AND CONDITIONS OF STOCK APPRECIATION RIGHTS

**9.1.    Right to Payment.**

An SAR shall confer on the Grantee a right to receive, upon exercise thereof, the excess of (A) the Fair Market Value of one share of Stock on the date of exercise over (B) the SAR Exercise Price, as determined by the Committee. The Award Agreement for an SAR shall specify the SAR Exercise Price, which ~~may be fixed at the Fair Market Value of a share of Stock on the grant date or may vary in accordance with a predetermined formula while the SAR is outstanding; provided that the SAR Exercise Price~~ may not be less than the Fair Market Value of a share of Stock on the grant date, except with respect to Awards made in substitution for or in exchange for awards made by an entity acquired by the Company or an Affiliate, in which case the SAR Exercise Price does not need to be at least the Fair Market Value on the grant date. SARs may be granted alone or in conjunction with all or part of an Option or at any subsequent time during the term of such Option or in conjunction with all or part of any other Award. An SAR granted in tandem with an outstanding Option following the grant date of such Option may have a SAR Exercise Price that is equal to the Option Price; <u>provided</u>, <u>however</u>, that the SAR Exercise Price may not be less than the Fair Market Value of a share of Stock on the grant date of the SAR.

**9.2.    Other Terms.**

The Committee shall determine at the grant date ~~or thereafter~~<u>as set forth in an Award Agreement</u>, the time or times at which and the circumstances under which an SAR may be exercised in whole or in part (including based on achievement of performance goals and/or future service requirements), the time or times at which SARs shall cease to be or become exercisable following termination of Service or upon other conditions, the method of exercise, method of settlement, form of consideration payable in settlement, method by or forms in which Stock will be delivered or deemed to be delivered to Grantees, whether or not an SAR shall be in tandem or in combination with any other Award, and any other terms and conditions of any SAR.

A-9



**Table of Contents**

**10.   TERMS AND CONDITIONS OF RESTRICTED STOCK AND RESTRICTED STOCK UNITS**

**10.1.   Restrictions.**

At the time of grant, the Committee may, in its sole discretion, establish a period of time (a "restricted period") and any additional restrictions including the satisfaction of corporate or individual performance objectives applicable to an Award of Restricted Stock or Restricted Stock Units. Each Award of Restricted Stock or Restricted Stock Units may be subject to a different restricted period and additional restrictions. Neither Restricted Stock nor Restricted Stock Units may be sold, transferred, assigned, pledged or otherwise encumbered or disposed of during the restricted period or prior to the satisfaction of any other applicable restrictions.

**10.2.   Restricted Stock Certificates.**

The Company shall issue, in the name of each Grantee to whom Restricted Stock has been granted, stock certificates or other evidence of ownership, subject to **Section 3.3** hereof, representing the total number of shares of Restricted Stock granted to the Grantee, as soon as reasonably practicable after the grant date. The Committee may provide in an Award Agreement that either (i) the Secretary of the Company shall hold such certificates for the Grantee's benefit until such time as the Restricted Stock is forfeited to the Company or the restrictions lapse, or (ii) such certificates shall be delivered to the Grantee, provided, however, that such certificates shall bear a legend or legends that comply with the applicable securities laws and regulations and makes appropriate reference to the restrictions imposed under the Plan and the Award Agreement.

**10.3.   Rights of Holders of Restricted Stock.**

Unless the Committee otherwise provides in an Award Agreement, holders of Restricted Stock shall have the right to vote such Stock and the right to receive any dividends declared or paid with respect to such Stock~~:~~; provided, however, that any dividends shall be subject to the same restrictions that apply to the underlying Restricted Stock and paid to the Grantee (without interest) in accordance with the terms of the underlying Restricted Stock (if not forfeited). ~~The Committee may provide that any dividends paid on Restricted Stock must be reinvested in shares of Stock, which may or may not be subject to the same restrictions applicable to such Restricted Stock.~~ All distributions, if any, received by a Grantee with respect to Restricted Stock as a result of any stock split, stock dividend, combination of shares, or other similar transaction shall be subject to the restrictions applicable to the original Award.

**10.4.   Rights of Holders of Restricted Stock Units.**

**10.4.1.   Settlement of Restricted Stock Units.**

Restricted Stock Units may be settled in cash or Stock, as determined by the Committee and set forth in the Award Agreement.

**10.4.2.   Voting~~and~~ Dividend Rights.**

Holders of Restricted Stock Units shall have no rights as stockholders of the Company~~.~~, including any voting rights, with respect to shares of Stock represented by the Restricted Stock Units until the date of issuance such shares (if settled in shares rather than cash). The Committee may provide in an Award Agreement that the holder of such Restricted Stock Units shall be entitled to receive, upon the Company's payment of a cash dividend on its outstanding Stock, a cash payment for each Restricted Stock Unit held equal to the per-share dividend paid on the Stock, which may be deemed reinvested in additional Restricted Stock Units at a price per unit equal to the Fair Market Value of a share of Stock on the date that such dividend is paid to shareholders. Notwithstanding anything to the contrary, any such dividends shall be subject to the same restrictions that apply to the underlying Restricted Stock

A-10



**Table of Contents**

Units and paid to the Grantee (without interest) in accordance with the terms of the underlying Restricted Stock Units (if not forfeited).

### 10.4.3.  Creditor's Rights.

A holder of Restricted Stock Units shall have no rights other than those of a general creditor of the Company. Restricted Stock Units represent an unfunded and unsecured obligation of the Company, subject to the terms and conditions of the applicable Award Agreement.

### 10.5.  Termination of Service.

Unless the Committee otherwise provides in an Award Agreement or in writing after the Award Agreement is issued, upon the termination of a Grantee's Service, any Restricted Stock or Restricted Stock Units held by such Grantee that have not vested, or with respect to which all applicable restrictions and conditions have not lapsed, shall immediately be deemed forfeited, and the Grantee shall have no further rights with respect to such Award.

### 10.6.  Consideration.

The Committee may grant Restricted Stock or Restricted Stock Units to a Grantee in respect of Services rendered and other valid consideration, or in lieu of, or in addition to, any cash compensation due to such Grantee.

### 10.7.  Delivery of Stock.

Upon the expiration or termination of any restricted period and the satisfaction of any other conditions prescribed by the Committee, the restrictions applicable to shares of Restricted Stock or Restricted Stock Units settled in Stock shall lapse, and, unless otherwise provided in the Award Agreement, subject to **Section 3.3** hereof, a stock certificate for such shares shall be delivered, free of all such restrictions, to the Grantee or the Grantee's beneficiary or estate, as the case may be.

## 11.  TERMS AND CONDITIONS OF UNRESTRICTED STOCK AWARDS

The Committee may, in its sole discretion, grant (or sell at a Purchase Price determined by the Committee) an Award of unrestricted stock or unrestricted stock units to any Grantee pursuant to which such Grantee may receive shares of Stock free of any restrictions ("Unrestricted Stock") under the Plan. Awards of Unrestricted Stock may be granted or sold as described in the preceding sentence in respect of Services rendered and other valid consideration, or in lieu of, or in addition to, any cash compensation due to such Grantee. The provisions of **Section 10.4** shall apply to any awards of unrestricted stock units.

