William A. Hector (SBN 298490)
    Email: wahector@venable.com
VENABLE LLP
101 California St., Suite 3800
San Francisco, CA 94111
415.653.3738
415.653.3755 - Facsimile

VENABLE LLP
Frank C. Cimino, Jr.
    Email: fccimino@Venable.com
Megan S. Woodworth
    Email: mswoodworth@Venable.com
600 Massachusetts Avenue, NW
Washington, DC  20001
202.344.4569
202.344.8300 – Facsimile

VENABLE LLP
Robert E. Bugg
    Email: rebugg@Venable.com
151 West 42nd Street
New York, NY 10036
212.370.6241

Attorneys for Non-Party
WARDELL STEPHEN CURRY II

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATHALONZ, LLC | Case No. 3:23-mc-80324-LJC |
| Plaintiff, | **NON-PARTY WARDELL STEPHEN CURRY II'S REPLY IN SUPPORT OF HIS MOTION TO QUASH PLAINTIFF'S SUBPOENA** |
| v. | |
| UNDER ARMOUR, INC. | |
| Defendant. | |

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 1

II. THE ACCUSED FEATURES OF THE CURRY PRODUCTS........................................ 1

III. CURRY DOES NOT UNIQUELY POSSESS ANY RELEVANT
     INFORMATION ....................................................................................................... 2

IV. UNDER ARMOUR HAS IDENTIFIED THE RELEVANT WITNESSES
     AND PRODUCED THE RELEVANT DOCUMENTS ...................................................... 7

V. THE SUBPOENA IMPOSES AN UNDUE BURDEN........................................................ 8

VI. THE SUBPOENA FAILS TO PROVIDE A REASONABLE TIME TO
     COMPLY ................................................................................................................ 9

VII. CONCLUSION ......................................................................................................... 10

**VENABLE LLP**
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

NON-PARTY WARDELL STEPHEN CURRY II'S
REPLY ISO HIS MOTION TO QUASH PLAINTIFF'S SUBPOENA

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amini Innovation Corp. v. McFerran Home Furnishings, Inc.,*
300 F.R.D. 406 (C.D. Cal. 2014) ....................................................................................5, 6, 7

*Avaya Inc. v. Pearce*,
No. 19-cv-00565-SI, 2021 U.S. Dist. LEXIS 56013 (N.D. Cal. Mar. 24, 2021).....................9

*Bonzani v. Shinseki*,
No. 2:11-cv-00007-EFB, 2014 U.S. Dist. LEXIS 77619 (E.D. Cal. June 4,
2014) ............................................................................................................................10

*Free Stream Media Corp. v. Alphonso Inc*.,
No. 8:17-mc-00011, 2017 U.S. Dist. LEXIS 235015 (C.D. Cal. May 4, 2017)................8, 10

*Genus Lifesciences Inc. v. Lannett Co*.,
No. 18-cv-07603-WHO, 2019 U.S. Dist. LEXIS 222550 (N.D. Cal. Dec. 30,
2019) ..............................................................................................................................9

*Staley v. Gilead Scis., Inc.,*
No. 19-CV-02573-EMC (LB), 2022 U.S. Dist. LEXIS 45194 (N.D. Cal. Mar.
14, 2022) .........................................................................................................................5

*Under Armour, Inc. v. Battle Fashions,*
No. 18-mc-80117-LB, 2018 U.S. Dist. LEXIS 130983 (N.D. Cal. Aug. 3,
2018) .......................................................................................................................6, 8, 9

*Universal Church, Inc. v. Standard Constr. Co. of S.F., Inc*.,
No. 14-cv-04568-RS (KAW), 2015 U.S. Dist. LEXIS 143382 (N.D. Cal. Oct.
21, 2015) .......................................................................................................................10

**Statutes**

35 U.S.C. § 284 .....................................................................................................................4

NON-PARTY WARDELL STEPHEN CURRY II'S
REPLY ISO HIS MOTION TO QUASH PLAINTIFF'S SUBPOENA

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

1

## I.    INTRODUCTION

2       Athalonz has not, and cannot, establish that Curry's testimony or documents are relevant

3  to this case.  Rather, as explained in detail in the Opening Motion, and below, the discovery

4  sought by this Subpoena is irrelevant, unreasonable, duplicative, harassing, and available from

5  other sources that are more convenient, *i.e.* Under Armour, the party to the litigation.  The

6  Subpoena also includes facially overbroad requests, many of which are not relevant to the issues

7  in this litigation, and Athalonz has failed to demonstrate that the requested documents are not

8  also in the possession of Under Armour.