## 12.  FORM OF PAYMENT FOR AWARDS

### 12.1.  General Rule.

Payment of the Option Price for the shares purchased pursuant to the exercise of an Option or the Purchase Price, if any, for Restricted Stock, Restricted Stock Units or Unrestricted Stock, shall be made in cash or in cash equivalents acceptable to the Company, except as provided in this **Section 12**.

### 12.2.  Surrender of Stock.

To the extent the Award Agreement so provides, payment of the Option Price for shares purchased pursuant to the exercise of an Option or the Purchase Price, if any, for Restricted Stock, Restricted Stock Units or Unrestricted Stock may be made all or in part through the tender to the



**Table of Contents**

Company of shares of Stock, which shall be valued, for purposes of determining the extent to which the Option Price or Purchase Price has been paid thereby, at their Fair Market Value on the date of exercise or surrender.

### 12.3.  Cashless Exercise.

To the extent permitted by law and to the extent the Award Agreement so provides, payment of the Option Price may be made all or in part by delivery (on a form acceptable to the Committee) of an irrevocable direction to a licensed securities broker acceptable to the Company to sell shares of Stock and to deliver all or part of the sales proceeds to the Company in payment of the Option Price, and any withholding taxes described in **Section 16.3**, on the date of exercise.

### 12.4.  Net Exercise.

To the extent permitted by law and to the extent the Award Agreement so provides, payment of the Option Price may be made by instructing the Committee to withhold a number of shares of Stock otherwise deliverable to the Grantee pursuant to exercise of the Option having an aggregate Fair Market Value on the date of exercise equal to the aggregate Option Price.

### 12.5.  Other Forms of Payment.

To the extent the Award Agreement so provides, payment of the Option Price or the Purchase Price may be made in any other form that is consistent with applicable laws, regulations and rules.

## 13.  TERMS AND CONDITIONS OF DIVIDEND EQUIVALENT RIGHTS

### 13.1.  Dividend Equivalent Rights.

A Dividend Equivalent Right is an Award entitling the Grantee to receive credits based on cash or stock distributions that would have been paid on the shares of Stock specified in the Dividend Equivalent Right (or other award to which it relates) if such shares had been issued to and held by the Grantee. A Dividend Equivalent Right may be granted hereunder to any Grantee as a component of another ~~award~~Award (other than an Option or SAR) or as a freestanding Award. The terms and conditions of Dividend Equivalent Rights shall be specified in the Award Agreement~~.~~ and established and administered either consistent with an exemption from, or in compliance with, the applicable requirements of Section 409A. Dividend equivalents credited to the holder of a Dividend Equivalent Right may be paid currently or may be deemed to be reinvested in additional shares of Stock, which may thereafter accrue additional equivalents. Any such reinvestment shall be at Fair Market Value on the date of reinvestment. Dividend Equivalent Rights may be settled in cash or Stock or a combination thereof, in a single installment or installments, all determined in the sole discretion of the Committee. A Dividend Equivalent Right granted as a component of another ~~award may~~Award shall provide that such Dividend Equivalent Right shall only be settled upon exercise, settlement, or payment of, or lapse of restrictions on, such other ~~award~~Award, and that such Dividend Equivalent Right shall expire or be forfeited or annulled under the same conditions as such other ~~award~~Award. A Dividend Equivalent Right granted as a component of another Award may also contain terms and conditions different from such other ~~award~~Award. Notwithstanding any provision of this **Section 13.1** to the contrary, no Dividend Equivalent Right may provide for settlement directly or indirectly contingent upon the exercise of an Option or Stock Appreciation Right.

### 13.2.  Termination of Service.

Except as may otherwise be provided by the Committee either in the Award Agreement or in writing after the Award Agreement is issued, a Grantee's rights in all Dividend Equivalent Rights shall automatically terminate upon the Grantee's termination of Service for any reason.

A-12



**Table of Contents**

### 14.    REQUIREMENTS OF LAW

#### 14.1.    General.

The Company shall not be required to sell or issue any shares of Stock under any Award, and no Award may be exercised, if the sale or issuance of such shares would constitute a violation by the Grantee, any other individual exercising an Option, or the Company of any provision of any law or regulation of any governmental authority, including without limitation any federal or state securities laws or regulations. If at any time the Company shall determine, in its discretion, that the listing, registration or qualification of any shares subject to an Award upon any securities exchange or under any governmental regulatory body is necessary or desirable as a condition of, or in connection with, the issuance or purchase of shares hereunder, no shares of Stock may be issued or sold to the Grantee or any other individual exercising an Option pursuant to such Award unless such listing, registration, qualification shall have been effected or obtained free of any conditions not acceptable to the Company, and any delay caused thereby shall in no way affect the date of termination of the Award. Specifically, in connection with the Securities Act, upon the exercise of any Option or the delivery of any shares of Stock underlying an Award, unless a registration statement under such Act is in effect with respect to the shares of Stock covered by such Award, the Company shall not be required to sell or issue such shares unless the Committee has received evidence satisfactory to it that the Grantee or any other individual exercising an Option may acquire such shares pursuant to an exemption from registration under the Securities Act. Any determination in this connection by the Committee shall be final, binding, and conclusive. The Company may, but shall in no event be obligated to, register any securities covered hereby pursuant to the Securities Act. The Company shall not be obligated to take any affirmative action in order to cause the exercise of an Option or the issuance of shares of Stock pursuant to the Plan to comply with any law or regulation of any governmental authority. As to any jurisdiction that expressly imposes the requirement that an Option shall not be exercisable until the shares of Stock covered by such Option are registered or are exempt from registration, the exercise of such Option (under circumstances in which the laws of such jurisdiction apply) shall be deemed conditioned upon the effectiveness of such registration or the availability of such an exemption.

#### 14.2.    Rule 16b-3.

During any time when the Company has a class of equity security registered under Section 12 of the Exchange Act, it is the intent of the Company that Awards and the exercise of Options granted hereunder will qualify for the exemption provided by Rule 16b-3 under the Exchange Act.

### 15.    EFFECT OF CHANGES IN CAPITALIZATION

#### 15.1.    Changes in Stock.

If the number of outstanding shares of Stock is increased or decreased or the shares of Stock are changed into or exchanged for a different number, class or kind of shares or other securities of the Company on account of any recapitalization, reclassification, stock split, reverse split, combination of shares, exchange of shares, stock dividend, spin-off or other distribution payable in capital stock, or other increase or decrease in such shares effected without receipt of consideration by the Company occurring after the Effective Date, the number, class and kinds of shares for which grants of Options and other Awards may be made under the Plan, including the maximum number of shares of Stock reserved for issuance under the Plan, the maximum number of shares of Stock with respect to which Options or, Stock Appreciation Rights or other Awards may be granted pursuant to the Plan in any calendar year to any one Service Provider or other participant in the Plan, and the Option Price and SAR Exercise Price and other price of securities subject to outstanding Awards, to the extent applicable, shall be adjusted proportionately and accordingly by the Company Committee; provided that any such adjustment shall comply with Section 409A and Section 424 of the Code to the extent

A-13



**Table of Contents**

applicable. In addition, the number, class and kind of shares for which Awards are outstanding shall be adjusted proportionately and accordingly so that the proportionate interest of the Grantee immediately following such event shall, to the extent practicable, be the same as immediately before such event. Any such adjustment in outstanding Options or SARs shall not change the aggregate Option Price or SAR Exercise Price payable with respect to shares that are subject to the unexercised portion of an outstanding Option or SAR, as applicable, but shall include a corresponding proportionate adjustment in the Option Price or SAR Exercise Price per share. The conversion of any convertible securities of the Company shall not be treated as an increase in shares effected without receipt of consideration. Notwithstanding the foregoing, in the event of any distribution to the Company's stockholders of securities of any other entity or other assets (including an extraordinary cash dividend but excluding a non-extraordinary dividend payable in cash or in stock of the Company) without receipt of consideration by the Company, the ~~Company~~Committee may, in such manner as the ~~Company~~Committee deems appropriate, adjust (i) the number, class and kind of shares subject to outstanding Awards and/or (ii) the ~~exercise price~~Option Price of outstanding Options and the SAR Exercise Price of Stock Appreciation Rights to reflect such distribution.