9       Likewise, the deposition Athalonz seeks of Curry is improper.  There is nothing relevant

10  to this litigation that Curry could tell Athalonz that Under Armour's witnesses cannot provide.

11  Curry lacks unique personal knowledge of any material facts in the underlying action, including

12  facts relating to the allegedly infringing design of the Accused Curry Products.  The burden to

13  Curry of disrupting his demanding schedule to prepare for and attend a deposition on patent

14  infringement issues of which he has no knowledge is unjustified, as any information that Curry

15  possess about the Accused Curry Products is more readily and properly obtained directly from

16  Under Armour—the company actually engaged in designing, developing, advertising, selling and

17  accounting for the products at issue.  The Subpoena also demands production of documents

18  within an unreasonable time frame.  For these reasons and the reasons set forth below, the Court

19  should grant Curry's motion to quash.

20  ## II.    THE ACCUSED FEATURES OF THE CURRY PRODUCTS

21      Athalonz cannot plausibly argue that the accused features of the accused products are

22  anything other than the shape and materials of the accused shoe's sole.  Opp., 2-3.  The Asserted

23  Patents repeatedly and consistently refer to the sole design and materials as the allegedly

24  inventive features.  The entire specification is directed to the allegedly novel "athletic

25  positioning" design of a shoe's sole, and not once do any of the asserted claims describe any

26  other potentially novel feature.  *See, e.g.*, Opp., Ex. B.  Claim 1 of the '291 patent cited in the

27  Opposition is demonstrative, as the only component claimed aside from the design features of

28  the sole (which includes the midsole, insole and outsole) is a generic "upper"—a feature

-1-

1    common to all shoes—which Athalonz does not suggest is remotely relevant to patentability.

2    Opp., 3.  The dependent claims of the '291 patent all describe additional aspects of the shoe's

3    sole, including additional heights and slopes that define its precise shape and dimensions.  Opp.,

4    Ex. B, claims 2-8.  The other four Asserted Patents are similar, wherein nothing more than a

5    generic "upper" is claimed in addition to the allegedly novel design features of the shoe's sole,

6    including the sole's shape and compressibility of the materials it is made from, as is

7    demonstrated by the representative claims identified in Athalonz Opposition.  Opp., 3 (citing

8    U.S. Patent Nos. 10,674,786 claim 5; 11,064,760 claim 1; 11,510,456 claim 1; and 11,375,768

9    claim 1).

10           Likewise, in its Complaint against Under Armour, Athalonz described its "patented

11   technology" as the "three-dimensional sloped shape and compressibility" of the shoe's sole.  Ex.

12   1, ¶ 15.  Athalonz then continued to describe its "technology" as being exclusively directed to the

13   shape or materials used in the allegedly novel shoe's sole (*id*., ¶¶ 16-24), and even compared the

14   Athalonz midsole design with flat midsoles and U-shaped midsoles found in most athletic shoes,

15   as shown in the diagram below.  *Id*., ¶ 23.



Figure 8. Comparison of the various forces at play when an athlete wears a flat midsole, U-shaped midsole, or an Athalonz developed midsole.

## III.    CURRY DOES NOT UNIQUELY POSSESS ANY RELEVANT INFORMATION

26          Athalonz's citation to various high-level descriptions of the role Curry plays with respect

27   to the design of the Accused Curry Products in Exhibits C-H of the Opposition (Opp., 4) fails to

28   demonstrate that he is a witness in possession of relevant, non-cumulative information.  None of

1  the articles or press releases cited by Athalonz suggest that Curry had any involvement in

2  designing, developing or testing the soles of the Curry products—the only accused feature of the

3  products at issue—and none contradict the sworn statements of Mr. Curry's agent, William J.

4  Austin, and Ryan Drew, Vice-President of the Curry Brand at Under Armor, that demonstrate

5  Curry's lack of unique, relevant information.

6      For example, Mr. Austin explained that Curry "does not design or develop the shape of

7  the soles of the SC line of shoes, nor determine what materials are used in the soles" and that

8  "Under Armour proposes, designs [and] develops … all SC products" and "oversees and

9  manages the advertising and production of the SC line of products."  Dkt 1-2, ¶¶ 3-4.