**15.2.   Definition of Change in Control.**

"Change in Control" shall mean the occurrence of any of the following:

    a.   Any 'person' (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becomes the 'beneficial owner' (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the total voting power represented by the Company's then-outstanding voting securities, <u>provided</u>, <u>however</u>, that a Change in Control shall not be deemed to occur if an employee benefit plan (or a trust forming a part thereof) maintained by the Company, and/or Kevin Plank and/or his immediate family members, directly or indirectly, become the beneficial owner, of more than fifty percent (50%) of the then-outstanding voting securities of the Company after such acquisition;

    b.   A change in the composition of the Board occurring within a two (2)-year period, as a result of which fewer than a majority of the directors are Incumbent Directors. 'Incumbent Directors' shall mean directors who either (A) are directors of the Company as of the Effective Date, or (B) are elected, or nominated for election, to the Board with the affirmative votes of at least a majority of the Incumbent Directors at the time of such election or nomination (but shall not include an individual whose election or nomination is in connection with an actual or threatened proxy contest relating to the election of directors to the Company);

    c.   The consummation of a merger or consolidation of the Company with any other corporation, other than a merger or consolidation which would result in (a) the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or being converted into voting securities of the surviving entity) at least fifty percent (50%) of the total voting power represented by the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation in substantially the same proportion as prior to such merger or consolidation; or (b) the directors of the Company immediately prior thereto continuing to represent at least fifty percent (50%) of the directors of the Company or such surviving entity immediately after such merger or consolidation; or

    d.   The consummation of the sale or disposition by the Company of all or substantially all of the Company's assets.

A-14



**Table of Contents**

**15.3.   Effect of Change in Control**

The Committee shall determine the effect of a Change in Control upon Awards, ~~and such~~which effect ~~shall~~may be set forth in the appropriate Award Agreement. The Committee may provide in the Award Agreements at the time of grant, or any time thereafter ~~with the consent of the Grantee~~, the actions that will be taken upon the occurrence of a Change in Control, including, but not limited to, accelerated vesting~~, termination or assumption.~~ or lapse of restrictions, termination, cancellation, assumption, substitution or conversion, as the Committee, in its discretion, deems appropriate and consistent with applicable law, including Section 409A and Section 424 of the Code if and to the extent applicable. The Committee may also provide in the Award Agreements at the time of grant, or any time thereafter ~~with the consent of the Grantee~~, for different provisions to apply to an Award in place of those described in **Sections** ~~15.1~~15.1 and ~~15.2.~~15.2. Notwithstanding anything to the contrary, if the per share Option Price or SAR Exercise Price of an Option or SAR is equal to or greater than the Fair Market Value of a share of Stock, such Option or SAR may be cancelled with no payment due hereunder or otherwise in respect thereof.

Any Stock, cash or other property or other Award delivered pursuant to this Section with respect to an Award may, in the discretion of the Committee, contain such restrictions, if any, as the Committee deems appropriate, including to reflect any performance or other vesting conditions to which the Award was subject and that did not lapse (and were not satisfied), that any amounts paid in respect of such Award in connection with the Change in Control be subject to any escrow, holdback or other contingency applicable to stockholders in connection with the Change in Control or otherwise made subject to such restrictions as the Committee deems appropriate in connection with the Change in Control.

Notwithstanding any other provision of this Section 15.3, (i) no Change in Control shall trigger payment of an Award subject to the requirements of Section 409A unless such Change in Control qualifies as a change in the ownership or effective control of the Company, or in the ownership of a substantial portion of the assets of the Company, as described in Section 409A, and (ii) any Award that otherwise is intended to satisfy the requirements of Section 409A shall not be amended or modified (directly or indirectly, in form or operation) to the extent such amendment or modification would cause compensation deferred under the applicable Award (and applicable earnings) to be included in income under Section 409A.

**15.4.   Reorganization, Merger or Consolidation.**

If the Company undergoes any reorganization, merger, or consolidation of the Company with one or more other entities and there is a continuation, assumption or substitution of ~~Options and SARs~~Awards in connection with such transaction, any ~~Option or SAR~~Award theretofore granted pursuant to the Plan shall pertain to and apply to the securities to which a holder of the number of shares of Stock subject to such ~~Option or SAR~~Award would have been entitled immediately following such reorganization, merger, or consolidation, with a corresponding proportionate adjustment ~~of~~, consistent with Section 409A and Section 424 of the Code to the extent applicable, to the number of shares underlying the Award and the Option Price or SAR Exercise Price per share so that the aggregate Option Price or SAR Exercise Price thereafter shall be the same as the aggregate Option Price or SAR Exercise Price of the shares remaining subject to the Option or SAR immediately prior to such reorganization, merger, or consolidation. Subject to any contrary language in an Award Agreement, any restrictions applicable to such Award shall apply as well as to any replacement shares received by the Grantee as a result of the reorganization, merger or consolidation.

If the Company undergoes any reorganization, merger, or consolidation of the Company with one or more other entities and there is not a continuation, assumption or substitution of ~~Options and SARs~~Awards in connection with such transaction, then in the discretion and at the direction of the

A-15



Table of Contents

Committee, each ~~Option and SAR~~Award may be canceled unilaterally in exchange for the same consideration that the Grantee otherwise would receive as a shareholder of the Company in connection with such transaction ~~(or cash equal to such consideration)~~ if the Grantee held the number of shares of Stock ~~obtained by dividing~~, with such payment equaling the excess, if any, of (i) the ~~excess of the~~ Fair Market Value of a share of Stock multiplied by the number of such shares ~~which remain~~ subject to the ~~exercise of the~~ vested portion of ~~such Option or SAR~~the Award immediately before such ~~Change in Control over~~transaction, minus (ii) the total Option Price ~~or~~, SAR Exercise Price or purchase price, if any, for such vested portion ~~as the case may be, by (ii) the Fair Market Value of a share of Stock on such date~~ of such Award, which number shall be rounded down to the nearest whole number. An ~~Option or SAR~~Award may be cancelled without consideration and without the Grantee's consent if such Award has no value, as determined by the Committee, in its sole discretion. Any Stock, cash or other property or other Award delivered pursuant to this Section with respect to an Award may, in the discretion of the Committee, contain such restrictions, if any, as the Committee deems appropriate, including to reflect any performance or other vesting conditions to which the Award was subject and that did not lapse (and were not satisfied), that any amounts paid in respect of such Award in connection with the reorganization, merger, or consolidation be subject to any escrow, holdback or other contingency applicable to stockholders in connection with the reorganization, merger, or consolidation or otherwise made subject to such restrictions as the Committee deems appropriate in connection with the reorganization, merger, or consolidation.