10     Likewise, Mr. Drew explained that it is Under Armour—not Curry—that "designs,

11  develops, [and] promotes … the Under Armour products that are part of the Curry brand;" that

12  "Curry does not design the shape of the sole, or any other component, of the accused Curry

13  products;" and that "Curry does not choose the materials used in the sole, or any other

14  component, of the accused Curry products."  Dkt. 1-3, ¶¶ 4-6.

15     Despite numerous unfounded allegations regarding the veracity of the declarations,

16  Athalonz cannot demonstrate that Mr. Austin's and Mr. Drew's statements are false.  Rather,

17  both declarants consistently and conclusively support Curry's lack of involvement with the

18  accused features of the Curry products.[1]  The fact that Under Armour and Curry have a

19  partnership, that Curry owns stock in Under Armour and that Curry was named President of the

20  Curry product line (Opp., 5) does not alter the fact that he is uninvolved in the critical question of

21  whether the Accused Curry Products infringe the Asserted Patents, or the calculation of any

22  potential damages associated with the alleged infringement.  Motion, 8.

23     Athalonz's suggestion that Curry possesses relevant insight into the value of the

24

25  _____

26  [1] Athalonz suggestion that the Austin and Drew declarations should be ignored because they allegedly lacked knowledge as to what the "accused features" are, as shown in Athalonz's patent and infringement contentions (Opp., 12), is unsupported as neither declarant ever refers to the

27  "accused features" in his declaration.  Rather, both expressly refer to the shape and materials of

28  the Curry shoe soles.

1    particular features of the Curry products, including "relevant insight into the value of the injury

2    prevention aspects of the Accused Curry products" is unsupported and irrelevant.  The only

3    relevant design features of the products are those covered by the Asserted Patents, *i.e.* the shape

4    and compressibility of the materials used in the sole, for which the motion demonstrates Curry

5    lacks knowledge.  Motion, 7-9.  While Curry does wear at least some of the Accused Curry

6    Products, Athalonz's suggestion that he could somehow be able to opine on "how and why the

7    Accused Curry Products have been commercially successful, and what benefits the accused

8    features in the Accused Curry Products bring customers" (Opp., 8-9) is unsupported as any such

9    testimony would be entirely speculative.  The same logic applies to Curry's supposed ability to

10   "discern which features of the shoes specifically speak to the benefits and value of the invention"

11   (Opp., 9),[2] as Curry has already stated that he is "not responsible for assessing the value or

12   benefits of the Accused Curry Products" (Opp., Ex. P, pp. 8-9) and lacks knowledge with respect

13   to the comparative value or benefits of the accused products compared to other shoes.  Motion, 9.

14   Any alleged insight that Curry could provide regarding the products' impact on his "personal

15   professional basketball experience" (*id*.) is irrelevant to damages, as what one professional

16   athlete believes about a product is completely untethered to Athalonz's ability to demonstrate

17   commercial success or demand for the product.  And Athalonz's suggestion that Curry has any

18   insight into the "long-felt unsolved needs and failure of others" or the level skill of a POSITA

19   (Opp., 9-10) is again speculation unsupported by the facts of the case, where Curry has

20   demonstrated that he lacks knowledge of, and involvement with, the allegedly novel aspects of

21   the accused shoes.

22           While Athalonz's makes much of Judge Gilstrap's Order suggesting that another of

23   Under Armour's sponsored athletes, Jordan Spieth, may have relevant information based on an

24

25   [2] 35 U.S.C. § 284 states that the relevant framework for calculating damages is "the use made of
     the invention by the infringer," not how any particular user feels about or values various aspects
26   of the accused products.  Thus, Athalonz's suggestion that Curry has "unique" and relevant
     testimony regarding the alleged value or benefits of the patented invention is wrong.  The same
27   could be said about each of Under Armour's customers, and that doesn't give Athalonz the right
     to subpoena them, or Curry, for testimony on this point.
28

NON-PARTY WARDELL STEPHEN CURRY II'S
                                        REPLY ISO HIS MOTION TO QUASH PLAINTIFF'S SUBPOENA

1   Under Armour article posted on his website (Opp., 11), he too lacks relevant unique knowledge

2   of the accused features of the accused Spieth products, and thus a similarly improper target of

3   Athalonz's subpoenas.  Judge Gilstrap's decision about Spieth's relevance was based on an

4   incomplete record (and discovery there will show his assumption was incorrect); but here, the

5   record contains declarations demonstrating that Curry had no involvement in designing,

6   developing or testing the soles of the Curry products.  And Athalonz's suggestion that Curry is

7   somehow an "owner," officer" or "director" of Under Armour under Maryland law based on his

8   ownership of Under Armour stock or his role with the Curry Brand (Opp., 13) is unfounded, and

9   Athalonz cannot show that either of these facts somehow makes Curry's testimony any more

10  relevant.