### 15.5.   Adjustments.

Adjustments under this **Section 15** related to shares of Stock or securities of the Company shall be made by the Committee, whose determination in that respect shall be final, binding and conclusive. No fractional shares or other securities shall be issued pursuant to any such adjustment, and any fractions resulting from any such adjustment shall be eliminated in each case by rounding downward to the nearest whole share.

### 15.6.   No Limitations on Company.

The making of Awards pursuant to the Plan shall not affect or limit in any way the right or power of the Company to make adjustments, reclassifications, reorganizations, or changes of its capital or business structure or to merge, consolidate, dissolve, or liquidate, or to sell or transfer all or any part of its business or assets.

## 16.   GENERAL PROVISIONS

### 16.1.   Disclaimer of Rights.

No provision in the Plan or in any Award Agreement shall be construed to confer upon any individual the right to remain in the employ or service of the Company or any Affiliate, or to interfere in any way with any contractual or other right or authority of the Company either to increase or decrease the compensation or other payments to any individual at any time, or to terminate any employment or other relationship between any individual and the Company. In addition, notwithstanding anything contained in the Plan to the contrary, unless otherwise stated in the applicable Award Agreement, no Award granted under the Plan shall be affected by any change of duties or position of the Grantee, so long as such Grantee continues to be a Service Provider, if applicable. The obligation of the Company to pay any benefits pursuant to this Plan shall be interpreted as a contractual obligation to pay only those amounts described herein, in the manner and under the conditions prescribed herein. The Plan shall be unfunded under the Code and shall in no way be interpreted to require the Company to transfer any amounts to a third party ~~trustee or otherwise hold any amounts~~ in trust or escrow for payment to any Grantee or beneficiary under the terms of the Plan.

A-16



**Table of Contents**

**16.2.  Nonexclusivity of the Plan.**

Neither the adoption of the Plan nor the submission of the Plan to the stockholders of the Company for approval shall be construed as creating any limitations upon the right and authority of the Board to adopt such other incentive compensation arrangements (which arrangements may be applicable either generally to a class or classes of individuals or specifically to a particular individual or particular individuals), including, without limitation, the granting of stock options as the Board in its discretion determines desirable.

**16.3.  Withholding Taxes.**

The Company or an Affiliate, as the case may be, shall have the right to deduct from payments of any kind otherwise due to a Grantee any federal, state, or local taxes of any kind required by law to be withheld, including: (i) with respect to the vesting of or other lapse of restrictions applicable to an Award, (ii) upon the issuance of any shares of Stock upon the exercise of an Option, or (iii) pursuant to an Award. At the time of such vesting, lapse, or exercise, the Grantee shall pay to the Company or the Affiliate, as the case may be, any amount that the Company or the Affiliate may reasonably determine to be necessary to satisfy such withholding obligation. Subject to the prior approval of the Company or the Affiliate, which may be withheld by the Company or the Affiliate, as the case may be, in its sole discretion, the Grantee may elect to satisfy such obligations, in whole or in part, (i) by causing the Company or the Affiliate to withhold shares of Stock otherwise issuable to the Grantee or (ii) by delivering to the Company or the Affiliate shares of Stock already owned by the Grantee. The shares of Stock so delivered or withheld shall have an aggregate Fair Market Value equal to such withholding obligations, or such greater amount up to the maximum statutory withholding rate under applicable law as applicable to such Grantee, if such other greater amount would not result in adverse financial accounting treatment as determined by the Committee. A Grantee who has made an election pursuant to this **Section 16.3** may satisfy his or her withholding obligation only with shares of Stock that are not subject to any repurchase, forfeiture, unfulfilled vesting, or other similar requirements.

**16.4.  Captions.**

The use of captions in this Plan or any Award Agreement is for the convenience of reference only and shall not affect the meaning of any provision of the Plan or any Award Agreement.

**16.5.  Other Provisions.**

Each Award Agreement may contain such other terms and conditions not inconsistent with the Plan as may be determined by the Committee, in its sole discretion.

**16.6.  Number and Gender**

With respect to words used in this Plan, the singular form shall include the plural form, the masculine gender shall include the feminine gender, etc., as the context requires.

**16.7.  Severability.**

If any provision of the Plan or any Award Agreement shall be determined to be illegal or unenforceable by any court of law in any jurisdiction, the remaining provisions hereof and thereof shall be severable and enforceable in accordance with their terms, and all provisions shall remain enforceable in any other jurisdiction.

**16.8.  Governing Law.**

The validity and construction of this Plan and the instruments evidencing the Award hereunder shall be governed by the laws of the State of Maryland, other than any conflicts or choice of law rule or

A-17



**Table of Contents**

principle that might otherwise refer construction or interpretation of this Plan and the instruments evidencing the Awards granted hereunder to the substantive laws of any other jurisdiction.

~~**16.9.   Clawback Events.**~~

**16.9.   Company Policies.**

<u>Awards under the Plan shall be subject to the Company's policies and procedures governing the issuance or holding of Stock as in effect from time to time, including, without limitation, its insider trading policy, stock ownership guidelines and clawback policy.</u> Notwithstanding any other provisions in this Plan, any Award which is subject to recovery under any law, government regulation or stock exchange listing requirement will be subject to such deductions and clawback as may be required to be made pursuant to such law, government regulation or stock exchange listing requirement (or any policy adopted by the Company from time to time, pursuant to any such law, government regulation, stock exchange listing requirement or otherwise) and the Committee, in its sole and exclusive discretion, may require that any Grantee reimburse the Company all or part of the amount of any payment in settlement of any Award granted hereunder**.**

**16.10. Beneficiary Designation.**

In accordance with procedures adopted by the Committee from time to time, a Grantee may designate a beneficiary to exercise the rights of the Grantee and to receive any distribution with respect to any Award upon the Grantee's death. Each such designation shall revoke all prior designations by the same Grantee, shall be in a form prescribed by the Committee, and will be effective only when filed by the Grantee in writing with the Committee during the Grantee's lifetime. A beneficiary, legal representative, or other person claiming any rights under the Plan shall be subject to all terms and conditions of the Plan, any applicable Award Agreement, and to any other conditions deemed appropriate by the Committee. In the absence of any such beneficiary designation, a Grantee's unexercised Awards, or amounts due but remaining unpaid to such Grantee, at the Grantee's death, shall be exercised or paid as designated by the Grantee by will or by the laws of descent and distribution.