11       Notably, Athalonz has cited but a single case to suggest that the motion to quash should

12  denied based on the relevance of the witness and/or undue burden, *Staley* (Opp., 11), and it is

13  easily distinguishable.  In *Staley*, a subpoena was issued to Dr. Cogan, a former board member of

14  defendant Gilead, for whom the Court found that "there is no dispute … was involved in

15  decisions relevant to the litigation."  *Staley v. Gilead Scis., Inc*., 2022 U.S. Dist. LEXIS 45194, at

16  *10 (N.D. Cal. Mar. 14, 2022).  There, Dr. Cogan's only argument regarding undue burden was

17  that "plaintiffs have not demonstrated that 'he has relevant, nonprivileged information,'" and that

18  he is a "busy person."  *Id*. *9.  In stark contrast, Curry has expressly demonstrated that he lacks

19  relevant knowledge regarding the design and development of the accused features of the Curry

20  products, and is an extremely busy international celebrity and star basketball player in the midst

21  of the NBA season, making the subpoena extremely burdensome.

22       Athalonz also fails to meaningfully distinguish the *Battle Fashions* and *Amini Innovation*

23  cases that squarely support the quashing of this subpoena.  Although Athalonz urges that the

24  *Battle Fashions* case "is nothing like the litigation here," (Opp., 13) the facts in *Battle Fashions*

25  mirror those here.  In *Battle,* like here, Curry was subpoenaed by a Plaintiff who had brought suit

26  against Under Armour alleging infringement by Under Armour's Curry Brand products.  Much

27  like Athalonz, the Plaintiff in *Battle* argued that Curry possessed unique information regarding

28  the "importance" of the mark to Curry's brand, and information relevant to damages, *i.e.* the

1    proper amount of profits to disgorge and what the lost royalty measurement should be.  *Under*

2    *Armour, Inc. v. Battle Fashions*, No. 18-mc-80117-LB, 2018 U.S. Dist. LEXIS 130983, at *10

3    (N.D. Cal. Aug. 3, 2018).  But the Court found that Mr. Curry's view on these issues was

4    irrelevant, as was Mr. Curry's own personal view of whether the mark was descriptive.  *Id*.  Like

5    here, the plaintiff in *Battle* also argued that the subpoena was justified because "Mr. Curry is

6    involved in the design of Under Armour products."  *Id*.  But the Court held that "discovery about

7    Mr. Curry's involvement in the design of Under Armour products is at best of marginal

8    relevance….  In the end, Under Armour is the one that is selling whatever products that Mr.

9    Curry may or may not have designed, and it is Under Armour against whom Mr. Battle is

10   litigating his trademark dispute."  *Id*.  Finally, like here, the plaintiff in *Battle* asserted that Mr.

11   Curry's testimony was relevant because he "is personally involved in marketing and promoting

12   Under Armour products and has a contract with Under Armour to do so."  *Id*.  Again, the court

13   held that Curry's involvement in promoting the Curry Products was not a reason to justify his

14   subpoena, and suggested that the contract between Curry and Under Armour was unimportant as

15   the plaintiff failed to show it related to the use of the mark at issue, (*id*.) just like Athalonz fails

16   to show that the Under Armour-Curry sponsorship contract is related to the accused features of

17   the Curry products.  And Athalonz's suggestion that "this litigation is specifically about the

18   marketing and promotion of the Accused Curry Products" (Opp., 13) is simply untrue.  This is

19   not a case about marketing or promotion of products, but rather a patent infringement case that

20   centers on whether the soles of Under Armour's Accused Curry Products have certain features

21   that infringe Athalonz's patents.

22         Athalonz's attempt to distinguish *Amini Innovations* similarly fails.  Like here, Plaintiff,

23   Amini, subpoenaed a celebrity, actress Jane Seymour, who allegedly "co-designed" a product

24   that she promoted in advertisements and on her website that Amini alleged infringed its protected

25   trade dress.  *Amini Innovation Corp. v. McFerran Home Furnishings, Inc*., 300 F.R.D. 406, 408

26   (C.D. Cal. 2014).  In granting the motion to quash, the Court determined that the plaintiff failed

27   to show that Seymour was likely to possess information relevant to the specialized topics at issue

28   in a trade dress case, *i.e.* the design's functionality, secondary meaning and likelihood of

-6-

1   confusion (*id.*, at 412), in a similar way that Curry lacks knowledge pertaining to the level of

2   skill in the art, long felt need, or the failure of others.  Opp., 9-10.  Rather, like Curry, any

3   testimony Seymour could provide, "such as what the design actually is … and how it is

4   presented to and received by the public" is "marginal to the issues in the action" and even if

5   relevant, "the information that Seymour [or Curry] might be expected to possess about [their]

6   role in that process … is not necessarily unique to [them]."  *Amini*, 300 F.R.D. at 412.