**16.11. Section 409A.**

It is intended that each Award either be exempt from the requirements of Section 409A or will comply (in form and operation) with Section 409A so that compensation deferred under an applicable Award (and any applicable earnings) will not be included in income under Section 409A. Any ambiguities in this Plan will be construed to affect the intent as described in this **Section 16.11**. Unless the Committee provides otherwise in an Award Agreement, each Award shall be paid in full to the Grantee no later than the fifteenth (15th) day of the third month after the end of the first calendar year in which such Award is no longer subject to a "substantial risk of forfeiture" within the meaning of Section 409A of the Code. If an Award is subject to Section 409A, the Award Agreement will satisfy the written documentation requirement of Section 409A either directly or by incorporation by reference to other documents. Notwithstanding any contrary provision in the Plan or Award Agreement, each Award that is subject to Section 409A and that is payable under the Plan to a "specified employee" (as defined under Section 409A) as a result of such employee's separation from service shall be delayed for the first six (6) months following such specified employee's separation from service (or, if earlier, the date of death of the specified employee) and shall instead commence (in a manner set forth in the Award Agreement) upon expiration of such delay period. The Company shall have no liability to a Grantee or any other party, if an Award that is intended to be exempt from, or compliant with, Section 409A is not so exempt or compliant or for any action taken by the Committee or the Company and, in the event that any amount or benefit under the Plan becomes subject to interest or penalties with respect to Section 409A, responsibility for payment of such penalties shall rest solely with the Grantee and not



**Table of Contents**

with the Company. The Company does not make any representation to any Grantee as to the tax consequences of any Awards made pursuant to this Plan, and the Company shall have no liability or other obligation to indemnify or hold harmless the Grantee or any beneficiary for any tax, additional tax, interest or penalties that the Grantee or any beneficiary may incur as a result of the grant, vesting, exercise or settlement of an Award under this Plan. For purposes of Section 409A, each payment in a series of payments made under the Plan or any Award will be treated as a separate payment.

### 16.12.  Establishment of Sub-Plans.

The Committee may at any time and from time to time (including before or after an Award is granted) establish, adopt, or revise any rules and regulations as it may deem necessary or advisable to administer the Plan for participants based outside of the United States and/or subject to the laws of countries other than the United States, including by establishing one or more sub-plans, supplements or appendices under the Plan or any Award agreement for the purpose of complying or facilitating compliance with non-U.S. laws or taking advantage of tax favorable treatment or for any other legal or administrative reason determined by the Committee. Any such sub-plan, supplement or appendix may contain, in each case, (i) such limitations on the Committee's discretion under the Plan and (ii) such additional or different terms and conditions, as the Committee deems necessary or desirable and will be deemed to be part of the Plan but will apply only to participants within the group to which the sub-plan, supplement or appendix applies (as determined by the Committee); provided, however, that no sub-plan, supplement or appendix, rule or regulation established pursuant to this provision shall increase number of shares available for issuance under the Plan.

## 17.  TERMS AND CONDITIONS OF PERFORMANCE AWARDS

### 17.1.  Performance Awards.

**"Performance Award"** means an Award made subject to the attainment of performance goals (as described in **Section 17.3**) over a performance period established by the Committee in its discretion.

### 17.2.  [RESERVED].

### 17.3.  Performance Awards Qualifying as Performance-Based Compensation.

If and to the extent that the Committee grants a Performance Award to a Grantee, the grant, exercise and/or settlement of such Performance Award shall be contingent upon achievement of pre-established, objective performance goals and other terms set forth in this **Section 17.3**. A Performance Award may, but need not, also require the completion of a specified period of employment or other service with the Company or its Affiliates.

#### 17.3.1.  Performance Goals Generally.

The performance goals for such Performance Awards shall consist of one or more business criteria and a targeted level or levels of performance with respect to each of such criteria, as specified by the Committee consistent with this **Section 17.3**. ~~Performance goals shall be objective. A performance goal is objective if a third party having knowledge of the relevant facts could determine whether the goal is met.~~ The Committee may determine that such Performance Awards shall be granted, exercised and/or settled upon achievement of any one performance goal or that two or more of the performance goals must be achieved as a condition to grant, exercise and/or settlement of such Performance Awards. Performance goals may differ for Performance Awards granted to any one Grantee or to different Grantees.

A-19



**Table of Contents**

### 17.3.2.   Business Criteria.

One or more of the following business criteria for the Company, on a consolidated basis, and/or specified subsidiaries or business units of the Company (except with respect to the total stockholder return and earnings per share criteria), shall be used exclusively by the Committee in establishing performance goals for such Performance Awards, including but not limited to, the following: (1) total stockholder return; (2) such total stockholder return as compared to total return (on a comparable basis) of a publicly available index such as, but not limited to, a Standard & Poor's stock index; (3) net revenues; (4) net income; (5) earnings per share; (6) income from operations; (7) operating margin; (8) gross profit; (9) gross margin; (10) pretax earnings; (11) earnings before interest expense, taxes, depreciation and amortization; (12) return on equity; (13) return on capital; (14) return on investment; (15) return on assets; (16) working capital; (17) free cash flow; and (18) ratio of debt to stockholders' equity.

### 17.3.3.   Timing for Establishing Performance Goals.

Performance goals shall be established in writing by the Committee not later than ninety (90) days after the beginning of any performance period applicable to such Performance Awards, provided that the outcome is substantially uncertain at the time the Committee actually establishes the goal and provided that it is established at or before twenty-five percent (25%) of the performance period has elapsed. or at such other date as may be determined by the Committee.

### 17.3.4.   Adjustment of Performance-Based Compensation.

The Committee may provide in any Award that any evaluation of achievement of performance goals may, among other things, include or exclude any of the following events that occur during or otherwise impact a performance period: (a) asset write-downs, (b) litigation, claims, judgments or settlements, (c) the effect of changes in tax laws, accounting principles, or other laws or provisions affecting reported results, (d) any reorganization and restructuring programs or other corporate transactions, (e) extraordinary and/or nonrecurring items as described in the Company's financial statements or notes thereto and/or in management's discussion and analysis of financial condition and results of operations, and in any case appearing in the Company's annual report to shareholders for the applicable year, (f) acquisitions or divestitures, and (g) foreign exchange gains and losses, and (h) such other exclusions or adjustments as the Committee specifies at the time the Award is granted. Performance Awards that are intended to qualify as performance-based compensation may not be adjusted upward; however, the Committee shall retain the discretion to adjust such Awards downward, either on a formula or discretionary basis, or any combination, as the Committee determines.

### 17.3.5.   Settlement of Performance Awards; Other Terms.

Settlement of such Performance Awards shall be in cash, Stock, other Awards or other property, in the discretion of the Committee. The Committee may, in its discretion, reduce (but not increase) or reduce the amount of a settlement otherwise to be made in connection with such Performance Awards. The Committee shall specify the circumstances in which such Performance Awards shall be paid or forfeited in the event of termination of Service by the Grantee prior to the end of a performance period or settlement of Performance Awards.

### 17.3.6.   Committee Certification.

The Committee must certify in writing prior to payment of, or other event that results in the inclusion of income (for example, the vesting of Restricted Stock) from, the related compensation that the performance goals and any other material terms were in fact satisfied. Approved minutes of the Committee meeting in which the certification is made shall be treated as a written certification.