7   **IV.    UNDER ARMOUR HAS IDENTIFIED THE RELEVANT WITNESSES AND**

8          **PRODUCED THE RELEVANT DOCUMENTS**

9          Athalonz fails to address that Under Armour has identified multiple witnesses that

10  possess knowledge of the relevant issues which have not yet been deposed, and that Under

11  Armour has already agreed to produce, and/or has produced, any relevant and responsive

12  documents, including: all design and technical documents for the accused products; all

13  development documents for the accused products; all promotional documents for the accused

14  products; all testing documents for accused products; sales and profit data for accused products;

15  and all documents related to Curry's involvement in the design, development, or testing of the

16  accused features of the accused products.  Motion at 1, 4-5.  These categories include at least the

17  documents sought in Requests 3-5, and 8, and Curry has already responded that he is unaware of

18  any responsive documents for Requests 1 and 2.  Regarding Requests 6 and 7, Curry explained

19  that he is "not responsible for assessing the value or benefits of the Accused Curry Products,

20  particularly as compared to other Under Armour basketball shoes or other basketball shoes

21  available on the market" and "not responsible for assessing the market for basketball shoes in the

22  United States."  Opp., Ex. P, pp. 8-9.

23         Athalonz also ignores the fact that Curry has already stated that he lacks knowledge with

24  respect to Request Nos. 3-8 generally, including (1) the marketing, advertising and promotion of

25  the accused products; (2) the comparative value or benefits of the accused products compared to

26  other shoes; (3) the market for basketball shoes generally; and (4) Under Armour's pricing,

27  margins, costs, sales strategies, or sales comparisons.  Motion, 9.  And for all Requests (Nos. 1-

28  10), Curry has explained that "[a]ny non-privileged documents responsive to this Request would

-7-

1  be in Under Armour's possession; therefore, discovery should be requested from Under Armour,

2  the proper party, not non-party Curry." Opp., Ex. P, pp. 5-11.

3      The irrelevant documents that Under Armour has not agreed to produce, *e.g.* the

4  sponsorship agreement(s) between Curry and Under Armour that fall within the scope of Request

5  Nos. 5 and 9,[3] are also the subject of a motion to compel, (Opp., 5) so if the Court deems that

6  these documents are somehow relevant, Under Armour will produce them. Furthermore,

7  Athalonz's suggestion that Under Armour has wrongfully limited its production to only produce

8  documents related to Curry's role relating to the "accused features of the accused products"

9  (Opp. at 5) is incorrect. In fact, "Under Armour ... previously agreed to produce all technical

10  drawings, internal specifications, business plans, marketing plans, promotional materials,

11  development documents and testing documents for the Accused Products. … By nature, these

12  agreed categories include any sponsored athlete's involvement in said design, development,

13  testing, marketing, advertising or promotion." Ex. 12, Response to Motion to Compel, p. 4.

14  Furthermore, this scope of production exceeds that required in the Eastern District of Texas,

15  which limits production to documents relating to the accused features of the products at issue.

16  *Id.*, pp. 3-4.

17  **V.      THE SUBPOENA IMPOSES AN UNDUE BURDEN**

18      Athalonz's attempts to downplay the burden of forcing Curry to sit for a deposition fail.

19  Athalonz's comparison of Mr. Curry's schedule to most people's five-day workweek (Opp., 15)

20  is unreasonable. And as Curry has explained, his current in-season schedule includes much more

21  than just games. Motion, 11. Furthermore, Curry has not suggested that it is only during the

22  NBA season that a deposition would be burdensome. Opp., 15. Rather, Curry identified several

23  obligations, including training, team obligations, endorsement, sponsorship and charity