A-20



**Table of Contents**

### 17.3.7.    Annual Share Limits.

**Section 4** sets forth the maximum number of shares of Stock with respect to which Options or Stock Appreciation Rights may be granted pursuant to the Plan in any calendar year to any one Service Provider. Subject to adjustment as provided in **Section 15** hereof, the maximum number of shares of Stock that may be granted to any one Service Provider under a Performance Award, other than an Option or Stock Appreciation Right, in any calendar year shall be 1~~2~~.0 million.

### 17.4.    Written Determinations.

All determinations by the Committee as to the establishment of performance goals, the amount of any Performance Award pool or potential individual Performance Awards, and the achievement of performance goals relating to Performance Awards shall be made in writing. The Committee may delegate any responsibility relating to such Performance Awards to the extent permitted by the Company's certificate of incorporation and bylaws and applicable law.

### 17.5.    Status of Section 17.3 Awards Under Section 162(m) of the Code.

Notwithstanding anything in the Plan to the contrary, the Committee shall administer any Awards in effect on November 2, 2017 which qualify as "performance-based compensation" under Section 162(m) of the Code, as amended the by Tax Cuts and Jobs Act (the "TCJA"), in accordance with the "grandfathering" transition rules applicable to written binding contracts in effect on November 2, 2017 and shall have the discretion to amend the Plan to conform to the TCJA, all without obtaining further approval from the Company's shareholders (unless otherwise required by applicable law). Further, this amended and restated Plan is not intended, and shall not be deemed as amending, any such Awards to the extent it would result in the loss of deductibility under the TCJA's "grandfathering" rules under Section 162(m) of the Code.

A-21



**Table of Contents**

*Appendix B*

# RECONCILIATION OF NON-GAAP FINANCIAL MEASURES

This Proxy Statement refers to "currency neutral net revenue" and "adjusted operating income," which are considered non-GAAP financial measures, as defined by SEC Regulation G. We have provided below a reconciliation of each measure to the most directly comparable financial measure calculated in accordance with GAAP. We believe these non-GAAP financial measures may be useful in evaluating our financial information and comparing year-over-year performance, and we have incorporated this measure into certain of our executive compensation programs. However, these measures should not be considered in isolation and should be viewed in addition to, and not as an alternative for, our reported results prepared in accordance with GAAP. In addition, our non-GAAP financial information may not be comparable to similarly titled measures reported by other companies.

For purposes of this Proxy Statement, we define currency neutral net revenue as our reported net revenues, adjusted to exclude the impact of changes in foreign currency exchange rates as compared with the foreign currency exchange rates used in our initial annual operating plan. The following table provides a numerical reconciliation of currency neutral net revenue to net revenues (in millions):

|  | Year Ended March 31, 2023 | |
| --- | --- | --- |
| Net revenues (GAAP) | $ | 5,904 |
| Add: Foreign exchange losses | $ | 83 |
| Currency neutral net revenue (Non-GAAP) | $ | 5,987 |

For purposes of this Proxy Statement, we define adjusted operating income as our reported income from operations, adjusted to exclude the impact of certain specified items for purposes of evaluating performance against compensation targets, including, as applicable, the impact of certain goodwill impairment charges, the impact of restructuring and other related charges, litigation related expenses, changes in foreign currency exchange rates as compared with the foreign currency exchange rates used in our initial annual operating plan and charges related to the write-down of our accounts receivable asset due to customer bankruptcies. The following table provides a numerical reconciliation of adjusted operating income to income from operations (in millions):

|  | Year Ended March 31, 2023 | |
| --- | --- | --- |
| Income from operations (GAAP) | $ | 284 |
| Add: Foreign exchange losses | $ | 13 |
| Add: Charges related to the write-down of accounts receivable due to customer bankruptcies | $ | 6 |
| Add: Litigation related expenses | $ | 27 |
| Adjusted operating income (Non-GAAP) | $ | 330 |

B-1



**Table of Contents**



*UNDER ARMOUR, INC.*
*ATTN: CORPORATE SECRETARY*
*1020 HULL STREET*
*BALTIMORE, MARYLAND 21230*



**VOTE BY INTERNET**
*Before The Meeting* - Go to **www.proxyvote.com** **or scan the QR Barcode above**

Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 p.m. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

*During The Meeting* - Go to **www.virtualshareholdermeeting.com/UAA2023**

You may attend the meeting via the Internet and vote during the meeting. Have the information that is printed in the box marked by the arrow available and follow the instructions.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 p.m. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

V17894-P94938                    KEEP THIS PORTION FOR YOUR RECORDS

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — —

DETACH AND RETURN THIS PORTION ONLY

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

| UNDER ARMOUR, INC. | For All | Withhold All | For All Except | To withhold authority to vote for any individual nominee(s), mark "For All Except" and write the number(s) of the nominee(s) on the line below. |
|---|---|---|---|---|
| **The Board of Directors recommends you vote FOR the following:** | ☐ | ☐ | ☐ | |
| 1.     Election of Directors | | | | |

**Nominees:**

| | | | |
|---|---|---|---|
| 01) | Kevin A. Plank | 06) | David W. Gibbs |
| 02) | Douglas E. Coltharp | 07) | Karen W. Katz |
| 03) | Jerri L. DeVard | 08) | Stephanie C. Linnartz |
| 04) | Mohamed A. El-Erian | 09) | Eric T. Olson |
| 05) | Carolyn N. Everson | 10) | Patrick W. Whitesell |

**The Board of Directors recommends you vote FOR proposals 4 and 5:**

| | For | Against | Abstain |
|---|---|---|---|
| | ☐ | ☐ | ☐ |
| 4.     To approve the Fourth Amended and Restated 2005 Omnibus Long-Term Incentive Plan to increase the number of shares of Class C Common Stock reserved for issuance, among other changes. | | | |

**The Board of Directors recommends you vote FOR proposal 2:**

| | For | Against | Abstain |
|---|---|---|---|
| 2.     To approve, by a non-binding advisory vote, the compensation of executives as disclosed in the "Executive Compensation" section of the proxy statement, including the Compensation Discussion and Analysis and tables. | ☐ | ☐ | ☐ |
| 5.     Ratification of appointment of independent registered public accounting firm for the fiscal year ending March 31, 2024. | ☐ | ☐ | ☐ |

**NOTE:** Such other business as may properly come before the meeting or any adjournment thereof.

**The Board of Directors recommends 1 YEAR for proposal 3:**

| | 1 Year | 2 Years | 3 Years | Abstain |
|---|---|---|---|---|
| 3.     To recommend, by a non-binding advisory vote, the frequency of future advisory votes on executive compensation. | ☐ | ☐ | ☐ | ☐ |

| | Yes | No |
|---|---|---|
| Please indicate if you plan to virtually attend this meeting. | ☐ | ☐ |

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name by authorized officer.

| Signature [PLEASE SIGN WITHIN BOX]     Date | Signature (Joint Owners)     Date |
|---|---|

**Table of Contents**

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:**
The Proxy Statement and Under Armour, Inc.'s Fiscal Year 2023 Annual Report are
available at www.proxyvote.com.