24

25  [3] *See Battle Fashions*, 2018 U.S. Dist. LEXIS 130983, at *12 (denying production of Curry-
Under Armour contract as irrelevant to trademark dispute); *Free Stream Media Corp. v.*
26  *Alphonso Inc.*, No. 8:17-mc-00011, 2017 U.S. Dist. LEXIS 235015, at *10 (C.D. Cal. May 4,
2017) (denying production of "any and all agreements, regardless of whether they are related to
27  the accused products," holding that even if they are "tangentially relevant," the third-party
should not bear the burden of discovery).
28

-8-

NON-PARTY WARDELL STEPHEN CURRY II'S
REPLY ISO HIS MOTION TO QUASH PLAINTIFF'S SUBPOENA

1  commitments, which run all year.  Motion 11; *see also Battle Fashions*, 2018 U.S. Dist. LEXIS

2  130983, at *9-12 (quashing subpoena to Curry served during the NBA offseason).

3       Athalonz also fails to address the overbroad nature of its document requests, including

4  Requests No. 5 and 9 which are unrelated to the products accused of infringement and for which

5  Athalonz has failed to provide any legal authority in support of their production.  Motion, 12.

6  Athalonz also does not address the fact that none of the requests are limited in time, and that

7  Request No. 2 seeking all documents relating to a party in the underlying action, are facially

8  overbroad.  *Id*.  Here, as in *Battle Fashions* and *Amini*, the Court should consider the overbreadth

9  of the subpoena due to the burden it places on Curry compared to the likely value of the

10  discovery sought.  Motion, 12-13.

11       Finally, Athalonz's suggestion that Curry should somehow be obligated to produce

12  documents that are also in Under Armour's possession because Curry shares counsel with Under

13  Armour or has an organization at his disposal to "manage his off-court business profile" (Opp.,

14  17) directly contradicts the longstanding precedent in this District which holds that documents

15  should be obtained from the party, and not from a non-party, whenever possible.  *See Genus*

16  *Lifesciences Inc. v. Lannett Co*., No. 18-cv-07603-WHO, 2019 U.S. Dist. LEXIS 222550, at *10-

17  11 (N.D. Cal. Dec. 30, 2019); *Avaya Inc. v. Pearce*, No. 19-cv-00565-SI, 2021 U.S. Dist. LEXIS

18  56013, at *3 (N.D. Cal. Mar. 24, 2021); *Battle Fashions*, 2018 U.S. Dist. LEXIS 130983, at *9.

19  **VI.    THE SUBPOENA FAILS TO PROVIDE A REASONABLE TIME TO COMPLY**

20       Athalonz fails to show that the seven business days it provided Curry was a reasonable

21  time to respond.  While Athalonz tries to twist the facts to suggest that Curry was somehow

22  provided with 2 weeks to respond based on it emailing a copy of the subpoena to Curry's counsel

23  ***before*** they represented him (Opp., 18), it cites no caselaw suggesting that this practice is

24  adequate.  Likewise, the cases Athalonz cite in its Opposition support Curry, not Athalonz, as

25  none suggest that a subpoena with as short a response time as Athalonz provided to be

26  reasonable.  Rather, the subpoenas in *Universal Church* and *Bonzani* (Opp., 18) provided

27  response times of 11 days and 14 days, respectively.  *See Universal Church, Inc. v. Standard*

28  *Constr. Co. of S.F., Inc*., No. 14-cv-04568-RS (KAW), 2015 U.S. Dist. LEXIS 143382, at *8

(N.D. Cal. Oct. 21, 2015); *Bonzani v. Shinseki*, No. 2:11-cv-00007-EFB, 2014 U.S. Dist. LEXIS 77619, at *12 (E.D. Cal. June 4, 2014). Athalonz also fails to explain why their response period of less than 10 days—the amount of time the *Free Stream* Court deemed "presumptively unreasonable"—should be permitted, and fails to address the *Natera* decision which held that nine business days was insufficient. Motion, 14.

## VII.    CONCLUSION

For the foregoing reasons and those in Curry's opening Motion, Curry respectfully requests that the Court grant this Motion and quash the Subpoena.

Dated: January 22, 2024                          VENABLE LLP

                                    By:    /s/ William A. Hector
                                           William A. Hector (SBN 298490)
                                           Frank C. Cimino, Jr. (*pro hac forthcoming*)
                                           Megan S. Woodworth (*pro hac forthcoming*)
                                           Robert E. Bugg (*pro hac forthcoming*)

                                           Attorneys for Non-Party
                                           WARDELL STEPHEN CURRY II

NON-PARTY WARDELL STEPHEN CURRY II'S
REPLY ISO HIS MOTION TO QUASH PLAINTIFF'S SUBPOENA