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — —

V17895-P94938

**UNDER ARMOUR, INC.**
**Annual Meeting of Stockholders**
**August 29, 2023 10:00 AM Eastern Time**
**This proxy is solicited by the Board of Directors**

**CLASS A COMMON STOCK**

The undersigned hereby appoints Kevin A. Plank and Mehri F. Shadman, and each or any of them, as proxies, with full powers of substitution, to represent and to vote all shares of the Class A Common Stock of Under Armour, Inc. which the undersigned is entitled to vote at the Annual Meeting of Stockholders of Under Armour, Inc. to be held on August 29, 2023, and at any adjournment or postponement thereof. The undersigned acknowledges receipt of notice of the meeting and the proxy statement.

**This proxy will be voted as directed. If no direction is made, this proxy will be voted "FOR" all Nominees under Proposal 1, "FOR" Proposal 2, for "ONE YEAR" for Proposal 3, "FOR" Proposal 4 and "FOR" Proposal 5.**

**In their discretion, the proxies are authorized to vote upon such other business as may properly come before the meeting.**

**Continued and to be signed on reverse side**

**Table of Contents**



UNDER ARMOUR, INC.
ATTN: CORPORATE SECRETARY
1020 HULL STREET
BALTIMORE, MARYLAND 21230



**VOTE BY INTERNET**
*Before The Meeting* - Go to **www.proxyvote.com** **or scan the QR Barcode above**

Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 p.m. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

*During The Meeting* - Go to **www.virtualshareholdermeeting.com/UAA2023**

You may attend the meeting via the Internet and vote during the meeting. Have the information that is printed in the box marked by the arrow available and follow the instructions.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 p.m. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

V17896-P94938                    KEEP THIS PORTION FOR YOUR RECORDS

DETACH AND RETURN THIS PORTION ONLY

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

| UNDER ARMOUR, INC. | For All | Withhold All | For All Except | |
|---|---|---|---|---|
| | | | | To withhold authority to vote for any individual nominee(s), mark "For All Except" and write the number(s) of the nominee(s) on the line below. |
| **The Board of Directors recommends you vote FOR the following:** | ☐ | ☐ | ☐ | |
| 1.   Election of Directors | | | | |

Nominees:

| | | | |
|---|---|---|---|
| 01) | Kevin A. Plank | 06) | David W. Gibbs |
| 02) | Douglas E. Coltharp | 07) | Karen W. Katz |
| 03) | Jerri L. DeVard | 08) | Stephanie C. Linnartz |
| 04) | Mohamed A. El-Erian | 09) | Eric T. Olson |
| 05) | Carolyn N. Everson | 10) | Patrick W. Whitesell |

| The Board of Directors recommends you vote FOR proposal 2: | For | Against | Abstain |
|---|---|---|---|
| 2.   To approve, by a non-binding advisory vote, the compensation of executives as disclosed in the "Executive Compensation" section of the proxy statement, including the Compensation Discussion and Analysis and tables. | ☐ | ☐ | ☐ |

| The Board of Directors recommends 1 YEAR for proposal 3: | 1 Year | 2 Years | 3 Years | Abstain |
|---|---|---|---|---|
| 3.   To recommend, by a non-binding advisory vote, the frequency of future advisory votes on executive compensation. | ☐ | ☐ | ☐ | ☐ |

| | Yes | No |
|---|---|---|
| Please indicate if you plan to virtually attend this meeting. | ☐ | ☐ |

| The Board of Directors recommends you vote FOR proposals 4 and 5: | For | Against | Abstain |
|---|---|---|---|
| 4.   To approve the Fourth Amended and Restated 2005 Omnibus Long-Term Incentive Plan to increase the number of shares of Class C Common Stock reserved for issuance, among other changes. | ☐ | ☐ | ☐ |
| 5.   Ratification of appointment of independent registered public accounting firm for the fiscal year ending March 31, 2024. | ☐ | ☐ | ☐ |

**NOTE:** Such other business as may properly come before the meeting or any adjournment thereof.

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name by authorized officer.

| | | | |
|---|---|---|---|
| Signature [PLEASE SIGN WITHIN BOX] | Date | Signature (Joint Owners) | Date |

Table of Contents

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:**
The Proxy Statement and Under Armour, Inc.'s Fiscal Year 2023 Annual Report are
available at www.proxyvote.com.

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — —

V17897-P94938

**UNDER ARMOUR, INC.**
**Annual Meeting of Stockholders**
**August 29, 2023 10:00 AM Eastern Time**
**This proxy is solicited by the Board of Directors**

**CLASS B COMMON STOCK**

The undersigned hereby appoints Kevin A. Plank and Mehri F. Shadman, and each or any of them, as proxies, with full powers of substitution, to represent and to vote all shares of the Class B Common Stock of Under Armour, Inc. which the undersigned is entitled to vote at the Annual Meeting of Stockholders of Under Armour, Inc. to be held on August 29, 2023, and at any adjournment or postponement thereof. The undersigned acknowledges receipt of notice of the meeting and the proxy statement.

**This proxy will be voted as directed. If no direction is made, this proxy will be voted "FOR" all Nominees under Proposal 1, "FOR" Proposal 2, for "ONE YEAR" for Proposal 3, "FOR" Proposal 4 and "FOR" Proposal 5.**

**In their discretion, the proxies are authorized to vote upon such other business as may properly come before the meeting.**

**Continued and to be signed on reverse side**

# EXHIBIT R



Join now    Sign in



## SC30 Inc.

Spectator Sports

Bay Area, California  ·  7,663 followers

Follow

View all 16 employees

## About us

SC30 Inc. is the off-court presence of four-time NBA Champion and two-time MVP, Stephen Curry, which prioritizes endeavors spanning brand partnerships, media, investments and philanthropy. With a focus of aligning purpose and profit, SC30 Inc. exists to deliver unparalleled products, experiences, content and opportunities. Launched in 2018, the nine-time NBA All-Star and founder set out to expand his footprint and impact beyond the game of basketball. An emerging figure in the Bay Area, the athlete's brand touts a number of innovative and progressive consumer, entertainment and non-profit entities, such as Unanimous Media, which features award-winning media projects; Eat. Learn. Play. Foundation with wife Ayesha; and UNDERRATED, an inspiring lifestyle brand committed to providing equity, access and opportunity to underrepresented communities.

Motivated to challenge the status quo, SC30 Inc.'s ultimate vision is to inspire by Elevating the Underrated.

| **Website** | https://sc30.com/ 🔗 |
|---|---|
| **Industry** | Spectator Sports |
| **Company size** | 11-50 employees |
| **Headquarters** | Bay Area, California |
| **Type** | Privately Held |
| **Founded** | 2017 |

## Locations

Primary

Bay Area, California, US

Get directions

## Employees at SC30 Inc.

**Tiffany Williams**


**Lesha Ruffin**

Senior Manager, Brand Partnerships at SC30 Inc.


**Kris Stone**

VP Relations & Business Development at SC30


**Halima Eno**

Executive Assistant at SC30 Inc.

See all employees

## Updates

**SC30 Inc.**
7,663 followers
6mo

**Unanimous Media**
2,933 followers
6mo

Let us take a moment to reintroduce ourselves!

Unanimous Media is a multimedia company rooted in its mission to inspire and uplift audiences through authentic storytelling centered around family, faith, and sports. The company was founded in 2018 by four-time NBA Champion Stephen Curry alongside Producer/Creative Erick Peyton.

Here at Unanimous, we are committed to collaborating with underrepresented filmmakers, creators, and writers across the entertainment industry, championing their diverse voices and bringing a lens to narratives that need to be heard. Follow along as we share our latest and greatest!

(P.S. Don't forget to mark your calendars on July 21st for the release of our new documentary 'Stephen Curry: Underrated')

#UnanimousMedia

1.00

10 · 1 Comment

| Like | Comment | Share |

**SC30 Inc.**
7,663 followers
6mo

**Eat. Learn. Play. Foundation**
7,736 followers
6mo · Edited

What a great afternoon at Topgolf #Columbus! Kids from Nationwide Children's Hospital Play Strong physical activity program perfected their golf shots in the Topgolf hitting bays and enjoyed healthy snacks all courtesy of Topgolf and the Memorial Tournament presented by Workday.

Stop by Topgolf Columbus through June 4th to participate in their Drive for Good Campaign to help raise program support dollars for Eat. Learn. Play. Foundation. Donate with your purchases and you could receive a $15 Topgolf Game Play Card or two Any Day Practice Round tickets for the Memorial Tournament, presented by Workday.

Photos by Brigid Gallagher

+4

6

Like                     Comment                     Share

**SC30 Inc.**
7,663 followers
6mo

**Eat. Learn. Play. Foundation**
7,736 followers
6mo · Edited

We are wrapping up a great week at The Memorial Tournament with a special thank you to the **Workday** team and their co-founder and co-CEO, Aneel Bhusri, for their continued support of **Eat. Learn. Play. Foundation**, not only through their sponsorship of **the Memorial Tournament presented by Workday**, but as ongoing supporters of our work since our launch in 2019. We remain grateful for their partnership and this opportunity to extend our impact in and around Columbus, Ohio, and our hometown of Oakland, California. **#theMemorial**

Photos by **Brigid Gallagher**

+2

51 · 1 Comment

Like                    Comment                    Share

**SC30 Inc.**
7,663 followers
6mo

**Eat. Learn. Play. Foundation**
7,736 followers
6mo · Edited

Students at Oakland Unified School District's Elmhurst United Middle School had a surprise guest at their Oakland Genesis soccer practice when Stephen Curry stopped by with the Eat. Learn. Play. Foundation Bus to help hand out healthy snacks, prepared meals, and new books along with our partners, Alameda County Community Food Bank, Oakland Literacy Coalition, and Community Kitchens. The students then hit the soccer pitch to get some encouragement from Coach Curry and show him their skills! Special thanks to CarMax for their help and support in making the day a success.

Photography: Noah Graham

38 · 1 Comment                                                    +4

Like                          Comment                          Share

**SC30 Inc.** reposted this

**Eat. Learn. Play. Foundation**
7,736 followers
6mo

We're here in Dublin, OH at the 48th playing of the Memorial Tournament presented by Workday! Founded and hosted by the legendary Jack Nicklaus, the tournament benefits Eat. Learn. Play. Foundation and Nationwide Children's Hospital with a portion of the proceeds supporting youth programs in Central Ohio and our hometown of Oakland, California.

Special thank you to Workday for their continued support and partnership. For the second straight year, Eat. Learn. Play. is being recognized as a co-charity beneficiary, supporting our programs that unlock the amazing potential of every child through access to nutritious meals, quality reading resources, and opportunities to play and be active. #theMemorial

Photography: Brigid Gallagher

+4

339 · 3 Comments

| Like | Comment | Share |

**SC30 Inc.**
7,663 followers
6mo

**Stephen Curry** has been named the 2022-23 Kareem Abdul-Jabbar Social Justice Champion!

Our CEO was selected for his dedication to pursuing social justice and advancing Abdul-Jabbar's life mission to engage, empower and drive equality.

University of San Francisco Institute for Nonviolence and Social Justice, which investigates, illuminates, and advances the theory and practice of transformational nonviolence to confront and overcome injustice and systemic violence and contribute to the just resolution of communal conflict, will receive a $100,000 contribution on Curry's behalf.

#sc30inc

222 · 3 Comments

| Like | Comment | Share |

**SC30 Inc.**
7,663 followers
6mo

**Stephen Curry** has been awarded the 2022-23 J. Walter Kennedy Citizenship Award!

Each year, the Professional Basketball Writers Association honors a player, coach or athletic trainer who displays outstanding service and dedication within his community.

His dedication to children and families in the city of Oakland through his foundation Eat. Learn. Play. Foundation and his philanthropic work in pursuing equality through sports with Underrated have brought him to this recognition. Stephen is just getting started as his impact continues to expand!

#sc30inc

316 · 4 Comments

Like                              Comment                              Share

---

**SC30 Inc.** reposted this

**Eat. Learn. Play. Foundation**
7,736 followers
6mo · Edited

Congratulations to Stephen Curry for winning the J. Walter Kennedy Citizenship Award, presented annually by the Professional Basketball Writers Association to a player, coach or athletic trainer who shows outstanding service and dedication to the community.

"Few athletes have as great a reach or as powerful a platform as Steph Curry, and he has used it to the fullest to benefit others," said PBWA President Howard Beck.

We're proud to work alongside Stephen and Ayesha to help Oakland kids and families thrive. Together we are advancing Eat. Learn. Play. Foundation's mission to unlock the amazing potential of every child through access to nutritious meals, quality reading resources, and opportunities to play and be active. And as Stephen always reminds us, we're just getting started!

Read more: https://lnkd.in/gKcrX7Kt

182 · 5 Comments

Like                              Comment                              Share

**SC30 Inc.**
7,663 followers
7mo

Congratulations to our CEO Stephen Curry for earning All-NBA Second Team! This is his ninth career All-NBA selection and we couldn't be more thrilled! 🏆

#sc30inc

212 · 10 Comments

Like                          Comment                          Share

**SC30 Inc.**
7,663 followers
8mo

**Eat. Learn. Play. Foundation**
7,736 followers
8mo

Thank you Stephen Curry for representing Eat. Learn. Play. Foundation in the tunnel last night! We're proud to work with you and Ayesha Curry everyday, and look forward to supporting you this postseason. Go Warriors!

Unanimous Media, Underrated, SC30 Inc.

18

Like                    Comment                    Share

## Similar pages



**Unanimous Media**
Media Production
Culver City, California



**Penny Jar Capital**
Financial Services
Bay Area, CA



**Eat. Learn. Play. Foundation**
Non-profit Organization Management
Oakland, CA



**35V**
Spectator Sports
New York, New York

Show more similar pages ⌄

# Browse jobs

### Investor jobs
26,289 open jobs

### Head of Analytics jobs
4,962 open jobs

### Student Advisor jobs
187,737 open jobs

### Co-Founder jobs
8,828 open jobs

### Optimization Manager jobs
75,294 open jobs

### Head jobs
1,135,865 open jobs

### Business Development Representative jobs
64,128 open jobs

### Analyst jobs
760,055 open jobs

### Assistant jobs
728,748 open jobs

### Project Manager jobs
312,603 open jobs

Show more jobs like this

More searches

© 2023

About

Accessibility

User Agreement

Privacy Policy

Your California Privacy Choices

Cookie Policy

Copyright Policy

Brand Policy

Guest Controls

Community Guidelines                                        Language